No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**OPENING BRIEF OF APPELLANT**

**THIS IS A DEATH PENALTY CASE**

**ORAL ARGUMENT REQUESTED**

> Peter Williams
>    *Counsel of Record*
> Claudia Van Wyk
> Assistant Federal Defenders
> Federal Community Defender Office
> for the Eastern District of Pennsylvania
> 601 Walnut Street, Suite 545 West
> Philadelphia, PA 19106
> 215-928-0520
> *Counsel for Petitioner-Appellant*

October 21, 2020

## RULE 26.1 DISCLOSURE STATEMENT

The full name of Petitioner/Appellant is Chadrick Evan Fulks. Attorneys Claudia Van Wyk and Peter Williams, of the Federal Community Defender Office for the Eastern District of Pennsylvania, represent Fulks before this Court and represented him in the 28 U.S.C. § 2241 proceedings below in the United States District Court for the Southern District of Indiana. Petitioner/Appellant is not a corporation.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT..................................................................... i
TABLE OF CONTENTS.............................................................................................. ii
TABLE OF AUTHORITIES ...................................................................................... iv
GLOSSARY............................................................................................................... vii
INTRODUCTION ........................................................................................................1
REQUEST FOR ORAL ARGUMENT ........................................................................3
STATEMENT OF JURISDICTION.............................................................................4
STATEMENT OF THE CASE......................................................................................4

    A.    Conviction, Sentencing, and § 2255 Proceedings.........................................4

    B.    Section 2241 Petition .....................................................................................5

          1.    Intellectual Functioning.......................................................................6

          2.    Adaptive Functioning ..........................................................................8

          3.    Structural Evidence of Brain Impairments.........................................12

          4.    Age of Onset.......................................................................................13

           5.    Request for § 2241 Review .................................................................15

    C.    The District Court's Ruling..........................................................................16

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..........................17
STANDARD OF REVIEW .........................................................................................17
SUMMARY OF ARGUMENT ...................................................................................17
ARGUMENT ..............................................................................................................19
I.      FULKS IS INTELLECTUALLY DISABLED AND INELIGIBLE TO BE EXECUTED.
       RELIEF IS APPROPRIATE UNDER § 2241. THE DISTRICT COURT ERRED IN
       DISMISSING FULKS'S CLAIM FOR RELIEF WITHOUT AN EVIDENTIARY
       HEARING...............................................................................................................19
    A.    *Atkins* and Its Progeny Bar Petitioner's Execution....................................19
    B.    Review Is Appropriate Under 28 U.S.C. § 2241 Because Fulks Satisfies
        the Savings Clause. ......................................................................................20

          1.    New Legal Standards Set Forth in *Hall*, *Moore-I*, and *Moore-II*. ......23

          2.    New Diagnostic Standards Set Forth in the AAIDD–2012 and
             DSM-5. ...............................................................................................29

3. Previously Unavailable Legal and Factual Bases for Fulks's *Atkins* Claim Entitle Him to § 2241 Review. ............................................... 32

4. The *Bourgeois* Panel's Opinion Does Not Undermine Fulks's Request for Review. ........................................................ 36

C. Fulks Is Entitled to § 2241 Review Because He Challenges the Execution of His Sentence. ........................................................ 41

D. The District Court Erred by Finding that Fulks's *Atkins* Claim Was Not Cognizable Under § 2241. ........................................................ 42

1. The District Court's Ruling Violated *Atkins* and Its Progeny and Ignored the Structural Defect in § 2255. ............................................... 42

2. That the New Factual Developments Post-Date Fulks's Trial Strengthens His Request for Savings Clause Review. ........................ 43

3. *Davenport*, *Garza*, and *Webster-I* All Support Fulks's Claim for § 2241 Review. ........................................................ 47

4. That § 2255(h) Permits *Some* Successive Motions Does Not Cure § 2255's Defect Because § 2255(h)'s Criteria Are Not Met Here. ......... 48

5. Fulks Had No Reasonable Opportunity to Pursue an *Atkins* Claim in His Initial § 2255 Proceedings. ........................................... 49

6. The District Court Erred in Its Analysis of *Hall's* Relationship with *Webster-I*. ........................................................ 52

7. The District Court's Commentary on Serial § 2241 Petitions Is Unfounded. ........................................................ 53

8. The District Court Erred in Rejecting Mr. Fulks's Challenge to the Execution of His Death Sentence. ........................................ 54

II. BECAUSE FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY. ............................ 57

CONCLUSION ........................................................ 60

iii

# TABLE OF AUTHORITIES

**Federal Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................................ *passim*

*Basham v. United States*, 109 F. Supp. 3d 753 (D.S.C. 2013) ............................ 28

*Bourgeois v. Watson*, --- F.3d ---, No. 20-1891, No. 20-1891, 2020 WL 5905326
(7th Cir. Oct. 6, 2020)........................................................................ 36, 37, 38, 39

*Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) ......................................... 17, 20

*Camacho v. English*, 872 F.3d 811 (7th Cir. 2017) ............................................. 42

*Colby v. J.C. Penney*, 811 F.2d 1119 (7th Cir. 1987) ........................................... 40

*Figueroa v. Tarquino*, 737 F. App'x 789 (7th Cir. 2018) ............................... 54, 55

*Ford v. Wainwright*, 477 U.S. 399 (1986) .............................................. 32, 46, 57

*Fulks v. United States*, 875 F. Supp. 2d 535 (D.S.C. 2010) ................................. 15

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) ….. ................................. 20, 21, 35

*Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008) ........................................... 26, 27

*Hall v. Florida*, 572 U.S. 701 (2014) ................................................. 15, 23, 24, 52

*Ihmoud v. Jett*, 272 F. App'x 525 (7th Cir. 2008) ............................................... 56

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) ........................... 20, 21, 35, 41, 51

*Johnson v. United States*, 576 U.S. 591 (2015) ...................................................... 5

*Kramer v. Olson*, 347 F.3d 214 (7th Cir. 2003) .................................................... 41

*Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020) ....................................................... 20

*Madison v. Alabama*, 139 S. Ct. 718 (2019) ........................................ 2, 17, 57, 58

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879
(7th Cir. 2003) ..................................................................................................... 59

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore-I*") .................................... *passim*

*Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore-II*") .......................... 15, 25, 40, 55

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ......................................... 57

*Poe v. LaRiva*, 834 F.3d 770 (7th Cir. 2016) ................................... 48, 49

*Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015) ........................... 27, 28, 53

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020) ............................ 20, 39, 47

*Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012) ........................... 26

*Roper v. Simmons*, 543 U.S. 551 (2005) ............................................... 32

*Sasser v. Hobbs*, 735 F.3d 833 (8th Cir. 2013) ................................... 7-8

*Shepherd v. Krueger*, 911 F.3d 861 (7th Cir. 2018) ....................... 42, 58

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................... 59

*Storm v. U.S. Parole Comm'n*, 667 F. App'x 156 (7th Cir. 2016) ........................ 56

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) ................................ 4

*United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012) ............................ 5

*United States v. Walton*, 255 F.3d 437 (7th Cir. 2001) ......................... 40

*Valona v. United States*, 138 F.3d 693 (7th Cir. 1998) ......................... 41

*Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010) ............................. 26, 27

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ("*Webster-I*")................. *passim*

*Webster v. Watson*, --- F.3d ---, No. 19-2683, 2020 WL 5638691 (7th Cir. Sept. 22, 2020) ("*Webster-II*") ................................................ 46

**Federal Statutes**

28 U.S.C. § 1291 ........................................................................................ 4

28 U.S.C. § 2241 .................................................................................. *passim*

28 U.S.C. § 2254 ...................................................................................... 26

28 U.S.C. § 2255 .................................................................................. *passim*

**State Cases**

*Ex parte Briseño,* 135 S.W.3d 1 (Tex. Crim. App. 2004) ...................................... 25

**Other**

Seventh Circuit Rule 34 ............................................................................ 3

Fed. R. Civ. P. 59 .............................................................................. 4, 16, 45

## GLOSSARY

| | |
|---|---|
| AAIDD | American Association on Intellectual and Developmental Disabilities |
| AAIDD–2010 | American Association on Intellectual and Developmental Disabilities, *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition* (2010) |
| AAIDD–2012 | American Association on Intellectual and Developmental Disabilities, *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition* (2012) |
| AEDPA | The Anti-Terrorism and Effective Death Penalty Act |
| APA | American Psychiatric Association |
| DSM-5 | American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (2013) |
| FASD | Fetal Alcohol Spectrum Disorder |
| ID | Intellectual Disability |
| PA | Petitioner-Appellee's Appendix |

**INTRODUCTION**

Chadrick Fulks is intellectually disabled. He was born with brain damage

caused by a fetal alcohol spectrum disorder and has had significant intellectual and

adaptive deficits since long before the age of 18. His execution is constitutionally

prohibited by *Atkins v. Virginia*, 536 U.S. 304 (2002). However, the current

diagnostic and legal standards that form the basis for his *Atkins* claim post-date

Fulks's trial and the filing of his initial 28 U.S.C. § 2255 petition. Because these

diagnostic and legal authorities were unavailable to Fulks at the time of his trial

and initial § 2255 proceedings, he could not have pursued an *Atkins* claim during

either of those proceedings as a result. Because these new developments do not

meet the requirements for a successive § 2255 motion, Fulks cannot pursue this

claim under § 2255 now. Accordingly, Petitioner's intellectual disability renders

him constitutionally exempt from execution, but he is without an avenue under §

2255 to vindicate this claim for relief. For this reason, § 2255 is "inadequate or

ineffective" to test the legality of Fulks's death sentence, and 28 U.S.C. § 2241

review is appropriate under § 2255(e)'s "savings clause."[1]

Section 2241 review is also appropriate where a prisoner challenges the

execution, as opposed to the imposition, of his sentence. As Fulks is not arguing

---

[1] § 2255(e) has also been referred to as the "safety valve." For clarity, this brief
will refer to § 2255(e) as the savings clause. Additionally, Petitioner/Appellant
Chadrick Fulks shall be referred to as "Fulks" or "Petitioner."

that the death sentence was improperly rendered at the time of trial, but that—under current legal and diagnostic standards—he is ineligible to be executed now, he is entitled to § 2241 review regardless of whether his claim fits within the savings clause.

The district court that dismissed Fulks's § 2241 petition determined that he "present[ed] extensive evidence that he has an intellectual disability, has diminished cognitive functioning, and suffers from fetal alcohol spectrum disorder." PA0002 (footnote omitted). The court nevertheless dismissed Fulks's petition without reaching the merits or hearing any of the evidence, holding that § 2241 review was barred by the savings clause and that Fulks did not challenge the execution of his sentence because he asked that his death sentence be "set aside." PA0002, PA0015–17. The court dismissed Fulks's alternate claim—which challenged the execution of his sentence as categorically barred by the functional application of the Eighth Amendment announced in *Madison v. Alabama*, 139 S. Ct. 718 (2019)—on the same procedural bases. PA0015.

The district court's order should be reversed. *Atkins* and its progeny categorically prohibit the execution of intellectually disabled defendants, mandate that *current* diagnostic standards govern ID determinations in *Atkins* cases, and reject as unconstitutional any procedure creating an unacceptable risk that an intellectually disabled person will be executed. *Moore v. Texas*, 137 S. Ct. 1039,

1050–53 (2017) ("*Moore-I*"). Denying Petitioner § 2241 review violates all of these constitutional mandates as it precludes consideration of an *Atkins* claim under current standards and would lead directly to the execution of an intellectually disabled defendant: Fulks. This Court has found savings clause review appropriate when there is "some kind of structural problem with section 2255." *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) ("*Webster-I*"). Here, there is a structural defect in § 2255 relating to *Atkins* claims: it does not account for cases such as this one where the defendant was not entitled to *Atkins* relief in prior proceedings, is entitled to that relief now under current legal and diagnostic standards, but cannot pursue a successive motion based on these new developments. Furthermore, Fulks's reliance on a categorical exemption based on developments that post-date prior proceedings is a prime example of a challenge to the *execution* to his death sentence, rather than its imposition.

The district court's rulings violated the Eighth Amendment and this Court's precedent. Petitioner's case should be remanded for an evidentiary hearing so that his substantive claims can be addressed.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Seventh Circuit Rule 34(f), Petitioner respectfully requests oral argument.

3

## STATEMENT OF JURISDICTION

This appeal is taken from the final decision of the United States District Court for the Southern District of Indiana, entered on September 20, 2019 (denying habeas petition), ECF No. 73, and April 1, 2020 (denying timely Rule 59 motion), ECF No. 83, by the Honorable James R. Sweeney II. Petitioner's Rule 59 motion was filed on October 17, 2019. ECF No. 75. The Notice of Appeal was filed with the district court on May 28, 2020. ECF No. 84.

The district court had jurisdiction over this case as a civil action arising under the laws of the United States pursuant to 28 U.S.C. § 2241. Petitioner is under sentence of death and currently incarcerated at USP-Terre Haute in Terre Haute, Indiana. This Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

### A.    Conviction, Sentencing, and § 2255 Proceedings

In May 2004, Fulks pleaded guilty to eight charges, including two death-eligible offenses, arising from the November 2002 abduction and death of Alice Donovan. On June 30, 2004, a jury sentenced Fulks to death after a contested penalty phase. His convictions and sentence were affirmed by the United States Court of Appeals for the Fourth Circuit. *See United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006), *cert. denied*, 551 U.S. 1147 (2007).

4

On June 23, 2008, Fulks filed a motion to vacate the convictions and sentence and for a new trial pursuant to 28 U.S.C. § 2255, which was amended on October 21, 2008. The motion was denied and the denial was affirmed on appeal. *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012), *cert. denied*, 551 U.S. 1147 (2013).[2]

## B.      Section 2241 Petition

On January 29, 2015, Fulks filed a pro se Petition for Writ of Habeas Corpus in the U.S. District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 2241. ECF No. 1. After counsel were appointed, Fulks filed a counseled amended habeas petition on March 8, 2019. ECF No. 55. In it, he averred that he was intellectually disabled under current legal and diagnostic standards, and thus, categorically exempt from execution under *Atkins*. Fulks further argued that, even assuming, *arguendo*, that he did not meet the precise diagnostic criteria for intellectual disability, he was still ineligible for execution under *Atkins* and *Madison* as he was functionally intellectually disabled. PA0230–72; PA0283–97.

As the district court determined, Fulks's proffered presentation on intellectual disability, fetal alcohol spectrum disorder, and cognitive impairments

---

[2] After the issuance of *Johnson v. United States*, 576 U.S. 591 (2015), Petitioner applied for and received permission to file a successive § 2255 motion in the United States District Court for the District of South Carolina. The successive motion is still pending in that district. *See United States v. Fulks*, 4:02-CR-992-JFA (D.S.C.).

was "extensive." PA0002. There are three prongs to a finding of intellectual disability: deficits in intellectual functioning ("prong one"), deficits in adaptive functioning ("prong two"), and onset before age eighteen ("prong three"). *See, e.g.,* PA0493 (DSM-5); PA0506 (AAIDD–2010). Fulks meets all three of these prongs. Neuropsychologist Barry Crown, Ph.D., evaluated Fulks under current diagnostic standards and has diagnosed him with intellectual disability. PA0475–77.

### 1.    Intellectual Functioning

Deficient intellectual functioning is defined as an intelligence quotient ("IQ") of approximately 70 with a confidence interval for measurement error of 5 points taken into account. For this reason, at a minimum, scores up to 75 also fall within the presumptive range for intellectual disability. PA0497 (DSM-5).

Scores above 75 may also qualify. Diagnostic standards have rejected fixed cutoff points and made clear that the assessment of intellectual functioning is a clinical assessment rather than an actuarial determination. PA0523 (AAIDD–2012); PA0497 (DSM-5). IQ scores must also be corrected for the Flynn Effect, a well-established finding that IQ scores are inflated at a rate of 0.3 points per year from the year of the development of the data upon which the test is based. PA0523 (AAIDD–2012); PA0497 (DSM-5). Furthermore, the spurious inflation of IQ scores arising from prior administrations of intelligence tests—the "practice

effect"— must be taken into consideration. PA0497 (DSM-5); PA0523–24 (AAIDD–2012). *See also* PA0232–35.

Fulks satisfies prong one. He has been given three individually administered, comprehensive IQ tests as an adult. In April 2003, he received a full-scale IQ score of 77, which Flynn-corrects to 75 (74.6) and is within the presumptive range for ID. In a strikingly consistent testing pattern, Fulks received scores of 78 in August 2003 and 79 in February 2004, which Flynn-correct to 76 (75.6) and 77 (77.2), respectively. As the one- and two-point increase in scores on the last two tests are consistent with the initial score of 75 and explained by the practice effect, all three scores satisfy prong one. *See* PA235–36; ECF No. 51-1 at App. 274, 286, 304.

During childhood, Fulks was administered three IQ tests with Flynn-corrected scores spanning from the mid-80s to 91. At the age of 9, he received a score of 90, which Flynn-corrects down to an 86 (85.5). At 12, he received a score of 96, which Flynn-corrects to 91 (90.6). At 14, he received a score of 93, which Flynn-corrects to an 87 (87.3). PA0236–37.

That Fulks's testing history began with higher scores and regressed to scores in the ID range as he grew older is consistent with intellectual disability and typical of the diagnosis. As they age, individuals with ID such as Fulks develop more slowly than the age-peers against whom they are compared, they fall increasingly behind, and their scores drop. *See, e.g., Sasser v. Hobbs*, 735 F.3d 833, 848 (8th

7

Cir. 2013) ("[I]individuals with mild mental retardation 'often are not distinguishable from children without Mental Retardation until a later age.'"); ECF. No. 50-1 at App. 7.

### 2. Adaptive Functioning

The adaptive deficits prong is satisfied if there is a significant limitation in any one of the three domains of adaptive behavior: conceptual, social, or practical. AAIDD–2010 at 43; PA0497 (DSM-5). Fulks has had significant adaptive deficits in all three domains throughout his life.

To start with the conceptual domain, Fulks showed a consistent pattern of profound impairments in learning, comprehension, self-direction, academics, and communication throughout his life. He repeated the first grade, began receiving special education for speech and language issues during his second time through the first grade, and was referred again to special education in the third grade because he continued to fall behind. He was placed in the self-contained behavioral disorder classroom, and received special education support, either in the behavioral disorder or learning disorder programs, for the rest of his schooling. Those supports generally encompassed all academic subjects—Math, Reading, Social Studies, and Science—and included individualized or small group attention in a self-contained classroom. Nevertheless, Fulks fell increasingly behind his peers. He failed to successfully complete the seventh, eighth, or ninth grades and

eventually dropped out in the ninth grade. *See* PA0241–47; PA0250–51; PA0338, PA0389, PA0395–96; ECF No. 50-4 at App. 1077–79.

