No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**APPENDIX TO OPENING BRIEF OF APPELLANT
VOLUME II
PAGES PA0038-PA0299**

**<u>THIS IS A DEATH PENALTY CASE</u>**

Peter Williams
   *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

October 21, 2020

# INDEX TO APPENDIX

## Volume I – Short Appendix[1]

Certificate of Compliance ............................................................................ PA0001

Order Denying Petition for a Writ of Habeas Corpus, *United States v. Fulks*,
2:15-cv-33 (S.D. Ind. Sept. 20, 2019).......................................................... PA0002

Final Judgment, *United States v. Fulks*, 2:15-cv-33
(S.D. Ind. Sept. 20, 2019) ............................................................................ PA0032

Order Denying Motion to Amend or Alter Judgment, *United States v. Fulks*,
2:15-cv-33 (S.D. Ind. April 1, 2020) ............................................................ PA0034

## Volume II – Supplemental Appendix

Orders and Opinions

Direct Appeal Opinion, *United States v. Fulks*, 545 F.3d 410
(4th Cir. July 27, 2006) ................................................................................ PA0038

Order Denying Petition for Rehearing and Rehearing En Banc for Direct Appeal,
*United States v. Fulks*, 04-33 (4th Cir. Aug. 22, 2006) ................................ PA0070

Judgment, *United States v. Fulks,* 4:02-cr-992 (D.S.C. Aug. 20, 2010)
...................................................................................................................... PA0072

Opinion, *United States v. Fulks*, 875 F.Supp.2d 535 (D.S.C. Aug. 20,
2010) ............................................................................................................ PA0073

Order Reinstating Judgment, *United States v. Fulks,* 4:02-cr-992
(D.S.C. Aug. 20, 2010) ................................................................................ PA0172

---

[1] Consistent with Seventh Circuit Rule 30(a) and (b)(7), the short appendix has been bound with Petitioner/Appellant's opening brief, and the supplemental appendix has been separately bound and filed because it exceeds fifty pages.

Order on Motion for Clarification, *United States v. Fulks*,
4:02-cr-992 (D.S.C. Aug. 25, 2010) ........................................................... PA00173

Order Denying Motion to Alter or Amend, *United States v. Fulks,*
4:02-cr-992 (D.S.C. Jan. 13, 2011)............................................................. PA0174

Judgment, *United States v. Fulks*, 04-33, (4th Cir. June 26, 2012) .............. PA0204

Opinion, *United States v. Fulks*, 683 F.3d 512 (4th Cir. June 26, 2012)....... PA0205

Order Granting Authorization to File Successive §2255,
*United States v. Fulks*, 16-9, (4th Cir. June 27, 2016).................................. PA0219

Pleadings

Amended Petition for Writ of Habeas Corpus, *United States v. Fulks,*
2:15-cv-33 (S.D. Ind. March 8, 2019) ......................................................... PA0220

## **Volume III - Supplemental Appendix cont'd**

Expert Reports

Report of Natalie Novick-Brown, Ph.D. - Feb. 11, 2019 .............................. PA0300

Report of Julian Davies, M.D. - March 4, 2019 ........................................... PA0437

Report of Barry M. Crown, Ph.D. - March 6, 2019....................................... PA0470

Excerpts of Diagnostic Manuals

Excerpt from *Diagnostic and Statistical Manual of Mental Disorders*,
*5th Edition*, American Psychiatric Association (2013) ................................. PA0479

Excerpt from *Intellectual Disability: Definition, Classification, and Systems of Supports – 11th Edition*, American Association of Intellectual and Developmental Disabilities (2010)........................................................................................ PA0502

Excerpt from *User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports – 11th Edition*, American Association of Intellectual and Developmental Disabilities (2012) ............................................................... PA0520

malicious and thus qualifies as a strike under § 1915(g). This is but one example, and there may well be other situations where the circumstances would warrant treating as a strike a dismissal of an action filed by a prisoner who did not first exhaust his administrative remedies. Routine dismissals based solely on the fact that exhaustion has not occurred, however, do not qualify as strikes under § 1915(g).

### III.

Accordingly, for the foregoing reasons, we conclude that a routine dismissal of a prisoner's complaint for failure to exhaust administrative remedies does not qualify as a strike for purposes of the PLRA. We therefore grant Green's motion for leave to proceed without pre-payment of fees.

*MOTION GRANTED.*



**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Chadrick Evan FULKS, Defendant–**
**Appellant.**

**No. 04–33.**

United States Court of Appeals,
Fourth Circuit.

Argued May 23, 2006.

Decided July 27, 2006.

**Background:** Defendant was convicted in the United States District Court for the District of South Carolina, Joseph F. Anderson, Jr., Chief Judge, of carjacking and kidnapping resulting in the death of victim, and defendant appealed imposition of death sentence.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

(1) prosecution was not dilatory in discovering phone call defendant made to witness using witness's stolen phone card;

(2) defendant was not prejudiced by district court's admission of testimony of witnesses not included on prosecution's pretrial witness list;

(3) jurors were qualified to be empaneled for sentencing phase of defendant's capital murder case;

(4) defendant was not entitled to a new trial in penalty phase of capital murder proceedings based on a juror's nondisclosure that her husband was murdered just weeks after the couple was married;

(5) defendant did not have a constitutional right to the admission of testimony concerning polygraph examinations;

(6) victim impact testimony did not violate defendant's due process rights; and

(7) Federal Death Penalty Act (FDPA) was constitutional.

Affirmed.

Williams, Circuit Judge, concurred and filed opinion.

**1. Criminal Law ⚷1148**

Court of appeals would review for abuse of discretion district court's decision to permit the testimony in a capital case of witnesses not included on the prosecution's pretrial witness list. 18 U.S.C.A. § 3432.

**2. Criminal Law ⚷629.5(2)**

A witness not included on the prosecution's pretrial witness list should only be permitted to testify at trial in a capital case when the prosecution has demonstrat-

ed that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation and even then, if the defendant can demonstrate actual prejudice resulting from the lack of pretrial notice that the witness would testify, the trial court should preclude the witness from testifying unless a brief adjournment of the trial would cure the prejudice. 18 U.S.C.A. § 3432.

**3. Criminal Law ⊙629.5(1)**

Prosecution was not dilatory in discovering phone call defendant made to witness using witness's stolen phone card and a reasonable investigation would not have discovered the call, despite its failure to follow up on the calls made using the phone card, as required to allow prosecution to present testimony of after-discovered witnesses not included on pretrial witness list; the witness was a minor witness, who testified for only about five minutes concerning a matter entirely collateral to the main issues in the case, that her purse and cell phone were stolen from a vehicle in Ohio, the prosecution had no reason to believe that the witness had any useful information to offer, beyond the fact that the purse and cell phone had been stolen, and, because of the considerable distance between where the witness lived in Ohio and where defendant's trial was conducted, the prosecution made the decision to conduct a quick pre-testimony interview when witness and her father arrived in South Carolina for the trial. 18 U.S.C.A. § 3432.

**4. Criminal Law ⊙629.5(4)**

Capital murder defendant was not prejudiced by district court's admission of testimony of witnesses not included on prosecution's pretrial witness list concerning phone call defendant made to witness's home using her stolen phone card made during alleged crime spree; defendant was offered a three-day hiatus to prepare to meet the testimony, which was declined,

and defense lawyers were aware of the phone call given that defense investigator learned of the call when he traveled to meet with witness and e-mailed the defense team about the call. 18 U.S.C.A. § 3432.

**5. Criminal Law ⊙1152(2)**

An appellate court reviews for abuse of discretion the determination of whether a juror is excludable for cause.

**6. Jury ⊙108**

Where voir dire examination reveals that a juror will fail in good faith to consider the evidence of mitigating circumstances as the instructions require him to do, he is excludable for cause.

**7. Jury ⊙108**

Juror was qualified to be empaneled for sentencing phase of defendant's capital murder case; although juror initially advised defense counsel that he would automatically impose the death penalty on any defendant who committed a knowing and intentional murder, he also repeatedly asserted that he would consider mitigating evidence.

**8. Jury ⊙108**

Juror was qualified to be empaneled for sentencing phase of defendant's capital murder case; although juror first asserted that she would impose the death penalty for any knowing and intentional killing, she then said "it just depends on what the facts are" and she ultimately assured the court that she would impose the death penalty if warranted by the facts, "but not just because he killed two people."

**9. Jury ⊙108**

Juror was qualified to be empaneled for sentencing phase of defendant's capital murder case; juror indicated that she would "listen" to mitigating evidence and although she equivocated on whether she

could hold true to a position opposed by her fellow jurors, she later indicated she could hold firm to an unpopular position if entirely convinced of its correctness.

**10. Criminal Law ☞1156(1)**

An appellate court reviews a district court's denial of a motion for a new trial for abuse of discretion.

**11. Criminal Law ☞923(2)**

Defendant was not entitled to a new trial in penalty phase of capital murder proceedings based on a juror's nondisclosure that her husband was murdered just weeks after the couple was married; had the juror disclosed her husband's murder, the district court concluded that it would not have excluded her for cause and at post-trial hearing, juror explained that she honestly believed she had disclosed her husband's murder, which the district court believed.

**12. Jury ☞85, 97(1)**

A failure to excuse a prospective juror for cause constitutes an abuse of discretion in only two situations: (1) where a per se rule of disqualification applies, and (2) where the court demonstrates a clear disregard for the actual bias of the juror.

**13. Jury ☞97(2)**

Prospective juror was qualified to be empaneled for sentencing phase of defendant's capital murder case; although juror indicated on her questionnaire that he sister had been a victim of sexual assault, when questioned on voir dire, juror assured the court that she could be fair, notwithstanding her sister's experience.

**14. Jury ☞97(1)**

Juror was qualified to be empaneled for sentencing phase of defendant's capital murder case; although juror and her daughter were approximately the same ages as the murder victims and although

she was initially unsure that she could be neutral, juror subsequently asserted that she could be fair.

**15. Criminal Law ☞1153(1)**

An appellate court reviews for abuse of discretion a trial court's rulings concerning the admissibility of evidence.

**16. Sentencing and Punishment ☞1757**

During capital sentencing proceedings, defendant did not have a constitutional right to the admission of testimony concerning three polygraph examinations administered to defendant prior to his trial indicating that defendant's statements to the FBI had been truthful and that he neither knew of nor participated in the murders of victims.

**17. Constitutional Law ☞270(2)**
     **Sentencing and Punishment ☞1763**

Victim impact testimony, consisting of a letter read by victim's sister written by the victim to her sister concerning their past abuse by their father and her desire to leave her abusive husband, did not violate defendant's due process rights during sentencing phase of defendant's capital trial; although hearsay, the letter did not bear the hallmarks of unreliability and to the contrary, it was written in confidence to a close family member and it was evidently not written with ulterior motives, and, although the letter was written with much emotion, that fact cut towards the letter's reliability.  U.S.C.A. Const.Amend. 5.

**18. Sentencing and Punishment ☞1626**

Federal Death Penalty Act (FDPA) was not rendered unconstitutional by virtue of its withholding of the protections of the Federal Rules of Evidence from a defendant in a capital sentencing trial and providing only that a district court may exclude evidence if its probative value is outweighed by the danger of creating un-

fair prejudice, confusing the issues, or misleading the jury. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3593(c).

**19. Criminal Law ☞1139**

An appellate court reviews de novo a district court's ruling concerning the constitutionality of a statute.

———

**ARGUED:** John Henry Blume, III, Cornell Law School, Ithaca, New York, for Appellant. Scott Newton Schools, Assistant United States Attorney, Executive Office For U.S. Attorneys, Washington, D.C., for Appellee. **ON BRIEF:** Keir M. Weyble, Blume & Weyble, L.L.C., Columbia, South Carolina; William F. Nettles, IV, Assistant Federal Public Defender, Office Of The Federal Public Defender, Florence, South Carolina, for Appellant. Reginald I. Lloyd, United States Attorney, Jonathan S. Gasser, Assistant United States Attorney, John C. Duane, Assistant United States Attorney, C. Todd Hagins, Assistant United States Attorney, Office of the United States Attorney, Columbia, South Carolina, for Appellee.

Before WIDENER, WILLIAMS, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Widener joined. Judge Williams wrote a concurring opinion.

## OPINION

KING, Circuit Judge.

Chadrick Evan Fulks appeals from the death sentence imposed on him in the District of South Carolina on his federal convictions for carjacking and kidnapping resulting in the death of Alice Donovan in 2002. By this appeal, Fulks makes seven contentions of error, each of which relate to his 2004 capital sentencing trial in Columbia: (1) the district court erroneously permitted the prosecution to present testimony from two witnesses not included on its pretrial witness list; (2) the court abused its discretion in qualifying three jurors who were unconstitutionally prone to impose the death penalty; (3) the court abused its discretion in denying Fulks a new trial on the basis of a juror's failure to disclose during voir dire that her first husband had been murdered; (4) the court abused its discretion in qualifying two jurors whose life experiences rendered them incapable of impartially deciding Fulks's case; (5) the court abused its discretion in excluding testimony concerning three polygraph examinations of Fulks; (6) the court abused its discretion in permitting Donovan's sister to read to the jury a 1990 letter that Donovan had written her; and (7) the court erred in concluding that the relaxed evidentiary standard applicable to capital sentencing proceedings is constitutional. As explained below, we reject these contentions and affirm.

### I.

#### A.

Fulks, who grew up in the tri-state area around Huntington, West Virginia, began dating an exotic dancer named Veronica Evans in April 2002. Shortly thereafter, Fulks, who was then twenty-five years old, began living with Evans and her three-year-old son Miles in the eastern Kentucky community of Lewisburg. On June 11, 2002, Fulks and Evans were married. Fulks supported his new family in the same way he had supported himself for years—by breaking into cars and stealing. And as he had with other women, Fulks often became violent with Evans, sometimes beating her severely and assaulting her sexually.

On August 25, 2002, Fulks directed Evans to use a stolen credit card to buy a necklace at a Wal–Mart in Madisonville, Kentucky. Upon entering the store, Evans reported to police that Fulks was in the parking lot with a gun and that she was afraid he would kill her. The police responded and searched Evans's car, discovering, among other things, stolen credit cards and a pistol. The officers subsequently arrested Evans and Fulks and transported them to the Hopkins County Detention Center (the "HCDC"). Three-year-old Miles was placed in foster care. On August 27, 2002, Evans agreed to cooperate with the government and was released from the detention center. On the basis of evidence seized from their home, Fulks was ultimately charged with twelve counts of credit card fraud in Hopkins County, Kentucky.

Branden Basham had been housed at the HCDC on bad check charges for over a year when Fulks arrived in late August 2002. According to guards at the prison, Basham was disruptive and annoying, often pestering his fellow inmates. In order to protect him from other prisoners, Basham was frequently reassigned cell mates, and, in mid-October 2002, he was placed in a cell with Fulks. On November 3, 2002, after about two months in custody, the Kentucky State Police served Fulks with an indictment charging him with first degree abuse of a child aged twelve years or younger (Miles). The next evening, at approximately 6:30 p.m., a jailer released Fulks and Basham, at Basham's request, into an outdoor recreation area. The jailer became diverted administering medication to other inmates, and when she returned at about 8:00 p.m. to check on Fulks and Basham, they were gone. They had escaped from the HCDC through the ceiling of the recreation area by using a makeshift rope made of blankets and sheets.

By the following day, November 5, 2002, Fulks and Basham had made their way on foot to the residence of James Hawkins, about eight to twelve miles from the HCDC. Basham approached the residence and, after using the phone, persuaded Hawkins to drive him and Fulks to a nearby convenience store. Shortly after departing from the house, Hawkins agreed to drive Fulks and Basham to their car, which they claimed to be located about forty miles away in Robards, Kentucky. At some point, Basham pulled a knife on Hawkins, and Fulks ordered Hawkins to pull to the side of the highway so that Fulks could drive. Soon thereafter, Fulks stopped the truck on a remote state road, intending to abandon Hawkins. Basham started to tie Hawkins to a tree, but Fulks, dissatisfied with Basham's effort, soon took over the job. Once Fulks was convinced that Hawkins would be unable to escape, he and Basham departed in Hawkins's truck. Hawkins freed himself some fifteen hours later, hailed a passing motorist, and called the police. According to Hawkins's testimony at trial, although Basham held him at knifepoint throughout the carjacking incident, Fulks remained in charge, with Basham merely following Fulks's orders.

After leaving Hawkins, Fulks and Basham drove to Portage, Indiana, where, on November 6, 2002, they abandoned Hawkins's truck at a hotel and proceeded on foot to a trailer shared by Tina Severance and Andrea Roddy. Fulks had met Severance at the Westville (Indiana) Correctional Institute in 2001, while he was serving time there and she was working as a correctional officer. After a few hours in the trailer, Fulks and Basham became very nervous, and the four of them (Fulks, Basham, Severance, and Roddy) travelled in Severance's van to the Sands Motel in northern Indiana, where they spent the next two nights. At some point while at

the Sands Motel, Fulks told Severance that he had escaped from prison because he feared a lengthy prison sentence on the pending child abuse charges. During their second night at the Sands Motel, Fulks asked Severance if she knew where they could obtain firearms. She replied that a friend, Robert Talsma, kept firearms at his home in nearby Michigan City, Indiana. On the morning of November 8, 2002, in accordance with a preconceived plan, Severance and Roddy lured Talsma away while Fulks and Basham broke into his home and stole several firearms, as well as a ring and some checks.

The four of them then drove Severance's van to Sturgis, Michigan, where they rented a motel room. Basham and Roddy spent the night of November 8, 2002, at the motel, while Fulks and Severance spent that night in Goshen, Indiana, smoking marijuana and methamphetamine with Fulks's brother, Ronnie Fulks. The next day, Fulks and Severance returned to the Sturgis motel to find Basham crouched on the floor holding a gun. Apparently convinced that the authorities had caught up with them, Basham was highly agitated, repeatedly asserting that he was going to shoot a police officer. He eventually calmed down, and the four then drove to the Indiana home of Ronnie Fulks, where they spent the night.

On November 10, 2002, Fulks, Basham, Severance, and Roddy, with Fulks driving Severance's van, travelled to Piketon, Ohio, where they checked into a Town and Country Motel. They then drove to a nearby Wal–Mart, where Basham wrote bad checks for items that Roddy later returned for cash. Also on November 10, 2002, at a K–Mart in Piketon, Ohio, Fulks met a young woman with a butterfly tattoo (later determined to be Heather Jacobi) with whom he used drugs. On that same date, Fulks stole a purse and cell phone

belonging to nineteen-year-old Amy Ward from a vehicle parked at a Wal–Mart in Waverly, Ohio. On the following day, Fulks, Basham, Severance, and Roddy drove to Kenova, West Virginia, and rented a room at the Hollywood Motel. Fulks and Basham then left the motel, not to return until the early morning hours of November 12, 2002.

According to statements Fulks made to the FBI in 2003, after he and Basham left the Hollywood Motel on November 11, 2002, they smoked methamphetamine and then drove to the Barboursville Mall, near Huntington, West Virginia, intending to break into cars and steal purses. When they arrived at the mall, they split up. The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name. In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns. After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car. They then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to find a place to rape Burns. Fulks then followed Basham in Severance's van to a secluded area by the Ohio River. Fulks parked some distance from Burns's car, and in such a way that his view of the passenger side of the car was obstructed. He observed Basham exit the driver's side of the car and walk around to the passenger's side. He saw nothing else until about twenty minutes later when Basham—alone—drove Burns's car to where Fulks was parked and informed Fulks that he wanted to burn the vehicle in order to remove any fingerprints. After buying gasoline, Basham set fire to Burns's car on

a rural road near Lavalette, West Virginia, and he and Fulks returned to the Kenova motel. From that point forward, Basham wore, on a chain around his neck, a heart-shaped ring that was later determined to belong to Burns. Although both Fulks and Basham have admitted that Burns is dead, her body has never been recovered.[1]

On November 12, 2002, Fulks, Basham, Severance, and Roddy drove the van to Little River, South Carolina, where Fulks had lived during the late 1990s. During their trip to Little River, Basham repeatedly taunted Severance by asking whether she wanted to go "swimming" in the Ohio River. Fulks eventually ordered Basham to stop teasing Severance, and Basham complied. When the four of them arrived at Little River, they checked in at the Lake Shore Motel. Fulks and Basham spent the following day, November 13, 2002, breaking into cars and stealing purses. On November 14, the four left Little River for the Beach Walk Hotel in Myrtle Beach, South Carolina. After checking in, Fulks and Basham left the hotel in Severance's van.

At around 2:00 p.m. on November 14, 2002, Carl Jordan stumbled upon Fulks and Basham burglarizing his son's residence outside Conway, South Carolina. According to Jordan, both Fulks and Basham fired gunshots at him, with Fulks shooting out the back window of Jordan's truck.[2] Jordan then attempted to retreat in his truck, with Fulks and Basham following in Severance's van. Fulks and Basham eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck. They then made their way to a Wal–Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car.

At 2:37 p.m. that same day, a Wal–Mart surveillance camera recorded a blue BMW driven by Alice Donovan enter the Wal–Mart parking lot, with Fulks and Basham following closely behind. As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW. Both vehicles then began moving again, travelling outside the range of the cameras. Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat. After leaving the Wal–Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines. At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan. According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so. They then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities. Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car. Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so. Basham then led Donovan into the woods and out of Fulks's sight. He returned

---

1. In connection with Burns's death, Basham and Fulks each received sentences of life imprisonment in the Southern District of West Virginia, after pleading guilty to the federal offense of carjacking resulting in death, in contravention of 18 U.S.C. § 2119.

2. A defense expert testified at trial that the trajectory of the bullet that shattered the window of Jordan's truck belied Jordan's belief that Fulks had fired the shot.

twenty minutes later, alone. As with Burns, both Fulks and Basham have admitted that Donovan was killed, but her body has never been found.

Fulks and Basham then returned to the Beach Walk Hotel in Myrtle Beach, where they informed Severance and Roddy that the police were in possession of the van, and that Fulks and Basham needed to return to West Virginia alone. According to Fulks, it was on their return journey to West Virginia that Basham first informed him that he had killed Burns and Donovan. On November 15, 2002, Fulks and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a friend of Fulks. McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did.

Two days after arriving at McGuffin's home, on November 17, 2002, Fulks and Basham drove to the Ashland Mall in nearby Ashland, Kentucky, where they planned to break into cars. At around 7:30 p.m., in the Ashland Mall parking lot, Basham attempted to carjack Deanna Francis and her fifteen-year-old daughter. After Francis reported the incident, a police officer spotted Basham and began to pursue him on foot. Basham initially eluded the officer by running behind some railcars, but he was apprehended at around 9:00 p.m. that evening, hiding across the railroad tracks in the Ohio River.

Fulks returned to McGuffin's home late that same evening and was there when the television stations reported Basham's arrest. The following day, November 18,

2002, Fulks left Huntington in Donovan's BMW for his brother's home in Goshen, Indiana. That evening, an Ohio State Trooper, having observed the BMW and ascertained that it was stolen, attempted to apprehend Fulks at a rest area near Marion, Ohio. Following a highway chase reaching speeds of 130 miles per hour, Fulks narrowly escaped. He arrived at his brother's home in Indiana on the evening of November 19, 2002, and, on the morning of November 20, 2002, hid the BMW in a barn near Bristol, Indiana. Police officers had earlier set up a surveillance operation at Fulks's brother's home and, on the afternoon of November 20, 2002, after a brief foot chase, Fulks was finally apprehended.

### B.

#### 1.

Fulks and Basham were initially indicted in the District of South Carolina on December 17, 2002. On April 23, 2003, the grand jury returned a superseding indictment charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the death penalty on the first two counts: carjacking resulting in Donovan's death (18 U.S.C. § 2119), and kidnapping resulting in Donovan's death (18 U.S.C. § 3571).[3]

On September 12, 2003, the prosecution notified Fulks and Basham of its intention to seek the death penalty against them on the carjacking and kidnapping counts. Thereafter, on January 29, 2004, the dis-

---

**3.** In addition to the carjacking and kidnapping offenses, Fulks and Basham were indicted for the following offenses: (1) interstate transportation of a stolen motor vehicle (18 U.S.C. § 2312); (2) conspiracy to commit numerous offenses, including carjacking and kidnapping (18 U.S.C. § 371); (3) conspiracy

to use firearms in furtherance of a crime of violence (18 U.S.C. § 924(*o*)); (4) use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)); (5) being felons in possession of firearms (18 U.S.C. § 922(g)(1)); and (6) possession of stolen firearms (18 U.S.C. § 922(j)).

trict court granted Fulks and Basham a trial severance. On March 5, 2004, the court issued an order denying, inter alia, Fulks's motion to strike the death penalty on the basis that the Federal Death Penalty Act, in rendering the Federal Rules of Evidence inapplicable to capital sentencing proceedings, contravened constitutional due process.

On May 4, 2004, Fulks tendered pleas of guilty to all eight counts in the superseding indictment. With regard to the carjacking and kidnapping counts on which the prosecution was seeking the death penalty, Fulks admitted in the plea colloquy to raping Donovan but disclaimed any knowledge of or participation in her murder. The substance of his admission tracked his 2003 statements to the FBI, in which he generally admitted his involvement in the crime spree but claimed that Basham had killed both Burns and Donovan without his knowledge. The district court accepted Fulks's guilty pleas on May 7, 2004.

On May 10, 2004, the prosecution, as required by 18 U.S.C. § 3432, provided Fulks with a list of the names and addresses of 181 potential trial witnesses. Among those potential witnesses was Amy Ward, whose purse and cell phone Fulks had stolen on November 10, 2002, in Waverly, Ohio. On May 21, 2004, defense investigator Pete Skidmore met with Amy Ward and her mother, Donna Ward, seeking to determine whether Amy was the young woman with the butterfly tattoo with whom Fulks had used drugs during the escapade. At this meeting, Donna advised Skidmore that she had received a phone call on November 17, 2002, from a man purportedly seeking to meet with Amy at a local hardware store that evening at 10:30 p.m. to discuss her recent job application with the store. Donna, knowing that Amy had submitted no such job application, became suspicious, but when she attempted to ascertain the caller's identity, he hung up. Donna also told Skidmore at the May 21, 2004 meeting that she believed the caller to be the same person who had stolen Amy's purse and cell phone. Although Skidmore claims he notified Fulks's lawyers of the November 17, 2002 phone call to Donna Ward, they have no such recollection.

Jury selection was conducted in the district court from May 10 to May 21, 2004. As relevant here, Fulks challenged for cause venirepersons Richard Goehring, Lisa Harvey, and Sylvia Allison on the ground that the strength of their beliefs in favor of the death penalty rendered each of them unwilling to consider any mitigating evidence that he would offer. Fulks also challenged for cause venirepersons Joni Novinger and Elizabeth Plyler, contending that their personal experiences rendered them incapable of impartially serving on his jury. Specifically, Fulks asserted that Novinger's ability to be impartial was impaired by the fact that her sister had been the victim of a sexual assault, and that Plyler's impartiality was impaired because she and her daughter were roughly the same ages (respectively) that Donovan and Burns had been when they were killed. The district court rejected each of these challenges and qualified these five venirepersons over Fulks's objections.

2.

Fulks's sentencing trial commenced on June 1, 2004, with the prosecution's opening statement. In its opening, the prosecution, anticipating Fulks's strategy of casting Basham as the leader of their crime spree and the actual murderer, forecast the evidence it would introduce to demonstrate that Fulks played an active, if not leading, role in the entire criminal enterprise. Among other things, the pros-

ecution advised the jury that it would hear evidence that the crime spree touched on places with which Fulks—not Basham—was familiar, that shortly after their prison escape Fulks had asked Severance where he could obtain guns, that Fulks had tied Hawkins to the tree where he was abandoned, and that both Fulks and Basham had fired at Jordan when he discovered them burglarizing his son's residence.

In response, defense counsel countered in its opening statement with a forecast of the evidence it planned to present, suggesting that Basham—rather than Fulks—was the leader, instigator, and killer. For example, defense counsel advised the jury it would learn that Basham had lured Hawkins from his home and held him at knifepoint, had carried a gun throughout the crime spree, had expressed his intention of killing a police officer while in the Sturgis motel room, had asked Severance whether she wanted to go "swimming" in the Ohio River the day after Burns was murdered, and had worn Burns's ring around his neck. In addition to the evidence depicting Basham as the leader, defense counsel outlined its case for mitigation, explaining that the jury would hear that Fulks was a victim of Fetal Alcohol Spectrum Disorder, and had been raised in abject poverty by alcoholic, abusive parents who neglected his education, encouraged criminality, and failed to provide him with the basic necessities of life. Finally, in tying its two main points together, defense counsel asserted that once the jury learned more of Fulks's life, background, and criminal history, it would understand that the murders of Donovan and Burns were not crimes Fulks would have committed on his own.

On June 2, 2004, prior to the commencement of the prosecution's case-in-chief, the court granted the prosecution's motion to exclude testimony concerning three pri-

vately administered polygraph examinations, the results of which indicated that Fulks had truthfully disclaimed knowledge of, or participation in, the murders of Burns and Donovan. The prosecution then presented testimony from the first of approximately a hundred witnesses that it called during its three-week presentation of evidence.

Amy Ward, who was scheduled to testify on June 11, 2004, arrived in South Carolina on June 10, accompanied by her father Byron Ward. Just prior to Amy's testimony, Byron, while engaged in small talk with FBI Agent Jeff Bruning, mentioned the November 17, 2002 phone call his wife Donna had received regarding Amy's purported job application at the hardware store. Agent Bruning soon began investigating whether the call could be traced to Fulks, and, with the assistance of the Sprint telephone company, discovered that the phone call had been placed using a prepaid phone card found in Fulks's possession at his arrest. With further investigation, it was established that the call had been placed at 8:38 p.m. on November 17, 2002. Because Basham was hiding from the police in the Ohio River at that very moment, the timing of the call appeared to conclusively establish that Fulks, acting alone, had placed the call. On June 17, 2004, the court ruled that Donna Ward and Agent Bruning could testify regarding the call even though they had not been included on the prosecution's pre-trial witness list. The court then offered Fulks a three-day trial hiatus so that he could prepare to meet their testimony, but Fulks's counsel declined the offer, stating that a three-day recess would be useless at that point in the trial.

The prosecution's final witness, presented on June 22, 2004, was Donovan's sister Judy Ezell. Ezell, a victim impact witness, primarily testified concerning the

sexual abuse she and Donovan had suffered as children at the hands of their father. Over Fulks's objection, the court permitted Ezell to read to the jury a letter Donovan had written to her, congratulating her on confronting their father about the abuse and explaining that Donovan had decided to leave her abusive husband and start a new life.

Fulks presented testimony to the jury from June 22 to June 25, 2002. That testimony consisted primarily of mitigating evidence, detailing Fulks's miserable childhood as well as his asserted mental deficiencies. Fulks also presented the testimony of Heather Jacobi and Pete Skidmore, through which Fulks attempted to explain that, by his November 17, 2002 call to Donna Ward, he was not trying to lure a new victim (Amy Ward), but rather was attempting to locate the young woman with the butterfly tattoo with whom he had used drugs. Jacobi, the young woman with the butterfly tattoo, testified that she had met Fulks in November 2002 at a K–Mart parking lot in Portsmouth, Ohio, a city about thirty miles from Waverly, Ohio, where Fulks, on November 10, 2002, had stolen Amy Ward's purse and phone from her car. Skidmore's testimony served largely to corroborate what Jacobi had said.

The parties delivered their closing arguments to the jury on June 29, 2004. On the following day, the jury returned a unanimous verdict, recommending that Fulks be sentenced to death on both the carjacking and kidnapping counts.

### 3.

Shortly after the verdict was announced, defense counsel first learned—by virtue of a July 1, 2004 article on Fulks's trial in the Myrtle Beach *Sun News*—that juror Allison's husband had been murdered in 1971, six weeks after the couple had been mar-

ried and while she was pregnant with their child. Prior to jury selection, Allison, along with all other prospective jurors, was required to complete a written juror questionnaire. As relevant here, Allison left blank Question 42, which inquired into whether she or any close relatives had been a crime victim.

On July 9, 2004, Fulks moved for a new trial on the basis of Allison's failure to disclose her husband's murder. On July 16, 2004, the district court conducted a hearing to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias. At the hearing, Allison testified that her failure to answer Question 42 was inadvertent. She asserted that her selection for the jury surprised her and that she had hoped her husband's murder would lead to her being dismissed from the venire. When asked by the court whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded, "None at all." J.A. 3046.

On December 20, 2004, the district court denied Fulks's motion for a new trial and imposed sentence: death on the kidnapping count, a separate sentence of death on the carjacking count, and a total of 744 months in prison on the remaining six counts, to run consecutively to the two death sentences. Fulks has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

### II.

By this appeal, Fulks makes seven contentions: (1) the district court committed reversible error in permitting the prosecution to present the testimony of Amy Ward and Agent Bruning despite its failure to include them on the pretrial witness list

furnished to Fulks; (2) the court abused its discretion in qualifying jurors Goehring, Harvey, and Allison, each of whom Fulks asserts were unconstitutionally prone to impose the death penalty; (3) the court abused its discretion in denying Fulks a new trial on the basis of juror Allison's failure to disclose her husband's murder; (4) the court abused its discretion in qualifying jurors Novinger and Plyer, whose personal experiences assertedly rendered them biased against him; (5) the court abused its discretion in excluding evidence regarding the results of three polygraph examinations of Fulks, which indicated that Fulks had truthfully disclaimed knowledge of and participation in the murders of Burns and Donovan; (6) the court abused its discretion in permitting Donovan's sister Judy Ezell to read to the jury the 1990 letter Donovan had written to her concerning the abuse she had suffered at the hands of her father and first husband; and (7) the court erred in upholding the constitutionality of the relaxed evidentiary standard applicable to capital sentencing proceedings. We assess each of these contentions in turn.[4]

### A.

**[1]** Fulks first contends that the district court committed reversible error in allowing the prosecution to present the trial testimony of Donna Ward and Agent Bruning, neither of whom were included on the pretrial witness list it provided to Fulks pursuant to 18 U.S.C. § 3432. *See United States v. Fulks*, CR–02–992 (D.S.C. June 23, 2004). Although no court has yet determined the standard of appellate review applicable to a trial court's decision to permit the testimony in a capital case of a witness not included on the prosecution's pretrial witness list, decisions regarding whether a witness should be allowed to testify are generally reviewed for abuse of discretion. *See Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 188–89 (4th Cir.1994) (observing that decision to allow witness to testify even though his identity had not been revealed before trial reviewed for abuse of discretion); *see also United States v. Moreland*, 437 F.3d 424, 430 (4th Cir.2006) (noting that decision to allow expert testimony is reviewed for abuse of discretion); *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir.2002) (observing that restriction on cross-examination is reviewed for abuse of discretion); *United States v. Montgomery*, 262 F.3d 233, 244 (4th Cir.2001) (noting that refusal to allow testimony from witness who violates sequestration order is reviewed for abuse of discretion). We see no reason to apply a different standard of

---

**4.** In addition to analyzing each of Fulks's appellate contentions, we are obliged to ''review the entire record'' and consider two issues not raised by him: (1) whether his sentence ''was imposed under the influence of passion, prejudice, or any other arbitrary factor;'' and (2) whether the evidence supports the jury's ''special finding of the existence of an aggravating factor required to be considered under section 3592.'' *See* 18 U.S.C. § 3595. Accordingly, we have reviewed the entire record in this case, including ''the information submitted during the sentencing hearing[,] . . . the procedures employed in the sentencing hearing [,] and . . . the special findings returned under section 3593(d).''

*See* § 3595(b). On the basis of such review, we conclude that Fulks's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Indeed, the record reflects that the trial court conducted the proceedings in an exemplary manner, maintaining decorum and ensuring fairness throughout. And we similarly conclude that the evidence supports the jury's special finding that Donovan's death, or the injury that caused her death, occurred during Fulks's ''commission or attempted commission of, or during his immediate flight from[ ] his commission of[,] a kidnapping.'' *See* J.A. 2960; *see also* § 3592(c)(1).

review in this case, especially since any error of law in the district court's application of § 3432 would constitute an abuse of discretion. *See United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir.2005) (observing that, "[b]y definition, a court abuses its discretion when it makes an error of law" (internal quotation marks omitted)).

### 1.

Pursuant to § 3432 of Title 18, the prosecution was obliged to furnish Fulks with a witness list at least three days before his sentencing trial began. More specifically, § 3432 provides:

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.[5]

As the Supreme Court explained many years ago in its leading case on this provision, the purpose of § 3432 is "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence." *Logan v. United States*, 144 U.S. 263, 304, 12 S.Ct. 617, 36 L.Ed. 429 (1892). In other words, § 3432 is designed to prevent trial by ambush where a defendant's life is at stake.

Fulks first asserts that, in a capital sentencing trial, § 3432 categorically precludes the testimony of any witness not included on the prosecution's pretrial list and that permitting such testimony constitutes per se reversible error. In support of this proposition, Fulks relies on our decision in *Hall v. United States*, where we observed that "[p]rovision for [the] capital list is mandatory, and failure to provide it in a capital case is ordinarily reversible error." 410 F.2d 653, 660 (4th Cir. 1969); *see also United States v. Lee*, 374 F.3d 637, 651 (8th Cir.2004) (citing *Hall* for same proposition); *United States v. Crowell*, 442 F.2d 346, 348 (5th Cir.1971) (concluding that failure to provide witness list is "plain error"); *Amsler v. United States*, 381 F.2d 37, 45 (9th Cir.1967) (same). In this case, however, the prosecution did not fail to timely provide Fulks with a pretrial witness list; indeed, it provided Fulks with the list of witnesses a full three weeks prior to trial. Instead, the prosecution sought to present the testimony of two witnesses it discovered only after it had provided Fulks with the witness list and after the deadline for providing the list had expired. Whether the prosecution should be permitted to present the testimony of these after-discovered witnesses is a question on which § 3432 is silent.

Although the Supreme Court has not decided the issue, in *Logan* it left open the possibility that "particular witnesses, afterwards coming to the knowledge of the government, or becoming necessary by reason of unexpected developments at the trial, might be permitted, on special reasons shown, and at the discretion of the

---

**5.** As § 3432 makes clear, the prosecution is not required to provide the list if the court finds that provision of the list would endanger any person. And the Supreme Court has recognized that § 3432 does not require the prosecution to include rebuttal witnesses on the list. *See Goldsby v. United States*, 160

U.S. 70, 76, 16 S.Ct. 216, 40 L.Ed. 343 (1895). Neither of these exceptions applies here. The court made no finding on endangerment, and the prosecution presented the testimony of Donna Ward and Agent Bruning during its case-in-chief.

court, to testify in the case." 144 U.S. at 306, 12 S.Ct. 617. In the years following *Logan*, virtually every court to have directly addressed the question of after-discovered witnesses has determined that § 3432 does not categorically preclude such witnesses from testifying at trial. *See United States v. Greene,* 497 F.2d 1068, 1082 (7th Cir.1974); *United States v. Rosenberg,* 195 F.2d 583, 599–600 (2d Cir.1952); *United States v. Fernandez,* 172 F.Supp.2d 1265, 1279–80 (C.D.Cal.2001); *United States v. Gregory,* 266 F.Supp. 484, 487 (D.D.C. 1967).[6]

We agree with the proposition that § 3432 imposes no per se bar against testimony from witnesses discovered after the prosecution's witness list is due. That witnesses are sometimes discovered in the midst of a trial, even after the most diligent pretrial investigation, is simply a reality of the litigation process. And to construe § 3432 to categorically preclude the testimony of such witnesses in capital trials would unnecessarily subvert the truth-seeking function of criminal proceedings, by precluding the introduction at trial of material evidence.

That said, it is beyond question that permitting the prosecution to present witnesses not included on the pretrial witness list deprives the defendant of the notice which § 3432 is designed to provide. Thus, as an initial matter, the prosecution should not be entitled to present an after-discovered trial witness unless it was without fault in failing to discover the witness prior to the expiration of the deadline established in § 3432. This means that the prosecution may not present a trial witness who was not included on its witness list unless its failure to list the witness was a good faith omission. *See Rosenberg,* 195 F.2d at 599–600 (requiring demonstration that prosecution furnished pretrial witness list in good faith before permitting presentation at trial of after-discovered witness); *see also Greene,* 497 F.2d at 1082 (citing *Rosenberg* for same proposition). This proposition also means that the prosecution may not present an after-discovered witness at trial if its failure to discover the witness prior to the expiration of the deadline established in § 3432 was due to a lack of reasonable diligence in conducting its pretrial investigation. *See Fernandez,* 172 F.Supp.2d at 1280 ("Because of the societal interest in ensuring that the death penalty is imposed only as a result of the most reliable and fair procedures our system can offer, § 3432 does not excuse sloppiness or negligence on the part of the government."); *Gregory,* 266 F.Supp. at 487 (requiring showing of diligence and good faith before permitting presentation of after-discovered witness).

In assessing this contention, we are mindful as well of the purpose which § 3432 seeks to achieve: "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence." *Logan,* 144 U.S. at 304, 12 S.Ct. 617; *see also Hall,* 410 F.2d at 661 (observing that purpose of § 3432 is to prevent surprise and provide defendant with "opportunity to prepare to examine witnesses and to meet their testimony"). And we recognize that, in certain situations, permitting a trial witness not included on the prosecution's witness list to testify against the defendant will undermine this statutory purpose, even when the prosecution is not at fault in failing to

---

**6.** The only contrary decision appears to be *United States v. Neverson,* 12 D.C. (1 Mackey) 152 (1880), where the court interpreted § 3432 "literally" to preclude any witness not on the witness list from testifying at trial.

Importantly, that decision was implicitly abrogated thirteen years later in *United States v. Schneider,* 21 D.C. (Tuck. & Cl.) 381, 412 (1893).

include the witness on its list. Thus, if a defendant can demonstrate that permitting an after-discovered witness to testify would cause him "actual prejudice" in the form of unfair surprise, a trial court should first consider whether a brief adjournment to allow the defendant to meet the witness's testimony would eliminate the prejudice caused by the surprise. *United States v. Tipton,* 90 F.3d 861, 889 (4th Cir.1996); *see also Rosenberg,* 195 F.2d at 600 (discussing possibility of adjournment upon showing of surprise). Where such a trial adjournment would fail to cure the prejudice, the court should preclude the witness from testifying. *See Greene,* 497 F.2d at 1082 (permitting after-discovered witness to testify where defendant could not show prejudice); *cf. Tipton,* 90 F.3d at 889 (concluding that failure to include addresses of witnesses does not mandate reversal absent showing of prejudice); *Hall,* 410 F.2d at 661 (allowing trial testimony of witnesses not included on list where defendant had knowledge they would testify). In so ruling, we emphasize that the focus of the prejudice inquiry is not the extent to which the after-discovered witness's *testimony* would be damaging to the defendant's case; rather, the prejudice must result from the *lack of notice* that the witness would testify.

[2] In sum, a witness not included on the prosecution's § 3432 pretrial witness list should only be permitted to testify at trial in a capital case when the prosecution has demonstrated that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation. Even then, if the defendant can demonstrate actual prejudice resulting from the lack of pretrial notice that the witness would testify, the trial court should preclude the witness from testifying unless a brief adjournment of the trial would cure the prejudice. With these principles in mind, we turn to the contention that the district court erroneously permitted Donna Ward and Agent Bruning to testify for the prosecution at Fulks's sentencing trial.

### 2.

First of all, Fulks does not assert that the prosecution's failure to include Donna Ward and Agent Bruning on its witness list was in bad faith. He does, however, contend that its failure was due to a lack of diligent investigation, and that he was actually prejudiced as a result. We assess these contentions in turn.

### a.

[3] With regard to his diligence contention, Fulks contends that, had the Government conducted a diligent investigation prior to trial, it would have discovered the November 17, 2002 call to Donna Ward prior to the expiration of the § 3432 deadline for provision of the witness list. Specifically, he asserts that the prosecution should have done two things prior to trial, either of which would have led to the discovery of the phone call: (1) travelled to the Wards' home in Waverly, Ohio, to conduct an interview of Amy Ward (who was included on the witness list), and (2) followed up on the phone card found in Fulks's possession at the time of his arrest. The district court explicitly concluded, however, that the prosecution was not dilatory in discovering the phone call and that a reasonable investigation would not have discovered the call. Because the trial court is in the best position to evaluate a party's pretrial investigation, and because this diligence inquiry forms a part of the court's decision on whether to permit the trial testimony of an after-discovered witness, we review the court's determination that the prosecution was diligent for abuse of discretion. *Cf. S. States Rack & Fix-*

*ture, Inc. v. Sherwin–Williams Co.,* 318 F.3d 592, 597 (4th Cir.2003) (observing that determination whether nondisclosure of evidence was "substantially justified" under Federal Rule of Civil Procedure 37(c)(1) is reviewed for abuse of discretion).

First, we reject Fulks's contention that a reasonable investigation on the part of the prosecution necessarily would have included a face-to-face, pretrial interview of Amy Ward. As the prosecution points out, Amy was a minor witness, who testified for only about five minutes concerning a matter entirely collateral to the main issues in the case—that her purse and cell phone were stolen from a vehicle in Ohio on November 10, 2002. Moreover, the prosecution had no reason to believe that the Wards had any useful information to offer, beyond the fact that Amy's purse and cell phone had been stolen. Finally, because of the considerable distance between Waverly, Ohio (where Amy Ward lived), and Columbia, South Carolina (where Fulks's trial was conducted), the prosecution made the decision to conduct a quick pre-testimony interview when Amy and her father arrived in South Carolina for the trial. The district court did not abuse its discretion in concluding that this decision was reasonable under the circumstances.

Fulks's second contention in this regard—that the prosecution should have followed up on the phone card found on Fulks at the time of his arrest, over nineteen months prior to trial—is more troublesome to us than his first contention. For its part, the prosecution asserts that it had no indication that an inquiry into the calls made using the phone card would further the primary objectives of its pretrial investigation: proving that Fulks was understating his role in the multiple offenses committed during the crime spree and countering his case for mitigation.

Tracing the calls Fulks made during the crime spree, however, could easily have led to individuals and information, unknown to the prosecution, that would have shed light on Fulks's role in the offenses. Indeed, the prosecution would have discovered the November 17, 2002 call to Donna Ward, if it had followed up on the phone card. Nevertheless, as the prosecution points out, this trial presented unique challenges for everyone, in that the crime spree spanned several states and touched over a hundred individuals the prosecution expected to call as witnesses. In these circumstances, we are unable to conclude that the district court abused its discretion in concluding that the prosecution was diligent in its pretrial investigation, despite its failure to follow up on the calls made using the phone card.

b.

**[4]** Fulks also asserts that the lack of pretrial notice that Donna Ward and Agent Bruning would testify for the prosecution irreparably prejudiced his defense. Again, because a trial court's vantage point enhances its ability to discern prejudice to a party's trial presentation, and because the prejudice inquiry forms part of the court's determination of whether an after-discovered witness should be permitted to testify, we review for abuse of discretion its conclusion that Fulks suffered no prejudice from the lack of notice that Donna Ward and Agent Bruning would testify. *Cf. S. States Rack & Fixture,* 318 F.3d at 597 (observing that decision whether nondisclosure of evidence was "harmless" under Federal Rule of Civil Procedure 37(c)(1) is reviewed for abuse of discretion). And, as an initial matter, we observe that the district court, in denying Fulks's motion to exclude the testimony of Donna Ward and Agent Bruning, offered Fulks a three-day hiatus to prepare to meet their testimony, an offer Fulks de-

clined as useless. Thus, our inquiry focuses on whether any prejudice to Fulks was such that only outright exclusion of the after-discovered witnesses was warranted.

According to Fulks, his trial strategy was twofold: to cast Basham as the instigator and sole murderer, and to present a strong case of mitigation based on Fulks's mental problems and troubled childhood. Thus, defense counsel's opening statement emphasized numerous facts suggesting that Basham was more volatile, dangerous, and controlling, and it outlined the evidence detailing Fulks's miserable childhood and asserted mental deficiencies. Throughout the prosecution's case-in-chief, Fulks's lawyers crafted the manner in which they cross-examined witnesses to further this strategy. Fulks contends that the testimony concerning the November 17, 2004 phone call completely undermined the first half of this strategy by tending to show that Fulks, acting independently of Basham, attempted to lure another victim, Amy Ward. And according to Fulks, the tardiness of the notice he received that Donna Ward and Agent Bruning would testify for the prosecution made it impossible for him to switch gears and pursue a different strategy. He contends that, had he been aware prior to trial that the prosecution intended to call Donna Ward and Agent Bruning, he would have pursued a different trial strategy. He would perhaps have focused exclusively on mitigation, perhaps focused on his impulsiveness (a trait defense counsel claimed it downplayed at trial because it was inconsistent with the Basham-as-instigator theory), or perhaps adhered to his not guilty plea and forced the prosecution to prove the entirety of its case.

As the prosecution points out, however, Fulks chose to pursue his trial strategy in the face of an abundance of evidence casting Fulks as an equal, if not leading, part-

ner in the crime spree. Perhaps most damagingly, both Hawkins and McGuffin testified that Basham took orders from Fulks and that Fulks was continually in charge of what the two of them did. Furthermore, the prosecution presented evidence suggesting that Fulks instigated the Kentucky prison break because he was afraid of being sentenced to a lengthy term of imprisonment on child abuse charges that he learned of the day before the escape. And Tina Severance testified that Fulks, not Basham, approached her about obtaining firearms shortly after their escape. Although Basham also fired shots when Jordan discovered the two of them burglarizing his son's home, Jordan testified that Fulks fired at him as well. Finally, throughout the crime spree, Fulks and Basham only travelled to places with which Fulks was familiar, and they did so with Fulks behind the wheel. The testimony concerning the November 17, 2002 call to Donna Ward was certainly damaging to Fulks's case, but viewed in the context of the trial evidence suggesting Fulks's leading role in the crime spree, it was hardly the silver bullet Fulks makes it out to be.

Moreover, Fulks was able to present the jury with an alternative explanation of why he had called Donna Ward on November 17, 2002. Although his defense lawyers felt that the three days offered by the court was insufficient to prepare Fulks to testify concerning the call, Fulks presented testimony from both Jacobi and Skidmore suggesting that Fulks, in making the call, was trying to contact the young woman with the butterfly tattoo with whom he had used drugs, and not attempting to lure Amy Ward. Perhaps more importantly, the prosecution's version of the story—that Fulks was trying to lure Amy Ward to the hardware store—hardly paints Fulks as an effective predator. Even if Fulks had been able to persuade Donna Ward that

her daughter had applied for a job at the hardware store, and that she had an interview for the position at the unlikely hour of 10:30 p.m., Amy presumably would have known that she had not applied for such a job and would not have shown up for the purported "interview." That Fulks, acting alone, made such a bungled attempt to bait another victim might have actually bolstered Fulks's position that he could not have committed the offenses he was accused of on his own.

Finally, the fact that the defense team had notice, as early as May 21, 2004, of the November 17, 2002 phone call, further undermines Fulks's claim of prejudicial surprise. As spelled out above, defense investigator Pete Skidmore learned of the call during his interview of Donna Ward on May 21, 2004, when he travelled to Waverly, Ohio, seeking to determine whether Amy was the girl with the butterfly tattoo. Although the defense lawyers do not recall being notified of the call, they do not dispute that Skidmore advised them of the call via email. To be sure, of course, our inquiry under § 3432 centers on the surprise occasioned by the prosecution's failure to timely notify the defendant that a witness will testify; it does not focus on whether the substance of the testimony itself is a surprise. Nevertheless, although Fulks's knowledge of the call does not carry the day, it at least cuts against his claim of surprise, for he should have anticipated that the prosecution might discover the call and seek to apprise the jury of its existence.

For the foregoing reasons, the district court did not abuse its discretion in concluding that Fulks suffered no prejudice as a result of the prosecution's failure to include Donna Ward and Agent Bruning on its pretrial witness list. Accordingly, the court did not err in permitting them to testify on behalf of the prosecution at trial.

B.

[5] Fulks next asserts that the court erroneously qualified jurors Goehring, Harvey, and Allison over his objection. According to Fulks, the district court was obliged to excuse these jurors for cause because their responses to questions on voir dire revealed that they would not properly consider the mitigation evidence offered by Fulks, rendering them disqualified to sit on his jury under the Supreme Court's decision in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "[B]ecause [the] inquiry turns in a large part on assessments of demeanor and credibility we cannot duplicate," we review for abuse of discretion the determination of whether a juror is excludable for cause. *United States v. Barnette,* 211 F.3d 803, 812 (4th Cir.2000).

[6] The Supreme Court has ruled that a juror should be excluded for cause if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation marks omitted). And, in a capital sentencing proceeding, a juror's duties include giving meaningful consideration to any mitigating evidence that the defendant can produce. *See Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (observing that sentencer may not refuse to consider any mitigating factor). Thus, where voir dire examination reveals that a juror "will fail in good faith to consider the evidence of . . . mitigating circumstances as the instructions require him to do," he is excludable for cause. *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222; *see also Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (observing that jury must "be able to consider and

give effect to" mitigating evidence); *Tipton*, 90 F.3d at 878 (noting that *Morgan* requires the exclusion of jurors who "would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law"). And "[i]f even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222. Thus, if the district court abused its discretion in determining that Goehring, Harvey, or Allison would consider the mitigating evidence offered by Fulks, Fulks is entitled to a new sentencing trial. We assess its rulings on these jurors seriatim.

### 1.

The court commenced voir dire of juror Goehring by explaining that an individual at the extremes, who would either always or never impose the death penalty, is ineligible to serve on the jury. The court advised Goehring that it needed jurors "in the middle" who could base their decision on the law and the facts. J.A. 573. Goehring assured the court that he could do so. In response to questions by defense counsel, however, Goehring asserted that he would automatically impose the death penalty on a defendant who had committed a knowing and intentional murder. But when defense counsel inquired about "circumstances presented about the defendant's life and background, unrelated to the offense," Goehring responded that such circumstances would "weigh[ ] into my decision." *Id.* at 577–78. He expressed his belief that "abuse" and like circumstances were relevant, but that "say 90 percent of the time, I mean unless its something outrageous," he would vote for the death penalty. *Id.* at 578. Where there was evidence that the defendant was responsible for two murders, he asserted that mitigating factors would "become less." *Id.* at 579. In response to ques-

tions by the prosecution, Goehring again asserted that he would consider and "process" mitigating evidence. *Id.* at 583. The court qualified Goehring over Fulks's objection.

[7] Although the issue may be close, the court did not abuse its discretion in qualifying Goehring to serve on Fulks's jury. As we have recognized, *Morgan* only requires the exclusion of jurors who would categorically reject any mitigating evidence offered by the defendant. *See Tipton*, 90 F.3d at 878; *see also Yeatts v. Angelone*, 166 F.3d 255, 265 (4th Cir.1999) (observing that only those jurors who would fail to consider mitigating evidence must be removed for cause). Although Goehring initially advised defense counsel that he would automatically impose the death penalty on any defendant who committed a knowing and intentional murder, he also repeatedly asserted that he would consider mitigating evidence. Nevertheless, according to Fulks, Goehring's statement that he would vote for the death penalty "90 percent of the time" belies the truth of his assertions that he would consider mitigating evidence and demonstrates a strong predisposition toward imposing the death penalty. We agree with Fulks that Goehring's "90 percent" statement reveals that only a strong case for mitigation would convince him that a convicted murderer deserves mercy. That fact alone, however, did not require his exclusion, for although a juror must be willing and able to consider mitigating evidence, he is entitled to "determine the weight to be given" to any such evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Taken as a whole, Goehring's statements demonstrate that he was willing to consider the mitigating evidence that Fulks could muster. That he might not accord such evidence as much weight as his fellow jurors

did not render his qualification by the court an abuse of discretion.

### 2.

**[8]** The court began juror Harvey's voir dire examination in the same manner as it began Goehring's, explaining to her that it was looking for jurors between the extremes of those who would always or never impose the death penalty. It then inquired whether she could consider mitigating evidence offered by the defendant, after hearing evidence from the prosecution that the defendant was responsible for two murders. She responded that she could. In response to questioning by defense counsel, Harvey first asserted that she would impose the death penalty for any knowing and intentional killing, but then said "it just depends on what the facts are." J.A. 644. After further inquiry, she stated that she would automatically impose the death penalty if the defendant committed two murders, but she seems to have been confused by the questioning. Although the record is not entirely clear on this point, it appears that Harvey did not understand that, as a juror in this case, she would be permitted to consider evidence of a second murder even though Fulks was only being tried for one. For example, when Fulks's lawyer explained that she would hear evidence concerning two murders, Harvey responded, "I would be for the case we are doing." *Id.* at 647. And when the court asked her whether hearing about two murders would "cause [her] to become so prejudiced against the defendant that [she] would not go forward and hear his case in mitigation before making up [her] mind," Harvey responded, "No, no, no, no. No. I mean, just because he killed two people, I would be listening to all the facts but basing it on the one that we were trying." *Id.* at 648. By the end of this exchange, Harvey seemed to grasp the fact that she would be legally permitted to consider both murders, and she ultimately assured the court that she would impose the death penalty if warranted by the facts, "but not just because he killed two people." *Id.* at 650. The court then qualified Harvey over Fulks's objection.

The facts with respect to juror Harvey's voir dire examination serve to underscore why the appellate courts provide the district courts substantial latitude on the qualification of trial jurors. As best we can surmise from the transcript of the voir dire proceedings, Harvey was confused by the questions from both the court and defense counsel, and it is not entirely clear that her confusion had dissipated by the end of her voir dire examination. Although she gave some answers that plainly satisfy the *Morgan* standard, certain other answers suggested that she may have been unwilling to consider mitigating evidence in the face of evidence that Fulks had committed two murders. In qualifying Harvey over Fulks's objection, however, the court remarked that "[i]t's a close call, but as I said, just hearing her demeanor, I think her answers were the best she could do given her limited education. She struck me as an honest person who would sincerely try to do her job in the way she's supposed to." J.A. 665. Given the difficulty in gleaning anything constitutionally relevant from the cold transcript of Harvey's voir dire examination, the court's determination on this point is entitled to our deference. And because Harvey ultimately asserted that she would not impose the death penalty solely on the basis of two murders, the court did not abuse its discretion in qualifying her to sit on Fulks's jury.

### 3.

**[9]** The court began voir dire of juror Allison as it had with Goehring and Har-

vey, explaining to her that only those individuals "in the middle," not those who would always or never impose the death penalty, could serve on the jury. J.A. 708–09. During this exchange, Allison assured the court that she was willing to consider mitigating evidence, and when questioned about whether she would impose the death penalty for a double murder, she responded, "I—I would have to go—listen to the whole case, I wouldn't decide it just on that." *Id.* at 714. In response to questioning by the defense lawyers, Allison asserted that she would not automatically impose the death penalty, explaining that "I'm willing to listen to whatever is said and make my decision, at that time, that's all I can tell you." *Id.* at 722. When defense counsel inquired whether she could hold firm to a position opposed by her fellow jurors, she equivocated, but she later told the court she could stick with her position if she was "entirely convinced" that her position was correct. *Id.* at 726. The court qualified Allison over Fulks's objection.

Fulks contends that, because Allison only advised his lawyers that she would "listen" to mitigating evidence, she never committed to meaningfully considering such evidence. In so contending, however,

Fulks is reading her voir dire statements too literally. Viewing her examination as a whole, we think it highly unlikely that Allison meant to imply, by use of the word "listen," that she intended to listen to the evidence but entirely disregard it. The trial court—which unlike us was in the best position to view Allison's demeanor and assess her credibility—was convinced that she would carefully weigh all the evidence. That finding, given Allison's answers on voir dire, is entitled to deference. Finally, Fulks asserts that the trial court should have disqualified Allison because she equivocated on whether she could hold true to a position opposed by her fellow jurors. Her later statement to the court that she could hold firm to an unpopular position if entirely convinced of its correctness, however, cures any deficiency in her earlier equivocating statement. As a result, Fulks's appellate contentions on juror Allison must also be rejected.[7]

## C.

### 1.

**[10]** Fulks next asserts that the district court erred in denying his motion for a new trial on the basis of juror Allison's failure to disclose her husband's murder in a timely manner. *See United States v.*

---

**7.** In addition to challenging the district court's qualification of Goehring, Harvey, and Allison, Fulks asserts that the manner in which the district court conducted their voir dire examinations deprived him of a fair trial. Specifically, he maintains that the court's questions were too general to satisfy *Morgan*. In addition to establishing that a capital defendant is entitled to a jury that will consider mitigating evidence, the Court in *Morgan* concluded that such a defendant must also receive the benefit of a voir dire "adequate" to identify unqualified jurors. *See* 504 U.S. at 729, 112 S.Ct. 2222. Although the Court concluded that general questions concerning whether a juror would "follow the law" or be "impartial" are inadequate to protect a defendant's right to a jury that would not automati-

cally impose the death penalty, *see id.* at 735, 112 S.Ct. 2222, it did not spell out the types of voir dire questioning that is required. In our *Tipton* decision, however, we ruled that inquiring into whether a juror "would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense" would be sufficient to satisfy the *Morgan* principle. 90 F.3d at 878–79. In this case, the court asked each juror whether he or she would automatically impose the death penalty for capital murder, inquired into how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. Such an examination was plainly sufficient to satisfy *Morgan*.

*Fulks,* CR–02–992 (D.S.C. Dec. 23, 2004). We review a district court's denial of a motion for a new trial for abuse of discretion. *See United States v. Stokes,* 261 F.3d 496, 502 (4th Cir.2001). As discussed above, each prospective juror completed a written questionnaire prior to jury selection. Question 42 of the questionnaire inquired whether the prospective juror or a close relative had ever been the victim of a serious crime. Although her husband had been murdered in 1971, just after the couple was married, Allison left Question 42 blank. Unfortunately, neither the court nor the lawyers for either party inquired during voir dire into why Allison had failed to answer Question 42.[8]

**[11]** Fulks first learned of the murder of Allison's husband by virtue of a July 1, 2004 article in the Myrtle Beach *Sun News.* On July 9, 2004, Fulks moved for a new trial, asserting that Allison's failure to disclose her husband's murder and the related circumstances demonstrated that she had been biased against him. The district court conducted a hearing on the issue on July 16, 2004, in order to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias. At the hearing, Allison advised that her failure to answer Question 42 had been inadvertent. Moreover, she asserted that she was surprised that she had been selected for the jury and had hoped that her husband's murder would lead to her dismissal from the venire. When the court asked whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded, "None at all." J.A. 3046.

By its order of December 23, 2004, the court denied Fulks's motion for a new trial. Applying the test established by the Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the court first found that, had Allison fully answered Question 42, it would not have excluded her for cause. In this respect, the court observed that it had qualified a juror, over Fulks's objection, who had been robbed at gunpoint and another whose relative had been the victim of a murder-suicide. The court also noted that, in Basham's trial, it had qualified over objection a juror whose daughter had been raped twenty-four years earlier. Based on its explicit finding that Allison honestly believed she had disclosed her husband's murder, the court further concluded that Fulks had failed to show that Allison was actually biased. Finally, the court ruled that the circumstances surrounding her husband's murder and her failure to disclose it were not extreme enough to warrant a finding of implied bias.

2.

Under the *McDonough* test, a party is entitled to a new trial on account of a prospective juror's nondisclosure on voir dire if it can

> first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

464 U.S. at 556, 104 S.Ct. 845. As we have heretofore recognized, the Supreme Court, in spelling out the *McDonough* test, did

---

**8.** The prosecution does not contend on appeal that, by failing to inquire during voir dire into

Allison's failure to answer Question 42, Fulks has waived any claim relating thereto.

not " 'foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury.' " *Fitzgerald v. Greene,* 150 F.3d 357, 363 (4th Cir.1998) (quoting *McDonough,* 464 U.S. at 556, 104 S.Ct. 845 (Blackmun, J., concurring)). After *McDonough,* " 'it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.' " *Id.* (quoting *McDonough,* 464 U.S. at 556–57, 104 S.Ct. 845 (Blackmun, J., concurring)). The doctrine of implied bias is a principle "limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller,* 854 F.2d 656, 664 (4th Cir. 1988). Examples of such situations include revelations " 'that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.' " *Fitzgerald,* 150 F.3d at 365 (quoting *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring)).

[12] Fulks first contends that he is entitled to relief under *McDonough.* As discussed above, the district court concluded that Fulks failed to satisfy the second part of the *McDonough* test (that a correct response would have provided a valid basis for a challenge for cause) because the court would not have excused Allison for cause even if she had fully answered Question 42. Given this explicit conclusion, Fulks's *McDonough* claim necessarily fails unless the court would have committed reversible error—that is, abused its discre-

tion—in failing to dismiss Allison for cause. *See United States v. Turner,* 389 F.3d 111, 115 (4th Cir.2004) (observing that we review challenges to qualifications of jurors for abuse of discretion). As our precedent makes clear, a failure to excuse a prospective juror for cause constitutes an abuse of discretion in only two situations: (1) where a per se rule of disqualification applies; and (2) where the court "demonstrates a clear disregard for the actual bias" of the juror. *Id.* at 115 (internal quotation marks omitted). Because there is no per se rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which a defendant is being tried, *see United States v. Jones,* 608 F.2d 1004, 1008 (4th Cir.1979), Fulks is obliged, in order to prevail on his *McDonough* claim, to establish that the court clearly disregarded Allison's actual bias against Fulks.

On this point, Fulks contends that inconsistencies in Allison's testimony at the July 16, 2004 hearing demonstrated her actual bias against him. Specifically, he asserts that her explanation for the non-disclosure—that she believed she had answered Question 42 and was thus surprised that she was chosen for jury service—is not credible, and reveals that she deliberately concealed her husband's murder in order to serve on Fulks's jury. The district court, however, explicitly found, based on her "demeanor and body language," that Allison honestly believed she had disclosed her husband's murder. J.A. 3119. That finding is not clearly erroneous and is entitled to deference. Fulks is thus not entitled to a new trial under *McDonough.*

Moreover, the district court correctly concluded that the circumstances surrounding the murder of Allison's husband, and her failure to disclose it, did not warrant a finding of implied bias. Because it is generally within a trial court's discretion

to qualify a juror whose close relative was a victim of a crime similar to that with which a defendant is charged, *see Jones*, 608 F.2d at 1008, such a circumstance is not, standing alone, sufficiently "extreme" to warrant a finding of implied bias, *Fitzgerald*, 150 F.3d at 365. And given the court's finding that Allison's nondisclosure of her husband's murder was inadvertent, the circumstances surrounding the nondisclosure would not support a finding of implied bias. The district court thus did not abuse its discretion in denying Fulks's motion for a new trial.

### D.

In his final contention concerning the jurors in his case, Fulks asserts that the district court improperly qualified jurors Novinger and Plyler over his objection. As explained above, we review a district court's qualification of a prospective juror for abuse of discretion, and we may find such an abuse only if a per se rule required a juror's disqualification or if the court "demonstrate[d] a clear disregard for the actual bias" of the juror. *See Turner*, 389 F.3d at 115.

### 1.

**[13]** On her written questionnaire submitted prior to the jury selection proceedings, Novinger indicated that her sister had been a victim of sexual assault. When questioned on voir dire, Novinger assured the court that she could be fair, notwithstanding her sister's experience. The court then qualified Novinger over Fulks's objection. As discussed above, there is no per se rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which the defendant is charged. *See Jones*, 608 F.2d at 1008. Thus, the court abused its discretion in qualifying Novinger only if it "demonstrated a clear disregard for [her] actual

bias" against Fulks. *Turner*, 389 F.3d at 115. As noted, Novinger assured the court that she could be fair, and Fulks can point to nothing other than her sister's sexual assault to suggest otherwise. Accordingly, the court did not abuse its discretion in qualifying Novinger as a juror in Fulks's trial.

### 2.

**[14]** Fulks's challenge to the qualification of juror Plyler centers on the age similarities between Plyler and her daughter, on the one hand, and Donovan and Burns, on the other. At the time of Fulks's trial, Plyler was the same age as Donovan had been when she was killed (forty-four years old) and Plyler's daughter was close to the same age as Burns had been when she was killed (twenty-one and nineteen years old respectively). When questioned on voir dire concerning her ability to be impartial, Plyler initially equivocated, advising that "[r]ight now I could say I would be fine with being neutral, but getting there and being in front and hearing everything, I don't know. When you put it that way, maybe not. But right now sitting here I say I could." J.A. 613. When pressed on whether the age similarities between her and Donovan, and her daughter and Burns, would influence her decisions as a juror, Plyler asserted that "I would think that, 'Oh my gosh, my daughter is that age. Well, gosh, I'm that age,' that kind of thing, but I think I—I still feel like I could be fair." *Id.* at 613–14. The court then qualified Plyler over Fulks's objection.

As no per se rule requires the exclusion of jurors who have been victims (or whose close relatives have been victims) of a crime similar to that with which the defendant is charged, *see Jones*, 608 F.2d at 1008, it follows *a fortiori* that closeness in age between a prospective juror and her

family members, on the one hand, and the victims of a crime, on the other, does not suffice to mandate that the prospective juror be excused for cause. On the question of whether Plyler was actually biased against Fulks, it is clear that, although she was initially unsure that she could be neutral, the court credited her final assertion that she would be fair. That finding is not clearly erroneous, and the district court thus did not abuse its discretion in qualifying Plyler as a juror.

### E.

**[15]** Fulks next asserts that the district court erroneously excluded testimony concerning three polygraph examinations administered to him prior to trial. *See United States v. Fulks*, CR–02–992 (D.S.C. July 7, 2004). The results of those examinations indicated that Fulks's 2003 statements to the FBI had been truthful and that he neither knew of nor participated in the murders of Burns and Donovan. We review for abuse of discretion a trial court's rulings concerning the admissibility of evidence. *See United States v. Forrest*, 429 F.3d 73, 79 (4th Cir.2005).

**[16]** Unfortunately for Fulks, his contention on this point is foreclosed by our decision in *Goins v. Angelone*, 226 F.3d 312 (4th Cir.2000), *abrogated on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir.2000). In that case, Goins asserted that the prosecutor had committed a *Brady* violation by failing to disclose the results of a polygraph test taken by Barry Scott, who, according to Goins, had committed the murders with which Goins was charged. *See* 226 F.3d at 325. In disposing of Goins's *Brady* claim, we first concluded that, because the record did not reveal which questions Scott had answered untruthfully, there was no basis on which to conclude that the polygraph results were favorable to Goins. *Id.* We also

ruled, however, that Goins could not demonstrate that the polygraph results were "material" because polygraph results were inadmissible for any purpose under Virginia law. *Id.* As relevant here, Goins asserted that the Constitution mandated the admissibility of polygraph results during the sentencing phase of his capital trial. We disposed of this contention in a footnote: "[a]s the district court noted, . . . '[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings.'" *Id.* at 326 n. 7 (quoting *Goins v. Angelone*, 52 F.Supp.2d 638, 675 (E.D.Va.1999)). The district court in *Goins* had derived this conclusion from *United States v. Scheffer*, where the Supreme Court upheld, in a non-capital case, the military's per se ban on the admission of polygraph results in court-martial proceedings. *See* 523 U.S. 303, 305, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Although the district court acknowledged that *Scheffer* was a non-capital case, it concluded that "*Scheffer*, with its emphasis on the unreliability of polygraph evidence and the interest of courts in excluding such unreliable evidence, certainly suggests that exclusion of polygraph results would pass constitutional muster in th[e capital] context, as well." 52 F.Supp.2d at 675.

Although the issue of the admissibility of polygraph results surfaced in *Goins* in the context of a *Brady* claim, we are bound by its conclusion that "the Constitution does not mandate admission of polygraph results in capital sentencing proceedings." 226 F.3d at 326 n. 7 (internal quotation marks omitted). That conclusion bears directly on the question before us now and, because it disposed of Goins's *Brady* claim (albeit in the alternative), it cannot be properly characterized as dicta. *See MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 346 n. 4, 106 S.Ct. 2561, 91

L.Ed.2d 285 (1986) (observing that alternative holdings are not dicta). As a result, *Goins* compels the conclusion that the district court did not abuse its discretion in denying Fulks's motion to admit the results of his polygraph examinations.

### F.

Fulks next contends that the district court erred in permitting Judy Ezell, Donovan's sister and a prosecution witness, to read aloud to the jury a 1990 letter from Donovan to Ezell. We, of course, also review the district court's ruling on this evidentiary issue for abuse of discretion. *See Forrest,* 429 F.3d at 79 (observing that we review rulings on admissibility of evidence for abuse of discretion).

As briefly discussed above, the jury heard testimony from Ezell concerning the sexual abuse she and Donovan had suffered at the hands of their father. Ezell testified that, in 1990, she had sent a letter to their father confronting him about the abuse and expressing her willingness to forgive him. She sent a copy of the letter to Donovan, and Donovan replied in a letter that Ezell read, over Fulks's objection, to the jury. In pertinent part, the letter stated as follows:

> The letter that you wrote and sent to Leo was so powerful. You must be on an emotional high. I know I am. Thank you for including me. I cried when I read it over and over again. We are healing. Judy, I wish you were here.
>
> * * *
>
> Before Mom left, she stopped in to say bye.... My fear and anger that I carried for her has been lifted. I feel love in my heart for her. And I accept her for herself, not someone I wanted her to be. I will be that mother to my inner child.

> * * *
>
> In order for me to continue on this path, I have made yet another major decision in my life. George [Donovan's first husband] and I are getting divorced. I cannot and will not live with his abuse. To make a long story short, ha-ha, he got very sexually violent with me. He also threatened to kill me when he was done. This was in July, and, of course, he was drunk. And this is not the first time he has done that. As I lay there crying and waiting to see what he would do next, I made a promise to myself that it would be the last time that he would ever hurt me again, whether he killed me or I survived. Well, I am here to write, I do not deserve to be abused in any way, shape, or form. And I won't be by any man again.
>
> * * *
>
> Judy, for the first time in my life I have taken back what was taken from me as a small child. I am in control of my life and that is a great, powerful feeling.

J.A. 2544–47.

**[17]** Fulks now contends that the district court abused its discretion in permitting Ezell to read Donovan's letter to the jury, asserting that the letter was so prejudicial as to deny him due process. In *Payne v. Tennessee*, the Supreme Court—abrogating its prior precedents in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989)—ruled that the Eighth Amendment erects no per se bar to the admission of victim impact evidence during the sentencing phase of a defendant's capital trial. *See* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In so ruling, the Court reasoned that the gravity of

an offense depends in part on the harm caused by the defendant to the victim, to the victim's family, and to society. *See id.* at 819, 111 S.Ct. 2597. Thus, evidence demonstrating that "the victim is an individual whose death represents a unique loss to society and in particular to his family" is generally admissible. *Id.* at 825, 111 S.Ct. 2597 (internal quotation marks omitted); *see also id.* at 823, 111 S.Ct. 2597 (observing that victim impact evidence "is designed to show ... *each* victim's uniqueness as an individual human being" (internal quotation marks omitted)). Also generally admissible is evidence concerning the harm caused to the victim herself. *Id.* at 825, 111 S.Ct. 2597. In response to concerns that victim impact evidence would unnecessarily inflame the passions of juries, the Court observed that due process would require exclusion of victim impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.; see also Barnette,* 211 F.3d at 818 ("To violate due process, an error must be of sufficient significance that it denied the defendant the right to a fair trial.").

As an initial matter, it is clear that Donovan's 1990 letter to Ezell constituted victim impact evidence. First, it served to demonstrate Donovan's uniqueness in that it highlighted struggles Donovan had faced in her life and the strength with which she confronted them. Moreover, the jury could have surmised from the letter that, given her history of abuse and her determination to avoid it in the future, Donovan suffered all the more at the hands of Fulks and Basham (although, as the district court noted, the letter could cut both ways on this point). The issue, then, is whether the reading of the letter to the jury was so unduly prejudicial to Fulks that it offends due process. It is on this contention that Fulks primarily relies.

Fulks first maintains that the letter violated due process because it was neither brief nor current. Put simply, this assertion is without merit. We have held that due process was not violated where seven of the prosecution's twenty-three witnesses were victim impact witnesses who "presented stories of the victims' childhoods, family experiences, and the trauma of their deaths, and poems reflecting their deep sadness and regret over their losses." *Barnette,* 211 F.3d at 818. In that case, the victim impact evidence formed a substantial portion of the prosecution's case at sentencing and included evidence relating as far back as the victims' childhood.

Fulks next asserts that Donovan's letter to her sister was unreliable because it was hearsay and not subject to cross-examination. The relevant inquiry, however, is not whether the letter was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the letter was so unreliable that its admission violated due process. And, although hearsay, Donovan's letter does not bear the hallmarks of unreliability. To the contrary, it was written in confidence to a close family member, and it was evidently not written with ulterior motives (trickery, in anticipation of litigation, etc.). Although the letter was written with much emotion, this fact cuts towards the letter's reliability. *Cf.* Fed.R.Evid. 803(2) (excepting excited utterances from hearsay rule).

Finally, Fulks contends that the letter improperly focused the jury's attention on the harm that Donovan had suffered during her rape by Fulks and Basham. Because victim impact evidence focuses in part on the harm caused to the victim, *see Payne,* 501 U.S. at 825, 111 S.Ct. 2597, this contention is also without merit. The district court thus did not abuse its discretion

in permitting Ezell to read Donovan's letter to the jury.

### G.

**[18, 19]** In his final appellate contention, Fulks asserts that the Federal Death Penalty Act (the "FDPA") is unconstitutional because it withholds the protections of the Federal Rules of Evidence (the "Evidence Rules") from a defendant in a capital sentencing trial, providing only that a district court may exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We review de novo a district court's ruling concerning the constitutionality of a statute. *United States v. Williams*, 364 F.3d 556, 559 (4th Cir.2004).

In presenting his contention that the FDPA is unconstitutional, Fulks does not assert that the Evidence Rules must apply to the presentation of evidence on the ultimate issue of whether the aggravating factors present in the case sufficiently outweigh any mitigating factors such that the death penalty should be imposed. *See* § 3593(e) (providing that sentencer must find aggravating factors sufficiently outweigh mitigating factors before imposing death sentence). Indeed, the Supreme Court has already made clear that, in deciding whether a death-eligible defendant should receive the ultimate penalty, "the jury [should] have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion); *see also Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (observing that decision whether death-eligible defendant should receive death penalty "is an *individualized* determination on the basis of the character of the individual and the circumstances of the

crime" (internal quotation marks omitted)). Rather, relying on the Court's ruling in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Fulks maintains that the Evidence Rules must govern the presentation of evidence on the threshold question of whether a defendant is eligible for the death penalty—that is, whether the prosecution has proven the existence of at least one statutory aggravating factor beyond a reasonable doubt.

In *Ring*, the Court concluded that the Sixth Amendment right to trial by jury precludes imposition of the death penalty unless an aggravating factor necessary to support that sentence is proven to the jury beyond a reasonable doubt. *See* 536 U.S. at 609, 122 S.Ct. 2428. This conclusion derived from the principle first enunciated in *Apprendi v. New Jersey*: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). As the Court explained, regardless of the label a legislature may place on a particular fact, if the finding of such fact results in a sentence more severe than that which the defendant could otherwise receive, the fact "operate[s] as the functional equivalent of an element of a greater offense," and the Sixth Amendment requires that it be found by a jury beyond a reasonable doubt. *Ring*, 536 U.S. at 609, 122 S.Ct. 2428 (internal quotation marks omitted).

Fulks does not (and could not) assert that he was denied the essential right guaranteed by the holding in *Ring:* that the prosecution be required to prove to a jury beyond a reasonable doubt the existence of any aggravating factor necessary to impose the death penalty. Rather, Fulks contends that, because an aggravating factor is "the functional equivalent of

an element" under *Ring*, the jury's determination of whether such an aggravating factor exists is closer to a trial on guilt or innocence than to a traditional sentencing proceeding. Thus, he asserts, he is constitutionally entitled, with respect to the jury's determination of whether such an aggravating factor is in existence, to the protections of the Evidence Rules.

Even if the Court in *Ring* mandated that a defendant receive, with respect to a jury finding of an aggravating factor, the protections applicable to a guilt-or-innocence trial, it does not follow that the defendant is entitled to the protections of the Evidence Rules. The Evidence Rules "do not set forth the constitutional parameters of admissible evidence, nor does a criminal defendant have a constitutional right to have the [Evidence Rules] in place." *United States v. Fell*, 360 F.3d 135, 144 (2d Cir.2004). Indeed, as a general matter, the Evidence Rules provide greater protection than that which is constitutionally mandated. *See, e.g., Dowling v. United States*, 493 U.S. 342, 352–54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (ruling that due process was not violated by introduction of evidence made inadmissible under Rule 404(b) of the Evidence Rules).

Moreover, the FDPA provides a capital defendant with constitutionally sufficient evidentiary protections. Even without the protections of the Evidence Rules, "it remains for the [district] court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial." *Fell*, 360 F.3d at 145. The FDPA provides a ready mechanism for a trial court to fulfill this function, permitting the exclusion of evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." § 3593(c). We must

rely on the trial courts, in applying this provision, to exclude evidence that transgresses a defendant's constitutional rights. For these reasons, the evidentiary standard of the FDPA withstands constitutional scrutiny. *See United States v. Lee*, 374 F.3d 637, 648 (8th Cir.2004) (reaching same conclusion); *Fell*, 360 F.3d at 138 (same).

### III.

Pursuant to the foregoing, Fulks's contentions of error are rejected, and the judgment of the district court is affirmed.

*AFFIRMED.*

WILLIAMS, Circuit Judge, concurring:

I agree with the judgment reached by the majority and concur in Parts I and II.A.2.b.—III of the majority opinion. While I agree with the result reached in the remainder, I disagree with my good colleagues' interpretation of 18 U.S.C.A. § 3432 (West 2000). I would instead hold that the district court contravened the statute by allowing Donna Ward and Agent Bruning to testify, but that the error was harmless. I write separately to emphasize the correct reading of the statute, which is "too plain to be misunderstood." *Logan v. United States*, 144 U.S. 263, 304, 12 S.Ct. 617, 36 L.Ed. 429 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Section 3432 provides in full:

A person charged with treason or other capital offense *shall* at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of *the witnesses* to be produced on the trial *for proving the indictment*, stating the place of abode of each veniremen and witness, except that such list of the veniremen

and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

18 U.S.C.A. § 3432.[1]  The majority holds that this section is not violated when the prosecution calls to the stand a newly discovered witness if "the prosecution has demonstrated that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation" and the defendant cannot demonstrate actual prejudice.  *Ante* at 424.  This exception is not found in the text of the statute and is an entirely judge-made creation.[2]

The only exception to the statute's absolute rule that a listing of "the witnesses . . . for proving the indictment" shall be provided three days prior to trial is where production of "the list may jeopardize the life or safety of any person."  18 U.S.C.A.

§ 3432.  Thus, the plain language of the statute makes no exception for good faith or due diligence on the part of the Government.  Indeed, the statute "is . . . mandatory to the [G]overnment; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense."  *Logan*, 144 U.S. at 304, 12 S.Ct. 617.  Thus, according to *Logan*, Congress's concern in passing the statute was with allowing defendants facing possible sentences of death sufficiently to prepare their defense, regardless of whether the statute precluded the Government from introducing some relevant testimony.

In this case, the Government provided a list of *most* of the witnesses it ultimately produced for proving the indictment in ample time under the statute.  The statute, however, requires that the defendant be provided with a list "of *the* witnesses to be produced on the trial for proving the

---

**1.**  I assume without deciding (as neither party raises the issue) that the statute applies equally to the underlying guilt trial as well as the "separate sentencing hearing to determine the punishment to be imposed."  18 U.S.C.A. § 3593 (West 2000).

**2.**  I concede, and the majority notes, that the weight of authority is in favor of recognizing a judge-created good faith exception.  I note, however, that the reasoning behind this authority is not grounded on the text of the statute, but instead on one faulty 1893 opinion from the Supreme Court of the District of Columbia.  In *United States v. Schneider,* 1893 WL 11435 (D.C. Jan. 9, 1893), the court noted that "the statute never was intended to preclude the [Government] from making use of any material testimony discovered during the progress of the trial."  *Id.* at *20.  For this proposition, the court did not cite a single source or refer to the text of the statute.  Rather, it merely offered its view as its "opinion."  *Id.*

More troubling, in offering this opinion, the *Schneider* court ignored (without even recognizing) the holding of *United States v. Never-*

*son,* 1880 WL 18716 (D.C. June 7, 1880).  In *Neverson,* the same court held that the statute is violated when notice of a witness is not "given until after the trial beg[ins]."  *Id.* at *13.  *But see id.* at *20 (MacArthur, J., concurring) (disagreeing and arguing that the statute should not apply when the Government "us[es] the utmost diligence and exercis[es] the utmost good faith").  *Schneider* also ignored the Supreme Court's language in *Logan v. United States,* 144 U.S. 263, 304, 12 S.Ct. 617, 36 L.Ed. 429 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which recognized that the statute was "mandatory" and "its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense."  *Id.*

To compound matters, both circuit courts that have (before today) since recognized the judge-created exceptions (either as alternative holdings or dicta) have primarily relied on *Schneider's* unsupported language.  *See United States v. Greene,* 497 F.2d 1068, 1082 (7th Cir.1974) (quoting *Schneider's* language); *United States v. Rosenberg,* 195 F.2d 583, 599– 600 (2d Cir.1952) (same).

indictment." 18 U.S.C.A. § 3432 (emphasis added). Thus, the statute is no more "silent" on the question of after-discovered witnesses that are offered to prove the indictment, as the majority concludes, *ante* at 422, than it is "silent" on the question of prior-discovered witnesses that are offered to prove the indictment. It speaks only of *the* witnesses, and by using the definite article "the" without relevant exception, the statute's plain language calls for a list of each and every witness to be produced at trial "for proving the indictment," *id.,* not "the witnesses for proving the indictment that to date have been discovered."

The statute is unmistakingly clear that if the Government is to call a witness for the purpose of proving the indictment, the name of that witness must be provided to the capital defendant at least three entire days prior to commencement of trial unless providing the name would jeopardize personal safety. *Cf. Goldsby v. United States,* 160 U.S. 70, 76, 16 S.Ct. 216, 40 L.Ed. 343 (1895) (allowing an undisclosed rebuttal witness to testify because the statute's combination of the phrase "the witnesses" with the phrase "for proving the indictment" clearly refer[s] to *the witnesses relied upon the by prosecution to establish the charge* [and does] not extend to such witnesses as may be rendered necessary for rebuttal purposes." (emphasis added)). Unless the result reached from following Congress's plain language is absurd (which surely it is not), I think it best for the Court to "interpret[ ] § 3432 'literally'," *ante* at 423 n. 6, especially when that literal interpretation is plainly in harmony with what the Supreme Court has explained is the purpose of the statute—to allow a capital defendant to prepare his defense. *Logan,* 144 U.S. at 304, 12 S.Ct. 617.

Aside from the plain language, Congress's relatively recent willingness to amend this statute with an explicit exception further counsels against reading judge-made exceptions into the statute. In 1994, Congress added the exception to the statute's mandatory directive for when production of "the list [of witnesses and veniremen] may jeopardize the life or safety of any person." Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, Tit. VI, § 60025, 108 Stat. 1982 (1994). The fact that a recent Congress was willing to amend § 3432 with this exception should allay fears that Congress will fail to act in the future if it—like most of the Article III courts that have considered the question—concludes that application of the plain meaning of the statute "would unnecessarily subvert the truth-seeking function of criminal proceedings." *Ante* at 423. Moreover, when "Congress explicitly enumerates certain exceptions to a general prohibition, *additional exceptions are not to be implied,* in the absence of evidence of a contrary legislative intent." *United States v. Smith,* 499 U.S. 160, 167, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991) (emphasis added and internal quotation marks omitted).

Finally, I note that I share the majority's instinct that the exception it recognizes is grounded in sound judgment and makes perfect sense as a policy matter. Nonetheless, I believe it is Congress's place—not ours—to make policy and if it so chooses, to amend the statute, as it has shown a willingness to do as recently as 1994. *See Sigmon Coal Co., Inc. v. Apfel,* 226 F.3d 291, 308 (4th Cir.2000), *aff'd,* 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("[E]ven if . . . the literal text of the statute produces a result that is, arguably, somewhat anomalous—we are not simply free to ignore unambiguous language because we can imagine a preferable version."). I also note that even under the

plain meaning of § 3432, the Government is not without any recourse because it often will be able to present the after-discovered witness as a rebuttal witness, as the Government contends it could have done in this case. (*See* Appellee's Br. at 55 (arguing that Ward and Bruning "would have made not only appropriate, but also devastating, rebuttal witnesses")).

In short, I would hold that the district court erred in allowing the two witnesses that were not included on the witness list to testify during the prosecution's case-in-chief. Nonetheless, I would find the error harmless after undertaking a traditional Rule 52(a) harmlessness analysis in order "to determine whether the error was prejudicial." *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). I believe that the Government, as evidenced by the majority's persuasive discussion of lack of prejudice in Part II. A.2.b., has met its burden of proving harmlessness. Accordingly, I concur in the judgment reached by the majority.



**Andrew GARCIA, Petitioner–Appellee,**

**v.**

**Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent–Appellant.**

**No. 05–50382.**

United States Court of Appeals, Fifth Circuit.

June 23, 2006.

**Background:** State prisoner petitioned for writ of habeas corpus. The United States District Court for the Western District of Texas, W. Royal Furgeson, Jr., J., granted habeas relief, and the state appealed.

**Holdings:** The Court of Appeals, Edith Brown Clement, Circuit Judge, held that:

(1) *Brecht* harmless-error review was appropriate in federal habeas proceeding to determine whether state court's *Sandstrom* error warranted habeas relief;

(2) state court's *Sandstrom* error in instructing jury that defendant was an accomplice who performed the acts alleged was harmless; and

(3) petitioner did not establish that defense counsel was ineffective at trial in arguing in favor of accomplice witness instruction which was *Sandstrom* error, and on appeal by failing to raise the error.

Reversed.

**1. Habeas Corpus ⚖768**

A state court's factual findings are presumed to be correct in a federal habeas proceeding, and a habeas petitioner has the burden of rebutting the presumption with clear and convincing evidence; such deference extends not only to express findings of fact, but to the implicit findings of the state court. 28 U.S.C.A. § 2254(d)(1).

**2. Habeas Corpus ⚖452**

For purpose of habeas corpus relief, a state court's conclusion of law is contrary to clearly established federal law, as determined by the United States Supreme Court, under two conditions: (1) the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at

Document 1

PA0070

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

FILED
August 22, 2006

No. 04-33
CR-02-992

UNITED STATES OF AMERICA

       Plaintiff - Appellee

v.

CHADRICK EVAN FULKS

       Defendant - Appellant


--------------------
On Petition for Rehearing and Rehearing En Banc
--------------------

    Appellant's petition for rehearing and rehearing en banc was submitted to this Court.  As no member of this Court or the panel requested a poll on the petition for rehearing en banc, and

    As the panel considered the petition for rehearing and is of the opinion that it should be denied,

    IT IS ORDERED that the petition for rehearing and rehearing en banc is denied.

    Entered for a panel composed of Judge Widener, Judge Williams, and Judge King.


For the Court,

/s/ Patricia S. Connor
_____

CLERK


PA0071

4:02-cr-00992-JFA   Date Filed 08/20/10   Entry Number 1345   Page 1 of 1
Case: 20-1900   Document: 21-1   Filed: 10/21/2020   Pages: 266
AO 450 (SCD 04/2010)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of South Carolina

| | | |
|---|---|---|
| United States of America | ) | |
| *Government/Respondent* | ) | |
| v. | ) | Criminal Action No.  4:02-992 |
| Chadrick Evans Fulks | ) | Civil Action No.  4:08-70072 |
| *Defendant/Petitioner* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($__),
which includes prejudgment interest at the rate of ___ %, plus postjudgment interest at the rate of ___ %, along with
costs.

❐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
recover costs from the plaintiff *(name)* _____.

■   other: **IT IS ORDERED AND ADJUDGED** that petitioner, Chadrick Evans Fulks  shall take nothing on
the  petition filed pursuant to 28 USC § 2255 and this action is dismissed with prejudice.

This action was *(check one)*:

❐ tried by a jury, the Honorable _____ presiding, and the jury has rendered a verdict.

❐ tried by the Honorable _____ presiding, without a jury and the above decision was reached.

■   This action came before the Court on the record, Honorable Joseph F. Anderson, Jr.,  United States District
Judge, presiding on the Petitioner's Petition under 28 USC § 2255.   The court having heard the merits in an
evidentiary hearing, denies §2255 petition as to all 33 claims asserted.

Date:   August 20, 2010

*LARRY W. PROPES, CLERK OF COURT*

s/Mary L. Floyd, Deputy Clerk

_____
*Signature of Clerk or Deputy Clerk*

PA0072

mary judgment, and the Corporation's cross-motion for summary judgment.

KEY NUMBER SYSTEM

**Chadrick Evans FULKS, Petitioner,**

**v.**

**UNITED STATES of America, Respondent.**

**C/A No. 4:08–70072–JFA.**
**CR No. 4:02–992–JFA.**

United States District Court,
D. South Carolina,
Florence Division.

Aug. 20, 2010.

**Background:** Defendant was convicted in the United States District Court for the District of South Carolina, Joseph F. Anderson, Jr., Chief Judge, of carjacking and kidnapping resulting in the death of victim, and defendant appealed imposition of death sentence. The United States Court of Appeals for the Fourth Circuit, 454 F.3d 410, affirmed, and the United States Supreme Court, 551 U.S. 1147, 127 S.Ct. 3002, 168 L.Ed.2d 731, denied relief. Thereafter defendant returned to district court with a petition to vacate, set aside, or correct his federal death sentence.

**Holdings:** The District Court, Joseph F. Anderson, Jr., J., held that:

(1) it was not ineffective for counsel not to call additional experts to explain the possible connection between defendant's childhood, his drug abuse, the true effects of powerful stimulants, his alleged cognitive problems and the crimes he was charged with committing;

(2) counsel's investigation of mitigation evidence was not constitutionally inadequate;

(3) counsel were not ineffective in advising defendant to give a statement to the FBI when no proffer letter or plea agreement was in place;

(4) counsel was not ineffective for advising defendant to plead guilty to carjacking; and

(5) defendant's Fifth and Eighth Amendment rights were not violated by evidence of efforts to locate victim's body.

Petition denied.

**1. Criminal Law** ⟨key⟩**1451, 1452**

As a general rule, relief on motion to vacate, set aside or correct sentence is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a complete miscarriage of justice, or led to proceedings which were inconsistent with the rudimentary demands of fair procedure. 28 U.S.C.A. § 2255.

**2. Criminal Law** ⟨key⟩**1890**

If the claim or claims that counsel failed to raise are devoid of legal merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

**3. Criminal Law** ⟨key⟩**1519(8)**

In a case where a defendant enters a plea of guilty, the defendant, in order to obtain relief on motion to vacate, set aside or correct sentence, must show that (1) his or her counsel's representation fell below an objective standard of reasonableness demanded of attorneys in criminal cases, and (2) there is a reasonable probability that, but for counsel's errors, he or she would have proceeded to trial instead of pleading guilty. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2255.

PA0073

**536**

**4. Criminal Law ⚖1871**

A defendant bears the burden of proof as to both prongs of the *Strickland* ineffective assistance of counsel standard. U.S.C.A. Const.Amend. 6.

**5. Criminal Law ⚖1871, 1884**

Courts should be deferential in inquiring into ineffectiveness of counsel claim, and have a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; defendant must overcome the presumption that the representation might be considered sound trial strategy. U.S.C.A. Const. Amend. 6.

**6. Criminal Law ⚖1883**

In demonstrating that counsel's inadequate performance prejudiced him, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability, in turn, is defined as a probability sufficient to undermine confidence in the outcome. U.S.C.A. Const.Amend. 6.

**7. Criminal Law ⚖1888**

Courts may bypass the performance prong of ineffective assistance of counsel inquiry, and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice. U.S.C.A. Const.Amend. 6.

**8. Criminal Law ⚖1961**

It was not ineffective for counsel in capital murder trial not to call additional experts to explain the possible connection between defendant's childhood, his drug abuse, the true effects of powerful stimulants such as methamphetamine, his alleged cognitive problems and the crimes he was charged with committing; additional mitigation evidence that defendant claimed should have been presented would have opened the door for the government to present very damaging evidence against defendant, as such evidence might have included evidence that defendant had physically abused his three-year-old step son and that defendant escaped from prison because he knew he was about to be arraigned on child abuse charges. U.S.C.A. Const.Amend. 6.

**9. Criminal Law ⚖1961**

Defendant failed to demonstrate prejudice under *Strickland* due to defense counsel's failure to present additional expert testimony on cumulative humanizing evidence in capital murder trial; counsel pursued a reasonable trial strategy that would have been undermined by the expert testimony that defendant had met the diagnostic measures of antisocial personality disorder and detract from defense's theory that defendant's associate was the instigator of the crimes. U.S.C.A. Const. Amend. 6.

**10. Criminal Law ⚖629(3.1)**

Prosecution in a capital case is statutorily required to provide the defendant with a list of potential witnesses at least three days prior to trial; however, statute does not apply to witnesses called to rebut or disprove the defendant's defense. 18 U.S.C.A. § 3432.

**11. Criminal Law ⚖1906**

Even if defense counsel failed to anticipate testimony of certain prosecution witnesses during the government's case-in-chief even though they were not listed on the pretrial witness list, any failure to realize that those witnesses could have been called as a rebuttal witnesses did not diminish or prejudice capital murder defendant's case so as to constitute ineffective assistance of counsel; trial counsel used the witnesses's testimony to support defense strategy that defendant's mental capabilities were so limited by his dam-

aged brain that he was easily manipulated by his associate. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3432.

**12. Criminal Law ⟐1954**

Counsel is only required under Sixth Amendment to make a reasonable investigation for possible mitigating evidence. U.S.C.A. Const.Amend. 6.

**13. Criminal Law ⟐1960**

Trial counsel's investigation of mitigation evidence enabled them to make an adequate and meaningful presentation of mitigation evidence which painted an empathetic picture of capital murder defendant's life; trial counsel painted a compelling and empathetic picture of a young defendant growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being, and most of nine uncalled witnesses's testimony would have been cumulative to the testimony of other witnesses who gave compelling descriptions of the depravity of the conditions in the defendant's home. U.S.C.A. Const.Amend. 6.

**14. Criminal Law ⟐1955**

For purposes of ineffective assistance of counsel claim, a trial counsel's failure to present merely cumulative mitigating evidence does not prejudice a defendant's case. U.S.C.A. Const.Amend. 6.

**15. Criminal Law ⟐1891**

Trial counsel's use of law students to assist in the mitigation investigation in capital murder case did not constitute ineffective assistance of counsel; trial counsel hired trained investigators and mitigation specialists to conduct the bulk of the mitigation investigation, including a private investigator, and an investigator employed by an organization regularly retained by the federal public defender. U.S.C.A. Const.Amend. 6.

**16. Criminal Law ⟐1969**

Appellate counsel was not ineffective for failing to appeal the format employed by court in explaining the role of mitigating factors during deliberations in capital murder case; court listed on the verdict form virtually every mitigator suggested by the defendant, placed no restrictions on the amount of trial testimony received regarding mitigation, and instructed the jury there was "no limit" on the number of mitigators that it could consider. U.S.C.A. Const.Amend. 6.

**17. Criminal Law ⟐1944**

Defendant's counsel was not ineffective for failing to object to the prosecutor's argument in capital murder trial; assuming that the law announced by *Tennard* was clear at the time the challenged summation was made, prosecutor's argument did not imply a strict causal nexus was required, and to the extent the prosecutor might have suggested that indirectly, court's omnibus jury charge clearly explained to the jury the proper role of mitigating factors in the case. U.S.C.A. Const.Amend. 6.

**18. Criminal Law ⟐1932**

Trial counsel were not ineffective in advising defendant to give a statement to the FBI when no proffer letter or plea agreement was in place in capital murder case; trial counsel's decision to have defendant give a statement was a reasonable trial strategy, especially in light of the multitude of witnesses and physical evidence of defendant's participation in seventeen-day crime spree, the decision to give the statement was part and parcel of the decision to plead guilty, to get defendant's version out without exposing him to the microscope of cross-examination given his lengthy criminal record, and it was reasonable for trial counsel to advise defendant

to give the statement without a proffer or plea agreement for the strategic reason that it showed some level of acceptance of responsibility and remorse for accepting the role he had in the crimes, while most significantly, establishing his position that he was not the killer, and defendant failed to show that the outcome of his trial would have been different had he not given the statement to the FBI. U.S.C.A. Const. Amend. 6.

**19. Criminal Law ⟲1963**

Trial counsel were not ineffective for failing to insist that additional "catch-all" mitigation instruction and "minor participation" mitigation instruction be included on the verdict form in capital murder trial; court told the jury that there was, essentially, no limit on the number of factors or things that the jury could consider in mitigation, and trial counsel risked the possibility of a strong adverse reaction from the jury to suggest that defendant's participation in an extensive seventeen-day spree that spanned seven states and affected at least thirteen identifiable victims was "minor." U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3592(a)(8).

**20. Conspiracy ⟲41**

Generally, *Pinkerton* doctrine imposes vicarious liability on a co-conspirator for the substantive offenses committed by the members of the conspiracy when the offenses are committed during and in furtherance of the conspiracy.

**21. Criminal Law ⟲1429(2)**

Claims challenging guilty plea which postconviction petitioner had opportunity to raise on direct appeal, but did not, were procedurally defaulted. 28 U.S.C.A. § 2255.

**22. Criminal Law ⟲1920**

Any incomplete or inaccurate assessment of *Pinkerton* with regard to counsel's

advising defendant to plead guilty to capital offense, which was premised upon a *Pinkerton* theory, was cured when the jury returned a verdict of death on count charging kidnapping resulting in death to which the defendant pled guilty without reliance upon *Pinkerton*. U.S.C.A. Const. Amend. 6.

**23. Criminal Law ⟲1892, 1920**

Trial counsel was not ineffective for advising defendant to plead guilty to carjacking because it was done pursuant to a reasonable legal trial strategy; in light of the overwhelming evidence against defendant, trial counsel employed a valid and reasonable trial strategy in anticipatorily heeding the dictate in *Nixon* that, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed, and, in advising defendant to plead guilty and proceed directly to the sentencing phase in an effort to avoid a death sentence, trial counsel reasonably determined that it was in defendant's best interest to concede guilt as a way of showing remorse and accepting responsibility. U.S.C.A. Const. Amend. 6.

**24. Criminal Law ⟲1961**

Trial counsel was not ineffective in failing to present evidence of defendant's associate's manipulation and leadership such that it would have overcome the prosecution's compelling exegesis of defendant's own manipulation and leadership warranting the imposition of the death penalty; defendant's actions could not be described as lesser such that he could reasonably be considered to have been a minor participant in extensive seventeen-day spree that spanned seven states and affected at least thirteen identifiable victims. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3592(a)(3).

**25. Sentencing and Punishment ☞1657**

A co-conspirator's state of mind is not relevant to the jury's determination of the proper punishment of another defendant because the Eighth Amendment requires an individualized determination of sentencing in death penalty cases. U.S.C.A. Const.Amend. 8.

**26. Criminal Law ☞1961**

Trial counsel's decision to call only one of the three potential witnesses for testimony regarding future dangerousness was not constitutionally ineffective trial strategy in capital case; presentation of other two potential witnesses would render them subject to impeachment which could have seriously undermined the witnesses's credibility, if not the credibility of the entire defense case. U.S.C.A. Const.Amend. 6.

**27. Criminal Law ☞1880**

Sixth Amendment guarantee of counsel does not guarantee an ideal or perfect representation. U.S.C.A. Const.Amend. 6.

**28. Criminal Law ☞1901**

Defendant failed to show that juror's participation in capital murder trial affected the fairness or the reliability of the trial, and that if trial counsel had asked juror about whether any close relatives had been a victim of a crime, the result would have been different. U.S.C.A. Const.Amend. 6.

**29. Criminal Law ☞1901**

Trial counsel's decision to seat certain venirepersons and not to request additional peremptory strikes was based on a reasonable strategy of preserving an issue for possible reversal. U.S.C.A. Const.Amend. 6.

**30. Criminal Law ☞1969**

Appellate counsel were not ineffective for not appealing court's ruling sustaining a government objection to a statement by sheriff regarding a partial "admission" allegedly made by defendant's associate; appellate could would not have found an abuse of discretion by the court in denying the admission into evidence of the statement, which statement tended to show that associate was involved in charged murder, but did not absolve defendant of involvement in the murder. U.S.C.A. Const. Amend. 6.

**31. Constitutional Law ☞4629**

Mere inconsistency in the government's argument does not violate due process, it is the use of inherently factually contradictory theories that violates due process. U.S.C.A. Const.Amend. 5.

**32. Criminal Law ☞1999**

There was no plea agreement or other promise from the government outstanding at the time witness gave her testimony in defendant's trial, and thus no agreement that prosecution was obliged to disclose under *Brady*; any decision by police department to drop the relatively minor misdemeanor charges against her occurred after the trial had concluded and was not made pursuant to the agreement with the prosecutors in defendant's case.

**33. Criminal Law ☞2132(1)**

Fifth Amendment precludes a prosecutor from commenting to a jury on the failure of an accused to testify in his own defense. U.S.C.A. Const.Amend. 5.

**34. Sentencing and Punishment ☞1780(2)**

Failure to strike prosecutor's closing remark which told the jury that in sentencing defendant to death, they would be engaging in "an act of self defense" was not error; self-defense comment was brief and was part of a larger discussion of the issue of future dangerousness.

**35. Criminal Law ☞1925**

Trial counsel's strategic decision to not question defendant's brother on the stand about a .45 revolver given to him by defendant was a reasonable judgment and did not constitute ineffective assistance of counsel; trial team analyzed the issue, and ultimately decided that they "needed" brother's testimony, and did not want to alienate him because of the favorable testimony that he could provide about defendant's life and background. U.S.C.A. Const.Amend. 6.

**36. Criminal Law ☞1961**

Capital murder defendant failed to demonstrate how lay mitigation witnesses' testimony would have been stronger with any additional preparation by trial counsel, and therefore lack of additional preparation of those witnesses did not constitute ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

**37. Constitutional Law ☞4722**

In analyzing the effects of improper prosecutorial sentencing phase arguments on due process, courts look to see whether the proceeding at issue was rendered fundamentally unfair by the improper argument; such a determination requires the court to consider the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated. U.S.C.A. Const.Amend. 5.

**38. Criminal Law ☞1962**

Trial counsel's failure to object to the government's alleged improper insertion of religion in its closing argument in capital murder trial was not constitutionally ineffective; government's two comments were fleeting and were, at most, veiled references to biblical language, and the defense itself suggested that the jury should use the Bible to influence its deliberations. U.S.C.A. Const.Amend. 6.

**39. Criminal Law ☞1961**

Trial counsel were not constitutionally ineffective for not bringing capital defendant's artistic ability to the attention of the jury; evidence of defendant's artistic ability would have had little positive effect on the jury and most probably would have been counterproductive. U.S.C.A. Const. Amend. 6.

**40. Sentencing and Punishment ☞1796**

Use of lethal injection to carry out death sentence would not violate the Eighth Amendment. U.S.C.A. Const. Amend. 8.

**41. Constitutional Law ☞4744(2)**

**Sentencing and Punishment ☞1756**

Capital murder defendant's Fifth and Eighth Amendment rights were not violated by evidence of efforts to locate victim's body, which was discovered four-and-a-half years after the trial, and defendant's assistance in that regard; furthermore, defendant made no showing that sentencing jury's decision might have been different had two brief references to the search efforts been omitted from the trial. U.S.C.A. Const.Amends. 5, 8.

———

Chadrick E. Fulks, Terre Haute, IN, pro se.

Kirsten Elena Small, Nexsen Pruet, Greenville, SC, Amy Gershenfeld Donnella, Billy Nolas, Federal Community Defender Office, Philadelphia, PA, for Petitioner.

Jimmie Ewing, Robert F. Daley, Jr., Jeffrey Mikell Johnson, Robert C. Jendron, Jr., William Kenneth Witherspoon, U.S. Attorneys Office, Columbia, SC, for Respondent.

ORDER DENYING PETITION
FOR RELIEF UNDER 28
U.S.C. § 2255

JOSEPH F. ANDERSON, JR., District
Judge.

### INTRODUCTION

Chadrick Evans Fulks was sentenced to death by a South Carolina federal jury for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan. After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit [1] and the United States Supreme Court,[2] Fulks returns to this court with a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his federal death sentence.

Contending that his trial counsel were constitutionally ineffective in a variety of ways, and that other violations of his constitutional rights render his death sentence infirm, Fulks asserts thirty-three claims in his § 2255 petition, as amended. Because the court finds no merit to any of the grounds of error asserted, the petition is denied for the reasons that follow.

### PROCEDURAL HISTORY OF THE UNDERLYING CRIMINAL CASE

*Facts Relating to the Criminal Acts*

The facts surrounding the abduction, rape, and murder of Alice Donovan were set out at length by the Fourth Circuit Court of Appeals in Fulks's direct appeal of this case. The undersigned hereby incorporates the following facts in this order:

Fulks, who grew up in the tri-state area around Huntington, West Virginia, began dating an exotic dancer named Veronica Evans in April 2002. Shortly thereafter, Fulks, who was then twenty-five years old, began living with Evans and her three-year-old son Miles in the eastern Kentucky community of Lewisburg. On June 11, 2002, Fulks and Evans were married. Fulks supported his new family in the same way he had supported himself for years—by breaking into cars and stealing. And as he had with other women, Fulks often became violent with Evans, sometimes beating her severely and assaulting her sexually.

On August 25, 2002, Fulks directed Evans to use a stolen credit card to buy a necklace at a Wal–Mart in Madisonville, Kentucky. Upon entering the store, Evans reported to police that Fulks was in the parking lot with a gun and that she was afraid he would kill her. The police responded and searched Evans's car, discovering, among other things, stolen credit cards and a pistol. The officers subsequently arrested Evans and Fulks and transported them to the Hopkins County Detention Center (the "HCDC"). Three-year-old Miles was placed in foster care. On August 27, 2002, Evans agreed to cooperate with the government and was released from the detention center. On the basis of evidence seized from their home, Fulks was ultimately charged with twelve counts of credit card fraud in Hopkins County, Kentucky.

Brandon Basham had been housed at the HCDC on bad check charges for over a year when Fulks arrived in late August 2002. According to guards at the prison, Basham was disruptive and annoying, often pestering his fellow inmates. In order to protect him from other prisoners, Basham was frequently

---

**1.** *United States v. Fulks,* 454 F.3d 410 (4th Cir.2006)

**2.** *Fulks v. United States,* 551 U.S. 1147, 127 S.Ct. 3002, 168 L.Ed.2d 731 (2007)

reassigned cell mates, and, in mid-October 2002, he was placed in a cell with Fulks. On November 3, 2002, after about two months in custody, the Kentucky State Police served Fulks with an indictment charging him with first degree abuse of a child aged twelve years or younger (Miles).[3] The next evening, at approximately 6:30 p.m., a jailer released Fulks and Basham, at Basham's request, into an outdoor recreation area. The jailer became diverted administering medication to other inmates, and when she returned at about 8:00 p.m. to check on Fulks and Basham, they were gone. They had escaped from the HCDC through the ceiling of the recreation area by using a makeshift rope made of blankets and sheets.

By the following day, November 5, 2002, Fulks and Basham had made their way on foot to the residence of James Hawkins, about eight to twelve miles from the HCDC. Basham approached the residence and, after using the phone, persuaded Hawkins to drive him and Fulks to a nearby convenience store. Shortly after departing from the house, Hawkins agreed to drive Fulks and Basham to their car, which they claimed to be located about forty miles away in Robards, Kentucky. At some point, Basham pulled a knife on Hawkins, and Fulks ordered Hawkins to pull to the side of the highway so that Fulks could drive. Soon thereafter, Fulks stopped the truck on a remote state road, intending to abandon Hawkins. Basham started to tie Hawkins to a tree, but Fulks, dissatisfied with Basham's effort, soon took over the job. Once Fulks was convinced that Hawkins would be unable to escape, he and Basham departed in Hawkins's truck. Hawkins freed himself some fifteen hours later, hailed a passing motorist, and called the police. According to Hawkins's testimony at trial, although Basham held him at knifepoint throughout the carjacking incident, Fulks remained in charge, with Basham merely following Fulks's orders.

After leaving Hawkins, Fulks and Basham drove to Portage, Indiana, where, on November 6, 2002, they abandoned Hawkins's truck at a hotel and proceeded on foot to a trailer shared by Tina Severance and Andrea Roddy. Fulks had met Severance at the Westville (Indiana) Correctional Institute in 2001, while he was serving time there and she was working as a correctional officer. After a few hours in the trailer, Fulks and Basham became very nervous, and the four of them (Fulks, Basham, Severance, and Roddy) travelled in Severance's van to the Sands Motel in northern Indiana, where they spent the next two nights. At some point while at the Sands Motel, Fulks told Severance that he had escaped from prison because he feared a lengthy prison sentence on the pending child abuse charges. During their second night at the Sands Motel, Fulks asked Severance if she knew where they could obtain firearms. She replied that a friend, Robert Talsma, kept firearms at his home in nearby Michigan City, Indiana. On the morning of November 8, 2002, in accordance with a preconceived plan, Severance and Roddy lured Talsma away while Fulks and Basham broke into his home and stole several firearms, as well as a ring and some checks.

The four of them then drove Severance's van to Sturgis, Michigan, where

---

**3.** The government had photographs of the child to support its allegation that Fulks abused the child by striking his testicles, burning his genital area, bruising his back, and leaving a choke mark on his neck. (Presentence Investigation Report ''PSR'' at 29.)

they rented a motel room.  Basham and Roddy spent the night of November 8, 2002, at the motel, while Fulks and Severance spent that night in Goshen, Indiana, smoking marijuana and methamphetamine with Fulks's brother, Ronnie Fulks.  The next day, Fulks and Severance returned to the Sturgis motel to find Basham crouched on the floor holding a gun.  Apparently convinced that the authorities had caught up with them, Basham was highly agitated, repeatedly asserting that he was going to shoot a police officer.  He eventually calmed down, and the four then drove to the Indiana home of Ronnie Fulks, where they spent the night.

On November 10, 2002, Fulks, Basham, Severance, and Roddy, with Fulks driving Severance's van, travelled to Piketon, Ohio, where they checked into a Town and Country Motel.  They then drove to a nearby Wal–Mart, where Basham wrote bad checks for items that Roddy later returned for cash.  Also on November 10, 2002, at a K–Mart in Piketon, Ohio, Fulks met a young woman with a butterfly tattoo (later determined to be Heather Jacobi) with whom he used drugs.  On that same date, Fulks stole a purse and cell phone belonging to nineteen-year-old Amy Ward from a vehicle parked at a Wal–Mart in Waverly, Ohio. On the following day, Fulks, Basham, Severance, and Roddy drove to Kenova, West Virginia, and rented a room at the Hollywood Motel. Fulks and Basham then left the motel, not to return until the early morning hours of November 12, 2002.

According to statements Fulks made to the FBI in 2003, after he and Basham left the Hollywood Motel on November 11, 2002, they smoked methamphetamine and then drove to the Barbours-

ville Mall, near Huntington, West Virginia, intending to break into cars and steal purses.  When they arrived at the mall, they split up.  The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name.  In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns.  After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car.  They then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to find a place to rape Burns.  Fulks then followed Basham in Severance's van to a secluded area by the Ohio River.  Fulks parked some distance from Burns's car, and in such a way that his view of the passenger side of the car was obstructed.  He observed Basham exit the driver's side of the car and walk around to the passenger's side.  He saw nothing else until about twenty minutes later when Basham-alone-drove Burns's car to where Fulks was parked and informed Fulks that he wanted to burn the vehicle in order to remove any fingerprints.  After buying gasoline, Basham set fire to Burns's car on a rural road near Lavalette, West Virginia, and he and Fulks returned to the Kenova motel.  From that point forward, Basham wore, on a chain around his neck, a heart-shaped ring that was later determined to belong to Burns.  Although both Fulks and Basham have admitted that Burns is dead, her body has never been recovered.[4]

4.  In connection with Burns's death, Basham    and Fulks each received sentences of life im-

On November 12, 2002, Fulks, Basham, Severance, and Roddy drove the van to Little River, South Carolina, where Fulks had lived during the late 1990s. During their trip to Little River, Basham repeatedly taunted Severance by asking whether she wanted to go "swimming" in the Ohio River. Fulks eventually ordered Basham to stop teasing Severance, and Basham complied. When the four of them arrived at Little River, they checked in at the Lake Shore Motel. Fulks and Basham spent the following day, November 13, 2002, breaking into cars and stealing purses. On November 14, the four left Little River for the Beach Walk Hotel in Myrtle Beach, South Carolina. After checking in, Fulks and Basham left the hotel in Severance's van.

At around 2:00 p.m. on November 14, 2002, Carl Jordan stumbled upon Fulks and Basham burglarizing his son's residence outside Conway, South Carolina. According to Jordan, both Fulks and Basham fired gunshots at him, with Fulks shooting out the back window of Jordan's truck.[5] Jordan then attempted to retreat in his truck, with Fulks and Basham following in Severance's van. Fulks and Basham eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck. They then made their way to a Wal–Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car.

At 2:37 p.m. that same day, a Wal–Mart surveillance camera recorded a blue BMW driven by Alice Donovan en-ter the Wal–Mart parking lot, with Fulks and Basham following closely behind. As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW. Both vehicles then began moving again, travelling outside the range of the cameras. Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat. After leaving the Wal–Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines. At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan. According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so. They then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities. Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car. Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so. Basham then led Donovan into the woods and out of Fulks's sight. He returned twenty minutes later, alone. As with Burns, both Fulks and Basham have admitted that Donovan was killed, but her body has never been found.[6]

---

prisonment in the Southern District of West Virginia, after pleading guilty to the federal offense of carjacking resulting in death, in violation of 18 U.S.C. § 2119.

**5.** A defense expert testified at trial that the trajectory of the bullet that shattered the win-dow of Jordan's truck belied Jordan's belief that Fulks had fired the shot.

**6.** As noted in this order, Donovan's remains were found subsequent to the Fourth Circuit's decision on the direct appeal of Fulks's conviction.

Fulks and Basham then returned to the Beach Walk Hotel in Myrtle Beach, where they informed Severance and Roddy that the police were in possession of the van, and that Fulks and Basham needed to return to West Virginia alone. According to Fulks, it was on their return journey to West Virginia that Basham first informed him that he had killed Burns and Donovan. On November 15, 2002, Fulks and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a friend of Fulks. McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did.

Two days after arriving at McGuffin's home, on November 17, 2002, Fulks and Basham drove to the Ashland Mall in nearby Ashland, Kentucky, where they planned to break into cars. At around 7:30 p.m., in the Ashland Mall parking lot, Basham attempted to carjack Deanna Francis and her fifteen-year-old daughter. After Francis reported the incident, a police officer spotted Basham and began to pursue him on foot. Basham initially eluded the officer by running behind some railcars, but he was apprehended at around 9:00 p.m. that evening, hiding across the railroad tracks in the Ohio River.

Fulks returned to McGuffin's home late that same evening and was there when the television stations reported Basham's arrest. The following day, November 18, 2002, Fulks left Huntington in Donovan's BMW for his brother's home in Goshen, Indiana. That evening, an Ohio State Trooper, having observed the BMW and ascertained that it was stolen, attempted to apprehend Fulks at a rest area near Marion, Ohio. Following a highway chase reaching speeds of 130 miles per hour, Fulks narrowly escaped. He arrived at his brother's home in Indiana on the evening of November 19, 2002, and, on the morning of November 20, 2002, hid the BMW in a barn near Bristol, Indiana. Police officers had earlier set up a surveillance operation at Fulks's brother's home and, on the afternoon of November 20, 2002, after a brief foot chase, Fulks was finally apprehended.

*Fulks*, 454 F.3d at 413–17.

### *The Criminal Indictment and Notice to Seek the Death Penalty*

Fulks and Basham were indicted in the District of South Carolina on December 17, 2002. The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the Death Penalty on the first two Counts: (1) carjacking resulting in Alice Donovan's death (18 U.S.C. § 2119); and (2) kidnapping resulting in Alice Donovan's death (18 U.S.C. § 3571).

The notice of intent to seek the death penalty was filed on September 13, 2003, pursuant to 18 U.S.C.A. § 3593(a) and the Federal Death Penalty Act ("FDPA").

### *Appointment of Defense Counsel*

Pursuant to the Federal Death Penalty Act,[7] this court initially appointed two attorneys to represent Fulks: John H. Blume and William F. Nettles IV. Attorney Sheri Lynn Johnson also began working on the case from the beginning (HT

---

**7.** The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. *See*

Pub.L. No. 103–322, Title VI, §§ 60001–26, Sept. 13, 1994, 108 Stat.1959 (codified at 18 U.S.C. § 3591–3598).

Vol. 4 at 11), and the court subsequently admitted her pro hac vice. These lawyers were joined by an array of pro bono lawyers and law students from Blume and Johnson's clinic at Cornell Law School to provide an experienced defense team to represent Fulks.

### Counsel's Qualifications

Blume graduated from Yale Law School in 1984, and served as a law clerk to the Honorable Thomas A. Clark of the United States Court of Appeals for the Eleventh Circuit. After several years in private criminal defense practice, he became the Executive Director of the South Carolina Death Penalty Resource Center in 1988, where he remained until 1996. He joined Cornell Law School as a professor in 1993, and, in conjunction with Cornell professors

Sheri Lynn Johnson and Stephen Garvey, formed the Cornell Death Penalty Project to "foster empirical scholarship on the death penalty, offer students an opportunity to work on death penalty cases, and provide information and assistance to death penalty lawyers." [8] Blume teaches courses on criminal procedure, evidence law, the Death Penalty in America, and also supervises several capital clinics at Cornell Law School. Additionally, since 1996 Blume has served on the Habeas Assistance and Training Project Counsel which consults with the Defender Services Committee of the Administrative Office of the United States Courts.

In addition to his noteworthy scholarly activity,[9] Blume has been an active presenter at related educational seminars.[10] In

---

**8.** *See* http://www.lawschool.cornell.edu/faculty/bio.cfm?id=5; last checked July 29, 2010.

**9.** According to Blume's CV, which is available on the Cornell Law School website, Blume has recently authored the following publications: *In Defense of Non–Capital Habeas: A Reply to Hoffman and King,* with Sheri Johnson, and Keir Weyble, Cornell L.Rev. (forthcoming, Fall 2010); *When Lightning Strikes Back: South Carolina's Return to the Unconstitutional, Standardless, Capital Sentencing Regime of the Pre–Furman Era,* Charleston L.Rev., (forthcoming, Fall 2010); *The Dance of Death or (Almost) "No One Gets Out of Here Alive": The Fourth Circuit's Capital Punishment Jurisprudence,* with Sheri Johnson, Emily Paavola, and Keir Weyble, 61 S.C. L.Rev. 465 (2010); FEDERAL HABEAS CORPUS UPDATE, with Mark Olive, Denise Young & Keir Weyble (Administrative Office of the U.S. Courts, 20th Ed., August 2009); *Unstacking the Deck: A Handbook for Capital Defense Attorneys Challenging the State's Case in Aggravation,* with Emily Paavola (Death Penalty Defense and Resource Center, December 2009); *Statement Handbook: Questions to Ask About the Admissibility of a Criminal Defendant's Statements,* with Emily Paavola (Death Penalty Defense and Resource Center, August 2009); *Gilmore v. Utah: The Persistent Problem of Volunteers,* in Blume & Steiker, DEATH PENALTY STORIES (Foundation

Press 2009); *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases,* with Sheri Johnson and Christopher Seeds, 18 Cornell J.L. & Pub. Pol'y 689 (2009); *An Empirical Look at Atkins v. Virginia and its Application in Capital Cases,* with Sheri Johnson and Christoper Seeds, 76 Tenn. L.Rev. 625 (2009); *Back to the Future: Reversing Keith Simpson's Death Sentence and Making Peace with the Victim's Family Through Post–Conviction Investigation,* 77 UMKC L.Rev. 963 (2009); *Mental Retardation and the Death Penalty Five Years After Atkins,* with Sheri Johnson and Christopher Seeds, in THE FUTURE OF AMERICA'S DEATH PENALTY (Carolina Academic Press 2009); *Crime Labs and Prison Guards: A Comment on Melendez–Diaz and its Potential Impact on Capital Sentencing,* with Emily Paavola, 3 Charleston L.Rev. 205 (2009).

**10.** In 2009 alone, Blume made the following presentations: *" 'Volunteers:' The Relationship between Suicide and Death Row Inmates who Waive their Appeals,"* American Academy of Psychiatry and the Law Annual Meeting, November 2009, Baltimore, MD;. *"New Hope for an Old Punishment? What will the Future Bring: The Death Penalty in Thailand and China,"* Clarke East Asia Speaker Series, Cornell Law School, October, 2009, Ithaca, NY; *"The Fourth Circuit's Capital Punishment Jurisprudence,"* Fourth Circuit Symposium, Uni-

recent years, Blume has been involved as counsel of record in eighteen cases in which the federal death penalty was sought. He was successful in securing a verdict of life without parole, either by way of a jury verdict or a negotiated plea, in all eighteen cases. Further, he has been involved in approximately twenty habeas actions brought pursuant to § 2254 challenging state death penalty convictions, and an additional twenty federal proceedings under § 2255.

Recently, Blume served as the featured speaker at a symposium in Columbia, South Carolina, sponsored by the South Carolina Law Review. The symposium focused on Fourth Circuit appellate procedures and jurisprudence. As an outgrowth of that project, Blume has authored an article published in the South Carolina Law Review dealing with the Fourth Circuit's death penalty jurisprudence. 61 S.C. L.Rev. 3 (2010). He is also the coauthor of an article that appeared in the March 2010 issue of the *South Carolina Lawyer* magazine, a publication of the South Carolina Bar. John H. Blume and Emily C. Paavola, *Is It Admissible? Tips for Criminal Defense Attorneys on Assessing the Admissibility of a Criminal Defendant's Statements,* South Carolina Lawyer, March 2010, at 28.

William F. Nettles IV has been an Assistant Public Defender with the Federal Public Defender's Office in Florence, South Carolina, for the past fifteen years.

After graduating from the University of South Carolina School of Law in 1988, Nettles served as a law clerk to the Honorable John Hamilton Smith of the South Carolina Circuit Court before becoming an Assistant Solicitor. Thereafter, he worked for five years in private practice before joining the Federal Public Defender's Office.

Assisting Blume and Nettles on a pro bono basis was Sheri Lynn Johnson, also a Professor of Law at Cornell Law School, where she has served as the Assistant Director of the Cornell Death Penalty Project since 1996. Johnson graduated from Yale Law School in 1979, and worked for a year in the Criminal Appeals Bureau of the New York Legal Aid Society before joining the Cornell Law School faculty in 1981. She currently teaches constitutional and criminal law, and supervises the Post–Conviction Litigation and Capital Trial Clinics.

Like Blume, Johnson balances her academic work with courtroom participation in capital criminal cases. She has worked on two death penalty trials and has also been involved, directly or as second chair, with eight additional capital cases that were resolved short of a trial. Significantly, of the ten capital cases she was involved with prior to this case (two trials and eight pleas), all of the defendants received a life sentence rather than the death penalty. Johnson has also worked on approximately thirty capital post-conviction relief petitions over the last fifteen years.

---

versity of South Carolina School of Law, October 2009, Columbia, SC; *"Criminal Cases Pending before the Supreme Court," Supreme Court Preview,* William & Mary School of Law, October 2009, Williamsburg, VA; *"Supreme Court Update,"* National Habeas Corpus Seminar, August 2009, Pittsburgh, PA; *"Protecting Relief: Strategies for Getting Certiorari Denied,"* Supreme Court Advocacy Institute, New York University School of Law,

June 2009, New York, NY; *"An Empirical Analysis of Post–Atkins Mental Retardation Claims in Capital Litigation,"* National Seminar on the Development and Presentation of Mitigating Evidence in Capital Cases, April 2009, Philadelphia, PA; *"The Death Penalty: What Will the Future Bring?"* Charleston Law School, March 2009, Charleston, SC. From 2001 to 2008, Blume made at least twenty-one other presentations.

Blume and Johnson utilized the services of several Cornell law students primarily to perform basic legal research and locate witnesses. Additionally, the trial team included the assistance of Blume's associate in his South Carolina office, Keir Weyble. Further, pursuant to the provisions of the FDPA, this court authorized the defense team to enlist the assistance of various professionals including social workers, mitigation specialists, investigators, physicians, and mental health experts. Numerous submissions for compensation of these necessary adjuncts were submitted to the court and none was declined. It appeared to the court that because the crime spree involved in this case spanned seventeen days and covered seven states, with thirteen identifiable victims (including two women who were raped and killed, and several other individuals who narrowly escaped death), the defense team would need a full panoply of resources to mount a proper defense to what promised to be a vigorous prosecution by the United States government.

### *The Guilty Plea*

In January 2004, the court determined that it would be necessary to sever Basham and Fulks for separate trials. On May 4, 2004, six days before the scheduled commencement of jury selection, Fulks decided to tender pleas of guilty to all eight counts of the superseding indictment and the court began the colloquy required by Rule 11 of the Federal Rules of Criminal Procedure. With regard to the carjacking and kidnapping counts on which the prosecution was seeking the death penalty, Fulks admitted to raping Donovan, but

disclaimed any knowledge or participation in her murder.

Near the end of the Rule 11 colloquy, the court asked Fulks to detail his involvement in the crimes for which he was pleading guilty. Fulks responded, through Blume, his attorney, that he would rely on his Rule 302 Statement (the "302") given to the Federal Bureau of Investigation during the investigatory stage of the case. When the court expressed its concern about the propriety of accepting a guilty plea to an offense carrying a potential death sentence without a clear admission by the defendant that he participated in the conduct at issue, defense counsel suggested that, for Count One at least, a guilty plea could be tendered pursuant to the *Pinkerton* theory of liability.[11]

After the court expressed its continued concern regarding the validity of the tendered plea, the court adjourned the Rule 11 colloquy for four days and invited counsel for both the government and the defendant to research the issue and submit memoranda on the viability of a guilty plea to a capital case under *Pinkerton*.

Both the government and the defense responded with memoranda arguing that a plea pursuant to *Pinkerton* was appropriate under the circumstances presented in this case. The court thereupon accepted Fulks's guilty plea as to Count One, premised upon a *Pinkerton* theory of liability, and then accepted Fulks's plea to Counts Two through Eight as well, with no reliance on *Pinkerton*.

Upon Fulks's guilty plea, the court proceeded with the penalty phase to select jurors who would determine Fulks's sentence. Jury selection on the penalty phase

---

**11.** Under the *Pinkerton* doctrine, a conspirator may be held liable for an act committed by a fellow conspirator when the act is committed in furtherance of the conspiracy, falls within the scope of the conspiracy, or is rea-

sonably foreseeable as a natural consequence of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

of the case required two weeks beginning May 10, 2004. The five-week trial commenced on June 1, 2004, and on June 30, 2004, the jury deliberated and returned a verdict of death on Counts One and Two. The jury convicted Fulks on the remaining noncapital counts as well.[12]

### Direct Appeal of Fulks's Conviction

Fulks thereafter appealed to the United States Court of Appeals for the Fourth Circuit, raising seven appellate issues. Fulks's trial counsel (Blume, Nettles, and Blume's law partner, Keir Weyble) were also appointed to represented Fulks on direct appeal.

The seven contentions of error raised by Fulks on direct appeal were that: (1) the district court erroneously permitted the prosecution to present testimony from two witnesses not included on its pretrial witness list; (2) the court abused its discretion in qualifying three jurors who were unconstitutionally prone to impose the death penalty; (3) the court abused its discretion in denying Fulks a new trial on the basis of a juror's failure to disclose during voir dire that her first husband had been murdered; (4) the court abused its discretion in qualifying two jurors whose life experiences rendered them incapable of impartially deciding Fulks's case; (5) the court abused its discretion in excluding testimony concerning three polygraph examinations of Fulks; (6) the court abused its discretion in permitting Donovan's sister to read the jury a 1990 letter that Donovan had written her; and (7) the court erred in concluding that the relaxed evidentiary standard applicable to capital

sentencing proceedings is constitutional. *Fulks,* 454 F.3d at 410.

On July 27, 2006, the Fourth Circuit issued its decision rejecting all seven grounds for appeal and affirming the sentence of death on both Counts One and Two. *Fulks,* 454 F.3d at 410. Fulks then petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court denied the petition on June 25, 2007. *Fulks v. United States,* 551 U.S. 1147, 127 S.Ct. 3002, 168 L.Ed.2d 731 (2007).

### Appointment of Counsel for the § 2255 Petition

Following the refusal of the Supreme Court to hear the case, this court appointed counsel to represent Fulks in his yet-to-be-filed § 2255 petition. Rather than appoint one attorney as allowed by the Federal Death Penalty Act, this court appointed two attorneys to represent Fulks on his collateral review: Beattie B. Ashmore and William W. Watkins, Jr.

Ashmore graduated from the University of South Carolina School of Law and was admitted to the South Carolina Bar in 1987. He was admitted to the United States District Court for the District of South Carolina in 1990 and to the United States Court of Appeals for the Fourth Circuit in 1992. Ashmore worked as an Assistant United States Attorney for the District of South Carolina from 1990 until 1996. He was a partner in the law firm of Ashmore and Yarborough, P.A., in Greenville, South Carolina, from 1996 until 2000, and since 2000, he has been a partner with

---

**12.** The remaining noncapital counts to which Fulks pled guilty, in addition to the carjacking and kidnapping offenses, were: (1) interstate transportation of a stolen motor vehicle (18 U.S.C. § 2312); (2) conspiracy to commit numerous offenses, including carjacking and kidnapping (18 U.S.C. § 371); (3) conspiracy to use firearms in furtherance of a crime of

violence (18 U.S.C. § 924(*o*)); (4) use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)); (5) being felons in possession of firearms (18 U.S.C. § 922(g)(1)); and (6) possession of stolen firearms (18 U.S.C. § 922(j)). *Fulks,* 454 F.3d at 415 n. 3.

Price, Ashmore & Beasley, P.A. Ashmore was appointed by the South Carolina Supreme Court in 2005 to the Commission on Lawyer Conduct. He has had significant indigent criminal defense experience, including handling both appellate matters and general criminal defense in both state and federal court. His trial experience includes serving as lead counsel in numerous criminal trials. His appellate experience, covering more than a dozen appeals at the Fourth Circuit, includes several criminal appeals.

Watkins graduated from the University of South Carolina School of Law in 1999 and served as a law clerk for two years to the Honorable William B. Traxler, Jr., on the United States Court of Appeals for the Fourth Circuit. He was admitted to the United States District Court for the District of South Carolina and to the United States Court of Appeals for the Fourth Circuit in 2001. After his federal clerkship, Watkins worked at the law firm of Womble Carlyle Sandridge & Rice, PLLC, in Greenville, South Carolina. He has substantial experience on issues of federal jurisdiction and appellate procedure, and as a member of his firm's appellate litigation team, he devoted a considerable amount of his time to appellate work in the state and federal systems. Watkins also serves as a pro bono Special Prosecutor for the South Carolina Attorney General's Office and is a Section Counsel Officer for the South Carolina Bar's Trial and Appellate Advocacy Committee.

As with trial counsel, this court was receptive to repeated requests by Fulks's new team of lawyers for compensation for expert and investigatory assistance. The court was informed that the new attorneys representing Fulks in his § 2255 petition would necessarily have to retrace the steps taken by trial counsel in an effort to ascertain if trial counsel had properly interviewed witnesses, pursued available defenses, and adequately researched Fulks's life story. This necessitated a renewed sweep by § 2255 counsel of the seven states involved in the seventeen-day crime spree, review of the voluminous record assembled thus far in this case, and interviews with Fulks's original trial lawyers.

In the Fall of 2008, one of Fulks's appointed § 2255 attorneys, Watkins, accepted an offer to become an Assistant United States Attorney for the District of South Carolina. When the court was informed of this development, it issued a stern warning to Watkins that a "Chinese wall" would have to be erected between him and any other employee of the United States Attorneys Office. Although the investigation had been completed and the initial briefs filed, out of an abundance of caution, the court appointed attorney Kirsten E. Small of Greenville, South Carolina, as substitute counsel to replace Watkins.

Small graduated from Georgetown University Law Center in 1994 and is admitted to the bars of Maryland, North Carolina, and South Carolina, and to the United States District Court for the District of South Carolina, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court. She served as a law clerk to the Honorable William W. Wilkins of the United States Court of Appeals for the Fourth Circuit from 1994 until 2007, when she began working at Nexsen Pruet, LLC, in Greenville, South Carolina. She has been appointed to serve on the United States Court of Appeal's Criminal Justice Appellate Panel Committee for the Fourth Circuit and has substantial experience on issues of federal jurisdiction and appellate procedure. As a member of her firm's appellate litigation team, she devotes a considerable amount of her time to appellate work in the state and federal sys-

tems. The court found that Small was qualified to handle this matter in conjunction with Ashmore.

The court-appointed attorneys selected by this court were assisted on a pro bono basis by at least six lawyers from the San Francisco, California, firm of O'Melveny & Myers, LLP. That firm has been involved in this litigation from the outset of post-conviction proceedings, including attorneys David P. Dalke, Kymberleigh Damron–Hsiao, Amy J. Laurendeau, Stephanie L. Noble, Danielle N. Oakley, and Amy J. Longo. Dalke, Damron–Hsiao, Noble, and Oakley participated in the evidentiary hearing on the § 2255 petition. Suffice it to say that the pro bono lawyers from O'Melveny & Myers, each of whom demonstrated superior intellect and excellent writing and debating skills, contributed measurably to the efforts of the court-appointed counsel in this case.

### Fulks's § 2255 Petition

Section 2255 provides federal prisoners with the statutory vehicle for collaterally challenging the lawfulness of their convictions. That section states in relevant part as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

> \* \* \*

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set aside the judgment and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

**[1]** As a general rule, relief under § 2255 is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings which were "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 783–84, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (citing *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).

Fulks's initial § 2255 petition [13] (ECF No. 1090) was filed on June 23, 2008, just before the one-year statutory deadline established by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. Contemporaneously with the filing of the § 2255 petition, Fulks's counsel filed a motion requesting 120 days to file a memorandum of law in support of the § 2255 petition, which extension the court granted, rendering the memorandum due by October 21, 2008. Fulks timely filed an amended § 2255 petition and memorandum which supplemented the original peti-

---

**13.** The matter before the court is, technically speaking, a motion under 28 U.S.C. § 2255. All parties have, however, referred to the mo-

tion as a "petition," and Fulks as the "Petitioner." For consistency, the court will adopt this nomenclature.

tion, but did not add new grounds.[14]

### *The Interlocutory Appeal on Production of Attorney Records*

The court originally scheduled an evidentiary hearing on the § 2255 petition for September 28, 2009. In the weeks leading up to the scheduled hearing, the government moved, successfully, for an order of this court requiring Fulks's original trial team to turn over its records pertaining to the case, contending that Fulks had waived the attorney-client privilege by asserting ineffective assistance of counsel. After the court entered its order requiring Blume, Nettles, and Johnson to turn over their files and records, Fulks took an interlocutory appeal on September 15, 2009, to the Fourth Circuit for a stay pending appeal and to place the case in abeyance, which motions the Fourth Circuit denied by order filed September 28, 2009. The court necessarily cancelled the evidentiary hearing on the § 2255 petition, and rescheduled the hearing for October 5, 2009.

Prior to the § 2255 evidentiary hearing, Fulks appealed to the United States Supreme Court on the question of whether trial counsel's records had to be produced. By order dated October 19, 2009, the Supreme Court stayed this court's orders compelling production to the government of materials pertaining to communications and advice between Fulks and his trial counsel pending further order. The court necessarily cancelled the evidentiary hearing on the § 2255 petition scheduled for October 5, 2009.

The Supreme Court subsequently issued a decision bearing on the issues in Fulks's appeal in an unrelated case, *Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009). The Court in *Mohawk* held that disclosure orders adverse to the attorney-client privilege do not qualify for immediate appeal under the collateral order doctrine. *Id.* As a result of the *Mohawk* decision, the Supreme Court dissolved its stay on Fulks's appeal and the case was ultimately returned to this court for a hearing on the merits. After discussions with counsel, the court rescheduled the evidentiary hearing on the § 2255 petition for February 22, 2010.[15]

### *Discovery of Donovan's Remains and Amendment to § 2255 Petition*

Approximately three months after Fulks's amended § 2255 petition was filed, bone fragments were found in the area of

---

**14.** For ease of reference, citations to the Amended Petition in the order that follows will be ''Pet. at ____,'' it being understood that it is the Amended Petition from which the court is working. Additionally, because it will be necessary for the court to cite from Fulks's trial, Basham's trial, and several pre and post trial hearings in both cases, the court will adopt the following abbreviations for references to testimony and exhibits in this case: TT = trial transcript of Fulks's Penalty Phase Trial in June 2004; HT = transcript of evidentiary hearing on Fulks's § 2255 petition in February 2010; Basham TT = trial transcript of co-defendant Brandon Basham's trial in November 2004; Govt. Ex. ____ = Government's Exhibits introduced at the § 2255 evidentiary hearing; Pet. Ex. ____ = Petitioner's Exhibits introduced at the

§ 2255 evidentiary hearing; and Pet. App. Ex. ____ = Exhibits from Petitioner's Appendix attached to his § 2255 petition, as amended. In addition, Claim 33 is the subject of a separate document and referred to herein as Supp. Pet. at ____.

**15.** During the pendency of this § 2255 proceeding, Fulks filed several motions to dismiss his appeal and expedite his execution, and subsequently withdrew them. *See* ECF No. 1009 filed Dec. 14, 2006 (withdrawn by ECF No. 1015 filed Apr. 5, 2007); ECF No. 1114 filed Sept. 9, 2008 (supplemented by ECF No. 1119 filed Sept. 26, 2008); and ECF No. 1126 filed Oct. 27, 2008—all motions to dismiss were withdrawn by ECF No. 1151 filed Feb. 25, 2009.

Horry County, South Carolina, near the intersection of Water Tower and Long Bay Roads. This was one of the three areas to which Fulks had directed authorities during the search for Donovan's body following Fulks's arrest and prior to his federal criminal trial. The other geographic area suggested by Fulks, an area known generally as Savannah Bluff, was some fifteen miles away from the Water Tower and Long Bay Roads area. The bone fragments were eventually identified by DNA testing as those of Alice Donovan.

The location of Alice Donovan's bone fragments prompted Fulks to file an additional ground to his § 2255 petition (referred to in this order as Claim 33). Therein Fulks contends that the prosecution used false information by suggesting to the jury that Fulks had misled law enforcement authorities who were searching for the Donovan remains in the months between Donovan's murder and Fulks's trial. The government did not object on timeliness grounds to the amended motion to vacate nor the addition of Claim 33 regarding the location of the Donovan remains. Accordingly, the court deemed all issues properly before the court and the matter ripe for the court's review.

*Necessity for an Evidentiary Hearing*

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.

"Section 2255 of Title 28 U.S.C. provides that unless the record conclusively shows that the prisoner is entitled to no relief, the district court should conduct an evi-

dentiary hearing and state its findings and conclusions." *United States v. Young,* 644 F.2d 1008, 1013 (4th Cir.1981). "A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue." *United States v. Coon,* 205 Fed. Appx. 972, 973 (4th Cir.2006) (citing *United States v. Witherspoon,* 231 F.3d 923, 925–27 (4th Cir.2000)). Finding that some issues presented in the § 2255 petition contained a few disputes of material facts, this court held an evidentiary hearing on the matters.

After the noted procedural delays, the court commenced the § 2255 evidentiary hearing on February 22, 2010. Arrangements were made to allow Fulks to participate in the hearing via satellite from his place of incarceration, the Federal Correctional Institution in Terra Haute, Indiana. Fulks was able to view the witnesses, the court, and the attorneys in real-time video conference, and was also provided a private telephone line through which he could conduct confidential communications with his counsel as the evidentiary hearing progressed.

Following the six-day evidentiary hearing, during which the court heard from a total of eight witnesses, the court took the matter under advisement. This order serves to announce the court's ruling on all thirty-three claims for relief.

As noted above, the court determined that an evidentiary hearing was necessary because factual disputes were present in at least some of the thirty-three claims for relief asserted by Fulks. At the evidentiary hearing, the court heard from a total of eight witnesses. Additionally, with the express consent of the parties,[16] the court

---

**16.** The parties agreed to waive their hearsay objections to the affidavits and allow the

court to consider the information contained

received affidavits from several other witnesses.

Although the court heard from more than a dozen witnesses, either in person or by way of affidavit, the testimony of those witnesses, for the most part, did not involve disputed factual matters. In fact, there were few factual issues presented amongst the thirty-three claims raised by Fulks in § his 2255 petition. In large measure, the issues raised by Fulks's petition involve conclusions of law.

Because of the predominance of legal questions in this case, the court has determined that it would serve no useful purpose, and would more likely be counterproductive, for this court to set out its factual findings separate and apart from its conclusions of law. A more practical means for the court to comply with the mandates of 28 U.S.C. § 2255 is for the court to proceed through the claims asserted by Fulks in the order in which they are raised in the petition. Where a factual issue is squarely presented by one of Fulks's claims, the court will resolve that factual dispute with a factual finding imbedded within the discussion of the claim at issue. All other aspects of this court's order constitute this court's conclusions of law.[17] Because of the myriad claims asserted in this case, a separate recitation of findings of fact, followed by a recitation of the court's conclusions of law would, be more confusing than helpful to the reader.

### § 2255 CLAIMS

*Standard of Review for Ineffective
Assistance of Counsel Claims*

**[2, 3]** The court will first address Fulks's claims of ineffective assistance of

therein as if the witness had testified from the witness stand.

**17.** Although the Fourth Circuit has never squarely addressed the issue, several other circuits have concluded that a separate listing

counsel. The Supreme Court has held that to establish a claim of ineffective assistance a petitioner must show that his attorneys' performance was objectively deficient and such deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, the Supreme Court stated:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or . . . sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* It is axiomatic that if the claim or claims that counsel failed to raise are devoid of legal merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance of counsel. *Id.* In a case where a defendant enters a plea of guilty, the defendant in order to obtain § 2255 relief must show that (1) his or her counsel's representation fell below an objective standard of reasonableness de-

of findings of facts followed by a separate listing of conclusions of law is not required. *See, e.g., Perera v. United States,* 932 F.2d 973, 1991 WL 73709 (9th Cir.1991) (unpublished).

manded of attorneys in criminal cases; and (2) there is a reasonable probability that, but for counsel's errors, he or she would have proceeded to trial instead of pleading guilty. *See Hill v. Lockhart*, 474 U.S. 52, 56–59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

**[4, 5]** The defendant bears the burden of proof as to both prongs of the *Strickland* standard. First, the defendant must show that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. Courts should be deferential in this inquiry, and have "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The defendant must therefore overcome the presumption that the representation "might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted).

**[6, 7]** Second, the defendant must demonstrate that counsel's inadequate performance prejudiced him. *Id.* at 687, 104 S.Ct. 2052. Thus, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability, in turn, is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Additionally, courts may bypass the performance prong and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

## CLAIM 1:

### MENTAL HEALTH MITIGATION

**[8]** In Claim 1, Petitioner argues that trial counsel were ineffective for failing to present a meaningful mental health case in mitigation. Specifically, Petitioner claims that trial counsel should have presented the testimony of Drs. Seymour Halleck, Margaret Melikian, James Hilkey, and William Morton. These mental health experts had been retained by trial counsel and were prepared to testify at Fulks's trial, but trial counsel did not call them to testify.

A review of the trial record reveals that trial counsel presented a substantial mental health case. Trial counsel had to make difficult strategic decisions concerning the amount and type of mental health testimony to present—sufficient to convince the jury, but not of the type that would open the door to some type of counter-attack by the government. Mental health evidence is a "double-edged sword that might as easily condemn a defendant to death as excuse his actions." *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir.1998); *Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir.2003) (counsel were not ineffective for failing to present testimony by a psychiatrist and a psychologist because the suggestions of antisocial behavior which the experts found could have been harmful to the defense).

In developing its mental health case in mitigation, Fulks's trial team hired or consulted with many experts, including the following individuals: Drs. Jonathan Venn, David Bachman, Ruben Gur, Christos Davatzikos, Fred Bookstein, James Evans, Margaret Melikian, Seymour Halleck, James Hilkey, Arlene Andrews, and Howard Becker.

Trial counsel initially retained Dr. Venn to complete a neuropsychological battery of evaluations on Fulks, including Halstead–Reitan testing. According to Dr. Venn's seventeen-page neuropsychological evaluation report dated March 30, 2004 (Gov't Ex. 10G), he examined Petitioner on

at least eight occasions, and also interviewed several individuals in preparing his report. Specifically, Dr. Venn interviewed Dr. Elin Berg, a psychiatrist who treated Fulks during his pretrial detention; Betty Burroughs, a mental health social worker who saw Fulks during his pretrial detention; Lieutenant Bob Garrison of the Lexington County Detention Center; and Dr. Oliver P. Harden, a physician who treated Fulks during his pretrial detention. Because Dr. Venn's neuropsychological battery indicated that Fulks was low functioning and that he had brain damage, trial counsel asked neurologist Dr. Bachman to also conduct a neurological evaluation of Fulks. Dr. Bachman believed based on his neurological exam, brain imaging tests, and patient history that Fulks most likely had a fetal alcohol spectrum disorder ("FASD").

Thereafter, the trial team retained Dr. Fred Bookstein, who conducted brain imaging studies to help confirm the FASD diagnosis. Dr. Bookstein prepared a report for trial counsel (Gov't Ex. 10A). Dr. Christos Davatzikos examined Fulks's quantitative brain imaging and prepared a report for trial counsel (Gov't Ex. 10B). The trial team also retained Dr. James R. Evans, a licensed clinical psychologist, to conduct a neurophysiological evaluation report (Gov't Ex. 10C), which indicated that Fulks had brain damage and neuropsychological impairment, and other mental illnesses.

In determining the range of potential mental health issues involved in Fulks's case, trial counsel consulted with psychologist Dr. James Hilkey (Gov't Ex. 16), and forensic psychiatrist Dr. Seymour Halleck (Gov't Ex. 15). Trial counsel also retained psychologist Dr. Ruben Gur, forensic psychiatrist Dr. Margaret Melikian, and Dr. Howard Becker, a teaching expert with academic expertise in FASD. Trial counsel

conducted multiple focus groups and also retained attorney Jeff Bloom, a jury/litigation consultant, to conduct a mock trial and record the mock jury's deliberations and comments (Gov't Exs. 6–8). Bloom's efforts resulted in a recommendation that FASD evidence was the strongest mitigator for trial counsel to pursue.

After conducting a thorough mental health investigation, including input from at least ten mental health experts, trial counsel decided to call six experts to present Fulks's mental health case in mitigation. Contrary to Petitioner's contentions, trial counsel presented a substantial mental health case that did not rest singularly on a FASD diagnosis. Trial counsel presented testimony of the following experts in FASD, cognitive neuroscience, behavioral neuroscience, and neuropsychology: Dr. Ruben Gur testified as an expert in cognitive neuroscience; Dr. David Bachman testified as an expert in behavioral neurology; Dr. Howard Becker testified as an expert in FASD; Dr. James Evans testified to the battery of neuropsychological tests he administered to Fulks and to his review of tests administered by others; Dr. Fred Bookstein was qualified as an expert in biostatistics and morphometrics and testified regarding the anatomical abnormalities of Fulks's brain and their significance; and Dr. Arlene Andrews testified as an expert in child development and conducting family history assessments. Dr. Andrews presented her research regarding Fulks's childhood and explained the significance of Fulks's childhood experiences.

Before addressing the alleged deficiencies of trial counsel, the court notes for the record Petitioner's emphasis on the ABA Guidelines, rather than the prevailing professional practice, at the time of the trial. The Supreme Court has made clear that the ABA Guidelines do not set the standard for effective representation, and the

court refuses to recognize them as the constitutional standard here.[18]

Petitioner claims trial counsel did not present the jury with evidence of his mental illness and his resulting diminished capacity to conform his conduct to the requirements of the law. Fulks claims that trial counsel should have presented evidence of a litany of Fulks's mental illnesses and psychological issues.

According to Dr. Halleck's diagnosis, Fulks has Cognitive Impairment, Polysubstance Dependence, Major Depressive Disorder, Dysthymic Disorder, and Antisocial Personality Disorder. According to Dr. Melikian's diagnosis, Fulks has Cognitive Disorder, Major Depressive Disorder, Adjustment Disorder with Anxiety, Amphetamine Dependence, Cannabis Dependence, Alcohol Dependence, and Antisocial Personality Disorder. According to Dr. Hilkey's diagnosis, Fulks has Polysubstance Dependence, Dysthymic Disorder, and Cognitive Disorder. According to Dr. Morton's diagnosis, Fulks has Methamphetamine Dependence.

Petitioner argues that Drs. Melikian, Hilkey, Halleck, and Morton could have explained the significance of the evidence presented at trial regarding his upbringing to allow the jury to gain insight into the psychological impairments and mental illness that elucidate Petitioner's behaviors.[19]

However, a review of the trial record reveals similar testimony on these matters by the experts who were, in fact, called. Specifically, Dr. Bachman explained that

Fulks suffers from FASD, a condition exacerbated by Fulks's life of alcohol and drug abuse starting from a young age, which, together with his multiple head injuries, significantly impacted his cognitive ability. (TT Vol. 18 at 31.) Dr. Gur testified that Fulks has "a highly abnormal brain," and that "the abnormality in the brain structure and function explain a lot of the behaviors, and the cognitive and emotional deficits that have been documented in his case," especially the frontal lobe portion which is the "executive that decides what to do with all that information that comes from the back of the brain . . . . [t]he one that tells you to stop, think about alternatives, particularly in relation to emotional situations." (TT Vol. 12 at 40, 47, and 79.) Dr. Gur testified that because of his abnormal brain, Fulks makes poor decisions. Dr. Bachman confirmed Dr. Gur's assessment that Fulks has an abnormal brain, and testified that Fulks consistently failed to perform the tasks on the inhibition testing and the tasks requiring frontal lobe involvement. (TT Vol. 18 at 47–48.) Dr. Evans testified that his psychological testing showed Fulks had a damaged frontal lobe, which causes him to act impulsively, learn slowly, fail to plan ahead, and puts him at higher risk for criminal behavior. (TT Vol. 17 at 14–15, 34.) He explained the reasons for Fulks's diminished capacity to properly interact with others, based on visual perception impairments. *Id.* at 22–23. Dr. Becker testified that persons with FASD have dif-

---

**18.** As Justice Alito noted in his concurring opinion, the ABA is a private organization with limited membership, and that "[i]t is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination." *Bobby v. Van Hook,* 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (Alito, J. concurring).

**19.** Petitioner claims that the failure to present the available mental health evidence was due to trial counsel's alleged apoplexy over the Ward/Bruning testimony, which is a separate ineffective assistance of counsel claim addressed in Claim 2.

**558**    **875 FEDERAL SUPPLEMENT, 2d SERIES**

ficulty communicating with others and picking up on social cues, they do not learn from experience, they are impulsive, and they act before thinking. *Id.* at 142–145.

Petitioner next claims that trial counsel failed to call experts who could have better explained "the significance of the evidence presented regarding the beatings received by Petitioner, his chaotic family environment, drug and alcohol abuse, sexual abuse, deprivations, etcetera." A review of the trial record reveals compelling testimony by Dr. Gur about the effect of one's family background on behavior:

> But behavior is, to a large extent shaped by your upbringing. It is not all biology. You can take the same kid and use the environment in order to give him a better executive.... They like structure, and they realize there is something wrong in their own executive, so they are looking for guidance. If you guide them well, they can turn out being fine. If they are guided otherwise, they can turn out to be very difficult.

(TT Vol. 12 at 140.)

Additionally. Dr. Andrews testified at length to the negative influences and absent parenting in Fulks's childhood development. She testified that Fulks's father did not remember him at all before the age of twelve: "He doesn't remember when he was born. He doesn't remember he was in special classes at school. He doesn't remember that he tried to commit suicide." (TT Vol. 18 at 151–52.) Likewise, Dr. Andrews testified that Fulks's mother did not remember his birth or whether he went to kindergarten. (*Id.* at 151–152.) As explained in detail in Claim 3, Dr. Andrews explained Fulks's miserable childhood full of chaos. (*Id.* at 172.) Dr. Andrews testified that the lack of consistency in Fulks's life impeded his social development and made him insecure and confused. Although Petitioner claims his experts did not inform jurors about his emotional problems and substance abuse, Dr. Andrews described Fulks's substance abuse, depression, and suicide attempt, which Dr. Becker explained are secondary disabilities often arising as a result of the brain dysfunction caused by FASD. (*Id.* at 146–147.)

Petitioner also claims that trial counsel should have called Dr. Hilkey and Dr. Melikian to explain his borderline range of intelligence—a topic that the experts at trial fully explained. Dr. Evans testified that Fulks suffers from borderline intelligence, ranging from 75–79, moderate brain impairment, and cognitive impairment. (TT Vol. 17 at 10, 13.) Dr. Gur explained that Fulks "is clearly not a bright individual" and that his I.Q. test "comes up on the borderline, slightly above the cut of retardation. But a lot of the measures that go into that fruit salad [that make up I.Q.] are below that, well below that threshold." (TT Vol. 12 at 139.) Dr. Andrews testified that having an I.Q. above 70 actually makes people with brain damage from prenatal exposure more susceptible to breaking the law, being unemployable, being kicked out of school, and other problems. (TT Vol. 18 at 124.)

The court finds that it was not ineffective for counsel not to call additional experts to explain the possible connection between Fulks's childhood, his drug abuse, the true effects of powerful stimulants such as methamphetamine, his alleged cognitive problems and the crimes he was charged with committing. The court finds that the experts presented by trial counsel testified to such connection, as recited above.

Next, Petitioner claims that the jury was never told that his propensity for abusive conduct towards women was related to his psychological impairments and the alleged sexual abuse he experienced as a child and

teen. Specifically, Petitioner claims that a teenage babysitter performed oral sex on him at age eight or nine, that around age thirteen he was molested by a friend's father, and that at age fifteen he moved in with a twenty-eight-year-old woman. However, the trial record is replete with witness testimony that Fulks's childhood environment was filled with inappropriate sexual activity including graphic pornography on the walls and ceilings; that Fulks was molested by an older man when he was a child; and that he had a sexual relationship with a "twenty-something" year old woman when he was fifteen.

As trial counsel testified during the § 2255 hearing, the trial team tried to obtain additional evidence of Fulks having been sexually abused as a child, but were unable to ferret out any. Trial counsel thought that it was very likely that Fulks had been sexually abused, but when multiple members of the trial team asked Fulks about it, he denied any sexual abuse at the hands of his family members.

The additional information which Petitioner now claims should have been presented includes Monica Wolowinski's report of Ronnie Fulks telling her the story of Chad Fulks allegedly sitting on his father's lap begging his father to stop rubbing his groin and thighs. Further, Petitioner complains that the jury did not hear of his teenage babysitter pulling down his pants when he was eight years old and performing fellatio, a story he apparently reported during his interview by Dr. Halleck. The court finds that this additional information was inherently unreliable because it came either by hearsay or by the Petitioner's self-serving statements.

Petitioner also claims that trial counsel should have called Dr. Morton to testify how heavy methamphetamine use, such as the kind Fulks participated in after escaping from jail in Hopkins County, Kentucky, can lead to confusion, paranoia, hallucinations, and homicidal thoughts. This, in turn, is said to explain the events leading to the death of Alice Donovan.

The court notes the inherent danger of the admission of the proposed testimony of the uncalled experts to explain that Fulks learned the behaviors that he later perpetrated. Testimony that Fulks was predisposed to "violent sexuality such as rape" would have tended to show Fulks had a motive to kidnap Samantha Burns and Alice Donovan, and would not have aligned with his claim that he did not want to rape Alice Donovan, but felt pressured to do so by Basham. *See St. Pierre v. Walls,* 297 F.3d 617, 633 (7th Cir.2002) (facts that show a defendant has a condition or proclivity toward violence are often aggravating, not redeeming or mitigating factors). Such expert testimony would have conflicted with the themes of Fulks's defense that he did not intend to kidnap and rape Samantha Burns and Alice Donovan. *See Satcher v. Pruett,* 126 F.3d 561, 572 (4th Cir.1997) (finding that trial counsel was not ineffective for not presenting testimony by a psychologist and a psychiatrist who examined the defendant for the purpose of developing mitigating evidence where the psychologist and the psychiatrist found no psychiatric or neurological disorders, but also finding that the defendant had an antisocial personality disorder that might make him a "future danger").

The additional mitigation evidence that Petitioner argues should have been presented would have also opened the door for the government to present very damaging evidence against Fulks. Such evidence might have included evidence that Fulks had physically abused his three-year-old step son and that Fulks escaped from prison because he knew he was about to be arraigned on child abuse charges. In light of the testimony by many wit-

**560**      **875 FEDERAL SUPPLEMENT, 2d SERIES**

nesses concerning Fulks's childhood and background, any potential humanizing additional evidence would have offered an insignificant benefit compared to the potentially devastating evidence the prosecution would have offered in rebuttal. Detective Scott Smith testified that Fulks escaped from the Kentucky prison after being served with the indictment from criminal child abuse. (*See* TT Vol. 14 at 42–45, 52.)

**[9]** After reviewing the record, the court finds that Petitioner has failed to demonstrate prejudice under *Strickland* for failing to present additional expert testimony on cumulative humanizing evidence. *See Wong v. Belmontes,* 558 U.S. 15, 130 S.Ct. 383, 387–88, 175 L.Ed.2d 328 (2009) (when a substantial mitigation case was presented, evidence that is merely cumulative to the humanizing evidence actually presented fails to demonstrate the prejudice necessary to meet the prejudice prong of *Strickland* ). In evaluating whether there is reasonable probability the additional mitigation evidence would have resulted in a different verdict, this court is charged with considering all of the relevant evidence that the jury would have had before it, not just the mitigation evidence. The court finds that trial counsel pursued a reasonable trial strategy that would have been undermined by the expert testimony that Petitioner argues should have been presented. Trial counsel carefully investigated and considered all possible mitigation evidence before making a strategic decision not to present the testimony of Drs. Halleck, Morton, Melikian, and Hilkey.

The cases that Petitioner cites for support of his claim that trial counsel were ineffective for failing to present a meaningful mental health case in mitigation are inapposite. To describe Fulks's trial counsel's death penalty experience as significant is an understatement. *Cf. Gray v. Branker,* 529 F.3d 220 (4th Cir.2008) (counsel lacked any capital experience, discounted all mental condition information, never discussed nor presented any mental health evidence); *Belmontes v. Ayers,* 529 F.3d 834, 859 (9th Cir.2008), *overruled by Wong v. Belmontes,* 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (trial counsel failed to consult with experts and investigate mitigating evidence for penalty phase); *Smith v. Mullin,* 379 F.3d 919 (10th Cir.2004) (trial counsel lacked any capital experience and was unaware defendant's mental state or mental illness could be introduced as mitigation in penalty stage).

Trial counsel were well-aware of the need for expert witnesses in mitigation in a capital case.[20] However, trial counsel did not want the jury to hear that Fulks had met the diagnostic measures of antisocial personality disorder, even if the experts did not believe that he was, in fact, antisocial. As attorney Johnson explained, if trial counsel had put up Dr. Hilkey, then that would also open the door to the government putting up experts who would have found that his own experts' testing showed him high on the antisocial personality disorder scale, a diagnosis that counsel did not want the jury to hear.[21] Also, trial counsel did not think it was beneficial

20. *See* John H. Blume, Sheri Lynn Johnson & Scott E. Sunby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation,* 36 Hofstra L.Rev. 1035, 1041 (2008) ("First, the defense team must secure appropriate expert assistance, primarily from mental health experts.").

21. Blume has written several articles discussing that antisocial personality disorder is a diagnosis to be avoided. *See* John H. Blume & David P. Voisin, *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder,* 24 Champion 69 (Apr.2000) (antisocial personality disorder diagnosis "can be the kiss of death, because to many people, and most

to inject into trial a debate about whether Fulks did or did not have antisocial personality disorder, especially coming immediately after the jury heard testimony tending to show that Fulks planned and attempted to lure another victim, Ward, without Basham's help. Trial counsel was worried it would end up impeaching its own experts' theory, such that the jury would end up believing as true the government's antisocial personality disorder diagnosis and detracting from trial counsels' theory that Basham was the instigator of the crimes.

Instead of presenting additional mental health experts to discuss the hodgepodge mix of mental illnesses that Fulks may have had, trial counsel reasonably utilized suggestions from its jury consultant and mock jury deliberations to emphasize that the criminal acts related to Fulks's brain damage, as evidenced by hard evidence such as diagnostic tests including CAT scans, PET scans, and EEGs. The court finds that trial counsels' decision not to present the testimony of Drs. Halleck, Melikian, Morton, and Hilkey was a reasonable strategic decision made after a thorough mental health investigation and in light of the risks of opening doors to damaging evidence. Therefore, the court rejects Petitioner's claim that his trial counsel were ineffective in their presentation of the mental health case in mitigation.

## CLAIM 2:

### REBUTTAL WITNESSES

Petitioner's second claim alleges that trial counsel were ineffective for allegedly failing to recognize that Donna Ward and Jeff Bruning could have been called as rebuttal witnesses by the prosecution.

[10] Pursuant to 18 U.S.C.A. § 3432, the prosecution in a capital case must provide the defendant with a list of potential witnesses at least three days prior to trial.[22] The statute does not apply to witnesses called to rebut or disprove the defendant's defense. *See Goldsby v. United States,* 160 U.S. 70, 76, 16 S.Ct. 216, 40 L.Ed. 343 (1895); *United States v. Hessler,* 469 F.2d 1294 (7th Cir.1972). The facts on this issue were summarized by the Fourth Circuit as follows:

> On May 10, 2004, the prosecution, as required by 18 U.S.C. § 3432, provided Fulks with a list of the names and addresses of 181 potential trial witnesses. Among those potential witnesses was Amy Ward, whose purse and cell phone Fulks had stolen on November 10, 2002, in Waverly, Ohio. On May 21, 2004, defense investigator Pete Skidmore met with Amy Ward and her mother, Donna Ward, seeking to determine whether Amy was the young woman with the butterfly tattoo with whom Fulks had used drugs during the escapade. At this meeting, Donna advised Skidmore that she had received a phone call on November 17, 2002, from a man purportedly seeking to meet with Amy at a local hardware store that evening at 10:30 p.m. to discuss her recent job application with the store. Donna, know-

---

judges, this means that the defendant is little more than a remorseless sociopath.'').

**22.** ''A person charged with treason or other capital offense shall at least three entire days before commencement of trial [ ] be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment,

stating the place of abode of each venireperson and witness, except that such list of the venirepersons and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.'' 18 U.S.C. § 3432.

ing that Amy had submitted no such job application, became suspicious, but when she attempted to ascertain the caller's identity, he hung up. Donna also told Skidmore at the May 21, 2004 meeting that she believed the caller to be the same person who had stolen Amy's purse and cell phone. Although Skidmore claims he notified Fulks's lawyers of the November 17, 2002 phone call to Donna Ward, they have no such recollection.

* * *

Amy Ward, who was scheduled to testify on June 11, 2004, arrived in South Carolina on June 10, accompanied by her father Byron Ward. Just prior to Amy's testimony, Byron, while engaged in small talk with FBI Agent Jeff Bruning, mentioned the November 17, 2002 phone call his wife Donna had received regarding Amy's purported job application at the hardware store. Agent Bruning soon began investigating whether the call could be traced to Fulks, and, with the assistance of the Sprint telephone company, discovered that the phone call had been placed using a prepaid phone card found in Fulks's possession at his arrest. With further investigation, it was established that the call had been placed at 8:38 p.m. on November 17, 2002. Because Basham was hiding from the police in the Ohio River at that very moment, the timing of the call appeared to conclusively establish that Fulks, acting alone, had placed the call. On June 17, 2004, the court ruled that Donna Ward and Agent Bruning could testify regarding the call even though they had not been included on the prosecution's pre-trial witness list. The court then offered Fulks a three-day trial hiatus so that he could prepare to meet their testimony, but Fulks's counsel declined the offer, stating that a three-day recess would be useless at that point in the trial.

*United States v. Fulks,* 454 F.3d 410, 418–19 (4th Cir.2006).

Specifically, Petitioner claims that he was prejudiced because his trial counsel decided to present some, but not all, of the testimony by mental health experts, allegedly as a result of the unexpected testimony by Donna Ward and Agent Bruning.

At trial, Fulks's counsel argued that he was not the leader during the events of November 2002. Because the testimony of Donna Ward would rebut this argument, the prosecution could have called her as a rebuttal witness without violating § 3432. On appeal, the Fourth Circuit found no error in the court allowing Donna Ward and Agent Bruning to testify on behalf of the prosecution at trial, during the government's case-in-chief, even though they were not listed on the pretrial witness list.

Petitioner now argues that his trial counsel failed to familiarize themselves with the law of rebuttal, because had they done so, they would have realized that Ward and Bruning could have been called as a rebuttal witnesses whether they were on the prosecution's pretrial witness list or not. Petitioner claims that had his trial counsel recognized that Ward and Bruning could testify as rebuttal witness, they would have prepared their mental health experts in advance and not have pulled them from testifying.

[11] The government responds that Petitioner's trial counsel were not ineffective "for failing to anticipate the unexpected." *See Dutton v. Brown,* 812 F.2d 593, 598 (10th Cir.1987) (counsel who did not anticipate the trial court's sua sponte exclusion of an important defense witness was not ineffective). The government further contends that Fulks's trial counsel presented a logically cohesive case on

Fulks's behalf in accordance with counsel's trial strategy and that counsel's failure to anticipate the testimony by Ward and Bruning did not prejudice Fulks's case.

During the § 2255 hearing, trial counsel would not admit that they would have pursued a different strategy had they been aware Ward and Bruning would be called as witnesses, but merely stated that "it had an effect on the ultimate decision, the final decision that was made." (HT Vol. 1 at 77.) In fact, when asked if he had known about the call to Donna Ward, defense counsel Blume candidly stated:

> I don't know what I would have done, I can't—it's unlikely that I would have pursued it to the extent of trying to get the card and have it analyzed to determine, you know, if it was in fact true. I mean, maybe some other lawyer would have, maybe some other lawyer should have. I can't imagine that I would have done that.

(*Id.* at 169.)

Further, as the Fourth Circuit noted on appeal, "[t]he testimony concerning the November 17, 2002 call to Donna Ward was certainly damaging to Fulks's case, but viewed in the context of the trial evidence suggesting Fulks's leading role in the crime spree, it was hardly the silver bullet Fulks makes it out to be." *Fulks*, 454 F.3d at 426.

Petitioner's claim that Blume "has very limited trial experience" is simply false. Aside from representing Fulks, Blume has been involved in some fourteen state capital cases, all of which resulted in sentences less than death (i.e., life imprisonment or a term of years).[23] Additionally, Blume has handled approximately twenty state post-conviction relief (PCR) evidentiary hearings in death penalty cases, another twenty to thirty appeals of PCR hearing decisions, fifteen to twenty federal habeas cases filed pursuant to 28 U.S.C. § 2254 attacking state death penalty cases, and fifteen to twenty appeals of § 2254 petitions. (HT Vol. 1 at 125–132; Gov't Ex. 1.) Blume has argued eight cases before the United States Supreme Court and has been co-counsel in another ten to fifteen appeals. (HT Vol. 1 at 130.) He has had years of private criminal defense practice, served as the Executive Director of the South Carolina Death Penalty Resource Center for eight years, and for the past seventeen years he has worked with the Cornell Death Penalty Project advising criminal defense trial lawyers. In addition, Blume teaches criminal procedure, evidence, the Death Penalty in America, and also supervises several capital clinics at Cornell Law School. To label Blume's experience as "very limited" falls wide of the mark.

---

**23.** At the § 2255 hearing, Blume briefly related his capital trial experience in the following South Carolina cases: *State v. Telus Edwards* (1986) (pled to manslaughter); *State v. William Looper Hunter, Jr.* (1988) (received life verdict in jury trial); *State v. Leonard Gardner* (1980s) (pled to life with a thirty-year parole eligibility); *State v. Ronnie Skipper* (late 1980s) (received a life sentence before Judge Baggett in a resentencing case); *State v. Limmie Arthur* (pled to life sentence after death sentence was reversed on appeal); *State v. Michael Preston* (late 1980s or early 1990s) (pled to life); *State v. James Russell Cain* (pled to life); *State v. Shannon Ardis* (pled guilty and received a life sentence after a bench trial); *State v. Sterling Spann* (pled to life after resentencing and served 14 years); *State v. Lino Delacruz* (2001) (conceded guilt and received a life sentence from a jury); *State v. Danny Han* (pled to life); *State v. Chavis Miller* (pled to life); *State v. Terrion Warren* (2006) (pled guilty and was then sentenced to life in front of a judge); *State v. Ringo Pearson* (found to have mentally retardation and subsequently sentenced to a term of years). (HT Vol. 1 at 125–132). Blume's trial experience is also listed in Government's Exhibit 1.

Likewise, Petitioner's claim that trial counsel was somehow unfamiliar with the law of rebuttal, is not supported by the record. There is simply no evidence that supports the allegation. Aside from the fact that Blume teaches evidence law, Petitioner has submitted no affidavit by Blume, Johnson or Nettles that they did not know the law of rebuttal, and Petitioner elicited no testimony at the § 2255 hearing that trial counsel did not know the law of rebuttal. Furthermore, Petitioner's argument that trial counsel's alleged unfamiliarity with the law of rebuttal, even if true, does not constitute lack of knowledge about the "relevant law" about which courts have found counsel ineffective. *Cf. Saranchak v. Beard*, 538 F.Supp.2d 847, 881–84 (M.D.Pa.2008) (finding an attorney's performance to fall below the objective standard of reasonableness where the attorney had a "clear misunderstanding of the law regarding a general guilty plea" and failed to litigate a suppression issue once his client decided to plead guilty).

Rather, the court finds that trial counsel made a strategic decision not to call Drs. Hilkey, Halleck and Melikian. Their testimony was not consistent with the trial strategy first, that Basham, rather than Fulks killed both victims; and second, that Fulks's damaged brain, together with his warped childhood, mitigated his lesser role in those crimes. Trial counsel was on the fence about calling these mental health experts at any rate, "long before trial," (HT Vol. 4 at 36). As Blume stated in an email to the trial team on April 23, 2004: "I am still torn on whether to just go ahead and cut the shrinks loose and just go with bad brain/bad family leads to bad things." (Gov't Ex. 26) Ultimately, Blume made the decision to not call these experts at trial. The court finds that the strategic decision not to call the additional mental health experts at trial cannot be said to

have been the result of trial counsel's unfamiliarity with the law of rebuttal.

Further, while trial counsel may not have anticipated the testimony of Ward and Bruning, counsel used the witnesses's testimony to support their strategy that Fulks's mental capabilities were so limited by his damaged brain that he was easily manipulated by Basham. At closing, trial counsel argued:

"But, let's assume for the sake of argument, that Chad was trying to lure Amy Ward. Does it prove how limited and stupid he is? . . . You tell them that they have applied for a job at a hardware store where they know they didn't apply, their child didn't apply, they want to meet you at 10:30 at night for a job interview? . . . you have to be brain damaged to even say it."

(TT Vol. 21 at 153.) Fulks's trial counsel turned testimony by the government's witnesses into support for Fulks's case. Consequently, even if defense counsel may have failed to anticipate the testimony of Donna Ward and Agent Jeff Bruning, any failure did not diminish or prejudice Fulks's case.

### CLAIM 3:

### MITIGATION REGARDING PETITIONER'S EARLY LIFE

Petitioner's third claim alleges that trial counsel were ineffective for allegedly failing to undertake an adequate and meaningful mitigation investigation that would have painted an empathetic and accurate picture of Petitioner's life. Petitioner claims that the primary mitigation witnesses called at trial did not "convey the true depth of the despair of Petitioner's life," and that trial counsel should have discovered and called other witnesses.

**[12]** The court reviews trial counsel's mitigation investigation in light of the *Strickland* standard. Counsel has the responsibility to adequately investigate and present evidence in mitigation of guilt. *Byram v. Ozmint,* 339 F.3d 203, 209–210 (4th Cir.2003). However, counsel is only required to make a reasonable investigation for possible mitigating evidence. *Id.* (citing *Matthews v. Evatt,* 105 F.3d 907, 919 (4th Cir.1997)). This court is to review counsel's strategic decisions concerning the evidence to present at trial according to a "highly deferential" standard, with a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). That is to say, *Strickland* requires more than a mere possibility that the allegedly deficient performance may have prejudiced the defendant in some way. *Poyner v. Murray,* 964 F.2d 1404, 1420–1421 (4th Cir.1992).

### *Investigation Strategy*

**[13]** In explaining trial counsel's strategy for conducting the mitigation investigation, Johnson explained that they attempted to "investigate everything," starting with the people closest to Fulks. (HT Vol. 4 at 16.) Because the trial team did not know precisely what to look for, the mitigation investigation started as very broad, with trial counsel asking a lot of questions. (*Id.* at 16–17.) The mitigation investigation primarily started with a series of meetings with Fulks about his life and background, family, school history, people with whom he had various relationships. It progressed to interviews of significant people in Fulks's life and in the neighborhood where he grew up, including exploration of his marital and romantic relationships, and interviews with his teachers and social workers. There were several reference points for the mit-

igation investigation: on the West Virginia/Ohio border, where Fulks spent most of his life; on the Indiana/Michigan border, where many of Fulks's family members lived; in the Kentucky/Indiana area where Basham grew up; and other areas where the seven-state crime spree occurred.

Trial counsel used two primary mitigation investigators: social worker Drucie Glass, and mitigation specialist Tracey Dean of the Center for Capital Litigation. Blume, Johnson, and Nettles, with the assistance of several law students, conducted some of the interviews, but Glass and Dean had the primary responsibility for interviewing witnesses. Trial counsel retained Dr. Arlene Andrews, Ph.D., MSW, to tell Fulks's life history. Dr. Andrews also interviewed some witnesses, as Blume testified "because of special training ... she is better at getting sometimes people to admit things they don't want to admit or talk about, not easy to talk about." (HT Vol. 2 at 3.) Collectively, the attorneys, paralegals, and mitigation investigators are referred to in this order as the "trial team" or the "team." The trial team, primarily through Blume's paralegal Jill Ryder, along with Glass and Dean, also obtained releases from Fulks and his family for school/education records, employment records, health records, information related to Fulks's prior criminal activity, and a great deal of information concerning Basham.

The investigation in Indiana/Michigan included members of the trial team visiting the Hopkins County Detention Center in Kentucky from which Fulks and Basham escaped and talking to the jail administrator and the correctional officer who was fired as a result of the escape. The team also talked with Fulks's drug counselor Mr. Taylor at Westville (Indiana) Correctional Institute where Fulks had been im-

prisoned in 2001, and Fulks's Probation Officer Mariann Pough.

The investigation in Kentucky and Indiana included going to the neighborhood where Basham grew up and talking with people who knew him then and those with whom that he had contact as he became older; DSS workers involved in the investigation into Fulks's alleged abuse of his son Miles; and James Hawkins, the man that Fulks and Basham kidnapped and tied naked to a tree.

The investigation in West Virginia/Ohio included attempts to discover favorable information from Heather Goodman; Beth McGuffin; Amber Fowler; Donnie Carroll; Amy Ward; former probation officers Sue Hatcher (who recommended Fulks be taken from his childhood home), Jon Kincaid, and Trina Robinez, as well as former juvenile referee Tom Woelful; former teachers Kay McComus, Mike Sheets, Ray Sandridge; former neighbors Charles Vaughn, James and Linda Smith, and Sue Adkins; retired mailman Richard Beckner; former friend Brad Scarberry; Kimmie Royal of the group home in Iron, Ohio where Fulks lived for some time; former youth minister at Israel Tabernacle Church Chris Parsons; Callaher Elementary Principal Adams; Officer Alan Meek and social worker Denise Sayre of the West Virginia Division of Human Services, among others. The trial team also consulted with anthropologist Karen Lee Simpkins, an expert on Appalachian culture.

The investigation in South Carolina included attempts to discover favorable information from J.D. Brooks of Conway, witnesses to the shoot-out, and inmates in Columbia who may have heard information from Basham—Mike Sumpter, Melvin Gore, Travis Robinson, and Henry Hardy.

### Investigation Charts

As a result of the wide-ranging mitigation investigation, the trial team developed numerous charts to consolidate, share, and track the collected information. The charts organized the information gathered, identified the areas of additional facts needed to be developed, identified themes for trial, and served as checklists at trial.

For example, the trial team created a comprehensive eighty-one page compendium, which included a genogram of Fulks's family members, including grandparents, parents, siblings, uncles and aunts on both maternal and paternal sides of his family. (Gov't Ex. 31.) The compendium described in extensive detail the family environment into which Fulks was born, created from records that the trial team obtained, together with information gathered from interviews with family members and people who knew Fulks, including the following: paternal grandmother Nancy Fulks, father Roger Fulks, mother Diana Thompson, sister Sherry Fulks, brothers Dewayne, Ronnie, and Shannon Fulks, maternal uncle Kevin Holbrook, maternal aunt Gail Beatty, paternal uncle Mark Fulks, neighbors Linda Adkins and Harriet and David Kiser, teacher Dottie Thompson, friend and neighbor Laurie Messinger, former girlfriend Heather Goodman, and Brian Messinger, who dated Fulks's sister Sherry and lived in the Fulks house for a year.

The trial team also created a seven-page chart of "Facts to Prove" that was a tool used "primarily to structure the examinations" of witnesses at trial, mainly including the issues to present to the jury as facts in mitigation. (HT Vol. 2 at 10; Gov't Ex. 32.) The chart served as a blueprint for the trial team's mitigation case, describing in detail Fulks's childhood environment; the relationships he had; his behavior while on the run; his post-arrest behavior showing honesty and remorse; his ability to adapt to prison life and lack

of future dangerousness; and his mental impairments. As well, the chart included facts to prove at trial concerning Basham's mental instability, violence, leadership, lies, and evidence that Basham was the killer—facts to support Fulks's argument that he had a relatively less culpable role in the crimes. The trial team gathered information that went into the compendium from interviews with the following individuals: Beth McGuffin, Linda Adkins, Sue Hatcher, Larry Browning, Andrea Roddy, and Marianne Paugh, in addition to interviews with family members Ronnie, Dwayne (and his ex-wife Carla), Sherry and Mark Fulks, and Wilda Mae Holbrook.

The trial team also created a twelve-page "Time Line of Events" which described in detail the events beginning the day before Fulks's escape from the Kentucky jail until the day that prosecutors announced their intent to seek the death penalty. (Gov't Ex. 34.) The trial team also created a sixteen-page comprehensive "Chronology of Events" which described the events between Fulks's release from Westville Correctional Institution on March 23, 2002 and the day of Fulks's arrest in this case. (Gov't Ex. 35.) The trial team gathered this information from the following individuals: Tina Severance, Veronica Evans, James Hawkins, Hawkins' son, Andrea Roddy, Kandi Burns, Missy Jeffers, Sonya Johnson, Brandon Basham, Anna Puskas, and police/FBI records.

The trial team created a four-page chart of Fulks's "Mental Health History" (Gov't Ex. 36); a ten-page chart of Fulks's "Criminal History Chart" (Gov't Ex. 37); a 163–item chart of the favorable and unfavorable facts for Fulks and Basham (Gov't Ex. 39); and a comprehensive file on Basham, including charts on his criminal record, DSS reports, jail behavior, jail records, mental health records, and social services records (Gov't Ex. 49). Additionally, the team prepared charts of the historical arrests of all members of Fulks's family, Fulks's progress in school, his IQ scores, and a head injury chart. As Blume testified at the § 2255 hearing:

> I'm a list compiler by nature. I don't know if it's a positive trait or a negative trait, but you know, I do to—do lists like this so I can keep track of—it's a way of me sort of ordering my thoughts, laying out what I think need to be done and being able to hopefully try and manage the investigation and make sure that things get done that—hopefully things get done that need to be done.

(HT Vol. 1 at 171.)

As early as December 21, 2003, Blume had "two-week work plans" of tasks to be accomplished in preparation for trial. (*See* email, Gov't Ex. 23.) Aside from the mitigation investigation concerning Fulks's background, the crime spree, and his relative culpability vis-a-vis Basham, the team also conducted four large searches for Alice Donovan's body, in addition to investigator Skidmore's independent searches in his helicopter. The trial team thought that if Fulks's information could lead to the discovery of Alice Donovan's body, perhaps the government would withdraw the death penalty notice. Some of the trial team's searches utilized cadaver dogs, law students, and even an anthropologist to determine if any bones found were human remains rather than the more common find of deer bones.

Blume estimates that the trial team spoke with approximately 100 individuals during the mitigation investigation. While there were individuals that the trial team wanted to find, some individuals, such as former girlfriend Tracy Graybeal, could not be located, despite the trial team's

efforts.[24] As Blume explained, many of the individuals were simply difficult to find:

> Some of them were homeless, some of them were prostitutes, some of them were drug addicts. So, there were some people that we did not, could not find. But, I mean, we attempted to find the people that we believed to be important and relevant and we found the ones we could.

(HT Vol. 1 at 180–81.)

According to trial counsel, the team started its investigation without assuming a theory of the case, but after gathering information, theories eventually emerged. As a result of the foregoing thorough mitigation investigation of law and facts relevant to plausible options, *see Strickland* at 690, 104 S.Ct. 2052, trial counsel pursued a two-fold trial strategy: "to cast Basham as the instigator and sole murderer, and to present a strong case of mitigation based on Fulks's mental problems and troubled childhood." *Fulks*, 454 F.3d at 426. That trial strategy resulted in the presentation of the following synopsis of evidence to the jury.

### *Mitigation Testimony at Trial*

The trial record reveals as complete and exhaustive a mitigation defense as one could reasonably expect in capital cases. Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being.

The mitigation testimony spanned four days, including testimony by Fulks's friends and relatives who described his horrible childhood, as well as various mental health and other experts, including his private investigator and mitigation investigator. Trial counsel presented testimony from: (1) Kevin Holbrook, Fulks's maternal uncle; (2) Gayle Beatty, Fulks's maternal aunt; (3) Mark Fulks, Fulks's paternal uncle; (4) Kelly Fite, a firearms expert; (5) Brian Messinger, a friend of the Fulks family who lived with them for approximately six months when Fulks was about eleven years old; (6) Lorie Messinger, a friend of the Fulks family who dated Fulks's brother Dewayne; (7) Linda Atkins, a neighbor in Huntington, West Virginia; (8) Cindy Harper, Fulks's kindergarten teacher; (9) Gayle Wolfe, Fulks's fifth grade special education teacher; (10) Martha Floyd, Fulks's sixth grade teacher; (11) Sue Hatcher, a probation officer assigned to Fulks when he was nine years old because he committed battery on an elderly lady and pulled down the pants of a four or five-year-old girl on a playground; (12) Joseph Jones, a former boyfriend of Fulks's ex-wife Veronica Evans; (13) Dina Jones, the aunt of Fulks's ex-wife Veronica Evans; (14) Heather Jacobi, a young woman whom Fulks met in Portsmith, Ohio and used drugs with; (15) Heather Roche, a dog handler who conducted searches for the remains of Alice Donovan on February 13–14, 2004 and April 30–May 1, 2004; (16) Jeff O'Neill, a Cornell Law School student; (17) Pete Skidmore, Fulks's private investigator; (18) Don Romine, a former warden at several federal correctional institutions, who testified as an expert in prison management and prison security. These witnesses testified in addition to the six aforementioned mental health experts,

---

**24.** Blume talked to Tracy's parents several times, but they would not disclose her whereabouts.

Drs. Evans, Gur, Becker, Bachman, Bookstein, and Andrews.

Fulks's uncle, Kevin Holbrook, testified that Fulks's mother drank a lot of whiskey while she was pregnant with Fulks and had been at the bars the night Fulks was born; that Fulks's parents would "bareknuckle fist fight" which usually resulted in Fulks's mother having a black eye and busted lip; that Fulks's father abused him and his brothers by hitting them, beating them with a belt, and kicking them; that Fulks's parents would sell their food stamps to buy beer; and that the Fulks's house as always "nasty," with "rats, and mice, and roaches, and cats, and dogs, and everything." Holbrook testified to hearing Fulks's parents call their children "sons-of-bitches, fuckers, mother fuckers, . . . cocksuckers," noting that "there isn't a name they haven't been called." He also said that while Fulks's parents regularly partied in their basement, he could not recall them having a birthday party for the kids. He testified that Fulks's father had all the children tattooed; that the parents showed no interest in the children's education; that Fulks's father liked to watch pornographic movies and thought it was funny to let the children watch too. (TT Vol. 16 at 129–42.)

Fulks's aunt, Gayle Beatty, testified about Fulks's alcoholic grandfather beating his mother in their poverty-stricken home, and described the poverty, hunger, and filth that she personally observed in the Fulks home, holes in the floor in front of the toilet looking down to the basement below, and Fulks's desperation to leave his parents and live with his aunt. (TT Vol. 16 at 149–59.) She told the story of arriving early one morning while Fulks's parents were still asleep, and going to the kitchen to feed the hungry Fulks children:

> I could only find one bowl. . . . I poured some cereal into the bowl and milk.

> There was a chip broke out of the top of the bowl . . . Chad was having to tilt the bowl back a little bit so the milk wouldn't pour out. Ronnie Dale was telling him to hurry because he wanted some cereal."

(*Id.* at 154–155.) She told of Fulks's sweetness in purchasing earrings from the gas station for her instead of buying himself candy with the money she gave him. (*Id.* at 155.)

Fulks's Uncle Mark estimated that ninety percent of the time he saw Fulks's parents, they were drinking, and that they were alcoholics. (TT Vol. 16 at 161–62.) He testified to Fulks's mother passing out several times, sometimes partially clothed. (*Id.* at 162.) He said Fulks's parents would bare-knuckle fight, throw things at each other, and that Fulks's mother had once pulled out a shotgun and pointed it at Fulks's father's face. (*Id.* at 163.) He described the physical and verbal abuse of the Fulks children by their parents, the filthy, bug-infested house, and the lack of food in the house. (*Id.* at 167–170.)

Brian Messinger testified that the Fulks children were totally unsupervised; that the parents thought it was funny when the children stole or got into trouble with law enforcement; that the Fulks boys slept anywhere they could find; and that one of the boys, probably Chad Fulks, said he wanted to kill himself. (*Id.* at 211–17.)

Lorie Messinger testified that the Fulks boys fought with each other and anybody; that Fulks's father made her uncomfortable and made suggestive comments about the size of her breasts and attempted to touch them; and she described the sexually graphic pictures on the walls and ceilings in the basement of the Fulks's house. (*Id.* at 223–25.)

Linda Adkins testified that Fulks's mother asked her for money for food, but

then would use it to buy beer, and when she started giving Fulks's mother food instead of money, she stopped asking for help; that many times when Fulks's parents fought, the children would come to her house, including one morning, about 3:00 o'clock, when the Fulks children came running to her house, telling her that their mother had a two by four and was threatening to hit their father's van with it. They said "if she hits the van, daddy will kill her." She testified that once when Fulks was three or four-years-old, no one could find him, and they eventually found him asleep on a pile of leaves in a corner of her garage. (*Id.* at 232–35.) Cindy Harper, Fulks's kindergarten teacher, testified to Fulks once having bad diarrhea that soiled his jeans and shoes, but she testified that no parent picked him up, and that he missed thirty-five days of school that year. (*Id.* at 74.)

Martha Floyd described Fulks as a follower, and recalled that he did not have a coat, even though the winters in West Virginia were harsh. (TT Vol. 17 at 85.) She said she had seen bruises on him. (*Id.* at 91.)

Sue Hatcher, a probation officer, told the jury about the lack of responsiveness when she contacted Fulks's mother to discuss some of her concerns about Fulks, and that she recommended that Fulks be removed from his home, but her recommendation was not followed. (TT Vol. 17 at 95–103.)

Fulks's trial counsel also presented the testimony of Dr. Andrews as an expert in conducting a family history assessment. (TT Vol. 18 at 132.) Dr. Andrews found the major theme in Fulks's life to be chaos, with his parents constantly drinking and fighting and his lacking any proper supervision and care givers. Dr. Andrews based her findings on a family history that she prepared using records from Fulks's childhood, a genogram, and various interviews that she conducted. (*Id.* at 133–38.) She presented the jury with a comprehensive description of Fulks's history and child development (*id.* at 133, 152–71), describing his problems in school and subsequent mental health assessments. She described Fulks being placed in a behavioral disorder classroom because he was emotionally and behaviorally disturbed, bullying children, being disrespectful, and needing supervision. She testified that the school principal, a police officer, and a probation officer recommended Fulks be removed from his home because he was not receiving adequate adult supervision. (*Id.* at 160–61.)

Dr. Andrews testified that Fulks was beaten by his father, that his mother walked around the house, while neighbors were present, in see-through gowns, and, on one occasion, naked, and sometimes she completely passed out from drinking. (*Id.*) She presented the jury with testimony that Fulks's mother did not provide for him emotionally, even after she stopped drinking when she became "saved" when Fulks was twelve or thirteen years old, as she was away from home for long hours. (*Id.* at 163–64.) She also testified that this caused an escalation in the fighting between Fulks's parents, and Fulks's father left the home. (*Id.*) During this time, Fulks got into more trouble at school, both behaviorally and academically and that just before he turned fourteen, Fulks took a large quantity of acetaminophen in an apparent suicide attempt. (*Id.* at 166.) He lost consciousness and was taken to the hospital, and a subsequent psychiatric evaluation resulted in the hospital's offer to admit him to the adolescent treatment unit, which Fulks and his mother refused. (*Id.*) Subsequent to his parents' divorce, Fulks moved to Indiana to live with his father and his step-mother (*id.* at 167), at a

time when Fulks was drinking alcohol, smoking marijuana, and huffing gas on "a very regular basis." (*Id.* at 168.) Fulks's school psychologist noted that he had been molested by an older man and that he had a sociopathic pattern. (*Id.*) After the school psychologist's referral for Fulks to see a psychiatrist, he was diagnosed with major depression and prescribed an anti-depressant. (*Id.* at 169.) There is no record of any follow-up care, and Fulks's troubles continued. (*Id.* at 170.) Fulks was charged with arson for setting fire to a wooden plaque hanging on a school wall (*id.*), referred for alcohol and drug counseling, and sent to a group home around the age of fifteen. (*Id.*) Fulks began living with a woman in her late twenties, and never returned home to live. (*Id.* at 170–71.) He lived in group homes, was incarcerated, or stayed with different family members. (*Id.* at 171.)

Dr. Andrews explained the impact on Fulks of having two alcoholic parents, explaining that they do not learn about the things a responsible parent teaches children:

> They don't want responsibility, they don't want respect for [sic] others, they don't learn to solve problems well. They don't learn to effectively communicate their needs or feelings. They don't learn impulse control. They don't learn to have hopes and aspirations for the future. They live day-by-day, sometimes hour-by-hour. And they don't learn to cope with difficult situations with stress or trauma that may happen in their lives.

(TT Vol. 18 at 175.)

Dr. Andrews testified as to the "profound," "constant," and "extreme" exposure Fulks had to the violence between his parents. (*Id.* at 179.) Dr. Andrews testified that Fulks never learned to control his anger and developed low self-esteem and

depression as a result of the exposure to domestic violence. Dr. Andrews surmised that Fulks was inflicted with multiple stressors and deprived of emotional attention, that he did not have the resiliency or intellect to handle them, so he turned to alcohol, drugs, and other negative behavior to cope with the anxiety. (*Id.* at 185–187.)

*Witnesses Not Called to Testify*

Petitioner complains that the trial team should have called the following nine witnesses to testify: (1) Monica Wolowinski, the mother of Fulks's best friend, who could have testified to having seen Fulks sleeping under trees; that his mother did not care that he was gone from his home for extended periods; that he was often hungry; that the residence was filthy; and that his mother cursed at and abused him; (2) Nathan Fulks, Petitioner's cousin, who could have testified as to the abuse and filth in the Fulks household; that Fulks's parents did not change the children's diapers; that the family was so poor that one of Fulks's brothers, with Diane's approval, stole from Nathan to buy food; that Fulks's father was a sexual deviant who "ran sex trains" on various women; "was a very violent man and would look for any excuse to fight;" would beat Diane and the children, including one beating that Fulks suffered where his back was so badly scourged that dried blood caused Fulks's shirt to stick to his back. Fulks also claims Nathan could have testified that his father's friends would congregate in their basement, where alcohol and drug consumption and fighting with firearms was the norm, and that Fulks's father Roger told him that something that led him to believe that Fulks had been sexually abused by one of Roger's contemporaries; (3) Tracy Graybeal, Petitioner's friend and sometimes girlfriend, who could have testified that Fulks used alcohol to cope with abuse by

his parents and that his older sister had allegedly molested him when he was a small boy; (4) Christina Kirkman, who lived at the Fulks residence one summer and was allegedly raped by one of Fulks's uncles and assaulted by one of his brothers, could have testified to the abuse Fulks suffered, and that the Fulks children were used to seeing their parents passed out; (5) Beth McGuffin, who grew up with Fulks, who testified at trial, but whose testimony Petitioner now alleges trial counsel did not adequately develop. Allegedly, McGuffin could have testified about seeing Petitioner's mother with black eyes, about a man named Ed who used to pick up her and Petitioner off the street and take them to drink alcohol and smoke at the age of ten or eleven-years-old, that she and Petitioner used drugs when they were twelve-years-old, and that Fulks had sex with an older woman named Rhonda. Petitioner now claims that evidence of his sexual abuse would have mitigated his admission to raping Alice Donovan; (6) Harry Tyree, deacon at the Abundant Life Baptist Church in Proctorville, Ohio, could have testified that the Fulks's house was very dirty, with beer cans on the floor and the ashtrays overflowed with cigarette butts, and that Petitioner, his mother, and his brother attended the church for several years, where Petitioner behaved well; (7) Mark Thompson, a neighbor, could have testified that after Petitioner's mother stopped drinking, that she was consumed with church, but provided no better care for her children and let them roam the streets. He could have testified that Fulks would hang out around his house and eat because Fulks's mother did not cook meals for Fulks and that Fulks was a follower and not a leader; (8) Sharon Dotson, Petitioner's maternal aunt, could have testified about Fulks's mother's poor and abusive upbringing, that she often contem-

plated suicide, that the children were abused and subjected to a sexually inappropriate environment with "pictures up on the wall of naked women with their legs spread;" and (9) Elvin Taylor, counselor at the Westville Correctional Institution when Petitioner was an inmate, could have testified that Fulks completed a long-term substance abuse program; that Fulks would complain that he was susceptible to being influenced by others using drugs and was influenced by others engaging in criminal activity. He could have also testified that Fulks adapted well to a structured prison environment, was a model inmate, completed his seminar presentations, was eventually was put in charge of the dorm maintenance department, and was actively involved in resolving disputes between inmates through conflict resolution training.

[14] The court finds that most of these nine witnesses's testimony would have been cumulative to the testimony of other witnesses who gave compelling descriptions of the depravity of the conditions in the Fulks home, including the violence, verbal abuse, alcohol and drug abuse, and pornography that surrounded Fulks as a child. Trial counsel's failure to present merely cumulative mitigating evidence does not prejudice a defendant's case. *Buckner v. Polk,* 453 F.3d 195, 206 (4th Cir.2006). As the Supreme Court has observed, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distracts from more important duties." *Bobby v. Van Hook,* 558 U.S. 4, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009). Given the evidence trial counsel had already unearthed from those closest to Fulks's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and

interview every other relative of a friend or friend of a relative. *See id.*

As to the non-cumulative evidence proffered by the uncalled witnesses, the evidence is either not relevant to Fulks's upbringing (e.g., sexual abuse of Kirkman) or has questionable reliability, or the probative value of the evidence is far surpassed by the prejudicial impact of other evidence that would enter as a result of the doors that would open by presenting such evidence. *See Moody v. Polk,* 408 F.3d 141, 154 (4th Cir.2005) (to the extent affidavits presented new information, they were "double-edged").

As to Graybeal's information that Fulks revealed to her that his older sister had molested him when he was a small boy, the record reveals that Fulks did not make the revelation to Graybeal until 2007, three years after his trial. The court cannot deem trial counsel ineffective for failing to discover information from witnesses which Petitioner himself could have provided to his counsel, but chose not to, even assuming it was true.

The record reflects, and the jury found,[25] that trial counsel effectively presented evidence that Petitioner's childhood was one of physical abuse, emotional neglect, sexual abuse, and self-medication with drugs and alcohol. *See United States v. Roane,* 378 F.3d 382, 407 (4th Cir.2004) (in light of the compelling mitigation case presented by defendant's counsel during the penalty phase which resulted in the jury finding twelve mitigating factors, the court correctly concluded that their performance was not constitutionally deficient

---

**25.** Twelve jurors found: Mitigating Factor Number 1, Chadrick Evan Fulks's mother abused alcohol while she was pregnant with him. Number 9, Chadrick Evan Fulks suffered from learning disabilities as a child. Number 12, Chadrick Evan Fulks was neglected by both of his parents. Number 13, Chadrick Evan Fulks lived in a house that was often filthy and infested with roaches and ants. Number 14, Chadrick Evan Fulks's parents did not provide him with adequate clothing or school supplies. Number 16, Chadrick Evan Fulks's parents sold food stamps to get money for beer. Number 18, Chadrick Evan Fulks was often left without supervision. Number 19, Chadrick Evan Fulks was permitted to roam the streets as a young child. Number 20, A principal, a police officer, and a probation officer all recommended Chadrick Evan Fulks be removed from the home at the age of nine, but he was not removed. Number 21, Chadrick Evan Fulks's parents gave him little attention or affection. Number 22, Chadrick Fulks was subjected to emotional abuse as a child. Number 23, Chadrick Evan Fulks was subjected to physical abuse as a child. Number 24, Chadrick Evan Fulks grew up seeing his parents frequently fighting each other. Number 25, Chadrick Evan Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house. Number 27, Chadrick Evan Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement. Number 28, Chadrick Evan Fulks's father showed him pornographic movies as a young child. Number 31, Chadrick Evan Fulks started drinking at the age of 9 and using marijuana at 11 or 12, and his parents made no effort to stop him. Number 32, Chadrick Evan Fulks's brother taught him to inhale gasoline and paint as a young teenager. Number 34, Chadrick Evan Fulks's mother ignored his stealing. Number 35, Chadrick Evan Fulks's brother taught him to steal, fight, and break into cars. Number 36, Chadrick Evan Fulks attempted suicide at age 13. (TT Vol. 22 at 20–25.) Eleven jurors found Mitigating Factor Number 15, that Fulks frequently went hungry or was uncertain whether he would get food as a child. (*Id.* at 21.) Ten jurors found: Number 11, Chadrick Evan Fulks's parents cared so little for his education that they never helped him with homework and even left him at school with soiled pants. Number 37, Chadrick Evan Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age 14. (*Id.* at 21, 24.) Nine jurors found Mitigating Factor 2, Chadrick Fulks's brain was permanently damaged by his mother's drinking during her pregnancy. (*Id.* at 20.)

and that defendant was not prejudiced by the absence of additional witnesses).

The court rejects Petitioner's allegation that trial counsel's failure to present certain witnesses was not one of strategy, but of a failure to investigate adequately and to discover that these witnesses even existed. To the contrary, the foregoing recitation of trial counsel's mitigation efforts reveals that Fulks was the beneficiary of a dream team of attorneys who afforded him the constitutional guarantee of effective assistance of trial counsel. Petitioner's complaints about his trial counsel's mitigation efforts fall well short of demonstrating his "attorney's unprofessional errors were of such magnitude as to create a reasonable probability that the outcome of the proceeding in question would have been different." *Poyner v. Murray,* 964 F.2d, 1404, 1421 (4th Cir.1992).

The court finds significant the dictate in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91, 104 S.Ct. 2052. In this case, trial counsel fulfilled its duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Petitioner's claims to the contrary are without merit.

CLAIM 4:

ASSIGNMENT OF TASKS TO LAW CLERKS

**[15]** Petitioner's Claim 4 alleges that trial counsel was ineffective for allegedly assigning law students critical aspects of the mitigation investigation. Specifically,

Petitioner alleges that the law students were not given proper training or guidance, and the mitigation investigation that resulted was inadequate because key testimony and witnesses were overlooked. Petitioner claims that trial counsel should have used trained investigators for all aspects of the mitigation investigation and that the failure to do so was unreasonable.

Because trial counsel assessed the investigation as "overwhelming, both because of the geographic spread of the crimes and the number of crimes" (HT Vol. 4 at 28), they reasoned that using law students would be helpful. The law students were primarily from the Cornell Law School Death Penalty Clinic where Blume and Johnson teach.

After Blume's appointment to the case, it was his initial impression that the government was not investigating, so Blume "wanted to try and get out in front of them with a lot of these different witnesses and different locations." (HT Vol. 1 at 117.) As Blume described it: "[t]here were a lot of different jurisdictions and lot of different incidents. [Fulks] and Mr. Basham escaped from an institution in Kentucky, went sort of north through the heartland and then back down to West Virginia, to South Carolina and then sort of back up where Mr. Fulks was apprehended." (*Id.* at 117.) By using mainly four or five law students to assist in the investigation in addition to two professional, retained investigators, trial counsel "covered more ground than any one investigator would cover." (HT Vol. 4 at 28.)

Blume, Johnson, and Glass took some students with them to conduct investigations in Indiana, West Virginia, Ohio, and South Carolina. (HT Vol. 1 at 117, 133.) Nettles traveled to Kentucky with retained investigator Skidmore and law students Casey Hinkle and Mary Mulhern to "dig up dirt" on Basham to support their theory

that "Basham was violent and unpredictable and that he was most likely the perpetrator." (*Id.* at 133, 179–80.)

Another reason trial counsel chose to use law students, according to Johnson, was "that students often are very good at being unintimidating and can sometimes get people to initially speak who might slam a door in an attorney's face." (HT Vol. 4 at 28.) Johnson stated that the law students primarily located individuals pursuant to trial counsel's instruction. (*Id.*) As to individuals who were not deemed "significant witnesses," such as people in the neighborhood, trial counsel had the law students speak to some of them initially and then trial counsel went back and re-interviewed them. (*Id.*) However, trial counsel did not send law students to interview powerful material witnesses or Fulks's relatives. (HT Vol. 1 at 183–84.) Trial counsel also used law students to collect school records and mental health records. (HT Vol. 4 at 29.)

Prior to using the law students, Johnson and Blume trained them on interviewing, complete with handouts (Gov't Ex. 44), with an eye towards the law students trying to find individuals who knew Fulks or had information to assist in the mitigation aspect of the case. (HT Vol. 4 at 39–40.) Blume had the law students do mock interviewing with role playing exercises before sending them out to conduct any interviews. (HT Vol. 1 at 182.)

The law students were instructed to write up everything that the witness told them, and trial counsel would review the memos and make a judgment about following up with an interview by one of the trial counsel. (HT Vol. 4 at 28–29.) Johnson stated that "if anyone had anything that looked like it was promising to say, virtually anyone, we—one of us would have gone to see that person afterwards." (*Id.* at 29.) Fulks's § 2255 counsel could not

identify a single individual with whom the law students spoke with who had relevant information, but whom trial counsel did not follow up with themselves. (*Id.* at 40.) Trial counsel did not follow up on the individuals who responded to the law students' inquiries that they never knew the Fulks family. (*Id.* at 29.)

Significantly, Blume did not send any law students alone to interview anyone, with two exceptions. These two exceptions were due to the training and background of the two interviewers: (1) Tim Cane worked for several years as an investigator for a capital defense unit in San Francisco prior to attending Cornell Law School; and (2) Matthew Rawlings was an ordained minister from Huntington, West Virginia, whom Blume felt was mature and comfortable enough to talk to people on his own, and whom Johnson testified persuaded a witness to talk to trial counsel. (HT Vol. 1 at 182–83.) Among the other law students Petitioner complains were not trained or otherwise competent to aid in the mitigation investigation were Matthew Jury, a British lawyer on an internship at the Center For Capital Litigation, a nonprofit corporation that represented death row inmates.

Although law students were not used to draft any of the pleadings, they did draft internal memos on legal issues which contained preliminary research. (HT Vol. 4 at 29–30.) Trial counsel would read the cases cited, and did not submit any memoranda to the court "without having done the research, rechecked the research." (*Id.* at 30.) Matthew Jury prepared a memo, (Pet. Ex. 45), and was present during jury selection. (HT Vol. 1 at 64.) Keith Palumbo, a Cornell law student prepared a memo on Fetal Alcohol Syndrome. (Pet. Ex. 47; HT Vol. 1 at 64.) Kerry Davenport, also a Cornell law student, prepared a separate memo on Fetal Alcohol

Spectrum Disorders. (Pet. Ex. 46.) Another student, Casey Hinkle, prepared a memo regarding the admissibility of evidence to show consciousness of guilt in the penalty phase of Fulks's trial. (Pet. Ex. 43.)

The court finds that trial counsel's use of law students to assist in the mitigation investigation does not constitute ineffective assistance of counsel. As Petitioner concedes, trial counsel hired trained investigators and mitigation specialists to conduct the bulk of the mitigation investigation, including a private investigator, Pete Skidmore, and an investigator employed by Southeastern Professional Investigations, an organization regularly retained by the Federal Public Defender. Petitioner's allegation that many important investigation tasks were left to law students, without describing those tasks, is without support in the record.

As discussed *supra* in Claim 3, Fulks's mitigation team of experts included medical doctors, forensic psychologists, forensic psychiatrists, social workers, and other experts in mental health. The use of law students to assist initially in order to cover as broad an investigation as possible was a reasonable strategic decision. By his own testimony and as evidenced in the record, Blume and trial counsel trained the law students and conducted mock interviews before sending them to knock on doors. The law students reported their findings in writing to trial counsel, and trial counsel followed up on every contact that appeared the least bit promising. The court finds that trial counsel provided the students with effective training, development, and education that allowed them to effectively use law students in their mitigation investigation. Trial counsel's use of the law students was limited, of a cumulative nature, and was highly supervised by Johnson, Blume, and Nettles. While this court does not recognize the ABA Guidelines as the constitutional standard for effective representation, Petitioner was the beneficiary of a comprehensive pretrial investigation, with a pretrial team that far surpassed the "minimum" assistance of a professional investigator and a mitigation specialist suggested by the 2003 ABA Guideline 4.1 that Petitioner cites. The court rejects Petitioner's claims that trial counsel was ineffective for assigning law students to some aspects of the mitigation investigation.

CLAIM 5:

### COURT'S INSTRUCTIONS ON MITIGATING FACTORS

**[16]** In Claim 5, Petitioner contends that his appellate counsel was ineffective for failing to appeal the format employed by this court in explaining the role of mitigating factors during deliberations. The disputed instruction was as follows:

As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, *you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven.*

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.

Secondly, if you determine that the factor has been proven, *you must determine whether the fact is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison*

*without parole and not death is the appropriate punishment.*

(TT Vol. 21 at 274 (emphasis added).)

Petitioner argues that rather than advising the jury that it could give whatever weight it deemed appropriate to a particular mitigating factor, the court's instruction asked the jury, once it has already found that a particular fact exists, to further screen that factor to determine whether it is, in fact, mitigating. Fulks argues that this violates the Eighth Amendment because it created a substantial risk that the jury would screen out, and therefore fail to consider, facts that are unquestionably mitigating. (Pet. at 92.)

During the colloquy between the court and counsel regarding the content of the jury instructions at the end of the case, an issue arose regarding the relatively large number of allegedly mitigating factors the defendant proposed to be included in the jury charge and on the verdict form. The government was concerned that Fulks's trial counsel were attempting to "sand bag" the government's case by listing a large number of somewhat duplicative, and potentially irrelevant, factors for the jury to consider as mitigators. The court had earlier expressed its own concern that there appeared to be a degree of duplication in some of the mitigators proposed by the defendant. Shortly before the jury charge was finalized, the government attorneys suggested that the jury should be told that, with regard to mitigators, there were two issues: "(1) is it proved; and (2) is it mitigating?" (TT Vol. 20 at 217.)

The prosecutor continued:

I want the jury to be instructed that if they find, as a fact, that Chad Fulks's mother ignored his stealing, for example, they can find that that was proved by the defendant. That is not the end of the jury assessment . . . . The jury must

also find that . . . it weighs in favor of imposition of a life without parole sentence.

(*Id.* at 217–18.)

After an extended colloquy, this court responded:

That might eliminate my dilemma [regarding the need] to consolidate some of these [mitigators]. I can leave a fairly long number and tell them they don't have to take a vote and tally it on the vote sheet unless they determine that it has been proved and it is a mitigating factor.

(*Id.* at 218.)

Fulks's trial counsel objected to the court's reformulated instruction on mitigating factors, but did not appeal the adverse ruling. Fulks contends that the failure to appeal this issue was ineffective assistance of counsel because, he argues, *Eddings v. Oklahoma,* 455 U.S. 104, 114–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), requires that in a death penalty sentencing regime, sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."

In *Eddings,* the trial court, acting as the sentencing judge, refused, as a matter of law, to consider in mitigation the circumstances of the defendant's unhappy upbringing and emotional disturbance. *Id.* at 109, 102 S.Ct. 869. Relying upon *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court held that the sentencing judge had erred. In *Lockett,* the Ohio death penalty statute permitted consideration of only three mitigating circumstances. The Supreme Court had little trouble in finding that it was unconstitutional for a state to place limits on mitigating factors that a death penalty sentencer may consider. *Eddings* was an

extension of *Lockett.* There, the state did not limit, by statute, the mitigators that a sentencer could consider, but the trial judge indicated at sentencing that he was precluded "as a matter of law" from considering the suggested mitigators.

It can easily be seen that both *Eddings* and *Lockett* dealt with situations where the state affirmatively placed limitations on the sentencing body even *considering* certain potentially mitigating factors. In Fulks's case, the court's instructions did nothing to preclude the jury from considering the array of mitigators suggested by Fulks in the proposed verdict form. Rather, the court instructed the jury to first determine if the mitigator was proved, and, secondly, if so, to determine whether it was in fact mitigating.

Courts of Appeals dealing with this question after *Eddings* have undercut Petitioner's contention that *Eddings* requires a reversal of the death sentence in this case. In *United States v. Jackson,* 549 F.3d 963 (5th Cir.2008), the defendant contended that the verdict form was inconsistent because the jury failed to find several mitigators that were essentially undisputed, including one (that a co-defendant did not receive the death penalty) that the prosecution stipulated. The Fifth Circuit logically concluded that by not checking the mitigator on the verdict form provided, the jury was merely signaling its decision that even if the factor existed, it was not mitigating. The court said:

> [T]he jury was not required to find that a factor was mitigating, even if it believed the factor's factual predicate to be true. All the law requires is that jurors be aware that they can consider a factor to be mitigating. For example, no juror found that Jackson, "experienced persistent falling when trying to walk until he was 5 years old and this factor is mitigating." In reaching that conclusion,

the jurors could have believed Jackson experienced problems walking but that the factor did not weigh against a sentence of death.

*Id.* at 983.

The Fourth Circuit Court of Appeals was faced with an identical situation in *United States v. Higgs,* 353 F.3d 281 (4th Cir.2003). In *Higgs,* the defendant argued that his death sentence was flawed because the jurors failed to find as a mitigating factor that a co-defendant did not receive a death sentence. On appeal, Higgs argued that the jury's failure to find this undisputed factor "reflect[ed] an arbitrary and unreliable decision requiring [the court] to vacate the sentence." *Id.* at 327. Writing for the court, then-judge (now Chief Judge) Traxler observed that the appellant's argument failed, because:

> [T]he Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. There is no constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence. In addition, the jury's failure to find that [the co-defendant's] life sentence was a mitigating factor for Higgs was supported by the evidence. Although it was undisputed that [the co-defendant] was the triggerman, a rational juror could well have found that Higgs had the dominant role in the murders and therefore that Higgs and [the co-defendant] were not equally culpable in the crime.

*Id.* at 327 (emphasis in original).

Viewed in the light of *Higgs* and *Jackson,* this court's jury instruction (and the accompanying verdict form), did no more than allow the jurors to do what the jury did in those cases, which is to determine whether a factor is not "mitigating" even though there may have been overwhelming evidence to support the existence of the

particular factor. Moreover, the verdict indicates that the Fulks jury did not rubber stamp the government's case. Of the forty-three mitigators the court included on the verdict form at Fulks's urging, the jury unanimously found that over half (twenty-two) of the mitigators were proved. Nine or more jurors found that an additional four mitigators were proved.

At trial, the jury heard four days of testimony regarding Fulks's mitigators. This included testimony regarding his background of deprivation and abuse, his psychological condition, and his substance abuse. At the conclusion of the penalty phase trial, the court instructed the jury:

> A mitigating factor is simply information about a defendant's background, record, or character or about the circumstances surrounding the offense or any other information that you deem relevant that would suggest, in fairness and mercy, that a sentence of death is not the most appropriate punishment, or that a sentence of life in prison without any possibility of release is the more appropriate punishment.

> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation.

(TT Vol. 21 at 273–74.)

There then followed the court's disputed instruction on the two-step process the jury was to employ. The court continued:

> Unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require unanimous agreement with regard to mitigating factors. *Any juror persuaded that a mitigating factor exists, must consider it in this case.*

> Further, you may consider a mitigating factor found by another juror, even if you do not find that factor to be mitigating. *It is up to each individual juror to determine how much weight should be given to any particular mitigating circumstance.*

(*Id.* at 275 (emphasis added).)

In short, unlike the sentencing regimes that were involved in *Eddings* and *Lockett*—which forbade, as a matter of statutory or state common law, the consideration of certain mitigators—here the court listed on the verdict form virtually every mitigator suggested by the defendant, placed no restrictions on the amount of trial testimony received regarding mitigation, and instructed the jury there was "no limit" on the number of mitigators that it could consider.

Finally, the court told the jury that if any juror was persuaded that a mitigating factor existed, the juror "must consider it" in the deliberations. In sum, the court finds no constitutional error in Fulks's trial counsel's failure to appeal the jury charge on mitigation.

## CLAIM 6:

### CAUSAL NEXUS

**[17]** In this claim, Petitioner contends that the prosecutor, in his closing argument, encouraged the jury to think about mitigation in terms of a causal nexus between the mitigating evidence and the crimes committed. Such a nexus test had been rejected by the Supreme Court in *Tennard v. Dretke,* 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), a case handed down while Fulks's trial was in progress and five days before the allegedly improper closing argument. Trial counsel did not object to the argument nor move for a mistrial based upon the prosecutor's comments which were as follows:

Now the defendant's mitigation.... Two points I want to make, reminders, and, again, I will discuss with you in reply. One is this, this whole idea of cause-and-effect. You heard that phrase used in some of the questions. Every one of the defense experts admitted there is no cause-and-effect. That whatever issues that Chad Fulks has, there is no cause-and-effect. What does that mean? That means, despite the fact that Chad Fulks might have a cyst on his brain, might have an IQ of 79, or might have had a bad upbringing, the fact that those causes exist, does not make people commit violent crimes. There is no evidence of that. Anyone to come in the courtroom and claim that, that is junk science. Even their experts acknowledge that. There is no cause-and-effect.

Ladies and gentlemen, think about, think about all of the millions of Americans that suffer, that have significant brain injuries, that have cysts and tumors on their brain, that have damaged brains from gunshot wounds, epilepsy, from all kinds of diseases and accidents. Think about the millions of Americans who have damaged brains but don't carjack women. And think about the millions of Americans with IQs of 79 or lower that don't rape women. And think of all the citizens in this country throughout the years from the—even before the Great Depression ... all the struggles that people have faced, all of the prejudice, all of the biases, all of the poverty, all of the horrible upbringings, but the overwhelming majority of people that grow up in crack-infested households, with alcoholic parents and abusive situations that have a terrible upbringing, the overwhelming majority of these people, they don't kill women. There is no cause-and-effect.

(TT Vol. 21 at 129–30.)

Relying upon *Tennard*, as well as *Eddings* (discussed earlier in regard to Claim

5), and *Smith v. Texas*, 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (decided after Fulks's trial had concluded), Petitioner argues that the prosecutor set forth a "legally flawed argument that the jury must find some causal nexus between the evidence offered as mitigating and the crime committed before such evidence can be taken into account by the jury...." (Pet. at 98.)

The court is constrained to deny relief on this claim. As an initial proposition, close examination of the prosecutor's summation, in context, reveals that it did not suggest to the jury that a rigid nexus requirement had to be shown between a mitigator and the murder in question. Viewed as a whole, the prosecutor made the point that "every one of the defense experts admitted there was no cause-and-effect." In other words, none of the experts testified as to a direct correlation between the deficiencies they had identified regarding Fulks's background and physical and mental well-being and the murder of Alice Donovan. In this sense, the prosecutor was commenting on the evidence the jury had heard. He also told the jury that "millions of Americans" suffer from brain injuries, and other maladies, or suffer from a low I.Q., and do not rape and kill women.

In *Tennard*, the jury was instructed to determine the appropriate punishment by considering only two "special issues," which inquired into whether the crime was committed deliberately and whether the defendant posed a risk of future dangerousness. 542 U.S. at 277, 124 S.Ct. 2562. Earlier, in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Supreme Court held that a rigid application of three special issues did not allow the jury to give effect to Penry's

mitigating mental retardation and childhood abuse evidence. Notwithstanding *Penry,* the Fifth Circuit had developed the concept of "constitutional relevance" and focused on whether the mitigating evidence was evidence of a "uniquely severe permanent handicap . . . [ ]that the criminal act was attributable to this severe permanent condition." *Tennard,* 542 U.S. at 283, 124 S.Ct. 2562. The Supreme Court squarely rejected the Texas court's nexus test. *Id.* at 289, 124 S.Ct. 2562.

It can readily be seen that what was at issue in *Tennard* was the same sort of problem first addressed in *Eddings,* which is some type of statutory or common law bar to the jury giving full consideration to the mitigating factors produced at trial. Unlike the trial court in *Tennard,* this court instructed the jurors that they could consider any factors to be mitigating if the factor tended to suggest life in prison without parole, and not death, should be the appropriate sentence. (TT Vol. 21 at 274.)

The court's instruction, both before and after closing arguments, made no mention of a requirement that there be a causal connection between the mitigating factor and the death of Donovan. Further, the court instructed the jury that arguments of the attorneys were not evidence. (TT Vol. 22 at 250–51.) As the government observes in its brief, in order for the jurors not to have considered the numerous mitigating factors they found (the jury unanimously found twenty-two of the forty-three mitigators advanced by Fulks), they would have had to blatantly ignore this court's oral and written instructions.

In sum, Fulks's counsel was not ineffective for failing to object to the prosecutor's argument. Assuming, without deciding, that the law announced by *Tennard* was clear at the time the challenged summation was made, the prosecutor's argument did not imply a strict causal nexus was re-

quired, and to the extent the prosecutor might have suggested this indirectly, the court's omnibus jury charge clearly explained to the jury the proper role of mitigating factors in this case. Hence, there was no error by the court or counsel.

## CLAIM 7:

### FBI 302 STATEMENT

**[18]** In Claim 7, Petitioner alleges that trial counsel were ineffective in advising him to give a statement to the FBI when no proffer letter or plea agreement was in place. Upon being arrested on November 20, 2002 and for the five months that followed, Petitioner gave no statement to the police. On April 28, 2003, pursuant to the advice of trial counsel, Fulks admitted to being involved in the abduction and rape of Alice Donovan. Petitioner argues that absent his voluntary statement, the government would have had difficulty proving either Petitioner's or Basham's guilt beyond a reasonable doubt. Thus, Petitioner argues, his willingness to provide a statement was of great value to the government, and counsel's advice that Petitioner take nothing in exchange for his statement was objectively unreasonable.

The government contends, however, that at the time that Fulks, through counsel, first approached the government about providing information regarding the whereabouts of Alice Donovan's remains, the government had no interest in receiving that information under conditions that would not allow the use of the information directly or derivatively. (*See* Gov't Ex. C, Decl. of AUSA Scott N. Schools at 4.) The government's insistence that information be provided without restriction was based on several realities. First, the evidence against Fulks at that time was already overwhelming. (*Id.*) Second, even though the government was interested in facilitat-

ing the location of Alice Donovan's remains to secure some closure for her family, whatever evidentiary value her remains may have had in November 2002, was likely lost or considerably dissipated by April 2003. (*Id.*) For both of these reasons, the government was willing to forego receipt of any information from Fulks unless the information could be used against him. (*Id.*) Third, the government had determined that Fulks and Basham were the only witnesses to the actual murders and expected that they would accuse each other of committing the murders. (*Id.*) Finally, the government had declined to execute a proffer letter with Basham (when he had sought to cooperate with the government in late-November 2002) when the information known to the government was less extensive. Therefore, the government saw no reason to treat Fulks more favorably in April 2003, after it had overwhelming evidence of Fulks's guilt. (*Id.* at 2, 5.) The government prosecutor stated that, for all of the reasons set forth above, "I can state with certainty that the government would have foregone any interview of Fulks rather than receive information from him that could not be used against him." (*Id.*)

Independently, trial counsel concluded on the basis of the strength of the government's case, that Fulks's guilt was not subject to any reasonable dispute.[26] Trial counsel was knowledgeable about proffers and had attempted to engage in plea negotiations to convince the government to drop the death penalty notice in exchange for Fulks's guilty pleas to all charges.[27] However, prosecutors systematically indicated their unwillingness to recommend a sentence other than death. (*See* Gov't Ex. C, *supra* at 4–6.) With the inevitability of trial on two capital charges, trial counsel focused on the penalty phase as the only way to save Fulks's life by presenting a well-thought-out case in mitigation during the sentencing phase.

Having substantial experience in capital defense as detailed in this court's findings, and in light of the government's unwillingness to withdraw the death penalty notice, Blume made the strategic decision to have Fulks make a 302 statement to the FBI.

According to Blume, Nettles, and Johnson, they reasoned that the only way to get into evidence Fulks's version of the crime spree without subjecting Fulks to cross-examination, was through a 302 statement. Fulks's version claimed that he had a less culpable role in the crimes, specifically pin-

---

**26.** At the § 2255 hearing, Blume said, "I believed that he would be found guilty, I didn't see any credible defense or issue which he would be found not guilty of the offenses. And so given that, I felt like that it was in Mr. Fulks's best interest to plead guilty." (HT Vol. 1 at 45.) Every court to consider this cases agreed with trial counsel's assessment of the evidence. For example, according to the Fourth Circuit, "Fulks chose to pursue his trial strategy in the face of an abundance of evidence casting Fulks as an equal, if not leading, partner in the crime spree." *Fulks*, 454 F.3d at 410, 426. In fact, after the verdict was returned, all four alternate jurors requested an audience with the undersigned so that they could inform the court that they, too, would have unanimously voted in favor of the death penalty.

**27.** "Because I believe [sic] then and I believe now he was remorseful for his responsibility in this. And so a proffer in my mind would have been self-defeating. I wanted the statement to come in. I mean, my main concern wasn't that the statement would come in, but the government might not use it on the basis of they thought it might be self-serving, and then I didn't know. You know, I did know about a proffer, but I didn't—you know, right or wrong, it's not my decision to say whether this is the right decision or the wrong decision, but my decision was that I didn't want a proffer and I didn't think it was in Mr. Fulks's interest to ask for one." (HT Vol. 1 at 43.)

ning the murder of Alice Donovan on Basham. Because trial counsel wanted the government to admit the 302 statement in the trial, Blume believed a proffer would be self-defeating. Further, trial counsel determined that if Fulks gave a statement without a proffer or a plea agreement, that would demonstrate his acceptance of responsibility and remorse for acknowledging his role in the crimes, especially without asking for anything in exchange. *See Meyer v. Branker,* 506 F.3d 358, 369–70 (4th Cir.2007) ("A guilty plea demonstrates remorse, and, since the same jury sits during the guilt and penalty phases of a capital trial, . . . it also lessens the exposure of jurors to the often dramatic evidence of the crime."); *Simpson v. Polk,* 129 Fed.Appx. 782, 797 (4th Cir.2005) (defense strategy was that by entering the guilty plea "maybe the jury would have some mercy and sentence [defendant] to life in prison"); *Jones v. Page,* 76 F.3d 831, 844–45 (7th Cir.1996). As Blume testified:

> The purpose of giving the [302] statement was to not only get Chad's version out there, but to demonstrate some acceptance of responsibility and expression of remorse. And that those might be the factors which persuade the government to drop death or it could be used in mitigation of punishment at the sentencing phase of Mr. Fulks's trial.

(HT Vol. 1 at 45.) Blume also testified:

> Well, it was clear to us at the time the government wasn't going to enter into one. You know, part of the purpose of having him give the statement and then continue to take polygraphs, provide the information, hopefully find the body was not only to try and create—Chad wanted to help, that was one thing. So, we were trying to facilitate his desire to try to help find her remains. We were trying to see if this ongoing cooperation and maybe the assistance of this might

create a situation in which a plea bargain might eventually happen. And three, if that didn't to try and create a situation where he could maybe take advantage of responsibility and remorse as mitigating factors.

(HT Vol. 2 at 15.)

Additionally, as the government points out, the 302 statement to the FBI buttressed Fulks's attempt to admit supportive private polygraph examinations. As noted by the government, "[i]n the best case, the polygraphs would support Fulks's assertion that Basham was the killer. In the worst case, the strategy preserved an issue for appeal for which there was some legal support while also assuring that the jury would at least be aware that Fulks had accused Basham of being the killer." (Gov't Mem. Opp'n at 80, citing Gov't Ex. 3, *supra,* at 5).

To the extent that Petitioner claims his 302 statement allowed the government "to fill in the gaps in its evidence," the court finds that any information he provided was cumulative or not critical to the case. That is to say, Petitioner has failed to show that the outcome of his trial would have been different had he not given a 302 statement to the FBI.

The fact that trial counsel advised Fulks to speak with the FBI, and Fulks told the FBI that Alice Donovan was killed in South Carolina and that he provided details of his involvement in the crimes with which he was charged cannot automatically be said to have been ineffective assistance of counsel. Independently of his statement, Fulks's guilt was not subject to any reasonable dispute. As the Fourth Circuit summarized:

> [B]oth Hawkins and McGuffin testified that Basham took orders from Fulks and that Fulks was continually in charge of what the two of them did. Furthermore, the prosecution presented evi-

dence suggesting that Fulks instigated the Kentucky prison break because he was afraid of being sentenced to a lengthy term of imprisonment on child abuse charges that he learned of the day before the escape. And Tina Severance testified that Fulks, not Basham, approached her about obtaining firearms shortly after their escape. Although Basham also fired shots when Jordan discovered the two of them burglarizing his son's home, Jordan testified that Fulks fired at him as well. Finally, throughout the crime spree, Fulks and Basham only travelled to places with which Fulks was familiar, and they did so with Fulks behind the wheel.

*Fulks,* 454 F.3d at 426.

Petitioner next contests as speculative the suggestion that trial counsel advised him to cooperate with the government as part of an overall strategy to introduce evidence that he did not kill Alice Donovan and Samantha Burns. The evidence at the § 2255 hearing, however, repeatedly demonstrated that such was precisely the strategy:

> I felt like Mr. Fulks could probably tell the story to the police, he could get out his version of the events, which was that he was not the actual killer. And then the government would hopefully admit this at trial as Mr. Fulks's version of the offense. And then I also hoped through maybe if we could help use this to find the body, if we could find the body, with the combination of giving the statement and finding the body, with the polygraph that he was able to pass, the numerous polygraphs might result in the government withdrawing death. So, on balance, you know, although we talked about this a lot, and there was some trepidation, there's always, of course, a lot of trepidation about having your client go and talk to the police, that I

felt like it was in Mr. Fulks's best interest to go and talk to the government. (HT Vol. 1 at 41–42.)

> \*    \*    \*

> [T]he purpose of having him give the statement, we wanted to do two things. Number one, is have him show some acceptance of responsibility by not asking for anything. By going to the government and giving a statement which effectively meant he was going to be convicted of these crimes. So, we wanted it to demonstrate, A, acceptance of responsibility, B, hopefully some true indicia of remorse.

(*Id.*) Blume also testified: "I thought that our main chance to save Chad's life was to convince the jury that he wasn't the killer." (HT Vol. 1 at 137.)

The court finds that trial counsel's decision to have Fulks give a 302 statement was a reasonable trial strategy, especially in light of the multitude of witnesses and physical evidence of Fulks's participation in the seventeen-day crime spree. The decision to give the 302 statement was part and parcel of the decision to plead guilty—to get Fulks's version out without exposing him to the microscope of cross-examination given his lengthy criminal record. It was reasonable for trial counsel to advise Fulks to give the statement without a proffer or plea agreement for the strategic reason that it showed some level of acceptance of responsibility and remorse for accepting the role he had in the crimes, while most significantly, establishing his position that he was not the killer. Trial counsel believed Fulks was not the killer, and reasonably believed that he could convey the same information to the government to convince the government to drop death against Fulks and pursue it against Basham as the actual killer. Although the government ultimately did not remove the death penalty notice, but the court finds

that trial counsel's decision to allow Fulks to discuss the case with the FBI was a reasonable trial strategy, and, therefore, does not constitute ineffective assistance of trial counsel.

### CLAIM 8:

### CATCH–ALL MITIGATING FACTOR

[19] Petitioner alleges in Claim 8 that trial counsel were ineffective for failing to insist that additional, or more favorable, mitigating factors be included on the verdict form.

First, Petitioner argues that what is sometimes referred to as the "catch-all mitigation instruction" on the verdict form did not include the exact language found in 18 U.S.C. § 3592(a)(8), namely, "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence." Absent this language, Petitioner argues the sentencing process was "fatally flawed."

At Fulks's request, the court instructed the jury on a total of forty-three potentially mitigating factors. The verdict form on which the jury recorded its verdict listed these factors. Mitigator No. 41 read as follows: "Other factors in Chadrick Evan Fulks's childhood, background, or character weigh against imposition of the sentence of death." In Claim 8, Petitioner alleges that catch-all Mitigator No. 41 did not track exactly the language of § 3592(a)(8) and is therefore defective.

After the § 2255 petition was filed in this case, the United States Court of Appeals for the Fourth Circuit issued its opinion in the direct appeal of Fulks's co-defendant, Brandon Basham. The verdict form in the Basham trial did not include even a "watered-down" catch-all mitigator, such as Mitigator No. 41 in the Fulks trial. Basham had objected, at trial, to this court's refusal to include a blank line on the verdict form on which a juror could record some type of catch-all mitigating factor. The Fourth Circuit Court of Appeals rejected Basham's claim. *United States v. Basham*, 561 F.3d 302, 337 (4th Cir.2009).

Basham argued that although this court's oral instructions followed the precise language of § 3592(a)(8), the absence of such a mitigating factor from the special verdict form created a reasonable likelihood that the jurors believed that they were precluded from considering "other factors" in mitigation. Relying upon *Jones v. United States*, 527 U.S. 373, 393, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the Fourth Circuit concluded that this court's "explicit instruction" could overcome any ambiguity or confusion caused by the verdict form in Basham's case.

In Fulks's case, as in *Basham*, this court explained to the jury the law regarding aggravating and mitigating factors. With regard to aggravating factors, the court instructed the jury that the statutory and non-statutory aggravating factors contained in the jury instructions and included on the verdict form were the "only . . . aggravating factors that you may consider. You *may not* consider any other facts in aggravation which you may think of on your own." (TT Vol. 21 at 273 (emphasis added).)

As to mitigating factors, however, the court told the jury "the law provides that there is, essentially, *no limit* on the number of factors or things that the jury may consider in mitigation." (TT Vol. 21 at 274 (emphasis added).)

The court continued:

Unlike aggravating factors, the law does not limit your consideration of mitigating factors to those that are listed for you. Therefore, if there are any mitigat-

ing factors not argued by the attorneys for the defendant, but which any juror finds to be established, by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision.

(TT Vol. 21 at 279.)

In Fulks's case, unlike in *Basham,* the court *did* include a modified catch-all mitigator in the form of Mitigation Factor No. 41. At Fulks's § 2255 hearing, Blume explained that in his view, Fulks would be best served by "as many [mitigators] as possible . . . a lot of very short mitigators." (HT Vol. 2 at 185.) He wanted "short declarative sentences which no one can disagree with." (HT Vol. 1 at 174.) Mitigator 41 conveyed the essence of § 3592(a)(8) in the form desired by Blume: short, to-the-point, and unencumbered by compound phrases and repetition that quite possibly could have confused the jury.

Because the Fourth Circuit has already determined that the court's failure to include *any* catch-all mitigating factor on the verdict form was not error, or was, in any event, cured by the court's explicit instructions regarding § 3592(a)(8), and because in the present case, the court gave at least a watered-down version of this concept, the court finds no error in counsel's decision not to request the precise words of the statute be read to the jury.

The second portion of Claim 8 challenges trial counsel's failure to request the statutory mitigating factor provided in 18 U.S.C. § 3592(a)(3):

[t]he finder of fact shall consider . . . (3) Minor Participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge."

In this court's view, for Fulks's trial team to have suggested to the jury that Fulks's participation in the crime was "relatively minor" might well have been counterproductive. As set forth earlier in this order detailing the chronology of events, Basham and Fulks were partners in crime in an extensive seventeen-day spree that spanned seven states and affected at least thirteen identifiable victims. Fulks drove the automobile, as Basham could not drive. The Wal–Mart video clearly depicts both defendants participating in the abduction and carjacking of Alice Donovan. There was strong evidence that Fulks raped Alice Donovan as evidenced by his semen on the back seat of her automobile.

On this record, trial counsel risked the possibility of a strong adverse reaction from the jury to suggest that Fulks's participation was "minor." To be sure, counsel could, and did, argue that Fulks was "less culpable" than Basham, a strategy that strikes this court as reasonable under the circumstances. The court is not convinced, however, that trial counsel were ineffective for failing to insist on a Minor Participation mitigating factor in this case.

### CLAIMS 9, 10, 11, 12 & 27:

### GUILTY PLEA

Shortly before trial, the court was informed that Fulks had decided to plead guilty to all eight counts of the superseding indictment and proceed to trial on the penalty phase only. A guilty plea hearing was scheduled for May 4, 2004. At the hearing, the court followed its standard procedure for accepting a guilty plea in compliance with the requirements of Rule 11 of the Federal Rules of Criminal Procedure. Mindful of the serious consequences attendant to a guilty plea, and of the possibility of a later challenge to the validity of the plea, the court was especially careful to

strictly comply with each and every aspect of Rule 11.

Near the end of the Rule 11 colloquy, the court attempted to determine if there was a factual basis for the guilty plea as required by Rule 11(b)(3). It is this court's standard practice with regard to Rule 11(b)(3) to first ask the defendant to advise the court, under oath, exactly what he or she did to become guilty of the crime. This is traditionally followed by a recitation by the prosecutor, or sometimes the investigating law enforcement officer, of the facts the government has developed as a result of its investigation and what evidence the government would be prepared to go forward on and prove if a trial were held. Following this, the court asks the defendant if he agrees with the government's recitation of his involvement in criminal activity.

When the court asked Fulks to explain exactly what he did to become guilty of the facts charged in all eight counts, Fulks responded, through trial counsel John Blume, that instead of making a statement in the courtroom he would rely upon the information contained in the statement he made to the investigating FBI agent as summarized in the agent's 302 report. The court immediately expressed its surprise and concern regarding this development. The court had not been apprised prior to the hearing that Fulks would not make a statement in court, but would instead rely upon the 302 statement to support his guilty plea. Defense counsel further informed the court that the government had agreed to accept the 302 in lieu of Fulks's oral confession at the Rule 11 hearing and that the government also believed the 302 formed a sufficient factual basis to support Fulks's plea on all counts.

The court took a recess to read the 302 to see, in particular, whether all of the elements of the two capital offenses were supported by the facts admitted. After reviewing the 302, the court was not convinced that the statement contained an admission of specific intent relating to the death of Alice Donovan. The court then expressed its concern to counsel that Fulks was attempting to plead guilty to capital crimes without admitting any direct or indirect participation in the death of the victim. Counsel for the defendant and the government all stated that Fulks could plead guilty to the capital offenses, without admitting any specific intent to cause death, under the doctrine set forth in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

[20]  Generally speaking, "[t]he *Pinkerton* doctrine imposes vicarious liability on a co-conspirator for the substantive offenses committed by the members of the conspiracy when the offenses are committed during and in furtherance of the conspiracy." *United States v. Carrington,* 301 F.3d 204, 211 (4th Cir.2002) (quoting *United States v. Aramony,* 88 F.3d 1369, 1379 (4th Cir. 1996)). Because Fulks admitted in the 302 that he and co-defendant, Brandon Basham, conspired to kidnap and carjack Donovan, counsel argued that Fulks could be held liable for Donovan's death even if he had not intended it, under a *Pinkerton* theory of criminal responsibility.

As the hearing continued, the court expressed its concern about the propriety of accepting a guilty plea to carjacking resulting in death under a *Pinkerton* theory of liability:

> So, on the state of the record here, we have to look at either aiding and abetting liability or *Pinkerton* liability. Aiding and abetting requires some type of specific intent to help bring about the crime.

I don't think [aiding and abetting] fits the facts set out in his 302 form, because, as I said, Mr. Fulks does not admit that he knew that she was going to be killed, and he does not admit that he wanted to help bring it about.

Then we are left with so-called *Pinkerton* liability, which was established by the Supreme Court in the case of *Pinkerton versus United States* back in 1946. In that case the Supreme Court held that a conspirator may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy.

But what I have been agonizing over is, counts 1 and 2, two counts that carry the death penalty, do not charge a conspiracy. . . .

So, I'm not sure that we need to—I think the thing to do is to just stop right here and resume tomorrow and let me hit the books and y'all hit the books tonight to see if the law is that *Pinkerton* can apply to a murder case where a conspiracy is not charged.

(Plea HT, May 4, 2004 at 68–69.)

At the conclusion of that hearing, this court again reiterated its concerns:

My concern is, I did not know when I walked out here that all I was going to have for a factual statement was his 302 that really admits kidnapping and admits car-jacking, but does not admit any complicity in death.

And so the two options we have I think are looking at aiding and abetting, which I don't think fits. . . .

Then we have *Pinkerton* liability, the co-conspirator theory of imputing liability. But I'm just not sure of my authority to apply that doctrine to counts 1 and 2 which do not charge a conspiracy, and

that's my precise question that I would like for y'all to take a look at.

(*Id.* at 72–73.)

The court then adjourned the hearing for three days to allow counsel to brief the question of whether a *Pinkerton* theory of liability could support a guilty plea for carjacking resulting in death. The briefs submitted by both the government and the defendant argued that a *Pinkerton* theory was viable under the circumstances presented in this case.

When the hearing resumed, the court reiterated its tentative concern regarding the *Pinkerton* theory, noted that both parties had urged upon the court that *Pinkerton* was viable, and agreed to accept the plea on this basis. In doing so, the court was trying to steer between the Scylla of accepting a potentially defective guilty plea and the Charybdis of forcing the defendant to go to trial, thereby denying his guilt in front of the jury and possibly compromising his case in mitigation during the penalty phase, if one ensued. Recognizing that the issue might arise again during the course of this litigation, the court entered a memorandum opinion reciting the events leading up to the guilty plea and the court's basis for accepting the plea. *United States v. Chadrick Evans Fulks,* CR No. 4:02–992 [D.S.C.] (order entered July 2, 2004). As the court noted in that order:

The court . . . must balance its own due process concerns about *Pinkerton* against Fulks's right to chose a strategy that he believes gives him the best chance that the jury will spare his life, pleading guilty, but not admitting intent.

*Id.*

The court noted in that same order that if it were later determined that the guilty plea was improvidently accepted, the error could well prove to be harmless. This was because Count Two, charging Kidnapping resulting in death, has no mens rea re-

quirement as does Count One, and so if the jury found that the defendant should receive the death penalty on Count Two, any deficiency in the guilty plea to Count One would be harmless. As noted previously, the jury was required to render separate verdicts on both Count One and Count Two and imposed the death penalty on both counts.

As the court supposed at the time the guilty plea was accepted, Fulks has now returned to this court suggesting that notwithstanding his earlier position and the strong urging he made at the time to have the court accept his guilty plea by way of his admission to the 302 as part of a valid trial strategy, his plea should be set aside and a new trial ordered. With this background, the court now turns to the issues raised in these five claims (9, 10, 11, 12, and 27).

Petitioner asserts the following five claims challenging his guilty plea: (a) Claim 9: that there was not a sufficient factual basis for the guilty plea to Count One because Fulks did not possess the requisite intent to plead guilty to the carjacking count; (b) Claim 10: that trial counsel was ineffective for advising him to plead guilty to the carjacking count; (c) Claim 11: that trial counsel was ineffective for allowing Fulks to plead guilty to the carjacking count because the distinction between the intent required under *Pinkerton* and the gateway intent factors of the Federal Death Penalty Act was too fine for a lay juror to appreciate; (d) Claim 12: that the Eighth Amendment precludes the application of *Pinkerton* in a capital case; and (e) Claim 27: that trial counsel was ineffective in advising Petitioner to plead guilty because this allowed the prosecution to introduce evidence of Petitioner's bad acts that would have been inadmissible in a guilt phase trial to which the Federal Rules of Evidence would apply.

*Claims 9 & 12*

**[21]** Because Fulks had the opportunity to raise Claims 9 and 12 on direct appeal and did not, *see United States v. Mastrapa*, 509 F.3d 652 (4th Cir.2007) (vacating plea on direct appeal for lack of sufficient factual basis), he has procedurally defaulted these claims. *See United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir.1999). As a result, the court determines Claims 9 and 12 to be procedurally defaulted. Therefore, the only basis for Fulks to maintain any claims challenging his guilty plea is to argue that his trial counsel was ineffective for allowing him to plead guilty, as raised in Claims 10, 11, and 27.

*Claim 10*

**[22]** Claim 10 is an assertion that Fulks was denied the effective assistance of counsel when his trial counsel improperly advised him to plead guilty. In this argument, petitioner asserts that he was prejudiced by trial counsel's incomplete and inaccurate assessment of *Pinkerton* which formed the basis for his decision to accept counsel's advice to plead guilty. As a secondary proposition, Petitioner contends that he suffered prejudice by acting in reliance on his counsel's erroneous advice that he plead guilty when the plea lacked a legally sufficient factual basis. In essence, both of these arguments derive from the very same issue that concerned this court when the guilty plea was proffered. For the reasons that follow, the court concludes that counsel was not ineffective with regard to Fulks's plea and, perhaps more importantly, any error committed by trial counsel with regard to the guilty plea was unquestionably cured when the jury returned a verdict of death on Count Two (Kidnapping resulting in death) to which the defendant pled guilty without reliance upon *Pinkerton.*

**590**        **875 FEDERAL SUPPLEMENT, 2d SERIES**

All of the arguments asserted in support of Claim 10 parrot the court's concern expressed on May 4 and May 7, 2004 when the court was urged by defense counsel and the government to accept the guilty plea. In essence, Petitioner's § 2255 attorneys contend that Fulks's statements contained in the 302 report were not sufficient to support a guilty plea to Count One, and the conviction and resulting death sentence on Count One must therefore be set aside.

The court's basic rationale for accepting the plea to Count One under *Pinkerton* is set out at length in the court's July 2, 2004 order. As the court noted in that order, there is sufficient evidence in the record from which the court could have concluded that Fulks intended serious harm or death, at the moment he took control of Donovan's automobile, to support his plea.

According to Fulks's own 302 statement, at the time Donovan was carjacked, Fulks and Basham were fleeing the scene of an attempted murder and first-degree burglary in a stolen white pickup truck; Fulks and Basham abandoned the pickup truck immediately after they carjacked Mrs. Donovan in her blue BMW from the Wal–Mart parking lot in Conway, South Carolina; and Donovan was subsequently raped and killed. Fulks further admits that he and Basham had previously carjacked and kidnapped Samantha Burns from a mall parking lot in Huntington, West Virginia, just a few days before Donovan's abduction. Burns was also raped

and killed. Accordingly, the court could have logically inferred from the 302 that Fulks intended death or serious bodily harm at the moment he carjacked Donovan.[28]

Moreover, as pointed out by the government, the intent requirement for carjacking resulting in death is satisfied when the government proves that the defendant "was conditionally prepared to act if the person failed to relinquish the vehicle." *United States v. Foster,* 507 F.3d 233, 247 (4th Cir.2007). It is not necessary to prove, as the Petitioner apparently contends, that the defendant actually intended to cause the harm. According to Fulks's 302 comment, Fulks saw that Basham was sitting on Donovan when Fulks first saw that Basham had entered the BMW. Basham, armed with a .22 revolver, forced Donovan into the back of the BMW so Fulks could drive. The physical sitting on Donovan, the ordering that she drive to the back of the parking lot, the ordering of Donovan into the back seat of the BMW, and the use of the .22 revolver were sufficient to infer that Basham, with Fulks's help, possessed the intent to seriously harm or kill Donovan if necessary to obtain control of her vehicle.

Because the record demonstrates that Fulks's trial counsel were correct in their assessment of *Pinkerton* liability, and because Petitioner's plea was supported by an adequate factual basis, the court con-

---

**28.** As the government observes in its brief, the court is authorized to determine if a guilty plea is supported by "anything that appears in the record." *United States v. Mastrapa,* 509 F.3d at 660. In this case, the government orally supplemented Fulks's 302 statement at the guilty plea hearing with an extensive rendition of Basham and Fulks acting as partners during their seventeen-day crime spree, a period that included the abduction, rape, and murder of two women, the abduc-

tion and leaving for dead a third individual (Hawkins), and the potential abduction of yet two other women. Fulks's trial counsel protested the rendition of matters outside the 302, and indicated that the only concessions Fulks would make were those contained in the 302. This court is reluctant, therefore, to rely upon the government's rendition at the guilty plea hearing, for, although it "appears in the record," it was disputed by Fulks.

cludes that there is no merit to Claim 10.[29]

### Claim 11

In Claim 11, Petitioner contends that, assuming arguendo that the guilty plea pursuant to *Pinkerton* was valid, trial counsel was nevertheless ineffective in advising Petitioner to plead guilty because the distinction between intent under *Pinkerton* and the gateway intent factors under the Federal Death Penalty Act is "far too fine a line for a lay jury to appreciate." As the government observes in its response to the petition, no authority is offered for this proposition. Instead, Petitioner simply asserts that the distinction between the intent required for *Pinkerton* liability and the gateway intent factors of the Federal Death Penalty Act is a filament too fine to be disentangled by a jury composed of ordinary citizens.

Initially, it should be noted that such an assertion bespeaks a distrust of the common law jury trial. Frequently, jurors are required to compartmentalize their thinking, draw fine distinctions, and, in some cases, even ignore evidence that was produced in the courtroom. Jurors are sometimes instructed that an item of evidence is admitted against one defendant, but not against another, and jurors are occasionally instructed to consider certain evidence for one purpose (e.g., notice), but not another (e.g., liability). Moreover, it is sometimes necessary for the trial judge to instruct the jury to disregard testimony that it has already heard when a judge later determines it was improvidently admitted. Although this case was, and remains, a serious case to those involved, it was not an unusually complex or intellectually challenging one such as anti-trust cases, securities fraud cases, and a variety of other complex, highly technical disputes that are put before juries across the United States on a daily basis.

Petitioner contends that once a defendant has pled guilty to a crime that has "intent to cause death or serious bodily harm" as an element of the offense, a lay jury will view that as a concession that the defendant did act with the requisite gateway intent set forth in 18 U.S.C. § 3591(a)(2)(D) of "intentionally and specifically engag[ing] in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constitutes a reckless disregard for human life."

Importantly, Claim 11 suffers from a faulty premise, namely, the assertion that "the jury was instructed" that Petitioner had pled guilty to carjacking "with intent to cause death or serious bodily harm." (Pet. at 134.) Contrary to this assertion, when the court instructed the jury, there was no mention of the intent element required for Fulks to be guilty of carjacking.

---

**29.** In *Holloway v. United States,* 526 U.S. 1, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999), the Court required an assessment of the mens rea requirement at the inception of the carjacking. In this case, the government asserts that because Fulks and Basham kidnapped Donovan, the crime of carjacking occurred over an extended period of time. Accordingly, the argument goes, the court is authorized to determine Fulks's mens rea at any point during the commission of the *actus rea.* Because Fulks and Basham, among other things, both raped Donovan while the carjacking was in progress, the government contends that the concurring opinion in *United States v. Lebron–Cepeda,* 324 F.3d 52, 63 (1st Cir.2003) leads to the conclusion that even if the requisite mental state was not demonstrated at the precise moment the carjacking began, it was unquestionably shown while the carjacking was in progress. Because the court did not rely on this theory in accepting Fulks's plea, and because counsel for the government offered only a lukewarm argument at the hearing, the court declines to rely upon this theory.

At the commencement of the trial, the court instructed the jury as follows:

        \*      \*      \*

Let me stop here and clarify something you may wonder about. As I have said, Mr. Fulks has pled guilty to Kidnapping, resulting in death, and carjacking, resulting death. In pleading guilty to these two charges, Mr. Fulks has admitted that he participated in the Kidnapping of Ms. Alice Donovan and that he participated in the carjacking of Ms. Alice Donovan. He also admits that the Kidnapping and carjacking ultimately resulted in the death of Ms. Donovan. *He denies, however, any direct involvement in the actual death of Ms. Donovan; therefore, the question of whether Mr. Fulks was directly involved in the actual death of Ms. Donovan is a fact that you will have to consider in reaching your verdict in this case.* The statutory intent factors I have just outlined for you relate to the question of whether Mr. Fulks had any direct involvement in Ms. Donovan's death.

(TT Vol. 1 at 35–36 (emphasis added).)

Then, at the penalty phase trial's conclusion, the court instructed the jury:

The defendant's guilty pleas before this trial began ensure that he will be punished with one of the two most severe punishments available under law.

As you know, the defendant has pleaded guilty to two offenses: carjacking, resulting in death, and kidnapping, resulting in death.

(TT Vol. 21 at 249.)

        \*      \*      \*

The law does not decide which is the appropriate sentence. The law does not assume that every defendant who is found guilty of committing a capital crime should be sentenced to death. Nor does the law presume that this de-

fendant, in particular, should be sentenced to death.

(*Id.* at 249.)

        \*      \*      \*

Let me now turn and discuss with you the deliberative steps that you should follow in considering as to both of the offenses for which death is a possible punishment. That is, carjacking, resulting in death, and Kidnapping, resulting in death. There are a total of six possible steps. I will first outline for you the steps you may be required to go through, and then I will address each of these steps in more detail later in these instructions.

(*Id.* at 255.)

        \*      \*      \*

Second, you must consider whether the government has proven, beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.

(*Id.*)

        \*      \*      \*

Next, before you may consider the imposition of the death penalty, you must also unanimously find, beyond a reasonable doubt, that the defendant acted with one of four potential mental states, called threshold intent factors, described below.

(*Id.* at 257–58.)

The court then gave detailed instructions on the four potential mental states that the jury would have to consider, and then concluded:

You must find at least one of these threshold intent factors has been proven beyond a reasonable doubt, before you may continue your deliberations.

(*Id.* at 261.)

        \*      \*      \*

If you do not find that the defendant acted with one of the described mental states, your deliberations end.

(*Id.*)

It can readily be seen, then, that the jury was merely instructed that Fulks had pled guilty to "carjacking resulting in death," with no reference whatsoever to the mental state that accompanied the guilty plea. The jury was then thoroughly and carefully instructed on the gateway intent factors the government was required to prove, beyond a reasonable doubt, in order to support a verdict of death.

Claim 11 essentially seeks to capitalize on this court's concern over the propriety of Fulks's guilty plea when the court expressed its reservations during the guilty plea phase about whether Fulks had acknowledged enough facts to support a guilty plea under *Pinkerton*. Here, the jury was not confronted with the dilemma that the trial court faced during the guilty plea phase. Accordingly, there is no merit to Claim 11.

### Claim 27

[23] In Claim 27, Petitioner contends that had he not pled guilty and gone through a guilt phase trial, the Federal Rules of Evidence would have applied and would have prohibited the admission of Fulks's alleged other bad acts, such as violence towards his wives and former girlfriends. At the sentencing hearing in this case, the jury heard testimony about Fulks beating and raping Heather Goodman, hitting and dragging Amber Fowler, his wife, through the house by her hair, and punching, dragging by the hair, and raping his second wife, Veronica Evans. Evans even testified that on one occasion, Fulks poked an arrow into her, handcuffed her, punched her in the face, and raped her. (*See generally,* TT Vol. 14 at 37–185.)

The government responds that had Fulks opted to plead not guilty and demand a jury trial to determine his guilt, much of the testimony cited above would have come in as evidence of other bad acts offered to show motive or intent under Rule 404(b) of the Federal Rules of Evidence.

The court does not have to reach the argument made by the government because Claim 27 suffers from a fatal analytical flaw. Even assuming, had Fulks opted for a trial on guilt, that the court kept out evidence of violence towards other women, if Fulks had been convicted at the guilt phase trial, evidence of the violence towards other women would still have come in at the penalty phase, just as it did in the trial that was conducted. In other words, reasonable counsel would have concluded that evidence of violence towards women would be admissible in a penalty phase regardless of whether the penalty phase was occasioned by a guilty plea or a verdict of guilty by a jury following a trial. This fact has nothing to do with whether it was reasonable for Fulks to plead guilty based on the evidence the government had collected against him in this case.

At the § 2255 evidentiary hearing, Fulks advanced an argument not directly made in his petition, which is that *Pinkerton* and other considerations aside, it was bad trial strategy to plead guilty to the death-eligible counts. Rather, the argument goes, Fulks should have pleaded not guilty and required the government to prove guilt beyond a reasonable doubt. In support of this argument, Petitioner submitted the testimony of Andrea Lyon, a clinical professor of law at DePaul University College of Law in Chicago, and also an experienced capital litigator. Lyon has practiced since 1976 and specializes in criminal defense, almost exclusively homicides and capital offenses.

Lyon testified to the remarkable proposition that there are *never* any circumstances imaginable under which it would be appropriate to plead guilty to a capital crime without the government's concession for a sentence of life. In fact, Lyon contended that such a position is the "standard practice in [the] industry." (HT Vol. 2 at 84 (emphasis added).) This court rejects Lyon's opinion on the categorical illegitimacy of pleading guilty when death remains on the line.

Some six months after Fulks's trial, the United States Supreme Court decided *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), in which the Court determined that counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial does not automatically render counsel's performance deficient. In *Nixon*, the Court noted that a guilty plea "may be tactically advantageous for the defendant," citing to its ruling in *Boykin v. Alabama*, 395 U.S. 238, 240, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and also noted that where counsel is unable to negotiate a guilty plea for a life sentence, defense counsel "must strive at the guilt phase to avoid a counterproductive course." 543 U.S. at 191, 125 S.Ct. 551 (citing Sundby, *The Capital Jury and Absolution:* The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1597 (1998) (explaining that "in capital cases, a 'run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt' can have dire implications for the sentencing phase.")).

In fact, immediately after referencing one of Lyon's law review articles, the *Nixon* court stated, "[i]n this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a 'use-

less charade.' " 543 U.S. at 192, 125 S.Ct. 551 (quoting *United States v. Cronic*, 466 U.S. 648, 656–657 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).

In light of the overwhelming evidence against Fulks, the court finds that trial counsel employed a valid and reasonable trial strategy in anticipatorily heeding the dictate in *Nixon* that "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." 543 U.S. at 192, 125 S.Ct. 551. In advising Fulks to plead guilty and proceed directly to the sentencing phase in an effort to avoid a death sentence, trial counsel reasonably determined that it was in Fulks's best interest to concede guilt as a way of showing remorse and accepting responsibility. Counsel's performance in allowing the guilty plea cannot be said to have fallen below an objective standard of reasonableness under *Strickland*.

In sum, trial counsel was not ineffective for advising Fulks to plead guilty to carjacking because it was done pursuant to a reasonable legal trial strategy.

## CLAIM 13:

### MINOR PARTICIPATION

[24]  Among the mitigating factors that the jury is required to consider in determining whether a sentence of death is to be imposed on a defendant under the Federal Death Penalty Act is the defendant's role in the offense. Specifically, 18 U.S.C. § 3592(a)(3) provides: "Minor participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge." "In other words, if a defendant is guilty of an offense, *but played a small part in it,* the

jury (or, in a bench trial, the judge) could find that he was not sufficiently culpable to warrant the imposition of the death penalty." *United States v. Moussaoui*, 382 F.3d 453, 486 (4th Cir.2004) (Gregory, J., concurring in part, dissenting in part) (emphasis added).

As Blume testified, one of trial counsel's main goals at trial was to demonstrate that Fulks was not the person who actually killed Donovan or Burns. In that effort, the trial team assembled information about Basham to prove that he was more culpable for the crimes than Fulks. Blume stated, "we exhausted the sources that I was aware of at the time." (HT Vol. 2 at 19.)

Petitioner claims that trial counsel neglected to introduce evidence that Basham was a master manipulator and the leader for the purpose of a comparative analysis between Basham and Fulks to differentiate their degrees of culpability. Petitioner goes to great lengths to claim that the government portrayed Fulks as the leader during his sentencing trial. However, a review of the record shows that the government's argument was that Fulks and Basham were equally culpable:

> They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha, and they could not have done things they did to Alice without acting in unison, without acting as one. The government is not saying Chad Fulks is more culpable than Brandon Basham. And the government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable.

(TT Vol. 21 at 24.)

Specifically, Petitioner claims trial counsel should have obtained testimony from staff of Columbia Care Center ("CCC") and from prison guards at the Alvin S. Glenn Detention Center ("AGDC"). As to the CCC staff, Petitioner argues that trial counsel should have called detention officer Jeremiah Bush to testify about Basham's construction of a rope made of bed sheets for a planned escape at the facility. Petitioner suggests that because a similar rope was constructed for the escape at the Hopkins County Detention Center ("HCDC") in Kentucky, the jury could have concluded that Basham's role in constructing the rope was some evidence of his leadership in the HCDC escape and the later incidents of the crime spree.

However, this argument ignores the evidence pointing to Fulks's own attempt to escape from CCC while awaiting trial. That escape attempt involved Fulks having hoarded five bed sheets torn into a rope-like configuration, having removed the screen from his room window, having collected pepper packets to throw off police from his scent, and having attempted to persuade another inmate provide an alibi for him. (HT Vol. 2 at 21.)

Petitioner next argues that trial counsel should have called CCC nurse supervisor Celia Bowman to testify that Basham was a very manipulative inmate who skillfully manipulated the staff to obtain medication and other items. (Basham TT Vol. 10/12/2004 at 15–227.) Likewise, Petitioner argues that trial counsel should have called prison guard Robert McEachern to describe Basham as "very observant," "intelligent," and "crafty," (Basham TT Vol. 10/13/2004 at 16–102); and prison guard Francis Kirkland to describe Basham as ". . . very aggressive. Aggressive-type individual. He likes to have things his way or no way at all. He wants to take control." (Basham TT Vol. 10/13/2004 at 16–62). Petitioner complains that trial counsel should have called prison guard Lee James to describe Basham's leadership qualities: "He is a leader. He can lead.

**596**    **875 FEDERAL SUPPLEMENT, 2d SERIES**

He can get the dorm in an uproar when he wants to," (Basham TT Vol. 10/14/2004 at 17–57); and prison guard Erick Dash to comment on Basham's volatility: "He is manipulative. He can go off at anytime. You never know. He can just go off." (Basham TT Vol. 10/14/2004 at 17–65).

Petitioner's claim that trial counsel was ineffective in failing to introduce testimony by CCC staff and AGDC prison guards on Basham's leadership and manipulation is unavailing. The reality is that trial counsel did present substantial evidence of Basham's leadership and manipulation, to consider in conjunction with Petitioner's self-serving statement to the FBI disclaiming any direct part in the death of Alice Donovan. It is not reasonable to suggest that evidence from the foregoing additional witnesses would have established evidence of Petitioner's role as a follower and not a leader such that Petitioner would have not been sentenced to death.

**[25]** Evidence that makes one defendant look more culpable does not necessarily help another defendant in the case. *See Howard v. Moore,* 131 F.3d 399, 420 (4th Cir.1997) (co-conspirator's intent to kill victim was not mitigating evidence in favor of defendant). Furthermore, a co-conspirator's state of mind is not relevant to the jury's determination of the proper punishment of another defendant because the Eighth Amendment requires an individualized determination of sentencing in death penalty cases. *Id.* (citing *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. 2954).

Contrary to Petitioner's argument, trial counsel effectively portrayed Basham as the leader and more aggressive than Fulks, including testimony from Tina Severance that Basham had a quick temper and was paranoid (TT Vol. 4 at 21); that Basham wore Samantha Burns's ring around his neck and that he threatened Severance (*id.* at 15–17); and that Basham

was a time bomb ready to explode. (*Id.* at 22.) Through Andrea Roddy, trial counsel focused the jury on Basham's possessiveness of the stolen guns and his threats to kill police officers and a teenage boy. (*Id.* at 103–106.) However, the evidence of Fulks's own actions cut against Petitioner's argument that he had a minor participation in the crime spree.

Fulks's actions could not be described as lesser such that he could reasonably be considered to have been a minor participant in the crime spree. When asked by the government, "Did you see Mr. Fulks as a minor participant in this case?" Blume testified pithily, "No." (HT Vol. 2 at 184.) Moreover, the trial record reflected abundant evidence of Fulks's own aggressiveness, craftiness, and manipulation. More problematically, witnesses who had observed both Fulks and Basham provided devastating testimony of Fulks's leadership and ordering Basham around. The uncontradicted testimony was that Fulks, not Basham, drove the vehicles during the commission of all three kidnappings. James Hawkins testified that it was Fulks who ordered him to put his arms around a tree; who ordered Basham to tape Hawkins's hands; who cursed at Basham that he wasn't "doing it fucking right;" who taped Hawkins's hands more tightly; who tied his legs together; and who duct-taped his mouth shut. (TT Vol. 2 at 133–46.)

It was Fulks who chose to travel to Tina Severance's home; who convinced her to occupy her friend, Robert Talsma, while Fulks and Basham stole his guns (*id.* at 78–79); and who later pointed a gun at her head at the Lake Shore Hotel, which she testified was "the closest she came to dying." It was Fulks who drove to visit his family; who Carl Jordan testified shot at him, along with Basham. (TT Vol. 5 at 49–61.) Fulks stole and drove Olieta Hyman's pickup truck into the Wal–Mart parking

lot. Fulks chose to leave the pickup truck and get into the driver's seat of Alice Donovan's car, while Basham sat on top of her with a gun in his lap. Fulks drove himself, Basham, and Donovan away from the Wal–Mart parking lot. (*Id.* at 123–155.) It was Fulks who purchased electrical tape from the gas station (TT Vol. 6 at 16), who then drove to an isolated area where he and Basham raped Alice Donovan. (TT Vol. 6 at 29–32, 43–45, 56.)

Fulks's trial counsel attempted to portray Basham as the more aggressive and the leader of the two. It is speculative to suggest that any additional evidence in the form of testimony from the CCC staff and prison guards would have convinced the jury that Basham was more of a "master manipulator" than was Fulks. It was Fulks who, after stealing a shirt emblazoned with the FBI emblem, impersonated an FBI agent to rob two young men, and afterwards laughed at his cunning play. (TT Vol. 14 at 72, 97.) It was Fulks who convinced CCC staff of his terrible pain, but who was able to attempt an escape, fight five guards, and badly wound one. Perhaps most notable was Fulks's pretending, in the presence of a jailhouse prayer group, to receive a telephone call informing him that his wife, mother-in-law, and newborn baby girl had been hit by an eighteen-wheeler, and none of them was expected to survive. He cried in his cell for a day and a half (TT Vol. 14 at 259), so much so that his bed linens were wet with tears. (*Id.* at 260.) So convincing was his pretense that the nurses gave Fulks Tylenol PM to help sedate him (*id.* at 260).

While at another place of incarceration, Fulks persuaded his fellow jail inmate's mother, Nell Lee, to bond him out. After he told Nell Lee that his mother-in-law had died, his wife was injured, and that his little girl was in critical condition (*id.* at 282), Nell Lee spent about two hours on the telephone in an attempt to help him find the hospital where his alleged daughter was located. (*Id.* at 281.) The next day, Fulks had Nell Lee take him to the airport to rent a car to go take care of his child. (*Id.* at 280.) When Fulks was unable to rent a car, Nell Lee loaned him a car, gave him money for gas (*id.* at 281), and gave him a note indicating her permission for Fulks to use the car for five days. (*Id.* at 283.) Each day for five days, Fulks called Nell Lee to report his baby girl's condition. (*Id.* at 284.) On the fifth day, Fulks told Nell Lee that he would be back with her car in about two hours. (*Id.* at 285.) Nell Lee did not hear from Fulks again, but later discovered the truth: that there had been no accident, and in fact, that Fulks had no wife, mother-in-law, or baby.

In sum, the court finds that Petitioner has failed to show any evidence that trial counsel failed to present evidence of Basham's manipulation and leadership that would have overcome the prosecution's compelling exegesis of Fulks's own manipulation and leadership.

CLAIM 14:

FUTURE DANGEROUSNESS

**[26]** In an effort to persuade the jury that Fulks would not pose any future problems to staff or other inmates if allowed to serve a life sentence in prison, Fulks's trial team retained, interviewed, and had on standby three potential witnesses to testify on the issue of future dangerousness. These witnesses were: Don Romine, Dr. Mark Cunningham, and James Aiken. Ultimately, only one of the three, Romine, was called to testify at trial. Romine was a former Marine with thirty-one years of experience working for the Federal Bureau of Prisons. (TT Vol. 19 at 63–64.) He began his career as a correctional officer and worked his way up to a senior

executive level position, ultimately serving as warden at two federal prisons, including a high-security facility. (*Id.* at 65, 72.) Romine had also helped draft security policies for federal prisons. (*Id.* at 66–67.) He received an award for heroism while working at the federal facility at Marion, Illinois. (*Id.* at 69–70.)

Romine was called as a witness to testify to the simple proposition that no one escapes from federal maximum security institutions. To this end, Romine described the elaborate security apparatus and procedures in place at the institution at which Fulks would be housed if given a life sentence. In this court's view, Romine was perhaps one of the strongest witnesses the defense team presented in terms of attempting to spare Fulks's life.

As for the two witnesses who were not called, if they had testified in accordance with their declarations attached to the petition, they would have said that Fulks was a gentle person who would not constitute an escape risk or threat to prison safety. Among other things, Cunningham would have testified that, in his opinion, an offender's alleged acts of violence in the community have little value in predicting violent behavior in a prison context. (Pet. Ex. 77 at ¶ 8.) Aiken would have gone further, testifying that rather than Fulks being a threat to other inmates, Fulks himself would have been a potential victim: "In fact, the major concern I have of Mr. Fulks is the need to protect him from the predator, more dangerous, violent and disruptive prison population, especially as he grows older." (Pet. Ex. 76 at ¶ 12.) Aiken would have also testified to the somewhat remarkable proposition that Fulks's "criminal history and confinement record do not reflect a pattern of a prison predator nor is there evidence of his continual, methodi-

cal use of violence to gain control over inmates, staff or the operation of the prison." (*Id.* at ¶ 8.)

In discussing the tendency of some attorneys to "overtry" a case, the late Francis Murnaghan of the United States Court of Appeals for the Fourth Circuit once observed,

> Resourceful lawyers . . . often desire to be thorough and to overlook nothing in the commendable zeal to afford first-class representation. Consequently in many cases they tend to excess as they inundate us with a plethora of arguments, some good and some not so good. Sometimes one wonders whether such lack of selectivity is not counterproductive, for a party raising a point of little merit exposes himself to the risk of excessive discount for a better point because of the company it keeps.[30]

What Judge Murnaghan said regarding cumulative and sometimes counterproductive arguments can also be said about trial witnesses. To have added the testimony of Cunningham and Aiken to that of Romine, perhaps the defense's strongest witness in the entire trial, could well have been counterproductive because it would have arguably weakened Romine's testimony.

The choice of what type of expert to use is one of trial strategy and deserves "a heavy measure of deference." *Turner v. Calderon,* 281 F.3d 851, 875–76 (9th Cir. 2002). On the record in this case, the court is unable to conclude that the decision to call only one of the three potential witnesses for testimony regarding future dangerousness was constitutionally ineffective trial strategy.

---

**30.** *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1183 (4th Cir.1982), *overruled* *in part by Busby v. Crown Supply, Inc.,* 896 F.2d 833 (4th Cir.1990).

As the government observes in its memorandum in opposition to the § 2255 petition, Cunningham would have actually given testimony damaging to the Petitioner. In his declaration, Cunningham conceded that there is a 20 to 30 percent likelihood of a capital offender committing an act of violence at some time during his prison term, and an 8 to 10 percent likelihood that a capital offender will present a chronic violence problem. (Pet. Ex. 77 at ¶ 11.) Moreover, Cunningham estimated that there is between 26.2 and 31.5 percent probability that Fulks would commit a "serious assault" during his incarceration. (*Id.*)

Nevertheless, Cunningham was apparently prepared to testify that Fulks's "prior prison incarceration and incarceration pretrial records reveals [sic] that he has no serious violence in his past prison confinement, and has exhibited no serious violence in past extended jail incarcerations." (*Id.* at ¶ 9.)

Cunningham and Aiken would have no doubt been extensively cross-examined about Fulks's behavior while incarcerated. To begin, Fulks successfully escaped from jail in Kentucky, and attempted on two occasions to escape while being held pending trial in this case. One of these attempts included collecting bed sheets to make into a rope, and accumulating small quantities of pepper that could be used to throw off tracking dogs. (TT Vol. 15 at 117–40.)

The record in this case contains several episodes of what could be termed major scuffles with prison guards while Fulks was being held awaiting trial in this case. These included an April 2003 incident where Fulks became angry because he was not allowed to carry personal photographs with him during a prison move. In the ensuing scuffle, Fulks kicked the officers, attempted to bite them, and spit on them. (TT Vol. 15 at 81–108.)

The following month, while at the inmate medical facility CCC, Fulks became agitated and refused to put on a paper gown. Again, a scuffle ensued and Fulks kicked one officer and bit another sufficient to cause blood to ooze through the officer's shirt. (*Id.* at 195–99.) That same day, when a nurse attempted to administer a sedative to Fulks, which had been ordered by a doctor, Fulks again began swinging, kicking, yelling, and biting. It took five correctional officers to restrain Fulks long enough for the nurse to administer the sedative. (*Id.* at 185.)

There was ample evidence of an abdominal wound that Fulks administered to himself, and thereafter manipulated by removing the dressing and inserting toilet paper and removing it from the wound. (TT Vol. 20 at 59.) All of these transgressions would have been a fertile field for cross-examination by the government and would have seriously undermined the witnesses's credibility, if not the credibility of the entire defense case.

When questioned at the hearing why Cunningham and Aiken were not called, Blume admitted that although Cunningham had testified at a number of federal capital cases, he had always testified as a defense witness. Blume was therefore concerned that he would be viewed as nothing more than a "hired gun" for the defense. (HT Vol. 1 at 167.) As to Aiken, Blume testified that he believed that he got the same testimony that Aiken would have given from Romine, and he was concerned about having "two people up there that might contradict each other on the small points. I felt we got what we needed out of Mr. Romine." (HT Vol. 2 at 22.) Finally, Aiken's experience was more related to the state prison system, whereas

Romine dealt exclusively with the federal correctional facilities.

On this record, the court concludes that Blume's decision not to call Cunningham and Aiken to testify as to Fulks's future dangerousness was part of a reasonable trial strategy.

CLAIM 15:

VOIR DIRE

In Claim 15, Petitioner claims that during voir dire, his trial counsel failed to gather useful information, educate the prospective jurors, or establish a rapport with them. He also contends that counsel was ineffective by failing to ask open-ended questions, to listen to the answers, and to show the jurors respect and honesty. As a result, Petitioner argues that the was denied a fair trial.

Blume was well-familiar with conducting an effective voir dire. In addition to having participated in fifteen to twenty mock death penalty voir dires, and three actual courtroom voir dire proceedings, Blume has written on voir dire in capital cases, including an article entitled "*Probing Life Qualification Through Expanded Voir Dire,*" 29 Hofstra L.Rev. 1209, 1220 (2001). Blume has also lectured on conducting voir dire in capital cases. In the instant case, trial counsel retained jury consultant Jeff Bloom to conduct a mock voir dire session for the trial team, during which the trial team members critiqued one another and discussed what to try and accomplish during voir dire. (HT Vol. 2 at 23–24.)

Blume testified that the team's approach to voir dire was to "try and identify jurors who are likely to give the death penalty, to do what you can to get them excused for cause, to—and then to try and identify jurors who might be receptive to your case in mitigation or your case for life and to try and give them the tools to get out of

the jury room with a life verdict if they want to vote for life." (HT Vol. 2 at 33.) To that end, trial counsel developed a detailed voir dire outline (Gov't Ex. 51), along with a more condensed version (Gov't Ex. 49) to be used at the podium during voir dire.

Prior to jury selection, the trial team compiled a notebook of the juror questionnaires, with each team member tasked to go through the questionnaires and to rate them pre-voir dire as to their "pro deathness or lack thereof" basis (Gov't Ex. 56–14); (HT Vol. 2 at 27). Specifically, the trial team adopted the "Colorado Method of Jury Selection." (Gov't Ex. 52.) Such a method was developed for use capital cases to rate potential jurors on a scale of 1 through 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death.

The trial team's pre-voir dire assessments were consolidated together on a single sheet for use during voir dire. During voir dire, trial counsel had four or five members of the team fill out a "Juror Rating Form" on each juror. Trial counsel prepared a chart of the jurors deemed qualified by the court for use in determining its strikes. (Gov't Ex. 53.) The chart contained a composite of information on each juror, including their name, their race, the status of whether they were qualified over an objection or not, and the trial team's rating assessment.

In preparing to select the jury, the trial court, upon defense counsel's motion, summoned a state-wide venire of 800 jurors. Each juror was mailed a standard questionnaire containing a total of fifty-eight questions to be returned to the court in advance of jury selection. These questionnaires were formulated after receiving suggestions from the government and the

defendant. Each venireperson was also given a supplemental questionnaire upon arrival at the courthouse to test his death penalty views on paper before one-on-one questioning by the court and counsel. Defense counsel received most of the standard questionnaires several weeks in advance of voir dire.[31]

The court conducted jury selection from May 10 to May 21, 2004. At least one assisting defense lawyer (if not two) was present at counsel table at all times to assist the lawyer questioning prospective jurors. Voir dire was conducted by Blume, Johnson, and Nettles.[32] The assisting lawyer routinely pointed out to counsel engaged in questioning additional information (either from the standard questionnaire, the supplemental questionnaire, or just general followup) he or she thought important to ensure that all defense questions had been answered before a juror was excused.

The voir dire of each venireperson commenced with the court explaining that an individual at the extremes, that is, one who would either always or never impose the death penalty, is ineligible to serve on the jury. The court advised each venireperson that the court needed jurors "in the middle" who could base their decision on the law and the facts. The court explained to each juror that he or she must listen to the evidence carefully, then listen to the law as it is explained by the trial judge, and apply the law, whether he or she agrees with the law or not. The court asked each juror if

he or she understood this requirement and asked if the juror could comply with those instructions and be fair and impartial. (TT Vol. 1 at 64–65, 183–84; Vol. 2 at 6–8, 277–79; Vol. 4 at 25–27; Vol. 5 at 114–15, 260–62, 291–92; Vol. 6 at 234–35; Vol. 8 at 104–106, 173–75, 229–32.) Each prospective juror was also individually subjected to voir dire by the government and Fulks's trial counsel.

Additionally, each venireperson was asked if he or she would automatically impose the death penalty for capital murder, how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. The Fourth Circuit found such an examination plainly sufficient to satisfy *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Fulks,* 454 F.3d at 430 n. 7.

Petitioner complains that trial counsel's questions were rambling, confusing, intimidating, too long, and did not engage the prospective juror in a dialog. He also contends that trial counsel failed to ask open-ended questions, to listen to the answers, and to show the jurors respect and honesty. Petitioner complains that the manner of trial counsel's voir dire denied him a fair trial.

[27] The Sixth Amendment guarantee of counsel does not guarantee an ideal or perfect representation. *Mickens v. Tay-*

---

**31.** The standard questionnaires that had been returned to the court were released to defense counsel as follows: On March 31, 2004, 299 questionnaires were released; on April 1, 2004, 224 questionnaires were released; on April 15, 2004, thirty questionnaires were released; on April 27, 2004, twenty questionnaires were released; and on May 6, 2004, eleven questionnaires were released. That means defense counsel had access to 523 of 584 total questionnaires by April 1, 2004.

**32.** Of those jurors seated, Blume conducted the voir dire of Sylvia Allison, Agnes Bryan, Richard Goehring, Lisa Harvey, Mary Ellen Huggins, Timothy Kurzwell, Anne Lee, and Karl Nations; Sheri Johnson conducted the voir dire of Pearl Gordon, Elizabeth Plyler, and Cynthia Steele; and Bill Nettles conducted the voir dire of Joni Novinger.

*lor,* 240 F.3d 348, 363 (4th Cir.2001). Instead, it "guarantees a defendant on trial for his life the right to an impartial jury." *Morgan,* 504 U.S. at 728, 112 S.Ct. 2222.

This court presided over Blume's voir dire of all the venirepersons, and has reviewed the transcript of the jury selection process. After this review, the court is constrained to disagree with Petitioner's contention that Blume's questions to prospective jurors were rambling, confusing, intimidating, or otherwise ineffective. As the court has noted previously, Blume brought with him to the trial a wealth of experience in the well of the courtroom. Petitioner's bald allegations that the questions posed by Blume were improper, ineffective, or offensive to jurors is unavailing. The court finds no error in trial counsel's conduct of voir dire.

## CLAIM 16:

## JUROR QUESTIONNAIRES

**[28]** Petitioner claims that trial counsel were ineffective in their review of juror questionnaires. Prior to jury selection, all prospective jurors were required to complete a written juror questionnaire. Question 42 of the juror questionnaire inquired into whether the juror or any close relatives had been a victim of a crime. Juror Sylvia Allison left blank question 42. Petitioner now alleges that his trial counsel were ineffective in not asking Allison why she left question 42 blank—the answer to which would have revealed that her husband had been murdered in 1971. (*Id.* at 158–159.) The court qualified Allison over Fulks's objection on other grounds.

Fulks appealed the trial court's rulings concerning Allison, and the Fourth Circuit affirmed, finding no error. *Fulks,* 454 F.3d at 410. Because Fulks raised this issue on direct appeal, the government argues that Petitioner is foreclosed from as-

serting it in this § 2255 matter. *See Withrow v. Williams,* 507 U.S. 680, 715, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring) (listing cases holding that a federal prisoner generally cannot raise on collateral review a claim that was previously decided on direct review).

Out of an abundance of caution, however, the court has considered the merits of Petitioner's argument, and finds the ineffective assistance claim to be without support. The *Strickland* test requires that Petitioner show a reasonable probability that "the result of the proceeding would have been different." *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Luchenburg v. Smith,* 79 F.3d 388, 393 (4th Cir.1996) (requiring the petitioner to show a reasonable probability of prejudice). Because Petitioner cannot demonstrate a reasonable probability of prejudice if trial counsel had questioned Allison on question 42 (which she left blank), his ineffective assistance of counsel claim fails.

At a post-trial hearing to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias, Allison testified that her failure to answer Question 42 was inadvertent. When asked by the court whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded: "None at all." *Fulks,* 454 F.3d at 431.

This court denied Fulks's motion for a new trial and discussed at length its reasoning in an order dated December 23, 2004, 2004 WL 5042206. Specifically, the court applied the test established by the Supreme Court in *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), and

found that had Allison actually answered question 42, she would not have been excluded for cause. Further, the court found that Allison honestly believed she had disclosed her husband's murder and that Fulks had failed to show that Allison was actually biased. Finally, the court found the circumstances of Allison's husband's murder and her failure to disclose it did not warrant a finding of implied bias. The Fourth Circuit affirmed this court's ruling on appeal. *Fulks,* 454 F.3d at 432–33.

Petitioner has failed to show that juror Allison's participation affected the fairness or the reliability of the trial, and that if trial counsel had asked Allison about question 42, the result would have been different. To the extent that Petitioner contends that he was denied the opportunity to exercise a peremptory challenge on Allison, the Fourth Circuit has explicitly rejected this analysis post-*McDonough.*[33] Therefore, his ineffective assistance of counsel claim fails.

### CLAIM 17:

### ADDITIONAL PEREMPTORY STRIKES

**[29]** In Claim 17, Petitioner alleges that trial counsel were ineffective for choosing to seat automatic death venirepersons, instead of moving for additional peremptory strikes. After the court re-fused to excuse jurors Goehring, Harvey, Allison, Novinger, and Plyler for cause, trial counsel elected to seat them, hoping for reversal on appeal. Fulks challenged the seating of these five jurors on direct appeal, and the Fourth Circuit rejected Fulks's challenges.[34] *See Fulks,* 454 F.3d at 410, 427–35.

Trial counsel lodged objections to those jurors they believed were erroneously qualified, struck some jurors, and seated three jurors based on trial counsel's understanding that to preserve the issue for appeal, he needed to seat the jurors. Petitioner asserts that lead counsel was unfamiliar with federal jury selection procedures. The evidence in the records proves otherwise. Aside from Blume's extensive familiarity and experience with capital voir dire, Nettles had at least fifteen years of experience in federal jury selection procedures from working in the Federal Public Defender's Office. Furthermore, the records of trial counsel reveal that Blume considered filing a motion for additional strikes, but chose not to based on a reasonable strategy of preserving what he perceived as a strong appealable error.

While Petitioner characterizes the foregoing jurors as "automatic death venirepersons," such was not the court's assessment of the jurors, otherwise the court would have dismissed them for cause. The

---

**33.** In *Jones v. Cooper,* the Fourth Circuit stated that, to the extent *United States v. Bynum,* 634 F.2d 768 (4th Cir.1980), stood for the proposition that a defendant denied the right to exercise intelligently a peremptory challenge is entitled to a new trial, "this reasoning was subsequently rejected by the Supreme Court in *McDonough,* 464 U.S. at 555, 104 S.Ct. 845; it is no longer good law." *Jones,* 311 F.3d 306, 314 n. 3 (4th Cir.2002).

**34.** Fulks challenged for cause the following venirepersons: Richard Goehring, Lisa Harvey, and Sylvia Allison on the ground that the strength of their beliefs in favor of the death penalty rendered each of them unwilling to consider any mitigating evidence that he would offer; and Joni Novinger and Elizabeth Plyler on the ground that their personal experiences rendered them incapable of impartially serving on his jury because Novinger's sister had been the victim of a sexual assault, and because Plyler and her daughter were roughly the same ages that Donovan and Burns had been when they were killed. The court rejected the challenges, qualified the five venirepersons over Fulks's objections, and the Fourth Circuit found no error. *Fulks,* 454 F.3d at 427–34.

court's own voir dire of the venirepersons eliminated the individuals "at the extremes"—who would either always or never impose the death penalty—as ineligible to serve on the jury. Therefore, the remaining venirepersons were those "in the middle" who informed the court, either orally or in their written questionnaires, that they could base their decision on the law and the facts.

The court disagrees with Petitioner's claim that trial counsel's decision not to move for additional strikes fell below an objective standard of reasonableness. The court's evaluation of counsel's performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." *Strickland*, 466 U.S. 668, 689–690, 104 S.Ct. 2052. The court finds trial counsel's decision to seat the foregoing venirepersons and not to request additional peremptory strikes was based on a reasonable strategy of preserving an issue for possible reversal. In light of the *Strickland* standard, counsel's decision was reasonable and entitled to deference.

### CLAIM 18:

### THE "DEER" STATEMENT

**[30]** Petitioner's Claim 18 alleges that appellate counsel were ineffective for not appealing this court's ruling sustaining a government objection to a statement by Sheriff Ronald Hewett regarding a partial

"admission" allegedly made by Basham. Petitioner claims that the partial statement "was a key piece of evidence showing that Fulks did not strike the fatal blow that killed Alice Donovan," and "would likely have led the jury to a different conclusion about Petitioner's moral responsibility for Donovan's death." The court disagrees and finds that appellate counsel was not ineffective because the Fourth Circuit would not have found an abuse of discretion by the court in denying the admission into evidence of Basham's statement to Sheriff Hewett.

By way of background, Basham met with law enforcement representatives in Brunswick County, North Carolina, on November 28, 2002, to help search for the remains of Alice Donovan. Accompanying Basham were Sheriff Hewett, FBI Agent Jeff Long, an unidentified police officer, and two of Basham's attorneys. According to Hewett, at some point during their ride, a deer jumped in front of their vehicle and Basham volunteered: "You know, I could never kill a deer and here I have . . . ." Hewett stated that Basham stopped before finishing the sentence. (Pet. Ex. 30).

During Fulks's trial, his counsel sought to introduce Basham's so-called "deer statement" as a declaration against penal interest or an excited utterance,[35] as evidence that Basham, and not Fulks, killed Donovan. The government argued against

---

**35.** During the trial, the court was mindful of the fact that the Federal Rules of Evidence do not technically apply in a capital sentencing trial. *Fulks*, 454 F.3d at 437. Instead, the Federal Death Penalty Act provides that the court may exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). In spite of this, throughout the trial, the parties made objections and referred to specific evidentiary rules as did the court in ruling on the

objections. References to these rules were by analogy only, and the court was aware of the somewhat more flexible standard for admissibility established by § 3593(c). Moreover, the Petitioner has no standing to object to this court's reference to the Rules of Evidence because he contended on appeal that the Federal Death Penalty Act was unconstitutional because the FRE do not apply to the sentencing phase of a FDPA trial. *Fulks*, 454 F.3d at 437.

admission of the statement as being taken out of context and as ambiguous. The court agreed with the government and ruled that Basham's deer statement was inadmissible.

Petitioner argues that during the Basham trial a few months later, the government took an inconsistent position when it introduced Basham's deer statement through Sheriff Hewett. He thus contends that his attorney should have raised the issue on appeal.[36]

The court finds that appellate counsel's decision not to appeal the court's exclusion of the Basham's deer statement in Fulks's trial was not ineffective. As Blume testified, "[i]f there was an argument which I thought was potentially meritorious, I would have raised it." (HT Vol. 2 at 37.) Given the broad discretion afforded to trial courts in evidentiary rulings, appellate counsel would have had to demonstrate that the court abused its discretion in excluding Basham's deer statement. *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir.2005).

Petitioner fails to show an abuse of discretion. As the court analyzed in detail during argument outside the jury's presence, while Basham's deer statement tends to show that Basham was involved in Donovan's murder, it does not absolve Fulks of involvement in the murder. In discussing the issue at trial, the court noted that second half of Basham's deer statement could have included any number of things such as "here I have helped my co-defendant kill one, I helped bury a dead body, I held the woman down while she was killed. He could have said a number of things that

still inculpated [himself]." (TT Vol. 21 at 251.)

Moreover, the court was concerned that if it admitted Basham's partial deer statement, it would have to admit the rest of Basham's statements to authorities—made on multiple occasions—that it was Fulks who actually killed Donovan. For example, during the same day spent searching with Sheriff Hewett, Basham said that Fulks slit Donovan's throat and stuffed her in the trunk of her car.

Ultimately, the court applied the balancing test required by the Federal Death Penalty Act, 18 U.S.C. § 3593(c), and denied the admission of Basham's deer statement because the danger of confusing the issues and misleading the jury substantially outweighed its probative value. To admit the deer statement, which is ambiguous and only partially implicated Basham in the murder of Donovan, while at the same time disallowing the remainder of Basham's recitations of what happened—all of which pinned the blame for the death squarely on Fulks—would have unquestionably mislead the jury as to the import of Basham's deer statement.

Finally, in light of the fact that the trials of Fulks and Basham were severed on the defendants' motion, the court found that allowing testimony about all of Basham's statements regarding Fulks's culpability would defeat the purpose of having severed the trials.

Petitioner has failed to show that the court abused its discretion in making this evidentiary ruling. Therefore, his Claim 18 that appellate counsel were ineffective

---

**36.** In closing argument of the Basham trial, the government stated: "Do you remember what Brandon Basham's comments were? He sees that doe and he says to himself, spontaneously, "here I couldn't even kill a deer, and I have," and his lawyer, Mr. Little-

john stops him. "Here, I couldn't even kill a deer, and here I have"—what do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?" (Basham TT Vol. 12 at 79.)

for failing to raise this issue on appeal is without merit.

### CLAIM 19:

#### INCONSISTENT THEORIES

In Claim 19, Petitioner alleges that his due process rights were violated by the government's presentation of allegedly inconsistent theories in his trial and his co-defendant Basham's trial concerning the relationship between the co-defendants. Specifically, Petitioner alleges that, depending on the trial, the government averred that either Basham or Fulks acted as mastermind of the crime spree; that either Basham or Fulks was solely responsible for allegedly strangling Alice Donovan; and that either Basham or Fulks deferred decisions of life and death to the other. Neither defendant took the stand in his respective trial, but counsel for each defendant blamed the other defendant for Donovan's murder.

A review of the record does not sustain Petitioner's position that the government presented inconsistent theories going to the core of its case. "[T]he Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir.2003). However, the law permits the government to focus on the particular role of the defendant on trial. *Higgs*, 353 F.3d at 326–27.

Petitioner contends that the government took an inconsistent position in the trials regarding Basham's "deer statement" and Basham's demonstration, in the presence of Sheriff Hewett, of how Alice Donovan was allegedly strangled with a purse strap.

As noted in Claim 18, in the Fulks trial, the government argued to the court that Basham's deer statement was ambiguous and the court kept it out of evidence. In Basham's own trial, however, the court admitted his deer statement. In closing argument of the Basham trial, the government stated:

> Do you remember what Brandon Basham's comments were? He sees that doe and he says to himself, spontaneously, 'here I couldn't even kill a deer, and I have,' and his lawyer, Mr. Littlejohn stops him. 'Here, I couldn't even kill a deer, and here I have'—what do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?

(Basham TT Vol. 12 at 79.) Petitioner now contends that the government's argument to the jury in Basham's trial about the deer statement was inconsistent with its argument to the court in Fulks's trial that the deer statement was without meaning.

Next, Petitioner contends that in Fulks's trial, the government argued that Basham's purse strap demonstration was explaining how "Chad Fulks took the purse strap and strangled" Alice Donovan. (TT Vol. 16 at 255.) Petitioner argues that in Basham's trial, the government took the position that it was Basham demonstrating how he, and not Fulks, used the purse strap to strangle Alice Donovan and that in closing argument the government characterized Basham's demonstrations an admission that Basham killed Alice Donovan with her own purse strap. Petitioner's contortion of the record cannot go uncorrected.

A review of the record Basham's trial transcript reveals that Sheriff Hewett testified as to how Basham demonstrated the purse strap was used to strangle Alice Donovan. On cross-examination, Sheriff Hewett testified:

> A. The only thing that I can state, honestly, that I remember Brandon

Basham telling me was that Chadrick Fulks was driving and we did what Chadrick Fulks wanted to do. He was the leader.

          \*       \*       \*

Q. There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?

A. No, sir. He did not tell me he used the strap. He demonstrated, though.

Q. He demonstrated?

A. Yes, sir.

Q. Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?

A. That is true because he didn't say. He showed.

(Basham TT Vol. 10 at 53–54.)

In its closing argument in Basham's trial, the prosecutor did not argue that Basham confessed. Rather the prosecutor told the jury:

> What does Brandon Basham say in the presence of Sheriff Hewitt? It is not really what he says, it is what he does. He is shackled. He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt how Alice Donovan was strangled. And then he tells Sheriff Hewitt, "I threw the purse strap into the woods." He has demonstrated. He even has his arms down. You saw Sheriff Hewitt stand up there and show.

(Basham TT Vol. 29 at 57.)

It is a stretch for Petitioner to argue that "[i]ndeed, Basham actually confessed,

without prompting, to strangling Alice Donovan through his demonstration to Sheriff Hewett," and that "[t]his can only be deemed to be government misconduct for failure to reveal this to Mr. Fulks's trial team."

A review of Basham's trial record demonstrates that Basham did not confess, Sheriff Hewett did not testify Basham confessed, and the government did not argue Basham confessed to strangling Donovan. As Nettles testified, he understood Hewett's testimony to mean that Fulks strangled Donovan. (HT Vol. 2 at 140.) Hewett's use of the passive tense in describing Basham's strap demonstration leaves to speculation who actually used the strap to strangle Donovan, if that is what happened.[37]

Petitioner argues alternatively that it was ineffective assistance of counsel to fail to uncover what Hewett actually saw and what he would say under oath. In light of the motion for a hearing pursuant to *Jackson v. Denno* and the evidentiary hearing held prior to trial, Petitioner's claim that his trial counsel failed to investigate Hewett's testimony is without merit. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Throughout Fulks's trial, the government maintained a theory that Chad Fulks and Brandon Basham were equally culpable for the crimes committed. The theory was repeated in the government's closing argument to the jury:

> It required the actions and the conduct of both Chad Fulks and Brandon Basham. The two of these men acted together as one in concert with one anoth-

---

**37.** It should be noted that Basham's version of when and how Donovan died changed several times as the investigation progressed. At one time, Basham indicated that Fulks, acting alone, had taken Donovan to an undisclosed location and left her there without any in-

volvement by Basham at all. Later, the story changed to indicate that Fulks had taken Donovan to a location with Basham's involvement. Still later, Basham said that Fulks had slit Donovan's throat and put her in the back of the car.

er. They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha, and they could not have done the things they did to Alice without acting in unison, without acting as one. The government is not saying Chad Fulks is more culpable than Brandon Basham. And the government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable. Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there is but one conclusion: these two were acting together as one. But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

(TT Vol. 21 at 24–25.)

During Basham's trial, the government maintained the same theory that Chad Fulks and Brandon Basham were equally culpable for the crimes committed. In the government's closing argument to the jury in Basham's trial, the same theory was propounded:

Remember, the evidence and the testimony that you saw during the guilt phase of this case, this was a two-man team. This was Brandon Basham and Chad Fulks acting together as a team. Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable. But for the

actions of Brandon Basham, and but for the actions of Chad Fulks, Samantha Burns would be alive today and Alice Donovan would be alive today. . . . But for Brandon Basham and Chad Fulks, not only would Samantha Burns be alive today, not only would Alice Donovan be alive today, but none of us, no one in this courtroom would be here today.

(Basham TT Vol. 29 at 43–44.)

While Petitioner claims that the government argued to the Basham jury that Fulks made all the life and death decisions, the record reveals otherwise:

No question, Chad Fulks was the leader in many aspects of this seventeen-day spree. Where they were going, there is no question about that, ladies and gentlemen. But there is also no question, the government submits, that Brandon Basham was a willing, eager, and reliable foot soldier. He was eager to please his friend. And he was willing to participate and make choices. You know who summed it up? When Tina Severance was on that witness stand, I think it was in redirect, some innocuous question about how they were getting along. Do you remember what Tina Severance said spontaneously? Like two peas in a pod. They were always together having a good time. That is Brandon Basham and Chad Fulks in November 2002. Like two peas in a pod. Brandon Basham could not have carjacked, kidnapped, and killed Alice Donovan without Chad Fulks; Chad Fulks could not have carjacked, kidnapped, and killed Alice Donovan without Brandon Basham.

(Basham TT Vol. 12 at 82.)

The government did not present mutually inconsistent theories in Fulks's trial and Basham's trial. As the court in *McNeill v. Branker* explained:

The law does not provide that every inconsistency amounts to a due process violation requiring reversal. A due process violation only occurs when the inconsistency exists in the core theory of the prosecutor's case.... In *Bradshaw v. Stumpf,* 545 U.S. 175, 184–87, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), the Supreme Court considered a petitioner's challenge to his guilty plea of aggravated murder and attempted aggravated murder. The Court rejected Stumpf's argument that inconsistent arguments about the identity of the triggerman at his trial and the trial of his co-perpetrator required reversal of the convictions. It reasoned that the identity of the triggerman was immaterial because the intent element of the offense did not require the defendant to pull the trigger.

601 F.Supp.2d 694, 706–707 (E.D.N.C. 2009) (internal citation omitted).

**[31]** Petitioner has failed to demonstrate that the government adopted an inconsistent position rising to the level of a due process violation. Mere inconsistency in the government's argument does not violate due process, it is "[t]he use of inherently factually contradictory theories" that violates due process. *Smith v. Groose,* 205 F.3d 1045, 1052 (8th Cir.2000). Viewing the Petitioner's argument in a generous light shows, at best, an inconsistent argument concerning the vagueness of Basham's statements, but fails to demonstrate that the government relied upon factual theories that were inconsistent at the core of its case. Accordingly, Petitioner's Claim 19 alleging a due process violation fails.

## CLAIMS 20 & 21:

### WITNESS INTIMIDATION AND *BRADY* REQUIREMENTS

Petitioner contends that the prosecution inappropriately influenced witness testimony and failed to disclose a deal made with one of the witnesses in violation of the government's obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### *Claim 20*

Two of the principal witnesses called by the government were Andrea Roddey and Tina Severance. Roddey was one of the four people who traveled with Fulks from Indiana to Conway, South Carolina, where Donovan was abducted. She participated in the burglary of Robert Talsma's house, witnessed several events where Basham threatened to kill police and other persons, and generally assisted the group in using fraudulent checks and the like. After the trial, Roddey submitted a one-page affidavit which indicates that during her questioning by the FBI agents, the agents "focused on Chad Fulks and asked me very few questions about Brandon Basham." (Pet. App. Ex. 12 at ¶ 3.) When she asked the agents why they were not interested in Basham, the agents responded that she "need not worry about the target of their question." (*Id.*)

Secondly, Roddey averred that the agents "put pressure on her to testify that during the events of November 2002, Chad Fulks threatened my life and the life of Tina Severance." (*Id.* at ¶ 5.) Fulks says that she told the agents that this was not true and that she would not lie, but despite her protestations, the agents "continued to push me on these issues." Significantly, the Roddey affidavit does not indicate that she gave in to the pressure by the FBI or that she gave testimony that was in any way untrue at trial.

At trial, Roddey did not testify that Fulks threatened her, and, in some respects, her testimony was adverse to the government. For example, she testified that there was no mud on the driver's side

**610**    **875 FEDERAL SUPPLEMENT, 2d SERIES**

of Severance's van the morning Fulks and Basham returned to the motel after abducting Burns. This was helpful to the Fulks defense because the undisputed testimony was that Fulks did all of the driving.[38]

At most, the Roddey affidavit, if believed, indicates that FBI agents made a thinly-veiled and entirely unsuccessful effort to have her change her testimony so as to harm Fulks more than it did. The court finds that Roddey's post-trial, one-page affidavit indicating that inappropriate pressure was placed upon her to testify against Fulks is not credible. More importantly, even if the court were to find that law enforcement authorities put inappropriate pressure on Roddey to testify in a certain way, the effort was not successful in that Roddey gave testimony that was, in certain respects, helpful to the Petitioner.

As noted previously, Tina Severance also had extensive knowledge of the misdeeds of Basham and Fulks during their crime spree. Like Roddey, Severance was in the van for many of the events of November 2002. She offered damaging testimony that Fulks put a gun to her head in a Myrtle Beach hotel room. (TT Vol. 3 at 173–74.) She also testified that neither federal or state prosecutors or officials had offered her any "promises or rewards" in exchange for her testimony. (*Id.* at 184.)[39] At the same time, Severance acknowledged the pendency of the Myrtle Beach misdemeanor warrant against her.

Fulks's § 2255 counsel have now produced for the court a letter from the Myrtle Beach Police Department, dated January 24, 2008 (nearly four years after the

trial of this case), which reads in its entirety as follows:

> To Whom It May Concern:
>
> In regards to *State v. Tina Severance* all charges against her were dismissed. There are currently no active warrants against her. This is pursuant to her cooperation in a case in 2002 in which she was a witness.
>
> If you would like to discuss this any further please contact me.

(Pet. App. Ex. 31.)

**[32]** The court finds no conflict between the testimony given by Severance at trial that no deals were made with her in return for her testimony and the fact that at some point subsequent to the trial, the Myrtle Beach Police Department dropped relatively minor misdemeanor charges against Severance. Although the letter states that the dismissal of the charges were "pursuant to her cooperation" in the Fulks trial, there is no assertion that federal prosecutors had anything to do with the decision to drop the charges or that the agreement to drop the charges was made by Myrtle Beach Police Department prior to Severance's testimony. The letter from the Myrtle Beach Police Department could be read broadly to indicate that there was some type of pre-testimony agreement with Tina Severance to have her charges dismissed. To reach this conclusion, however, the court will have to determine that this sole, unsworn letter carries more probative value than: (1) Tina Severance's sworn testimony at trial that no deals had been made in return for her testimony; and (2) the statement made during trial by the Assistant United States

---

**38.** It should be noted that the Roddey testimony regarding mud on the driver's side of the vehicle was contrary to a photograph introduced in evidence which showed mud on both sides of the front of the vehicle.

**39.** In fact, the government attorney stated during the trial that no deals, promises, or special provisions were made for *any* of the more than 100 witnesses called by the government.

Attorney handling this case, as an officer of the court, that no deals of any kind had been made with any of the prosecution's witnesses. A more likely reading of the Myrtle Beach Police Department's letter is that the relatively minor charges were dismissed after the Department learned that Ms. Severance had testified for the government in an unrelated case.

After a careful review of all of the evidence relating to Tina Severance's testimony, the court finds that there was no plea agreement or other promise from the government outstanding at the time Severance gave her testimony in the Fulks trial. Any decision by the Myrtle Beach Police Department to drop the charges against her occurred after the trial had concluded and was not made pursuant to the agreement with the prosecutors in this case.

Finally, and most importantly, it should be noted that like Roddey, Severance gave testimony that was, in part, harmful to the government. She testified that Fulks did not carry a gun and she claimed that there was only a little mud on the driver's side of the floorboard when Fulks and Basham returned to the motel after kidnapping Samantha Burns.

### Claim 21

Claim 21 is a reassertion of those claims asserted in Claim 20 in the context of a *Brady* violation. Specifically, Petitioner contends that the government was under an obligation to disclose, pursuant to the dictates of *Brady v. Maryland,* favorable evidence that was material to either guilt or sentencing. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Petitioner argues that the failure to disclose the pressure put upon Roddey by the FBI and the favorable deal made with Severance were matters that should have been disclosed. Because the court finds no support for the proposition that agents pressured Roddey or that there was a pre-testimony deal

with Severance, both the prosecutorial misconduct and the *Brady* violation claims must fail.

### CLAIMS 22 & 23:

### PROSECUTORIAL COMMENTS DURING SUMMATION

In Claims 22 and 23, Petitioner asserts that, during his summation, the prosecutor made a total of five statements that were improper and prejudicial. As to some of the statements, Petitioner's counsel objected, and as to one, the court sustained the objection. The defense counsel did not, however, move for a mistrial, nor did they appeal any of these issues. Petitioner argues that, where appropriate, the failure to object, the failure to move for a mistrial, and the failure to appeal the forensic misconduct that he contends occurred during the trial were error.

As noted previously, prior to his escape from the Kentucky prison, Fulks was incarcerated on state child abuse charges that could have subjected him to a life sentence. There was trial testimony that Fulks related to Tina Severance that he "probably would never get out [of jail]." (TT Vol. 3 at 224.) During summation, Assistant U.S. Attorney Jonathan Gasser reminded the jury of these developments and then said: "Those aren't Detective Smith's words. Those are Chad Fulks's words. 'I probably will never get out.'" (TT Vol. 21 at 30–31.)

The prosecutor then noted that Fulks thought he might end up serving a life sentence in Kentucky and "ma[de] a choice, and he escapes, and he participates in the kidnapping, and the rape, and the murder of two women, and he is caught. And you know what he is asking you jurors to do? To give him a pass." (*Id.* at 30–31.)

**612**    **875 FEDERAL SUPPLEMENT, 2d SERIES**

Finally, the prosecutor concluded by saying:

> So, what is he asking you to do, facing all of that time, commits all of these horrible crimes, kills two women, and he is asking you for a life sentence. It is the government's contention, in essence, that that 2–week crime spree, he is not held accountable for. He was looking at serious and significant time before, and now he is looking at life without parole. So, where is the punishment? Where is the accountability for what he did to these two women?

(*Id.* at 31–32.)

Fulks's trial counsel objected to this comment in what is generally termed a "speaking objection," stating in the presence of the jury: "Objection ... He [Fulks] was not facing life without parole before. Life without parole is not a pass. It is the second most severe and substantial punishment." (TT Vol. 21 at 31.) Although the court overruled the objection, the court indicated that "the defense will be allowed free reign to make whatever argument is appropriate on this point."

While it is true that Fulks was not under an existing life sentence at the time he committed the acts for which he was convicted in this case, he was, as revealed by his own words to Tina Severance, potentially subject to a life sentence for the crimes he was being held for in the Kentucky prison. Because of this, the prosecutor's comment was reasonable in light of the record in this case, and this court properly determined that it was a matter for argument going both ways.

Fulks next contends that the prosecutor improperly claimed that Fulks raped Samantha Burns. The objectionable comment was as follows:

> What are Brandon Basham and Chad Fulks doing dressed out in camouflage that night? No other night. No evi-

dence or testimony they wore camouflage any other night. They were hunting, the government submits to you. They were hunting down somebody. They were hunting, and they located, and they isolated, and they abducted, and they raped, and they robbed, and they killed their prey. She just happened to be a nineteen-year-old college co-ed named Samantha Burns.

(TT Vol. 21 at 41.)

Contending that the statement that Fulks raped Samantha Burns is "an outright lie" (Pet. at 182), Petitioner contends that the government conveyed false information to the jury. In response, the government points out that the repeated use of the pronoun "they" in the disputed passage clearly suggests that the prosecutor was implying that Fulks and Basham worked as a team throughout their seventeen-day crime spree including the rape of Burns. The government points out that immediately following the sentences quoted above, the prosecutor noted:

> They [Fulks and Basham] did everything together. That night [November 11] before they left, they got camouflage clothing ... Chad Fulks was stealing money from the ATM machine, and they returned together. Everything they did that night, they did together. The two of them acting as one ... when they arrived back at the motel room. Not one, both of them were covered in mud.

(TT Vol. 21 at 41).

Viewed in context, the prosecutor's comment about the rape of Samantha Burns was not improper.

The third comment at issue relates to Fulks's demeanor in the courtroom as the trial progressed. During closing argument, the prosecutor argued to the jury that the Fulks they saw at trial was not

the same Fulks who committed the alleged crimes. The prosecutor said:

> The Chad Fulks you see sitting in this courtroom here today is not the Chad Fulks Samantha Burns confronted. It is not the Chad Fulks that Alice Donovan saw face-to-face lying on top of her. You know, I refer to this as a caged lion analysis. You take your kids to the zoo. The lions are lethargic. We know zoo animals have to be doped up, drugged up. Lethargic.

(TT Vol. 21 at 76–77.)

Petitioner contends that this comment labels him a "zoo animal" and is a "dehumanizing" comment that violated his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The government responds that the reference to zoo animals quoted above is taken out of context and the court agrees.

The prosecutor was making the point that Fulks looked different at trial than when he was committing the significant crimes at issue in this case because he had been medicated in the same way animals are sometimes medicated at zoos. Defense counsel objected and the court held a bench conference. At the conference, defense counsel reiterated his objection to the prosecutor comparing Fulks the defendant to a "wild animal" and the prosecutor responded that all of the experts who testified had confirmed that Fulks was medicated during trial. The court ruled: "The analysis will stop with the fact that wild animals are drugged or sedated. I will overrule the objection as long as that's as far as you are going." (*Id.* at 77.) After this colloquy, the prosecutor finished the analogy as follows:

> The point is this. That is why I asked all those doctors if they are aware of the medication that Chad Fulks is on, the sedatives, tranquilizers, all the drugs he is on. The point I am trying to make

... is the picture you see of Chad Fulks, the chalky, pasty skin Chad Fulks, the Chad Fulks that you have seen in this court room looking straight ahead, all benign, all shy, all quiet, that is not the Chad Fulks. That is not the crack-smoking rapist that roamed the streets of Kentucky and West Virginia and South Carolina in November of 2002. And you have to understand that. You have to grasp that. In order for the government to have a fair trial, in order for you to make an informed decision on what the appropriate punishment should be ... you have to have the ability to close your eyes and attempt to picture, in your mind, the testimony and evidence that you have heard. And picture in your mind what truly happened. What was the true representation of what happened in November of 2002? And the Chad Fulks that these women saw. The Chad Fulks that these women confronted, is that Chad Fulks. That is the Chad. That is a picture of Chad Fulks taken outside the Florence County Courthouse. That muscular Chad Fulks. Not the one you see here in this courtroom.

(TT Vol. 21 at 77–78.)

It is thus apparent that the prosecutor was not using a metaphor to describe Fulks as a wild animal. Rather, he was pointing out that just as animals are sedated in zoos and appear to be lethargic and benign, Fulks was sedated during the trial and was not the same person who engaged in the seventeen-day crime spree. This court concludes that its ruling on the objection correctly cabined the prosecutor's summation. There was no error in the argument that was given by the prosecutor.

Fulks next contends that the prosecutor violated the Constitution when he made an indirect reference to the defendant's refus-

al to take the stand and testify. In closing argument, the prosecutor noted that Fulks never told his brother or anyone else that the seventeen-day crime spree was all caused by Basham. The pertinent language is as follows:

> Sometimes, Ladies and Gentlemen, it is not only what people say that matters, it is what people don't say that is every bit as important. [Fulks] had an opportunity to spill his guts to his brother, and he says nothing. And, I submit to you, because he is in it up to his neck. That is the truth.

(TT Vol. 21 at 91.)

**[33]**  The Fifth Amendment precludes a prosecutor from commenting to a jury on the "failure of an accused to testify in his own defense." *United States v. Ollivierre,* 378 F.3d 412, 419 (4th Cir.2004). This principle has been extended to statements that the jury would "naturally and necessarily take ... to be a comment on the failure of the accused to testify." *United States v. Francis,* 82 F.3d 77, 78 (4th Cir.1996). In making this determination, the court must examine the statement in context. *United States v. Percy,* 765 F.2d 1199, 1204 (4th Cir.1985). Here, viewing the statement in context, it is clear that the statement refers to Fulks's interactions with his family, not his failure to testify at trial.

**[34]**  Finally, Petitioner contends that the prosecutor erred when he told the jury that in sentencing Chad Fulks to death, they would be engaging in "an act of self defense." He argues that this statement carries with it the insinuation that Petitioner was in a position to harm the jury and that the jury needed to protect themselves from Petitioner. (Pet. at 183.)

The full argument, in context, was as follows:

> [O]ne last point on future dangerousness. Ladies and Gentlemen, you can decide for whatever reason, obviously, the 12 of you can decide that the death penalty is the appropriate punishment. But the facts of this case ... are so egregious, are so horrific, that Chad Fulks deserves to die. It will, obviously, be your decision. That retribution is appropriate in this case. The government submits to you, when it comes to future dangerousness, when it comes to all of these factors, when it comes to all of the evidence that I have just discussed with you, the government submits to you, Ladies and Gentlemen, that, in essence, in essence, it will be an act of self-defense.

(TT Vol. 21 at 114.)

Trial counsel objected and the court conducted a sidebar conference. At the conference, the Assistant United States Attorney, an experienced prosecutor, stated that he had heard similar comments in closing arguments "a hundred times." (*Id.* at 115.) The court disagreed, indicating that the argument was "going too far." Although the court did not grant the defense counsel's request that the jury be instructed to disregard the comment, the court made it clear that no further argument along this line would be allowed. (*Id.*)

Other courts, facing similar statements by prosecutors during summation, have found the "self-defense" analogy to be proper argument. *See, e.g., United States v. Chandler,* 996 F.2d 1073, 1095 (11th Cir.1993) (finding that prosecutor's comment that "recommending the death penalty is a form of self defense for society" was not improper); *Ingram v. State,* 779 So.2d 1225, 1267 (Ala.Crim.App.1999) (prosecutor's argument that capital punishment "was a form of 'self defense' and was imposed for the sake of society" was not error).

Moreover, the self-defense comment was brief and was part of a larger discussion of the issue of future dangerousness. The court finds no error in the failure to strike the self-defense remark.

### CLAIMS 24 & 25:

### HANDGUN ISSUES

[35] In Claim 24, Petitioner claims that the government engaged in prosecutorial misconduct by asserting that Fulks had been armed with a .45 caliber revolver. In Claim 25, Petitioner claims that his trial counsel were ineffective for failing to question Ronnie Fulks about the revolver when he took the stand.

At trial, Robert Talsma and Tina Severance testified that Fulks and Basham stole Talsma's .45 caliber revolvers on November 8, 2002. (TT Vol. 3 at 84–87; Vol. 2 at 217–19.) Dewayne Fulks admitted he told FBI agents who came to his father's house the day before Fulks was arrested that he saw Fulks with two revolvers. (TT Vol. 4 at 124–25.) After apprehending Fulks in Indiana, the government did not recover one of the .45 caliber revolvers, and believed that Fulks must have disposed of the gun while he was running from them in the woods. Fulks told his trial counsel that he had given the gun to his brother Ronnie Fulks when he had been in Indiana. Because Ronnie was a felon, if he acknowledged having received the gun, he would have exposed himself to criminal liability for felon in possession of a weapon. Trial counsel attempted to obtain the gun from Ronnie or at least have him agree that he had the gun, which trial counsel claims Ronnie refused to do. Ultimately, trial counsel "decided not to push

it" because Ronnie had helpful things to testify about his life and background when he was going to be called by the government and trial counsel did not want to alienate him.

During closing, the government argued that Fulks was armed with two .45 caliber revolvers the day he and Severance went to Goshen, Indiana, to see Fulks's brothers. (TT Vol. 21 at 38.) The government also asserted that Fulks shot at Carl Jordan, although the prosecutor told the jury that it did not know with certainty whether the gun Fulks used to shoot at Carl Jordan was a .45 caliber revolver or a .22 caliber revolver because it did not have the gun, but that it did not matter. (TT Vol. 21 at 57–58.) This argument was not improper, as Jordan testified that Fulks shot at him. (TT Vol. 5 at 49.)

Petitioner claims that the government should have accepted Fulks's claim that he gave a .45 revolver to his brother Ronnie Fulks and provided Ronnie with immunity for testifying about it. Further, Petitioner asserts that his claim about having given the .45 caliber revolver to Ronnie should have precluded the government from arguing that Fulks was armed with a .45 revolver during the remainder of the crime spree. Petitioner claims that the significance of Ronnie Fulks's proposed testimony is that it would have established Basham as the only individual with an operational handgun during all relevant times.[40]

The prosecution had no obligation to accept Fulks's claims that Ronnie had one of the .45 caliber revolvers, especially when Ronnie did not mention it to the government. In light of the testimony gathered at trial, the government had good

---

**40.** Assuming Fulks's story was true, that Ronnie had one of the .45 revolvers, the other .45 revolver had inoperable ammunition and the .45 automatic had no ammunition clip, thus

leaving one operational firearm, the .22 caliber revolver, which witnesses testified Basham always carried.

reason to believe Fulks was in possession of a gun or guns during the crime spree. Tina Severance testified that when they were staying at the Lake Shore Motel, Fulks became "frantic" because he could not find a revolver, and thought that Severance or Basham had taken it. (TT Vol. 3 at 138.) Another time at the motel, Fulks became angry at Severance and pointed a gun at her head. (*Id.* at 177–178.) Beth McGuffin testified that she noticed a gun in the glove box, and that Fulks said the gun belonged to him. (TT Vol. 6 at 113–14.) Che McCoy testified that Fulks wanted to sell a .22 caliber revolver to McCoy or to trade it for McCoy's gun. (TT Vol. 7 at 214.) Because there was reliable evidence that Fulks had a gun during the crime spree, it was not improper for the government to so argue during the trial.

Petitioner claims that his trial counsel were ineffective for failing to question Ronnie about the .45 revolver when he took the stand. Petitioner argues that if trial counsel had asked questions about the .45 revolver, Ronnie could have asserted his Fifth Amendment right, and trial counsel could have argued effectively to the jury at closing that Fulks gave Ronnie the only operational .45 revolver. The trial team analyzed this issue in an email (Gov't Ex. 56), and ultimately decided, as Blume testified, that they "needed Ronnie," and did not want to alienate him because of the favorable testimony that he could provide about Fulks's life and background. The court finds that trial counsel's strategic decision to not question Ronnie on the stand about the .45 revolver was a reasonable judgment and does not constitute ineffective assistance of counsel. *Meyer v. Branker,* 506 F.3d 358, 371 (4th Cir.2007) ("It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that strategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable."). This standard is "necessary to avoid second-guessing of 'perfectly reasonable judgments,' and to 'eliminate the distorting effects of hindsight' after an adverse decision." *Id.* (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

### CLAIM 26:

### PREPARATION OF MITIGATION WITNESSES

**[36]** Petitioner's Claim 26 alleges that trial counsel were ineffective for allegedly failing to adequately prepare three lay mitigation witnesses for their testimony. Specifically, Petitioner complains that his trial counsel did not adequately prepare his uncle Mark Fulks and his sixth grade teacher Martha Floyd for their direct testimony and failed to meet with his brother Ronnie Fulks prior to his testimony. Petitioner claims that "had counsel prepared these witnesses, their testimony would have been much more compelling and could have changed the outcome of the proceeding."

As detailed in Claim 3, trial counsel's mitigation testimony spanned four days and included some twenty-four witnesses, many of whom testified as to Fulks's deplorable living conditions as a child, surrounded by constant violence, alcohol and drug abuse, and many instances of sexual depravity. As to the three witnesses that Petitioner claims trial counsel did not prepare for trial, the record reveals that trial counsel spoke to each mitigation witness before he or she testified. A review of Mark Fulks's and Martha Floyd's declarations themselves reveals that trial counsel did meet with them prior to their testimony. As to Ronnie Fulks, he was called by the government, and no requirement exists for an attorney to prepare a witness that

he will cross-examine, although both Johnson and Blume interviewed Ronnie Fulks in advance of the trial. (HT Vol. 2 at 45.)

Blume testified that Martha Floyd was prepared by mitigation specialist Tracy Dean before being interviewed by Blume himself in West Virginia. During his interview of Martha Floyd, he took five pages of handwritten notes. (Gov't Ex. 58.) Blume also testified that he did not perceive that the government would contest the facts that she was going to relay. (HT Vol. 2 at 41–43.)

Blume testified that Mark Fulks was interviewed by mitigation specialist Tracy Dean in April of 2003 (Gov't Ex. 61) before being interviewed by Blume himself in Indiana on August 21, 2003. During his interview of Mark Fulks, Drucy Glass took notes. (Gov't Ex. 60.) In preparation for trial, the trial team prepared a direct examination outline for Mark Fulks. (Gov't Ex. 59.)

As recited in Claim 3, Mark Fulks estimated that 90 percent of the time he saw Fulks's parents, that they were drinking; that they were alcoholics; that Fulks's mother regularly passed out, sometimes partially clothed; that Fulks's parents would bare-knuckle fight, throw things at each other, with Fulks's mother pulling out a shotgun and pointed it at Fulks's father's face; that Fulks's parents would physically and verbally abuse him and his siblings; that their house was filthy, bug-infested, and lacked food. (TT Vol. 16 at 159–81.)

Martha Floyd testified that she taught Fulks sixth grade in a self-contained behavioral disorder learning disability class. She testified to Fulks's poor upbringing; that she saw bruises on him; that he lacked school supplies and money for book rentals, special treats or snacks; that he did not have a coat in the tough West Virginia winters; that a teacher purchased shoes for him; that he was a follower; that

he was a slow learner who tried really hard in school, and would sit in a rocking chair by himself. She testified that his parents were inaccessible, never came to school or responded to notices of meetings, and did not respond to phone calls or notes sent home. (TT Vol. 17 at 85–93.)

Ronnie Fulks testified that he and his brother Chad grew up in the same exact environment and household, one in which their parents drank "every day, all day," until they got staggering drunk and passed out. He testified that his parents grew and used marijuana, that they would fight every day, that his mother broke a ketchup bottle over his fathers head, used coffee pots and ashtrays and whatever was handy to beat his father, that his father beat his mother, that they both beat the children, and that his parents would curse at them. He testified that people were frequently in his parents' basement partying and fighting every night, and that if the police were called, the partygoers would "hear it go over the police scanner. Everybody would break up and go home, and come and do it the next night." Ronnie testified that as a six-year-old child, he would use alcohol and drugs along with the partygoers in the basement, that his brothers Chad and Dewayne would also drink and use drugs as children, that he would get high huffing gasoline and paint, that he would get in a lot of trouble as a kid stealing and beating and cutting people with a knife. He testified that his parents let him and his brothers do anything they wanted, that their parents never helped with their homework and did not care about their schooling. Ronnie told a story of his father smashing the windows of a car and tearing "the whole inside of the car up," and then asking Ronnie, who was then a teenager, to take the blame for it. Ronnie took the blame and left the state. He also testified that he stopped speaking to his mother

after she refused to let him be paroled to her house, causing him to serve an additional fourteen months in an Ohio jail. He testified that his best memory of his childhood was leaving home at fourteen. (TT Vol. 8 at 10–23.)

In sum, Petitioner argues that three of 156 total witnesses at trial would have been "more compelling" if they had been better prepared by trial counsel. Petitioner has failed to demonstrate how the witnesses' testimony would have been stronger with any additional preparation by trial counsel. Petitioner argues only that if trial counsel had properly prepared these three witnesses (Mark Fulks, Martha Floyd, and Ronnie Fulks), they "would have been able to testify competently about strong mitigating factors, including Mr. Fulks's tragic upbringing, the child abuse Mr. Fulks suffered, Mr. Fulks's parents' alcoholism, and other unfortunate circumstances." As the record reveals, these three witnesses did testify, compellingly, about these matters.

Petitioner has failed to show that his trial counsel's performance fell outside the wide range of reasonable professional assistance. The allegations contained in Claim 26 do not come close to supporting the contention that but for counsel's errors, the result would have been different. Having failed to do so, Petitioner has failed to show prejudice. *Hedrick v. True,* 443 F.3d 342, 353–55 (4th Cir.2006).

### CLAIM 28:

### THE GUILTY PLEA AND ACCEPTANCE OF RESPONSIBILITY

Petitioner's Claim 28 alleges that trial counsel were ineffective in allegedly failing to explain to the jury the concept of acceptance of responsibility. Petitioner claims he "received no benefit from the entry of his guilty plea," and that trial counsel "never made the point" that a defendant who enters a plea of guilty should receive a lesser sentence.

Fulks's argument is not supported by the record. All twelve jurors unanimously found as a mitigating factor that "Chadrick Evan Fulks pleaded guilty to kidnapping and car jacking resulting in death." (Special Verdict Form, ECF No. 649; TT Vol. 22 at 25.)

In his opening statement, trial counsel explained that Fulks had accepted responsibility for his actions by pleading guilty:

> Chad Fulks has pled guilty to kidnapping and carjacking Alice Donovan. By doing that, he has accepted responsibility for his role in the deaths of these two women. And has insured that he will never be released from prison and that he will die there. As the prosecutors told you during voir dire, as the judge told you all individually and collectively, life without parole means just that. It means life without parole. It means the person will die in prison. And that there is nothing gentle about that. That is not gently confessing. That is stepping up and saying there are only one of two things that could happen: I am going to plead guilty, my life will either be taken by lethal injection, or I will spend the rest of my life in a federal prison.

(TT Vol. 1 at 129.)

Trial counsel continued this theme in his closing argument:

> Chad pled guilty to these offenses, ensuring he will never be released. He will spend the rest of his life in a maximum security prison. Sending him to prison for the rest of his life is not excusing what he did. It is not giving him a pass. Life without parole is not only severe punishment, it is a just pun-

ishment. And it is the appropriate punishment for Chad Fulks. Choose life." (TT Vol. 21 at 173.)

Contrary to Petitioner's claim, trial counsel capitalized on Fulks's guilty plea and used it to argue for a life sentence instead of death.

Petitioner's argument that he "received no benefit from the entry of his guilty plea" is a simplistic and incorrect view of the criminal justice system. Petitioner essentially and incorrectly argues that regardless of what crimes a defendant is found to be guilty of, the law requires that the death penalty be removed as an option from the jury's deliberation upon a plea of guilty. Such is clearly not the law.

Petitioner claims that he would not have pled guilty if he had known that counsel would not have introduced evidence of acceptance of responsibility. Instead, Petitioner claims he "would have put the government's evidence to the test and the outcome of the proceeding most likely would have been different." The court finds such a statement to be wholly speculative, and cannot agree with Petitioner's assessment that if he had pled not guilty that it "is very likely that the jury would have recommended life rather than death."

### CLAIM 29:

### REFERENCES TO RELIGION IN CLOSING ARGUMENT

Petitioner's Claim 29 alleges that trial counsel were ineffective in failing to object to the government's alleged insertion of religion in the trial. Petitioner specifically complains about two comments by the government during its closing argument: first, the government's use of the term "born-again" as "an improper powerful religious reference that painted Petitioner as a Godless killer;" and second, the government's reference to Petitioner's habit of taking multiple showers during the day, stating that "There are no amount of showers that Chad Fulks could take that could wash his sins away. None." (TT Vol. 21 at 232.)

**[37]** In analyzing the effects of improper prosecutorial sentencing phase arguments on due process, courts look to see "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." *Bennett v. Angelone*, 92 F.3d 1336, 1345 (4th Cir.1996) (internal citations omitted). Such a determination requires the court to consider "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Id.*

The first comment originated out of the examination of Fulks's uncle Mark. During his direct examination, Fulks's trial counsel asked Mark if he remembered when Fulks was in prison in Indiana, to which Mark responded affirmatively. During cross-examination, the prosecutor asked about a letter Mark had written on January 31, 2000 to Judge Brown, the Indiana state court judge who was to sentence Fulks after his guilty plea to burglary. In his letter, which was published to the jury (Gov't Trial Ex. 410), Mark asked for leniency on Fulks and stated his belief that Fulks had "turned his life around." (TT Vol. 16 at 177–78.) Mark's letter included the statement that "I watch him start walking on the path to the Lord. I know you hear that a lot, but I see it in him because I gave my life to the Lord a couple of years ago. I know what it takes to change." (*Id.*) The prosecutor then engaged in the following colloquy:

Q. Now, Mr. Fulks, I guess, prior to January of 2000, you became a born-again Christian?

A.  Yes.

Q.  And would you, at times, talk to Chad about that?

A.  Yes, I have.  I would over the telephone.

Q.  And with your conversations that you had with your nephew Chad, based on what he was telling you, you believed that Chad Fulks had turned his life over to God, as well?

A.  I had no reason not to believe it.

(TT Vol. 16 at 178–79.)

The government's cross examination was appropriate to support its attempt to show that Fulks feigned a religious conversion to manipulate his uncle to write a letter requesting that Fulks receive a more lenient sentence for a burglary conviction in Indiana prior to his later crime spree with Basham.  It was relevant to counter trial counsel's repeated claim that Fulks had limited mental capacity.  (*See* TT Vol. 21 at 143 (noting Fulks's "clear limitations"); *id.* at 144 ("It is a manifestation of his limitations, not of his cunning"); *id.* at 153 ("You have to be brain damaged to even say it.  To even think about it . . . . It is stupid."); *id.* at 160 ("another example of his mental limitations").)

[38]   In his closing argument, the prosecutor made the following statement:

In 2000, in front of the Judge in Indiana, he gets his Uncle Mark, a good and solid man, Mark Fulks.  A man that truly has found God. A born-again Christian.  Took that witness stand, told you how Chad, Chad comes to him and says Uncle Mark, I am following the path of the Lord. Please write this letter.  Please write this letter to the Judge so my sentence is not so bad.  Uncle Mark believes him.  Uncle Mark writes that letter, and the Judge accepts that letter that Chad Fulks, this man that would go

on to rape, and to carjack, and to kill, was a man of God.

(TT Vol. 21 at 122.)

Petitioner claims that trial counsel were ineffective for not objecting and requesting a curative instruction to the prosecutor's "born-again" reference as the government seeking to gain an improper advantage by "invoking Christian doctrine to a Bible-belt jury."  The second statement about which Petitioner complains is the prosecutor's comment in his closing argument, referencing Fulks's habit of taking multiple showers each day, stating, "There are no amount of showers that Chad Fulks could take that could wash his sins away. None." (TT Vol. 21 at 232.)

When compared to the defense's extensive use of many direct Bible quotations during its closing arguments earlier, the government's isolated comment during reply closing argument concerning Fulks's repeated washing cannot be considered as the government seeking to gain an improper advantage by "invoking Christian doctrine to a Bible-belt jury."  (*See,* e.g., TT Vol. 21 at 163 (noting that there is no "eye for an eye" under the law);  *id.* at 173 (noting that the prophet Micah "encouraged us to love, to do justice, to love mercy, and to walk humbly" and that "life without parole is both merciful and just"); *id.* at 201 ("The Bible says a parent should train a child up in the way he should go."); id. at 210 (claims to not be invoking Bible by quoting Bible, including "Let he who is without sin throw the first stone."); *id.* at 210 ("even if they have sinned themselves, which, of course, we all have."); *id.* at 210–12 (over the prosecution's objection, defense was allowed to give a long analysis of the life of the Apostle Paul and quoted him as saying, "Not that I have already obtained this, or am already made perfect.").

The defense itself suggested that the jury should use the Bible to influence its

jury deliberations. After a long explanation of the Apostle Paul's ministry and his desire to make up for his past sins and seek righteousness (*id.* at 212–14), defense counsel stated:

> And there is a second way that what Paul says in Philippians is instructive, and that is as a guide for jury deliberations, the process of deliberation. It may be that the juror sitting right next to you does not have the same understanding you have. It may be that he or she can only see the crime and not the brain damage and the avalanche of horrible experiences that shape the person who committed it.

(TT Vol. 21 at 215.)

The court finds trial counsel's failure to object to the government's alleged improper insertion of religion in its closing argument was not ineffective. The government's two comments were fleeting and were, at most, veiled references to biblical language. In light of the isolated and brief nature of the comments, made in the course of the government's 147–page closing argument, and considering the religious-laden arguments of opposing counsel, and the court's instruction to the jury that the arguments of the attorneys is not evidence,[41] the court finds Petitioner's claim of a due process violation on this issue is without merit.

### CLAIM 30:

### PETITIONER'S ARTISTIC ABILITY

Petitioner's habeas counsel have attached copies of Petitioner's artwork to his petition (Pet. App. Ex. 38), and suggest that these drawings reveal that Petitioner has great artistic talent. Moreover, the artwork is said to show that Petitioner "has the ability to transcend human suffering and bring joy and enlightenment both to himself and those viewing his work." (Pet. at 138.) Petitioner thus argues that Blume and his trial team were constitutionally ineffective for not bringing Petitioner's artistic ability to the attention of the jury. At the evidentiary hearing, Blume testified that he recalled seeing Fulks's artwork, but does not remember "considering presenting it as mitigation."

[39] On the record assembled in this case, the court is constrained to conclude that evidence of Petitioner's artistic ability would have had little positive effect on the jury and most probably would have been counterproductive. The jury heard evidence that Fulks and Basham escaped from jail, engaged in a seventeen-day crime spree that spanned seven states with thirteen identifiable victims, including two whose lives were taken after they were raped. The remains of one of the victims have yet to be found and the remains of the other have only recently been found. With this background, it is difficult for the court to conclude that the jury would have given any weight to the suggestion that Fulks possesses artistic ability. Moreover, to suggest to the jury that this ability enabled him to "transcend human suffering" and "bring joy and enlightenment to both himself and those viewing his work," would quite possibly have angered the jurors. The trial testimony revealed that Blume did not ignore this factor; rather, he concluded that it would not be of help in attempting to spare Fulks's life. This court is not prepared to say that Blume's conclusion was constitutionally unreasonable under the circumstances.

---

**41.** The court instructed the jury that "what the lawyers say is not evidence" (TT Vol. 21 at 17), and that "the arguments of the attorneys and the comments and rulings of the court are not evidence." *Id.*

**622**    875 **FEDERAL SUPPLEMENT, 2d SERIES**

CLAIM 31:

CUMULATIVE EFFECT
ALLEGED ERRORS

In Claim 31, Petitioner argues that the alleged errors made by his counsel and this court rise to the level of cumulative error and mandate a setting aside of his sentence. As the government observes in its memorandum in opposition to the § 2255 petition, the cases Petitioner relies upon for this proposition involve matters actually determined to be constitutional error. In those cases, each error, standing alone, was not grounds for relief, but cumulatively the errors compelled the court to order a new trial.

As the Fourth Circuit said in the appeal of Fulks's co-defendant, Basham:

> Generally, . . . if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error. To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness. When none of the individual rulings work any cognizable harm it necessarily follows that the cumulative error doctrine finds no foothold.

*Basham*, 561 F.3d at 330. (internal punctuation and citations omitted).

In this court's view, this case is not one where there were a number of constitutional errors or numerous instances of ineffective assistance of counsel. Accordingly, the cumulative error doctrine does not afford any relief in this case.

CLAIM 32:

EXECUTION BY LETHAL
INJECTION

**[40]** In Claim 32, Petitioner asserts that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution which prohibits "cruel and unusual" punishment. (Pet. at 145.) Without citing any authority, Petitioner contends that the combination of drugs used, the protocol governing the execution, the use of untrained nonmedical and unqualified personnel, and the physical space in which the execution would be carried out, all combine to result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment. (*Id.*) The record is devoid of any facts to support these assertions, and death by lethal injection has been upheld by a variety of courts in recent years. *See, e.g., Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) ("this Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."); *Evans v. Saar*, 412 F.Supp.2d 519, 522 (D.Md.2006) ("Circuit after circuit (including the Fourth) has ruled that the [3–drug] protocol does not run afoul of the Eighth Amendment.").

The government has responded to Claim 32 by also asserting, in its brief, facts that are not in the record. The government suggests that the Bureau of Prisons has a multi-step procedure designed to protect the health and safety of all involved. It is suggested that the federal protocol compares favorably with other execution protocols that have recently passed Eighth Amendment scrutiny.

The court is thus faced with deciding this issue on a sparse record, but with ample precedent upholding the use of lethal injection in the United States. Petitioner has failed to carry his burden of showing that the Eighth Amendment would be violated by using the legal injection method to perform his execution. *See Baze*, 553 U.S. at 47, 128 S.Ct. 1520 ("[C]apital punishment is constitutional.

It necessarily follows that there must be a means of carrying it out;" there is broad consensus that lethal injection is the most humane method of execution available).

## CLAIM 33:

## LOCATION OF DONOVAN'S REMAINS

[41] On January 18, 2009, six years after the death of Alice Donovan, a search team located seven pieces of bone that appeared to be part of a human skull in a rural area of northeast Horry County, South Carolina. The search team subsequently found several additional bone fragments, including one that appeared to be a forearm bone. DNA testing confirmed that these partial remains were Alice Donovan's.

This discovery prompted Petitioner to file a motion to add an additional claim (this Claim 33) to his petition for relief, and to expand the record to include facts relating to this claim. The government opposed the motion, not on the grounds of timeliness,[42] but on the grounds of futility. The court grants Petitioner's motion to add Claim 33, expands the record to include all evidence relating to that claim, and addresses the claim on the merits.

Distilled to its essence, Claim 33 is an assertion that Fulks "consistently" directed authorities to the area where Donovan's remains were located, and that the jury that sentenced him to death was incorrectly given the impression that he had misled authorities as to the whereabouts of Donovan's remains. After a careful review of the developments following the death sentence in this case, the record produced at trial regarding efforts to locate the body, and the prosecutor's comment regarding "concealment" of Donovan's body, the court concludes that Petitioner's Fifth and Eighth Amendment rights were not violated.

To place Claim 33 in context, it is necessary to recite, in some detail, the testimony that was, and was not, allowed regarding the unsuccessful efforts to locate Donovan's body. After the jury was excused for the day on June 10, 2004, Fulks's trial counsel asked for a ruling on the evidence that he anticipated the government would offer the following day. The evidence included testimony concerning events that occurred shortly after Fulks was taken into custody in Indiana and while authorities in North Carolina and South Carolina were frantically attempting to locate Alice Donovan in the days following her disappearance. Basham, who was then being held in custody separate from Fulks, gave authorities a map depicting what is known as the Savannah Bluff area of Horry County, and indicated that authorities should search in that area. A search of the Savannah Bluff area was begun, and the Basham map was sent to Indiana for review by Robert Truitt,[43] the lawyer who had been appointed to represent Fulks in Indiana during the early stages of the criminal proceeding.

---

42. Collateral attacks on a sentence must be filed within one year from the latest of the date of the final judgment of conviction or "the date on which the facts supporting the claim . . . could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). The government concedes that Claim 33 was asserted within one year from the date the remains were discovered.

43. The exact name of the Indiana lawyer does not appear in the record. According to a 302 form attached to the government's memorandum in opposition to Claim 33, however, his name is Robert Truitt.

Apparently Truitt took the map, conferred with Fulks, and responded to an FBI agent in South Bend, Indiana, that Fulks agreed with Basham that the search should be focused on the Savannah Bluff area.[44] Truitt said, however, "I want to be clear that this will not be attributed to my client in any way." (TT Vol. 8 at 188.) As a result of Fulks's confirmation of the Basham map, law enforcement authorities intensified their search of the Savannah Bluff area, and searched for two additional days. The authorities found nothing.

In the discussions following the close of the testimony on June 10, 2004, Fulks's trial counsel made it clear that he wished to enforce the non-attribution condition imposed by Truitt and bar any reference to the fact that Fulks directly or through his lawyer suggested that authorities look in the Savannah Bluff area. (*Id.* at 189.) The government argued that the jury should be made aware that Fulks's lawyer (as opposed to Fulks himself) confirmed that authorities should look in the Savannah Bluff area.

During the colloquy as to whether and to what extent the court should admit testimony regarding the Savannah Bluff directions, the court learned that the government intended to introduce evidence, without objection, that on April 21, 2003 (some five months after Donovan was abducted), Fulks had directed authorities to a different area—the Water Tower and Long Bay Roads area, some fifteen miles away from the Savannah Bluff area—and was taken to that section of Horry County to assist with the search. As the government explained, Fulks's instructions to look in the Water Tower and Long Bay Roads area actually consisted of two sepa-

rate locations: one near Long Bay Road (the April 21, 2003 statement) and a second (given on March 23, 2004, the day Fulks was taken to the scene) near Water Tower Road which intersects with Long Bay Road. (TT Vol. 8 at 195.) The court then summarized the state of the record, which was that Fulks had, at one time or another, given authorities directions to three different locations, the latter two being reasonably close to each other, but it was only the first of the three that trial counsel sought to keep from the jury pursuant to the non-attribution agreement insisted upon by Truitt. All parties agreed that this was an accurate assessment of the situation before the court. (*Id.* at 195.) The court then took the matter under advisement.

The colloquy resumed the following day. After another extended discussion, the court announced that it would side with the defendant and would enforce the non-attribution agreement in all respects. As a result, the jury did not hear that Fulks had initially joined in Basham's suggestion that the remains would be found near the Savannah Bluff area. Instead, the jury heard only that Fulks gave directions to two different locations in the vicinity of Water Tower and Long Bay Roads. This testimony included significant details about the number of searches, the number of man-hours involved, the fact that helicopters and cadaver dogs were used, and the fact that Fulks himself was taken to the area to see if he could assist with the search. The jury also learned that the search efforts were to no avail, and that at the time Fulks's case went to trial, Donovan's remains had not been located.

---

44. Exactly what Truitt said to authorities is not clear. According to Fulks's trial counsel, "the lawyer came out and said, 'Well, okay, yeah, he looked at this, and that looks right'

or something to that effect.'' (TT Vol. 8 at 188.) According to the government, Truitt said, ''Basically, you are warm.'' (*Id.* at 191.)

It is undisputed that in January 2009, more than six years after Donovan's death and four-and-a-half years after the trial, Fulks was put in touch with Monica Caison, a specialist with The Community United Effort Center for Missing Persons of Wilmington, North Carolina. Fulks provided Caison with a package containing detailed instructions and a map of the location indicating where Donovan's remains were said to be located. Acting upon this information, Caison performed a systematic grid search and recovered the remains that ultimately proved to be Donovan's. That location was reasonably near the area that Fulks had suggested in his third direction to the location of the body (given on March 23, 2004).

In Claim 33, Fulks contends that he was convicted based on materially false information, specifically that the jury was left with the impression that he had misled authorities about the location of the body. As an initial matter, it should be noted that the idea that Fulks was less-than-truthful regarding the location of the body and that he led authorities on a "wild goose chase" was not one of the "central arguments" (Supp. Pet. at 1) of the case.[45] To begin, it is simply not accurate to state that Fulks "consistently" directed authorities to the location of Donovan's remains. Fulks confirmed Basham's suggestion that authorities should search for Donovan in the Savannah Bluff area, some fifteen miles away from where the remains were ultimately found. Fulks did this shortly after he was taken into custody, possibly while Alice Donovan was still alive, and certainly while her remains were still fresh enough to allow a forensic examination to determine the cause of death, and quite possibly the identity of the defendant who "struck the fatal blow." It was not until more than four months later, when Donovan was obviously deceased, and when it was more likely that her remains, if found, would be helpful to investigators, that Fulks began directing authorities to the Water Tower and Long Bay Road areas. In fact, Fulks initially provided information that caused investigators to look on the Long Bay Road side of the area, and only later, when Fulks was brought to the site, did he direct the searchers to the Water Tower Road area. Thus, the assertion that Fulks "consistently" led law enforcement to the correct location is incorrect.[46]

If Donovan's remains had been found before the trial at the location indicated by Fulks in his second or third set of instructions to authorities, the court would have faced a dilemma regarding Fulks's earlier confirmation, via his Indiana lawyer, that the body would be found near Savannah Bluff. To have kept out the Savannah Bluff statement, yet allow testimony re-

---

**45.** Claim 33 is contained in a separate filing with its own numbering system. To avoid confusion with the Amended Petition (''Pet.'') that is the subject of most of this order, references to the new Claim 33 will be as follows: Supp. Pet. at ____.

**46.** In addition to acquiescing in Basham's suggestion that authorities needed to look in the Savannah Bluff area, Fulks learned that at Basham's direction, law enforcement authorities were also searching the Bee Tree Farms area of North Carolina, some 52 miles distance from where the body was located. Nothing in the record indicates that Fulks did anything to stop authorities from searching this area. There was also evidence accumulated by the government (but note put before the jury) that Fulks actually told authorities that a ''live woman [was] taped to a tree'' in the woods on ''Wonderland Road'' near Conway, South Carolina. See FBI 302, date of transcription Nov. 25, 2002 (Fulks, through attorney, said that ''live woman taped to a tree'' in woods on ''Wonderland Road'' near Conway, SC) (attached as Ex. 3 to Government's Memorandum in Opposition to Supplement the Pleadings).

garding Water Tower and Long Bay areas where the body was actually located, would be to give the court's blessings to manipulation of authorities: While the evidence is fresh, provide information (indirectly through an attorney and carefully worded so as to not be attributed to the defendant) that sends authorities to an area where the perpetrator knows the remains will not be found; then, after passage of sufficient time to render a forensic examination largely irrelevant, direct the authorities to the proper location and receive credit for helping the victim's family find their loved one so that a suitable funeral could be arranged. In this case, the court did not have to face this dilemma because, as noted, the remains were not found until some four-and-one-half years after the trial. Suffice it to say, however, that to the extent Petitioner claims that his conviction was based upon "false evidence" in violation of the United States Constitution, the argument that he has, from day one, sincerely attempted to direct authorities to the proper location, rings hollow.

Secondly, the notion that Petitioner misdirected authorities did not "permeate" the trial. Although the notion that Fulks attempted to mislead authorities was initially included as part of the non-statutory aggravating factor of victim impact, the government decided that the better course of action was to abandon any evidence or argument that Fulks had lied to authorities regarding the location of the body. This became clear during the colloquy leading up to the court's ruling excluding Truitt's statement. During that colloquy, the court asked the government whether it sought to introduce evidence regarding

Fulks's suggestion to Truitt that authorities look in the Savannah Bluff area, only to later direct authorities to the Water Tower and Long Bay Roads area "to show that the defendant was sending you in two different directions, or jerking you around so to speak?" (TT Vol. 8 at 6.) The prosecutor responded:

> In fact, I actually disclaimed that, because of the non-attribution statement made by the lawyer in Indiana. Said we don't intend to argue. I think the jury, they may make that inference. I don't know that. But we don't intend to say Chad Fulks sent us in the wrong direction in Indiana. One of the tricky arguments is defendant's right to silence.

(*Id.*)

The trial resumed and the jury heard evidence that the authorities searched in the Bee Tree Farms area of North Carolina, the Savannah Bluff area of Horry County, and the Water Tower and Long Bay Roads area of Horry County.[47] The only testimony the jury heard regarding directions provided by Fulks related to the two locations near Water Tower and Long Bay Roads. Evidence regarding the government's extensive search efforts was a component of the government's case-in-chief because without having Alice Donovan's body upon which to perform tests and present evidence, the government needed to make a strong showing that every effort possible had been made to locate the body. To that end, the government offered, and the court allowed, extensive testimony regarding the search efforts.

---

**47.** It should be noted that the jury heard evidence regarding the search at Bee Tree Farms and Savannah Bluff not because of information Fulks provided, but rather because of information provided by his co-defendant, Basham. In producing this evi-

dence, the government was not attempting to lay fault at Basham's feet for giving them bad information; rather, it was merely an effort to convince the jury that all reasonable efforts had been made to locate the body.

*The Court's Introductory Remarks*

The only *direct* reference in the entire trial to Fulks misleading authorities regarding the search for Donovan's remains came on the first day of trial, as the court introduced the jury to the case and explained the statutory and non-statutory aggravating and mitigating factors that had been alleged. Among the non-statutory aggravating factors was victim-impact evidence. The court, in its preliminary remarks to the jury, stated:

> The final non-statutory aggravating factor alleged by the government is victim impact evidence. Under this factor, the government contends that defendant Fulks caused injury, harm, and loss to Alice Donovan, Alice Donovan's family, and Alice Donovan's friends and coworkers as demonstrated by Alice Donovan's personal characteristics as an individual human being and the impact of the death upon Ms. Donovan's family. The government alleges that the family of Alice Donovan has suffered injury, harm, and loss as a result of Ms. Donovan's death, including, but not limited to, one or more of the following:
>
> *First, defendant Fulks engaged in a series of lies and deceit during law enforcement's initial efforts to locate Alice Donovan's body which resulted in obstructing search efforts and gave Alice Donovan's family a false sense of hope during a period of intense despair.*
>
> Second, defendant Fulks engaged in a premeditated plan to dispose of Alice

Donovan's body in such a manner that recovery of the remains has not been achieved. The government alleges that this action by the defendant has caused significant emotional and psychological pain to Alice Donovan's family, beyond the expected grief associated in homicide cases.

(TT Vol. 1 at 40 (emphasis added).)

Petitioner does not challenge these remarks to the jury, but given that they constitute the only direct reference to an allegation that Fulks engaged in "lies and deceit" regarding the efforts to locate the body, the court's introductory remarks merit discussion here. First, the court was merely repeating the language of the indictment, and there was no pretrial effort to remove this language from the indictment or from the court's introductory remarks to the jury.

Second, in opening statements, Assistant U.S. Attorney Scott Schools did not suggest that Fulks had lied as to the location of the remains. Rather, he suggested to the jury that the authorities had conducted an extensive search at the location suggested by Fulks and found nothing. The prosecutor concluded that Basham and Fulks had "successfully concealed [Donovan's] remains." (TT Vol. 1 at 57.)

Third, as indicated above, the government rather quickly abandoned this line of attack, and the idea that Fulks engaged in "lies and deceit" to hinder the location of Donovan's body did not arise, directly or indirectly, for the duration of the trial.[48]

---

**48.** The issue of searching the Savannah Bluff area came up four days later when Fulks's trial counsel sought to introduce testimony that Fulks was present at a hearing where the government prosecutors indicated to the judge that one of the reasons that the government sought the death penalty for Basham was that Basham had purposefully given authorities bad information regarding the location of Donovan's remains. (TT Vol. 11 at

113–30.) After a somewhat confusing colloquy, it became clear that the reason Fulks's counsel wanted that information admitted was to raise the inference that Fulks, having heard that misleading authorities as to the location of Donovan's remains was one of the reasons the government sought the death penalty for Basham, would be less likely to produce bad directions himself; hence, Fulks had a motivation to be truthful, and was

Fourth, the court's final instructions contained no mention of the issue in light of the government's abandonment of it early in the case. The court told the jury:

It again becomes by duty, therefore, to instruct you on the rules of law that you must follow in arriving at your decision as to whether the defendant, Chadrick Evan Fulks, should be sentenced to death or to life in prison without the possibility of release.

\* \* \*

It would be a violation of your oaths, as jurors, to base your verdict upon any other view of the law that what I give you in *these* instructions.

(TT Vol. 21 at 248–49 (emphasis added).)

In addition to the fact that the jury was told to follow the final instructions only, the "lies and deceit" comment made in the introductory remarks occurred on the first day of a four-and-a-half week trial and comprised five lines out of a transcript that totaled 5,048 pages.

### The Trial Evidence

Moreover, no false evidence was put before the jury regarding the efforts to locate Donovan's remains. Fulks's directions to Water Tower and Long Bay Roads were admitted without objection, as was testimony regarding the extensive efforts made by law enforcement officers to locate the body, efforts that involved repeated searches, numerous individuals, and

even a search effort that was financed, personally, by Fulks's trial counsel. As the court observed during the colloquy on the Savannah Bluff statement, the government had a legitimate need to tell the jury about the extensive and heroic efforts made to locate Donovan's remains prior to trial. As the court analogized at trial, in a typical case, jurors want to see fingerprints or at least hear an explanation of why the fingerprints were not obtained. Here, with no body and no forensics examination associated with the body to produce to the jury, the government quite naturally realized that it needed to make a strong showing for the jury that all reasonable efforts were made to locate the body prior to trial. (TT Vol. 9 at 14.)

The only testimony Petitioner points to with specificity regarding the search for Alice Donovan is the following testimony of FBI Agent Jeff Long:

AUSA Gasser: Despite these thorough and exhaustive efforts by law enforcement, as you sit there in this witness box today, can you tell this jury how Alice Donovan died?

Agent Long: No, I can't.

AUSA Gasser: Can you tell this jury where the remains of Alice Donovan are?

Agent Long: No, I can't.

(TT Vol. 11 at 86.)

Fulks argues that Long's testimony "[d]rove home the point to the jury that

---

truthful, when he directed authorities to Water Tower and Long Bay Roads. The government protested that the court had previously sustained an objection to the fact that Fulks himself had directed authorities to the Savannah Bluff area, and suggested that it would not be fair to the government to allow in evidence of Basham's misdirection, and at the same time keep out evidence of Fulks's misdirection. (*Id.* at 123.) Ultimately, the government sided with Fulks and allowed the testimony that Basham had misled authorities as to the location of the body.

In the somewhat confusing colloquy that led up to this ruling, the government lawyers did seem to indicate, contrary to their earlier assertions, that they would make a ''wild goose chase'' argument as to Fulks. (*Id.* at 122–23.) The entire colloquy occurred while the jury was out of the courtroom, and, contrary to the government's statement during this hearing, the government did not, in fact, reverse course and seek to put before the jury the idea that Fulks had lied about the location of the body.

Mr. Fulks must have purposefully obstructed the search efforts." (Supp. Pet. at 11). The court is not persuaded that Long's testimony presented false or misleading information regarding Fulks's efforts to locate the body.

### The Prosecutor's Argument

Rather than focus on whether Fulks misled authorities, the government focused on the concept that Fulks had helped conceal the remains. It is undisputed that Donovan's remains were deposited in a secluded, rural, heavily overgrown, and somewhat swampy area. As the government correctly observes, that when Donovan was abducted, it was Fulks who was driving and who had lived in this area of South Carolina in the past and who most probably determined the location for disposal of the body. To conceal a body by placing it in a remote, hard-to-find location is one thing; to lie to authorities who are later searching for the body by directing them to the wrong location, or conflicting locations, is something else. It was the concealment argument, not the misdirection argument, that the government relied upon.

The passages from the government's closing argument related to concealment are as follows:

> On November 14th, 2002, Brandon Basham and Chad Fulks had a plan. Their plan involved Kidnapping and carjacking a woman in order to get her car, at that point. That is what their plan was. And that plan evolved. That plan then included rape and murder. Chad Fulks and Brandon Basham knew there would be no eyewitnesses. They knew they would take Alice Donovan to an isolated spot. Take that body where nobody would know how to find it. They accom-

plished that very same plan before, 72 hours before, with a 19–year–old girl in Huntington, West Virginia.

> And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. I didn't rape Samantha Burns. I didn't kill Samantha Burns. I didn't kill Alice Donovan. And I had nothing to do with getting rid of their bodies. Do you believe that? Are you going to accept that?

(TT Vol. 21 at 119.)

Fulks characterizes the prosecutor's closing argument as suggesting that Fulks obstructed the search for Alice Donovan and sent the law enforcement officers on a "wild goose chase." [49] In the court's view, the closing argument quoted above did nothing more than describe exactly what the evidence at trial demonstrated: Fulks and Basham disposed of Alice Donovan's body in a remote area where it would be extremely difficult for searchers to find her. The fact that it took over six years to discover a few remains of Alice Donovan's body demonstrates this fact. Additionally, the prosecution appropriately noted that Fulks waited more than five months after the kidnapping to provide accurate information about the possible location of Donovan's body. (TT Vol. 21 at 126.)

After the prosecutor concluded his initial closing argument, defense counsel addressed the jury and suggested that several of the government witnesses "said they had absolutely no idea how Alice Donovan died." (TT Vol. 21 at 154–55.) In reply, the prosecutor argued the following:

> Before I even get to some of the defense experts, a couple of points I need to

---

**49.** The term "wild goose chase" was actually used by Fulks's trial counsel and later by the court during a colloquy while the jury was not

in the courtroom. (TT Vol. 11 at 114–30.) The term was never used in front of the jury.

address that [were] brought up by Mr. Blume in his closing argument. Mr. Blume made the statement that one of the reasons why he argues to you jurors to vote for life without parole is that he states that the government has no body. He said that the government has no idea how Alice Donovan died. That the government cannot tell you how Alice Donovan died. And because of that, he asks you and he argues to you that life without parole is the most appropriate punishment. I want you to think about that for a moment, ladies and gentlemen. Why is it that the government has no body? Whose fault—at whose conduct is it that the government has no body? The reason the government doesn't have Alice Donovan's body, the reason why we can't put her and take her to a morgue and have a pathologist autopsy her and come in and take that witness stand and tell you jurors that she was raped, that her throat was cut, or that she was shot, is because of the actions, of Chad Fulks and Brandon Basham. Don't you think it is a little bit unfair? Don't you think it is unfair that somehow the government—it should be held against the government for not producing a body because the actions and the conduct of Chad Fulks and Brandon Basham have been successful? Under that theory, ladies and gentlemen, you could never seek the death penalty in a case in which somebody successfully hid or destroyed the body. Think of the logic there. So much of what we do in life, so much of the law is based on logic, simple logic. Should Chad Fulks and Brandon Basham be rewarded because they successfully were able to conceal the body of Alice Donovan? Should, somehow, you sentencing jurors and Brandon Basham's sentencing jurors go back there and hold that against the government because of the actions and

conduct of Brandon Basham and Chad Fulks? Is that fair? Is that just?

I submit to you, that that is what makes this crime more aggravating. More aggravating. The fact that they successfully disposed of her body so that the victims will not be able to bury her and so that the government is barred from providing you, jurors, a total picture. The government should not be held accountable for that.

(TT Vol. 21 at 219–21.)

The court finds nothing in this closing argument to be false or misleading. The prosecutor focused on the defendants' actions in "hid[ing] and destroy[ing]" the body, not on misleading authorities after-the-fact. Indeed, the *only* reference that the prosecution made to the unsuccessful search was that Fulks knew that the officials had been searching in the Savannah Bluff area in November 2004. In order to put the statement in context, it should be noted that the government, midway through its closing argument, began to recite a series of demonstrably false statements and actions taken by Fulks during his lifetime. The prosecutor began: "I am going to end up on two subject matters ... one is the defendant's credibility." (TT Vol. 21 at 119.) The prosecutor then rhetorically asked:

Why is Chad Fulks's credibility important? Why is that important to you jurors who will be making that decision? Chad Fulks says he didn't rape Samantha Burns. Chad Fulks says he didn't kill Samantha Burns. Chad Fulks says he didn't kill Alice Donovan. Chad Fulks says he had nothing to do with disposing of their bodies. One of the questions you will have to decide is, do you believe Chad Fulks ... this man who has spun a web of deceit his entire life. He has lied, he has deceived, he

has manipulated people, particularly the women, his entire life.

(*Id.* at 119–20.) The prosecutor then followed with a carefully constructed chronology of episodes in which Fulks had lied to or deceived other people.

Following this detailed summary, the prosecutor concluded:

> Do you think, with all of those lies I have just gone over from the incident with Nell lee and Robert Lee about his little girl, and all of those lies, in the whole, grand scheme of things, ladies and gentlemen, all of those matters are really not that serious. Lying about your identity, lying about whether you possess a firearm, lying to get out of jail, in the whole, grand scheme of things for which you are getting ready to do, really are not that serious. And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. I didn't rape Samantha Burns. I didn't kill Samantha Burns. I didn't kill Alice Donovan. And I had nothing to do with getting rid of their bodies. Do you believe that? Are you going to accept that?
>
> What else about his credibility, ladies and gentlemen? What did he tell the police in this case? Well, Ladies and Gentlemen, I submit to you, not much. You can put it in proper context. In April of 2003, five months after Alice Donovan is abducted, he sits down with the police and his Lawyers, and he says where Alice Donovan's body may be, and he talks about the things I have already discussed regarding Alice Donovan, basically, putting it on Brandon Basham.
>
> *Let's talk about the searches. First, with regard to the searches, Chad Fulks knew in April of 2003, he knew they had*

> *been searching the Savannah Bluff area, didn't find the body in November. Knew they had been searching Bee Tree farm area up in North Carolina, no body found. So he sends them to another location. Does that make it true? No.*

(*Id.* at 125–26 (emphasis added).)

The italicized language in the passage quoted above did not contain any untrue statements, nor was it in violation of the court's ruling regarding the search directions given by the Indiana lawyer. Further, when viewed in the light of the prosecutor's entire two-hour summary, it was a relatively insignificant reference to the general proposition that just because Fulks said something, it was not necessarily true. The statement was certainly not a "central argument" (Supp. Pet. at 1) or "theme" (*id.* at 11) that "permeated the proceedings" (*id.* at 10) or served as "one of the primary justifications for sentencing [Fulks] to death." (*Id.* at 26.)

Finally, the cases relied upon by Fulks for the proposition that a sentence of death based in part upon false information violates a "heightened reliability" requirement of the Eighth Amendment (Supp. Pet. at 21) are unavailing. In both *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), and *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the defendants had been sentenced to death based, in part, upon prior convictions that were invalidated, rendering the government's previous presentation of evidence regarding the convictions to be false. In the case at hand, however, the location of the remains of one of Fulks's victims does nothing to change, invalidate, or falsify the arguments made by the government at trial.

Petitioner also relies upon *United States v. Tucker,* 404 U.S. 443, 448, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), which holds that

due process is implicated if a sentencer's decision "might have been different" if it had not considered the false information. But here, no false information was presented to the jury. To the extent that the brief mention of the search efforts in the court's introductory remarks or the prosecutor's reference during the his two-hour summary were considered by the jury in this case, the court is in no way persuaded that the result "might have been different" had these two statements been omitted.

During the four-and-a-half week trial of this case, the jury heard about Fulks and Basham escaping from a new detention facility in Kentucky (where Fulks was being held on charges that might have exposed him to a life sentence) and then engaging in a seventeen-day crime spree that spanned seven states. During this crime spree, two women were abducted, raped, and murdered, and their remains were left in remote areas to be consumed by the elements or wild animals. Four other victims of the crime spree could have been murder victims as well. James Hawkins was duct-taped to a tree and left in the woods during temperatures in the low thirties and escaped with his life only when he was able to free himself fifteen hours later. Ohio State Highway Patrol Trooper Nicholas Malo dove onto a berm to avoid being struck by the BMW Fulks was driving at speeds of up to 130 miles per hour, and Fulks then drove the BMW onto the berm in an effort to strike him. (TT Vol. 7 at 166–98.) Carl Jordan confronted Fulks when he and Basham were burglarizing Jordan's son's house. Jordan found himself in a high-speed chase with Fulks driving a van directly at him and Basham shooting out the back window of his vehicle. (TT Vol. 5 at 46–58.) Although Fulks offered an explanation for it, Fulks's late night call to young Amy Ward could have been determined by the jury to be an attempt to have a third kidnapping victim.

In addition to these victims, or potential victims, of personal violence, the crime spree included numerous people whose homes were burglarized, whose vehicles were stolen, or whose identities, pocket books, or license plates were stolen.

In light of this extensive record of criminal activity, this court cannot conclude that the sentencing jury's decision "might have been different" had the two brief references to the search efforts been omitted from the trial.

## CONCLUSION

Chadrick Evan Fulks received world-class representation from a highly skilled, motivated team of four lawyers with death penalty experience, together with innumerable investigators and experts, law students, and others who contributed to mounting a vigorous defense marshaling all the evidence available in the best light to the defendant. Counsels' notes and other documents produced in discovery reveal an exhaustive effort to interview potential witnesses, locate and interview experts (some on multiple occasions), evaluate their potential testimony, and use those that would assist the defense team in its efforts to spare Fulks's life. In his petition before this court, Fulks has failed to show that his trial counsel were ineffective under *Strickland* or that any other errors of constitutional magnitude occurred. The petition is therefore denied.

### *Certificate of Appealability*

On December 1, 2009, the Rules governing Section 2254 and 2255 cases in the United States District Courts were amended to require that the district court issue or deny a certificate of appealability when a final ruling on a post-conviction petition is issued. *See* Rule 11(a) of the Rules governing 28 U.S.C. § 2254 and 2255. The court has reviewed its order and pur-

suant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 cases, issues a certificate of appealability as to Claims 1 through 28, and 32. As to Claims 29, 30, and 31, the Petitioner has not made a substantial showing of a denial of a constitutional right, and therefore, a certificate of appealability is denied as to these Claims. 28 U.S.C. § 2253(c)(2); *Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citing *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

IT IS SO ORDERED.



**S.H., et al., Plaintiffs,**

**v.**

**FAIRFAX COUNTY BOARD OF EDUCATION, Defendant.**

**Civil Action No. 1:11–cv–128.**

United States District Court, E.D. Virginia, Alexandria Division.

June 19, 2012.

**Background:** Parents brought Individuals with Disabilities Education Improvement Act (IDEA) action on behalf of their daughter, who had auditory memory and visual motor integration disorders and had difficulty with reading, written expression, and verbal expression, alleging that county board of education failed to provide daughter with free and appropriate public education (FAPE). Parties cross-moved for judgment on administrative record.

**Holdings:** The District Court, Liam O'Grady, J., held that:

(1) hearing officer's decision was regularly made and entitled to due weight;

(2) fifth grade IEP was reasonably calculated to provide daughter with some educational benefit;

(3) equity would bar reimbursement for costs of private placement for daughter's fifth grade year;

(4) sixth grade IEP was reasonably calculated to provide daughter with some educational benefit;

(5) seventh grade IEP was reasonably calculated to provide daughter with some educational benefit; and

(6) eighth grade IEP was reasonably calculated to provide daughter with some educational benefit.

Defendant's motion granted.

**1. Schools ⟂148(2.1)**

"Free and appropriate public education (FAPE)," within meaning of Individuals with Disabilities Education Improvement Act (IDEA), consists of educational instruction specially designed to meet unique needs of handicapped child, supported by such services as are necessary to permit child to benefit from instruction. Individuals with Disabilities Education Act, § 612(a)(1)(A), 20 U.S.C.A. § 1412(a)(1)(A).

See publication Words and Phrases for other judicial constructions and definitions.

**2. Schools ⟂148(2.1)**

Individuals with Disabilities Education Improvement Act (IDEA) does not obligate public school to furnish every special service necessary to maximize each dis-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


Chadrick Evans Fulks,                    )        C/A No.: 4:08-70072-JFA
                                         )        CR No.: 4:02-992-JFA
              Petitioner,                )
                                         )
v.                                       )        ORDER
                                         )
United States of America,                )
                                         )
              Respondent.                )
_____ )


On August 3, 2010, this court entered an order addressing all thirty-three claims

asserted by the petitioner in his § 2255 petition.  The court thereafter vacated the judgment,

upon motion of the petitioner, so that an official transcript could be filed in the case.  The

court reporter has now completed and filed the official transcript.

The Clerk is directed to vacate the August 3, 2010 order on the docket, and re-enter

the court's order[1] as of this date.  Judgment shall be entered forthwith.

        IT IS SO ORDERED.


August 20, 2010                                 Joseph F. Anderson, Jr.
Columbia, South Carolina                        United States District Judge

---

[1] Minor changes to the August 3, 2010 order have been made to reflect references to hearing
transcript pages that were renumbered when the official transcript was filed.

PA0172

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Chadrick Evans Fulks, | ) | C/A No.: 4:08-70072-JFA |
| | ) | CR No.: 4:02-992-JFA |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER ON MOTION |
| | ) | FOR CLARIFICATION |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

The petitioner has pointed out that, through inadvertence, this court's order of August 20, 2010, improperly granted a Certificate of Appealability for Claim 32 and did not mention Claim 33. It was the court's intention to grant a Certificate of Appealability for all Claims except for Claims 30, 31, and 32. Accordingly, the order of August 20, 2010 is hereby amended as follows: The Court has reviewed its order and pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 cases, issues a certificate of appealability as to Claims 1 through 29 and 33. As to Claims 30, 31, and 32, the petitioner has not made a substantial showing of the denial of a constitutional right, and therefore, a certificate of appealability is denied as to these Claims.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.

August 25, 2010                          Joseph F. Anderson, Jr.
Columbia, South Carolina                 United States District Judge

PA0173

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No. 4:02-992-JFA |
| | ) | |
| V. | ) | ORDER |
| | ) | ON MOTION TO ALTER OR AMEND |
| CHADRICK E. FULKS | ) | |
| | ) | |
| _____ | ) | |

INTRODUCTION

This matter is before the court upon defendant's motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend this court's order denying defendant's motion to vacate his sentence under 28 U.S.C. § 2255. The Rule 59(e) motion was timely filed and has been fully briefed by the parties. Additionally, the court heard oral argument on December 8, 2010, during which the defendant was present via video satellite. On alternative grounds (one procedural and the other substantive), the court denies the motion.

BACKGROUND

The extensive history of this case is set forth more fully in the court's order denying relief under § 2255, a copy of which is incorporated herein by reference. Briefly, the defendant, Chadrick Evans Fulks ("Fulks"), was sentenced to death by a South Carolina federal jury for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan. After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit[1] and the United States Supreme Court, Fulks returned to this court with a § 2255 motion to vacate, set aside, or correct his federal death sentence.

_____

[1] Fulks v. United States, 454 F.3d 410 (4th Cir. 2006), cert. denied 551 U.S. 1147 (2007).

1

PA0174

Contending that his trial counsel were constitutionally ineffective in a variety of ways, and that other violations of his constitutional rights rendered his death sentence infirm, Fulks asserted thirty-three claims in his § 2255 petition, as amended. The court found no merit to any of the grounds of error asserted and denied the petition in its 175-page order of August 20, 2010.[2] The court did, however, grant Fulks a certificate of appealability on all but three of his thirty-three claims.

The motion to alter or amend was filed by Fulks's newly-appointed counsel, Billy H. Nolas and Amy Gershenfeld Donnella, both of the Capital Habeas Unit of the Federal Community Defender for the Eastern District of Pennsylvania ("PCHU").[3] Mr. Nolas was appointed on August 27, 2010, and Ms. Donella was admitted as co-counsel on December 2, 2010. They are the fifteenth and sixteenth lawyers, respectively, who have represented Fulks during the pendency of the criminal and civil litigation at issue. Because their late involvement in the case impacts this court's ruling to a minor degree, it is necessary to recite in some detail, the course of events which led to the PCHU being involved in this case.

Following Fulks's indictment, the Magistrate Judge for this District, after a statutorily required consultation with the South Carolina Federal Public Defender, appointed John H.

---

[2] The original order denying relief was entered on August 3, 2010. The court vacated that order pending completion and filing of the official transcript of the evidentiary hearing. The final order (ECF No. 1344) and judgment (ECF No. 1345) were entered on August 20, 2010. On August 25, 2010, a one-page order was entered to clarify certain claims on which this court denied a certificate of appealability.

[3] The PCHU was formed in 1995 as an office of the Federal Public Defender for the Eastern District of Pennsylvania whose efforts are dedicated solely to capital habeas litigation. According to Fulks's motion to appoint PCHU, this unit has represented dozens of death-sentence prisoners in Pennsylvania's federal district courts, the third circuit, and four cases argued before the United States Supreme Court. The PCHU, as sole or supplemental counsel, represents individuals in capital § 2255 proceedings in multiple federal jurisdictions. Their office is funded by a grant of the Administrative Office of the United States Courts.

2

Blume   an attorney with extensive capital litigation experience who also teaches at Cornell Law, along with William Nettles   a long-time Federal Public Defender serving in the District of South Carolina, to represent Fulks.  Blume called to his assistance two other lawyers, Sheri Johnson and Keir Wyble, who both had capital litigation experience.

After Fulks's conviction was affirmed on appeal, this court appointed two attorneys to represent Fulks in his post-conviction relief efforts.  After an initial skirmish with Blume, who suggested that the court appoint different counsel, the court appointed Greenville, South Carolina attorneys William J. Watkins, Jr. and Beattie B. Ashmore to represent Fulks.  As detailed in previous orders of this court, both of these attorneys had extensive experience litigating in federal court.  Ashmore was primarily a criminal defense attorney with extensive courtroom experience, and Watkins, a former law clerk for the Fourth Circuit Court of Appeals, enjoyed a reputation as an excellent researcher and brief writer.

Shortly after Fulks's § 2255 petition was filed, Watkins accepted an appointment to serve as an Assistant United States Attorney for the District of South Carolina, thereby requiring that this court issue an order to substitute counsel.  As a replacement, the court chose Kirsten Small, an attorney with the South Carolina firm of Nexsen Pruett, who was also a former law clerk on the Fourth Circuit Court of Appeals with extensive brief writing and appellate advocacy skills.  Ashmore and Smalls were then joined by six lawyers from the California firm of O'Melveny & Meyers (David P. Dalke, Kymberleigh Damron-Hsiao, Amy J. Laurendeau, Stephanie L. Noble, Danielle N. Oakley, and Amy J. Longo), who entered the case on a pro bono basis and actually funded some of the investigation used in developing the claims in the § 2255 petition.

3

One other procedural development warrants special mention.  Fulks's initial § 2255 petition included an allegation that he had been sexually abused as a child, and that his trial counsel (Blume) was constitutionally ineffective for failing to fully explore this issue and develop it through testimony at trial.  Then on September 8, 2009, Fulks filed a pro se motion with the court (ECF No. 1231) in which he referred to the "lies of sexual abuse and also the wrongful representation of counsel in this case."  Later, in a status conference conducted on October 5, 2009, Fulks, who appeared at the conference via video satellite, informed the court that he did not want to go forward with the sexual abuse allegation and, further, that he was upset with his attorneys for having inserted this claim in the § 2255 petition without his consent.  When the court inquired of Fulks's counsel, counsel responded that they had already determined that the sexual abuse allegation would be dropped and that a motion to that effect would be forthcoming.  The court entered an order indicating that the sexual abuse claim was deemed abandoned.

After several postponements, including a lengthy delay occasioned by an appeal of a procedural ruling of this court to the United States Supreme Court, the matter was scheduled for an evidentiary hearing to commence on February 22, 2010.  Ten days before the hearing, counsel for Fulks filed a motion to once again raise the sexual abuse claim.  Counsel also sought a postponement of the evidentiary hearing and the authorization of additional expenditures for experts to further explore this issue.

Fulks's vacillation regarding whether the sexual abuse claim would be raised in this case mirrored his actions in other respects.  Specifically, on three separate occasions while this § 2255 action was pending, Fulks filed a motion to withdraw his appeals and proceed

4

with his execution.  On each occasion, he subsequently recanted and asked that the case go

forward.  On this record, the court denied the motion to continue the evidentiary hearing and

further exploration of the sexual abuse claim although, as will be seen, the court heard

extensive testimony regarding the sexual abuse allegations in the evidentiary hearing that was

eventually conducted.

On December 31, 2009, Fulks moved to appoint the PCHU as supplemental counsel.

After consulting with Fourth Circuit Court of Appeals Chief Judge William Traxler, and in

view of the fact that Fulks already had eight fully competent attorneys working on his behalf,

the court respectfully declined the motion to appoint two additional lawyers from the PCHU

to Fulks's § 2255 team.

After a six-day hearing in late February 2010, the court proceeded to address the

thirty-three claims raised in Fulks's § 2255 petition, issuing its 175-page order and judgment

on August 20, 2010.

On August 27, 2010, the court received a motion by Ashmore to withdraw as counsel

and to appoint Nolas of the PCHU, in his place. The court orally granted the motion and on

September 3, 2010, a written order was filed.  Fourteen days later, on September 17, 2010,

Nolas filed the motion to alter or amend presently before the court.  Appended to the motion

are the affidavits of seventeen individuals, dated between September 2 and September 16,

2010.  Notably, these affidavits were all obtained in a narrow window between the order

appointing Nolas to represent Fulks and the filing of the motion to alter or amend.  These

affidavits are in support of the four basic claims raised in Fulks's motion to alter or amend

which are as follows:

5

CLAIMS IN MOTION TO ALTER OR AMEND

(1) A contention that John Blume, Fulks's principal criminal trial attorney, did not possess the degree of capital litigation experience that had been represented to the court;

(2) A reassertion of arguments previously made to, and rejected by, this court that Blume rendered constitutionally ineffective assistance of counsel in a variety of ways, including principally the decision to recommend that Fulks (a) make a proffer to the government regarding Alice Donovan's abduction without any corresponding concessions from the government; and (b) admit guilt to the crime charged, thereby foregoing the guilt phase of the trial and proceeding directly to the penalty phase;

(3) A contention that this court erred in refusing to postpone the evidentiary hearing and allow further exploration of the sexual abuse issue and related expert testimony that might have derived from the alleged newly developed evidence; and

(4) A contention that, contrary to representations made by the government's attorney, special arrangements or concessions were made with regard to four witnesses who were called by the government in the penalty phase of the criminal trial.

STANDARD OF LAW

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 450 (1982).

"Rule 59(e) provides that a court may alter or amend the judgment if the movant shows either (1) an intervening change in the controlling law; (2) new evidence that was not available at trial; or (3) that there has been a clear error of law or a manifest injustice."

6

PA0179

<u>Robinson v. Wix Filtration Corp.</u>, 599 F.3d 403, 407 (4th Cir. 2010).

The court finds that there has been no intervening change in controlling law, nor has the defendant alleged that there has been a clear error of law.  Therefore, the only question before the court appears to be whether the evidence Fulks has now produced in seventeen new affidavits[4] was unavailable during the pendency of his § 2255 action.

The government responds in opposition to the motion arguing that the court should strike the additional affidavits supporting the Rule 59(e) motion because Fulks cannot show that this information was unavailable.  The government also contends that one or more of Fulks's claims are untimely and unauthorized successive § 2255 claims and that this court is without jurisdiction to hear such repetitive claims.  <u>United States v. Winestock</u>, 340 F.3d 200, 205 (4th Cir. 2003).

Because the court agrees with the government that Fulks cannot show that the information set forth in the seventeen post-judgment affidavits submitted was not available to Fulks or his counsel earlier, the court will strike all these affidavits as untimely under Rule 59(e).  Moreover, it clearly appears that at least one of the four issues outlined above (issue number 4) is untimely and unauthorized as a successive § 2255 claim under <u>Winestock</u>.  The court's decision to deny the motion to alter or amend rests upon these grounds.  Out of an

---

[4] On December 15, 2010, while this order was being drafted, Fulks's counsel filed additional exhibits to the motion to alter or amend including a declaration of Arlene Andrews (dated October 1, 2010); a second declaration of Amber Fowler (dated October 28, 2010); a letter from the prosecutors Scott Schools and Jonathan S. Gasser to John H. Blume III and William F. Nettles (dated August 19, 2003); and an exhibit of Jonathan Gasser's website listing his qualifications.

As was the case with the original seventeen declarations, there is no showing that any of the information contained in these new documents was not available earlier.  The additional four documents are therefore stricken for this reason.  Additionally, for substantive reasons discussed later in this order, the affidavits do not serve as the basis for altering or amending the judgment in this case.

PA0180

abundance of caution, however, and in the event that the Court of Appeals wishes to address these late issues on their merits, the court will issue an alternative ruling on the merits of the claims asserted in the present motion.

THE NEW AFFIDAVITS

The affidavits of H.F. Pete Partee and Lesley Coggiola, criminal defense lawyers who practice in Greenville and Columbia, respectively, indicate that Blume's participation in two state capital trials with them was of a limited nature. Partee and Coggiola, along with Mary Lou Newberger and Henderson Hill, criminal defense attorneys from West Virginia and North Carolina, respectively, all opine that Blume committed procedural error by advising Fulks to plead guilty and make a proffer to the government without any concessions in return. One affidavit also challenges Blume's failure to visit the scene of some of the events that occurred during the seventeen-day crime spree by Fulks and his co-defendant, Branden Basham.

All four of these individuals are active practicing attorneys, listed in phone books and various bar directories. Accordingly, they were clearly available for consultation prior to this court's August 20, 2010 order and judgment.

The next group of affiants, Lewis Lambert, Jr., Lewis Lambert, Sr., Kenneth Maynard, Odie Starks, and Mike Kaasee, are all individuals who were friends and neighbors of Fulks during his childhood. In their affidavits, they recount second-hand information regarding sexual abuse Fulks allegedly received as a child, although some of the information is cryptic and of limited probative value. There is no contention, let alone a showing, that any of these individuals were not available for interviews or to provide testimony prior to this court's

8

order and judgment of August 20, 2010.

The next affiant, Harry Krop, PhD, conducted a three and one-half hour interview with Fulks on September 13, 2010.[5]  During this interview, Fulks allegedly provided additional information regarding his sexual history.  Dr. Krop opines that he has never seen anyone who was "sexually victimized as often and by so many different adults as Mr. Fulks was."  Krop's declaration indicates that his interview with Fulks was done on a pro bono basis, with no indication as to why his pro bono activity could not have been performed earlier while the § 2255 case was actively pending before this court and while allegations of sexual abuse were being debated in the hearings that were conducted.

The next group of affiants are well-known to this court and to the lawyers involved in the case.  Drs. Margaret Melikian (forensic psychiatrist), James H. Hilkey (clinical forensic psychologist), and Seymour Halleck (forensic psychiatrist), all gave affidavits in support of the § 2255 petition.  These affidavits addressed Fulks's deprived childhood, the abuse (physical, emotional, and sexual) that they were aware of, and offered expert opinions as to Fulks's various disorders and problems.  The import of the initial affidavits at that time was that they had been retained by Blume as potential experts to be called at trial, but were jettisoned at the last minute and not called.  At the urging of Fulks's § 2255 counsel, and at great expense to the taxpayers, this court allowed these three witnesses to present live testimony at the § 2255 evidentiary hearing because, according to defense counsel, the court needed to have the benefit of seeing and hearing these important witnesses who were not

---

[5]  Krop previously submitted an affidavit on February 12, 2010, in support of the Fulks's motion to reinstate his sexual abuse claim.

9

called at Fulks's criminal trial. Melikian and Hilkey were put on the stand and testified extensively. For some unexplained reason, Halleck was not called, but the court did receive and consider his affidavit.

These three expert witnesses have all filed new affidavits indicating that had they known about the additional sexual abuse revealed by Fulks in his September 13, 2010 interview with Dr. Krop, their testimony regarding the effect of this abuse on Fulks's development would have been even stronger than it was in their original affidavits.

The final four affidavits relate to the contention that certain witnesses were promised favorable treatment by law enforcement in return for their testimony in contradiction to statements made by those witnesses at trial and statements made by the prosecuting Assistant United States Attorneys. Three of the affidavits are from the witnesses themselves: Beth McGuffin, Amber Fowler, and Veronica Evans. The fourth affidavit is from Amanda Oswalt, who did not testify at Fulks's trial but who purports to be a friend of Tina Severance (Fulks's former girlfriend), who did testify at trial. None of these affidavits constitute new evidence.

In their affidavits, Evans, McGuffin, and Fowler describe events that allegedly occurred during Fulks's 2004 criminal trial. Oswalt's affidavit centers on her alleged conversation in 2008 with Tina Severance. Thus, the information in these declarations was available long before this court issued its ruling on Fulks's § 2255 petition. Post-judgment declarations cannot serve as the basis for a Rule 59(e) motion when all of the events alleged therein occurred before the court entered judgment. Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 198 (4th Cir. 2006). Moreover, a party relying on new evidence "must

10

produce a legitimate justification for not presenting the evidence during the earlier proceeding.". Id. at 197. The reasons for non-compliance must be "compelling." Robinson v. Wix Filtration Corp., LLC, 599 F.3d 403, 410 n.9 (4th Cir. 2010).

In his Rule 59(e) motion, Fulks does not point to any reason, much less a compelling reason, why these declarations were previously unavailable.

On this record, the court is constrained to strike all the affidavits and deny relief on the motion to alter or amend. Nolas, newly-appointed counsel for Fulks, urged upon the court an argument that all of this information was developed in the narrow, fifteen-day window between the appointment of PCHU counsel and the filing of the motion to alter or amend. This proposition strikes the court as implausible, but is one which the court will accept as true for purposes of this motion. Nevertheless, as indicated by the brief summary recited above, none of the information contained in these seventeen affidavits was, in fact, previously unavailable. There was no impediment to Fulks's § 2255 counsel developing this information to the fullest prior to this court's lengthy evidentiary hearing and exhaustive 175-page memorandum opinion.

Indeed, the record in this case reflects that the court gave Fulks's § 2255 counsel *more* time than it gave Fulks's trial counsel to develop the record. Blume and Nettles were appointed as trial counsel on January 6, 2003. Jury selection for the trial began on May 10, 2004, thus giving Blume and the other trial attorneys a total of sixteen months to prepare for trial. The court appointed Watkins and Ashmore as § 2255 counsel on September 10, 2007. The § 2255 evidentiary hearing was not conducted until twenty-nine months later on February 22, 2010. The court took the matter under advisement and laboriously crafted its

11

PA0184

175-page opinion over the ensuing six-month period, rendering its decision on August 20, 2010. In other words, the preparation time between the appointment of habeas counsel and the § 2255 hearing was nearly *twice* as long for the § 2255 phase of this case as compared to the actual penalty phase trial.

It would set a bad precedent indeed for the court to permit capital litigants who, for the duration of this case have received what this court views to be first-class legal representation, to come forward with seventeen affidavits following immediately in the wake of this court's 175-page order, with no showing whatsoever that the information was not available earlier. The fact that counsel was able to glean this information within two weeks of the court's ruling strongly suggests that the information was readily available earlier.

The need for reasonable promptness and finality in capital litigation is clearly reflected in Fourth Circuit Court of Appeals Order 113 which provides, in pertinent part, "the district court is required to render a decision and enter a final judgment in a capital § 2255 action within 450 days of the date on which the petition is filed or sixty days after the date on which the case is submitted for decision, whichever is earlier, subject to an extension of up to thirty days if the district court determines that the ends of justice would be best served by the delay." See Judicial Council Order 113, Death Penalty Representation in the Fourth Circuit (Oct. 3, 1996). Absent an extension, Order 113 would have required a decision from the district court by September 15, 2009. This court wrote Chief Judge Traxler on July 24, 2009 requesting the thirty-day extension as allowed under Order 113. Chief Judge Traxler granted the extension on July 28, 2009, thereby setting a new decision deadline of October 15, 2009.

The Order 113 deadline was then thrown into a state of confusion when Fulks took

PA0185

an interlocutory appeal of an adverse ruling of this court regarding a discovery matter. Although the Fourth Circuit denied relief, the Supreme Court stayed this action pending resolution of an unrelated case on the issue of whether an adverse ruling on an attorney-client privilege issue may be appealed on an interlocutory basis   an issue that was ultimately decided adversely to Fulks. The court was powerless to comply with the time deadlines of Order 113 in light of the Supreme Court's stay, but did its best to handle the matter with dispatch once the stay was lifted and the case was returned to this district court. Such series of delays led in part to this court's decision to deny the effort to again postpone the February 2010 hearing so that Fulks could reassert his sexual abuse allegation after he had earlier personally indicated his firm intention to abandon this claim altogether.

The motion to alter or amend the judgment was filed on September 17, 2010, nearly a full year after the target judgment date of Order 113. This order is being rendered some four months later. Capital litigants simply cannot be allowed to sandbag the court by raising issues in affidavits that were readily available prior to judgment. Accordingly, the motion is denied on this basis.[6]

Alternatively, in the event that the Court of Appeals desires to address the issues raised in the motion to alter or amend on the merits, the court will proceed to review the four issues.

### 1. BLUME'S CAPITAL LITIGATION EXPERIENCE

Initially, Fulks argues that trial counsel John Blume, in his testimony during the § 2255 evidentiary hearing, "omitted crucial information about his lack of jury trial

---

[6] Additionally, the court finds issue number 4 to be barred under <u>Winestock</u>.

13

experience." Fulks submits the declarations of four attorneys, two of who state that Blume's involvement in two state capital trials was limited and was "far less extensive than suggested by his testimony." These two affiants, H.F. Pete Partee and Lesley Coggiola, were the lead attorneys in the two state death penalty trials to which Blume referenced in his Curriculum Vitae. At the § 2255 evidentiary hearing, however, Blume never testified that he was lead counsel, nor did he suggest that he played a key role in conducting voir dire or witness examination in those two state trials. Blume did not omit any information and neither of Fulks's habeas counsel asked him to provide details concerning his involvement in those state trials. Moreover, in its order appraising Blume's effectiveness, the court did not place any special significance on the depth of Blume's involvement in these two particular state trials.

Finally, and perhaps most importantly, this court was able to view Blume's trial performance firsthand. Unlike situations that frequently arise when federal courts are called upon to review the effectiveness of attorneys who represent state capital defendants in state court, this court was able to personally observe Blume's performance in its own courtroom. Moreover, as the presiding judge, the court was able to observe subtle events and nuances that are not discernable in a written trial transcript.

In addition to presiding over Blume's performance at trial, this court was given an extensive behind-the-scenes view of Blume's trial preparation at the § 2255 evidentiary hearing. As is set out in this court's order of August 20, 2010, Blume appeared to be a master organizer, formulating work assignments, charts, checklists, and multi-person review of all aspects of the events leading up to Fulks's trial. Accordingly, this court has no

14

hesitation whatsoever in concluding that Blume possessed the necessary requisites to perform quite capably as a courtroom lawyer during Fulks's penalty phase trial. The court reiterates and incorporates herein by reference all of its findings regarding Blume's trial performance from its August 20, 2010 order.

### 2. BLUME'S RECOMMENDATION THAT FULKS PLEAD GUILTY AND MAKE A PROFFER TO LAW ENFORCEMENT WITHOUT A CONCESSION IN RETURN

The affidavits of Partee and Coggiola both take issue with Blume's trial strategy regarding the guilty plea and the proffer to law enforcement. Additionally, two other lawyers, Henderson Hill of North Carolina and Mary Lou Newberger of West Virginia, have offered similar opinions.

Both of these claims were raised in the initial § 2255 petition, fully briefed and vigorously argued before this court issued its August 25, 2010 order. In fact, the court permitted Fulks's habeas counsel, at government expense, to call an expert witness, Andrea Lyons from Chicago, who offered an opinion on these very subjects. The court rejected Ms. Lyons' testimony in all respects. See Order of August 20, 2010 at 76 83 (relating to the FBI 302 Statement) and 92 94 (relating to the decision to plead guilty).

Because the court has already heard extensive testimony from a self-proclaimed expert in this area of the law and rejected it, the court cannot countenance an effort to supplement the record to boost arguments that have previously been determined unavailing by this court.

Additionally, Ms. Newberger, who served as second-chair to Blume when he was appointed by the Federal Court in West Virginia to represent Fulks in the Samantha Burns murder case, opines that Blume was ineffective for failing to personally review all of the

15

geographic locations involved in the seventeen-day crime spree engaged in by Fulks and his co-defendant Branden Basham. Such an argument is deficient in several respects. First, as noted above, Newberger was associated with Blume in the West Virginia criminal litigation which was concluded rather expeditiously when Fulks tendered a guilty plea and received an agreed upon life sentence. West Virginia does not recognize the death penalty in its state courts and apparently the United States Attorney in that district rather quickly concluded that the case could be disposed of by way of a stipulated life sentence. Blume's involvement in West Virginia, and Newberger's knowledge of it, was necessarily limited. Newberger does not know precisely what Blume did to prepare for the South Carolina litigation. Moreover, the evidence at the § 2255 hearing clearly disclosed that if Blume did not himself personally visit all the locations, his investigators certainly did. The court finds no error of constitutional dimension in Blume's failure to visit all of the many geographic locations that were identified during the testimony at trial.

3. THE SEXUAL ABUSE EVIDENCE AND RESULTING EXPERT TESTIMONY

The argument regarding new evidence of Fulks's sexual abuse begins with this court's decision not to postpone the evidentiary hearing (that had been set and rescheduled on several occasions) when Fulks sought to resurrect the sexual abuse claim ten days before the February 22, 2010 hearing. As recited earlier in this order, Fulks had personally, on the record, and in writing, expressed his strong desire to drop this claim, indicating that he did not wish to falsely accuse his parents of sexual misbehavior towards him while he was a child.

The reference to the court's failure to postpone the hearing also hints that the court

16

was particularly stingy with § 2255 counsel in terms of funds for investigative assistance. In this court's view, the court has been overly generous throughout the duration of this litigation in terms of providing tax-payer funded assistance to investigate and develop the issues in this case. All of the court's orders approving counsel's funding requests have been filed under seal and the government is not aware of the requests or the amounts. If, however, this issue is raised on appeal, this court hereby authorizes the unsealing of the funding records so that the Court of Appeals will have full access to the total amount of funds approved by this court for investigatory and expert assistance.

Turning to the merits of the sexual abuse issue, it should be noted that Blume himself testified that he felt that it was very likely that Fulks had been sexually abused but "when multiple members of the trial team asked Fulks about it, he denied any sexual abuse at the hands of his family members." Order at 33. In spite of Fulks's intransigence, counsel was able to develop some information regarding sexual abuse that was put before the trial jury and thoroughly discussed in this court's order. As this court noted, "[T]he trial record is replete with witness testimony that Fulks's childhood environment was filled with inappropriate sexual activity including the existence of graphic pornography on the walls and ceilings; that Fulks was molested by an older man when he was a child; and that he had a relationship with a '20-something' year old woman when he was fifteen." Id. Later, the court observed, "Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents . . ." Id. at 51. Still later, the court found that "trial counsel effectively presented evidence that

17

PA0190

petitioner's childhood was one of physical abuse, emotional neglect, sexual abuse, and self-medication with drugs and alcohol." Id. at 61 62. Finally, the court concluded that the mitigation testimony in this case "spanned four days and included some twenty-four witnesses, many of whom testified as to Fulks's deplorable living conditions as a child, surrounded by constant violence, alcohol and drug abuse, and many instances of sexual depravity." Id. at 144.

It can thus be seen that sexual abuse was a component of the mitigation testimony presented at trial and was developed by Blume to the extent practicable under the circumstances and in accordance with counsel's trial strategies. That Blume was unable to coax information regarding allegations of sexual abuse from family members is consistent with Fulks's statement directed to this court in a teleconference conducted on the record that he did not wish to allege that he was subjected to sexual abuse at the hands of family members. Additionally, none of the other fourteen lawyers who preceded Nolas and Donnella's involvement in this case were able to elicit sexual abuse information from Fulks either.

Fulks's present § 2255 counsel asked the court to accept the proposition that Fulks subconsciously repressed memories of family sexual abuse from the time that trial counsel's investigation in this case began (January 2003) until nearly eight years later (early September 2010). Fulks's revelations of sexual abuse included (1) a second-grade teacher; (2) a childhood friend, Gary Kaasee; (3) an older sister; (4) an adult female neighbor; (5) Fulks's stepfather; (6) an unidentified older man who forced Fulks to have sex with one of his close girlfriends; (7) Fulks's father who exposed him to sexual images; and (7) a teenage girl who

18

PA0191

taught Fulks how to perform sexual acts. Fulks revealed all of this activity to Dr. Krop in a three and one-half hour interview which Krop apparently accepted as absolute fact, leading to Krop's conclusion that Fulks was the most sexually victimized human being he had ever investigated.

It should also be noted that, as this court has previously found, Fulks has on several occasions demonstrated an uncanny ability to deceive others. See Order at 106 (detailing Fulks's successful impersonation of an FBI agent to rob two men on the highway); at 107 (setting forth Fulks's successful efforts to convince prison hospital authorities of severe pain to attempt an escape from the medical facility); and again at 107 (setting forth Fulks's ruse to a fellow jail inmate's mother that his mother-in-law had died, his wife was injured, and his infant daughter was in critical condition from a terrible automobile accident. The ruse was so successful that the jail inmate's mother bailed Fulks out of jail and loaned him her car so that he could travel to a distant hospital to visit his non-existent family. Fulks provided the mother with periodic progress reports on his family condition until the fifth day, when the car was supposed to be returned at which time the mother never heard from Fulks again). Suffice it to say that Fulks's recently-recalled incidents of family sexual abuse warrant a degree of skepticism at this juncture in the litigation.

Moreover, as set forth in detail above, evidence of sexual abuse by individuals was, in fact, put before the jury during the penalty phase trial, and considered by the experts who testified. All of this information is set out in detail in this court's August 20, 2010 order.

Finally, and of equal significance, is the fact that Blume himself recognized that evidence of repeated sexual abuse as a child could have been a double-edged sword. As the

19

PA0192

Seventh Circuit has observed regarding a § 2255 claim that evidence of the petitioner's damaged brain should have been presented to the jury:

> [J]urors may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that, when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate.

Burris v. Parke, 130 F.3d 782, 784 85 (7th Cir. 1997).

The same could be said for the failure to produce more evidence of sexual abuse. Simply explained, if Fulks's propensity towards sexually violent conduct directed at women    which was abundantly detailed in the record from Fulks's girlfriends and former wives    was caused by the extensive sexual abuse he suffered as a child, it does not mean that the jurors would have used this as a reason to decline to impose the death penalty.  Rather, they may have concluded that Fulks's violent sexual proclivities were due to forces beyond his control and that capital punishment was necessary to incapacitate Fulks from committing further violent sexual acts.  Thus, Fulks has not shown the prejudice prong required under Strickland v. Washington, 466 U.S. 668 (1984).

As this court has already noted, "[I]f it takes this [§ 2255] defense team, which is a very fine world-class team of defense attorneys, twenty-nine months and it still has not been able to ferret out any information about sexual abuse, especially when it is information that Mr. Fulks would be presumably in possession of . . . I think it's a real uphill battle to argue that Mr. Blume was ineffective in not developing it in the sixteen months he had." Order at 13.

4.   THE ALLEGED NEW EVIDENCE AND BRADY VIOLATION

In Claims 20 and 21 of the amended § 2255 petition, Fulks argued that his due process

rights under Brady v. Maryland, 373 U.S. 83, 87 (1963); Napue v. Illinois, 360 U.S. 264, 269

(1959), and their progeny, were violated by the prosecution's attempt to influence witness

testimony through intimidation tactics and improper deal-making, none of which was

disclosed to defense counsel.  In the motion to alter or amend, these claims are supplemented

by the affidavits of four women: Beth McGuffin, Amber Fowler, Veronica Evans, and

Amanda Oswalt.  Three of these individuals (McGuffin, Fowler, and Evans) testified at trial.

The other witness, Amanda Oswalt, did not testify at Fulks's trial, but claims in her affidavit

that in 2008 she had a conversation with Tina Severance, a witness who did testify.

To varying degrees, the affidavits of these individuals indicate that their testimony (or,

in the case of Oswalt, the testimony of Ms. Severance) at trial was perjured in that they were,

in fact, offered deals or were under threats at the time they gave their testimony.  Some of

the witnesses recant, at least in part, some of their substantive testimony, while the others

merely indicate that deals were made with them by the prosecution or their agents without

actually changing any of their substantive trial testimony.

Before delving into the specifics of the four affidavits, it should be noted that this

claim relates to the testimony of four out of 156 witnesses who testified in this case.  In many

respects, the testimony of the witnesses was corroborated by that of other witnesses.  In other

respects, the testimony was not entirely helpful to the government.

The four affidavits warrant a degree of skepticism because at the December 8, 2010,

hearing on the motion to alter or amend, defense counsel candidly admitted that she sought

21

PA0194

to allay any concerns that the witnesses might have regarding perjury charges that might be initiated by the government by telling the witnesses that "they would be protected by the court" with regard to new information or contradictory information contained in their affidavits. Specifically, defense counsel told the court at the December 8 hearing:

> Now, we sent an investigator out, we sent a couple of investigators out after we were appointed in the case to talk to these women again and to try and give them as many reassurances as we could that they would be protected by the court if they came forward and told the truth . . .

Tn. of Dec. 8, 2010 hearing at 54.

With these preliminary observations in mind, the court turns to the specifics of the declarations filed by the four individuals.

### BETH MCGUFFIN AFFIDAVIT

McGuffin was a childhood friend of Fulks's who spent the nights of November 15 and 16, 2002 with Fulks shortly before he was apprehended. Her testimony was the subject of a claim in the original § 2255 petition wherein Fulks argued that McGuffin was not properly prepared by defense witnesses when she testified at trial.

During her testimony at Fulks's penalty phase trial, McGuffin testified that nothing was promised to her in return for her testimony. TT Vol. 6 at 166.

In the declaration obtained after the § 2255 hearing, McGuffin indicates that from the time of Fulks's arrest, she was subject to multiple and confrontational interviews with West Virginia FBI agents who repeatedly accused her of complicity in the death of Samantha Burns.[7] McGuffin says that it was implied to her that if she did not testify against Fulks,

---

[7] Samantha Burns was the college co-ed who was abducted, raped, and killed in West Virginia.

22

PA0195

everyone in West Virginia would assume that she was involved with Samantha Burns's murder. McGuffin indicates that even after she testified, she moved back to West Virginia and to this day is harassed by the FBI regarding her potential involvement in the Burns murder.

As the government observes in its responsive memorandum, McGuffin's declaration does not come close to demonstrating government misconduct or suppression of material evidence. Even if FBI agents in West Virginia at some point suspected or accused McGuffin of complicity in Samantha Burns's murder, McGuffin does not state that the agents threatened her with charges if she did not testify at Fulks's trial. She states only that the FBI offered immunity in the Burns case if she revealed the location of the body. Even though she claims that FBI Agent Jeff Bruning told her "everyone in West Virginia" would think she "was a murderer" if she did not testify against Fulks, she does not claim that Agent Bruning threatened her with charges. Assuming, without deciding, that the West Virginia FBI agents "thought" McGuffin was involved in the Burns murder if McGuffin did not share what she knew, this does not lead to the conclusion that authorities were holding charges over McGuffin's head as a means of inducing her testimony.

AMBER FOWLER AFFIDAVIT

Amber Fowler was Fulks's first wife who testified primarily to sexual and physical abuse inflicted upon her by Fulks. This abuse included hitting her on the face and dragging her by her hair through the house. She testified that Fulks did not work and that he obtained money by breaking into cars and stealing the contents. She testified that she had at one time obtained a restraining order against Fulks, but then later reconciled with him. Regarding the

23

events of the murder, Fowler indicates that she and Fulks used to "park" where Samantha

Burns's car was found. Unlike the other women who testified, Fowler was not directly asked

if there were any deals offered to her in exchange for her testimony. She did, however,

indicate that she was told to testify as to nothing but the truth.

In her declaration of September 15, 2010, Fowler indicates that, when she was not

called to testify on a Friday as had been planned, FBI Agent Bruning gave her $400 for food,

lodging, and incidentals for the intervening weekend so that she could remain in South

Carolina and avoid a trip home to West Virginia over the weekend. She also indicates that

after she testified, she was "shocked" to get a check in the amount of $1,500 for per diem

expenses as a result of her South Carolina trip to testify.

The government responded with an affidavit from FBI Agent Jeff Bruning that he, in

fact, gave Fowler only $60. Attached to his affidavit is a handwritten receipt signed by

Fowler acknowledging that only $60 was paid. The receipt is witnessed by Assistant United

States Attorney Jonathan Gasser, one of the prosecutors in the Fulks case.

Fulks claims that the government "paid [Amber Fowler] off" in a thinly-veiled attempt

to influence her testimony. Fowler's affidavit also suggests that Agent Bruning told her that

she "had to show some emotion" during her testimony before the jury. Agent Bruning's

reply affidavit denies instructing Fowler to show emotion when testifying.

On this record, the court is constrained to deny relief as to this claim. First, as noted

above, most of Fowler's testimony was merely cumulative to other women who testified as

to the extensive physical and sexual abuse practiced upon them by Fulks during their

respective relationships. Although Fowler indicates that she was given what she believed to

24

be an excessive amount of money for expenses related to her testimony, she does not recant her testimony in any respect. Finally, whether the amount of cash paid to Fowler was $60 or $400, this amount, coupled with the $1,500 check, does not strike the court as excessive for an out-of-state government witness from West Virginia who was in Columbia, South Carolina for a week.

VERONICA EVANS AFFIDAVIT

Veronica Evans was Fulks's second wife, who also testified that she was abused on a regular basis while married to Fulks. She told the jury about being punched, dragged by the hair, and raped by Fulks. She also told them of an incident where Fulks poked her with an arrow, handcuffed her, punched her in the face, and then raped her. Evans testified that "no deals" had been offered to her in return for her testimony. Finally, Evans did admit that at one time she told one of her cell mates that she had been given a favorable deal, but at Fulks's trial she explicitly rejected this notion and said that she had lied to her cell mate in making this statement.

In her September 16, 2010 declaration, Evans now indicates that her testimony that she had no deals with the government was false. She says that at the time of trial testimony, she had been promised that her record would be expunged of convictions for child endangerment and receiving stolen property in exchange for her testimony against Fulks. Evans now says that she had also been threatened that if she failed to testify against Fulks, she would be brought into court for violation of her probation and returned to prison to serve a fifteen year sentence.

The court agrees with the government that this information is not material under

25

<u>Brady</u> for several reasons. To begin with, Evans's declaration is too vague to support a finding that the government made any undisclosed deals with her. Although she claims she "had been promised" an expungement in exchange for her testimony and "had been threatened" with a probation violation if she refused to testify, she does not identify who made the alleged threats or promises. Moreover, any incorrect statements that Evans made in her trial testimony regarding her probationary status were not material. Whether Evans had been released from probation, as she testified, or was on inactive status with supervision, as indicated by a court order appended to the motion to alter or amend, has no bearing on the substance of Evans's testimony about Fulks. Nor does it bear on her credibility.

Finally, as was the case with Amber Fowler, Evans's testimony regarding sexual and physical abuse by Fulks was entirely cumulative of that of the other women who testified at trial.

AMANDA OSWALT AFFIDAVIT

Oswalt did not testify at trial, but has submitted an affidavit regarding a conversation she had in September or October 2008 with Tina Severance, a witness who testified at Fulks's trial. Severance was a correctional officer who met Fulks in prison, developed a relationship with him, and accompanied Fulks and Basham on their seventeen-day crime spree after they escaped from a Kentucky jail. Unlike the other women who testified at trial primarily as to episodes of abuse by Fulks, Severance provided substantive testimony about the crimes committed and other actions taken by Fulks and Basham while they were fugitives.

At trial, Severance testified that she was not being paid for her testimony by any

26

source and that no "promises or rewards" had been offered to her in exchange for her testimony by the United States government or by state authorities in South Carolina or West Virginia.

Oswalt's declaration indicates that Severance lied at trial in several material respects. Oswalt says that Severance told her that, contrary to Severance's sworn testimony a trial, she "had a deal with the FBI and the government." The deal allegedly involved a probationary sentence for charges Severance was facing at the time. Oswalt claims that Severance told her "how it felt good that the FBI paid her to lie and that she was getting away with it." Oswalt indicates that "Tina said she knew Chad didn't kill anyone that she was happy that he was on death row." She also said "how happy she was that her deal allowed her to stay out of jail and put Chad on death row."

Regarding the substance of the Severance testimony, Oswalt's affidavit says that "Tina said that the FBI told her to say certain things about Chad. She didn't say what those things were. However, she did say that the FBI wanted her to lie about what Chad did in order to make him look worse than he already did."

It should be noted at the outset that the declaration regarding the Severance testimony was not offered by Severance herself. Rather, it is a hearsay assertion by Severance's friend, Amanda Oswalt. It purports to relate to a conversation Oswalt had with Severance in September or October 2008, precisely two years prior to the declaration being executed by Oswalt. It stains credulity to accept the notion that a third-party witness would wait two years to come forward with damning information and then provide that information in the narrow two-week window between the appointment of Fulks's new habeas counsel and the

27

PA0200

filing of a motion to alter or amend.

In addition, the declaration contains what must be considered as exaggerations, to say the least. For example, Oswalt quotes Severance as saying that she knew that Fulks did not commit the murder, that she was "glad" that she had helped "frame" Fulks. There is no way that Severance could know for a fact whether Fulks or Basham, or both, committed the murder of Alice Donovan. By her own testimony, Severance was not with Fulks and Basham when the abduction and subsequent murder of Donovan occurred. Accordingly, the hearsay statement by Oswalt, even if accepted as true, contains a statement by Severance that is not based upon first-hand information.

Oswalt's declaration is quite simply insufficient to support a finding that the government improperly influenced Severance's trial testimony. The witness only claims to have heard Severance say that "the FBI and the government" offered her probation, "paid her," and instructed her to "lie about what Chad did." Oswalt states that Severance did not reveal what the government authorities had told her to say. In other words, Oswalt's double-hearsay declaration claims that, according to what Severance told Oswalt, some unidentified FBI and government agent or agents, at an unspecified time and place, instructed Severance to say something false about Fulks's activities. As noted above, there is no declaration from Severance corroborating that this alleged deal took place or even confirming a conversation ever took place between Oswalt and Severance. Oswalt's declaration provides no basis for finding that a deal existed or that the government suppressed it in violation of <u>Brady</u>.

Finally, Severance's testimony was corroborated in many respects by the testimony of another witness at Fulks's trial, Andrea Roddy.

THE DECEMBER 2010 AFFIDAVITS AND EXHIBITS

The additional exhibits filed on December 15, 2010, merit little discussion. The first is a declaration of Arlene Andrews, Professor of Social Work at the University of South Carolina School of Social Work. She was retained by Blume as a potential witness, but was not called at Fulks's trial. Her affidavit indicates that she has now reviewed the declaration of Dr. Harry Krop, and now realizes that there is additional, significant information regarding Fulks's sexual abuse. She contends that the sexual abuse experienced by Fulks was a "defining moment of his childhood" and that his "history of sexual abuse is one of the most extreme that I have seen."

It can readily be seen that the Andrews declaration is cumulative to those offered by Drs. Melikian, Hilkey, and Halleck, which the court incorporates by reference its discussion of the declarations of these three witnesses. See pp. 17  21 infra.

AMBER FOWLER AFFIDAVIT OF OCTOBER 28, 2010

In this supplemental affidavit, Fowler reiterates her earlier contention that FBI Agent Jeff Bruning gave her $400, not $60 cash as spending money when she was required to stay in South Carolina over a weekend after not being called to testify on a Friday. She also reiterates her earlier contention that Agent Bruning told her to show more emotion during her testimony. There is no reference to the signed receipt for $60 witnessed by then-AUSA Jonathan Gasser that accompanied the counter-affidavit of Agent Bruning.

The supplemental Fowler affidavit essentially restates the original affidavit submitted by this witness and merits no further discussion here.

29

THURMOND/SCHOOLS/GASSER LETTER

The third exhibit is an August 13, 2003 letter from the AUSA's prosecuting this case to Fulks's trial attorneys Blume and Nettles dealing with a variety of pretrial matters. No indication is given as to the significance of this letter, nor which of the myriad claims asserted in this action the letter relates to. Nevertheless, the court has carefully reviewed the letter and finds no basis for disturbing its earlier order.

CREDENTIALS OF FORMER AUSA JONATHAN GASSER

The final document is a Curriculum Vitae ("CV") of Jonathan Gasser, the AUSA who was one of the government's principal trial attorneys in Fulks's penalty phase trial. The CV is apparently taken from the website of the private law firm that Gasser is presently associated with, the Law Firm of Harris and Gasser in Columbia, South Carolina. Included in the CV is a description of Gasser's litigation experience, with a brief mention of the Fulks case and the significant issues presented in that criminal trial.

Again, no indication is given as to the significance of this document, nor its relationship to the claims asserted. Nevertheless, the court has carefully reviewed the document and finds nothing contained therein which warrants an alteration or amendment of the judgment previously entered in this case.

CONCLUSION

For all the foregoing reasons, the motion to alter or amend is denied.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.

January 13, 2011                           Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge

30

PA0203

FILED: June 26, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 11-3
(4:02-cr-00992-JFA-1)
(4:08-cv-70072-JFA)

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CHADRICK EVAN FULKS

Defendant - Appellant

_____

J U D G M E N T

_____

In accordance with the decision of this court, the judgment of the district

court is affirmed.

This judgment shall take effect upon issuance of this court's mandate in

accordance with Fed. R. App. P. 41.

/s/ PATRICIA S. CONNOR, CLERK

PA0204

**512**                     **683 FEDERAL REPORTER, 3d SERIES**

pornography receive enhanced minimum and maximum sentences. *See, e.g., Sinerius,* 504 F.3d at 743 ("In short, § 2252A does not simply mandate a sentencing enhancement for individuals convicted of state offenses *equivalent* to sexual abuse. Rather, it mandates the enhancement for any state offense that stands in some relation, bears upon, or is associated with that generic offense"); *see also Sonnenberg,* 556 F.3d at 671; *Hubbard,* 480 F.3d at 347; *United States v. McCutchen,* 419 F.3d 1122, 1127 (10th Cir.2005).

At oral argument, Colson's counsel argued that because the language of the Virginia statute appeared to cover the prosecution of individuals who produce lewd exhibitions that have *fictional* children as their subject, a conviction under the statute would not qualify as a predicate offense under § 2252A(b)(1). But this argument fails to recognize that Virginia has not applied its statute to the circumstances that Colson posits. *See Freeman,* 288 S.E.2d at 465–66 ("Freeman also contends that the statute is overbroad because, he says, it sweeps within its purview 'artists and sculptors whose work requires no models at all more than imagination.' *The statute does not reach so far.* The conduct it defines is penalized *only when 'a person less than eighteen years of age' has been used as a model in the production of child pornography* " (emphasis added)); *see also United States v. King,* 673 F.3d 274, 279 (4th Cir.2012) (when applying the categorical approach "we are bound by a state supreme court's interpretation of state law" (internal quotation marks and alterations omitted)). Moreover, Colson's argument would impermissibly require an unconstitutional construction of the Virginia statute. *See Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (finding the Child Pornography Prevention Act of 1996 unconstitutionally overbroad, in part,

because it proscribed *virtual* child pornography involving imaginary children).

In short, the language of the Virginia statute and the fact of Colson's conviction demonstrate categorically that Colson was convicted in 1984 of producing or attempting to produce lewd visual material, utilizing a minor to assume an erotic or provocative pose. We conclude that a conviction on this conduct "relates to" the "physical or nonphysical misuse or maltreatment of a minor for a purpose associated with sexual gratification." *See Diaz–Ibarra,* 522 F.3d at 352. Accordingly, we hold that Colson's prior 1984 conviction under Virginia Code § 18.2–374.1(B) categorically qualifies as the type of conviction Congress sought to include as a predicate conviction within 18 U.S.C. § 2252A(b)(1)'s broadly phrased sentencing enhancement. The judgment of the district court is

*AFFIRMED.*



**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Chadrick Evan FULKS, Defendant–
Appellant.**

**No. 11–3.**

United States Court of Appeals,
Fourth Circuit.

Argued: March 20, 2012.

Decided: June 26, 2012.

**Background:** Following affirmance of his death sentence, 454 F.3d 410, defendant moved to vacate. The United States District Court for the District of South Car-

olina, Joseph F. Anderson, Jr., J., 2010 WL 3069390, denied defendant's motion and, 2011 WL 116138, denied defendant's motion to amend or alter judgment. Defendant appealed.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

(1) defense counsel provided effective assistance;

(2) sentencing court properly instructed jury on issue of mitigation; and

(3) government's approach to defendant's trial and co–defendant's trial was not inconsistent at its core.

Affirmed.

**1. Criminal Law ⚷1139, 1158.1**

Court of Appeals reviews de novo the district court's conclusions of law underlying its denial of a motion to vacate a sentence, and the district court's findings of fact derived from the evidence adduced at its hearing are reviewed for clear error. 28 U.S.C.A. § 2255.

**2. Criminal Law ⚷1519(4)**

Defendant seeking collateral relief from his conviction or sentence under *Strickland* must demonstrate both that counsel's performance was deficient, and that the defense was thereby prejudiced. U.S.C.A. Const.Amend. 6.

**3. Criminal Law ⚷1871**

Under *Strickland*, courts indulge a strong presumption that counsel performed reasonably. U.S.C.A. Const. Amend. 6.

**4. Criminal Law ⚷1883**

To make a claim of ineffective assistance of counsel under *Strickland*, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; the required "reasonable probability" is a probability sufficient to undermine confi-

dence in the outcome. U.S.C.A. Const. Amend. 6.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Criminal Law ⚷1883**

*Strickland* analysis of whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different requires the court deciding an ineffective assistance claim to consider the totality of the evidence before the judge or jury; the court is not bound to view the facts in the light most favorable to the prosecution and the requisite prejudice may be established short of showing that adequate performance would have resulted ultimately in the defendant's acquittal. U.S.C.A. Const. Amend. 6.

**6. Criminal Law ⚷1920**

Defense counsel's decision to have defendant speak to authorities, ostensibly due to desire to tell truth and help locate victim's body, and then plead guilty did not constitute ineffective assistance in prosecution for, inter alia, carjacking and kidnapping resulting in death, even though counsel obtained no palpable quid pro quo from government, where, in face of overwhelming evidence of defendant's guilt, decision was made to achieve "best case scenario" of avoiding death penalty by getting defendant's version of events on record and demonstrating acceptance of responsibility and some indicia of remorse, and there was little, if any, chance that jury would have made different recommendation than capital sentence it imposed. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1201, 2119(3).

**7. Jury ⚷133**

Sentencing court's determination that defense counsel's questions at voir dire did not harm defendant's case was not clear

error, even if court, at co–defendant's sentencing, warned co–defendant's counsel not to follow defense counsel's pattern of giving long fact patterns and then asking if juror would impose death penalty, forcing court to clarify each juror's response, where determination was based on court's first–hand, contemporaneous perception of dialogue between jurors and counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1201, 2119(3).

**8. Criminal Law ⚖1901**

Defense counsel's performance in selecting capital jury was reasonably effective, precluding defendant's claim of ineffective assistance in prosecution for, inter alia, carjacking and kidnapping resulting in death, even though counsel allowed three jurors to be seated notwithstanding assessment that these jurors were unfavorably disposed to defendant's cause; most defendant could assert was that counsel could have empaneled marginally more sympathetic jury by electing to seat three different jurors, but any determination that resulting jury would have imposed life sentence, rather than death sentence actually imposed, was speculative. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1201, 2119(3).

**9. Jury ⚖108**

Sentencing court is required to exclude those potential capital jurors who would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law.

**10. Sentencing and Punishment ⚖1780(3)**

Sentencing court properly instructed capital jury on issue of mitigation, in prosecution for, inter alia, carjacking and kidnapping resulting in death, where instruction informed jury that there was "no limit" on what it could consider in mitigation, and specifically directed that any juror persuaded that mitigating factor

existed was required to consider it, and fact that at least one juror found 32 of 43 proffered mitigating factors present, with 22 being found unanimously, showed that jury's discretion and compassion were not impermissibly curtailed. 18 U.S.C.A. §§ 1201, 2119(3).

**11. Criminal Law ⚖1983**

Government's approach to defendant's trial and co–defendant's trial was not inconsistent at its core, precluding defendant's due process claim in his prosecution for, inter alia, carjacking and kidnapping resulting in death, even if government used inconsistent argument concerning vagueness of co–defendant's potentially inculpatory statements, where core theory in each case was that both defendant and co–defendant were equally culpable for victim's death, and were similarly deserving of capital sentence regardless of which one actually killed victim, and there was no material variance in facts proved to establish victim's death at hands of defendant and co–defendant. U.S.C.A. Const. Amend. 5; 18 U.S.C.A. §§ 1201, 2119(3).

———

**ARGUED:** Billy Horatio Nolas, Amy Gershenfeld Donnella, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Thomas Ernest Booth, United States Department of Justice, Washington, D.C., for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, Robert F. Daley, Jr., Assistant United States Attorney, Office of the United States Attorney, Columbia, South Carolina; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, Scott N. Schools, Associate Deputy Attorney General, United States Department of Justice, Washington, D.C., for Appellee.

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge WILKINSON and Judge AGEE joined.

## OPINION

KING, Circuit Judge:

Having pleaded guilty in the District of South Carolina to all eight counts of a superseding indictment, Chadrick Evan Fulks was, on the recommendation of a jury, sentenced to the death penalty. The capital sentence was imposed on Fulks's convictions of Counts One and Two of the superseding indictment, respectively, carjacking resulting in death, in contravention of 18 U.S.C. § 2119(3), and kidnapping resulting in death, as proscribed by 18 U.S.C. § 1201. The federal charges in South Carolina related to the abduction and murder of Alice Donovan on November 14, 2002, in the course of a multistate crime spree engineered by Fulks and his cohort, Brandon Basham, following their escape from a Kentucky jail. Three days prior to Donovan being carjacked, kidnapped, and killed, Samantha Burns suf-

fered the same fate in West Virginia at the hands of Fulks and Basham.

The district court sentenced Fulks on December 20, 2004, and, on appeal, we affirmed his sentence in all respects. *See United States v. Fulks,* 454 F.3d 410 (4th Cir.2006).[1] The Supreme Court, on June 25, 2007, denied Fulks's petition for certiorari. On June 23, 2008, in accordance with 28 U.S.C. § 2255, Fulks filed a motion in the district court seeking to vacate his conviction and sentence, and thereupon to be tried anew.[2] The motion, as amended, encompassed thirty-three discrete claims for relief, with respect to which the court conducted an evidentiary hearing beginning on February 22, 2010, and concluding on March 1, 2010. *See* 28 U.S.C. § 2255(b).

Upon due consideration, the district court issued an exhaustive memorandum opinion and order rejecting each proffered claim. *See United States v. Fulks,* No. 4:02–cr–00992 (D.S.C. Aug. 20, 2010) (the "Opinion").[3] The court nonetheless granted a certificate of appealability as to Claims 1 through 29 and Claim 33.[4] From that order and a subsequent one entered on January 13, 2011, denying his motion to

---

**1.** Our prior opinion on direct appeal detailed the grim events culminating in the demise of the two women, and, except as necessary to provide context for the proceeding now before us, we will not repeat them here.

**2.** A federal prisoner may move to "vacate, set aside or correct" a sentence that is, inter alia, "not authorized by law or otherwise open to collateral attack," or to request appropriate relief if "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment [of conviction] vulnerable to collateral attack." 28 U.S.C. § 2255(a), (b). In the typical proceeding, of which Fulks's is one, the motion is required to be made within one year of "the date on which the judgment of conviction becomes final." § 2255(f)(1). Having been filed two days prior to the first anniversary of the date on which the Supreme Court de-

clined review of his direct appeal, Fulks's § 2255 motion was timely.

**3.** The unpublished Opinion is found at J.A. 100123–297 (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.)

**4.** *See* 28 U.S.C. § 2253(c)(1)(B), (c)(2) (confining § 2255 appeals to issues certified by federal justice or judge as presenting "a substantial showing of the denial of a constitutional right"). The August 20, 2010 "Order Denying Petition for Relief Under 28 U.S.C. § 2255" replaced the court's August 3, 2010 order, which was vacated pending filing of the official transcript memorializing the evidentiary hearing. On August 25, 2010, the district court entered a one-page clarifying order with respect to its ruling on the certificate of appealability.

alter or amend the judgment, *see* Fed. R.Civ.P. 59(e), Fulks timely filed a notice of appeal on March 2, 2011, maintaining that the district court erred in denying him relief on seven of his claims. We possess appellate jurisdiction over the judgment against Fulks pursuant to 28 U.S.C. §§ 1291, 2253(a), and 2255(d). For the reasons that follow, we reject his assignments of error and affirm.

## I.

Six of Fulks's seven live claims allege that his lawyers at the sentencing proceeding and on direct appeal were constitutionally ineffective. At the outset, Claim 7 criticizes counsel's decision to have Fulks give an inculpatory statement to the FBI, with no prior stipulation of use or negotiated plea agreement in place. Fulks subsequently entered a guilty plea, likewise without reservation, and he contends, through Claim 28, that the tactic unreasonably ceded valuable rights with no commensurate benefit. Though it was hoped that his plea would indicate that Fulks had accepted responsibility for his actions, he argues that counsel should have deemed such hope forlorn, unlikely to carry any weight with the sentencing jury.

That jury, according to Fulks, was unconstitutionally predisposed to recommend death. The jury's predisposition, the argument goes, was the result of counsel botching the voir dire (Claim 15), neglecting to discover and follow up on a juror's failure to answer an important part of her questionnaire (Claim 16), and choosing to seat three venirepersons the defense perceived hostile to Fulks, rather than exercising peremptory challenges (Claim 17).

Insofar as the jurors were willing to keep an open mind and consider evidence in mitigation of the death penalty, Claim 5 asserts that they were impermissibly hindered in that task by one of the district court's instructions on that topic. Though

counsel objected to the given instruction and preserved the putative error for potential review, Fulks maintains that not pursuing the issue on direct appeal constituted ineffective assistance.

Finally, in Claim 19, Fulks mounts a due process challenge against the government's use of statements uttered by Basham to the Brunswick County, North Carolina, Sheriff. Basham made the statements while assisting the Sheriff and others in locating Donovan's remains, and the government referred to them in both Fulks's and Basham's proceedings. Fulks accuses the government of conducting itself in a fundamentally unfair fashion by portraying the statements in different and inherently inconsistent ways, depending on which defendant was under jury scrutiny.

## II.

**[1]** We address each of the above contentions in turn, reviewing de novo the district court's conclusions of law underlying its denial of Fulks's § 2255 motion. *See United States v. Stitt,* 552 F.3d 345, 350 (4th Cir.2008). The court's findings of fact derived from the evidence adduced at its hearing are reviewed for clear error. *Id.*

## III.

### A.

**[2, 3]** The Sixth Amendment to the Constitution secures to all criminal defendants "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citation omitted). A prisoner seeking collateral relief from his conviction or sentence under *Strickland* "must demonstrate both that counsel's performance was deficient, and that the defense was thereby prejudiced." *Tice v.*

*Johnson,* 647 F.3d 87, 102 (4th Cir.2011). In view of the latitude customarily afforded criminal defense lawyers in formulating strategy, deficient performance will not be adjudged unless, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We are thereby constrained to "indulge a strong presumption" that counsel performed reasonably. *Id.* at 689, 104 S.Ct. 2052.

[4, 5] In the event that the presumption of reasonable performance is successfully rebutted, relief remains unavailable "if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The defendant must therefore demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The analysis "requires the court deciding the ineffectiveness claim to 'consider the totality of the evidence before the judge or jury.'" *Elmore v. Ozmint,* 661 F.3d 783, 858 (4th Cir.2011) (quoting *Strickland* at 695, 104 S.Ct. 2052). In evaluating the evidence, however, "[w]e are not bound . . . to view the facts in the light most favorable to the prosecution," *Tice,* 647 F.3d at 111, and the requisite prejudice may be established short of showing that adequate performance "would have resulted ultimately in the defendant's acquittal," *id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). As dictated by *Kyles* and *Tice,* then, Fulks may prevail on the prejudice prong though he be unable to show that competent counsel would have secured for him a life sentence, rather than death.

1.

[6] Fulks's statement to the FBI on April 21, 2003, about five months after his arrest, was made ostensibly because he "wanted to tell the truth and help . . . locate the body of Alice Donovan." J.A. 201893. The statement related, in pertinent part: (1) Basham carjacked Donovan's BMW and kidnapped her in a parking lot while Fulks circled in another stolen vehicle; (2) Basham carried a revolver, but Fulks was unarmed; (3) Basham raped Donovan in the car's backseat and pressured a reluctant Fulks to do the same; (4) Basham taped Donovan's wrists afterward; (5) upon stopping at a secluded area, Basham led Donovan into the woods while Fulks waited; (6) at Donovan's request, Fulks tried to dissuade Basham from taking the gun into the woods, to no avail; (7) Basham returned about twenty minutes later, carrying Donovan's few remaining clothes; (8) Basham initially said that Donovan had been tied up, but later that day admitted that he had strangled her; (9) Basham talked about murdering another woman two years prior and asked Fulks whether he had ever killed anyone, to which Fulks responded in the negative; and (10) during a later disagreement, Basham pointed the revolver at Fulks's head. *See id.* at 201893–98.

Fulks's statement had no strings attached. It was not exchanged for the promise of a reduced sentence; nor was it given in the form of a limited-use proffer, as is sometimes done in the course of negotiating a plea agreement. An expert for Fulks, Andrea Lyon, opined at the § 2255 hearing that the gratuitous statement was an unreasonable choice without first "get[ting] some kind of protection for him," J.A. 200951, or "at the very minimum . . . the conversation itself [being] protected," *id.* at 200953. Lyon testified

that, otherwise, "there's nothing to gain for the defendant." *Id.* at 200952.

John Blume, the lead defense counsel, retorted that he did not wish to subject Fulks to cross-examination by having him testify at the sentencing trial, and that, through the statement, Fulks "could get out his version of the events, which was that he was not the actual killer, and then the government would hopefully admit this at trial as Mr. Fulks' version of the offense." J.A. 200725–26. Blume insisted that he "didn't want a proffer ... we wanted the statement to be used" at trial, *id.* at 200726, clarifying that "we wanted it to demonstrate ... acceptance of responsibility [and] ... some true indicia of remorse." *Id.* at 200727.

Blume acknowledged that having Fulks go through with the statement committed the defense to the entry of a guilty plea about one year later, on May 7, 2004, but that both decisions were intended to achieve the "best case scenario" of avoiding the death penalty. J.A. 200732. Blume "didn't see any credible defense or issue" that would lead to a verdict of not guilty. *Id.* at 200729. Consistent with that view, Blume confronted his client with the unvarnished truth, as he saw it: "You know, Chad, they are going to find you guilty. And even if they accept everything you say is true in your [statement], you are guilty of the charged offenses. And I think the best chance to try and save your life is for you to plead guilty." *Id.* at 200733.

The facts establishing Fulks's involvement in the events leading to Donovan's death were, as Blume astutely surmised, beyond peradventure. Although there were no eyewitnesses to the murder other than the principals, one of the prosecutors submitted a sworn declaration that "[t]he investigation quickly developed independent evidence implicating Fulks and Basham in both murders [South Carolina and West Virginia], and the evidence regarding the South Carolina murder was particularly strong." J.A. 201956; *see also* Opinion 81 ("Independently of his statement, Fulks's guilt was not subject to any reasonable dispute."). The evidence was provided by members of the culprits' entourage who accompanied them during portions of their escapades, police officers and ordinary citizens who encountered them along the way, and physical items such as surveillance videos and credit card records. *See* J.A. 201956–58.

The compelling case against Fulks left his lawyers with little leverage for negotiation. Defense counsel engaged in ongoing discussions with the government concerning Fulks's willingness to cooperate, and, in particular, to assist the authorities in locating Ms. Donovan's body. The government made clear at the outset that it "had no interest in receiving that information under conditions that would not allow the use of the information directly or derivatively," and it "insist[ed] that information be provided without restriction." J.A. 201958.

The government's position was based in large part on the strength of the case against Fulks and Basham, and it was consistent with the prior rejection of Basham's proffer of cooperation in exchange for a life sentence. Of note here, the government turned down Basham at a time when the information derived from its investigation "was less extensive and the evidentiary value of locating the remains was greater." J.A. 201959. There was, therefore, "no reason in April 2003 to treat Fulks more favorably." *Id.* The uncontroverted evidence in the record shows that the government had informed Fulks that it would not negotiate a protected statement and, indeed, that the government "would have foregone any interview of Fulks rath-

er than receive information from him that could not be used against him." *Id.*

Nonetheless, according to defense expert Lyon, Fulks should not have volunteered any statement, nor should Blume have arranged for a guilty plea, regardless of the strength of the government's case. Lyon testified that a competent defense attorney would never do either absent an appropriate concession from the prosecution, and she suggested that the benefits cited by Blume supporting his strategy were largely illusory. Lyon indicated that Fulks could have gotten his story before the jurors through the mental health experts retained by the defense, and she was dubious that a sentencing jury, on the whole, would ever give a capital defendant any credit in mitigation for pleading guilty. *See* J.A. 200951–64.

Lyon's opinion as to the latter point appears to run counter to a simulation conducted on Fulks's behalf by a jury consultant, the results of which were memorialized in a memorandum dated March 9, 2004. Therein, the consultant recorded that several jurors in the mock proceeding "did find in fact that Chad's guilty plea was mitigating and remorseful." J.A. 201964. And, at the close of the actual sentencing trial, held throughout June 2004, the jury unanimously found—as a mitigating factor—that Fulks had pleaded guilty to the capital charges. *See id.* at 201816. Moreover, Lyon's suggestion that Fulks "testify" through his own witnesses ignores the likelihood that the jurors would give his version of events more attention and credence if relayed to them by a prosecution witness. Indeed, the government responded as Blume predicted, by calling one of the FBI agents who interviewed Fulks to present his statement to the jury.

We conclude that, given the unpalatable hand the defense team was dealt, having Fulks speak to the authorities and then plead guilty were reasonable litigation tactics, though Blume obtained no palpable quid pro quo from the government. Further, counsel's approach engendered no prejudice at sentencing, there being little, if any, chance that the jury would have made a different recommendation had Fulks instead stood silent or if his guilt had been found instead of admitted. Insofar as Fulks ventures beyond sentencing prejudice to argue that an acquittal was reasonably probable had the capital charges gone to trial with no inculpatory statement in the record, we readily reject that contention. In view of the totality of the evidence, we are confident that, under either strategy, the outcome of the guilt phase would have been the same.

2.

a.

**[7]** The parties engaged in jury selection from May 10–21, 2004, with Blume examining eight of the twelve jurors eventually seated. Lyon took strong issue with Blume's questioning, calling it "some of the worst voir dire I have ever read in my life." J.A. 200969. Lyon scoffed that "there's just pages and pages of him ... making speeches at the jurors, and then asking the juror to say yes or no to a question that gets lost in the middle." *Id.* On August 4, 2004, at the outset of voir dire in the Basham sentencing, the district court cautioned the defense lawyers against taking the same tack as Blume had several weeks previously:

You know from what you saw in the first go-round that ... I asked a juror the standard questions under the Supreme Court decisions on death-qualified jurors[,] ... ["]Do you have such strongly held beliefs about the death penalty that you could not set-aside those beliefs and conscientiously follow the law as announced by the judge?["]

\* \* \*

And, so, after I went through all of that, then Mr. Blume got up and on several witness jurors, ["]Mr. Juror, let's say you have a case where someone is over 18, not under a mental disability, not acting under duress, not acting in self-defense who commits a murder. Would you give that person the death penalty?["]  The juror said, ["]Yes, I would.["]  And every time I would have to then go back and say, ["]Now, Mr. Juror, you told me one thing, and you told Mr. Blume something else, have you changed your answer?["]  And the juror would be confused . . . [,] and almost every time the juror said, ["]Oh, no, no, no, I didn't mean to tell Mr. Blume that. I didn't understand him to ask me that question.["]

The result was, I think Mr. Blume really paid a price with the jurors because it looked like he was trying to trick them, to be honest with you.  And I just say that for [your] benefit.  You need to decide whether you are going to go down that same road or not.

*Id.* at 400446–48.

Fulks posits that the jury's recommendation of death manifested its dislike of Blume.  Squarely confronted with Fulks's hypothesis, the district court thought the notion invalid, announcing that it was "constrained to disagree with [the] contention that Blume's questions to prospective jurors were rambling, confusing, intimidating, or otherwise ineffective."  Opinion 116.  The court continued, "[the] bald allegations that the questions posed by Blume were improper, ineffective, or offensive to jurors [are] unavailing."  *Id.* at 116–17.

Having overseen the entirety of the jury selection process, the district court's opportunity to gauge the effect of counsel's questions was unparalleled.  The court's determination that Blume's voir dire did not harm his client's case, derived from its contemporaneous perception of the dialogue between the jurors and counsel, is a finding of fact to which we cannot ascribe clear error. *See Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (explaining that presiding court's assessment of juror bias or prejudice at voir dire is entitled to "special deference" as "essentially one of credibility, and therefore largely one of demeanor").

Although the district court appeared to express its disapproval of Blume's technique to Basham's lawyers, we do not perceive its comments on that occasion as fundamentally inconsistent with its finding here.  The court's offhand observation that a lawyer was less than optimally effective in no way mandates a conclusion that he was constitutionally ineffective.  Furthermore, we highly doubt that the court would have left the door open for Basham's counsel "to go down that same road" if it believed the jury would be impermissibly tainted as a result.

b.

[8]  Fulks contends that the jury that determined his fate was not the fair and impartial factfinder mandated by the Constitution.  For that, Fulks blames Blume, who allowed three jurors to be seated notwithstanding an assessment that they were unfavorably disposed to Fulks's cause.  One of those jurors was selected after neglecting to apprise the parties that her first husband had been the victim of a murder.  Fulks maintains that counsel's failure to detect the omission was another example of deficient performance substantially increasing the likelihood that the jury would recommend a death sentence.

The defense team employed a common technique known as the "Colorado Method" to rate potential jurors on a scale from 1 to 7, "with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give

death." Opinion 114. Among the venirepersons examined by Blume, with counsel's composite rating in parentheses, were Lisa Harvey (6.90), Richard Goehring (6.48), and Sylvia Allison (6.10). The defense used their twenty-three peremptory strikes on others, the majority of whom had lower ratings, because Blume ascertained that the three he agreed to seat presented the most promise for challenging on appeal the district court's refusal to dismiss them for cause.

Question 42 of the Juror Questionnaire inquired of each venireperson, "Have you or has any close friend or relative been the victim of a crime, whether it was reported to law enforcement authorities or not." J.A. 201837. An affirmative answer required additional details in follow-up. Allison left the question unanswered, though her newlywed husband had been murdered in 1971. At the evidentiary hearing below, Blume admitted the oversight: "I still don't know how we missed it but we missed it." *Id.* at 200793.

**[9]** We previously addressed both issues on direct appeal, applying the governing principle that a person is disqualified from a capital jury if voir dire reveals that he " 'will fail in good faith to consider the evidence of . . . mitigating circumstances as the instructions require him to do.' " *United States v. Fulks,* 454 F.3d 410, 427 (4th Cir.2006) (quoting *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). Put another way, the district court need only have excluded those potential jurors who "would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." *United States v. Tipton,* 90 F.3d 861, 878 (4th Cir.1996). In a similar fashion, because the court found that Allison's omission was inadvertent and that she would not in any event have been excused for cause, Fulks was required to demonstrate that she was actually or impliedly

biased in favor of imposing the death penalty. *See Fulks,* 454 F.3d at 431–32.

We concluded that the district court had acted within its broad discretion in declining to exclude any of the three jurors for cause, and, in denying Fulks's motion for a new trial, refusing to declare Allison unfit after the fact. Nothing has changed in this § 2255 proceeding, except that Fulks contends that the abuse-of-discretion standard of review we applied to these claims on direct appeal "is more stringent than the *Strickland* 'reasonable probability' standard applicable here." Br. of Appellant 58. Fulks argues that inasmuch as we earlier described the issue of whether Goehring should have been green-lighted as perhaps being "close," *Fulks,* 454 F.3d at 428, the more exacting scrutiny required by *Strickland* tips the scale and necessitates relief at this stage.

Fulks's argument misconstrues the relationship between the direct and the collateral proceedings; the latter is not designed to be a rehash of the former under a more defendant-friendly standard. The inevitable upshot of our holding on direct appeal that the district court had not abused its discretion with respect to juror selection or the post-proceeding attempt at disqualifying Allison was that the process had resulted in a fair and impartial jury. With the Supreme Court's denial of certiorari, that holding became, for all practical purposes, the law of the case. *Cf. Hodge v. Haeberlin,* 579 F.3d 627, 643 (6th Cir. 2009) (noting Kentucky Supreme Court's "straight-forward application of collateral estoppel" where *Strickland* claim "relies on proof of an element already resolved on direct review").

On collateral attack, our task is different. We may consider under *Strickland*'s prejudice prong whether there existed a reasonable probability of a different result on the determination (or assumption) that counsel rendered deficient performance.

*See, e.g., Smith v. Spisak,* 558 U.S. 139, 130 S.Ct. 676, 685, 175 L.Ed.2d 595 (2010) (assuming, without deciding, that counsel's performance was inadequate, but nonetheless rejecting defendant's *Strickland* claim for lack of prejudice). Because we commence, however, with the immutable premise that the jury in this case satisfied the strictures of the Constitution, Fulks can under no circumstances demonstrate the necessary precondition for his claim, i.e., that Blume's actions in selecting the jury strayed beyond the bounds of reasonableness.

The most that Fulks can say is that Blume could have conceivably empaneled a marginally more sympathetic jury by electing to seat different jurors in place of three that actually served. That is not enough, however, to trigger an analysis of whether such a hypothetical jury—comprised in part of nine of the same members who actually voted for death in this case—would have recommended a life sentence. *See Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."). A conclusion in the affirmative could only be based upon rank speculation, defying calculation of a reasonable probability.

### 3.

[10] An issue that we did not address on direct appeal, though preserved by objection at sentencing, was the propriety of one of the district court's instructions on mitigation:

> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case,

the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven.

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.

> Secondly, if you determine that the factor has been proven, you must determine whether the fact is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.

J.A. 303943. Fulks maintains that the court's "two-step" instruction, insofar as it directed the jury to "determine whether the fact is mitigating," invited the jurors to disregard evidence that was indisputably mitigating, contrary to the Supreme Court's admonition in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The Court in *Eddings* ruled that, consistent with the view of the Eighth Amendment it expressed in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a capital sentencing entity may not "refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Eddings,* 455 U.S. at 115, 102 S.Ct. 869. In light of what Fulks perceives as the strength of the *Eddings* issue, he contends that counsel was ineffective for not pressing it on appeal.[5]

---

5. Fulks maintains that the government's closing and rebuttal arguments exacerbated the alleged error occasioned by the instruction, in that the prosecutor suggested to the jury that the evidence of Fulks's upbringing was of limited relevance because it did not cause the offense conduct, *see* J.A. 303798–99, and because that conduct was relatively remote in

time from and not in direct retaliation for his abuse, *see id.* at 303899–900. We note that no contemporaneous objection was made to the prosecutor's remarks. The remote possibility that we would have discerned plain error in connection with this aspect of Fulks's claim precludes a conclusion under *Strick-*

The circumstances confronted by the Supreme Court in *Lockett* and *Eddings* are readily distinguishable from those at bar. The statute at issue in *Lockett* permitted consideration of only three mitigating factors, while, in *Eddings*, the trial court sentenced the defendant in the belief that it was barred from considering his family history in mitigation. Plainly, the practical effect of the instruction in Fulks's case was different: before a juror could determine that a proffered factor should be given no mitigating weight, he or she had to at least evaluate it at the threshold. *See United States v. Higgs*, 353 F.3d 281, 327 (4th Cir.2003) (observing that "the Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating"); *see also United States v. Basham*, 561 F.3d 302, 337 (4th Cir.2009) (instructing that neither the Constitution nor laws of the United States "require a capital jury to give mitigating effect or weight to any particular evidence" (citation omitted)). Unlike the situations in *Lockett* and *Eddings*, the decisionmakers here were not directed by law or influenced by misapprehension to stick their respective heads in the sand and ignore the defendant's evidence.

Just the opposite is true. The challenged instruction informed the jury that there was "no limit" on what it could consider in mitigation, and the district court specifically directed that "[a]ny juror persuaded that a mitigating factor exists, must consider it in this case." J.A. 303944. That at least one juror found thirty-two of forty-three proffered mitigating factors present in Fulks's case, with twenty-two being found unanimously, bespeaks not of a jury whose discretion and compassion were by any means impermissibly curtailed.

As with his claims pertaining to jury selection at sentencing, Fulks's assertion

*land* that a different result on appeal was

of ineffective appellate assistance fails for want of a tenable premise. In each instance, counsel's actions or omissions having engendered no significant error, deficient performance cannot be ascribed thereto.

### B.

**[11]** On the trip to locate Donovan's body, a doe jumped in front of the van in which Basham, his counsel, and several law enforcement officers were riding. Basham remarked to Sheriff Ronald Hewett, "You know, I could never even kill a deer and here I have—" before being abruptly stopped mid-sentence by his attorney. J.A. 400543. Later, with the group debarked at a cemetery, Basham showed Hewett through gestures how Donovan had been strangled with a strap Basham said came from a Liz Claiborne purse. Basham did not indicate whether he or Fulks had performed the physical act of strangulation. Basham then demonstrated how he had thrown the strap into the nearby woods. *See id.* at 400210–11, 400572–73.

In the midst of his sentencing trial, after the jury had been dismissed for the day, Fulks moved the district court to have the hearsay "deer statement" admitted on the theory that Basham had been on the verge of confessing he had personally ended Donovan's life. The government opposed the statement's admission on the ground that it was ambiguously incomplete, and the court agreed that Basham could have finished the deer statement by saying "a number of things that still inculpated Mr. Fulks," such as "I helped bury a dead body," or "I held the woman down while she was killed." J.A. 400513. Minutes later during the same colloquy, while arguing provisionally for reciprocal admission

reasonably probable.

of competing statements under the rule of completeness, counsel for the government recalled Sheriff Hewett's suppression hearing testimony concerning the demonstration at the cemetery "how Brandon Basham said that Chad Fulks took the purse strap and strangled [Donovan]." *Id.* at 400517.

Subsequently, at Basham's trial, the government introduced the deer statement and reminded the jury of it at closing, asking rhetorically, "What do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?" J.A. 400648. On the heels of that argument, the government referred to Sheriff Hewett's testimony concerning the incident at the cemetery, recounting that Basham "didn't say I killed Alice Donovan. No, he demonstrated it." *Id.* at 400649. A moment later, however, the government described the incident in more general terms, characterizing Basham's demonstration as "how Alice Donovan was strangled." *Id.* at 400650–51.

We have previously acknowledged that, "[i]n some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." *Higgs,* 353 F.3d at 326. A due process violation may occur "if 'an inconsistency . . . exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime,' " *id.* (quoting *Smith v. Groose,* 205 F.3d 1045, 1052 (8th Cir. 2000)), or if "the evidence used at the two trials is 'factually inconsistent and irreconcilable,' " *id.* (quoting *United States v. Paul,* 217 F.3d 989, 998 (8th Cir.2000)). According to Fulks, the government's approach to the two trials was inconsistent at its core, entitling him to relief.

We disagree. Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Dono-

van's murder and similarly deserving of the death penalty, regardless of which one physically ended her life. For example, the government told Fulks's jury that he and Basham "acted together as one in concert with one another . . . . They could not have done things that they did . . . without acting in unison." J.A. 303693. The story was the same at Basham's trial: "Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable." *Id.* at 400682.

In *Higgs,* we discussed the government's approach to the separate trials of the titular defendant and his accomplice in crime, Haynes. It was undisputed that Haynes was the trigger-man in a triple homicide, but he argued that he was acting under duress from Higgs. The government responded that Haynes's free will had not been overcome, which Higgs contended was inconsistent with the prosecution's argument at his own trial, namely, that Higgs was the mastermind and therefore more culpable. We rejected Higgs's assertion of core inconsistency:

> The government argued precisely the same factual predicate for Haynes's and Higgs's convictions, i.e., that Higgs retrieved the gun from his apartment, drove the van to the murder scene, and handed the gun to Haynes after the women got out of the vehicle . . . . [T]he argument that Haynes was a "partner in crime" with Higgs because he could have chosen not to murder the women is not inconsistent with the argument that Higgs was more culpable because he brought the murder weapon to the scene and told Haynes to do it. It was cer-

tainly not so inconsistent as to amount to a due process violation.

353 F.3d at 327.

Likewise here, there was no material variance in the facts proved to establish Donovan's death at the hands of Fulks and Basham. We are not unmindful that, in joint-action cases where the ultimate perpetrator is in doubt, sentencing juries may be less lenient with the defendant it perceives to have fulfilled that role. Nevertheless, in light of the overall theme of both Fulks's and Basham's trials (of which we have cited only an example or two for illustrative purposes), we cannot conclude that tangential inconsistencies relating to inferences drawn from the undisputed evidence are, in this case, so serious as to constitute a violation of due process. This is particularly so when significant portions of the events resulting in the alleged inconsistencies occurred outside the jury's presence.

We therefore agree with the district court that Fulks has shown, "at best, an inconsistent argument concerning the vagueness of Basham's statements, but [not] that the government relied upon factual theories that were inconsistent at the core of its case." Opinion 130. Fulks's sentencing to the death penalty thus comported with due process.

## IV.

Fulks understandably seeks to avoid his death sentence, and, toward that end, counsel has striven to characterize the jury's decision as unduly dismissive of the defense's efforts at trial to portray Fulks's unfortunate upbringing as presenting a good case in mitigation. As it happens, however, Fulks's despicable crimes also presented a mighty case in aggravation, and it cannot be supposed that the jury's recommendation of death was unjust or an anomaly, in light of all the circumstances.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED.*



**Jane Powers HUGGINS, trading as SADISCO of Maryland, Plaintiff–Appellant,**

**v.**

**PRINCE GEORGE'S COUNTY, MARYLAND; Cynthia D. Barry, Individually and in her Official Capacity as Zoning Inspector's Supervisor for the Prince George's County Department of Environmental Resources; Erv T. Beckert, Individually and in his Official Capacity as District Engineer in the Prince George's County Department of Public Works and Transportation; Jeffrey M. Dehan, Individually and in his Official Capacity as Code Enforcement Officer in the Community Standards Division, Site Development Inspection Section of the Prince George's County Department of Environmental Resources; Thomas F. Matzen, Individually and in his Official Capacity as Associate Director of the Community Standards Division of the Prince George's County Department of Environmental Resources; Anne E. Williams, Individually and in her Official Capacity as Environmental Crimes Specialist for the Division of Environmental Health of the Prince George's County Department of Public Works and Transportation, Defendants–Appellees.**

FILED:  June 17, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 16-9
(4:02-cr-00992-JFA-1)
_____

In re: CHADRICK EVAN FULKS

          Movant

_____

O R D E R

_____

Chadrick Evan Fulks has filed a motion pursuant to 28 U.S.C. §§ 2244(b),

2255(h) (2012) for authorization to file a second or successive 28 U.S.C. § 2255

(2012) motion. We grant authorization for Fulks to file a second or successive

§ 2255 motion. We express no view whatever on the merits of movant's claims.

A copy of the § 2255 motion attached to Fulks' motion for authorization is

transmitted to the district court in accordance with Local Rule 22(d).

Entered at the direction of the panel: Judge Wilkinson, Judge King, and

Judge Agee.

For the Court

/s/ Patricia S. Connor, Clerk

PA0219

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| CHADRICK EVAN FULKS,<br><br>Petitioner,<br><br>v.<br><br>T.J. WATSON, Warden, USP Terre Haute,<br>UNITED STATES OF AMERICA<br><br>Respondents. | : : : : : : : : : : : : : : : | CIVIL ACTION<br>(Capital Habeas Corpus)<br><br><br>No. 2:15–cv–00033–WTL–MJD<br><br>**Hon. William T. Lawrence**<br>**United States District Judge** |

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

*Counsel for Petitioner*

Dated: March 8, 2019

PA0220

## <u>PRELIMINARY STATEMENT</u>

Petitioner Chadrick Evan Fulks shall be referred to as Petitioner, Mr. Fulks, or, when discussed as a child or in conjunction with other members of the Fulks family, Chad. Respondent shall be referred to as the Government. Citations to witness declarations and affidavits shall be referred to as "Dec." and "Aff.," respectively, followed by the name of the relevant witness. Citations to expert reports shall be referred to as "Report," followed by the name of the expert, the date, and the page number. All declarations, reports, affidavits, and other relevant records cited herein are provided in the Appendix filed with this Petition. Cites to pages in the Appendix shall be referred to as "App." followed by the relevant page number.

The transcript from Petitioner's trial and § 2255 level proceedings shall be cited as "Tr.," followed by the relevant date and page number.

All other citations are either self–explanatory or will be explained.

All emphasis in this Petition is supplied unless otherwise indicated.

i

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................... i

TABLE OF CONTENTS................................................................................................................ ii

INDEX TO APPENDIX ............................................................................................................... iv

THE PARTIES................................................................................................................................ 1

PROCEDURAL HISTORY............................................................................................................ 1

CLAIMS FOR RELIEF ................................................................................................................. 3

I.      MR. FULKS IS INTELLECTUALLY DISABLED AND Is INELIGIBLE FOR THE
DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY.................... 3

    A.    Introduction................................................................................................................ 3

    B.    Deficits in Intellectual Functioning ......................................................................... 5

        1.    The Diagnostic Criteria.................................................................................5

        2.    Mr. Fulks Has Deficits in Intellectual Functioning. ....................................8

    C.    Deficits in Adaptive Functioning............................................................................ 10

        1.    Formal Testing of Adaptive Behavior ........................................................12

        2.    Multimethod Assessment: Conceptual Domain...........................................14

        3.    Multimethod Assessment: Social Domain...................................................27

        4.    Multimethod Assessment: Practical Domain...............................................30

    D.    Structural Evidence of Brain Impairments .............................................................. 31

    E.    Age of Onset ............................................................................................................ 35

    F.    Risk Factors for Intellectual Disability ................................................................... 36

        1.    Fetal Alcohol Spectrum Disorder ...............................................................37

        2.    Child Abuse .................................................................................................40

        3.    Head Trauma During the Developmental Period.........................................41

        4.    Parental Neglect, Impaired Parenting, Domestic Violence, and Malnutrition ......41

        5.    Family Poverty.............................................................................................43

        6.    Substance Abuse During Childhood............................................................44

        7.    Petitioner's FASD Is the Primary Cause of His Brain Impairments. ...................44

PA0222

G.      Mr. Fulks Is Intellectually Disabled...................................................................... 44

H.      Relief Is Appropriate Under 28 U.S.C. § 2241............................................................ 45

      1.      Petitioner's *Atkins* Claim Relies on New Legal and Factual Bases Not Available at the Time of His § 2255 Proceedings, and on Supreme Court Jurisprudence Effectively Reversing Fourth Circuit precedent. ...................................................47

      2.      Petitioner's Claim Challenges the Execution—not the Imposition—of His Sentence, as well as the Fundamental Legality of that Sentence...........................54

II.      BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY.................... 56

A.      The Eighth Amendment Prohibits the Execution of Individuals, Such as Mr. Fulks, Who Suffer from Deficient Cognitive Functioning and Adaptive Deficits Resulting from Fetal Alcohol Exposure........................................................................................ 57

B.      Mr. Fulks's Cognitive and Adaptive Deficits Render Him Ineligible for the Death Penalty........................................................................................................................ 62

      1.      Both Mr. Fulks's Adult IQ Scores and His Lifelong Adaptive Functioning Fall in the Intellectually Disabled Range and Render Him Categorically Ineligible for the Death Penalty. ...........................................................................................................62

      2.      Mr. Fulks's FASD Renders Him Categorically Ineligible for the Death Penalty. 63

C.      The Claim Is Cognizable Under § 2241. ...................................................................... 68

III.      PETITIONER'S SENTENCE OF DEATH WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL (WITHDRAWN). ............................ 70

REQUEST FOR RELIEF ....................................................................................................... 71

iii

PA0223

## INDEX TO APPENDIX

**VOLUME I**

Expert Reports and Declarations

1.  Report by Barry M. Crown, Ph.D. – March 6, 2019.................................................00001

2.  Report by Julian Davies, M.D. – March 4, 2019 ....................................................00012

3.  Report by Natalie Brown, Ph.D. – February 11, 2019.............................................00051

4.  Report by David Bachman, M.D. – July 31, 2013...................................................00188

5.  Declaration of Seymour Halleck, M.D. – September 17, 2010 ...............................00190

6.  Declaration of Margaret Melikian, D.O. – September 17, 2010...............................00193

7.  Declaration of James H. Hilkey, Ph.D. – September 16, 2010.................................00196

8.  Declaration of Harry Krop, Ph.D. – September 16, 2010.........................................00199

9.  Declaration of James H. Hilkey, Ph.D. – June 2, 2008.............................................00209

10. Declaration of Margaret Melikian, D.O. – May 27, 2008 ........................................00223

11. Declaration of Seymour Halleck, M.D. – May 9, 2008.............................................00236

12. Report by Ruben C. Gur, Ph.D. – June 13, 2004......................................................00261

13. Report by James H. Hilkey, Ph.D. – May 7, 2004....................................................00271

14. Report by Jonathan Venn, Ph.D. – March 30, 2004 .................................................00277

15. Report by Ralph Newman, M.D. et al. – February 19, 2004 .....................................00294

16. Letter from Jonathan E. Walker, M.D. to Jim Evans, Ph.D.
    January 14, 2004 ........................................................................................................00313

17. Report by James Evans, Ph. D. – January 8, 2004....................................................00315

**VOLUME II**

Witness Declarations

18. Declaration of Linda Adkins – January 27, 2017 .....................................................00321

iv

PA0224

19. Declaration of Laura Cooper – September 15, 2016 ................................................00323

20. Declaration of Sharon Dotson – June 18, 2008 ........................................................00326

21. Declaration of Nathan Faulks – June 4, 2008 ...........................................................00329

22. Declaration of Mike Kaasee – September 14, 2010 ..................................................00332

23. Declaration of Christina Kirkman – January 27, 2017 .............................................00334

24. Declaration of Joy Krug – November 15, 2016 ........................................................00336

25. Declaration of Lewis Lambert, Jr. – September 14, 2010 ........................................00356

26. Declaration of Lewis Lambert, Sr. – September 14, 2010.........................................00358

27. Declaration of Marilyn Lauver – November 14, 2016 .............................................00360

28. Declaration of Kelly Perry – January 27, 2017.........................................................00362

29. Declaration of Russell Spears – May 22, 2018..........................................................00364

Transcripts and Testimony

30. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
    Testimony of Linda Adkins – June 22, 2004............................................................00366

31. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Arlene Andrews – June 24, 2004 ........................................................00380

32. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of David Bachman – June 24, 2004.........................................................00482

**VOLUME III**

33. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVIII –
    Testimony of Fred Bookstein – June 24, 2004 .........................................................00568

34. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XX –
    Testimony of Christos Davatzikos – June 28, 2004 .................................................00606

35. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of James Evans – June 23, 2004 .............................................................00627

36. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
    Testimony of Martha Floyd – June 23, 2004............................................................00694

v

PA0225

37. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume IV –
Testimony of Dewayne Fulks – June 4, 2004...........................................................00706

38. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
Testimony of Mark Fulks – June 22, 2004 ...............................................................00762

39. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VII –
Testimony of Ronnie Fulks – June 9, 2004 ..............................................................00785

**VOLUME IV**

40. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume VIII –
Testimony of Ronnie Fulks – June 10, 2004 ............................................................00810

41. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XII –
Testimony of Ruben Gur – June 16, 2004 ................................................................00825

42. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of Cindy Harper – June 23, 2004............................................................01002

43. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of Sue Hatcher – June 23, 2004 ..............................................................01006

44. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
Testimony of Kevin Holbrook – June 22, 2004........................................................01022

45. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVI –
Testimony of Brian Messenger – June 22, 2004.......................................................01042

46. *United States v. Fulks*, 4:02-cr-992 (D.S.C.) Jury Trial Transcript Volume XVII –
Testimony of Gayle Wolfe – June 23, 2004 .............................................................01055

Records

47. The Gallaher School Results of Selective Screening for Chadrick Fulks – November 25,
1986...........................................................................................................................01064

48. The Gallaher School Referral for Multidisciplinary Assessment for Chadrick Fulks –
January 6, 1987 .........................................................................................................01065

49. Academic Evaluation Report by Peggy Blatt for Chadrick Fulks
February 24, 1987 .....................................................................................................01066

50. Psychological Evaluation Report by Rodney Pardue for Chadrick Fulks
March 4, 1987 ...........................................................................................................01073

PA0226

51. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 12, 1987 ................................................................................................01077

52. Peyton Elementary Review for Chadrick Fulks – March 1, 1989 .............................01078

53. Instructional Recommendation Plan/Individualized Education Program for Chadrick
Fulks – May 15, 1989 ................................................................................................01079

Additional Witness Declarations

54. Declaration of Dicie Fulks – July 17, 2008 ..............................................................01082

55. Declaration of Gayle Wolfe – September 15, 2016...................................................01084

PA0227

Pursuant to 28 U.S.C. § 2241 and this Court's order of December 6, 2018, *see* Dkt. 54,

Petitioner Chadrick Evan Fulks, through undersigned counsel, hereby submits this Amended

Petition for Writ of Habeas Corpus Pursuant ("Amended Petition").

## THE PARTIES

1.      Petitioner, CHADRICK EVAN FULKS, is a federal prisoner at the United States

Penitentiary at Terre Haute (USP–Terre Haute) under a sentence of death (Reg. No. 16617–074).

2.      Respondent, T.J. WATSON, is Warden of the USP Terre Haute and currently

maintains custody of Mr. Fulks.

## PROCEDURAL HISTORY

3.      In May 2004, Mr. Fulks pleaded guilty to eight charges, including two death–

eligible offenses, arising from the November 2002 abduction and death of Alice Donovan and

related events. On June 30, 2004, a jury sentenced Mr. Fulks to death. His convictions and

sentence were affirmed by the United States Court of Appeals for the Fourth Circuit. *See United

States v. Fulks*, 454 F.3d 410 (4th Cir. 2006). The Supreme Court denied Mr. Fulks's petition for

writ of certiorari on June 25, 2007. *See Fulks v. United States*, 551 U.S. 1147 (2007).

4.      On June 23, 2008, Mr. Fulks filed a motion to vacate the convictions and sentence

and for a new trial pursuant to 28 U.S.C. § 2255, which was amended on October 21, 2008. The

motion was denied and the denial was affirmed on appeal. *United States v. Fulks*, 683 F.3d 512

(4th Cir. 2012). The Supreme Court denied Mr. Fulks's petition for writ of certiorari on October

7, 2013. *See Fulks v. United States*, 571 U.S. 941 (2013).

5.      On January 29, 2015, Mr. Fulks filed a pro se Petition for Writ of Habeas Corpus

in this Court pursuant to 28 U.S.C. § 2241. Dkt 1. Upon order of the Court, Mr. Fulks filed a pro

se Response to the Court's Entry Directing Further Proceedings on April 7, 2015. Dkt. No. 6.

Both of these pleadings were prepared by another death row inmate. Dkt. 6 at 7. On May 11,

PA0228

2015, this Court issued an Order to Show Cause directing Respondent to answer the allegations of the habeas petition and show cause why the relief requested by Mr. Fulks should not be granted. Dkt. 7. Respondent requested and this Court granted two extensions of time to file the response to the Petition. Dkt. 8–11. On August 18, 2015, Respondent filed a Return to Order to Show Cause. Dkt. 12. This Court ordered Respondent, on September 4, 2015, to supplement the Return. Dkt. 14. Following a request for and grant of another extension of time, Dkt. 15, 17, Respondent filed a Supplemental Response to Order to Show Cause on November 18, 2015, Dkt. 18.

6.      On January 13, 2016, at Mr. Fulks's request and after complying with administrative protocol for requesting an out–of–district appointment, counsel from the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") moved for appointment in Mr. Fulks's habeas corpus proceedings. Dkt. 20. This Court appointed the FCDO to represent Mr. Fulks on February 1, 2016. Dkt. 22. Through the FCDO, Petitioner requested, and this Court granted, a series of extensions to allow counsel, inter alia, to investigate the possibility of filing an amended habeas petition.

7.      On December 6, 2018, the Court granted Petitioner leave to file, by March 8, 2019, an amended habeas petition to supersede the previously filed petition. Dkt. 54.

2

<u>**CLAIMS FOR RELIEF**</u>

**I.     MR. FULKS IS INTELLECTUALLY DISABLED AND IS INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA* AND ITS PROGENY.**

   **A.     Introduction**

   8.     In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. As the Court put it, "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id*. at 306.[1]

   9.     The United States Supreme Court has ruled that the current, prevailing clinical definitions are binding in the task of determining whether an individual should be exempted from the death penalty. *Moore v. Texas*, 137 S. Ct. 1039, 1049, 1052–53 (2016) ("*Moore–I*"). The Supreme Court cited the two main diagnostic authorities in the field of intellectual disability as embodiments of the prevailing medical standards: the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and the American Psychiatric Association ("APA"), which has most recently set forth its definition of intellectual disability in the Diagnostic and Statistical Manual of Mental Disorders – 5th Edition ("DSM–5"). These current standards, and

_____

[1] *Atkins* referred to this diagnosis as mental retardation, which was the name used in the field at the time. Since *Atkins* was decided, the diagnosis of mental retardation has been renamed as intellectual disability. In *Hall v. Florida*, the Supreme Court acknowledged this change in nomenclature and adopted the term intellectual disability instead of mental retardation. *Hall v. Florida*, 572 U.S. 701 (2014). Accordingly, this petition uses the term intellectual disability or the abbreviation "ID." However, the terms "mental retardation" or "mentally retarded" are also used in their historic context relevant to this case.

3

PA0230

not outdated standards employed in the past, govern the disposition of *Atkins* claims. *Moore–I*, 137 S. Ct. at 1053.

10.     Pursuant to the definitions set forth by the APA and the AAIDD and endorsed by the Supreme Court, there are three prongs to a finding of intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age eighteen ("prong three"). *See* DSM–5 at 33; *Intellectual Disability: Definition, Classification, and Systems of Supports – 11th Edition*, American Association on Intellectual and Developmental Disabilities (2010) ("AAIDD–2010") at 5. As the voluminous evidence summarized below shows, Petitioner Chadrick Fulks satisfies these criteria. He has significantly subaverage intellectual functioning, as measured by individually administered tests of comprehensive intelligence; and significant adaptive deficits, reflected in extensive testing, the vivid accounts of people who have known him, and extensive records documenting his impairments. Both his intellectual and adaptive deficits are further confirmed by the presence of structural defects in his brain, which have been present since his birth. These deficits are also corroborated by the presence of several significant risk factors including a Fetal Alcohol Spectrum Disorder ("FASD"), which has caused Petitioner to suffer from brain damage since before his birth. Mr. Fulks has been intellectually disabled all of his life and is ineligible for the death penalty.

11.     Mr. Fulks is entitled to pursue his *Atkins* claim under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when review under 28 U.S.C. § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown v. Carraway*, 719 F.3d 583 (7th Cir. 2015) (§ 2241 can be used to challenge a defendant's *sentence* in addition to his or her conviction). This includes a number of

4

circumstances including, inter alia, where the defendant challenges the execution, rather than the imposition of his sentence. Here, Mr. Fulks presents a claim that, if successful, would render him ineligible for the death penalty and ineligible to be executed. Consistent with the Supreme Court's directives, he also makes this claim under current, prevailing clinical standards. However, neither the current standards nor the Supreme Court rulings applying those standards to an *Atkins* case were present at the time of his trial or § 2255 proceedings. Because § 2255 proceedings are both inadequate and ineffective to test the legality of Mr. Fulks's death sentence and because Mr. Fulks challenges the execution of his sentence in addition to its imposition, Mr. Fulks's *Atkins* claim should be heard and his death sentence should be vacated.

### B.        Deficits in Intellectual Functioning

#### 1.        The Diagnostic Criteria

12.        Under the classification schemes outlined by the APA and the AAIDD, deficient intellectual functioning is defined as an intelligence quotient ("IQ") of approximately 70 with a confidence interval derived from the standard error of measurement ("SEM") taken into consideration. Because a margin for measurement error or "confidence interval" on IQ tests generally involves a measurement error of five points, at a minimum, scores up to 75 also fall within the presumptive range for intellectual disability. DSM–5 at 37. *See also* AAIDD–2010 at 36 (finding the consideration of the standard error of measurement or "SEM" and reporting an IQ score with a confidence interval deriving from the SEM to be critical considerations in the appropriate use of IQ tests).

13.        Consistent with the AAIDD's and APA's diagnostic criteria, the Supreme Court held in *Hall* that because the SEM is "a statistical fact, a reflection of the inherent imprecision of the test itself," at a minimum, full–scale IQ scores of 75 or below will establish the diagnosis of intellectual disability if the other two prongs are met. *Hall*, 572 U.S. at 712, 723. *See also*

*Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (IQ score of 75 was "squarely in the range of potential intellectual disability").

14.     In addition, both the AAIDD and the APA have rejected fixed cutoff points for IQ in the diagnosis of intellectual disability and mandated that any test score must be considered in the context of clinical judgment and adaptive functioning. In its 2010 Guidelines, the AAIDD specified:

> It is clear from th[e] significant limitations criterion used in this Manual that AAIDD . . . *does not* intend for a fixed cutoff point to be established for making the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically, it has become operational in some states [citation omitted]. It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination. A fixed point cutoff score for ID is not psychometrically justifiable.

AAIDD–2010 at 40 (emphasis in original).

15.     Similarly, the DSM–5 makes clear that "[c]linical training and judgment are required to interpret [IQ] test results and assess intellectual performance" and "clinical judgment is needed in interpreting the results of IQ tests." DSM–5 at 37. The DSM–5 also recognizes that a single IQ score is an imperfect predictor of functioning and must be considered in context with adaptive functioning when assessing an individual for ID. *Id.* For this reason, intellectual functioning is assessed through clinical assessment in addition to standardized testing. *Id.*

16.     The Supreme Court has also recognized that the assessment of intellectual functioning is not the rote imposition of hard cutoffs or actuarial determinations, but a conjunctive, clinical determination that is interrelated with the other prongs of the diagnosis, stating that: "Intellectual disability is a condition, not a number." *Hall*, 572 U.S. at 723; *see also id.* at 722 ("This awareness of the IQ test's limits is of particular importance when conducting the conjunctive assessment necessary to assess an individual's intellectual ability."); *id.* at 722–

6

23 ("It must be stressed that the diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination." (quoting AAIDD–2010 with approval)); *id.* at 723 ("It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." (citing DSM–5 with approval)).

17.     IQ scores must also be corrected for the Flynn Effect. The Flynn Effect reflects a well–established finding that the average IQ score of the population increases at a rate of 0.3 points per year or 3 points per decade. Accordingly, the AAIDD requires that any IQ score be corrected downwards at a rate of 0.3 points per year since the test was normed. *See User's Guide: Mental Retardation, Definition, Classification and Systems of Supports*, 10th Ed., AAIDD (2007) ("AAIDD–2007"), at 20–21; AAIDD–2010 at 37 (same); *User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports*, AAIDD (2012) ("AAIDD–2012") at 23 (same); McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability*, AAIDD (2015) at 160-66 (same); Watson, Dale G. Intelligence Testing, *The Death Penalty and Intellectual Disability*, AAIDD (2015)) at 118–19 (same).

18.     The APA also recognizes that "[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ scores be interpreted using clinical judgment and training. DSM–5 at 37. Test score interpretation using clinical judgment includes correction for the Flynn Effect.

19.     *The Death Penalty and Intellectual Disability*, published in 2015 by the AAIDD, stated the following regarding the Flynn Effect:

> Not only is there a scientific consensus that the Flynn [E]ffect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn [E]ffect, particularly in *Atkins* cases.

7

McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability* (AAIDD 2015) at 162. Furthermore, "in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn [E]ffect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence." *Id.* at 165.

20.     The AAIDD and APA also mandate that the spurious inflation of IQ scores arising from prior administrations of intelligence tests—the "practice effect"—be taken into consideration when interpreting IQ testing. *See, e.g.,* AAIDD–2010 at 38; DSM–5 at 37.

**2.     Mr. Fulks Has Deficits in Intellectual Functioning.**

21.     Petitioner has been given three individually administered, comprehensive tests of intellectual functioning as an adult. In April 2003, neuropsychologist Jonathan Venn, Ph.D., administered a Wechsler Adult Intelligence Scale, Third Edition ("WAIS–III") to Petitioner. He received a full–scale IQ score of 77. Report, Jonathan Venn, Ph.D., at 10 (App. 0286). Correcting for the Flynn Effect, the full–scale IQ score from this test is 75 (74.6), which is squarely within the range for intellectual disability. *See Brumfield*, *supra*.

22.     Petitioner's scores on the subsequent two tests are strikingly consistent with the first one. Less than four months after Mr. Fulks had taken the first WAIS–III in August 2003, psychologist James Hilkey, Ph.D., administered a second WAIS–III. On that test, Mr. Fulks received a full–scale IQ score of 78, which Flynn–corrects to a 76 (75.6). Report, James Hilkey, Ph.D., at 4 (App. 0274). In February 2004, neuropsychologist Eugene Gourley, Ph.D., administered the Woodcock Johnson Test of Cognitive Abilities, Third Edition ("WJ–III"). Mr. Fulks received a full–scale IQ score of 79, which Flynn–corrects to a 77 (77.2). Report, Butner

8

Medical Center, 3/25/04, at 11 (App. 0304). During this time, Petitioner was also administered four full batteries of either neuropsychological or psychological testing. The one– and two–point increase in scores on the subsequent two tests are consistent with the initial score of 75 and easily explained with the practice effect.

23.    During his childhood, Mr. Fulks was administered a comprehensive IQ test (the Wechsler Intelligence Scales for Children – Revised ("WISC–R")) three times: at the ages of nine, twelve, and fourteen. At the age of nine, he received a score of 90, which Flynn–corrects down to an 86 (85.5). At twelve, he received a score of 96, which Flynn–corrects to 91 (90.6). At fourteen, he received a score of 93, which Flynn–corrects to an 87 (87.3). *See* Report, Natalie Novick–Brown, Ph.D., at 121 (App. 0171).

24.    That Mr. Fulks's testing history began with higher scores and regressed to scores in the intellectual disability range as he grew older does not undermine his *Atkins* claim, but provides further support for it. "[I]individuals with mild mental retardation 'often are not distinguishable from children without Mental Retardation until a later age.'" *Sasser v. Hobbs*, 735 F.3d 833, 848 (8th Cir. 2013).

25.    Mr. Fulks's medical and social history makes such a regression particularly likely. As set forth, *infra*, Petitioner suffers from brain damage stemming from a Fetal Alcohol Spectrum Disorder ("FASD"). Individuals such as Mr. Fulks who were born with cognitive impairments frequently experience declines in IQ as they age. Because of these cognitive deficits, their intellectual capacity develops more slowly than their age–mates. As time goes on, they fall increasingly behind their peers. In Mr. Fulks's case, this dynamic is further exacerbated by other risk factors in his history which correlate both with intellectual disability and drops in

9

IQ. Accordingly, Petitioner was primed for such a decline in IQ to occur. *See* Report, Barry M. Crown, Ph.D., at 7 (App. 0007), discussed *infra*; Section F, *infra* (describing risk factors for ID).

26.     That Mr. Fulks had ID–level intellectual deficits before the age of eighteen is further confirmed by Petitioner's history of impaired adaptive behavior. These adaptive deficits emerged at a very young age, cut across all domains of functioning, and stem from brain abnormalities that have been present since before his birth. *See* Sections C and D, *infra*. Petitioner's brain abnormalities and adaptive functioning correspond to the ID level scores obtained in adulthood. They do not correspond to higher scores during childhood. Indeed, school personnel—without the benefit of the breadth and depth of evidence offered in support of Petitioner's *Atkins* claim—noted that Petitioner's overall functioning did not match his IQ scores and that he was functionally intellectually disabled. *See* Section C, *infra*; Report, Barry M. Crown, Ph.D., at 7 (App. 0007); Report, Natalie Novick–Brown, Ph.D., at 24–27 (App. 0074–77) (describing interviews with Joy Krug and Marilyn Lauver).

**C.     Deficits in Adaptive Functioning**

27.     The AAIDD has defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and performed by people in their everyday lives." AAIDD–2010 at 43. The DSM–5 describes adaptive deficits as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM–5 at 37. The focus in an adaptive behavior analysis is on *typical* performance, not *maximal* performance. AAIDD–2010 at 47.

28.     The adaptive deficits prong is satisfied if there is a significant limitation in any one of the three types of adaptive behavior: conceptual, social, or practical. AAIDD–2010 at 43; DSM–5 at 37. Skills included in the conceptual domain are: executive functioning (judgment, planning, impulse control, abstract thinking, and problem solving), memory, language, reading,

10

writing, mathematics, and acquisition of practical knowledge. The social domain encompasses skills and characteristics such as: social judgment and competence; interpersonal communication skills; awareness of others' thoughts, feelings, and experiences; gullibility; empathy; and friendship abilities. The practical domain involves learning and self-management across life settings, including personal care; job responsibilities; money management; recreation; self-management of behavior; and school and work-task organization. DSM–5 at 37; AAIDD–2010 at 44.

29.    As it is expected that strengths co–exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. "[S]ignificant limitations in conceptual, social or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." AAIDD–2010 at 47. The Supreme Court has recognized that "intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" *Brumfield*, 135 S. Ct. at 2281 (quoting AAIDD–2002). In *Moore–I*, the Supreme Court found unconstitutional the Texas Court of Criminal Appeal's attempt to overcome deficits with perceived adaptive strengths because "the medical community focuses the adaptive functioning inquiry on adaptive *deficits*." *Moore–I*, 137 S. Ct. at 1050 (citing AAIDD–2010, DSM–5, and AAIDD–2002 with approval). Subsequently, in *Moore v. Texas*, 2019 LEXIS 821, ___ S. Ct. ___ (Feb. 19, 2019) ("*Moore–II*"), the Supreme Court reversed the Texas Court of Criminal Appeals for again relying on strengths in its determination of Mr. Moore's *Atkins* claim. *Id.* at *9.

30.    Additionally adaptive functioning is not based on criminal behavior, "street smarts or behavior in jail or prison." AAIDD–2012 at 20; DSM–5 at 38 (adaptive behavior may

11

be difficult to assess in controlled settings such as prison). Consistent with this diagnostic standard, the Supreme Court has rejected adaptive behavior analyses that rely on improved functioning in prison. *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 2019 U.S. LEXIS 821 at *10–11.

31.    Assessments of adaptive functioning should be broad–based, comprehensive, and grounded in extensive data. They can include formal testing of adaptive functioning, as well as a multi–method and comprehensive evaluation. This multimethod assessment can include interviews with third–party reporters, records review, consideration of other testing, and review and synthesis of past evaluations. AAIDD–2012 at 16–20; AAIDD–2010 at 47; DSM–5 at 37–38. Here, all of these methods demonstrated that Petitioner has had significant adaptive deficits in all three domains of functioning both before and after the age of eighteen. Report, Natalie Novick–Brown, Ph.D., at 37 (App. 0087); DSM–5 at 37–38.

32.    Natalie Novick–Brown, Ph.D., a clinical and forensic psychologist, has conducted an assessment of Mr. Fulks's adaptive functioning. Dr. Brown has twenty-three years of clinical and forensic experience in FASD and other medical conditions involving developmental disabilities. She has also researched extensively in this field. After conducting formal testing of adaptive behavior as well as a comprehensive, multimethod evaluation, Dr. Novick–Brown has concluded that Petitioner has significant deficits in all three domains of adaptive functioning, and that these deficits were present before the age of eighteen. Report, Natalie Novick–Brown, Ph.D., at 2, 53–54 (App. 0052, 0103–04).

## 1.    Formal Testing of Adaptive Behavior

33.    The AAIDD has indicated that scores of approximately two standard deviations or more below the mean on a valid adaptive behavior instrument fall within the presumptive range for intellectual disability. The AAIDD also mandates that the instrument's standard error of measurement must be taken into consideration, which effectively expands the presumptive range

12

to the top of a 95% confidence interval bracketing 70 (typically scores of 75 and below).

However, the AAIDD makes clear that there is no fixed cutoff point for an adaptive behavior

score: "A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is

intended to reflect a clinical judgment rather than an actuarial determination." AAIDD–2012 at

23. The DSM–5 recommends the use of formal adaptive behavior testing, but sets no

presumptive range for intellectual disability on a formal test of adaptive functioning. DSM–5 at

37–38.

34.     Dr. Novick–Brown administered the Vineland Adaptive Behavior Scales – 3rd

Edition ("Vineland–3") to two reporters regarding Mr. Fulks's adaptive functioning: Gayle

Wolfe, his fifth grade special education teacher, and Linda Adkins, his childhood neighbor. Due

to the retrospective nature of this assessment, Ms. Wolfe and Ms. Adkins were asked to describe

Petitioner's functioning at the times they had regular contact with him within the developmental

period, at ages ten and thirteen, respectively.

35.     The Vineland–3 includes a composite score which encompasses the individual's

global functioning, and three domain scores: communication, social, and daily living skills,

which correspond to the conceptual, social, and practical domains of functioning.

13

PA0240

36.     Ms. Wolfe and Ms. Adkins reported the following scores.

**VINELAND–3 SCORES**
**(SS = Standard Score, Mean = 100, 1**
**Standard Deviation = 15)**

| Rater | Composite | Communication (Conceptual) | Socialization (Social) | Daily Living Skills (Practical) |
|---|---|---|---|---|
| Gayle Wolfe (5th Grade Teacher) | SS 48<br><br>< 1st Percentile | SS 38<br><br>< 1st Percentile | SS 38<br><br>< 1st Percentile | SS 63<br><br>1st Percentile |
| Linda Adkins (Neighbor) | SS 60<br><br>< 1st Percentile | SS 50<br><br>< 1st Percentile | SS 63<br><br>1st Percentile | SS 63<br><br>1st Percentile |

37.     All of these scores are two standard deviations or more below the mean. All of them fall within the presumptive range for intellectual disability.

### 2.     Multimethod Assessment: Conceptual Domain

### a.     Academic functioning, learning, and memory

38.     Petitioner's academic performance was abysmal. He repeated the first grade, and began receiving special education for speech and language issues during his second time through the first grade. In the third grade, his teacher Dottie Thompson referred him for a multidisciplinary assessment because he had weaknesses in most academic subjects, had deficits in self–direction, was easily distractible, and needed "guidance at all times." Report, Natalie Novick–Brown, Ph.D., at 90 (App. 0140). Ms. Thompson completed a Devereux Elementary School Behavior Rating Scale, which indicated, inter alia, that Petitioner had a low rating for comprehension. Petitioner was placed in the behavioral disorder ("BD") classroom, and was "to be mainstreamed as behavior and academics permit." He received special education supports for the rest of his academic history, in the context of either the BD or SLD (specific learning disability) programs for the various schools he attended. For much of his academic career, those

14

supports encompassed all academic subjects and included individualized or small group attention within a self–contained classroom. After he was placed in special education, school records describe him as "low functioning," "not keeping up," and someone with learning needs that were "very concrete." *Id.* at 96–97 (App. 0146–47). By the time he reached the eighth grade, Petitioner was receiving special education in all academic subjects: Math, English, Science, and Social Studies. Despite receiving this level of support, Petitioner fell increasingly behind his peers. He failed to successfully complete the seventh, eighth, or ninth grades and eventually dropped out of school in the ninth grade. *See id.* at 39 (App. 0089); Individualized Education Program, Cabell County School District, 5/12/87 (App. 1077); Review, Cabell County School District, 3/1/89 (App. 1078); Individual Educational Program, Cabell County School District, 5/15/89 (App. 1079); Dec. Joy Krug (App. 0336–38).

39.     Consistent with school records, third–party reporters repeatedly described Petitioner as slow, having an impaired ability to learn, and being consistently behind age–related expectations.

40.     Gayle Wolfe taught Petitioner in the BD class when he was in the fifth grade. The BD classroom was a self–contained special education class with a significantly smaller class size (e.g., seven children in the fifth grade). These students received small-group and individualized attention from the special education teacher, and were mainstreamed with monitoring from a BD teacher whenever the school deemed it possible. This was the maximum level of support that the Cabell County School District was able to provide short of a separate, specialized school. As Ms. Wolfe indicated: "This [separate school] option was very expensive for the county, so the school sought to avoid it. In general, a separate placement would only get financed if there was a lawsuit. There was otherwise not much lower you could go than a self–contained class." Dec.

15

Gayle Wolfe at ¶ 13 (App. 1086).  If a student had both intellectual and behavior problems, as Chad did, then the "BD" label took precedence because the school viewed behavior problems as the primary issue interfering with the student's education. Students with intellectual issues frequently had behavioral problems as they were frustrated with their academic difficulties. When Ms. Wolfe taught Chad in the fifth grade, five of the seven children in the BD class had intellectual problems and were "slow" like Chad. Report, Natalie Novick–Brown, Ph.D., at 20–21 (App. 0070–71) (describing interview with Gayle Wolfe); Dec. Laura Cooper at ¶ 7 (App. 0324).

41.    Even in the context of a special education class, Ms. Wolfe described Petitioner as slow and noted that he was far behind his age–mates. His reading skills were at the first grade level, and he could not understand phonetics. In math, she worked with him to learn addition and subtraction—second grade skills. Tellingly, it was easier to teach Petitioner math because it was more "hands on" and involved less abstract thought. Petitioner's writing skills were particularly impaired. Report, Natalie Novick–Brown, Ph.D., at 21 (App. 0071) (Interview of Gayle Wolfe). Although Ms. Wolfe worked intensively with Petitioner on writing, he still did not learn to write a sentence. *Id.* at 43–44 (App. 0093–94).

42.    Laura Cooper, who was Chad's sixth grade special education math teacher, reported that Petitioner was far behind his classmates. He had difficulties learning, and had to be taught slowly and repetitively. Ms. Cooper worked with Chad on basic practical skills, rather than sixth–grade math. Martha Floyd, who was also Chad's special education teacher in the sixth grade, reported that he was a slow learner. Cindy Harper, who taught Chad in kindergarten, reported that he had difficulty with learning even then. Dec. Laura Cooper (App. 0323–24); Tr.

16

6/23/04 at 85 (App. 0696) (Testimony of Martha Floyd); Tr. 6/23/04 at 74 (App. 1004)

(Testimony of Cindy Harper); Dec. Joy Krug (App. 0336–38).

43.     After his seventh grade year and the summer school that followed, Chad moved to

Indiana to live with his father and attended Westview Jr. High School. He enrolled in the eighth

grade on August 21, 1991, and was quickly referred for a special education assessment. He was

placed in a remedial reading program by September 10, 1991, and was evaluated by September

30, 1991. Marilyn Lauver, Chad's counselor there, reported that the school authorities quickly

provided special education services and bypassed the normal procedures for assessment. The

school acted so quickly with him because he had received special education services in the past

and because of his obvious intellectual and emotional deficits. Ms. Lauver further noted that his

communication, practical, and social skills were at an intellectually disabled level. *See* Report,

Natalie Novick–Brown, Ph.D., at 25–27 (App. 0075–77) (interview with Marilyn Lauver).

44.     School Psychologist Joy Krug, who assessed Chad in September 1991, found him

to be functionally intellectually disabled. She further concluded that he needed a great deal of

help to survive in school, that his verbal impairments prevented him from reasoning, and that his

ability to think abstractly and learn from experience was very limited. She also found that he was

"impulsive and tended to act before thinking." *Id.* at 24 (App. 0074) (describing interview with

Joy Krug). Based on Ms. Krug's assessment and his history, Chad received special education

supports in all academic subjects: Reading, Mathematics, Social Studies, and Science. *Id.* at 23–

25 (App. 0073–75); Dec. Joy Krug (App. 0336–38).

45.     After Westview, Chad returned to Ohio, transferred to an alternative school, and

was eventually sentenced to the Davis Center, a juvenile detention facility. There, he received his

GED and a certificate in welding. He received a second GED later while in prison in Indiana.

17

This is not evidence of adaptive behavior. Adaptive functioning is defined by an individual's typical functioning at home, at work, in school, or in the community, and focuses on the individual's need for supports in any one of these settings in order to function independently. DSM–5 at 38. By definition, highly structured environments such as prisons or juvenile placements provide a significant level of supports and do not allow individuals the freedom to function independently. Accordingly, inmates and residents in these institutions do not have to rely on their own adaptive resources in order to function and advance. For this reason, adaptive behavior assessments are not made based on functioning in prison or other highly structured environments. AAIDD–2012 at 20 (ID determinations are not based on prison functioning); DSM–5 at 38 (adaptive behavior may be difficult to assess in controlled settings such as prison). Consistent with this diagnostic standard, the Supreme Court has rejected adaptive behavior analyses that rely on improved functioning in prison. *Moore–I*, 137 S. Ct. at 1050; *Moore–II*, 2019 U.S. LEXIS 821 at *10–11. Accordingly, functioning in these settings is not probative of adaptive behavior.

46.     *To be clear, Petitioner is not proffering his juvenile detention and prison functioning as evidence of adaptive behavior.* Nevertheless, as a matter of thoroughness, Petitioner notes that even in the restrictive setting of the Davis Center and prison, Chad's performance was deficient. In juvenile detention, Chad required close supervision, had to retake one of the GED modules, and barely achieved the minimum average score needed to pass the exam (he received an average score of 45.6, with a score of 45 required). Similarly, even after receiving intensive, individualized instruction from the welding instructor, Chad still failed the welding test and had to retake it in order to receive his certificate. Finally, while in the restrictive environment of Indiana prison, having had additional years of cognitive development, and

18

having been carefully tutored on the GED while in juvenile before taking the GED a second time, Mr. Fulks still barely squeaked by with an average score of 48.  *See* Report, Natalie Novick–Brown, Ph.D., at 53, 107.

47.     Chad's impairments were apparent outside of the formal school setting as well. Linda Adkins, Chad's neighbor, indicated that he had early childhood delay in speech and language, motor, reading, and self–care skills. When he did learn to speak, he had a limited vocabulary, would frequently mispronounce words, and was very hard to understand. He also had difficulty understanding what he was being told and required frequent repetition before he could follow Ms. Adkins's instructions. Report, Natalie Novick–Brown, Ph.D., at 17 (App. 0067).

48.     Christina Kirkman (Holbrook), Chad's cousin, indicated that he had difficulty understanding basic schoolwork as a child. When he was in the second grade, she would help him with his homework. She found that he could not add or subtract, and had difficulties reading. Even with individualized instruction, Chad would have difficulty learning and become frustrated by his inability to grasp the material. He had deficits in attention and focus, and frequently could not repeat back what Ms. Kirkman was saying to him. At times, he would also perseverate on a phrase, repeating it over–and–over again. Report, Natalie Novick–Brown, Ph.D., at 18–20 (App. 68–70) (describing interview with Christina Kirkman); Dec. Christina Kirkman at ¶¶ 3, 7 (App. 0334).

49.     Dr. Novick–Brown administered the Fetal Alcohol Behavior Scale ("FABS") to Ms. Wolfe, Ms. Adkins, Ms. Lauver, and Ms. Kirkman. The FABS is a standardized assessment of behavior to determine whether an individual has the behavioral profile typical of someone with an FASD. Dr. Novick–Brown asked Ms. Wolfe, Ms. Adkins, Ms. Lauver, and Ms. Kirkman

19

to rate Petitioner's functioning on this scale at the target ages of ten, thirteen, fourteen, and twenty–one, respectively. All reporters returned scores in the range indicative of an FASD and found concordance on the following behaviors: "difficulty learning" and "performing precise tasks."[2] Report, Natalie Novick–Brown, Ph.D., at 34–36, 42 (App. 0084–86, 0092).

50.     Dr. Novick–Brown also administered a behavioral screening, inquiring into the presence of behaviors found to correlate with the presence of FASDs, to Gayle Wolfe, Linda Adkins, Christina Kirkman, and Marilyn Lauver. This screening focused on the presence of these characteristics at the ages of ten, thirteen, fourteen, and twenty–one, respectively. The results indicated concordance on the fact that Petitioner had difficulties learning from experience. Report, Natalie Novick–Brown, Ph.D., at 34–36, 42 (App. 0084–86, 0092).

51.     Achievement testing also reflected that Chad was consistently behind in his academic development. He first received individually administered achievement testing in the third grade, when he took the Wide Range Achievement Test ("WRAT") on November 1986 (nine years, six months). It reflected early evidence of impairments.[3] He scored in the bottom 9th percentile for word–reading, the bottom 12th percentile for mathematics, and the bottom 23rd percentile for spelling. The Kaufman Test of Educational Achievement, which was administered later that same school year, also reflected impaired scores: 18th percentile (math calculations); 14th percentile (spelling); 27th percentile (word–reading); and 37th percentile (reading comprehension). As time passed, he failed to develop intellectually and academically, his

---

[2] Ms. Kirkman responded "don't know" to many items, which rendered her overall score invalid. However, it did not render the individual responses invalid—which reflected concordance on "difficulty learning," "performing precise tasks," and other FABS data cited throughout this Petition.

[3] Although less reliable than individually administered testing and frequently inflated, group administered testing during early childhood also reflected impairments as early as kindergarten. *See* Report, Natalie Novick–Brown, Ph.D., at 41 (App. 0091).

20

classmates left him behind, and achievement test scores fell further and further below age–related expectations. *See* Report, Natalie Novick–Brown, Ph.D., at 40–42 (App. 0090–92).

52.    Chad took his last round of school–age individually administered achievement testing in September 1991 (fourteen years, four months). Despite having failed the first grade and having an additional year of cognitive development, Chad consistently received scores reflecting third to fifth–grade functioning on nine of the ten subtests that list grade equivalency. He also fell in the bottom 10th percentile or lower on fourteen of the sixteen reading, writing, and math subtests over four separate tests of achievement. (One of the tests does not list grade equivalencies.)  *See* Dec. Joy Krug (attached records) (App. 0339–41).

53.    Chad's eighth grade achievement test scores were as follows.

**INDIVIDUALLY ADMINISTERED**
**ACHIEVEMENT TEST SCORES – 8TH GRADE[4]**
**(14 years, 4 months – Age–Mates in the 9th Grade)**

| Test | Word–Reading | Reading Comp. | Spelling | Writing | Mathematics Calculation | Knowledge |
|------|-------------|---------------|----------|---------|------------------------|-----------|
| KBFAT | SS 68 2nd %ile GE 3.5 | | SS 75 5th %ile GE 4.6 | | SS 73 4th %ile GE 4.5 | |
| WJTA | | SS 95 37th %ile GE 8.0 | | SS 80 9th %ile GE 4.4 | SS 81 10th %ile GE 4.6 | SS 79 8th %ile GE 4.4 |
| WRAT | SS 74 4th %ile GE 4E | | SS 81 10th %ile GE 5B | | SS 66 1st % GE 4E | |
| TOWL | 2nd %ile | | 16th %ile | 2–5 %ile (4 subtests) | | |

---

[4] The abbreviations for this table are as follows. KFBAT: Kaufman Brief Form Achievement Test. WJTA: Woodcock Johnson Test of Achievement. WRAT: Wide Range Achievement Test. TOWL: Test of Written Language. SS: Standard Score. GE: Grade Equivalency.

21

PA0248

54. Mr. Fulks's adult–level achievement testing reflected similar impairments. As a twenty–five– and twenty–six–year–old, after years of special education supports and 2 rounds of GED courses, he tested predominantly at the fifth and sixth grade level across achievement testing administered by four separate psychologists and neuropsychologists. This testing reflected scores as low as the second grade level (writing). Even his most advanced scores were at the seventh and eighth grade levels, significantly below age–related expectations and showing significant impairments for a twenty–six–year–old adult. Report, Natalie Novick–Brown, Ph.D., at 41–42 (App. 0091–92).

**b. Executive functioning, memory, learning, and cognitive flexibility**

55. Mr. Fulks received neuropsychological testing from four separate neuropsychologists over the course of 2003 and 2004. This testing reflected cognitive impairments in, inter alia, his executive functioning, attention, processing speed, memory, and visuospatial processing. These constitute conceptual impairments themselves. They are also consistent with the behavioral descriptions of adaptive impairments described below.

56. In addition, a global analysis of Mr. Fulks's neuropsychological testing reflects a generalized processing and integration deficit that further impairs his executive functioning. Mr. Fulks has impairments in nine domains of neuropsychological functioning: intellectual functioning, academics, memory, visuospatial processing, attention, processing speed, motor skills, executive functioning, and communication. He is in the bottom 2nd percentile in at least 30 percent of the neuropsychological and achievement testing administered forensically. Dr. Novick–Brown explains that "executive functioning skills are responsible for making decisions about how to act," explaining that such skills are "[r]eferred to as 'higher order' cognitive processing because the executive center of the brain receives and then integrates, analyzes, and

22

PA0249

makes decisions based on neural input from other brain regions." *Id.* at 64 (App. 0114). Good executive functioning relies both on the cognitive capacity of the brain's decision–making centers as well as good input from the other regions of the brain. The testing demonstrates that Mr. Fulks has a widespread impairment both in his executive functioning and in the other areas of the brain that provide input to the executive functioning centers. Dr. Novick–Brown explains that "[t]est results in Mr. Fulks'[s] situation indicate marked executive dysfunction in conjunction with pervasive deficits in neural input, which largely explains why his adaptive functioning is so impaired when he had to make decisions on his own in complex situations." *Id.* at 65 (App. 0115). Accordingly, Mr. Fulks's executive functioning impairments become more severe as the environment or the tasks required of him become more complex. *Id.* at 64–65 (App. 0114–15).

57.     While they were assessed in adulthood, these impairments have been present since the developmental period. As detailed, *infra*, fetal alcohol diagnostician Julian K. Davies, M.D., has evaluated Petitioner and diagnosed him with an FASD. He has concluded that Petitioner's fetal alcohol exposure is a primary cause of his intellectual and cognitive impairments—including the impairments discussed above. Although Dr. Davies has noted the presence of other contributing factors to Petitioner's brain impairment, those factors all occurred during the developmental period and are additional risk factors for intellectual disability. *See* Section F, *infra*.

58.     Consistent with Mr. Fulks's neuropsychological impairments, the FASD behavioral screening administered by Dr. Novick–Brown to Ms. Adkins, Ms. Wolfe, Ms. Lauver, and Ms. Kirkman indicated agreement that Petitioner: was disorganized, was unaware of consequences, had difficulty following directions, was inattentive and had trouble concentrating,

PA0250

had transition problems, had a tendency to overreact, had poor impulse control, gave up easily, had poor judgment, could not take a hint, and was easily confused. Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096).

59.     The FABS results similarly showed that Petitioner had the following behavioral characteristics: unaware of the consequences of his behavior, had trouble completing tasks, poor judgment, poor attention control, and poor organizational skills. *Id.* at 46.

60.     Consistent with these behavioral ratings on instruments administered retrospectively, the Devereux Elementary School Behavior Rating Scale, completed by third grade teacher Dottie Thompson, returned significantly high scores in "Classroom Disturbance" and "Inattentive–Withdrawn," all of which indicates a lack of self–regulation. *See* Report, Rodney Pardue, 3/4/87 (App. 1075); Report, Natalie Novick–Brown, Ph.D., at 45 (App. 0095).

61.     Third–party reporters also described deficits in executive functioning. As discussed above, Dottie Thompson described Chad as distractible, having no self–direction or self–discipline, and needing constant supervision. Ms. Lauver described him as impulsive and unable to control his behavior. Ms. Krug found that Chad had impairments in reasoning, abstract thinking, impulse control, and the ability to learn from experience. *See* Report, Natalie Novick–Brown, Ph.D., at 46–47 (App. 0095–96) (describing interviews of Joy Krug, Marilyn Lauver); Referral for Multidisciplinary Assessment, Cabell County School District, 1/6/87 (App. 1065); Report, Rodney Pardue, 3/4/87 (App. 1073); Dec. Joy Krug (App. 0338).

62.     Chad's functioning outside of school reflected problems with executive functioning, memory, and cognitive flexibility as well. Ms. Adkins, Ms. Holbrook, and Kelly Perry (Ms. Adkins's daughter and Petitioner's childhood neighbor) described him as slow. Ms. Perry even noted that he was less developed cognitively than his younger brother Shannon. Mrs.

24

Perry also described Chad as emotionally unstable, indicating that he threw dramatic temper tantrums. *See* Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096) (describing interviews of Kirkman and Adkins); Dec. Kelly Perry (App. 0362).

### c.      Communication

63.      The neuropsychological testing conducted on Mr. Fulks over the course of 2003 and 2004 reflected impairments in both expressive and receptive communication. As discussed, *supra*, these deficits have been present since the developmental period and largely present since birth. Report, Natalie Novick-Brown, Ph.D., at 63 (App. 0113).

64.      Consistent with the testing administered during adulthood and his diagnosis of FASD, Chad showed communication impairments from early on in the developmental period. He received speech and language therapy from his second year of the first grade until the end of his school career. At age eight, the Arizona Proficiency Scale showed age–inappropriate errors in pronunciation. As noted *supra*, Chad's third grade teacher Dottie Thompson reported comprehension as a deficit when she completed the Devereux Elementary School Behavior Scale. That same year, his scores on the Peabody Picture Vocabulary Test ("PPVT")—a test of vocabulary and language—reflected a two–year delay in language development (bottom 12th percentile).[5] At the age of nine years, ten months, he tested at the three year, five month level. Finally, and consistent with other areas of functioning and his cognitive impairments, as Chad grew older, he fell further and further behind his age–mates. At fourteen years, four months, he was administered the PPVT again and his scores showed a five–year delay (age–equivalent of nine years, eight months, bottom 5th percentile). *See* Results of Selective Screening, 11/25/96

---

[5] School records reflect that Petitioner was administered the PPVT twice during the third grade, and that he received the same score (SS 81, bottom 12th percentile, Age Equivalent 7 y 9 m) both times.

(App. 1064); Academic Evaluation Report, Peggy Blatt, 2/24/87 (App. 1069); Dec. Joy Krug

(attached records) (App. 0341); Report, Julian K. Davies, M.D., at 19–20 (App. 0030–31).

65.     Chad's writing skills were similarly delayed. As discussed above, he was

administered the Test of Written Language ("TOWL") in the third grade (nine years old) and

was unable to complete it due to the length of the story. He was administered the TOWL again at

age fourteen. At that point, he was able to complete the test but received scores in the bottom 2nd

percentile on four of six subtests, the bottom 5th percentile on one of the six subtests, and the

bottom 16th percentile on the last subtest. Consistent with these impairments, when Mr. Fulks's

writing abilities were assessed at age twenty–six, he tested in the bottom 3rd percentile (at the

second grade level). *See* Report, Natalie Novick–Brown, Ph.D., at 122–23 (App. 0172–73).

66.     Third–party reporters also described language impairments. Linda Adkins

indicated that Chad's speech development was delayed. Ms. Adkins reported that he did not

begin speaking until three years old, and when he did it was difficult to understand him because

he would lisp and mispronounce words. (Ms. Perry also reported that he was difficult to

understand as a child.) Ms. Kirkman confirmed Chad's delay in speech development and that he

was difficult to understand even after he learned to speak. He also had difficulties with

pronunciation, and sounded "like a baby." *Id.* at 48 (App. 0098). Other children teased him

because of his speech issues. Ms. Kirkman indicated that he sounded more like a three–year–old

when he was seven. Even Mr. Fulks's father, whose memory of Chad's childhood was largely

nonexistent, indicated that Petitioner did not "say stuff real plain" as a child. *Id.* at 48 (App.

0098) (describing interviews with Linda Adkins, Christine Kirkman, and Roger Fulks); *see also*

Dec. Kelly Perry (App. 0362) (confirming that Petitioner was difficult to understand as a child).

26

67.     Chad also had deficits in receptive communication. Ms. Adkins and Ms. Perry reported that Ms. Adkins had to give him repeated instructions when asking him to do something, and even then he had difficulty understanding what Ms. Adkins wanted. Report, Natalie Novick–Brown, Ph.D., at 48–49 (App. 0098–99) (describing interviews with Linda Adkins and Christina Kirkman); Dec. Kelly Perry (App. 0362).

68.     Chad showed the same impairments in school. Ms. Wolfe reported that he was teased because of his speech impediment, was insecure about his speech, and frequently remained silent as a result. She also noted difficulties with receptive communication skills, indicating that she had to speak with him on a very basic level. Report, Natalie Novick–Brown, Ph.D., at 48–49 (App. 0098–99).

69.     The behavioral screening and FABS confirmed the presence of these impairments. All four reporters endorsed "indistinct speech" on the behavioral screening. On the FABS, the four reporters reflected concordance on: "communicates with poor timing/interrupts and communicates about unusual/unrealistic conversation topics." *Id.* at 47 (App. 0097).

### 3.     Multimethod Assessment: Social Domain

#### a.     Coping skills

70.     Chad was consistently described as having deficient coping skills in social settings. Gayle Wolfe described him as a follower and easily victimized socially. He was frequently in trouble, but never caused problems on his own. He was a "copycat" who was drawn into trouble by other, more sophisticated, children and could never explain what started the problems, why he got involved, or why he misbehaved. *Id.* at 49–50 (App. 0099–0100).

71.     Similarly, Ms. Lauver indicated that Chad was emotionally and socially immature. He seemed much younger than his age (fourteen), did not know how to solve problems with his peers, and did not know how to avoid social victimization in an age–

27

appropriate way. Ms. Lauver described his coping capacity as "almost non–existent." *Id.* at 50 (App. 0100).

72.     All four reporters on the behavioral screening "found concordance with respect to the following observed behaviors: immature, inflexible and stubborn, and moody/emotional outbursts." The standardized rating on the FABS reflected similar results. The reporters found concordance "on the following relevant behaviors: deficient mood control—rapid mood swings with changes triggered by seemingly small things and tendency to overreact." *Id.* at 49 (App. 0099).

### b.     Interpersonal relationships

73.     Mr. Fulks showed deficits in interpersonal relationships in multiple settings. Ms. Adkins reported that Chad was a follower and a "pleaser" as a child. He did not initiate activities. He was easily led by other children, and was frequently "picked on" and manipulated by his peers. He followed his older brother Dewayne around and "did whatever Dewayne told him to do. Dewayne tended to tell him do things that would get him into trouble." *Id.* at 50 (App. 0100) (describing interview with Linda Adkins). He seemed much younger than his actual age, and had no friends among his age–mates. Similarly, Ms. Kirkman could not recall Chad ever having a close friend in school, indicated that he did not know how to connect socially with people, and—as noted above—that he seemed more like a three–year–old when he was seven. *Id.* at 50–51 (App. 0100–01) (describing interviews of Christina Kirkman and Linda Adkins).

74.     Chad had similar impairments in the school setting. As detailed above, Ms. Wolfe noted that he was a follower, easily led by others, often lured into misconduct by more sophisticated children, and had little understanding as to why and how he got involved in misbehavior. Ms. Wolfe also indicated that that he was quiet, socially withdrawn, and immature.

PA0255

He acted like a five– or six–year–old, even though he was eleven at the time he was taught by Ms. Wolfe. He had weak social reciprocity skills, was "very backward socially," had no friends in school, and did not have the social skills to initiate friendships with peers. *Id.* at 51 (App. 0101). Additionally, he had little sense of risk, and consequently was caught up in serious fights on the playground. *Id.*

75.     Similarly, Ms. Lauver described Chad as unable to fit in despite initially trying to reach out to peers, lacking in social skills, and having no friends as a result. He came across as anxious, depressed, fearful, and suspicious. He showed no social judgment, and lacked basic social graces such as greeting people politely. He also had difficulty understanding jokes, and "[i]t was important to be very concrete and literal with" him. *Id.* at 26 (App. 0076). Ms. Lauver noted a marked delay in interpersonal skills: Petitioner acted like a seven–year–old, even though he was fourteen when she knew him. *Id.* at 52 (App. 0102).

76.     Regarding leisure activities, as detailed in Section 4, *infra*, in the discussion of the Practical Domain, Petitioner was teased and ostracized, and had difficulty fitting in, because he had trouble understanding the rules of games. *Id.* at 52 (App. 0102) (describing interviews with Linda Adkins and Christina Kirkman).

77.     The behavioral screening and FABS results all confirmed these behavioral reports. All four respondents on the behavioral screening agreed that Chad's behavior had the following characteristics: "superficial friendships, socially inept/problems with peers, follower/easily led by others, oppositional/disobedient, aggressive behavior with peers, difficulty with teamwork, and developmentally delayed." *Id.* at 50 (App. 0100). The FABS also returned concordance on the following characteristics: "had trouble playing on a team, established

29

superficial friendships easily but had no close friends, and seemed unaware of 'good manners.'"

*Id.*

### 4.     Multimethod Assessment: Practical Domain

#### a.     Recreation

78.     Kelly Perry, Linda Adkins, and Christina Kirkman reported that Chad had impairments in recreational skills during childhood, which stemmed from his trouble understanding the rules of games and impaired coordination. Ms. Perry stated that it was difficult to play with him because he was "slow in his thinking." *Id.* Ms. Adkins confirmed this account, indicating that Petitioner did not seem to understand games when he was a child, would get confused when he played volleyball, and did not understand the game. He had similar difficulties understanding kickball and would kick the ball at the wrong time. Ms. Kirkman also confirmed that Chad had difficulties understanding sports. All three reporters described problems with coordination. *Id.* at 52 (App. 0102) (describing interviews of Linda Adkins and Christina Kirkman); Dec. Kelly Perry (App. 0362).

79.     Visuomotor testing conducted in the developmental period confirmed Chad's brain–based problems with coordination. At age nine, he showed a two–year developmental delay. He showed visuomotor and perceptual problems again at age twelve. At age fourteen, he received test scores in the bottom 12th percentile (no age equivalency listed). Report, Natalie Novick–Brown, Ph.D., at 51–52 (App. 0101–02). Consistent with this childhood testing, Mr. Fulks's motor skills and visuospatial reasoning were shown to be impaired on neuropsychological testing administered when he was an adult. *Id.* at 56 (App. 0106).

80.     Finally, as an adolescent and an adult, Mr. Fulks had few normal recreational activities: his leisure activities largely consisted of drug and alcohol abuse. *Id.* at 52 (App. 0102).

30

### b.      Self–management across life settings

81.      Mr. Fulks showed a consistent failure to manage his functioning and behavior across multiple life settings. As discussed *supra*, he could not keep pace with his peers academically, despite years of special education supports; he was unable to sustain productive work during his adult years; and, he never lived independently for any length of time as an adult. *Id.* at 52–53 (App. 0102–03).

82.      Furthermore, he only accomplished something positive in his life—e.g., a GED, drug treatment, and a welding certificate—when in highly structured and controlled settings such as prison, juvenile facilities, or mental health placements. *Id.* To be clear, Petitioner is not proffering his prison functioning as evidence of adaptive behavior. *See* Section 2, *supra*. However, that he was unable to achieve anything of substance outside of these highly structured settings—when he had to rely on his own cognitive functioning to "organize and structure his behavior"—demonstrates the deficits in his ability to engage in adaptive reasoning and self–regulation across life–settings as well as deficits in the cognitive abilities related to self–sufficiency.[6] Report, Natalie Novick–Brown, Ph.D., at 52–53 (App. 0102–03).

### D.      Structural Evidence of Brain Impairments

83.      Evidence of Mr. Fulks's intellectual and adaptive deficits receives further support from structural evidence of brain damage. Prior to his trial, Mr. Fulks received an MRI, a PET scan, an EEG, and a Quantitative EEG ("QEEG"), all of which showed brain abnormalities. The MRI showed that there was a subarachnoid cyst in the right temporal lobe of Petitioner's brain, which had filled in an area where his brain had failed to develop. The PET scan and EEG revealed diffuse abnormality throughout his brain. The QEEG revealed evidence of brain

---

[6] As discussed above, although not reflective of his adaptive functioning, Mr. Fulks's functioning inside of juvenile detention and prison was also deficient.  *See* Section C.2, *supra*.

PA0258

damage in the frontal and occipital lobes. These structural abnormalities are consistent with brain damage from an FASD. Indeed, the nature and structure of these abnormalities, as shown on the PET scan and the MRI, demonstrated that both of these issues were congenital, and not formed through any post–natal trauma to the brain. Tr. 6/24/04 at 1–32 (Testimony of David Bachman, M.D.) (App. 0485–0513); Tr. 6/23/04 at 26 (App. 0648) (Testimony of James Evans, Ph.D.).

84. Prior to Mr. Fulks's 2004 trial, cognitive neuroscientist Ruben Gur, Ph.D., conducted a review of all of Mr. Fulks's imaging scans and a quantitative analysis of his PET scans, which revealed that he had a "highly abnormal brain." Tr. 6/28/04 at 24 (App. 0615). Dr. Gur noted the subarachnoid cyst, but also indicated that the cyst was "the least of [his] problems" because his "whole brain [was] misshapen." Tr. 6/16/04 at 78 (App. 0872). The structure of Mr. Fulks's brain abnormalities indicated that his brain never developed properly in the first place (as opposed to developing properly and then acquiring an injury). The quantitative analysis of the PET scan reflected abnormalities in the basal ganglia, thalamus, the cerebellum, and the frontal and temporal lobes. Consistent with Dr. Davies's diagnosis of FASD, these abnormalities were primarily congenital with fetal alcohol exposure as the most likely cause. *Id.* at 77–93 (App. 0871–87).

85. Christos Davatzikos, Ph.D., an Associate Professor of Radiology and Bioengineering at the University of Pennsylvania, subjected Mr. Fulks's MRI to a quantitative analysis. This quantitative analysis showed that Petitioner had a "highly abnormal profile" that could not have come from a normal brain. Tr. 6/26/04 at 19 (App. 0610). In addition to the cyst discussed above, quantitative MRI analysis reflected widespread abnormalities in the frontal and temporal lobes of the brain. This included, inter alia, abnormalities with the right frontal lobe, the

32

left temporal lobe, and the inferior frontal gyrus. Dr. Davitzikos also concluded that these abnormalities were likely congenital. *Id.* at 15–34 (App. 0606–25).

86.     Biostatistics and morphometrics expert Fred Bookstein, Ph.D., examined the MRI and noted that it showed an abnormal corpus callosum, which is highly correlated with FASDs. Dr. Bookstein concluded it was fifteen times more likely that Mr. Fulks brain was affected prenatally by alcohol than a brain in the general population and that the chance he suffered from an FASD was six hundred to one. Tr. 6/24/04 at 93–112 (App. 0574–93).

87.     Finally, as discussed above, Dr. Davies conducted a medical evaluation of Mr. Fulks and diagnosed him with an FASD. Dr. Davies is a Clinical Professor of Pediatrics at the University of Washington, School of Medicine. He is also a staff physician at the Fetal Alcohol Syndrome Clinic located in the University of Washington School of Medicine, which is both the longest–running FASD clinic in the country and one of the foremost Fetal Alcohol Spectrum Disorder diagnostic clinics in the United States. Dr. Davies has conducted research, authored articles, co–authored books, and conducted trainings related to FASDs. Curriculum Vitae, Julian K. Davies, M.D. (App. 0045–50); *See* Section F, *infra* (discussing Dr. Davies' analysis).

88.     FASD is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. Brain damage that results from FASD often includes lower IQ; attention and hyperactivity issues; difficulties with judgment and impulse control; language and social difficulties; learning problems; deficits in memory; and impairments in executive functioning skills such as flexibility; planning, organization; inhibition; and novel problem solving. *See* Report, Julian K. Davies, M.D., at 1 (App. 0012).

33

89.     Dr. Davies has reviewed the foregoing analyses and concluded that the nature of the structural brain damage documented above correlates with fetal alcohol exposure. Dr. Davies identified FASD as a primary cause of Mr. Fulks's brain damage. There are other potential risk factors for cognitive dysfunction in Mr. Fulks's history, such as pre–eighteen head injuries, early onset substance abuse, and complex trauma from an abusive and dysfunctional environment. However, Dr. Davies has identified these other factors as contributory factors to Mr. Fulks's brain damage that aggravated his FASD–related deficits.  Additionally, these risk factors were all present before the age of eighteen. *Id.* at 26–27, 31–33 (App. 0037–38, 0042–44).

90.     The structural brain damage documented above confirms Mr. Fulks's intellectual and adaptive impairments. Most fundamentally, it identifies the source of his intellectual and adaptive deficits and verifies that these deficits were present before the age of eighteen as his brain damage has been there since birth.

91.     Additionally, this brain damage lines up directly with the neuropsychological impairments described *supra*. The frontal and temporal lobes are associated with, inter alia, executive functioning (frontal), memory (temporal), and auditory language (temporal). Mr. Fulks's damaged frontal and temporal lobes explain the impairments in memory, attention, language, and executive functioning that are set forth through the neuropsychological testing. Furthermore, the thalamus functions as the "switchboard" of the brain and relays information from other parts of the brain to the executive centers for the purposes of making decisions. Tr. 6/16/04 at 49–50 (App. 0843–44) (Testimony of Ruben Gur, Ph.D.). The corpus callosum serves a similar function, relaying information back and forth between the two sides of the brain. These additional abnormalities show that Mr. Fulks's frontal and temporal lobe's ability to receive information from the rest of the brain is also impaired. This is consistent with the generalized

34

processing deficit reflected in the neuropsychological testing. Accordingly, Petitioner's structural brain damage, which has been present since before the age of eighteen, corresponds directly to his cognitive impairments. *Id.* at 47–48, 133–37 (App. 0841–42, 0927–31).

### E.  Age of Onset

92.  The age of onset for Mr. Fulks's intellectual and adaptive deficits was well before the age of eighteen. As set forth *supra*, Mr. Fulks had ID–level functioning from birth through adulthood. These deficits have been shown through: third–party reporters; records review; testing administered during the developmental period; achievement and neuropsychological testing administered forensically during adulthood; formal, retrospectively administered measures of adaptive behavior; behavioral ratings that were administered during the school years; and the retrospective administration of the FABS and a behavioral screening that encompassed three time periods before the age of eighteen. Additionally, Mr. Fulks suffers from an FASD and a number of other risk factors for intellectual disability, which establish the origin of the diagnosis and confirm that its age of onset was in the developmental period. *See* Section F, *infra*.

93.  The age of onset is further confirmed by the structural evidence of brain damage, which is a primary cause of the intellectual and adaptive deficits Mr. Fulks has suffered since birth. To the extent other risk factors such as substance abuse or head trauma have contributed to his impaired functioning, the evidence described above shows that the risk factors occurred in the developmental period and further strengthen the case for ID. *See* Section D, *supra*; Report, Julian Davies, M.D., at 2, 33 (App. 0013, 0044); Report, Natalie Novick–Brown, Ph.D., at 66–68 (App. 0116–18).

94.  That Mr. Fulks received IQ scores above the presumptive range for intellectual disability in childhood is consistent with an age of onset before the age of eighteen. Childhood

IQ scores are generally unstable, particularly in individuals such as Petitioner who were born with cognitive deficits. As age–peers progress, impaired individuals such as Petitioner develop more slowly than their age–group and fall increasingly behind. As a result, their scores drop. The risk factors for intellectual disability referred to above also correlate with drops in IQ during the developmental period. *See* Section B, *supra*, and Section F, *infra*; Report, Barry M. Crown, Ph.D. at 7–8 (App. 0007–08).

95.     Additionally, Mr. Fulks has had significant, pervasive adaptive deficits from early in his childhood. These deficits correspond to the ID–level intellectual functioning that was demonstrated during adulthood, not the scores from childhood. Even educators and mental health professionals who interacted with Petitioner when he was in school—who did not have the extensive imaging, record review, collateral reports, and testing that Petitioner presents— recognized that he was functionally intellectually disabled. Report, Natalie Novick–Brown, Ph.D., at 24–25, 27 (describing interviews with Joy Krug and Marilyn Lauver) (App. 0074–75, 0077); Report, Barry M. Crown, Ph.D. at 7–8 (App. 0007–08).

### F.     Risk Factors for Intellectual Disability

96.     Cause need not be determined for an ID diagnosis to be made. Intellectual disability has been established whenever the three prongs are present. DSM–5 at 39–40; AAIDD–2010 at 61. Nevertheless, current diagnostic standards have identified risk factors that correlate with the ID diagnosis and are known causes of it. *See* AAIDD–2010 at 57–68. These risk factors include biomedical factors that result in direct insults to cognition, as well as environmental risk factors in the social, educational, and behavior domains, which also affect cognitive development. *Id.* "Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning." *Id.* at 61. Frequently, biomedical risk factors interact with environmental ones to cause intellectual disability. *Id.* at 68.

36

97.     In its 2010 diagnostic manual, the AAIDD describes a person with ID who has the biomedical risk factor of a Fetal Alcohol Spectrum Disorder that interacts with environmental risk factors such as poverty, parental substance abuse, child abuse, and child neglect. *Id.* Petitioner's life history is almost identical to this example. He was born with an FASD and has a number of additional risk factors for ID in his history.

### 1.     Fetal Alcohol Spectrum Disorder

98.     FASD is a significant recognized risk factor for intellectual disability. *See* Greenspan, S., et. al., *Age of Onset and the Developmental Period Criteria*, The Death Penalty and Intellectual Disability (AAIDD–2015), at 80 (describing FASD as a "high frequency biological cause[] of ID"). As discussed in Section D, *supra*, FASD is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. *See* Report, Julian K. Davies, M.D., at 1 (App. 0012).

99.     Using the 4–Digit Code system, the most conservative and demanding of all diagnostic standards for evaluating FASDs, and also using the diagnostic system established by the Institute of Medicine ("IOM"), which is a subsidiary of the National Academies of Science, as well as the DSM–5, Dr. Davies concluded that Mr. Fulks suffers from an FASD. Under the 4–Digit Code, the diagnostic designation is Static Encephalopathy, Alcohol Exposed. Under the IOM Guidelines, the designation is Alcohol Related Neurodevelopmental Disorder. Under the DSM–5, he meets the definition of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure. Report, Julian K. Davies, M.D., at 2, 29 (App. 0013, 0040).

100.     Dr. Davies based his diagnosis on evidence of two diagnostic factors: prenatal alcohol exposure and brain dysfunction.

PA0264

### a.      Prenatal alcohol exposure

101.    Chad's mother, Diana Fulks, drank when she was pregnant with him. Both she and his father, Roger Fulks, reported that Diana drank alcohol throughout her pregnancies with Chad and his brothers Ronnie and Shannon. "Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone." During the time she was pregnant with Chad, she and Roger drank at least every weekend and transitioned into drinking on a daily basis. Roger would regularly come home from work to find her drunk. Report, Natalie Novick–Brown, Ph.D., at 29 (App. 0079).

102.    Kevin Holbrook, Petitioner's maternal uncle, reported that Diana drank heavily during all of her pregnancies, including her pregnancy with Petitioner. This included "[a] lot of whiskey. A lot of it." Both she and Roger would frequent bars during this time, and they were even out drinking on the night Diana went into labor with Chad. Tr. 6/22/04 at 129–30 (App. 1024–25) (Testimony of Kevin Holbrook).

103.    Furthermore Arlene Andrews, Ph.D., who conducted an assessment of Mr. Fulks's social history prior to his 2004 trial, interviewed a number of third–party reporters who stated that Diana and Roger "both started drinking heavily early, and she drank through her pregnancies with all of the sons." Tr. 6/24/04 at 154 (App. 0410) (Testimony of Arlene Andrews, Ph.D.).

104.    Diana's drinking habits after Chad's birth confirm her drinking while he was *in utero*. Diana drank heavily until Chad was fifteen years old. Christina Kirkman described Diana's problems with alcohol during Petitioner's childhood in an interview with Dr. Novick–Brown:

> She [Ms. Kirkman] recalled seeing Roger and Diana drinking alcohol together throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited

38

and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks [parents] would spend money on beer and cigarettes before buying clothes for their children.

Report, Natalie Novick–Brown, Ph.D., at 18 (App. 0068). *See also* Dec. Linda Adkins (describing Diana's alcohol abuse during Petitioner's childhood) (App. 0321).

### b.    Evidence of brain dysfunction

105.    The brain dysfunction criterion of an FASD is established in one of two ways: structural evidence of brain impairment or FASD–level deficits on neuropsychological testing. Although only one of these two elements has to be present for the criterion of brain dysfunction to be met, both elements are present for Mr. Fulks. The abnormal MRI, PET scan, EEG, and QEEG and the quantitative analyses of the MRI and PET scan discussed above all establish structural evidence of brain damage under both the IOM and the more demanding 4–Digit Code criteria. Report, Julian K. Davies, M.D., at 26–27 (App. 0037–38).

106.    Regarding neuropsychological evidence of impairments, the extensive neuropsychological and psychological testing conducted by four forensic practitioners prior to Petitioner's trial reflects 4–Digit Code–level neurocognitive impairments in five domains: executive functioning, memory, attention, language, and academic functioning. These deficits also meet the definition of neuropsychological evidence of brain impairment under the criteria set forth by the IOM. Mr. Fulks only needed this extent of impairments in three domains to satisfy this diagnostic element. Furthermore, Dr. Davies has found areas of dysfunction that do not rise to the 4–Digit Code level of impairment but still constitute brain damage in motor skills and intellectual functioning. Report, Julian K. Davies, M.D., at 17–21, 27 (App. 0028–32, 0038).

## 2.      Child Abuse

107.     Physical and/or sexual abuse during childhood is another risk factor for intellectual disability, regardless of whether head injuries occur. AAIDD–2010 at 60. This risk factor was present in Petitioner's history.

108.     Roger and Diana Fulks were physically abusive alcoholics who beat all of their children, whipped them, and threw them against walls. Roger beat Chad and his siblings with belts, pool sticks, and his fists. Diana hit them with her hands and with whatever objects she could lay her hands on. Witnesses observed both the beatings themselves, which were regular, and also observed injuries as a result of those beatings.[7]

109.     Chad also had an extensive history as the victim of child sexual abuse. Most significantly, when he was approximately thirteen years old, he was sexually abused by Gary Kaasee, Sr., the father of his childhood friend Michael Kaasee. He was sexually abused by a male stranger during that same period of time. At age fifteen, he was also sexually abused by his step–father Dean Thompson.[8]

---

[7] *See, e.g.,* Tr. 6/10/04 at 13–14 (Testimony of Ronnie Fulks) (App. 0814–15); Tr. 6/4/04 at 140 (Testimony of Dewayne Fulks) (App. 0732); Tr. 6/22/04 at 135–36 (Testimony of Kevin Holbrook) (App. 1030–31); Tr. 6/22/04 at 167, 174 (Testimony of Mark Fulks) (App. 0770, 0777); Dec. Nathan Fulks at ¶ 9 (App. 0330); Dec. Christina Kirkman (8/28/08) at ¶ 5 (App. 0334); Dec. Sharon Dotson at ¶ 11 (App. 0327); Tr. 6/22/04 at 234 (Testimony of Linda Adkins) (App. 0373); Tr. 6/22/04 at 212–13 (Testimony of Brian Messenger) (App. 1044–45); Tr. 6/23/04 at 91–94 (Testimony of Martha Floyd) (App. 0702–05).

[8] *See* Report, Natalie Novick–Brown, Ph.D., at 6–7, 11, 14 (App. 0056–57, 0061, 0064); Memo, Joy Krug, 11/26/91 (indicating that Petitioner has a history of "being molested by an older man") (App. 0349); Dec. Mike Kaasee at ¶¶ 7–8 (describing prompt report of sexual abuse) (App. 0333); Dec. Lewis Lambert, Sr. (describing Petitioner's emotional state after the abuse) (App. 0358); Dec. Lewis Lambert, Jr. (same) (App. 0356–57); Dec. Harry Krop, Ph.D. (describing Petitioner's history of sexual abuse) (App. 0204–08).

40

### 3.   Head Trauma During the Developmental Period

110.   Head trauma is also a risk factor for ID. AAIDD–2010 at 60. Mr. Fulks had a history of head injuries during the developmental period. Beginning at age seven, he suffered multiple instances of pre–eighteen head trauma including, inter alia, being hit with a can of paint and losing consciousness at age eleven or twelve, being knocked out while fighting with his brother at age nine or ten, and getting into car accidents at ages fifteen or sixteen and experiencing post–concussive symptoms. Report, Natalie Novick–Brown, Ph.D., at 13, 66 (App. 0063, 0116); Report, Barry M. Crown, Ph.D., at 3 (App. 0003); Dec. Russell Spears at ¶¶ 5–6 (App. 364).

### 4.   Parental Neglect, Impaired Parenting, Domestic Violence, and Malnutrition

111.   Parental neglect, impaired parenting, domestic violence, malnutrition, and poverty are all risk factors for ID. AAIDD–2010 at 60. They were all present in Petitioner's history.

112.   In addition to being physically abusive, Roger and Diana Fulks were neglectful, emotionally abusive, and impaired parents. Highly dysfunctional alcoholics, they drank until they were staggering or passed out. This occurred on a daily basis. They frequently drank and got high all night and slept through the day. They provided no parental supervision and overlooked obvious misbehavior such as stealing on the part of their children. The Fulks children played no sports, had no birthday parties, and did not participate in any normal childhood activities. Roger and Diana provided no support for the Fulks children to succeed academically, rarely attended conferences at the school, and, on one occasion, left Chad stranded at the school for hours after

41

he had a bathroom accident that soiled his clothing. Chad was described as receiving neither love nor moral guidance from his parents.[9]

113.    Petitioner was malnourished as a child. The Fulks children frequently went hungry as Diana and Roger would spend money on alcohol before they would buy food. The children often asked neighbors to feed them because their parents were either unable or unwilling to provide them with food. Indeed, when the children were very young, Diana gave the children bottles of Kool Aid instead of milk. The Fulks household was also filthy. It was overrun with roaches, flies, other bugs, rodents and dirty diapers. The Fulks children were frequently dirty and wore dirty, shabby, ill–fitting clothes.[10]

114.    Roger and Diana emotionally abused their children, cursing at them, insulting them, and calling them "unspeakable names." The weekly parties in the basement of their house where adults would drink, use drugs, fight, and engage in sexual acts, often in full view of the children. Roger displayed pornographic material where the children could see them and frequently showed Chad and his siblings pornographic movies, believing it to be funny.[11]

---

[9] *See, e.g.,* Tr. 6/10/04 at 10–12, 15–19 (Testimony of Ronnie Fulks) (App. 0811–13; Tr. 6/4/04 at 129–32, 137–39, 143, 145–48 (Testimony of Dewayne Fulks) (App. 0721–40); Tr. 6/22/04 at 136–37, 142–43 (Testimony of Kevin Holbrook) (App. 1031–1032, App. 1037–38); Tr. 6/22/04 at 162, 166–71 (Testimony of Mark Fulks); (App. 0765–74) Dec. Christina Kirkman, 1/27/17, at ¶ 2 (App. 0334); Dec. Linda Adkins, 1/27/17, at ¶¶ 2–3 (App. 0321); Tr. 6/22/04 at 231–33 (Testimony of Linda Adkins) (App. 0370–71); Tr. 6/22/04 at 212–15 (Testimony of Brian Messenger) (App. 1044–47).

[10] Tr. 6/4/04 at 129–32, 137–39, 143, 145–48 (Testimony of Dewayne Fulks) (App. 0721–40); Tr. 6/22/04 at 136–37, 142–43 (Testimony of Kevin Holbrook) (App. 1031–1032, App. 1037–38) ; Tr. 6/22/04 at 161–62, 166–71 (Testimony of Mark Fulks) (App. 0764–74); Dec. Nathan Fulks at ¶¶ 7–8 (App. 033); Dec. Dicie Fulks at ¶¶ 3–4, 7 (App. 1082–83); Dec. Linda Adkins, 1/27/17, at ¶¶ 2–3 (App. 0321); Dec. Kelly Perry, 1/27/17, at ¶¶ 2, 8 (App. 0362); Tr. 6/22/04 at 212–15 (Testimony of Brian Messenger) (App. 1044–47).

[11] Tr. 6/10/04 at 14 (Testimony of Ronnie Fulks) (App. 0815); Tr. 6/4/04 at 141–42, 150–51 (Testimony of Dewayne Fulks) (App. 0733–43); Tr. 6/22/04 at 135–38, 141–42 (Testimony of Kevin Holbrook) (App. 1030–37); Tr. 6/22/04 at 168–69; Dec. Sharon Dotson at ¶ 11 (App.

42

115.    Additionally, Roger and Diana had a volatile and mutually abusive relationship. They fought with each other using their fists and whatever objects were close at hand. This occurred in front of the children. Diana could fight as well as or better than most men, but Roger would eventually overcome her. In the aftermath of these fights, Diana was seen with bruises on her face and cut lips. These fights also occurred when Diana was pregnant with Chad.[12]

116.    Overall, Chad's childhood was characterized by turbulence, poverty, and abject parenting failures by Diana and Roger. Chad's juvenile probation officer Susan Hatcher and Officer Alan Meeks, a police officer who arrested Chad as a juvenile, agreed that Chad should be removed from his home because his home environment was so damaging. Tellingly, whether from lack of concern or the fact that he was in an alcoholic stupor for much of Chad's childhood, when questioned by Professor Andrews, Roger could not recall anything about his son before he was twelve years old. Tr. 6/23/04 at 0100–02 (Testimony of Susan Hatcher) (App. 1012–14); Tr. 6/24/04 at 138 (Testimony of Arlene Andrews, Ph.D.) (App. 0394).

### 5.    Family Poverty

117.    Family poverty is also a risk factor for intellectual disability. AAIDD–2010 at 60. As discussed above, Mr. Fulks grew up in poverty. His alcoholic parents failed to maintain a stable income, adequately manage the few financial resources they were able to maintain, or provide a stable environment. Chad and his siblings were undernourished and lived in horrible conditions. *See* Section 4, *supra*.

---

0327); Tr. 6/22/04 at 213 (Testimony of Brian Messenger) (App. 1045); Tr. 6/24/04 at 156–62, 68 (Testimony of Arlene Andrews, Ph.D.) (App. 0412–18, 0424).

[12] *See, e.g.,* Tr. 6/10/04 at 12–13 (Testimony of Ronnie Fulks) (App. 0813–14); Tr. 6/4/04 at 132–34 (Testimony of Dewayne Fulks) (App. 0724–26); Tr. 6/22/04 at 132–35 (Testimony of Kevin Holbrook) (App. 1027–30); Tr. 6/22/04 at 163–64 (Testimony of Mark Fulks) (App. 0766–67); Dec. Nathan Fulks at ¶ 5 (App. 0329); Tr. 6/22/04 at 233–35 (Testimony of Linda Adkins) (App. 0372–74); Tr. 6/22/04 at 213 (Testimony of Brian Messenger) (App. 1045); Tr. 6/24/04 at 156, 178–79 (Testimony of Arlene Andrews, Ph.D.) (App. 0412, 0434–35) .

43

### 6. Substance Abuse During Childhood

118. Childhood substance abuse is also a risk factor for intellectual disability, as it can cause drops in cognitive abilities over time. Report, Julian K. Davies, M.D., at 32 (App. 0043). Petitioner began drinking vodka and moonshine at eight or nine years old. At that same age, he began huffing paint and ingesting some form of formaldehyde and he eventually moved on to pre–eighteen use of cocaine, pills, and methamphetamine. *Id.*

### 7. Petitioner's FASD Is the Primary Cause of His Brain Impairments.

119. Although Mr. Fulks has a number of other risk factors for intellectual disability in his history, Dr. Davies has reviewed his history and functioning and determined that his FASD is a primary cause of his intellectual and cognitive impairments. Other risk factors for ID were present and likely contributed to his intellectual disability. However, his deficits presented themselves long before these risk factors emerged. Furthermore, the nature of his structural brain damage correlates highly with fetal alcohol exposure. Accordingly, Petitioner's FASD is the predominant cause of his ID and the other risk factors are co–occurring, contributory factors in Mr. Fulks's lifelong impairments. *See* Report, Julian Davies, M.D., at 30–33 (App. 0041–44); Report, Natalie Novick–Brown, Ph.D., at 66–69 (App. 0116–19); Report, Barry M. Crown, Ph.D., at 7 (App. 0007).

### G. Mr. Fulks Is Intellectually Disabled.

120. The above evidence establishes that Chad Fulks suffers from intellectual disability. He has deficits in intellectual and adaptive functioning, which had been present since before the age of eighteen. Petitioner's intellectual disability is established by extensive record review, four rounds of either neuropsychological or psychological testing, extensive imaging analyses, an EEG, and a QEEG, the presence of an FASD, and extensive interviews and testing

44

with collateral reports. His medical and functional history is almost identical to the archetype given by the AAIDD as to how intellectual disabilities develop.

121.    Mr. Fulks has been evaluated by neuropsychologist Barry M. Crown, Ph.D. An experienced clinical and forensic practitioner with decades of experience, Dr. Crown is a Diplomate with the American Board of Professional Neuropsychology, with added certifications in Child and Adolescent Neuropsychology, Neurodevelopmental Disabilities, Geriatric Neuropsychology, Forensic Neuropsychology, Rehabilitation Neuropsychology, Addiction Neuropsychology, and Neuroimaging in Neuropsychology. Dr. Crown has also served as the president, as the chair of the examinations committee, and as a member of the board of directors of the American Board of Professional Neuropsychology. Dr. Crown has conducted a clinical interview of Mr. Fulks, reviewed the extensive data discussed above, and evaluated Mr. Fulks under current diagnostic standards and concluded that he is intellectually disabled, meeting all three prongs of the diagnosis. *See* Report, Barry M. Crown, Ph.D. (App. 0001–09).

**H.     Relief Is Appropriate Under 28 U.S.C. § 2241.**

122.    This claim is appropriately brought under 28 U.S.C. § 2241. A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 586–89 (§ 2241 applies to challenges to a habeas petitioner's sentence, in addition to his conviction). "The essential function [of Section 2241] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (internal quotations omitted); *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (same).

123.    This category of claims includes, inter alia, claims that rely on a new legal or factual basis not available at the time of the petitioner's trial proceedings or his § 2255

45

proceedings. *See, e.g.*, *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Davenport*, 147 F.3d at 607–09; *Webster*, 784 F.3d at 1136. The majority of circuit courts of appeal—including the Seventh Circuit—have also expressly recognized that § 2241 is available to a petitioner if circuit precedent would have required the district court and appellate panel to erroneously reject petitioner's claim. *See, e.g.*, *Davenport*, 147 F.3d at 611.[13]

124.   Section 2241 is also the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence. *Kramer*, 347 F.3d at 217; *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241.").

125.   The Seventh Circuit has also found that § 2241 review is appropriate for "a non–frivolous claim of actual innocence" that could not have been brought under § 2255. *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). Likewise, § 2255 is "inadequate" when it prevents a prisoner from obtaining review of a legal theory that addresses the "fundamental legality" of a sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015).

126.   As detailed below, Mr. Fulks's claim that his intellectual disability renders him categorically ineligible for the death penalty fits within the category of claims cognizable under § 2241, as § 2255 was and remains inadequate or ineffective to test the legality of his sentence.

---

[13] *See also United States v. Barrett*, 178 F.3d 34, 51–52 (1st Cir. 1999); *Triestman v. United States*, 124 F.3d 361, 363 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245, 247–48, 251 (3d Cir. 1997); *United States v. Wheeler*, 886 F.3d 415, 434 (4th Cir. 2018); *Reyes–Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799, 805 (6th Cir. 2003); *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002).

PA0273

**1.      Petitioner's *Atkins* Claim Relies on New Legal and Factual Bases not Available at the Time of His § 2255 Proceedings, and on Supreme Court Jurisprudence Effectively Reversing Fourth Circuit Precedent.**

127.     As stated above, a federal prisoner may proceed under § 2241 when asserting a habeas claim that relies on a legal or factual basis not available at the time of petitioner's trial or § 2255 proceedings. *See Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607. For instance, in *Garza*, the § 2241 petitioner challenged his conviction and death sentence based on the issuance of an opinion from the Inter–American Commission on Human Rights, which found his execution would violate international law. *Id.* at 923. Because the opinion upon which the *Garza* petitioner relied could not have been generated until § 2255 proceedings had ended and Mr. Garza's legal claim did not satisfy the conditions necessary for a successive § 2255 petition, the Seventh Circuit found that Mr. Garza's claim was reviewable under § 2241. Similarly, in *Davenport*, the Seventh Circuit reviewed a claim based on a retroactive change in the United States Supreme Court's interpretation of federal statutory law under § 2241, explaining that § 2255 was not available because the Court's decision related to statutory, and not constitutional law. 147 F.3d at 607–11.

128.     In *Webster*, the habeas petitioner had been convicted of federal capital charges and sentenced to death. At his trial, Mr. Webster claimed that he was intellectually disabled and challenged his eligibility for the death penalty under *Atkins*, a claim the trial court rejected. *Webster*, 784 F.3d at 1125–33. Mr. Webster then presented newly discovered evidence of his intellectual disability that could not have been discovered at the time of trial by diligent counsel. *Id.* at 1133. Because Mr. Webster's execution would be constitutionally prohibited if his *Atkins* claim was meritorious and he could not seek review of this evidence under a successor § 2255 petition, the Seventh Circuit ruled that Mr. Webster's renewed *Atkins* claim and the new evidence were appropriately reviewed under § 2241. *Id.* at 1146.

47

129. Here, Mr. Fulks's *Atkins* claim relies on the Supreme Court's decisions in *Hall v. Florida* and *Moore v. Texas*, as well as the current diagnostic standards that *Hall* and *Moore* require courts to use in evaluating ID claims. Because *Hall* and *Moore* were decided in 2014 and 2017, respectively, they constitute legal bases that were not available at the time of Mr. Fulks's 2004 trial or at the time he filed his § 2255 petition. Likewise, because the current editions of the AAIDD–2012 and DSM–5 were not adopted until 2012 and 2013, respectively, they constitute new factual bases not available at the time of Mr. Fulks's 2004 trial or at the time he filed his § 2255 petition. Accordingly, the claim is properly asserted under § 2241.

        **a.**        **Petitioner's Claim that He Satisfies Prong One Relies on *Hall*, *Moore*, and Newly Adopted Diagnostic Criteria.**

130. While *Atkins* established that intellectually disabled persons are categorically ineligible for the death penalty, the Court did not provide "'definitive procedural or substantive guides for determining when a person who claims mental retardation' falls within the protection of the Eighth Amendment." *Hall*, 572 U.S. at 718. However, the Court did cite to language in the then–current fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) stating that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Atkins*, 536 U.S. at 308 n.3. The *Atkins* Court also observed that that an IQ "between 70 and 75 or lower" is usually considered the "cutoff IQ score" for prong one. *Id.* at 309 n.5 (internal quotation marks omitted). Indeed, at the time of Mr. Fulks's trial, several state statutes required an IQ score of 70 or below to establish intellectual disability and several others used a score of 70 or below as presumptive evidence of such a condition. *Id.* at 1196–97.[14]

---

[14] While federal law has prohibited the death penalty for the "mentally retarded" since 1994, the relevant statute does not define the term. 18 U.S.C. § 3596(c).

48

131.    However, the legal landscape governing *Atkins* claims changed significantly in 2014, when the Supreme Court held that intellectual disability cannot be assessed according to any single factor, but rather is a "conjunctive and interrelated assessment." *Hall*, 572 U.S. at 723. Specifically, in *Hall*, the Court struck down a Florida statute establishing a "strict IQ test score cutoff of 70" for determining the applicability of *Atkins*. *Id.* at 712. In doing so, the Court made clear that, in addition to IQ scores, "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is central to . . . diagnosing intellectual disability." *Id.* at 705 (citing DSM–5, at 37); *see also Brumfield*, 135 S. Ct. at 2277–78 (testimony that petitioner "scored 75 on an IQ test and *may have scored higher on another test* . . . was entirely consistent with intellectual disability" because "any IQ test score has a margin of error and is *only a factor* in assessing mental retardation") (emphasis added).

132.    More broadly, *Hall* was the first decision of the Supreme Court holding that States did not have "unfettered discretion to define the full scope of the constitutional protection" identified in *Atkins. Hall*, 572 U.S. at 719. Rather, with *Hall*, the Court established that the assessment of an *Atkins* claim must be "informed by the views of medical experts." *Id.* at 721; *see also id*. at 720–21 (recognizing that "[i]f the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality").

133.    Despite this requirement, however, many lower courts continued to employ outdated diagnostic standards, or to disregard clinical guidelines altogether, in assessing whether a defendant was entitled to *Atkins* relief. The Supreme Court definitively invalidated this practice with its 2017 decision in *Moore v. Texas*, in which it held that courts are required to apply the "medical community's *current standards*" when evaluating a claim of intellectual disability. *Id.*

49

at 1053 (emphasis added). Citing the current manuals from the APA and the AAIDD, the Court explained that "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* (quoting DSM–5, at xli).

134.    Although the *Moore* case itself focused on the adaptive–behavior prong of ID, it is equally significant for prong one because current clinical standards reject hard cutoffs for IQ scores, mandate application of the Flynn Effect and practice effect, and dictate that IQ scores be assessed in relation to adaptive deficits. *See* AAIDD–2007 at 20–21; AAIDD–2010 at 37; AAIDD–2012 at 23; DSM–5 at 37; *see also* McGrew, K., *Norm Obsolescence: The Flynn Effect*, at 160–62. Because all of these factors are critical to an accurate assessment of prong one of Mr. Fulks's *Atkins* claim, *Moore* (together with *Hall*) provided him with a previously–unavailable legal basis for that claim.

135.    In addition to these new legal bases for his claim, Mr. Fulks relies on new diagnostic criteria first published in the DSM–5 in 2013. For instance, the DSM–5 newly established that an individual's IQ scores must be evaluated in direct relation to his or her adaptive deficits, explaining:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real–life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

DSM–5 at 37. Consistent with this dynamic, the DSM–5 rejected the notion of ID evaluations as actuarial determinations, stating that "[t]he diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions." *Id.*

136.    The DSM–5, unlike the DSM–IV–TR, also recognizes that "[f]actors that may affect test scores include . . . the 'Flynn effect' (i.e. overly high scores due to out–of–date test norms)" and mandates that IQ scores be interpreted using clinical judgment and training. DSM–5 at 37. As discussed above, test score interpretation using clinical judgment includes correction for the Flynn Effect. *See supra* Section B.1.

137.    This newly available diagnostic standard constitutes new factual evidence in support of Mr. Fulks's ID claim that makes it reviewable under § 2241 in the same way that the newly–discovered evidence in *Webster* allowed the petition in that case to proceed under § 2241.

### b.    Petitioner's claim that he satisfies prong two relies on *Hall*, *Moore*, and newly adopted diagnostic criteria.

138.    As explained immediately above, before 2014, Supreme Court jurisprudence did not mandate that lower courts apply clinical standards in assessing an *Atkins* claim. Although this changed with the Court's decision in *Hall*, that case was limited to discussing the appropriate medical consensus regarding a prong–one evaluation. Thus, even in the wake of *Hall*, courts continued to ignore up–to–date medical consensus applicable to a prong two evaluation. For instance, in 2015, the Fourth Circuit rejected a petitioner's claim that the outcome of his sentencing would have been different had his jury been instructed pursuant to *Hall*, relying in particular on the evidence relating to his adaptive functioning. *See Prieto v. Zook*, 791 F.3d 465, 470–72 (4th Cir. 2015). In its analysis, the court deviated from the current diagnostic standards in several ways, including: overemphasizing the petitioner's perceived adaptive strengths, relying on erroneous lay stereotypes of intellectual disability, and considering the petitioner's criminal conduct and behavior in prison as part of the adaptive–deficits analysis. *See id.*; DSM–5 at 34–35, 38; AAIDD–2010 at 47, 49; AAIDD–2012 at 20, 60; *Moore–I*, 137 S. Ct. at 1046, 1050–52, n.6; *Moore–II*, 2019 U.S. LEXIS 821 at *9–13. The court also appeared to disregard

PA0278

evidence of significant risk factors for intellectual disability in the petitioner's history, which was also contrary to current diagnostic standards. *See Prieto*, 791 F.3d at 470–72; DSM–5 at 39; AAIDD–2010 at 57–62; *Moore–I*, 137 S. Ct. at 1051; *Moore–II*, 2019 U.S. LEXIS 821 at *5.

139.    Notably, the district court that presided over Mr. Fulks's sentencing and § 2255 proceedings committed similar errors just two years earlier in denying § 2255 relief to Mr. Fulks's co–conspirator, Brandan Basham. Specifically, the court found that Mr. Basham had failed to satisfy prong two of his *Atkins* claim based entirely on "the various 'skills' that Basham exhibited on his and Fulks's seventeen–day crime spree," agreeing with the Government that "Basham's actions clearly show that he operated at a level exceeding the ceiling abilities for mental retardation." *Basham v. United States*, 109 F. Supp. 3d 753, 841 (D.S.C. 2013). Among other unscientific aspects of the district court's analysis is the fact that it disregarded then– current diagnostic criteria expressly excluding criminal behavior from the adaptive behavior assessment. *See* AAIDD–2012 at 20; AAIDD–2010 at 49. Indeed, one of the seven so–called "*Briseño* factors" employed by Texas courts in assessing *Atkins* claims—the use of which was specifically struck down by the Supreme Court in *Moore*—asked the court to consider whether the petitioner's "offense require[d] forethought, planning, and complex execution of purpose?" *Moore–I* at 1046 n.6. As the Court observed in *Moore*, the *Briseño* factors were an "invention of the [Texas Court of Criminal Appeals] untied to any acknowledged source." *Id.* at 1044. It continued: "Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseño* factors 'creat[e] an unacceptable risk that persons with intellectual disability will be executed.'" *Id.* (quoting *Hall*, 134 S. Ct., at 1990).

140.    There is no reason to believe that, had Mr. Fulks asserted an *Atkins* claim in his § 2255 petition, the district court would have analyzed prong two of his claim any differently

52

than it analyzed that of Mr. Basham. However, post–*Moore*, it is clear that such an analysis is contrary to diagnostic standards and invalid. Hence, Mr. Fulks is now able to assert a successful *Atkins* claim on a legal basis that was not available to him at the time of his initial § 2255 proceedings.

141.   Additionally, the new prong two diagnostic criteria in the AAIDD–2012 and DSM–5, each of which was published after the district court denied Mr. Fulks's § 2255 petition, constitute new factual bases not available at the time of his § 2255 proceedings. For instance, both the AAIDD–2012 and the DSM–5 made clear for the first time that it is critical to avoid the use of stereotypes in assessing adaptive functioning. The AAIDD–2012 expressly identifies numerous commonly held, but erroneous, stereotypes relating to individuals with intellectual disability which "are unsupported by both professionals in the field and published literature" and "must be dispelled." AAIDD–2012 at 60; *see also id.* (warning that "a number of incorrect stereotypes" about ID "can interfere with justice"). These invidious stereotypes include that individuals with ID: "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." *Id.*

142.   The DSM–5 confronts several of these stereotypes by explicitly recognizing that persons with significant adaptive deficits can, inter alia, have romantic relationships in adulthood, maintain competitive employment in jobs that do not emphasize conceptual skills, function age–appropriately in personal care, arrange for their own transportation and manage

PA0280

money with support, raise a family with support, and develop a variety of recreational skills. *See*

DSM–5 at 34–35. The DSM–5 also provides more guidance as to what constitutes deficits in

adaptive functioning. *Id.* at 34–36.

143.    As with the new diagnostic criteria relating to prong one, the prong two criteria

that appeared for the first time in the AAIDD–2012 and DSM–5 constitute new factual bases

supporting Mr. Fulks's ID claim that were not available at the time of his § 2255 proceedings.

Together with the legal developments in *Moore–I*, these facts render Mr. Fulks's claim

appropriate for this Court's review under § 2241.

### 2.    Petitioner's Claim Challenges the Execution—not the Imposition—of His Sentence, as well as the Fundamental Legality of that Sentence.

144.    As explained above, § 2241 is the appropriate vehicle for claims that challenge

the execution, as opposed to the imposition, of a petitioner's sentence. This use of § 2241 has

been explained as follows:

> [F]ederal prisoners challenging some aspect of the execution of their sentence,
> such as denial of parole, may proceed under Section 2241. This difference arises
> from the fact that Section 2255, which like Section 2241 confers habeas corpus
> jurisdiction over petitions from federal prisoners, is expressly limited to
> challenges to the validity of the petitioner['s] sentence. Thus, Section 2241 is the
> only statute that confers habeas jurisdiction to hear the petition of a federal
> prisoner who is challenging not the validity but the execution of his sentence.

*Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001); *see also Valona*, 138 F.3d at 694 (7th Cir.

1998) ("A motion seeking relief on grounds concerning the execution but not the validity of the

conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain

of § 2241.").

145.    Here, Mr. Fulks is not claiming that his sentence violated *Atkins* at the time it was

imposed. Rather, consistent with the Supreme Court's decision in *Moore–I*, he claims that his

sentence is now unconstitutional under newly evolved diagnostic standards. *See Moore–I*, 137 S.

54

Ct. at 1050–53 (reversing Texas's denial of petitioner's *Atkins* claim, in part, because Texas employed diagnostic standards in effect at the time of petitioner's sentencing, as opposed to those current at the time of post–conviction review). And, because § 2241 contemplates challenges to the execution of petitioner's sentence, rather than the imposition, Mr. Fulks's claim that he is presently ineligible for the death penalty under *Atkins* and its progeny is properly brought under § 2241.

146.    Section 2241 is also the appropriate avenue of relief where the petitioner challenges the "fundamental legality" of his or her sentence. *Webster*, 784 F.3d at 1124–25 (7th Cir. 2015). The *Webster* court held that the petitioner had properly filed a § 2241 petition to establish that his intellectual disability made him ineligible for the death penalty. It described the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment." *Id*. at 1139. It accordingly recognized that, where a "structural problem" prevents a petitioner from bringing a second § 2255 motion, the petitioner may in some circumstances (there, because of the availability of new facts), bring a § 2241 petition. *Id*. "To hold otherwise," the Seventh Circuit explained, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.*; *see also id.* (noting that "a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence").

147.    Under current legal and diagnostic standards, Mr. Fulks is an intellectually disabled person. As such, precluding him from raising his *Atkins* claim under § 2241 to challenge the execution and fundamental legality of his unconstitutional death sentence would lead to precisely the "intolerable result" against which the *Webster* court warned.

PA0282

II.     **BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY**.

148.    Claim I establishes that Chad Fulks is ineligible for the death penalty on diagnostic grounds: he is intellectually disabled and meets all the criteria for intellectual disability. He is also ineligible on functional grounds, because, even assuming he is not intellectually disabled, his impairments satisfy all the requirements set forth in *Atkins*. Throughout his life, Mr. Fulks has suffered from the same adaptive deficits, measured by the same tests and clinical assessments, as the intellectually disabled. His deficits have impaired his functioning in the conceptual, social, and practical domains. He has longstanding deficits in intellectual functioning, with his three most recent IQ scores falling in the intellectually disabled range.

149.    In *Madison v. Alabama*, 2019 U.S. LEXIS 1595, ___ S. Ct. ___ (Feb. 27, 2019), the Supreme Court recently established that the Eighth Amendment forbids the execution of a person whose impaired functioning meets a constitutional test of categorical ineligibility, regardless of the underlying medical diagnosis. *Madison* establishes that Mr. Fulks is constitutionally ineligible for the death penalty for two independent reasons, in addition to the reasons in Claim I. First, his pervasive deficits warrant *Atkins* relief because he has the same lifelong adaptive impairments and the same low adult cognitive functioning as an intellectually disabled person, regardless of whether he qualifies for that medical diagnosis. Second, Mr. Fulks suffers from FASD, a disorder comparable in severity to ID. The adaptive and executive functioning deficits that accompany FASD are the same as those that accompany ID. Therefore, carrying out Mr. Fulks's death sentence would violate the Eighth Amendment for precisely the

56

same reasons that led the Supreme Court to announce a categorical ban on the intellectually

disabled in *Atkins*.

150.    This claim is cognizable under 28 U.S.C. § 2241 because: (a) it relies on a new

legal basis not available to Mr. Fulks at the time of his trial proceedings or his § 2255

proceedings; (b) it addresses the fundamental legality of his sentence; and (c) it involves a

challenge to the execution—as opposed to imposition—of his sentence under the Eighth

Amendment.

> **A.     The Eighth Amendment Prohibits the Execution of Individuals, Such as Mr. Fulks, Who Suffer from Deficient Cognitive Functioning and Adaptive Deficits Resulting from Fetal Alcohol Exposure.**

151.    As discussed extensively above, the Supreme Court held in *Atkins* that the

punishment of death for intellectually disabled offenders was excessive or disproportionate to

their crimes. 536 U.S. at 311. Three years later, in *Roper v. Simmons*, 543 U.S. 551 (2005), the

Court used similar reasoning to hold that juvenile offenders were also ineligible for the death

penalty. *Id.* at 568.

152.    To make these judgments, the Court applied the "evolving standards of decency

that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311–12 (quoting *Trop v.

Dulles*, 356 U.S. 86, 100–101 (1958)); *Roper*, 543 U.S. at 560–61. However, this objective

evidence, while important, was not dispositive for either of these determinations. The

Constitution, the Court held, required it to exercise its own judgment about whether there was a

"reason to disagree with" the societal consensus. *Atkins*, 536 U.S. at 312–13. Regarding the

intellectually disabled, the Court found:

> [Intellectually disabled] persons frequently know the difference between right and
> wrong, and are competent to stand trial. Because of their impairments, however,
> by definition they have diminished capacities to understand and process
> information, to communicate, to abstract from mistakes and learn from
> experience, to engage in logical reasoning, to control impulses, and to understand

57

PA0284

the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318.

153.    Similarly, in *Roper*, the Supreme Court found that juveniles have a "lack of maturity and underdeveloped sense of responsibility," that they "are more vulnerable or susceptible to negative influences and outside pressures," and that the "character of a juvenile is not as well formed as that of an adult." *Roper*, 543 U.S. at 569–70.

154.    Furthermore, regarding the intellectually disabled, the Court held that:

The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is enhanced . . . by the lesser ability of [intellectually disabled] defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. [Intellectually disabled] defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.

*Atkins,* 536 U.S. at 320–21.

155.    These deficiencies prevented either of the traditionally recognized justifications for capital punishment—retribution or deterrence—from applying to offenders who were intellectually disabled or offenders who were under the age of eighteen at the time of the crime. *Id.* at 319; *Roper*, 543 U.S. at 570. Accordingly, the Court concluded that executing intellectually disabled defendants and juveniles constituted cruel and unusual punishment.

156.    Most recently, the Court has adopted a functional, instead of a diagnostic, test for deciding whether an individual's limitations categorically exclude him or her from eligibility for capital punishment. *See Madison*, 2019 U.S. LEXIS 1595. *Madison* considered whether a prisoner's "insanity" rendered him ineligible for execution under the Eighth Amendment, and

58

PA0285

applied the test enunciated in *Panetti v. Quarterman*, 551 U.S. 930 (2007): whether "'the

prisoner's mental state is so distorted by mental illness' that he lacks a 'rational understanding'

of 'the State's rationale for his execution.'" *Madison*, 2019 U.S. LEXIS 1595 at *7 (quoting

*Panetti*, 551 U.S. at 958–60). In contrast to the prisoners in *Panetti* and the Court's earlier

opinion in *Ford v. Wainwright*, 477 U.S. 399 (1986), Madison suffered from dementia, not

delusions. Justice Kagan, for the majority, found the diagnosis constitutionally irrelevant:

> *Panetti* framed its test, as just described, in a way utterly indifferent to a
> prisoner's specific mental illness. The *Panetti* standard concerns, once again, not
> the diagnosis of such illness, but a consequence—to wit, the prisoner's inability to
> rationally understand his punishment. And here too, the key
> justifications *Ford* and *Panetti* offered for the Eighth Amendment's bar confirm
> our conclusion about its reach. As described above, those decisions stated that an
> execution lacks retributive purpose when a mentally ill prisoner cannot
> understand the societal judgment underlying his sentence. And they indicated that
> an execution offends morality in the same circumstance. Both rationales for the
> constitutional bar thus hinge (just as the *Panetti* standard deriving from them
> does) on the prisoner's "[in]comprehension of why he has been singled out" to
> die.

*Madison*, 2019 U.S. LEXIS 1595 at *20 (citations omitted). The Court remanded the case with

directions that the State address Madison's impairments in light of the appropriate Eighth

Amendment test, "even though he suffers from dementia, rather than delusions." *Id*., 2019 U.S.

LEXIS 1595 at *15.

157.     *Madison* requires a functional assessment of a particular prisoner's impairments.

It also requires a functional assessment of disorders other than ID. Since *Atkins*, informed

observers increasingly have recognized that other severe mental disorders are morally

indistinguishable from intellectual disability. In 2006, the American Bar Association adopted a

resolution providing in relevant part that:

> Defendants should not be executed or sentenced to death if, at the time of the
> offense, they had a severe mental disorder or disability that significantly impaired
> their capacity (a) to appreciate the nature, consequences or wrongfulness of their

59

conduct, (b) exercise rational judgment in relation to conduct, or (c) conform their conduct to the requirements of law.

*      *      *

A sentence of death should not be carried out if the prisoner has a mental disorder or disability that significantly impairs his or her capacity (i) to make a rational decision to forgo or terminate post–conviction proceedings available to challenge the validity of the conviction or sentence; (ii) to understand or communication pertinent information, or otherwise assist counsel, in relation to specific claims bearing on the validity of the conviction or sentence that cannot be fairly resolved without the prisoner's participation; or (iii) to understand the nature and purpose of the punishment, or to appreciate the reason for its imposition in the prisoner's own case.

American Bar Association, Resolution 122A (Aug. 7–8, 2006) *reprinted in* 30 Mental and Physical Disabilities Law Review 668 (Sept.–Oct. 2006). The American Psychiatric Association and the American Psychological Association had previously adopted this resolution in identical form. *Id.*

158.    Several experienced jurists, faced with the excruciatingly difficult duty of reviewing death sentences imposed on defendants who suffer severe mental disabilities, have concluded that the categorical exclusion of *Atkins* should be extended to individuals with serious mental illness. In *Corcoran v. State*, 774 N.E.2d 495 (Ind. 2002), Justice Rucker, citing *Atkins* and dissenting, wrote:

There has been no argument in this case that Corcoran is mentally retarded. However, the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill, namely evolving standards of decency. . . . I would hold that a seriously mentally ill person is not among those most deserving to be put to death. To do so in my view violated the Cruel and Unusual Punishment provision of the Indiana Constitution.

*Id.* at 502–03; *accord State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting) ("evolving standards of decency" should preclude execution of defendant who has chronic schizophrenia, a medical disease); *see also State v. Ketterer*, 855 N.E.2d 48, 81–

60

87 (Ohio 2006) (Stratton, J., concurring) (citing ABA resolution, and concluding that "[t]he time has come for our society to reexamine the execution of persons with severe mental illness"). Other jurists have voiced similar reservations in other contexts, as have representatives of religious communities, the European Union, and the United Nations Commission for Human Rights. *See* Laurie T. Izutsu, Note, *Applying* Atkins v. Virginia *to Capital Defendants With Severe Mental Illness*, 70 Brook. L. Rev. 995, 1007–10 & nn.86–103 (2005) (collecting references). National polling data, too, reflect increasing public opposition to the execution of those with severe mental impairments. *Id.* at 1010–11 & nn.105–16.

159.    As discussed in greater detail below, Mr. Fulks's specific deficits make him functionally ineligible for the death penalty. Just as Mr. Madison could be constitutionally ineligible for execution if his impairments satisfied *Panetti* and *Ford*, regardless of his diagnosis, Mr. Fulks is constitutionally ineligible for execution if his impairments satisfy *Atkins*, independently of whether he qualifies for an ID diagnosis. Moreover, FASD—another diagnosis that applies to Mr. Fulks—impairs judgment, reasoning, impulse control, and the ability to appreciate consequences. It is a congenital birth defect that originates *in utero* for reasons beyond the sufferers' control. Thus, the *Atkins* Court's reasons for declaring the execution of the intellectually disabled unconstitutional apply equally to those who, like Chad Fulks, suffer from FASD: "Because of their disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins*, 536 U.S. at 306.

61

**B.      Mr. Fulks's Cognitive and Adaptive Deficits Render Him Ineligible for the Death Penalty.**

**1.      Both Mr. Fulks's Adult IQ Scores and His Lifelong Adaptive Functioning Fall in the Intellectually Disabled Range and Render Him Categorically Ineligible for the Death Penalty.**

160.    As discussed in detail in Claim I, Mr. Fulks received three IQ tests in adulthood, over the course of a single ten–month period. On the first, he received a Flynn–corrected score of 75, which falls squarely within the range of intellectual disability. The second and third scores fell one and two points, respectively, above the presumptive range for ID when corrected for the Flynn Effect. *See* Report, Barry M. Crown, Ph.D., at 6 (App. 0006). According to Dr. Crown, practice effects could explain these slightly higher scores, given their proximity to first test. Dr. Crown found that, "overall, this pattern of test results is within the range for intellectual disability." *Id*.

161.    As Claim I also discusses in detail, Mr. Fulks's lifelong adaptive functioning has manifested significant deficits in multiple domains that more than satisfy the second requirement for an ID diagnosis. Dr. Brown administered a recognized test of adaptive behavior, the Vineland Adaptive Behavior Scales – 3rd Edition. Mr. Fulks scored at or below the first percentile in all three of the tested domains, communication, daily living skills, and socialization. *See* Report, Natalie Novick–Brown, Ph.D., at 32–34 (App. 0082–84). In addition, Dr. Brown, after conducting an extensive record review, interviewing third parties who had known Mr. Fulks, and considering other third–party reports, found Mr. Fulks deficient in multiple domains. *In the conceptual domain*, he had deficits in functional academics, learning and memory, executive functioning, and communication; *in the social domain*, he had deficits in coping and interpersonal behaviors; and *in the practical domain*, he had deficits in recreation and self–management. *Id.* at 39–53 (App.0089–0103).

62

162.    It is constitutionally irrelevant whether Mr. Fulks also qualifies for a formal ID

diagnosis, as established in Claim I. As an adult, he fully satisfies the functional criteria for ID—

significantly subaverage intellectual functioning and significantly deficits in adaptive behavior.

As in *Madison*, therefore, he is constitutionally ineligible for the death penalty.

### 2. Mr. Fulks's FASD Renders Him Categorically Ineligible for the Death Penalty.

163.    FASD is an umbrella term for a spectrum of birth defects and central nervous

system ("CNS") impairments caused by prenatal exposure to alcohol. Mr. Fulks's test results

amply satisfy the criteria for CNS impairments necessary for an FASD diagnosis:

> [N]europsychological testing by four different psychologists, using a variety of tests, found significantly impaired functioning (i.e., 1 or more standard deviations below the mean) in **nine** domains per CDC guidelines for neurocognitive disability in FAS or **eight** domains (excluding Academics) under more stringent 4–Digit Code guidelines (i.e., 2 or more standard deviations below the mean). In either case, the *number of deficient domains is consistent with ID* as well as *consistent with the central nervous system abnormality found in FASD.*

Report, Natalie Novick–Brown, Ph.D., at 57 (App. 0107) (emphasis in original). The sheer

number of these dysfunctional domains, and the number of those involving at least moderate

impairment, results in a "generalized processing and integration deficit" that impairs his ability

to deal with environmental complexity. *Id.* at 64–65 (App. 0114–15).

164.    The CNS deficits of FASD cause the same impairments that afflict the

intellectually disabled. The *Atkins* Court noted the "diminished capacities" of the intellectually

disabled to:

- Understand and process information;

- Communicate;

- Abstract from mistakes and learn from experience;

- Engage in logical reasoning;

63

PA0290

- Control impulses; and

- Understand the reactions of others.

536 U.S. at 318. The Court observed that, in group settings, the intellectually disabled tend to act as "followers rather than leaders." *Id*. It held that, because of these qualities, executing the intellectually disabled would not "measurably further" the goals of retribution or deterrence, and that accordingly "such punishment is excessive and [] the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id*. at 321 (quoting *Ford*).

165.    Those who suffer from FASD have similar limitations. As Dr. Davies describes:

> The brain injuries caused by drinking during pregnancy are variable, but can include such outcomes as lower IQ, ADHD (attention deficit/hyperactivity disorder), difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions – "higher–level" cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem–solving. Individuals with FASDs have daily functioning skills and life outcomes that are often more impaired than their IQ alone would predict.

Report, Julian Davies, M.D., at 1 (App. 0012) (citing A.P. Streissguth et al., *Risk Factors For Adverse Life Outcomes In Fetal Alcohol Syndrome And Fetal Alcohol Effects*, 25(4) Journal of Developmental & Behavioral Pediatrics 228–38 (2004)).

166.    Mr. Fulks, like others with FASD, has suffered from all the impairments described in *Atkins* throughout his life.

167.    *Understanding and processing information*: Achievement testing in Mr. Fulks's adult years showed "deficits in most academic domains" and "deficits as low as 2.5 standard deviations below the mean" in tests of memory and learning. He scored as low as 2.5 standard deviations below the mean in tests of his visuospatial processing skills, which are associated with

64

learning disabilities in mathematics, and as low as 3.3 standard deviations below the mean in tests of processing speed. Report, Natalie Novick–Brown, Ph.D., at 60, 61 (App. 0110, 0111). Mr. Fulks received special education services from his second year of first grade through junior high. *Id.* at 39 (App. 0089). Beginning in kindergarten, achievement testing during his school years "indicated learning deficiency in all academic areas." *Id.* at 40 (App. 0090).

168.    *Communication*: School records show that he received speech therapy throughout his school years. He received significantly low scores in comprehension on a structured rating instrument called the Devereux in third grade, and reporters who knew him in childhood described his indistinct speech. Testing of his communications skills found deficits that fell as low as two standard deviations below the mean, which was consistent with his childhood deficits. *Id.* at 47–49, 63 (App. 0097–99, 113).

169.    *Abstracting from mistakes and learning from experience*: Behavior Screens administered to a teacher, a neighbor, a cousin, and a school counselor who knew Mr. Fulks reported their "concordan[t]" recollections of his "inflexible" and "stubborn" behaviors. He was unable to explain to his fifth grade Behavioral Disorder teacher "what started problems, why he got involved, or why he did things." *Id.* at 49 (App. 0099). As Dr. Brown explains:

> The generalized processing deficit in FASD explains why Mr. Fulks cannot think quickly (i.e., deficient processing speed) or generalize (i.e., deficient executive functioning) in the context of a 'new' experience that doesn't exactly resemble an old event. Consistent with the generalized processing deficit, Mr. Fulks' history was replete with examples of situations where he made bad decisions, showing he did not learn from experience or cope adequately when left to his own devices.

*Id.* at 65 (App. 0115).

170.    *Logical reasoning*: "Executive dysfunction is *the* hallmark deficit in FASD." *Id.* at 62 (App. 0112). As Dr. Brown explains, "the executive system in an *intact* brain will conduct a complex reasoning process that includes considering consequences, weighing risks/benefits,

65

and linking cause and effect while resisting inappropriate impulses from the limbic system—*all*

*before communicating with the body about how to act. . . .* If executive functioning [] is

impaired, then the process of conscious cognitive processing will be faulty and produce adaptive

dysfunction." *Id.* at 64 (App. 0114) (emphasis in original). Among other deficiencies in the

components of executive functioning, "those with FASD tend to have problems on

neuropsychological tests that assess cognitive planning . . . and multiple measures of concept

formation." Mr. Fulks's scores on tests of executive function amply demonstrated deficiencies in

this domain, falling as low as 2.0 standard deviations below the mean and in one case more than

4.0 standard deviations below the mean. *Id*. at 62–63 (App. 0112–13). Reporters who completed

behavioral screens concurred on his deficiencies in consequential thinking, and his junior high

school psychologist reported that "his verbal impairments prevented him from reasoning, [and]

that his abilities to think abstractly and learn from experience were very limited." *Id.* at 46 (App.

0096).

171.    *Impulsivity*: Impulsivity in FASD also stems from executive functioning deficits.

The literature contains "consistent empirical evidence of impairments in . . . response inhibition

and executive control." *Id.* at 62–63 (App. 0112–13). As discussed above, Mr. Fulks achieved

deficient scores in tests of executive functioning as an adult. Standardized behavior rating in

third grade found that he lacked self–regulatory control. *Id.* at 45 (App. 0095) Many reporters

described his impulsive behaviors. Report, Natalie Novick–Brown, Ph.D., at 46 (App. 0096). As

Dr. Brown explains:

> The generalized [processing] deficit does not mean a person with FASD cannot
> lead others or plan or make choices. However, it does mean that the capacity to
> lead, plan, and make choices will be flawed by deficient executive processing.
> That is, executive processes such as considering consequences and weighing
> options will be biologically derailed by strong emotions and urges from the limbic
> system that the individual does not have the executive capacity to override.

PA0293

*Id.* at 65–66 (App. 0115–16).

172.    *Understanding reactions of others*: On a standardized screening instrument, the Fetal Alcohol Behavior Screen, three persons who had known Mr. Fulks in childhood or youth gave concordant reports about the following behaviors: he had trouble playing on a team, established superficial friendships easily but had no close friends, and seemed unaware of "good manners." *Id.* at 50 (App. 0100). His cousin recalled that he "didn't know how to connect socially," and a teacher described him as "weak in social reciprocity." *Id.* at 51 (App. 0101). A junior high school counselor reported that he lacked social graces and did not understand humor or jokes. *Id.*

173.    *Following*: Multiple persons who had known Mr. Fulks as a child described him as a follower. *Id.* at 50–51 (App. 0100–01).

174.    After reviewing these and other adaptive deficits, Dr. Brown concluded:

> Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.

*Id.* at 66 (App. 0116). Dr. Davies, relying on the "very poor adaptive functioning described in Dr. Brown's report," concluded that "[o]n the fetal alcohol spectrum, Mr. Fulks's brain injuries and overall functioning qualify as severe." Report, Julian Davies, M.D., at 28 (App. 0039).

175.    Executing a person who suffers from the CNS deficits of FASD no more serves the retributive or deterrent purposes of capital punishment than executing the intellectually disabled. Mr. Fulks's FASD, no less than his intellectual disability, should render him ineligible for the death penalty under the Eighth Amendment.

67

### C.    The Claim Is Cognizable Under § 2241.

176.    Mr. Fulks appropriately brings this claim under 28 U.S.C. § 2241. As discussed in Claim I, a federal prisoner may obtain habeas review under § 2241 when § 2255 is "inadequate or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e); *see also Brown*, 719 F.3d at 586–89. The courts have recognized the availability of § 2241 various types of cases. They have sometimes reviewed claims that rely on new legal bases not available at the time of petitioners' trial proceedings or § 2255 proceedings. *See, e.g.*, *Garza*, 253 F.3d at 924–25; *Davenport*, 147 F.3d at 607–09. Courts have also found § 2255 "inadequate" when it prevents a prisoner from obtaining review of a legal theory that establishes his or her actual innocence, *see Kramer*, 347 F.3d at 217 (citing *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)), or one that addresses the "fundamental legality" of a sentence, *Webster*, 784 F.3d at 1124–25. In other cases, courts have recognized the cognizability of claims under § 2241 that challenged the execution, as opposed to the imposition, of petitioners' sentences. *See Kramer*, 347 F.3d at 217; *Valona*, 138 F.3d at 694.

177.    Mr. Fulks's claim should likewise receive § 2241 review because he relies on new legal developments that establish the unconstitutionality of his sentence, and challenges the execution rather than the imposition of that sentence.

178.    First, Mr. Fulks relies on *Madison* to support his claim that he is functionally ineligible for the death penalty. The Supreme Court decided *Madison* on February 27, 2019, long after his trial, direct appeal, and § 2255 proceedings. A "structural problem" prevents him from seeking permission for a second § 2255 motion, *see Webster*, 784 F.3d at 1139, because the new evidence on which he relies does not establish that "no reasonable factfinder would have found [him] guilty," and the Supreme Court has not explicitly declared *Madison*'s retroactivity. *See* 28 U.S.C. § 2255(h)(1), (2).

68

PA0295

179.    Second, as in *Webster*, 784 F.3d at 1124–25, Mr. Fulks challenges the "fundamental legality" of his sentence. He relies on a series of cases, beginning with *Atkins* and culminating in *Madison*, that establish its unconstitutionality. *See Atkins*, 536 U.S. 304 (Eighth Amendment prohibits imposition of death penalty on the intellectually disabled); *Roper*, 543 U.S. 551 (Eighth Amendment prohibits imposition of death penalty on individuals who were under the age of eighteen at the time of the offense); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (Eighth Amendment prohibits imposition of death penalty for non–homicide offenses, including rape of child); *Graham v. Florida*, 560 U.S. 48 (2010) (Eighth Amendment prohibits imposition of sentence of life without parole sentence on juvenile offenders not convicted of homicide); *Miller v. Alabama*, 132 S. Ct. 2455 (2012) (Eighth Amendment precludes mandatory life in prison without possibility of parole for juvenile homicide offenders); *Hall*, 134 S. Ct. 1986 (categorical exemption for intellectually disabled established in *Atkins* cannot be statutorily limited to those with an IQ score falling below a certain number); *Moore–I*, 137 S. Ct. at 1053 (2017) (assessment for categorical exemption for intellectually disabled must employ current medical standards). As in *Webster*, a construction of the § 2255 savings clause that prevented Mr. Fulks from making this claim would qualify as "Kafkaesque." *Webster*, 784 F.3d at 1139.

180.    Finally, Mr. Fulks challenges the execution of his sentence. Even if petitioners in other cases have obtained *Atkins* relief before trial, on appeal, or in initial post–conviction and habeas proceedings, executing a person ineligible for the death penalty remains unconstitutional regardless of the validity of his conviction or the imposition of his sentence. Mr. Fulks therefore appropriately invokes § 2241 to challenge the execution of his own death sentence.

181.    Chad Fulks has struggled throughout his life with profound CNS deficits that followed him from the womb, impaired his development, and prevented him from understanding

69

and functioning adaptively in the world. This Court should recognize his ineligibility for the

death penalty and grant him § 2241 relief on this ground.

**III.      PETITIONER'S SENTENCE OF DEATH WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL (WITHDRAWN).**

182.     Petitioner withdraws this claim, which was originally advanced in his petition for

writ of habeas corpus, filed on January 29, 2015 (Dkt. 1).

70

PA0297

## **REQUEST FOR RELIEF**

For all of the above reasons, and based upon the full record of this matter, Petitioner

requests that the Court provide the following relief:

A)    That an evidentiary hearing be conducted on the merits of Petitioner's claims, any procedural issues, and all disputed issues of fact;

B)    That leave to amend this Petition be granted, if necessary, after further fact development through investigation and an evidentiary hearing;

D)    That Petitioner be allowed a reasonable time to file a memorandum of law in support of this Petition following any further fact development or following the denial of fact development; that the Government be allowed a reasonable time to respond; and that Petitioner be allowed a reasonable time to reply;

E)    That habeas relief from Petitioner's sentence of death be granted.

Respectfully submitted,

/s/ Peter Williams
PETER WILLIAMS
CLAUDIA VAN WYK
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Tel: 215.928.0520
Fax: 215.928.0826
pete_williams@fd.org
claudia_vanwyk@fd.org

Dated: March 8, 2019

71

PA0298

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on this 8th day of March, 2019, a copy of the

forgoing was served via ECF filing on the following person:


Winfield D. Ong, Esquire
Assistant United States Attorney
Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204–3048


/s/ Peter Williams
Peter Williams

PA0299

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing volume of Petitioner/Appellant's Appendix with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


/s/ *Peter Williams*
Peter Williams

Dated: October 21, 2020