Educational staff repeatedly described Fulks as slow, hard to teach, requiring repeated and hands-on instruction, and falling far behind his peers despite receiving significant assistance from his teachers. He had problems with self-direction, attention, decision making, impulse control, and reasoning. Reports confirmed that he had impairments in verbal communication, and he was teased by his peers as a result. These impairments were apparent outside of the school setting as well, as friends and relatives reported childhood deficits in comprehension, speech and language, motor skills, reading, and self-care skills. *See* PA0241–54; PA0316–26; PA0342–48; ECF No. 50-1 at App. 323–24, 334, 336–38, 341, 362; ECF No. 50-4 at App. 1064, 1069, 1073.

Formal testing confirmed these deficits. Fulks scored far below grade level on achievement tests throughout his academic career, despite having at least one more year of cognitive development than his grade-mates after repeating the first grade. For example, at the age of fourteen, he scored between the third and fifth grade level on nine of ten achievement test scores, despite being old enough for the ninth grade. In addition to achievement testing, the school conducted language testing that showed additional impairments in communication that became

increasingly severe as he grew older and fell further behind his peers. *See*

PA0247–48; PA0339–41; PA0421–22; ECF No. 50-1 at App. 339–41.

When Fulks was evaluated before his trial as a twenty-six-year-old adult, he

tested predominantly at the fifth and sixth grade levels across achievement testing

administered in four separate evaluations and, in one instance (writing), as low as

the second grade level. Even his most advanced scores were at the seventh and

eighth grade level, still showing impairments and well below age-related

expectations. PA0390–91.

Neuropsychological testing from these four evaluations reflected cognitive

impairments in executive functioning, attention, processing speed, memory,

communication, motor skills, and visuospatial processing. Debilitating

individually, the combined impact of these deficits along with the academic and

intellectual impairments discussed above created generalized deficits in processing

and integration that have further impaired Fulks's ability to exercise good

judgment, deal with problems, and cope with the world around him. PA0356–64.

Finally, psychologist and fetal alcohol expert Natalie Novick-Brown, Ph.D.,

administered behavioral instruments to four third-party reporters focusing on four

different time periods in Fulks's life: ages 10, 13, 14, and 21. These instruments

consistently reflected impairments in learning, following directions, attention,

impulse control, comprehension, communication, understanding the consequences

10

of his actions, and several other aspects of self-direction. PA0333–35; PA0341; PA0345–46.

Fulks's social functioning was similarly impaired. As a child, he was immature, a follower, and someone who was drawn into trouble by more sophisticated children. He was difficult to play with because he was "slow" and could not understand the rules of games. Childhood testing reflected visuomotor impairments, and his peers described him as clumsy and uncoordinated. Throughout his life, Fulks was emotionally unstable, could not problem-solve socially, and was prone to outbursts—particularly when dealing with situations calling for coping skills. He had difficulties forming relationships with others, alternating between social victimization, inappropriate behavior, and emotional instability. The behavioral instruments again confirmed these findings, both before and after age eighteen. *See* PA0254–57; PA0325; PA0349–51.

Fulks's practical functioning was similarly impaired. He failed to manage his behavior across multiple life settings, was unable to sustain productive employment as an adult, and never lived independently for any length of time. *See* PA0257–58; PA0350–52; PA0355.

Dr. Novick-Brown administered formal tests of adaptive behavior to two individuals regarding Fulks's functioning as a child. For both reporters, scores corresponding to all three domains of adaptive functioning and the composite score

11

that accounts for overall adaptive functioning all fell at or below the bottom first percentile—well within the ID range. *See* PA0239–41; PA0331–33.

### 3.    Structural Evidence of Brain Impairments

The structural evidence of Fulks's brain damage provides further support to the above evidence of intellectual and adaptive deficits. Prior to his trial, Fulks received an MRI, a PET scan, an EEG, and a Quantitative EEG, all of which showed obvious structural brain impairments. He had a subarachnoid cyst that had formed where the brain had failed to develop, widespread abnormalities across multiple regions that caused his "whole brain" to be "misshapen," and a corpus callosum that showed a six-hundred-to-one chance of having been damaged by prenatal alcohol exposure. And, the areas of the brain that were damaged corresponded with the impairments detected by neuropsychological testing. These structural impairments have been present since birth and were caused primarily by prenatal alcohol exposure. *See* PA0258–62; PA0462–63; PA0467–69; ECF No. 50-2 at App. 574–93; ECF No. 50-3 at App. 606–25; ECF No. 50-4 at App. 841–44, 871–87, 927–31.

### 4.    Age of Onset

The age of onset for Fulks's intellectual and adaptive deficits was well before the age of eighteen. As set forth *supra*, Fulks had ID-level functioning from birth through adulthood and his brain damage, the cause of those deficits, has also existed since birth. Although cause need not be determined for an ID diagnosis to be made, diagnostic standards have identified risk factors that correlate with the ID diagnosis and are known causes of it. *See* PA0508-519 (AAIDD). These risk factors include biomedical issues such as an FASD, pre-eighteen head injuries, and pre-eighteen exposure to toxins. *Id.* They also include environmental risk factors such as childhood abuse and neglect, improper parenting, poverty, malnutrition, and exposure to domestic violence. *Id.* Fulks had both biomedical and environmental risk factors for ID in his background.

Fetal alcohol diagnostician Julian Davies, M.D., has evaluated Fulks, concluded that he suffers from an FASD, and found that fetal alcohol exposure was the primary cause of his impairments. Consistent with these findings, collateral sources confirm that Fulks's mother drank on a daily basis when pregnant with him and had even been out drinking on the night she went into labor. This prenatal risk factor was compounded by Fulks's history of pre-eighteen head injuries and substance abuse. *See* PA0264–66; PA0312; PA0317; PA0328; PA0365–68;

13

PA0438; PA0453–57; PA0462–65; PA0466–69; PA0472; PA0476; ECF 50-1 at App. 364; ECF No. 50-2 at App. 410; ECF No. 50-4 at App. 1024–25.

Environmental risk factors further impaired Fulks's development. His parents were physically and emotionally abusive alcoholics who beat all of their children, whipped them, threw them against walls, and called them "unspeakable names." They drank, got high, and threw weekly parties where the Fulks parents and other adults would drink, use drugs, fight, or engage in sexual acts, often in full view of the children. Fulks and his siblings were malnourished, as their parents would spend money on alcohol before they would buy food. *See* PA0267–71 (citing declarations and testimony from trial).

Fulks's childhood was dysfunctional in many other ways. The Fulks household was filthy and overrun with roaches, other insects, rodents and soiled diapers. The Fulks children were frequently dirty and wore unclean, shabby, ill-fitting clothes. Fulks's parents provided no supervision to him, no support for him to succeed academically, and no love or moral guidance. The Fulks children played no sports, had no birthday parties, and did not participate in any normal childhood activities. Consistent with the vulnerability that accompanies cognitive impairments and dysfunctional parenting, Fulks was the victim of child sexual abuse, most significantly when he was sexually abused at age thirteen by the father of a childhood friend. *Id.* (same).

14

The judge who presided over Fulks's trial characterized the evidence of his childhood as "a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being." *Fulks v. United States*, 875 F. Supp. 2d 535, 568 (D.S.C. 2010).

### 5.     Request for § 2241 Review

Because the current diagnostic standards—as set forth by APA and the AAIDD—and the current legal standards—set forth by *Hall v. Florida*, 572 U.S. 701 (2014), *Moore-I*, and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore-II*")—all post-dated Fulks's trial and § 2255 petition, these authorities constituted newly available legal and factual bases that were unavailable to Fulks at trial or during his § 2255 proceedings. As none of these developments met the conditions needed to file a successive § 2255 motion under § 2255(h), Fulks argued in the district court that he was exempt from the death penalty as an intellectually disabled person, but without an avenue under § 2255 to litigate his claim for relief. He contended that this was a structural defect in § 2255, and § 2241 review under the savings clause was appropriate as § 2255 was inadequate or ineffective. PA0272–82.

Additionally, Fulks argued he was entitled to § 2241 review because he was challenging the *execution* rather than the imposition of his sentence: he did not

15

argue that the death sentence was improperly rendered at the time of trial, but that, under current legal and diagnostic standards, he now meets the criteria for *Atkins* relief and is ineligible to be executed. PA0272–82.

### C.     The District Court's Ruling

The district court denied Fulks's § 2241 petition.[3] The court acknowledged the extensive evidence regarding his intellectual disability and did not question the validity of this diagnosis, but did not reach the merits of Petitioner's claims because, it held, Fulks was not entitled to review under § 2241. PA0002. For Fulks's *Atkins* claim as well as his *Madison* claim, the court held that Fulks had not identified a structural defect in § 2255, rejected Fulks's claim that he was challenging the execution of his sentence, and dismissed Fulks's habeas petition without an evidentiary hearing. PA0015–30.

On October 17, 2019, Fulks filed a Rule 59 motion, alleging that the district court's dismissal of his *Atkins* claim constituted manifest error. ECF No. 75. The district court denied the motion on April 1, 2020. *See* PA0034–36. This appeal follows.

---

[3] United States District Judge James R. Sweeney II, who presided over Petitioner's § 2241 proceedings, shall be referred to as the "district court." United States District Judge Joseph F. Anderson, Jr., who presided over Petitioner's § 2255 proceedings in the District of South Carolina, shall be referred to as the "2255 court."

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

Did the district court err in denying Fulks's § 2241 petition based on a ruling that his claim of intellectual disability—despite being supported by extensive evidence—was not cognizable under 28 U.S.C. § 2241?

Did the district court err in denying Fulks's § 2241 petition based on its conclusion that his claim under *Madison v. Alabama*, 139 S. Ct. 718 (2019)—that even assuming that Fulks did not meet the precise criteria for intellectual disability he was entitled to relief because he was the functional equivalent of an intellectually disabled person—was not cognizable under 28 U.S.C. § 2241?

**STANDARD OF REVIEW**

This Court reviews the denial of a § 2241 petition de novo. *Brown v. Caraway*, 719 F.3d 583, 586 (7th Cir. 2013).

**SUMMARY OF ARGUMENT**

Fulks is intellectually disabled and categorically exempt from execution under *Atkins*. Because the current legal and diagnostic standards forming the basis for his *Atkins* claim did not exist at the time of trial or his initial § 2255 proceedings and he was not entitled to relief under then-applicable standards, he was unable to raise this claim in either of these prior proceedings. As the advent of new standards governing an *Atkins* claim does not satisfy the requirements for a successive § 2255 motion, he cannot pursue his *Atkins* claim under § 2255 now. Fulks, therefore, is entitled to § 2241 review under § 2255(e)'s savings clause as

17

§ 2255 is "inadequate or ineffective" to raise his *Atkins* claim. Furthermore, Fulks is not arguing that his sentence was unconstitutional at the time it was administered, but that it is unconstitutional now given intervening legal and diagnostic developments. Accordingly, he is also entitled to § 2241 review on the ground that he is challenging the *execution* of his death sentence, rather than its imposition. Alternatively, Fulks is entitled to § 2241 review of his claim challenging the execution of his sentence under the functional approach to the Eighth Amendment the Supreme Court recognized in *Madison*, because his functioning is indistinguishable from that of an intellectually disabled person even if, assuming *arguendo*, he does not meet the specific criteria for ID.

The district court erred by denying Fulks § 2241 review and dismissing his petition without an evidentiary hearing. *Atkins* and its progeny categorically prohibit the execution of the intellectually disabled, mandate the use of current diagnostic standards in *Atkins* determinations, and reject procedural rules creating an unacceptable risk that an intellectually disabled person will be executed. This Court's precedent also recognizes that savings clause review is appropriate when there is a structural problem with § 2255 and whenever a habeas petitioner challenges the execution of his sentence. Because Fulks's constitutionally untenable position requires § 2241 review and his case exposes a structural

18

problem in § 2255, the district court's dismissal of his habeas petition violated

*Atkins* and its progeny, § 2255(e), and this Court's § 2241 jurisprudence.

## ARGUMENT

I. **FULKS IS INTELLECTUALLY DISABLED AND INELIGIBLE TO BE EXECUTED. RELIEF IS APPROPRIATE UNDER § 2241. THE DISTRICT COURT ERRED IN DISMISSING FULKS'S CLAIM FOR RELIEF WITHOUT AN EVIDENTIARY HEARING.**

### A. *Atkins* and Its Progeny Bar Petitioner's Execution.

Fulks is intellectually disabled. The United States Supreme Court has ruled

that the current, prevailing clinical definitions are binding in the task of

determining whether an individual should be exempted from the death penalty

under *Atkins*. *Moore-I*, 137 S. Ct. at 1049, 1052–53. The Court has further cited the

manuals put forward by the two leading authorities on intellectual disability in the

United States, the AAIDD and the APA, as embodiments of current diagnostic

standards. *Id.* As Fulks was prepared to demonstrate to the district court, he meets

the diagnostic criteria set forth by these standards. *See supra* Statement of the

Case, § B. His deficits are both confirmed and explained by his FASD diagnosis,

the presence of other risk factors in his background, and the structural

abnormalities in his brain that have been present since birth. *Id.* As the district

court acknowledged, Fulks "present[ed] extensive evidence that he has an

intellectual disability, has diminished cognitive functioning, and suffers from fetal

19

alcohol spectrum disorder." PA0002 (footnote omitted). He is ineligible for the death penalty under *Atkins* and its progeny.

**B.      Review Is Appropriate Under 28 U.S.C. § 2241 Because Fulks Satisfies the Savings Clause.**

Under § 2255(e)'s "savings clause," a federal habeas petitioner is entitled to challenge the legality of his conviction and sentence through § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 586–89 (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction).

Three cases are central to this Court's savings clause jurisprudence: *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), and *Webster-I*. The holding running through each of these cases is that § 2241 was designed "to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," *Davenport*, 147 F.3d at 609, and that savings clause review is appropriate whenever there is "some kind of structural problem with section 2255." *Webster-I*, 784 F.3d at 1136. This standard is met when there is "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem." *Purkey v. United States*, 964 F.3d 603, 615 (7th Cir. 2020) (*rev'd on other grounds* at 2020 WL 3988688); *Lee v. Watson*, 964 F.3d 663, 666 (7th Cir. 2020) (same, citing *Purkey*).

20

In *Davenport*, two defendants (Davenport and Nichols) sought § 2241 review based on a new, retroactively applied rule of statutory law set forth by the United States Supreme Court that could invalidate their convictions. *Davenport*, 147 F.3d at 609–11. In the case of Nichols, because circuit precedent precluded him from raising this claim at the time of his initial § 2255 proceedings and because—as a new rule of *statutory* law—the Supreme Court's new, retroactive rule did not satisfy the requirements of § 2255(h), this Court held that Nichols was entitled to review under § 2241 because denying him the opportunity to rectify imprisonment for a "non-existent offense" was possibly an "inadequacy of constitutional dimensions." *Id.* at 610–11

In *Garza*, the defendant raised a claim based on a ruling by an international tribunal that was issued after the § 2255 proceedings were concluded. *Garza*, 253 F.3d at 922–24. Because this new ruling was not a new, retroactive rule and it was "literally impossible" for the defendant to have raised it in his initial § 2255 proceedings as the tribunal decision had not yet been issued, this Court held that § 2241 review was appropriate. *Id.*

In *Webster-I*, a death-sentenced habeas petitioner had re-raised a claim of intellectual disability that he had pursued at trial and in his initial § 2255 proceedings. *Webster-I*, 784 F.3d at 1125–36. Webster based his new claim on evidence of intellectual disability that was not discovered until after § 2255

21

proceedings were concluded. *Id.* at 1132–35. Because this evidence did not constitute a new, retroactive rule of constitutional law and it did not establish innocence of the crime, it did not satisfy the requirements for bringing a successive motion under § 2255(h). *Id.* at 1134–35. This Court noted in *Webster-I* that, on the one hand, *Atkins* categorically precluded the execution of the intellectually disabled and, on the other, the requirements of § 2255(h) precluded Webster—a potentially intellectually disabled defendant—from re-raising his *Atkins* claim based on this new evidence. *Id* at 1135–45.

This Court rejected the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id.* at 1139. It accordingly recognized that there was a "structural problem" preventing Webster from bringing a second § 2255 motion and granted him § 2241 review. *Id.* at 1136, 1139. "To hold otherwise," the Court explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.* at 1139.

In each of these cases and for three different reasons, this Court identified a structural defect in § 2255(h) that merited § 2241 review. Here, Fulks's *Atkins* claim relies on the Supreme Court's decisions in *Hall*, *Moore-I*, and *Moore-II*, as well as the current diagnostic standards that *Moore-I* and *Moore-II* require courts to use in evaluating ID claims. Because *Hall*, *Moore-I*, and *Moore-II* were decided

22

in 2014, 2017, and 2019, respectively, they constitute legal bases that were not available at the time of Fulks's 2004 trial or at the time he filed his § 2255 petition. Likewise, because AAIDD–2012 and the DSM-5 were not released until 2012 and 2013, respectively, they constitute new factual bases not available at trial or the initial § 2255 proceedings. Because these developments render Fulks ineligible for the death penalty, but do not satisfy § 2255(h)'s requirements for a successive motion, just as in *Davenport*, *Garza*, and *Webster-I*, Fulks has identified a structural defect that requires savings clause review.

### 1.     New Legal Standards Set Forth in *Hall*, *Moore-I*, and *Moore-II*.

While *Atkins* established that intellectually disabled persons are ineligible for the death penalty, it did not provide "'definitive procedural or substantive guides for determining when a person who claims mental retardation' falls within the protection of the Eighth Amendment," and left the task of defining ID to the states. *Hall*, 572 U.S. at 718.

That legal landscape changed in 2014, when the Supreme Court in *Hall* struck down a Florida statute establishing a "strict IQ test score cutoff of 70" for determining the applicability of *Atkins* and found that the "inherent imprecision" in an IQ test as reflected in measurement error must be taken into account. *Id.* at 712, 723. More broadly, *Hall* was the first decision of the Supreme Court holding that States did not have "unfettered discretion to define the full scope of the

23

constitutional protection" identified in *Atkins*. *Hall*, 572 U.S. at 719. Rather, with *Hall*, the Court established that the assessment of an *Atkins* claim must be "informed by the views of medical experts." *Id.* at 721; *see also id.* at 720–21.

The Supreme Court expanded on *Hall* in 2017 with *Moore-I*, which held that courts are required to apply the "medical community's current standards" when evaluating a claim of intellectual disability. 137 S. Ct. at 1053. Citing the current manuals from the APA and the AAIDD, the Court explained that, "[r]eflecting improved understanding over time, current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* (citations omitted) (quoting DSM-5, at xli). Consistent with this holding, the Court assessed the lower court's analysis of Moore's *Atkins* claim based on the diagnostic authorities that were present at the time *Moore-I* was litigated, and not the clinical definitions that were in place at the time of Moore's trial. *Id.* at 1050–53 (citing APA and AAIDD manuals from 2012 and 2013).

The *Moore-I* Court further invalidated a number of specific practices employed by courts in *Atkins* determinations as contrary to those standards, including: (1) making an adaptive behavior determination based on an individual's strengths, rather than his or her weaknesses; (2) relying on erroneous stereotypes regarding the intellectually disabled; (3) viewing risk factors for intellectual disability as evidence undermining the diagnosis of ID, rather than appropriately

24

noting them as recognized causes of ID; (4) viewing co-occurring disorders as undermining a diagnosis of ID; (5) relying on prison behavior during an adaptive behavior assessment; (6) using the *Briseño* factors,[4] which were seven factors employed by the state court in *Moore-I*; and (7) failing to find prong one when an IQ score falls within the diagnostically acknowledged range for ID. *Id.* at 1050–53.

Two years later, in *Moore-II*, the Supreme Court considered Moore's case again after it was remanded to the state court by *Moore-I*. *Moore-II*, 139 S. Ct. at 670. On remand, the state court purported to employ current clinical standards, and again found Moore not to be intellectually disabled. *Id.* The *Moore-II* court re-affirmed the binding nature of current diagnostic standards and rejected the lower court's credibility determinations because they departed from those standards. *Id.* at 670–71.

---

[4] Initially set forth by the Texas Court of Criminal Appeals in *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004), the seven *Briseño* factors that were rejected by the *Moore-I* court are as follows: (1) "Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?" (2) "Has the person formulated plans and carried them through or is his conduct impulsive? (3) "Does his conduct show leadership or does it show that he is led around by others?" (4) "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?" (5) "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" (6) "Can the person hide facts or lie effectively in his own or others' interests?" (7) "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Moore-I*, 137 S. Ct. at 1046 n.6

Prior to *Moore-I*, many jurisdictions, including the Fourth Circuit, departed from current diagnostic standards in their adjudication of *Atkins* claims. In *Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012), the Fourth Circuit considered an *Atkins* claim from a habeas petitioner who received IQ scores of 73 and 74, both of which were within the presumptive range for ID under then-applicable diagnostic guidelines and within the ID range per the standards subsequently applied in *Hall* and *Moore-I. Id.* at 151. Nevertheless, the Fourth Circuit rejected the habeas petitioner's *Atkins* claim. It found "no error in the [state] court's determination that Richardson failed to meet the first prong of the statutory definition of mental retardation because he does not have a *qualifying* I.Q. score of 70 or below."  *Id.* (emphasis added). *See also Green v. Johnson*, 515 F.3d 290, 300 (4th Cir. 2008) (denying *Atkins* relief on prong one because three of the defendant's four IQ scores "exceed[ed] the *maximum* score of 70") (emphasis added).

Previous Fourth Circuit precedent contradicted current diagnostic standards in its analysis of adaptive behavior as well. In *Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010), the Fourth Circuit denied *Atkins* relief in 28 U.S.C. § 2254 proceedings on prong two based on: (1) the habeas petitioner's strengths, rather than his weaknesses; (2) his prison functioning; (3) his criminal and verbal functioning, in violation of current diagnostic standards, *see* PA0521 (AAIDD–2012) ("Do not use

26

past criminal behavior or verbal behavior to infer level of adaptive behavior."); (4) erroneous stereotypes such as that people with ID cannot form romantic relationships, look and talk differently than the general population, cannot acquire the vocational and social skills needed for independent living, cannot drive or obtain a driver's license, and cannot perform complex tasks, *see infra* I.B.2 (listing erroneous stereotypes for the intellectually disabled that have been rejected by current diagnostic standards and *Moore-I*); and (5) *Briseño* factors such as whether the defendant has "formulated plans and carried them through or is his conduct impulsive," whether the defendant's "conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable" and whether the defendant "respond[s] coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject," *Moore-I*, 137 S. Ct. at 1046 n. 6. *Walker*, 593 F.3d at 324–28.

Similarly, in *Green*, the Fourth Circuit denied a prong two finding by focusing on the habeas petitioner's strengths, rather than his weaknesses; his criminal functioning; and erroneous stereotypes such as the belief that people with ID cannot have romantic relationships, cannot acquire the vocational and social skills necessary for independent living, and are completely incompetent and dangerous). 525 F.3d at 300–03. The Fourth Circuit employed the same reasoning again in *Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015), when it denied *Atkins* relief

27

on prong two by relying on the habeas petitioner's strengths, rather than his

weaknesses; relying on prison functioning; and relying on erroneous stereotypes,

including the belief that people with ID cannot do complex tasks, cannot obtain a

driver's license; are completely incompetent and dangerous; and cannot acquire the

vocational and social skills necessary for independent living. *Id.* at 471–72.

Notably, the district court that presided over Fulks's sentencing and § 2255

proceedings committed similar errors just two years earlier in denying § 2255

relief to Fulks's co-conspirator, Brandan Basham. Specifically, the court found that

Basham had failed to satisfy prong two of his *Atkins* claim based entirely on "the

various 'skills' that Basham exhibited on his and Fulks's seventeen-day crime

spree," agreeing with the Government that "Basham's actions clearly show that he

operated at a level exceeding the ceiling abilities for mental retardation," and that

"his behavior prior to and during the commission of his crimes and during his trial

show that Basham possessed communication and self-direction skills." *Basham v.*

*United States*, 109 F. Supp. 3d 753, 841 (D.S.C. 2013). Consistent with then-

applicable Fourth Circuit precedent but contrary to current diagnostic standards,

the 2255 court based its adaptive behavior analysis on strengths rather than

weaknesses, relied on erroneous stereotypes, based its analysis on criminal

functioning, and employed a *Briseño* factor: whether the petitioner's "offense require[d] forethought, planning, and complex execution of purpose?"[5]

Accordingly, at the time of his initial § 2255 proceedings, Fulks could not have pursued an *Atkins* claim because the Fourth Circuit employed diagnostically inappropriate practices that were later rejected in *Hall*, *Moore-I*, and *Moore-II*. Like many individuals with mild intellectual disability, Fulks could not meet the contra-diagnostic standard imposed on adaptive behavior by the Fourth Circuit in the cases cited above. Indeed, application of a hard cutoff of 70 alone would have precluded *Atkins* relief, as Fulks's Flynn-corrected IQ scores of 75, 76, and 77 are above the scientifically inappropriate cut-score of 70 endorsed by *Richardson* and *Green*. As the *Moore-I* court noted, few individuals with mild ID can meet these criteria. *Moore-I*, 137 S. Ct. at 1051 (noting that "by design and in operation," the *Briseño* factors create an unacceptable risk that individuals with ID will be executed).

### 2. New Diagnostic Standards Set Forth in the AAIDD–2012 and DSM-5.

Fulks also relies on new factual bases set forth in diagnostic criteria issued by the AAIDD and the APA in 2012 and 2013, respectively. Issued in 2013, the

---

[5] *Moore-I* at 1046 n.6. Mr. Basham did not challenge the district court's determination on appeal, nor could he have done so given the then-binding Fourth Circuit precedent permitting nonclinical analyses in *Atkins* determinations.

DSM-5 rejected the notion of ID evaluations as actuarial determinations, stating that "[t]he diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions." PA0497 (DSM-5). Additionally, with the DSM-5, the APA joined the AAIDD in requiring that correction for the Flynn Effect be taken into account in prong one determinations as a part of that clinical judgment. PA0497 (DSM-5) ("[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out-of-date test norms)").

AAIDD–2012 and the DSM-5 include new developments relating to prong two as well. For instance, the AAIDD–2012 and the DSM-5 made clear for the first time that it is critical to avoid the use of stereotypes in assessing adaptive functioning. The AAIDD–2012 expressly identified numerous commonly held, but erroneous, stereotypes relating to individuals with intellectual disability which "are unsupported by both professionals in the field and published literature," incorrect," and "must be dispelled." PA0246–48 (AAIDD–2012). These stereotypes include that individuals with ID: "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and

"are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." *Id.*

The DSM-5 confronted several of these stereotypes by recognizing that persons with significant adaptive deficits can maintain romantic relationships in adulthood, maintain competitive employment in jobs that do not emphasize conceptual skills, function age-appropriately in personal care, arrange for their own transportation and manage money with support, raise a family with support, and develop a variety of age-appropriate recreational skills. *See* PA0494–95 (DSM-5).

The DSM-5 also provided guidance as to what constituted deficits in adaptive functioning by setting forth clinical summaries as to what level of functioning satisfied prong two in each domain. PA0494-96 (DSM-5).

New diagnostic standards form a previously unavailable basis for Fulks's *Atkins* claim. Under the standards applicable at the time of his § 2255 proceedings, the mental health experts who had evaluated Fulks pre-trial concluded that his functioning was significantly impaired, but in the borderline intellectually disabled range and just shy of ID. *See* ECF No. 50-1 at App. 632–36, 685–87 (finding Fulks to be brain damaged and significantly impaired, but with functioning just above ID in the "borderline" range); ECF No. 50-4 at App. 933 (same, and describing Fulks's IQ scores as "borderline slightly above the cut of retardation"); ECF No. 50-1 at 212–14, 274–76 (finding Fulks cognitively impaired, but in the

31

"borderline" range of intellectual functioning rather than intellectually disabled); *id.* at 224 (finding Fulks to be cognitively impaired and having a low IQ, but not reaching a diagnosis of intellectual disability). Now, under current diagnostic standards, Petitioner satisfies all three prongs and Dr. Crown has diagnosed him as intellectually disabled. *See supra* Statement of the Case § B.

### 3. Previously Unavailable Legal and Factual Bases for Fulks's *Atkins* Claim Entitle Him to § 2241 Review.

The advent of new diagnostic standards and Supreme Court jurisprudence making those standards binding entitle Petitioner to review under the savings clause. Just as *Ford v. Wainwright*, 477 U.S. 399 (1986) imposed a substantive restriction on executing an incompetent defendant and *Roper v. Simmons*, 543 U.S. 551 (2005), barred the execution of individuals who committed potentially capital crimes as juveniles, *Atkins* imposed a categorical ban on the execution of the intellectually disabled. *See, e.g., Atkins*, 536 U.S. at 321 ("[W]e therefore conclude that such [capital] punishment is excessive and that the Constitution 'places a *substantive restriction* on the State's power to *take the life*' of a mentally retarded offender.") (emphasis added) (quoting *Ford*, 477 U.S. at 405).

*Atkins* and its progeny not only ban the execution of the intellectually disabled, but also reject as unconstitutional any procedures that "creat[e] an *unacceptable risk* that persons with intellectual disability will be executed." *Moore-I*, 137 S. Ct. at 1044 (alteration in original) (emphasis added) (internal

32

quotation marks omitted). Furthermore, *Moore-I* makes clear that *current* diagnostic standards are binding in an *Atkins* determination, not diagnostic standards used in the past. *Id.* at 1050-53.

Here, Fulks is constitutionally ineligible for execution under *Atkins* as an intellectually disabled person and has proffered "extensive evidence" in support of this diagnosis, the FASD from which it originated, and the brain abnormalities that produced his many deficits. PA0002. Because the current legal and diagnostic standards did not exist at the time of his initial § 2255 motion and he was not entitled to *Atkins* relief without them, he could not pursue this claim in his initial § 2255 motion.

Compounding this problem, a successive § 2255 motion can only be filed where it is based on (1) "newly discovered evidence" establishing the petitioner's innocence "of the offense" or (2) a new, previously unavailable, rule of constitutional law, that has been "made retroactive to cases on collateral review by the Supreme Court." § 2255(h). The Supreme Court has not ruled that *Hall*, *Moore-I*, or *Moore-II* are new rules of constitutional law that must be retroactively applied. And the DSM-5 and AAIDD–2012 are not newly discovered evidence that Fulks was innocent of the crime, but new evidence that he is ineligible for the death penalty. Thus, Petitioner's *Atkins* claim did not fit either of the criteria that would permit a successive § 2255 motion. Just as in *Webster-I*, Fulks is

33

categorically ineligible for the death penalty on the one hand, but without an

avenue to vindicate his claim under § 2255(h) on the other.

While failure to satisfy § 2255(h) may preclude relief entirely for some

claims, it cannot do so for claims such as this one where the Constitution forbids

the execution of the defendant. As this Court acknowledged in *Webster-I*, there is a

structural defect in § 2255(h) for cases involving categorical exemptions that is not

present in other cases:

> In Webster's case, the problem is that the Supreme Court has now
> established that the Constitution itself forbids the execution of certain
> people: those who satisfy the criteria for intellectual disability that the
> Court has established, and those who were below the age of 18 when
> they committed the crime.

*Webster-I*, 784 F.3d at 1139 (footnote omitted).

This is a fundamental problem with § 2255: it fails to account for capital

defendants who are categorically exempt from execution due to developments that

occurred after their initial § 2255 proceedings that do not satisfy § 2255(h). "[T]he

problem is that the Supreme Court has now established that the Constitution itself

forbids the execution of certain people: those who satisfy the criteria for

intellectual disability that the Court has established, and those who were below the

age of 18 when they committed the crime." *Id.* Section 2255(h) was adopted as a

part of the Anti-Terrorism and Effective Death Penalty Act of 1996. *Id.* at 1138-39.

That Congress failed to address this defect when § 2255(h) was adopted is hardly

surprising as "the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed." *Id.* at 1138. The timing of AEDPA, *Atkins*, and *Roper* "supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the [§ 2255] statute." *Id.* As this Court recognized in *Webster-I*, failing to authorize savings clause review in these circumstances, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.* at 1139.

This defect places Fulks's *Atkins* claim within the savings clause. Just as in *Davenport*, Fulks has no § 2255 remedies available to him and denying him § 2241 review would go beyond the mere possibility of an "inadequacy of constitutional dimension," 147 F.3d at 611, and result in the constitutionally prohibited execution of an intellectually disabled person. Just as it was "literally impossible" for Garza to rely on the tribunal's decision before it had been issued, *Garza*, 253 F.3d at 923–24, it was "literally impossible" for Fulks to rely on legal and diagnostic authorities that did not yet exist and similarly impossible to prevail on this claim without them. Finally, just as in *Webster-I*, the structure of § 2255 has created the "Kafkaesque" result of a defendant who is unable to litigate a meritorious ID claim because of a procedural rule that "would (or could) lead to" an unconstitutional execution. *Webster*-I, 784 F.3d at 1139. Should the district court's determination be permitted to stand, Fulks—an intellectually disabled person—will be ineligible

35

for execution, but have no avenue through which he can stop that execution from going forward.

### 4. The *Bourgeois* Panel's Opinion Does Not Undermine Fulks's Request for Review.

This Court's recent opinion in *Bourgeois v. Watson*, --- F.3d ---, No. 20-1891, 2020 WL 5905326 (7th Cir. Oct. 6, 2020),[6] does nothing to undermine Fulks's request for § 2241 review. *Bourgeois* considered a request for § 2241 review of an intellectual disability claim in a capital case where that claim had been considered and rejected in § 2255 proceedings. *Id.* at \*4-5. Bourgeois argued that § 2241 review was available because his § 2255 court had rejected the utility of current diagnostic standards in favor of "legal" standards in its adjudication of the ID claim—an appropriate determination at that time under then-binding circuit precedent. *Id.* at \*10-11. He observed that the analysis employed by the district court had since been rejected by *Moore-I*, *Moore-II*, and current diagnostic standards, and that § 2255 had no mechanism under which Bourgeois could bring this claim. Therefore, he argued, § 2255 was "inadequate or ineffective" to protect his rights and he could proceed under § 2241. *Id.* at 9-10.

The *Bourgeois* court "disagree[d] with Bourgeois's contention that the [§ 2255] district court eschewed medical standards in denying his § 2255 motion." *Id.*

---

[6] As of the time of this filing, the mandate in *Bourgeois* has not been issued and a Petition for Rehearing is pending.

36

at *10-11. Furthermore, because Bourgeois had relied on then-current medical standards when he raised his § 2255 ID claim, and was granted a full evidentiary hearing on that claim, the court concluded that nothing "formally prevented" him from raising his current arguments in § 2255 proceedings. It also reasoned that Bourgeois received a "reasonable opportunity" to litigate his ID claim regardless of the analysis employed by his § 2255 court or the legal or diagnostic standards in place now. *Id.* at *11-13.

Here, in contrast, *no* court has adjudicated the merits of Fulks's ID claim, and *no* court has ever heard his evidence at an evidentiary hearing, because the legal standards in place in the Fourth Circuit at the time of his § 2255 proceedings precluded relief. The district court that denied Fulks § 2241 review—which is only court ever to consider his proffered evidence of ID—characterized the evidence in support of this claim as "extensive." PA0002. The government offered no substantive response to the merits, but relied solely on its procedural arguments. *See* ECF No. 66 at 45 n. 14. The district court's determination was based solely on procedural grounds, the court effectively assumed that Fulks was intellectually disabled under current legal and diagnostic standards, and there has been no finding to the contrary.

Moreover, the *Bourgeois* opinion focused on the statutory requirements of the Federal Death Penalty Act and this Court's savings clause jurisprudence. It did

37

not confront the structural defect created by the *constitutional* nature of the rights set forth *Atkins* that was identified in *Webster* and discussed above. *Atkins* held that the Constitution "places a *substantive restriction* on the State's power to *take the life* of a mentally retarded offender." *Atkins*, 536 U.S. at 321 (emphasis added) (internal citations omitted). *Moore-I* required the application of current diagnostic standards to an ID determination, and rejected procedures creating an "unacceptable risk" that an ID defendant would be executed. *Moore-I*, *supra*, at 1044, 1051, 1053. The denial of savings clause review for Fulks would result in an execution in violation of the constitutional guarantees established by *Atkins* and *Moore-I. See supra* I.B.3. The *Bourgeois* panel did not discuss the structural defect created by the *constitutional* protections afforded to the intellectually disabled, but summarily rejected the constitutional claim along with the statutory claim.

The *Bourgeois* panel also relied on *Purkey*'s language that § 2241 requires "something more" than a lack of success in § 2255 proceedings and found that Bourgeois had failed to meet that threshold. *See Bourgeois*, *supra*, at *8-9. In *Purkey*, this Court held that the petitioner "was missing that 'something more'" because, at the time he filed his § 2255 motion, "nothing formally prevented him from raising" the ineffective-assistance-of-counsel claims he subsequently sought to raise via § 2241. *Purkey*, 964 F.3d at 615. The *Bourgeois* court concluded that nothing "formally prevented" Bourgeois from raising in his § 2255 proceedings the

38

same ID challenge and legal and diagnostic issues he relied on in his § 2241 proceedings, and denied him review on that basis. *Bourgeois*, *supra*, at *13-14.

Neither *Purkey* nor the *Bourgeois* court's application of *Purkey* applies here. Here, as in *Webster–I*, the "something more" is that intervening developments have rendered Fulks constitutionally exempt from execution—an exemption that neither Congress nor any judge-made rule can circumvent—but without a mechanism to enforce that exemption under § 2255. *See supra* I.B.3. *Purkey* did not involve a constitutional exemption from execution, and thus, did not address the structural defect that is present in Fulks's case. 964 F.3d at 614-18. The *Bourgeois* panel, as discussed above, did not substantively address the constitutional exemption invoked in his case, but focused on the statutory one. *Bourgeois*, *supra*, at *12-13.

Furthermore, Fulks was indeed "formally prevented" from pursuing his *Atkins* claim in his initial § 2255 motion. As the current medical standards which support his ID diagnosis now did not exist at the time of the initial § 2255 proceedings, he would have had no expert opinion to proffer in support of an *Atkins* claim, and thus, no factual basis to file it. *See supra* I.B.3.

Even if Fulks was not "formally prevented" from filing an *Atkins* claim in earlier proceedings, such a requirement would be unconstitutional as applied to his case. Fulks has proffered an "extensive" case in support of his *Atkins* claim, which has not been substantively contested by the Government. Requiring that he have

39

been "formally prevented" from filing such a claim earlier before savings clause review is granted would result in the execution of an intellectual disabled person in violation of *Atkins* and procedures creating an "unacceptable risk" that an intellectually disabled person would be executed in violation of *Moore-I*.

To the extent this Court finds that the ruling in *Bourgeois* is applicable here and the *Bourgeois* opinion becomes precedent after this brief is filed, then the *Bourgeois* opinion should be overruled. Precedent can be overturned if a compelling reason is present. *United States v. Walton*, 255 F.3d 437, 442 (7th Cir. 2001). Although a court must give "considerable weight" to prior decisions, "it is not absolutely bound by them and must give fair consideration to any substantial argument that a litigant makes for overruling a previous decision." *Colby v. J.C. Penney*, 811 F.2d 1119, 1123 (7th Cir. 1987); *Walton*, 255 F.3d at 442 (same). Should *Bourgeois* be found to be binding on Fulks, the defects discussed above constitute a compelling reason to depart from or overrule it.

The *Bourgeois* opinion should also be overturned because requiring an *Atkins* petitioner to have been "formally prevented" from filing an ID claim in his initial § 2255 proceedings is contrary to the Eighth Amendment and this Court's longstanding precedent. Unless current diagnostic standards are *actually applied* by the reviewing court during an ID determination, the proceeding violates *Atkins*. *Moore–I*, 137 S. Ct. at 1053; *Moore–II*, 139 S. Ct. at 672. Similarly, "whether [§]

2255 is inadequate or ineffective" depends not on whether a petitioner has been able to "raise" his claim, but "on whether it allows the petitioner 'a reasonable opportunity to obtain a *reliable judicial determination* of the fundamental legality of his conviction and sentence.'" *Webster–I*, 784 F.3d at 1136 (quoting *Davenport*, 147 F.3d at 609). *Bourgeois*'s requirement that a defendant have been "formally prevented" from filing an *Atkins* claim in earlier proceedings runs afoul of the Eighth Amendment, *Webster*, and *Davenport*.

### C.     Fulks Is Entitled to § 2241 Review Because He Challenges the Execution of His Sentence.

In addition to challenges made under the savings clause, § 2241 is the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003); *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241.").

Here, *Atkins* imposes a substantive constitutional prohibition on the execution of intellectually disabled defendants such as Fulks. *See supra* I.B. Because his *Atkins* claim is based on legal and diagnostic authority that did not exist at the time of trial, Fulks is not claiming that his sentence violated *Atkins* at the time it was imposed. *Id.* Rather, he claims that his sentence is now

41

unconstitutional under newly evolved diagnostic standards that were made binding

by *Moore-I* and *Moore-II*. *Id.* And, because § 2241 encompasses challenges to the

execution of a prisoner's sentence, Fulks's claim that he is presently ineligible for

the death penalty is properly brought under § 2241.

      **D.     The District Court Erred by Finding that Fulks's *Atkins* Claim Was Not Cognizable Under § 2241.**

This Court reviews the district court's denial of a § 2241 petition *de novo*.

*See Shepherd v. Krueger*, 911 F.3d 861, 864 (7th Cir. 2018), *cert. denied*, 139 S.

Ct. 1582 (2019); *Camacho v. English*, 872 F.3d 811, 813 (7th Cir. 2017). As set

forth in detail below, under this standard or any other, the lower court erred by

denying § 2241 review of Petitioner's *Atkins* claim and its rulings were contrary to

*Atkins*, its progeny, and this Court's precedent.

      **1.     The District Court's Ruling Violated *Atkins* and Its Progeny and Ignored the Structural Defect in § 2255.**

The district court failed to address the structural problem with § 2255

identified in Fulks's petition. Fulks did not qualify for *Atkins* relief at the time of

his trial and § 2255 proceedings under then-binding Fourth Circuit precedent and

then-applicable medical standards. Accordingly, Fulks was unable to present

expert opinion in support of an ID claim at that time and unable to pursue an ID

claim even if he had expert testimony in support of his opinion. And, because *Hall*,

*Moore-I*, and *Moore-II* have not been declared to be new, retroactive rules of

42

constitutional law and the new diagnostic standards do not prove his innocence of the crime, Fulks cannot file a successive § 2255 motion to prevent his execution. Absent § 2241 review, Fulks is exempt from the death penalty, but unable to enforce this exemption. *See supra* I.B.3. The district court's ruling does not address this fundamental problem.

### 2. That the New Factual Developments Post-Date Fulks's Trial Strengthens His Request for Savings Clause Review.

Citing *Webster-I*, the district court rejected the significance of the new diagnostic standards because they were "newly *created*" evidence, they did not exist at the time of trial, and this distinction was important "because *Atkins* focuses on the time of trial" and "[u]nlike a claim under *Ford*, which 'might involve later-acquired evidence, such evidence is not relevant to an *Atkins* claim unless it existed at the time the *Atkins* determination was made." PA0021–27.

However, *Atkins* did not confine its ban only to those defendants who could have received *Atkins* relief at trial, but exempted *all* intellectually disabled defendants from *execution*. *See Atkins*, 536 U.S. at 321; *supra* I.B.3. *Moore-I* made clear that procedures creating an "unacceptable risk" that an intellectually disabled defendant would be executed similarly ran afoul of the Eighth Amendment. 137 S. Ct. at 1044, 1051. *Moore-I* further mandated that *current* diagnostic standards were binding on an *Atkins* determination. *Id.* at 1053.

Under the district court's formulation, any defendant like Fulks, whose deficits did not satisfy the criteria for ID under past legal and diagnostic standards, but do meet these criteria now, would necessarily be prevented from litigating an *Atkins* claim. This would violate *Atkins*'s ban on the *execution* of the intellectually disabled. It would also preclude an ID finding based on *current* diagnostic standards as required by *Moore-I* where, as here, the standards have changed significantly since the time of the defendant's trial. And, a time-of-trial-only analysis would violate *Atkins* a third time because the previous two defects would create an "unacceptable risk," *Moore-I*, 137 S. Ct. at 1044, 1051, that an intellectually disabled person would be executed. For all of these reasons, the district court's ruling would also create "the intolerable result of condoning an execution that violates the Eighth Amendment," *Webster-I*, 784 F.3d at 1139.

That the diagnostic standards on which Petitioner relies on are "newly created" PA0024, renders Fulks's claim *more* compelling than Webster's, not less. There was a question of whether Webster's counsel could have acquired the newly discovered evidence earlier. 784 F.3d at 1146. No such question exists here. Prior counsel could not have invoked legal standards that were announced in 2014 (*Hall*) and 2017 (*Moore-I*), let alone diagnostic standards announce in 2012 (AAIDD-2012) and 2013 (DSM-5).

The district court modified some of its conclusions in response to Petitioner's Rule 59 motion, explaining:

> [S]ome statements in the opinion suggested that post-trial evidence is irrelevant to an *Atkins* claim. As Mr. Fulks points out, post-trial evidence *is* relevant to an *Atkins* claim. The Court's statements suggesting otherwise were meant to acknowledge what the Seventh Circuit recognized in *Webster*—that there are evidentiary differences for *Atkins* and *Ford* claims and whether they meet the savings clause.

PA0035 (citations omitted). The court nevertheless concluded that "the background principle that post-trial evidence is relevant to an *Atkins* claim" did not impact its determination. *Id.*

The district court's concession undermined its analysis. The *Webster-I* court was focused on the constitutionally untenable position that Webster was in: an *Atkins* claimant with new evidence of ID that could not be raised through § 2255. *Webster-I*, 784 F.3d at 1138-39. Here, the district court's rejection of *Webster-I* as relevant precedent turned on post-trial evidence being irrelevant to an *Atkins* determination. PA0021-26. If, as the court later acknowledged, "post-trial evidence *is* relevant to an *Atkins* claim," PA0035, then there is no meaningful difference between Webster and Fulks. *See* PA0021–26; PA0035.

Furthermore, the ultimate disposition of Webster's case *supports* Fulks's claim for relief. After Webster's case was remanded, the *Webster* district court did not apply the diagnostic standards that were in place at the time of Webster's trial, but the *current* diagnostic standards set forth by the AAIDD and the APA that are

45

in place now. *Webster v. Watson (Webster-II)*, --- F.3d ---, No. 19-2683, 2020 WL 5638691, *14 (7th Cir. Sept. 22, 2020). This Court determined that these current standards were the "proper criteria for finding intellectual disability," and affirmed the lower court's finding that Webster is intellectually disabled. *Id.* at *14–17. Citing *Moore-I*, AAIDD–2010, and the DSM-5, the *Webster-II* court reaffirmed that it is inappropriate to base an adaptive behavior determination on strengths, as opposed to deficits, and also that "adaptive skills are best measured not within the structured prison environment," but within the community. *Id.* at *14–15.

The district court's commentary on *Ford* and *Atkins* in this case highlights its failure to appreciate the nature of the categorical exemption set forth in *Atkins*. *Atkins*, like *Ford*, "places a *substantive restriction* on the State's power to take the life" of a certain class of offenders, and the very language the Supreme Court used to announce the *Atkins* exemption was taken from *Ford*. *Atkins*, 536 U.S. at 321 (emphasis added) (quoting *Ford*, 477 U.S. at 405). Although an *Atkins* claim *can* be litigated at the time of trial if the evidence and legal standards allow it at that time, that does not mean that it *must* be. If, as here, newly available diagnostic and legal standards change the way in which the defendant's impairments are assessed, *Atkins*—just like *Ford*—places a "substantive restriction" on the Government's power to take his life.

### 3.     *Davenport*, *Garza*, and *Webster-I* All Support Fulks's Claim for § 2241 Review.

Another error in the district court's analysis was its view that Fulks's case was not entitled to savings clause review because it did not match the precise factual and procedural scenarios in *Davenport*, *Garza*, and *Webster-I*. According to the district court, because Fulks relied on new constitutional—as opposed to statutory—developments, he could not rely on *Davenport*; because it was not "literally impossible" for Fulks's to raise an *Atkins* claim in his § 2255 proceedings, he could not rely on *Garza*; and, because Fulks's case did not rely on newly discovered evidence of ID that pre-dated the § 2255 proceedings, he could rely on *Webster-I*. PA0018-26.

However, as the district court acknowledged, PA0026, the savings clause does not only encompass the specific scenarios in *Davenport*, *Garza*, and *Webster-I*, but any setting where there is "some kind of structural problem with section 2255." *Webster-I*, 784 F.3d at 1136. As this Court recognized in *Purkey*, "[w]e do not agree with the idea that those cases [*Davenport*, *Garza*, and *Webster-I*] rigidly describe the outer limits of what might prove that section 2255 is 'inadequate or ineffective to test the legality' of a person's detention." 964 F.3d at 611–12. Because Fulks's case has a structural problem with § 2255, he should be granted savings clause review. *See supra* I.B.

47

### 4. That § 2255(h) Permits *Some* Successive Motions Does Not Cure § 2255's Defect, Because § 2255(h)'s Criteria Are Not Met Here.

Citing *Poe v. LaRiva*, 834 F.3d 770, 772 (7th Cir. 2016), the district court found that Fulks raised no "structural problem" with § 2255 and that *Davenport* was inapplicable because "Section 2255(h) explicitly permits certain constitutional problems to be brought in successive § 2255 motions." PA0018–20; PA0028–30.

However, that § 2255(h) permits the litigation of *some* constitutional claims does not matter, as it does not permit *Petitioner's* constitutional claim. *See supra* I.B. Fulks's *Atkins* claim and the development of new standards under which this claim is assessed set his case apart. As this Court acknowledged in *Webster-I* and the Supreme Court held in *Moore-I*, neither Congress nor the courts can impose procedural hurdles that would lead to the execution of an intellectually disabled defendant. *Webster-I*, 784 F.3d at 1139; *Moore-I*, 137 S. Ct. at 1044, 1051. Because § 2255(h)'s limitations preclude consideration of Fulks's ID claim, denying him § 2241 review would pave the way to the unconstitutional execution that the *Webster-I*, *Moore*, and *Atkins* courts sought to avoid.

This Court has not established a bright-line prohibition on the presentation of constitutional claims through § 2241. To the contrary, the *Poe* court acknowledged that *Webster-I*'s holding stemmed from the impossibility of Webster's position: "the defendant could not have used § 2255 at the time of

48

[*Atkins*] because he did not have the new evidence of his social security records and he could not use the new evidence when discovered because" it did not constitute "evidence of innocence of the offense." *Poe*, 834 F.3d at 774 (citation and emphasis omitted). Rather than categorically rejecting constitutional claims as not cognizable under § 2241, the *Poe* court based its rejection of Poe's § 2241 petition on the fact that Poe filed a claim for relief under § 2241 when he should have pursued the same claim under § 2255, could easily have filed a timely § 2255 petition on this issue, but waited until the statute of limitations had run to request relief under § 2255. *Id.* at 774 ("In contrast to Webster, Poe was unable to bring his *Richardson* claim because he filed the wrong petition under § 2241 and his subsequent petition under § 2255 was untimely."). Here, Fulks raises a claim that, in contrast to Poe's, could not have been raised in initial § 2255 proceedings and could not be raised in a successive § 2255 motion. In further contrast to Fulks, Poe, a non-capital defendant, did not claim to be categorically exempt from his sentence, so precluding review of his claim did not create constitutional problems.

### 5.  Fulks Had No Reasonable Opportunity to Pursue an *Atkins* Claim in His Initial § 2255 Proceedings.

The district court also held that Fulks had a reasonable opportunity to pursue his *Atkins* claim because he "could have" theoretically raised it in his initial § 2255 proceedings and it was not, as with Garza, "literally impossible" for him to do so. PA0020-21, PA0027-28. The lower court noted the 2255 court's denial of his co-

49

defendant's *Atkins* claim for reasons that were later found to be invalid under *Moore-I* and *Moore-II* and rejected Fulks's reliance on this disposition as "too speculative." PA0028–29.

But no speculation is required to determine that Fulks's *Atkins* claim would have been rejected before *Moore-I*. Regardless of what the 2255 court did with Fulks's co-defendant, the Fourth Circuit precedent governing *Atkins* claims at the time of Fulks's § 2255 proceedings employed unscientific practices that would have precluded Fulks from proceeding on an *Atkins* claim had he filed one. *See supra* I.B.1. Just as the Nichols defendant in *Davenport* was precluded by then-binding precedent from proceeding on his claim at the time of his initial § 2255 proceedings, Fulks was precluded by then-binding Fourth Circuit precedent from pursuing his *Atkins* claim regardless of what the district court found regarding the co-defendant.

The district court also ignored that the diagnostic standards prevailing at the time of Fulks's initial § 2255 petition precluded the presentation of an *Atkins* claim. The mental health experts who testified at trial and in his initial § 2255 proceedings concluded that he was impaired and borderline intellectually disabled, but just shy of a formal ID diagnosis. *See supra* I.B.2 and I.B.3. In contrast, relying in large part on *the same underlying data* reviewed by Fulks's prior mental health experts, but applying *current diagnostic criteria*, as mandated by *Moore-I* and

50

*Moore-II*, Dr. Crown diagnosed Fulks as intellectually disabled in 2019. *See* Statement of the Case, § B.

Accordingly, just as in *Davenport,* Fulks is entitled to raise his *Atkins* claim now that the previously binding precedent has been overturned. And, just as in *Garza*, it was "literally impossible" for Fulks to have raised his claim during initial § 2255 proceedings as the legal and diagnostic developments needed to do so had not yet been issued. The district court's ruling would require habeas petitioners to anticipate legal and diagnostic developments and file unsupported claims based on the possibility that either science or the law could develop in a favorable direction. This Court rejected such a requirement in *Davenport*, finding that it "would just clog the judicial pipes to require defendants, on pain of forfeiting all right to benefit from future changes in the law, to include challenges to settled law in their briefs on appeal and in postconviction filings." *Davenport*, 147 F.3d at 610.

Such a requirement would also violate *Atkins*'s dictate that the intellectually disabled are exempt from execution. That Fourth Circuit precedent improperly precluded Fulks's *Atkins* claim at the time of his § 2255 proceedings does not make him any less intellectually disabled now. To retroactively require that Fulks have filed a then-futile legal claim in his initial § 2255 proceedings would result in the execution of any defendant who did not have a viable *Atkins* claim at the time of his § 2255 proceedings, but does have one now. This again creates the precise

scenario that *Moore-I*, *Webster-I*, and *Atkins* sought to avoid: an execution in violation of the Eighth Amendment.

### 6.     The District Court Erred in Its Analysis of *Hall's* Relationship with *Webster-I*.

The district court also determined that Petitioner "primarily relies on the Supreme Court's decision in *Hall* as the new legal basis for his first [*Atkins*] claim," and that "[i]f reliance on the Supreme Court's decision in *Hall* was all that was required to meet the Savings Clause," *Webster-I* would not have "examine[d] whether Webster's claim of reliance on new evidence was sufficient" or limited its decision to evidence that existed before trial but went undiscovered through no fault of counsel. PA0020–21.

However, *Hall* was not discussed in *Webster-I* because *Hall* related specifically to the prong one component of ID and the main area of dispute between the parties was primarily prong two. *Id.* at 1132, 1143. That the *Webster-I* court did not simply rely on *Hall* is irrelevant.

Additionally, Fulks does not rely "primarily" on *Hall*. *Moore-I* and *Moore-II* are just as significant, if not more so. Although *Hall* established that ID assessments must be "informed by the views of medical experts," *Hall*, 572 U.S. at 721, current diagnostic standards were not binding until *Moore-I*. *See supra* I.B.1. As courts—including the Fourth Circuit—continued to deviate from current

diagnostic standards even after *Hall*, *see, e.g., Prieto*, 791 F.3d at 470–72, Fulks's

*Atkins* claim could not have been raised until after *Moore-I* was issued.

### 7.    The District Court's Commentary on Serial § 2241 Petitions Is Unfounded.

The district court further held that "if Mr. Fulks's theory is accepted, he

could refile his claims with each revision of the medical standards governing the

diagnosis of intellectual disability." PA0025–27.

But Fulks does not ask for § 2241 review based solely on his status as an

intellectually disabled person. He bases his request for review on the fact that he

falls into the category of habeas petitioners who did not meet the criteria for ID

under obsolete diagnostic and legal standards, but do meet those criteria under the

current ones. *See supra* I.B. Just as in *Webster-I*, *Garza*, and *Davenport*, he relies

on legal and factual developments that post-date his § 2255 proceedings, entitle

him to relief, and could not have been brought in a successive motion under

§ 2255(h). *Id.* His case presents a combination of factors mandating § 2241 review:

his execution is constitutionally prohibited, but the framework of § 2255 has no

mechanism under which he can vindicate this claim.

Neither does Fulks's argument imply that he could simply refile his claims

with each revision of medical standards. Just as the *Webster-I* court found that the

new evidence of the petitioner's intellectual disability would have been significant

in his *Atkins* litigation, 784 F.3d at 1143, for a habeas petitioner to refile based on a

53

change in diagnostic standards, the petitioner would have to establish—as Fulks has done here—that the new diagnostic and legal developments would have been significant in either the litigation or (as is the case here) the existence of an *Atkins* claim. As Fulks has met this burden, he should be permitted to proceed on the merits.

### 8. The District Court Erred in Rejecting Mr. Fulks's Challenge to the Execution of His Death Sentence.

Citing *Figueroa v. Tarquino*, 737 F. App'x 789 (7th Cir. 2018), the district court held that by asking it to "set aside" Mr. Fulks's death sentence, his claim "falls squarely within § 2255(a)'s language permitting claims that a prisoner's sentence should be vacated because it violates federal law." PA0015–17.

However, Fulks does not claim that he was categorically exempt from execution under the legal and diagnostic standards in place at the time the sentence was imposed in 2004, but that he is categorically exempt now. *See supra* I.B.3 and I.C. By definition, he is challenging the *execution* of his sentence. Even assuming that the district court's formulation of Petitioner's claim for relief as a challenge to the imposition of his sentence was correct, none of the authorities relied on by the district court establish that challenging *both* the imposition *and* the execution of his sentence renders him ineligible for § 2241 review.

To hold otherwise would violate the Eighth Amendment. *Atkins*, *Moore-I* and *Moore-II*, are forward-looking and prohibit the *execution* of intellectually

54

disabled defendants based on *current* diagnostic standards. *See Atkins*, 536 U.S. at 321; *Moore-I*, 137 S. Ct. at 1050–53; *Moore-II*, 139 S. Ct. at 670–71. Construing any challenge to the *execution* of a defendant with ID as a challenge to the imposition of his or her sentence only would bar challenges where the defendant was not eligible for *Atkins* relief at the time of his trial, but is exempt from execution now. This analysis would further bar *Atkins* determinations based on *current* diagnostic standards, rather than the standards in place in prior proceedings. All of these factors would create an unacceptable risk that an intellectually disabled person would be executed. *See Moore-I*, 137 S. Ct. 1044, 1051, 1053.

*Figueroa*, on which the district court relied for the proposition that any request to "set aside" a sentence must pass through the savings clause, does not support this conclusion. Figueroa was *granted* § 2241 review. *Figueroa*, 737 F. App'x at 789–90. That Figueroa did not ask this Court to "set aside" his sentence meant that, in the circumstances of his case, he was not challenging the imposition of his sentence. *Id.* at 790. The *Figueroa* court did not hold that *any* request to "set aside" a sentence categorically meant that the defendant was challenging the imposition rather than the execution of his sentence.

Furthermore, Petitioner's case is capital and Figueroa's was not. The imposition of a death sentence is distinct from the carrying out of that sentence,

which is the actual execution of the defendant. For this reason, a capital defendant can ask a court to set aside his death sentence if he is ineligible to be executed without challenging the imposition of that sentence. Here, because new developments occurring after Fulks's capital sentence was imposed render him ineligible for execution, Fulks's challenge to the execution of his sentence—his actual execution—does not constitute a challenge to that sentence's imposition.

The lower court also cited examples where § 2241 petitioners challenged conditions of parole, time credit calculations, and the behavior of the Bureau of Prisons as examples of challenges to the execution rather than the imposition of the sentence. PA0014–15. As with *Figueroa*, this Court granted § 2241 review in those settings without passing through the savings clause, but did not rule that these were the only settings in which defendants could challenge the execution, as opposed to the imposition, of their sentences. *See Storm v. U.S. Parole Comm'n*, 667 F. App'x 156, 157 (7th Cir. 2016); *Ihmoud v. Jett*, 272 F. App'x 525, 526 (7th Cir. 2008).

*Atkins* and its progeny prohibit the execution of all intellectually disabled defendants and require that ID determinations be made under current, prevailing diagnostic standards. Nothing in any authority cited by the district court authorizes the execution of the intellectually disabled. The Eighth Amendment entitles Fulks to review of his claim. Section 2241 review is appropriate because Fulks

56

challenges the execution of his sentence and, as set forth above, no other avenues

of relief are available to him.

**II.    BECAUSE FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY.**

The Supreme Court's recent opinion in *Madison v. Alabama*, 139 S. Ct. 718

(2019), provided a second ground for relief that was not previously available to

Fulks. *Madison* held that the Eighth Amendment forbids the execution of a person

whose impaired functioning renders him or her incompetent to be executed,

regardless of the underlying medical diagnosis. *Id.* at 727–30. Because the core

rationale behind *Ford*, 477 U.S. 399, and *Panetti v. Quarterman*, 551 U.S. 930,

958-59 (2007)'s prohibition on the execution of an incompetent defendant was that

such an execution lacked a retributive purpose, the *Madison* court ruled that no

specific diagnosis was required for a prisoner to be incompetent, only that the

prisoner's mental health or cognitive functioning rendered him or her unable to

rationally understand the reason for his execution. 139 S. Ct. at 727–30. This

newly recognized functional application of the Eighth Amendment gives rise to

Fulks's second claim.

Assuming, *arguendo*, that Fulks does not meet the diagnostic criteria for

intellectual disability, he has the same lifelong adaptive impairments and the same

low adult intellectual functioning as an intellectually disabled person. Furthermore,

he suffers from FASD, a disorder comparable in severity to ID. Under the functional approach to *Atkins* that the Supreme Court applied in *Madison* to a *Ford* claim, these deficits impair his functioning in the same way Darryl Atkins was impaired, and thus implicate the same policies that motivated the Supreme Court in *Atkins*. *See* PA0284–94. Accordingly, assuming that Fulks did not meet all the criteria for intellectual disability, he is ineligible for capital punishment and entitled to relief from his death sentence as his functioning is indistinguishable from that of an intellectually disabled person.

Fulks presented this argument in Claim II of his petition, and argued that it was cognizable under § 2241 because *Madison* was decided long after his trial, direct appeal, and initial § 2255 proceedings; because he was challenging the fundamental legality of his sentence; and because he was challenging its execution rather than its imposition. PA0295–97. The district court never addressed these cognizability arguments. It held that the "two claims are essentially the same, at least for purposes of whether they can proceed under § 2241." PA0015. It therefore "[did] not reach the merits of either claim." *Id*. It dismissed both claims on the basis of its cognizability analysis of Claim I. PA0030.

This Court reviews the district court's denial of § 2241 relief *de novo*. *See Shepherd*, 911 F.3d at 864. The basis on which the court dismissed Claim II—its cognizability analysis of Claim I—was erroneous for all the reasons previously set

58

forth in this brief. Furthermore, the district court erroneously failed to address Fulks's *Madison*-based cognizability argument and argument on the merits, and erroneously denied relief. Therefore, this Court should remand for a district court determination of the separate cognizability argument, and argument on the merits in Claim II. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (general rule is that federal appellate court does not consider issue not passed upon below); *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879, 884 (7th Cir. 2003) (citing *Singleton*, and remanding for district court to determine undecided issue in first instance).

# CONCLUSION

For the reasons set forth above, this Court should reverse the district court's opinion denying Fulks's Amended Petition and remand his case for an evidentiary hearing.

Respectfully submitted,

/s/ *Peter Williams*
Peter Williams
*Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West
Philadelphia, PA 19106
215-928-0520

*Counsel for Petitioner-Appellant*

Dated: October 21, 2020

60

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P.

28.1(e)(2)(B) and Seventh Circuit Rule 32(c) because it contains 13,974 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh

Circuit Rule 32(b), because it has been prepared in a proportionally spaced

typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ *Peter Williams*
Peter Williams

Dated: October 21, 2020

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing brief with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams

Dated: October 21, 2020

No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**APPENDIX TO OPENING BRIEF OF APPELLANT
VOLUME I
PAGES PA001-PA0037**

**<u>THIS IS A DEATH PENALTY CASE</u>**

Peter Williams
  *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

October 21, 2020

# INDEX TO APPENDIX

## Volume I – Short Appendix[1]

Certificate of Compliance ........................................................................... PA0001

Order Denying Petition for a Writ of Habeas Corpus, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. Sept. 20, 2019)............................................................ PA0002

Final Judgment, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. Sept. 20, 2019) ................................................................................ PA0032

Order Denying Motion to Amend or Alter Judgment, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. April 1, 2020) ............................................................... PA0034

## Volume II – Supplemental Appendix

Orders and Opinions

Direct Appeal Opinion, *United States v. Fulks*, 545 F.3d 410 (4th Cir. July 27, 2006) ................................................................................... PA0038

Order Denying Petition for Rehearing and Rehearing En Banc for Direct Appeal, *United States v. Fulks*, 04-33 (4th Cir. Aug. 22, 2006) .................................. PA0070

Judgment, *United States v. Fulks,* 4:02-cr-992 (D.S.C. Aug. 20, 2010) ...................................................................................... PA0072

Opinion, *United States v. Fulks*, 875 F.Supp.2d 535 (D.S.C. Aug. 20, 2010) ...................................................................................... PA0073

Order Reinstating Judgment, *United States v. Fulks,* 4:02-cr-992 (D.S.C. Aug. 20, 2010) .......................................................................... PA0172

---

[1] Consistent with Seventh Circuit Rule 30(a) and (b)(7), the short appendix has been bound with Petitioner/Appellant's opening brief, and the supplemental appendix has been separately bound and filed because it exceeds fifty pages.

Order on Motion for Clarification, *United States v. Fulks*,
4:02-cr-992 (D.S.C. Aug. 25, 2010) ............................................................ PA00173

Order Denying Motion to Alter or Amend, *United States v. Fulks,*
4:02-cr-992 (D.S.C. Jan. 13, 2011)............................................................... PA0174

Judgment, *United States v. Fulks*, 04-33, (4th Cir. June 26, 2012) .............. PA0204

Opinion, *United States v. Fulks*, 683 F.3d 512 (4th Cir. June 26, 2012)....... PA0205

Order Granting Authorization to File Successive §2255,
*United States v. Fulks*, 16-9, (4th Cir. June 27, 2016).................................... PA0219

Pleadings

Amended Petition for Writ of Habeas Corpus, *United States v. Fulks,*
2:15-cv-33 (S.D. Ind. March 8, 2019) .......................................................... PA0220

## **Volume III - Supplemental Appendix cont'd**

Expert Reports

Report of Natalie Novick-Brown, Ph.D. - Feb. 11, 2019 .............................. PA0300

Report of Julian Davies, M.D. - March 4, 2019 ........................................... PA0437

Report of Barry M. Crown, Ph.D. - March 6, 2019....................................... PA0470

Excerpts of Diagnostic Manuals

Excerpt from *Diagnostic and Statistical Manual of Mental Disorders*,
*5th Edition*, American Psychiatric Association (2013) ................................. PA0479

Excerpt from *Intellectual Disability: Definition, Classification, and Systems of
Supports – 11th Edition*, American Association of Intellectual and Developmental
Disabilities (2010)........................................................................................ PA0502

Excerpt from *User's Guide to Intellectual Disability: Definition, Classification, and
Systems of Supports – 11th Edition*, American Association of Intellectual and
Developmental Disabilities (2012) ............................................................... PA0520

## CERTIFICATE OF COMPLIANCE

I, Peter Williams, hereby certify that, all materials required by Seventh Circuit Rule 30(a) and(b) are included in the short and supplemental appendices filed with Petitioner/Appellant's initial brief.  To comply with Seventh Circuit Rule 30(b)(7), the short appendix is bound with Petitioner's brief and the supplemental appendix is separately bound because it exceeds fifty pages.

/s/ Peter Williams
Peter Williams
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Philadelphia, PA 19106
215-928-0520
Pete_Williams@fd.org

Dated: October 7, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHADRICK FULKS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-00033-JRS-MJD |
| | ) | |
| J. E. KRUEGER, | ) | |
| | ) | |
| Respondent. | ) | |

**Order Denying Petition for a Writ of Habeas Corpus**

Petitioner Chadrick Fulks is a federal prisoner incarcerated at the United States Penitentiary in Terre Haute, Indiana. He was convicted and sentenced to death in the United States District Court for the District of South Carolina. His convictions and sentence were affirmed on direct appeal, and his post-conviction motion under 28 U.S.C. § 2255 was denied.

Mr. Fulks now seeks a writ of habeas corpus from this Court pursuant to 28 U.S.C. § 2241. He presents two claims, both of which argue that he is categorically ineligible for the death penalty under the Eighth Amendment because he is intellectually disabled or functionally equivalent thereto. In support of his claims, Mr. Fulks presents extensive evidence that he has an intellectual disability,[1] has diminished cognitive functioning, and suffers from fetal alcohol spectrum disorder.

Ultimately, the Court cannot reach the merits of Mr. Fulks' claims because they are barred by 28 U.S.C. § 2255(e). Mr. Fulks cannot show that a structural problem with § 2255 prevented him from having a reasonable opportunity for a reliable judicial determination of these claims in his § 2255 proceedings. Accordingly, his claims must be dismissed with prejudice.

---

[1] The Court follows the Supreme Court's lead in using the term "intellectual disability" rather than the previously used term, "mental retardation." *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

1

## I.
## Background

The facts underlying Mr. Fulks' criminal convictions are irrelevant to the legal issues presented in his habeas petition.  They are set forth in detail in the opinion affirming Mr. Fulks' convictions and sentence on direct appeal.  *See United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006) ("*Fulks I*").  Relevant to Mr. Fulks' habeas petition is the procedural history of his other challenges to his convictions and sentence.  This procedural history is set forth below.

Mr. Fulks and his co-defendant, Brandon Basham, were indicted in December 2002 in the United States District Court for the District of South Carolina.  The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Mr. Fulks and Mr. Basham with eight counts.  In May 2004, Mr. Fulks pleaded guilty to all eight counts.  Two of those charges—carjacking resulting in death, *see* 18 U.S.C. § 2119(3), and kidnapping resulting in death, *see* 18 U.S.C. § 1201—made Mr. Fulks eligible for the death penalty.

A jury unanimously recommended that Mr. Fulks be sentenced to death on both death-eligible counts.  The sentencing court imposed the death sentence on both counts and sentenced Mr. Fulks to 744 months' imprisonment on the remaining six counts to run consecutively to the two death sentences.  The United States Court of Appeals for the Fourth Circuit affirmed Mr. Fulks' convictions and sentence in *Fulks I*.  The United States Supreme Court denied Mr. Fulks' petition for writ of certiorari on June 25, 2007.  *See Fulks v. United States*, 551 U.S. 1147 (2007).

On June 23, 2008, Mr. Fulks filed a motion to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255.  Notably, Mr. Fulks did not raise a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), in his § 2255 motion.  The District Court denied his motion, and, on June 26, 2012, the Fourth Circuit affirmed.  *See United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012) ("*Fulks II*").

2

The Supreme Court denied Mr. Fulks' petition for writ of certiorari on October 7, 2013.  *See Fulks*

*v. United States*, 571 U.S. 941 (2013).

On January 29, 2015, Mr. Fulks filed the instant habeas petition pro se.  Approximately a

year later, the Federal Community Defender Office from the Eastern District of Pennsylvania was

appointed to represent Mr. Fulks in this action.[2]  *See* Dkt. 22.  After nearly three years of extending

the deadline to file a reply brief, the Court granted Mr. Fulks' request to file an amended habeas

petition.  *See* Dkt. 54.

Mr. Fulks filed an amended habeas petition on March 8, 2019.  Although it became fully

briefed on July 12, 2019, the Court ordered supplemental briefing on Mr. Fulks' second claim,

since the parties did not agree on the legal basis for the claim.  That supplemental briefing was

recently completed, and Mr. Fulks' habeas petition is now ripe for decision.

## II.
## Legal Standards

The primary legal issue the Court must resolve is whether Mr. Fulks meets the requirements

of the "Savings Clause" found in 28 U.S.C. § 2255(e).[3]  Prior to the enactment of 28 U.S.C. § 2255

in 1948, federal prisoners wishing to file a collateral attack on their convictions or sentences were

required to petition for a writ of habeas corpus—codified in 28 U.S.C. § 2241—in the federal

---

[2] On June 17, 2016, Mr. Fulks received authorization from the United States Court of Appeals for the Fourth Circuit to file a successive motion for relief under 28 U.S.C. § 2255.  *See United States v. Fulks*, 4:02-cr-00992-JFA-1 (D.S.C.), dkt. 1617.  Mr. Fulks' § 2255 action remains pending in the United States District Court for the District of South Carolina.  In that action, Mr. Fulks is pursuing a different claim than those he pursues here.  Specifically, he argues that he is entitled to a new penalty phase because his conviction under 18 U.S.C. § 924(c)(3) is unconstitutional following the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and its progeny.  *See United States v. Fulks*, 4:02-cr-00992-JFA-1 (D.S.C.), dkt. 1618.

[3] The Court will refer to § 2255(e) as the "Savings Clause," as is the practice among federal courts.  *See Webster*, 784 F.3d at 1135.

3

district court in which they were incarcerated.  *In re Davenport*, 147 F.3d 605, 608 (7th Cir. 1998).

Congress passed § 2255 "to change the venue of postconviction proceedings brought by federal

prisoners from the district of incarceration to the district in which the prisoner had been sentenced."

*Id.* (citing *United States v. Hayman*, 342 U.S. 205, 212-19 (1952)).  Unlike a § 2241 petition,

§ 2255 motions "must be filed in the district of conviction."  *Webster v. Daniels*, 784 F.3d 1123,

1124 (7th Cir. 2015) (en banc).  "As a rule, the remedy afforded by section 2255 functions as an

effective substitute for the writ of habeas corpus[, 28 U.S.C. § 2241,] that it largely replaced."  *Id.*;

*see Chazen v. Marske*, --- F.3d ----, 2019 WL 4254295, *3 (7th Cir. Sept. 9, 2019) ("As a general

rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under

§ 2255 in the district of conviction.").

However, Congress created the Savings Clause to serve as a "safety hatch."  *Davenport*,

147 F.3d at 609.  It permits use of § 2241 if it "appears that that the remedy by motion [under

§ 2255] is inadequate or ineffective to test the legality of [] detention."  28 U.S.C. § 2255(e).

The Savings Clause was mostly inconsequential until Congress passed the Antiterrorism

and Effective Death Penalty Act ("AEDPA") in 1996.  Among other things, AEDPA limits federal

prisoners to one § 2255 motion attacking their conviction or sentence.  *See* 28 U.S.C. § 2244(b);

*Tyler v. Cain*, 533 U.S. 656, 661-662 (2001).  The appropriate court of appeals must authorize

second or successive § 2255 motions before the district court has jurisdiction to entertain them.

*See* 28 U.S.C. § 2244(b)(3)(A); 28 U.S.C. § 2255(h).  In order to obtain authorization from the

court of appeals, the petitioner must have

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a
> whole, would be sufficient to establish by clear and convincing evidence that no reasonable
> factfinder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the
> Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).  Many prisoners seek to raise claims that do not meet one of the two avenues

for authorization.  Thus, they file habeas petitions under § 2241 in the district of their incarceration.

To proceed under § 2241, however, they must pass through the Savings Clause, which is the critical

legal issue in this case—whether Mr. Fulks can pass through the Savings Clause and thus use

§ 2241 to raise his claims.

Federal courts across the country disagree regarding the circumstances under which the

Savings Clause is met.  *See, e.g.*, *Shepherd v. Krueger*, 911 F.3d 861, 862-63 (7th Cir. 2018)

("[T]he scope of [§ 2255(e)] is controversial both within this circuit and beyond."); *Camacho v.*

*English*, 872 F.3d 811, 815 (7th Cir. 2017) (Easterbrook, J., concurring) (noting that Seventh

Circuit decisions regarding the scope of § 2255(e) "have not persuaded other circuits" and urging

the Supreme Court "to decide whether § 2255(e) permits litigation of th[e] kind" authorized by the

Seventh Circuit).  Although Mr. Fulks was convicted and sentenced to death in the Fourth Circuit,

this Court applies Seventh Circuit law to determine whether Mr. Fulks can proceed under § 2241.

*See Webster*, 784 F.3d at 1135-39 (applying Seventh Circuit law to determine whether the Savings

Clause is met).

The Seventh Circuit has found § 2255 inadequate or ineffective only in limited

circumstances.  The most significant cases in which this occurred, at least for Mr. Fulks' purposes,

are set forth below.

The Seventh Circuit first found § 2255 inadequate or ineffective in *Davenport*.  There, the

Seventh Circuit addressed collateral attacks by two federal inmates—Davenport and Nichols.  The

Seventh Circuit framed the inquiry as follows: "To decide what 'adequacy' means . . . [in §

2255(e)] requires determining what the essential function of habeas corpus is and whether it is

impaired in the circumstances before us by the limitations on the use of the remedy provided in

5

section 2255." *Davenport*, 147 F.3d at 609.  It then explained that "[t]he essential function is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *Id.*

Davenport—who sought to challenge whether his 1981 burglary conviction qualified as a predicate crime under the Armed Career Criminal Act—could have raised that challenge during both his direct appeal and when he filed his first § 2255 motion but chose not to raise such a claim. Davenport thus could not meet the Savings Clause because "[n]othing in 2555 made the remedy provided by that section inadequate to enable Davenport to test the legality of his imprisonment. He had an unobstructed procedural shot at getting his sentence vacated." *Id.*

Nichols' case, the Seventh Circuit held, was different.  Unlike Davenport, during Nichols direct appeal and § 2255 proceedings, the "law of the circuit was so firmly against him" for the claim he wished to raise that it would have been futile to raise it.  *Id.* at 610.  The Supreme Court, however, had since overruled the Seventh Circuit's interpretation of the relevant statute and made that ruling retroactive.  Thus "Nichols could not [have] use[d] a first motion under [§ 2255] to obtain relief on a basis not yet established by law," nor could he have received authorization to file "a second or other successive motion . . . because the basis on which he [sought] relief [was] neither newly discovered evidence nor a new rule of *constitutional* law." *Id.* (emphasis added).

Given that the Supreme Court's decision of statutory interpretation applied retroactively, the Seventh Circuit explained: "A procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant *any* opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *Id.* at 611; *see id.* ("A federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a

6

fundamental defect in his conviction or sentence because the law changed after his first 2255

motion.").

Ultimately, *Davenport* created a three-part test used to determine if a petitioner can invoke

the Savings Clause and proceed under § 2241.  To do so, a petitioner must establish:

> (1) that he relies on not a constitutional case, but a statutory-interpretation case, so
> [that he] could not have invoked it by means of a second or successive section 2255
> motion, (2) that the new rule applies retroactively to cases on collateral review and
> could not have been invoked in his earlier proceeding, and (3) that the error is grave
> enough . . . to be deemed a miscarriage of justice corrigible therefore in a habeas
> corpus proceeding, such as one resulting in a conviction for a crime of which he
> was innocent.

*Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016) (citation and quotation marks omitted); *see*

*Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019).

After *Davenport*, the Seventh Circuit has infrequently found the Savings Clause satisfied

in circumstances beyond those articulated in *Davenport*.  One such instance was in *Garza v.*

*Lappin*, 253 F.3d 918 (7th Cir. 2001).  In *Garza*, after Garza's direct appeal and § 2255 proceedings

were complete, the Inter-American Commission on Human Rights (the "Commission")

determined that Garza's rights were violated during the penalty phase of his proceedings.  *Garza*,

253 F.3d at 919.  Garza sought to use this favorable decision to argue that he was entitled to habeas

relief.  *Id.*  Looking to *Davenport*, the Seventh Circuit reasoned that because Garza could not meet

either avenue set forth in § 2255(h) to file a second or successive § 2255 motion, and because it

was "literally impossible" for Garza to have raised the Commission's favorable decision in his

first § 2255 proceeding because the Commission had not yet issued its decision, § 2255 did not

then nor had it ever "provided an adequate avenue for testing Garza's present challenge to the

legality of his sentence."  *Id.* at 922-23.

7

Another instance was in the en banc Seventh Circuit's recent decision in *Webster*.[4] Webster was a federal prisoner who had been sentenced to death. He raised an *Atkins* claim in a § 2241 petition. Specifically, Webster wished to present "newly discovered evidence that would demonstrate that he [was] categorically and constitutionally ineligible for the death penalty under . . . *Atkins*." *Webster*, 784 F.3d at 1125. The question was whether the Savings Clause permitted him to proceed via § 2241, and the Seventh Circuit held that it did.

The Seventh Circuit began its analysis by reviewing *Davenport* and its progeny. Although noting some differences in its Savings Clause cases, the Seventh Circuit synthesized them as follows: "All of these decisions hold . . . that there must be some kind of structural problem with section 2255 before section 2241 becomes available. In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136; *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) ("[Meeting the Savings Clause] generally requires a structural problem in § 2255 [that] forecloses even one round of effective collateral review, unrelated to the petitioner's own mistakes." (citation and quotation marks omitted)).

Ultimately, the Seventh Circuit held that "[s]everal considerations" showed that "in the circumstances presented . . . the savings clause permits Webster to resort to a petition under section 2241." *Id.* at 1138. First, the Seventh Circuit reasoned that the language of subsections (a) and (e) of § 2255 suggests that the Savings Clause is met when § 2255 prevents a prisoner from

---

[4] Between *Garza* and *Webster*, the Seventh Circuit held that § 2241 is available not only to challenge convictions but also to challenge a prisoner's sentence, as long as the prisoner otherwise shows a structural problem with § 2255. *Brown v. Caraway*, 719 F.3d 583, 586-89 (7th Cir. 2013) ("[P]rovided that the other *Davenport* conditions are present, we conclude that a petitioner may utilize the savings clause to challenge the misapplication of the career offender Guideline, at least where, as here, the defendant was sentenced in the pre-*Booker* era.").

PA0009

challenging the "'legality of [the prisoner's] *detention.*'"   *Id.* (quoting 28 U.S.C. § 2255(e)).

Second, the Seventh Circuit noted that the fact that "the Supreme Court had not yet decided *Atkins*

. . . at the time AEDPA was passed supports the conclusion that the narrow set of cases presenting

issues of constitutional ineligibility for execution is another lacuna in the statute."   *Id.*   In other

words, the problem with § 2255 for Webster was that, after his conviction and sentence, "the

Supreme Court ha[d] now established that the Constitution itself forbids the execution of certain

people."   *Id.* at 1139.

Even if the language of the Savings Clause was not enough to show that it was met, the

Seventh Circuit explained that "the next step would be to take into account the fact that a core

purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence."

*Id.*   "To hold otherwise," the Seventh Circuit continued, "would lead in some cases—perhaps

Webster's—to the intolerable result of condoning an execution that violates the Eighth

Amendment."   *Id.*   Thus, the Seventh Circuit held that "there is no categorical bar against resort to

section 2241 in cases where new evidence would reveal that the Constitution categorically

prohibits a certain penalty."   *Id.*

After setting forth this broad holding, the Seventh Circuit applied the holding to the specific

circumstances of Webster's *Atkins* claim.   In doing so, it explicitly limited the availability of

§ 2241 in several important respects.   These limitations, as discussed in detail below, ultimately

prevent Mr. Fulks from relying on *Webster* to meet the Savings Clause.

### III.
### Discussion

Before resolving the primary issue presented by the parties—whether Mr. Fulks meets the

Savings Clause—two preliminary issues must be resolved.   First, the Court must resolve the

parties' disagreement over the contours of Mr. Fulks' second claim.   Second, the Court must

9

address Mr. Fulks' argument that he is not required to meet the Savings Clause to proceed under § 2241. After addressing these issues, the Court turns to whether Mr. Fulks can meet the Savings Clause.

**A.      The Contours of Mr. Fulks' Claims**

Mr. Fulks raises two claims in his habeas petition. The first is straightforward: he argues that he is intellectually disabled and thus ineligible for the death penalty pursuant to *Atkins* and its progeny. The contours of Mr. Fulks' second claim, however, are disputed. Mr. Fulks maintains that his claim is brought under *Atkins*, while Respondent contends it is necessarily brought under *Ford*. Resolving this dispute, and other issues discussed below, requires a basic understanding of Eighth Amendment claims under *Atkins* and *Ford v. Wainwright*, 477 U.S. 399 (1986).

Before Mr. Fulks pleaded guilty and was sentenced to death, the Supreme Court held in *Atkins* that the Eighth Amendment forbids execution of an individual who has an intellectual disability. *Atkins*, 536 U.S. at 321; *see Hall v. Florida*, 572 U.S. 701, 704 (2014). "*Atkins* largely left to the [sovereign] the job of developing criteria to determine" which prisoners have an intellectual disability and thus cannot receive the death penalty. *McManus v. Neal*, 779 F.3d 634, 650 (7th Cir. 2015).

Twelve years after its decision in *Atkins*, the Supreme Court addressed "how intellectual disability must be defined in order to implement . . . the holding of *Atkins*." *Hall*, 572 U.S. at 709. It ultimately deemed unconstitutional a Florida law that prohibited "all further exploration of intellectual disability" if a prisoner obtained a score of 70 or higher on an IQ test. *Id.* at 704. The Supreme Court noted that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.* at 722. The medical community diagnoses intellectual disability by analyzing three criteria: (1)

10

"significantly subaverage intellectual functioning"; (2) "deficits in adaptive functioning"; and (3) "onset of these deficits during the developmental period." *Id.* at 710; *see Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017) (setting forth the same three criteria). These criteria "will 'inform[]' but not 'dictate' whether a person has an intellectual disability." *McManus*, 779 F.3d at 634 (quoting *Hall*, 572 U.S. at 721). Given this "conjunctive and interrelated assessment," the Supreme Court held that it was unconstitutional for a state to prevent evidence supporting a diagnosis of intellectual ability, at least when "a defendant's IQ test score falls within the test's acknowledged and inherent margin of error." *Hall*, 572 U.S. at 723; *see McManus*, 779 F.3d at 634 ("*Hall* also mandated that the legal standard for determining subaverage intellectual functioning must account for the margin of error in IQ testing.").

Most recently, in 2017, the Supreme Court in *Moore* held that the Texas Court of Criminal Appeals misapplied *Hall*. *Moore*, 137 S. Ct. at 1049 ("The [Texas court's] conclusion that Moore's IQ scores established that he is not intellectually disabled is irreconcilable with *Hall*."). Because the margin of error for Moore's IQ test yielded a range of 69 to 79—meaning Moore's intellectual functioning as measured by the IQ test could be below 70 such that he met the first factor—the Texas court "had to move on to consider Moore's adaptive functioning." *Id.* The Supreme Court cast its ultimate decision as an application of *Hall*: "in line with *Hall*, we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id.* at 1050. Moreover, the Supreme Court made clear that, in making the intellectual-disability determination, courts had to use "[t]he medical community's current standards" rather than outdated standards, as the Texas court did. *Id.* at 1052-53. In both *Hall* and *Moore*, the Supreme Court looked to the most recent editions of the clinical

11

manual of the American Association on Intellectual and Developmental Disabilities ("AAIDD")

and the Diagnostic and Statistical Manual of Mental Disorders ("DSM") published by the

American Psychiatric Association. *Id.* at 1048-53; *Hall*, 572 U.S. at 710-23.

The claim first recognized in *Atkins* and at issue in *Hall* and *Moore* is distinct from the

claim first recognized in *Ford*, even though both are rooted in the Eighth Amendment.  In *Ford*,

the Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the

penalty of death upon a prisoner who is insane," which was defined as a person whose mental

condition "prevents him from comprehending the reasons for the penalty or its implications."  477

U.S. at 410, 417.  Or, as further explained by the Supreme Court in *Panetti v. Quarterman*, 551

U.S. 930 (2007), the Eighth Amendment prohibits the execution of a person whose "mental state

is so distorted by a mental illness" that he lacks a "rational understanding" of "the State's rationale

for [his] execution."  *Id.* at 958-59.  The Supreme Court recently reiterated that the proper inquiry

under *Ford* is "whether a mental disorder has had a particular *effect*"; the *Ford* standard "has no

interest in establishing any precise *cause*."  *Madison v. Alabama*, 139 S. Ct. 718 (2019).

In sum, although claims under *Atkins* and *Ford* are similar, they apply different standards

and focus on different time periods.  *Atkins* addresses the constitutionality of sentencing an

individual to death, while *Ford* asks whether a prisoner subject to a death sentence can have that

sentence carried out.  Thus, for example, evidence of further intellectual tests conducted on a

prisoner subject to a death sentence would have "no bearing on the *initial* conviction and

sentence"—that is, the *Atkins* inquiry—"though they would be highly pertinent to the ultimate

ability of the government to carry out the sentence" consistent with *Ford.  Webster*, 784 F.3d at

1140.  Because a *Ford* claim inquires into the prisoner's mental state near the time of execution, a

12

*Ford* claim is typically not ripe until an execution date has been set. *See Holmes v. Neal*, 816 F.3d 949, 954 (7th Cir. 2016).

Again, Mr. Fulks' first claim is a straightforward *Atkins* claim; he argues that he is intellectually disabled and thus the Eighth Amendment prohibits his execution. The factual predicate for Mr. Fulks' second claim is that his cognitive functioning and fetal alcohol spectrum disorder make him functionally equivalent to one who is intellectually disabled. He argues that regardless of whether he meets the diagnostic criteria to be categorized as intellectually disabled, the same justifications forbidding the execution of intellectually disabled individuals apply to individuals with functionally similar limitations. Mr. Fulks' claim, then, amounts to a request to extend *Atkins*, as *Atkins* held only that those who are *intellectually disabled* cannot be executed. *Atkins*, 536 U.S. at 321; *see Hall*, 572 U.S. at 704.

Although Mr. Fulks does not point to any federal court that has accepted this argument, Mr. Fulks argues that this extension of *Atkins* is appropriate based on the Supreme Court's decision in *Madison*, which, as noted above, involved a claim under *Ford*. Yet Mr. Fulks disavows any claim under *Ford*. He explains: "Mr. Fulks does not claim that he is ineligible for death because he is 'insane' under *Ford*, or because he lacks a rational understanding of his situation. He argues that this Court must use *Madison*'s functional approach to determining whether he is ineligible for death under *Atkins*." Dkt. 67 at 14; *see id.* at 15 ("Mr. Fulks asks this Court to follow *Madison* by taking a functional approach to its application of the *Atkins* criteria. Mr. Fulks does not ask this Court to apply the *Ford* criteria.").

Respondent presents several bases to reject Mr. Fulks' second claim on the merits. For example, Respondent argues that there is no legal basis to extend the protections of *Atkins* to those who are only functionally intellectually disabled, especially not *Madison*, which dealt exclusively

13

with a *Ford* claim.  Respondent also argues that, despite Mr. Fulks' disavowal of a *Ford* claim, his claim necessarily is brought under *Ford* and should be dismissed as unripe.

Ultimately, the Court construes Mr. Fulks' second claim as he describes it—namely, an *Atkins* claim rather than a *Ford* claim.  However, this means that Mr. Fulks' two claims are essentially the same, at least for purposes of whether they can proceed under § 2241.  The first is a traditional *Atkins* claim based on his contention that his is intellectually disabled, while the second is an *Atkins* claim based on the contention that he is functionally equivalent to one who is intellectually disabled and the corresponding argument that *Atkins* should be extended to cover such persons.

Because Mr. Fulks' two claims are both rooted in *Atkins*, the Court's analysis of whether his *Atkins* claims may be brought in a § 2241 petition is the same.  In the end, the Court does not reach the merits of either claim, concluding that they cannot be brought via § 2241.

**B.      Whether the Savings Clause Must be Met to Proceed under § 2241**

The second issue the Court must resolve is whether Mr. Fulks must meet the Savings Clause to proceed under § 2241.  Mr. Fulks argues that he need not meet the Savings Clause because he is challenging the execution of his sentence rather than its imposition.  *See* Dkt. 55 at 62-63.

Mr. Fulks is correct that "[a] motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241."  *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998).  This distinction is important because prisoners "attack[ing] the imposition, not the execution, of [their] sentence . . . must demonstrate that [they] fall within the 'savings clause' provided by § 2255."  *McCall v. United States*, 304 Fed. Appx. 449, 450 (7th Cir. 2008).

14

The reason for this is apparent from the scope of § 2255.  Section 2255 states, in relevant part, that prisoners "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  Simply put, § 2255 allows prisoners to challenge the legality of their convictions or sentences.  Habeas corpus claims falling outside this scope—such as those challenging how a sentence is executed— must be brought via the only remaining option, § 2241.  *Valona*, 138 F.3d at 694; *see Walker v. O'Brien*, 216 F.3d 626, 629 (7th Cir. 2000) ("28 U.S.C. § 2255, the habeas corpus substitute for federal prisoners, is properly used only for challenges to convictions and sentences, while § 2241 is used for other challenges to the fact or duration of confinement.").

Claims challenging the execution of one's sentence, for example, include "a motion contending that the prison unlawfully deprived a prisoner of good time credits[;] [a claim] that parole officials unconstitutionally denied an application for release," *Valona*, 138 F.3d at 694; challenges to spending a portion of one's sentence on home confinement, *see Storm v. United States Parole Comm'n*, 667 Fed. Appx. 156, 157 (7th Cir. 2016); challenges to the implementation of the Inmate Financial Responsibility Program, which sets up a monthly payment plan for inmates' restitution, *see Ihmoud v. Jett*, 272 Fed. Appx. 525, 526 (7th Cir. 2008); and challenges to whether one's supervised release runs consecutively or concurrently to one's sentence, *see Figueroa v. Tarquino*, 737 Fed. Appx. 789, 790 (7th Cir. 2018).  Notably, none of these examples are challenges to whether the petitioner's conviction or sentence is unlawful—that is, a challenge falling within the scope of § 2255(a).

Unlike these examples of challenges to how a sentence is executed, Mr. Fulks' claims clearly fall within the ambit of § 2255(a).  It is undisputed that *Atkins* claims generally are available

15

in § 2255 proceedings.  Mr. Fulks himself points to the fact that his co-defendant pursued an *Atkins* claim in his § 2255, and he does not dispute that he could have brought one.

Most important, Mr. Fulks' request for relief makes clear that he is challenging the constitutionality of his sentence: he asks the Court to vacate his death sentence because it violates the Eighth Amendment.  *See* dkt. 55 at 79 (requesting the Court to grant "habeas relief from Petitioner's death sentence").  Simply put, Mr. Fulks asks "the court to set aside his sentence" as violative of the Eighth Amendment, thus his claims fall within § 2255(a).[5]  *Figueroa*, 737 Fed. Appx. at 790.

Accordingly, because Mr. Fulks' claim falls within § 2255(a), he must meet the requirements of the Savings Clause to proceed under § 2241.  *See Walker*, 216 F.3d at 629.

## C.    Whether Mr. Fulks Meets the Savings Clause

Mr. Fulks argues that he meets the Savings Clause and can thus proceed under § 2241 for three different reasons.  His first two arguments are that his claims rely on both new legal and new factual bases that were unavailable during his trial or initial § 2255 proceedings.  *See* Dkt. 55 at 55-62.  Mr. Fulks' new factual bases consist of the updated editions of the AAIDD (from 2012, the "AAIDD-2012") and DSM (from 2013, the "DSM-5"), which have superseded earlier versions that governed the medical community's diagnosis of intellectual disability at the time of his trial and § 2255 proceedings.  Mr. Fulks' new legal bases consist of the Supreme Court's decisions in *Hall*, *Moore*, and *Madison*.  His third argument is that this Court should recognize the availability

---

[5] Mr. Fulks resists this conclusion by arguing that he "is not claiming that his sentence violated *Atkins* at the time it was imposed.  Rather, . . . he claims that his sentence is now unconstitutional under newly evolved diagnostic standards."  Dkt. 55 at 62.  But by his argument's own terms, he is challenging the constitutionality of his sentence and asking the Court "to set [it] aside," which falls squarely within § 2255(a)'s language permitting claims that a prisoner's sentence should be vacated because it violates federal law.  *Figueroa*, 737 Fed. Appx. at 790.

16

of § 2241 beyond the narrow set of circumstances already recognized by the Seventh Circuit.  The

Court will address each argument in turn.

> ### 1.      New Legal Developments

The Court turns next to Mr. Fulks' argument that he meets the Savings Clause because his

claims rely on new legal developments that were previously unavailable.  Specifically, Mr. Fulks

maintains that the Supreme Court's decisions in *Hall* and *Moore* dramatically changed the "legal

landscape governing *Atkins* claims."  Dkt. 55 at 57.  For example, Mr. Fulks contends that "*Hall*

was the first decision of the Supreme Court holding that States did not have 'unfettered discretion

to define the full scope of the constitutional protection' identified in *Atkins*."  *Id.* (quoting *Hall*,

572 U.S. at 719).  Similarly, as to Mr. Fulks' second *Atkins* claim, he argues that the Supreme

Court's recent decision in *Madison* is what allows him to argue that a functional approach should

be taken to *Atkins* claims.

The Seventh Circuit concluded that the Savings Clause was met when a prisoner's claim

(1) relied on a new case of statutory interpretation that is retroactive (*Davenport*); (2) and when

there was a subsequent decision about the case by an international tribunal (*Garza*).  The new legal

bases on which Mr. Fulks' claims rely—the Supreme Court's decisions in *Hall*, *Moore*, and

*Madison*—are not analogous to those relied on in either *Davenport* or *Garza*; indeed, the reasoning

of those cases suggests that Mr. Fulks cannot meet the Savings Clause based on new legal

developments.

Looking first to *Davenport*, it created the three-part test set forth above. The first

*Davenport* factor requires a prisoner to show "that he relies on not a constitutional case, but a

statutory-interpretation case[.]"  *Montana*, 829 F.3d at 783.  Mr. Fulks cannot meet this factor, as

17

he relies on *Hall* and *Moore* (which apply *Atkins*) and *Madison* (which applies *Ford*).  All of these cases involve Eighth Amendment claims, not statutory ones.[6]

Although *Davenport* was decided some time ago, the Seventh Circuit has recently reiterated that *Davenport* does not apply to constitutional claims.  *See Poe*, 834 F.3d at 773 (deeming "meritless" the argument that "*Davenport* does not actually preclude use of § 2241 for a constitutional case").  Constitutional claims, unlike statutory claims, do not reveal "some kind of structural problem with section 2255" that forecloses a single round of judicial review.  *Webster*, 784 F.3d at 1136.  "Where *Davenport* recognized a structural problem in § 2255(h) is in the fact that it did not permit a successive petition for new rules of *statutory* law made retroactive by the Supreme Court."  *Poe*, 834 F.3d at 773.  Section 2255(h), however, allows prisoners to pursue a successive § 2255 motion when there is "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  Thus, although there is no avenue but § 2241 for petitioners who rely on new statutory cases, the Seventh Circuit made clear in *Davenport*—and recently reiterated in *Poe*—that there is not a similar structural problem with § 2255 for prisoners such as Mr. Fulks who raise constitutional claims.

*Garza* is similarly unhelpful to Mr. Fulks.  There, the Seventh Circuit found a structural problem with § 2255 similar to that in *Davenport*.  As discussed above, Garza raised a claim

---

[6] Although the Court need not ultimately resolve whether *Atkins* claims should be governed by a functional approach, as Mr. Fulks suggests, it notes that *Madison* does not suggest that *Atkins* should be extended in the way Mr. Fulks urges.  *Madison* applied the doctrine established in *Ford*; it did not involve an *Atkins* claim.  *See Madison*, 139 S. Ct. at 722-23.  And even in the *Ford* context, the Supreme Court did not suggest it was adopting a *new* functional approach; it held that *Ford* and *Panetti* dictated a functional approach.  *See id.* at 728 ("*Panetti* has already answered the question [presented in this case]."); *id.* ("[T]he key justifications *Ford* and *Panetti* offered for the Eighth Amendment's bar confirm our conclusion about its reach.").  This shows that Mr. Fulks' argument that *Atkins* should be extended was available long before the Supreme Court decided *Madison*.

predicated on a favorable decision by an international tribunal that was issued after his first § 2255 was complete. Like the petitioner in *Davenport* who wished to rely on a subsequent decision of statutory interpretation, § 2255(h) similarly did not provide Garza an avenue to file a successive § 2255 motion because his claim was not a constitutional claim. Because it was "literally impossible" for Garza to have raised the international tribunal's favorable decision in his first § 2255 proceeding, § 2255 did not then nor had it ever "provided an adequate avenue for testing Garza's present challenge to the legality of his sentence."[7] *Garza*, 253 F.3d at 922-23.

Again, this is not the case for Mr. Fulks' constitutional claim. Section 2255(h) explicitly permits certain constitutional claims to be brought in successive § 2255 motions, and thus there is no "structural problem" with § 2255 that forecloses judicial review. *Webster*, 784 F.3d at 1136; *see Poe*, 834 F.3d at 773. In short, Mr. Fulks cannot meet the Savings Clause via the avenue opened in *Davenport* or *Garza*.[8]

One final note: Mr. Fulks' primarily relies on the Supreme Court's decision in *Hall* as the new legal basis for his first claim. But *Hall* was decided before the Seventh Circuit's decision in *Webster*. The Seventh Circuit repeatedly references whether Webster could meet the standards of

---

[7] Following *Garza*, the Seventh Circuit has noted that the case involved "'very unusual facts' . . . [and thus] its applicability beyond those facts is limited." *Kramer v. Olson*, 347 F.3d 214, 218 n.1 (7th Cir. 2003) (quoting *Garza*, 253 F.3d at 921).

[8] Mr. Fulks briefly argues that § 2241 is available for claims of actual innocence, citing to *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). But *Kramer* essentially applied the three *Davenport* factors, focusing on the third, which requires "that the error is grave enough . . . to be deemed a miscarriage of justice corrigible therefore in a habeas corpus proceeding, such as one resulting in a conviction for a crime of which he was innocent." *Cross*, 829 F.3d at 783. The Court need not reach this factor, as Mr. Fulks cannot meet the first *Davenport* factor. While Fulks is not arguing innocence of the crime to which he pleaded guilty, § 2241 is not available simply because one asserts he is actually innocent of a death sentence, which appears to be his argument. If it were, as discussed further below, the Seventh Circuit's decision in *Webster* would have been much different.

19

*Atkins* and *Hall*. *See, e.g.*, *Webster*, 784 F.3d at 1125, 1143, 1146. If reliance on the Supreme Court's decision in *Hall* was all that was required to meet the Savings Clause and proceed under § 2241, the Seventh Circuit's decision is *Webster* would have been dramatically different. There would have been no need, for example, to even examine whether Webster's reliance on new evidence was sufficient, nor any need for the Seventh Circuit to limit its decision, and thus the availability of § 2241, to cases of newly discovered evidence that "existed *before* the time of trial" and that were "not available during the initial trial" through no fault of Webster's counsel. *Id.* at 1140. It cannot be, as Mr. Fulks contends, that one need only invoke *Hall* (or any other subsequent Supreme Court case, such as *Moore* or *Madison*) to proceed under § 2241.

> ## 2. New Factual Developments

Mr. Fulks' next argument is that his claims rest on new factual bases. Specifically, Mr. Fulks contends that he has an intellectual disability as defined by *Atkins* based on the most recent editions of the AAIDD and DSM, which the medical community uses to determine whether an individual has an intellectual disability. Mr. Fulks contends that these new editions "constitute new factual bases not available at the time of Mr. Fulks' 2004 trial or at the time he filed his § 2255 petition." Dkt. 55 at 56.

Mr. Fulks' argument that these new factual bases allow him to proceed under § 2241 relies primarily on *Webster*. This is understandable: as in *Webster*, Mr. Fulks is attempting to bring *Atkins* claims in a § 2241 proceeding. Moreover, certain language in *Webster*, read in isolation, supports Mr. Fulks' position. In the end, however, the Seventh Circuit's holding in *Webster* was explicitly narrow. It made clear that the availability of § 2241 for Webster was based on multiple case-specific factors that are not present here.

The question presented in *Webster* was whether newly discovered evidence can ever "satisfy the demanding standard of [the Savings Clause]." *Webster*, 784 F.3d at 1125. To answer this question, the Seventh Circuit reviewed its precedents governing the Savings Clause. The Seventh Circuit synthesized its precedents as follows: "All of these decisions [*i.e.*, *Davenport*, *Garza*, *Brown*] hold . . . that there must be some kind of structural problem with section 2255 before section 2241 becomes available." *Webster*, 784 F.3d at 1136. Unlike the structural problem in *Davenport* or *Garza*—namely, that section § 2255 prevented the petitioner from relying on new legal authority—the structural problem identified in *Webster* was that newly discovered evidence may show that Webster was subject to an unconstitutional punishment. Specifically, Webster found records from the Social Security Administration that supported his claim of intellectual disability that, through no fault of his own, were not previously disclosed during his trial.

The Seventh Circuit held that "there is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." *Id.* at 1139. Mr. Fulks says his claims are no different; they are based on new evidence and preventing him from relying on this evidence in a § 2241 proceeding would lead to the "intolerable result of condoning an execution that violates the Eighth Amendment." *Id.* at 1139; *see id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

However, after the Seventh Circuit concluded that there was no "categorical bar" to such claims, it went on to consider whether Webster had "presented a proper case for [§ 2241's] use." *Id.* at 1140. In concluding that Webster had presented such a case, the Seventh Circuit made clear that the circumstances under which use of § 2241 is appropriate are extremely limited:

> We have established thus far that a person who proposes to show that he is categorically ineligible for the death penalty, based on newly discovered evidence,

21

may not be barred from doing so by section 2255. But this rule cannot apply to all newly discovered evidence, or else there would never be any finality to capital cases involving either the intellectually disabled or minors.[FN8]

> [FN8.] In fact, given the rule in *Ford v. Wainwright*, 477 U.S. 399 (1986), which holds that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane," *id.* at 410, there will always be some lack of finality for a person whose mental condition "prevents him from comprehending the reasons for the penalty or its implications." *Id.* at 417. Both parties have assumed, however, that the *Ford* standard is higher than the one imposed in *Atkins* and *Hall*. We assume for present purposes that this is correct.

*Webster*, 784 F.3d at 1140 & n.8. The Seventh Circuit went on to explain why its holding did not permit any case involving newly discovered evidence to meet the Savings Clause:

> Looking particularly at the intellectually disabled, it would always be possible to conduct more I.Q. and adaptive functioning tests in the prison. Those new scores would have no bearing on the initial conviction and sentence, though they would be highly pertinent to the ultimate ability of the government to carry out the sentence. But our concern is with the former, not the latter.
>
> What distinguishes Webster's case from the one we just hypothesized are two facts: first, the newly discovered evidence that current counsel have proffered existed before the time of the trial, and is relevant for precisely that reason; second, although the facts are disputed, there is evidence indicating that they were not available during the initial trial as a result of missteps by the Social Security Administration, not Webster's counsel. . . . . It will be a rare case where records that predate the trial are found much later, despite diligence on the part of the defense, and where those records bear directly on the constitutionality of the death sentence.

*Id.* at 1140.

The Seventh Circuit reiterated these limitations in a footnote, making clear that its ruling "depends" on an "array of limitations, both legal and factual." *Id.* at 1140 n.9. "[A]t least three principal reasons," it explained, ensure that its holding "will have a limited effect on future habeas corpus proceedings." *Id.* These specific limitations are as follows:

> First, the evidence sought to be presented must have existed at the time of the original proceedings. (A free-standing claim that an execution would violate *Ford v. Wainwright* might involve later-acquired evidence, but such a claim is quite

22

different from the one now before us.) Second, the evidence must have been unavailable at the time of trial despite diligent efforts to obtain it. Third, and most importantly, the evidence must show that the petitioner is constitutionally ineligible for the penalty he received. . . . These three limitations are more than adequate to prevent the dissent's feared flood of section 2241 petitions[.]

*Id.*

In short, the Seventh Circuit made clear that simply arguing that new evidence shows one's sentence is unconstitutional is not enough to meet the Savings Clause.  If it were, "there would never be any finality to capital cases involving . . . the intellectually disabled." *Id.* at 1140.  What made Webster's case unique—and § 2241 available to him—was the fact that there was newly discovered evidence that was (1) available at the time of trial (which is what made the evidence "relevant" to the *Atkins* claim), and (2) at least arguably unavailable through no fault of trial counsel. *Id.*

Against this background, Mr. Fulks' argument that his purportedly newly discovered evidence makes his case similar to *Webster* must fail.  As an initial matter, it is at best a stretch to construe updated versions of the AAIDD and DSM as "newly discovered evidence" as *Webster* used the term.  Rather than newly discovered evidence bearing on whether Mr. Fulks specifically was intellectually disabled at the time of trial (such as the Social Security Administration records discovered in *Webster*), Mr. Fulks relies on updated standards the medical community uses to evaluate whether anyone is intellectually disabled.  These standards are not newly *discovered* evidence that Mr. Fulks specifically is intellectually disabled.  They are instead newly *created* standards used to assess whether anyone is intellectually disabled.  The latter is not "newly discovered evidence" as the term was used in *Webster*.

Nevertheless, the Court need not rely on this distinction to conclude that Mr. Fulks cannot proceed under § 2241.  Even assuming the AAIDD-2012 and DSM-5 constitute newly discovered

23

evidence, they do not meet the most critical requirements for newly discovered evidence set forth in *Webster*—namely, "newly discovered evidence that . . . existed before the time of the trial." *Id.* at 1140; *see id.* at 1140 n.9 ("[T]he evidence sought to be presented must have existed at the time of the original proceedings."). The AAIDD-2012 and DSM-5 did not exist before Mr. Fulks' trial; they are only new evidence precisely because they were not created until *after* Mr. Fulks' trial.

This limitation in *Webster* is important because *Atkins* focuses on the time of trial. *Webster* made clear that the evidence at issue must have existed at the time of trial to be "relevant" to an *Atkins* claim. *Id.* at 1140. Unlike a claim under *Ford*, which "might involve later-acquired evidence," such evidence is not relevant to an *Atkins* claim unless it existed at the time the *Atkins* determination was made. *Id.* at 1140 n.9.

Relatedly, the Seventh Circuit made clear that later developed evidence is insufficient because to hold otherwise would prevent there from being "any finality to capital cases involving . . . the intellectually disabled." *Id.* at 1140. Just as it "would always be possible to conduct more I.Q. and adaptive functioning tests" and file a new *Atkins* claim based on that new evidence, *id.*, if Mr. Fulks' theory is accepted, he could refile his claims with each revision of the medical standards governing the diagnosis of intellectual disability. This, like additional testing, would preclude any finality in capital cases involving the intellectually disabled. The Seventh Circuit rejected this notion in *Webster*, and this Court must therefore reject it here.

In sum, Mr. Fulks' alleged newly discovered evidence does not allow him to proceed on the course charted by *Webster*. *Webster* is the only occasion the Seventh Circuit has permitted a constitutional claim to proceed under § 2241 because a structural problem with § 2255 prevented the claim from having a reasonable opportunity for adjudication. And since *Webster*, the Seventh Circuit has reiterated that "the *Webster* court took great care to assure that its holding was narrow

24

in scope" by limiting it to the "*rare* case where records that *predate* the trial are found much later[.]" *Poe*, 834 F.3d at 774. This is not such a case. Accordingly, *Webster* does not permit Mr. Fulks' claims to proceed under § 2241.

### 3.        Availability of § 2241 Beyond *Davenport*, *Garza*, and *Webster*

Having determined that Mr. Fulks' claims do not fall within any of the Seventh Circuit's Savings Clause precedents, the Court turns to Mr. Fulks' final argument for why he meets the Savings Clause—namely, that "the Seventh Circuit has never held, or even suggested, that [*Davenport* and *Webster*] represent the only circumstances under which the savings clause is available." Dkt. 67 at 11. Instead, Mr. Fulks contends that "the only requirement for establishing § 2241 jurisdiction through the savings clause is that there be 'some kind of structural problem with section 2255.'" *Id.* (quoting *Webster*, 784 F.3d 1136).

As a general matter, the Court agrees. The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found. Indeed, *Webster* itself represents a recent example of a § 2241 claim being permitted to proceed in a new context. But Mr. Fulks must point to a new structural problem with § 2255 that prevented him from raising his claims during his § 2255 proceedings. He has failed to do so.

First, Mr. Fulks argues that the structural problem here is the same as the one identified in *Webster*—that "because § 2255(h) was enacted prior to *Atkins*, 'as a structural matter,' Mr. Fulks' challenge to his sentence 'cannot be entertained by use of the 2255 motion." *Id.* at 12 (quoting *Webster*, 784 F.3d at 1139). But for all the reasons discussed above, Mr. Fulks cannot rely on *Webster*. Contrary to Mr. Fulks' suggestion, *Webster* did not hold that any *Atkins* claim exposes a structural problem with § 2255 since *Atkins* was decided after § 2255(h) was enacted. Had *Webster* so held, the Seventh Circuit would not have gone to the lengths it did to limit *Webster*'s

25

applicability to cases of "newly discovered evidence that . . . existed before the time of the trial."

*Webster*, 784 F.3d at 1140.  It would have simply stated that *Atkins* claims can proceed under

§ 2241.

Second, Mr. Fulks argues more generally that a structural problem with § 2255 exists

because he "could not have raised his *Atkins* claim at trial or in his initial § 2255 motion."  Dkt.

67 at 8.  Specifically, he contends he could not have raised his *Atkins* claims because, until the

Supreme Court's decisions in *Hall*, *Moore*, and *Madison* and the new diagnostic standards were

released, he did not have a "viable *Atkins* claim."  *Id.* at 10.  According to Mr. Fulks, the non-

viability of his claims is demonstrated by the fact that his co-defendant's *Atkins* claim was rejected

by the district court based on factors the Supreme Court subsequently deemed impermissible in

*Moore*.  *See id.*; *see also* dkt. 55 at 59-61.

But the Savings Clause focuses on whether a prisoner had a reasonable opportunity to raise

a claim, not whether that claim would have been successful.  This is suggested by the language of

the Savings Clause itself: § 2241 is available only when § 2255 "is inadequate or ineffective to

*test* the legality of [] detention."  28 U.S.C. § 2255(e) (emphasis added).  This is why whenever a

prisoner is determined to have met the Savings Clause, it is because he never had a fair *opportunity*

to raise the claim he now wishes to raise.  *See, e.g.*, *Poe*, 834 F.3d at 772 (explaining that meeting

the Savings Clause requires a structural problem with § 2255 that "forecloses even one round of

effective collateral review, unrelated to the petitioner's own mistakes" (quotation marks omitted));

*Webster*, 784 F.3d at 1136 (noting that in *Davenport* the Seventh Circuit held "that whether section

2255 is inadequate or ineffective depends on whether it allows the petitioner a reasonable

opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction

and sentence" (citation and quotation marks omitted)); *Garza*, 253 F.3d at 922 (recognizing that

26

§ 2255 is inadequate or ineffective when "the operation of the successive petition rules absolutely prevented the petitioner from *ever having an opportunity* to raise a challenge to the legality of his sentence" (emphasis added)).

There is no dispute that Mr. Fulks could have raised both of his *Atkins* claims in his § 2255 proceedings. His argument is that this was nevertheless not a reasonable opportunity to obtain a reliable judicial determination because, as demonstrated by the rejection of his co-defendant's *Atkins* claim, the district court would have relied on criteria the Supreme Court has since held are inappropriate. This argument is not without force, at least on its surface. The Seventh Circuit concluded in *Davenport* that the Savings Clause was met even though Nichols could have technically raised the claim. The claim Nichols sought to raise did not have a reasonable opportunity for a reliable judicial determination, the Seventh Circuit reasoned, because even if he had raised it the "law of the circuit was so firmly against him" that it would have been futile to do so. *Davenport*, 147 F.3d at 610.

Mr. Fulks' situation, however, is different than the structural problem faced by Nichols in *Davenport*. First and foremost, *Davenport*'s reasoning is limited to statutory claims. *See Poe*, 834 F.3d at 773 (deeming "meritless" the argument that "*Davenport* does not actually preclude use of § 2241 for a constitutional case"). "Where *Davenport* recognized a structural problem in § 2255(h) is in the fact that it did not permit a successive petition for new rules of *statutory* law made retroactive by the Supreme Court." *Poe*, 834 F.3d at 773. But § 2255(h) permits successive constitutional claims in certain circumstances. Thus, Mr. Fulks' argument that the applicable law foreclosed his constitutional claim during his § 2255 proceeding finds no support in *Davenport* or any other case. The Seventh Circuit has made clear that—except in the limited circumstances presented in *Webster*—there is no structural problem with § 2255 for constitutional claims.

27

Second, even if one applies *Davenport*'s reasoning to a constitutional claim, Nichols' argument in *Davenport* is meaningfully different than the one Mr. Fulks presents. Nichols' argument was obviously foreclosed as a legal matter based on the Seventh Circuit's interpretation of the statute at issue—an interpretation that the Supreme Court subsequently reversed. *See Davenport*, 147 F.3d at 610. Here, Mr. Fulks asks the Court to accept that an *Atkins* claim would have failed because the facts supporting it did not meet the then-current legal standard, as demonstrated by the reasoning used to reject his co-defendant's *Atkins* claim.

This asks too much of the Savings Clause, as Mr. Fulks seeks an expansion of access to § 2241 far beyond what any court has permitted. To accept Mr. Fulks' argument would require the Court to assess the evidence supporting Mr. Fulks' *Atkins* claim, then speculate how another federal court would have treated that evidence based on how it treated similar evidence in rejecting Mr. Fulks' co-defendant's *Atkins* claim.[9] Only then could the Court determine whether Mr. Fulks' first § 2255 presented "a reasonable opportunity to obtain a reliable judicial determination" of an *Atkins* claim. *Webster*, 784 F.3d at 1136 (citation and quotation marks omitted). But no two cases are the same, and thus there is no certainty that—even assuming the court relied on improper factors in rejecting Mr. Fulks' co-defendant's *Atkins* claim—that the court would have similarly done so for Mr. Fulks. Such a speculative analysis stands in stark contrast to the *Davenport* analysis, which only requires the Court to answer three relatively straightforward legal questions (one of which, again, limits *Davenport*'s reach to statutory claims).

---

[9] Notably, this speculative analysis would not be required had Mr. Fulks raised an *Atkins* claim in his § 2255 when he had the opportunity to do so. It would then be apparent whether the court applied factors that the Supreme Court subsequently deemed inappropriate in *Moore*, and this Court would not have to speculate how another court would have treated a wide-range of evidence regarding Mr. Fulks' alleged intellectual disability.

28

In sum, Mr. Fulks had an opportunity to raise an *Atkins* claim, but he chose not to do so until now, when the law and relevant medical standards are more favorable to him.  This is insufficient to meet the Savings Clause, as the Seventh Circuit has made clear that "something more than a lack of success"—or here, an anticipated lack of success—"with a section 2255 motion must exist before the savings clause is satisfied." *Webster*, 784 F.3d at 1136.  Moreover, the Court must reject Mr. Fulks' invitation to find a structural problem with § 2255 based on a speculative analysis of how Mr. Fulks' claims would have been decided by another court had he raised them.  Mr. Fulks does not point to any federal court that found the Savings Clause met in a remotely analogous case.  And analysis of the most analogous case—*Webster*—suggests that it is unlikely the Seventh Circuit would support extending the availability of § 2241 in the manner Mr. Fulks urges.

Accordingly, Mr. Fulks' claims are barred by the Savings Clause, and the Court cannot reach the merits of them in this § 2241 proceeding.

**IV.**
**Conclusion**

For the reasons explained above, Mr. Fulks' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is **denied**.  Mr. Fulks' claims are barred by § 2255(e) and therefore are dismissed with prejudice.[10]  *See Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017) (holding that failure to satisfy the Savings Clause is not a jurisdictional decision thus such claims should be dismissed with prejudice).  Final judgment consistent with this Order shall issue.

---

[10] Mr. Fulks requests that if the Court rejects his claims, it make clear that any dismissal of a *Ford* claim is without prejudice.  The Court accepted Mr. Fulks' construction of his second claim, which disavowed reliance on *Ford*; thus the Court did not adjudicate a *Ford* claim in this action.  To the extent his second claim should have been construed as a *Ford* claim, it is dismissed without prejudice.

PA0030

**IT IS SO ORDERED.**


Date: 9/20/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Bob Daley
OFFICE OF THE UNITED STATES ATTORNEY
bob.daley@usdoj.gov

Kathleen Michelle Stoughton
OFFICE OF THE UNITED STATES ATTORNEY
kathleen.stoughton@usdoj.gov

Claudia Van Wyk
FEDERAL COMMUNITY DEFENDER OFFICE
claudia_vanwyk@fd.org

Joe Howard Vaughn
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
joe.vaughn@usdoj.gov

Peter Konrad Williams
Federal Community Defender Office
pete_williams@fd.org

PA0031

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHADRICK FULKS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-00033-JRS-MJD |
| | ) | |
| J. E. KRUEGER, | ) | |
| | ) | |
| Respondent. | ) | |

**FINAL JUDGMENT**

The Court now enters final judgment. Petitioner Chadrick Fulks' petition for a writ of

habeas corpus is denied and the action is dismissed with prejudice.

Date: 9/20/2019

Laura A. Briggs, Clerk

BY: _____
Deputy Clerk, U.S. District Court

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Bob Daley
OFFICE OF THE UNITED STATES ATTORNEY
bob.daley@usdoj.gov

Kathleen Michelle Stoughton
OFFICE OF THE UNITED STATES ATTORNEY
kathleen.stoughton@usdoj.gov

Claudia Van Wyk
FEDERAL COMMUNITY DEFENDER OFFICE
claudia_vanwyk@fd.org

PA0032

Joe Howard Vaughn
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
joe.vaughn@usdoj.gov

Peter Konrad Williams
Federal Community Defender Office
pete_williams@fd.org

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CHADRICK FULKS,                          )
                                         )
                    Petitioner,          )
                                         )
          v.                             )          No. 2:15-cv-00033-JRS-MJD
                                         )
J. E. KRUEGER,                           )
                                         )
                    Respondent.          )

**Order Denying Motion to Amend or Alter Judgment**

Petitioner Chadrick Fulks, a federal prisoner who has been sentenced to death, filed this

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, arguing that he is categorically

ineligible for the death penalty because he is intellectually disabled (or the functional equivalent).

On September 20, 2019, the Court denied Mr. Fulks' petition because his claims are barred by

28 U.S.C. § 2255(e). Dkts. 73 and 74. On October 17, 2019, Mr. Fulks filed a motion to alter or

amend judgment.

To receive relief under Rule 59(e), the moving party "must clearly establish (1) that the

court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded

entry of judgment." *Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761,

770 (7th Cir. 2013) (cleaned up). Mr. Fulks seeks relief based on alleged errors by the Court, but

he has failed to identify a manifest error of law or fact that warrants relief.

Mr. Fulks correctly asserts that *Atkins v. Virginia* prohibits the execution of intellectually

disabled persons. 536 U.S. 304, 321 (2002); *see* dkt. 75, ¶¶ 6−21 (Mr. Fulks' motion, discussing

*Atkins*). The Court's opinion denying Mr. Fulks' habeas petition recognized this holding. *See*, *e.g.,*

dkt. 73 at 10 ("[T]he Supreme Court held in *Atkins* that the Eighth Amendment forbids execution of

an individual who has an intellectual disability."). But some statements in the opinion suggested that

1

PA0034

post-trial evidence is irrelevant to an *Atkins* claim. *See id.* at 12 (contrasting *Atkins* with *Ford v. Wainwright*, 477 U.S. 399 (1986)). As Mr. Fulks points out, post-trial evidence *is* relevant to an *Atkins* claim. The Court's statements suggesting otherwise were meant to acknowledge what the Seventh Circuit recognized in *Webster*—that there are evidentiary differences for *Atkins* and *Ford* claims and whether they meet the Savings Clause. *See Webster v. Daniels*, 784 F.3d 1123, 1140 (7th Cir. 2015). In any event, the background principle that post-trial evidence is relevant to an *Atkins* claim does not impact the Court's conclusion that Mr. Fulks' claims are barred by § 2255(e) and do not meet the statute's Savings Clause.[1] *See* dkt. 73 at 9−29.

Mr. Fulks argues that the Court's conclusion was wrong for two reasons. *First*, he argues that § 2255(e) does not apply to his claims at all because he is challenging "the *execution* of his death sentence rather than its *imposition*." Dkt. 75 at 13. The Court addressed and rejected this argument in its order denying relief. Dkt. 73 at 14-16. Section 2255(e) applies to any claim for which a petitioner is "authorized to apply for relief pursuant to [§ 2255]." And § 2255 authorizes prisoners convicted in federal court to move to vacate or set aside their sentences "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or *is otherwise subject to collateral attack*." 28 U.S.C. § 2255(a) (emphasis added). Mr. Fulks' § 2241 petition seeks to vacate or set aside his death sentence, and he has failed to show that his challenge is something other than a collateral attack on that sentence. Even if he concedes that the

---

[1]    An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(e).

PA0035

sentence was valid when it was imposed, he argues the sentence is unconstitutional now. He therefore has not shown that application of § 2255(e) is a manifest error of law.

*Second*, Mr. Fulks argues that if he is subject to § 2255(e), he has met the Savings Clause because § 2255 "is inadequate or ineffective to test the legality of his detention." Dkt. 75 at 15−25. This argument is merely a replay of Mr. Fulks' pre-judgment briefs. And for the reasons stated in the Court's order, Mr. Fulks has not met the Savings Clause. *Davenport* does not apply because Mr. Fulks raises constitutional claims, not statutory ones. *In re Davenport*, 147 F.3d 605, 608 (7th Cir. 1998); *see Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016) (emphasizing that *Davenport* does not apply to constitutional claims). And *Webster* does not apply because Mr. Fulks' is not "the rare case where records that predate trial are found much later, despite diligence on the part of the defense, and where those records bear directly on the constitutionality of the death sentence." 784 F.3d at 1140 (distinguishing Webster's claims from the far-more-common *Atkins* claim, like Mr. Fulks', based on new evidence created after trial). Mr. Fulks' arguments for extending *Davenport* and *Webster* do not demonstrate that the Court committed a manifest error of law in declining to do so.

Accordingly, Mr. Fulks' motion to alter or amend judgment, dkt. [75], is **denied**.

**IT IS SO ORDERED.**

Date:   4/1/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

3

Distribution:

Cindy Jane Cho
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
cindy.cho@usdoj.gov

Bob Daley
OFFICE OF THE UNITED STATES ATTORNEY
bob.daley@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Kathleen Michelle Stoughton
OFFICE OF THE UNITED STATES ATTORNEY
kathleen.stoughton@usdoj.gov

Claudia Van Wyk
FEDERAL COMMUNITY DEFENDER OFFICE
claudia_vanwyk@fd.org

Peter Konrad Williams
Federal Community Defender Office
pete_williams@fd.org

PA0037

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing volume of Petitioner/Appellant's Appendix with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


/s/ *Peter Williams*
Peter Williams

Dated: October 21, 2020