No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**APPENDIX TO OPENING BRIEF OF APPELLANT
VOLUME III
PAGES PA0300-PA0527**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
    *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

October 21, 2020

# INDEX TO APPENDIX

## Volume I – Short Appendix[1]

Certificate of Compliance ........................................................................... PA0001

Order Denying Petition for a Writ of Habeas Corpus, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. Sept. 20, 2019) ........................................................... PA0002

Final Judgment, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. Sept. 20, 2019) .............................................................................. PA0032

Order Denying Motion to Amend or Alter Judgment, *United States v. Fulks*, 2:15-cv-33 (S.D. Ind. April 1, 2020) ............................................................... PA0034

## Volume II – Supplemental Appendix

### Orders and Opinions

Direct Appeal Opinion, *United States v. Fulks*, 545 F.3d 410 (4th Cir. July 27, 2006) ................................................................................. PA0038

Order Denying Petition for Rehearing and Rehearing En Banc for Direct Appeal, *United States v. Fulks*, 04-33 (4th Cir. Aug. 22, 2006) ................................. PA0070

Judgment, *United States v. Fulks,* 4:02-cr-992 (D.S.C. Aug. 20, 2010) ................................................................................................................ PA0072

Opinion, *United States v. Fulks*, 875 F.Supp.2d 535 (D.S.C. Aug. 20, 2010) ............................................................................................................ PA0073

Order Reinstating Judgment, *United States v. Fulks,* 4:02-cr-992 (D.S.C. Aug. 20, 2010) ............................................................................... PA0172

---

[1] Consistent with Seventh Circuit Rule 30(a) and (b)(7), the short appendix has been bound with Petitioner/Appellant's opening brief, and the supplemental appendix has been separately bound and filed because it exceeds fifty pages.

Order on Motion for Clarification, *United States v. Fulks*,
4:02-cr-992 (D.S.C. Aug. 25, 2010) ............................................................ PA00173

Order Denying Motion to Alter or Amend, *United States v. Fulks,*
4:02-cr-992 (D.S.C. Jan. 13, 2011)............................................................... PA0174

Judgment, *United States v. Fulks*, 04-33, (4th Cir. June 26, 2012) .............. PA0204

Opinion, *United States v. Fulks*, 683 F.3d 512 (4th Cir. June 26, 2012)....... PA0205

Order Granting Authorization to File Successive §2255,
*United States v. Fulks*, 16-9, (4th Cir. June 27, 2016)................................... PA0219

Pleadings

Amended Petition for Writ of Habeas Corpus, *United States v. Fulks,*
2:15-cv-33 (S.D. Ind. March 8, 2019) .......................................................... PA0220

## **Volume III - Supplemental Appendix cont'd**

Expert Reports

Report of Natalie Novick-Brown, Ph.D. - Feb. 11, 2019 .............................. PA0300

Report of Julian Davies, M.D. - March 4, 2019 ........................................... PA0437

Report of Barry M. Crown, Ph.D. - March 6, 2019....................................... PA0470

Excerpts of Diagnostic Manuals

Excerpt from *Diagnostic and Statistical Manual of Mental Disorders*,
*5th Edition*, American Psychiatric Association (2013) ................................. PA0479

Excerpt from *Intellectual Disability: Definition, Classification, and Systems of
Supports – 11th Edition*, American Association of Intellectual and Developmental
Disabilities (2010)....................................................................................... PA0502

Excerpt from *User's Guide to Intellectual Disability: Definition, Classification, and
Systems of Supports – 11th Edition*, American Association of Intellectual and
Developmental Disabilities (2012) ............................................................... PA0520

NORTHWEST FORENSIC ASSOCIATES, LLC
Natalie Novick Brown, PhD

| Clinical and Forensic Psychology | 31811 Pacific Hwy S., B-341 |
| | Federal Way, WA. 98003 |
| | 425-275-1238 |
| | drnataliebrown@gmail.com |

## PSYCHOLOGICAL EVALUATION
**Chadrick Evan Fulks**
(DOB: 5/16/77)

February 11, 2019

Chadrick ("Chad") Fulks is a 41-year-old man referred for functional and behavioral assessment by the Federal Community Defender Office, Eastern District of Pennsylvania. Mr. Fulks is incarcerated on death row in the United States Penitentiary in Terre Haute, Indiana. In 2004, he pled guilty in the District of South Carolina for the 2002 carjacking and kidnapping of Alice Donovan, which resulted in her death. Following a sentencing hearing, Mr. Fulks was sentenced to death.

Mr. Fulks is diagnosed by Dr. Julian Davies (FAS Diagnostic and Prevention Network, Washington State) with *Alcohol Related Neurodevelopmental Disorder (ARND)* and *Static Encephalopathy Alcohol Exposed* (i.e., equivalent medical conditions), which fall under the fetal alcohol spectrum disorder (FASD) umbrella. Dr. Davies also diagnosed Mr. Fulks with the Diagnostic and Statistical Manual-Fifth Edition (DSM-5) mental health condition *Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE)*, which is a mental defect associated with FASD.

I have been asked by current habeas counsel to review Mr. Fulks' lifelong behavioral/functional history and respond to the following consultative questions:

1.  Does Mr. Fulks have significant impairments in his adaptive functioning that would meet the second diagnostic criterion for a diagnosis of intellectual disability (ID)?

2.  Were any impairments in Mr. Fulks' adaptive functioning present before the age of 18, as required by the adaptive behavior component of the third diagnostic criterion for a diagnosis of ID?

3.  Is Mr. Fulks' lifelong cognitive, intellectual, and adaptive functioning consistent with FASD?

4. Aside from fetal alcohol exposure, are there other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18?

5. Did Mr. Fulks experience any secondary disabilities that are associated with FASD?

6. Were there risk factors present in Mr. Fulks' life history that made these secondary disabilities more likely?

I am a clinical and forensic psychologist with specialized training and 23 years of forensic and clinical experience in FASD and other medical conditions involving developmental disabilities. Input regarding the above questions is typical for mental health professionals such as myself who have acquired expertise via formal training, review of the relevant literature, and experience in the developmental/behavioral manifestations of FASD.

My resume is attached as an appendix to this report.

### FORENSIC OPINION

**Data from multiple, independent, convergent sources indicate that Mr. Fulks exhibited significant impairments in child, adolescent, and adult adaptive functioning in three domains (i.e., Conceptual, Practical, and Social), which meets the second diagnostic criterion for a DSM-5 and AAIDD diagnosis of ID.**

**Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited significant adaptive deficits *prior to age 18*, which meets the third diagnostic criterion for a diagnosis of ID as it relates to adaptive behavior.**

**Data from multiple, independent, convergent sources indicate Mr. Fulks has exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.**

**Aside from fetal alcohol exposure, other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18 included postnatal head injury, substance abuse, and environmental traumas, most of which occurred after age 10. While such experiences may have had an additive and cumulative influence on his functioning from adolescence on, there was abundant evidence of significant functional problems very early in his life that preceded these events.**

**Mr. Fulks' developmental history reflected all eight secondary disabilities associated with FASD.**

**Because all of the risk factors associated with adverse developmental outcomes in FASD were present in Mr. Fulks' life history, and he received none of the protective factors, this significantly increased his risk of secondary disabilities.**

## PROCEDURES

This report is based on information from multiple sources, including (a) record review; (b) in-person interview with Mr. Fulks; (c) in-person interviews with all collateral witnesses identified below except Russell Spears, who was interviewed by phone; (d) psychological testing; (e) standardized adaptive behavior assessment and behavior questionnaires; (f) consultation with Dr. Paul Connor regarding neuropsychological testing of Mr. Fulks in the forensic context; (g) consultation with Dr. Julian Davies regarding his medical diagnosis; and (h) review of relevant research.

Mr. Fulks' interview took place on November 21, 2016, in a private room at the United States Penitentiary in Terre Haute, Indiana. The interview lasted 7.0 hours.

Three psychological tests were administered to Mr. Fulks:

- Early Trauma Inventory Self-Report Short Form (ETISR-SF),
- PTSD and Suicide Screener (PSS), and
- Trauma Symptom Inventory-2 (TSI-2).

The following persons were interviewed:

- Roger Fulks (biological father)
- Ronnie Fulks (older brother)
- Christina Kirkman Holbrook (maternal cousin)
- Joy Krug (school psychologist at Westview Junior High)
- Marilyn Lauver (junior high counselor at Westview Junior High)
- Gayle Wolfe (fifth grade behavioral disorder teacher)
- Linda Adkins (former neighbor)
- Russell Spears (friend)

I requested an interview with Diana Thompson (birth mother) but was informed by defense counsel as well as Mr. Fulks that she was ill from multiple strokes and no longer spoke intelligibly.

Behavior questionnaires (*Behavior Screen, Personal Behaviors Checklist, Behavior Rating Inventory of Executive Functioning*) were completed by the following individuals: Linda Adkins (former neighbor), Gayle Wolfe (fifth grade teacher), Marilyn Lauver (eighth grade counselor), and Christina Kirkman Holbrook (cousin).

The *Vineland Adaptive Behavior Scales-Third Edition (Vineland-3)* was administered in person to Gayle Wolfe (fifth grade teacher) and Linda Adkins (former neighbor).

I relied on neuropsychological test interpretation by Paul Connor, PhD, and consulted with Julian Davies, MD, regarding his diagnoses of Mr. Fulks.

Records reviewed for this evaluation (Appendix A) involved records obtained by trial counsel in 2002 and 2004 as well as additional records obtained by prior and current habeas counsel, including recently received declarations from witnesses who were available.

This report contains the following Appendices:

- A. Record List
- B. Documented Life History
- C. Standardized Testing Across the Lifespan
- D. Resume

My opinion is based on materials available to me at the time of this report, and I retain the right to revise my opinion should new information become available.

Data referencing Mr. Fulks in this report refer to him as "Chad" in childhood and "Mr. Fulks" in adulthood. Generally, after initial identification, collateral witnesses may be referred to by their first names for clarity.

## BRIEF SUMMARY OF RELEVANT RECORDS

See Appendix B for a detailed life history.

*Offense*

Chad Fulks pled guilty to the kidnapping and carjacking of Alice Donovan in 2004, which resulted in her death. He committed these crimes with co-defendant Brandon Basham in Myrtle Beach, South Carolina. Mr. Fulks acknowledged that both he and Basham raped Ms. Donovan prior to her death.

The Donovan incident followed Mr. Fulks' escape from prison with Basham and was part of the pair's 17-day flight across several states, during which they carjacked and kidnapped 19-year-old Samantha Burns in West Virginia, resulting in her death, and committed multiple other crimes. Ms. Burns' body has never been located. During the 17-day period of the offenses, both men drank large quantities of alcohol and used drugs, including marijuana and methamphetamine.

Mr. Fulks has consistently denied killing either woman and also denied knowing either had been killed until Basham told him after the fact that he (Basham) had killed them both.

After pleading guilty to kidnapping and carjacking resulting in the death of Alice Donovan, Mr. Fulks was sentenced to death following a penalty-phase proceeding in South Carolina. He also pled guilty in West Virginia to the kidnapping and carjacking that resulted in the death of Samantha Burns. In exchange for his guilty plea in the Burns case, he received a sentence of life imprisonment without the possibility of parole.

*Childhood History*

Chad Fulks is the son of Diana and Roger Fulks and the second youngest of their five children. His older siblings from oldest to youngest are Sherry, Dewayne, and Ronnie. Shannon Fulks is Mr. Fulks' younger brother.

Both Diana and Roger were alcoholics who abused alcohol daily. While intoxicated, they frequently fought physically with each other and beat their children. Diana drank alcohol throughout all of her pregnancies, including when she was pregnant with Chad.

The Fulks home was the "party house" in the neighborhood. The downstairs room of the house had a pool table in it, and the walls of the room were covered with sexually explicit magazine pictures. Roger had a large collection of pornographic videos, which he watched regularly with the children. During Chad's childhood, the pool room was the site of almost daily "parties," during which Diana, Roger, and other adults got drunk and used drugs. The police were dispatched to the house so often that the police radio simply directed patrol cars to the "blue house on the corner."

While drunk, Diana occasionally walked around the house nude in front of the children and sometimes passed out nude. One of Dewayne's childhood friends reported in a declaration that on one occasion when he was a teenager, Diana made sexual advances toward him when she was drunk.

The Fulks home was described as filthy and chaotic. There often was not enough to eat and other than Chad, who became obsessively clean in adolescence, no one in the family bathed regularly. Acquaintances reported the children always wore dirty, shabby, ill-fitting clothes. Diana and Roger often disturbed neighbors with their loud arguments

and fighting, which occasionally spilled into their front yard.

Both parents called their children vulgar names, and Diana hit them with household objects and threw objects like flower pots and coffee pots at them.

Because Roger often was unemployed, and Diana did not work, the family had little income. Roger and Diana usually spent what little money they had on alcohol rather than food for their children. Consequently, Chad and his siblings spent much of their time scrounging for food from neighbors. Ronnie reported that Dewayne's friends taught Chad how to break into cars, something which pleased Roger. A family friend reported that Roger and Diana would send Chad out to steal from gas stations and restaurants and wouldn't let him return home until he had obtained the food, liquor, and money they had sent him for.

In early childhood, Chad was very close to his two older brothers, Dewayne and Ronnie, and spent a lot of time with them. The three of them adopted a phrase, "True Soldiers for Life," to describe their mutual affection and loyalty. To this day, Mr. Fulks' signature on letters typically is followed by the initials, "T.S.F.L."

Peers, older friends, and adults who knew Chad Fulks as a child described him as very quiet and expressed a shared perception that he needed their protection because he spent so much time with his older brothers and their friends.

When Chad was around 12 years old, his mother abruptly became religious, stopped drinking "cold turkey," and started spending most of her time in church. Several witnesses reported that with this change, Diana became even less available to her children than she had been when she was drinking. She and Roger soon divorced, and the children were split up. Ronnie went with his father to live in Indiana, and Chad initially stayed with his mother. [Dewayne was out of the household by that point.] While witnesses generally attributed the break-up of the Fulks marriage to Diana's new sobriety and change of perspective, Mr. Fulks recently reported a belief that he caused his parents' divorce because they separated shortly after he told his mother he had witnessed his father's infidelity.

Diana began dating and soon married Dean Thompson not long after she and Roger divorced. When Diana moved in with Dean, they took Chad and his younger sibling Shannon to live in a two-bedroom apartment in Chesapeake, Ohio. At that point, Chad (age 13 at the time) began spending most of his free time out of the home with street youth.

Like his oldest brother Dewayne, who had set himself on fire during his teens, Chad also attempted suicide in his mid-teens by overdosing on pills. He was taken to a hospital for treatment, and when a counselor recommended psychological counseling, Diana took him to see a counselor one time. The suicide attempt occurred after Chad had been

sexually molested by a male stranger, and his mother did not support his report to the police about the incident.

Prior to the sexual abuse incident at age 13 noted above, Chad had been sexually abused by several other adults who partied with his parents. Several declarants, including family friends as well as neighbors with no particular attachment to the Fulks family, reported seeing a marked change in Chad's behavior around this time, which they attributed to the sexual abuse he had experienced.

When he was 14, Diana sent Chad to live with his father in Indiana. Chad was enrolled in eighth grade in Indiana, and although he saw the school counselor during the fall quarter, he did not receive any mental health counseling. After returning to his mother's care four months later, he spent much of the balance of his childhood in the streets. During that time period, he was expelled from ninth grade in Ohio and subsequently enrolled in alternative school. He did not complete ninth grade. At age 17, he was placed in the Davis Juvenile Detention Center for approximately nine months.

*Adult History*

Generally, Mr. Fulks' adulthood was as chaotic as his childhood. Except for one job that lasted eight months, he tended to hold jobs for only a few weeks and supported himself largely by breaking into cars and stealing or check fraud. He also used drugs and was arrested frequently. Relationships were short-lived and dysfunctional and involved the same kind of domestic violence he had observed in his parents' relationship.

At age 18, Mr. Fulks began a two-year marriage to Amber Fowler one month after she had given birth to a child he viewed as his son. The child died at five months of age after a young cousin jumped on his stomach. After the instant offense, Mr. Fulks reported to experts he had been devastated by his son's death and turned to drugs for emotional relief.

Following the marriage to Amber, Mr. Fulks had a series of relationships with other women, including another brief marriage. During the penalty phase of his trial, several of these women testified that he physically and sexually abused them repeatedly during their relationships.

In the years prior to the offense, Mr. Fulks was incarcerated numerous times for crimes involving drugs and various forms of theft. In 2002, he was in prison in Kentucky for relatively minor charges when he learned he was about to be indicted for physically abusing the nine-year-old son of his second wife, Veronica Evans, to whom he had been married for a few months. Shortly after hearing about these new charges, which could have resulted in substantial prison time, he escaped from prison with Brandon Basham and ultimately committed a series of crimes that resulted in the deaths of Samantha Burns and Alice Donovan. He was 25 years old at the time.

In July 2009, Mr. Fulks' oldest brother Dewayne committed suicide by hanging himself in jail. Records documented Mr. Fulks' reports to previous experts that he became deeply depressed after learning of his brother's suicide.

*Legal History*

In addition to truancy and school suspensions for misconduct, Mr. Fulks' juvenile history consisted of the following:

- Age 9: Battery (struck an elderly woman with a stick), placed on a 12-month Improvement Period;

- Age 10: Assault and Battery (pulled down a young child's pants) – pled guilty, placed on probation for one year;

- Age 12: Brandishing/Assault (put a gun to another child's head), committed to a six-month Improvement Period;

- Age 13: Destruction of Private Property (car prowl with older brother), placed on probation for one year, required to complete substance abuse treatment;

- Age 15: Arson, probation revoked;

- Age 16: Aggravated Burglary (guns and electronics) with oldest brother Dewayne. Adjudicated delinquent, Chad was sent to a youth facility in Ironton, Ohio, for 90 days. He escaped and was on escape status for over a year until he returned to his mother's residence and she notified police. He then was sent to another youth facility in West Virginia (Davis Center) and finally released to the community at age 18.

Mr. Fulks' adult criminal history included:

- Age 19: Operating a Motor Vehicle Without a License and Refusal to Provide Identification Data - He was convicted, fined, and given a suspended sentence and one year of probation. He violated probation on technical grounds after three months and then failed to appear in court.

- Age 19: Simple Possession of Marijuana - He was convicted and fined.

- Age 20: Worthless Checks, Attempted Forgery, Burglary, Fraud, Attempted Aggravated Criminal Trespassing - He was convicted and sentenced to nine months in prison.

- Age 20: Burglary - He was convicted and sentenced to ten years in prison, with four years suspended. After serving 25 months in prison [Butner report indicates 28 months], he was released and placed on probation, which he violated.

- Age 20: Charged with Forgery of Checks, Possession of Two or More Credit Cards, Fraud, Burglary, Use of Vehicle with Permission and Grand Larceny.

- Age 21: Transportation of a Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft, Aiding and Abetting Theft of Property, and Evading Arrest - He was convicted of these federal charges and sentenced to 12 months in prison, followed by three years of supervision.

- Age 21 - He was charged with Non-Sufficient Funds.

- Age 24 - A bench warrant was issued for Resisting Law Enforcement and Use/Possession of Drug Paraphernalia.

- Age 25 - A warrant was issued for failure to comply with the conditions of release.

- Age 25 - He was indicted for Unlawfully Dispensing Legend Drugs without a License. A 12-count charge for Fraudulent Use of a Credit Card was pending at the time of the instant offense. After his arrest, he pled guilty to all 12 counts of credit card fraud and received five years on each count, to run concurrently with each other.

- Age 25 - He was charged with First Degree Abuse of a Child Aged Twelve or Under. This charge eventually was dismissed after his arrest on the capital case.

- Age 25 - At the time of his arrest for the instant offense, Mr. Fulks had been charged with First Degree Robbery and had active bench warrants for Receiving Stolen Property, Possession of Marijuana, and Theft of a Legend Drug, all of which occurred in October 2002.

- Age 25 - INSTANT OFFENSE

### INTERVIEW OF CHAD FULKS

Chad Fulks presented as an immediately cooperative man who looked younger than his chronological age. He wore his hair in a crew cut and was clean-shaven. His hands were shackled. Throughout the interview, he exhibited two noticeable tics: head twitching to the left and blinking. [He reported that the tics began during his trial.] Socially, he was childlike and seemed eager for acceptance. He was quite forthcoming and reported negative as well as positive information.

He generally understood that the purpose of the interview was a psychological evaluation.

Asked about his current functioning, he reported that the last couple of years had been the most difficult for him in terms of depression and anxiety. He noted he had spent 14 years in solitary confinement and referred to his cell as a "living tomb." Although in the past he had enjoyed drawing, painting, and building things, he no longer participated in these activities because he had no money to purchase art supplies. He added that his

family did not send him money for canteen. He previously liked to read as well but no longer was able to concentrate due to anxiety, which included "bad anxiety attacks." He described the following symptoms during the attacks: tingly feeling in his body, numbness in his foot, breathing difficulty, rapid heartbeat, perspiration, and a perception that everything was moving very quickly, that he couldn't breathe, and that the walls were shutting in on him. The attacks happened two or three times a day, and each tended to last 10 to 15 minutes. He noted that while he had tried a number of medications for the attacks, no single medication helped much, although Effexor seemed to give him a little relief from depression symptoms. At the time of the current evaluation, he was taking Lyrica as well as Effexor. Lyrica, a mood stabilizer, reportedly reduced the frequency of the panic attacks.

Mr. Fulks also took Tylenol for extreme back pain. He noted his L4 disk "broke off" and although back surgery had been arranged in the past, it conflicted with his hearing schedule, had to be cancelled, and was never rescheduled. Asked what caused the back injury, he said that in 2007 his codefendant jumped on his back and stabbed him. Basham reportedly was angry because Mr. Fulks wouldn't stop helping the victims' families find their remains. He said Basham slipped out of his cuffs, jumped on him, and stabbed him behind his ear with a pencil. [He revealed an obvious scar from the incident and said he was in a wheelchair for six months after the attack because the injury caused him to lose all feeling in his legs.] He noted that prison medical staff thought he was faking his debilitation until a doctor discovered that a piece of his L4 disk had moved close to his sciatic nerve.

Mr. Fulks said the most important person in his life now was his mother. He said she quit writing to him long ago because she experienced a "brain injury" the same week he was sentenced to death and had been in a care center since then. He noted she was paralyzed and had difficulty speaking. He said he didn't hear from her anymore but still wrote her every week. He indicated he was very close to his two oldest brothers in childhood (especially his deceased brother Dewayne). Dewayne used to visit him prior to his suicide in 2009. Asked about the suicide, Mr. Fulks said Dewayne "blamed himself for me being here." He explained that after escaping from jail with Basham, he went to Dewayne's home, and Dewayne gave him "a bunch of crystal meth," which he binged on during the course of the offense.

Mr. Fulks reported no lasting friendships except for Donny Carroll, whose sister he had dated. He noted that all of his friendships tended to be superficial and short-lived because he was "always on the go so much."

At the time of this interview, Mr. Fulks was receiving correspondence from only two people: an elderly female pen pal in New Zealand and his spiritual advisor. He received visits once a month from the latter.

He said the happiest time in his life, but also the "toughest" time, was in his "younger days" when his family was together. He immediately began talking about his parents' divorce when he was 13. He described both parents as "alcoholics" and said they often were violent with each other. He added that his mother went to church one night and abruptly announced she was never going to drink or smoke again. From that point on, she spent most of her time in church. Around that same time, his father, who continued to abuse alcohol, moved to Indiana. Two months after his father relocated, divorce papers arrived in the mail.

While he reportedly loved his father, Mr. Fulks said they were never close because of his father's frequent physical abuse. He noted that In childhood, he viewed his father's harsh discipline as "normal."

He described his parents' party room, which was a pool room with a bar in the basement of their house in Huntington ("it was like a neighborhood gathering place"). He said neighbors routinely came to their house to get drunk and fight.

The most difficult and "confusing" time in his life was when his infant son died. He indicated that his son was "everything" to him ("I had dreams of giving him the life I never had"). Until that event, things were going relatively well in his life. He had obtained a state welding certificate while in a boys' home, was working hard to support his wife and son, and wanted "so bad to have a normal life."

Asked about the welding class, he said the class lasted a year and was very difficult for him. He received extra help from his instructor, Mr. Sandrich, who told him more than once, "I'm not letting you leave here till you're certified." The most difficult thing to learn was overhead welding because no matter how much he tried, he couldn't weld angles properly ("couldn't get my brain and hands to match up"). However, the instructor worked with him repetitively until he finally mastered the skill. Mr. Fulks said he wasn't used to having someone believe in him like that. At the end of the year, he passed the certification test, which required him to do a number of different welds that his instructor had worked with him on. His plan at the time was to go home, find a job, and have a "different kind of life." He was 17 at the time.

Asked what went wrong with his plan, Mr. Fulks said he couldn't bear living with his mother because her husband Dean Thompson had sexually abused him when he was 15. He soon married Amber Fowler and moved in with her parents, who immediately began pressuring him to get a job. Getting hired was not easy. Although he was certified to weld, he had no experience. After a lot of searching, he finally was hired by a company that needed repair work on river barges. He said he was "electrocuted" daily during the first month he worked there ("water is pouring out all the time, and you get shocked"). After about a month, he learned how to protect himself. About a week after he started feeling good about his job, his son died, which reportedly changed everything about his life. He explained that while he had been smoking marijuana until his son died,

he wasn't drinking alcohol or using any other drugs. However, after the death, he started using any drug he could find and drinking heavily in order to "numb" himself. Eventually, Amber's parents told him to leave because he and Amber were constantly fighting. For the next two months, he was homeless and stayed on the Ohio riverbank.

Asked how he ended up in his current situation, he said the explanation began five years before the offense.

One day while driving somewhere with his girlfriend Heather Goodman, his car broke down. With Heather as the "lookout," he broke into a salvage yard to steal a starter for his car, and while there his checkbook fell out of his back pocket ("I was like the world's dumbest criminal"). He said he took full responsibility for the offense at the time to protect Heather.

Sentenced to 10 years in prison for the burglary, he ultimately served only 28 months because he completed court-ordered drug treatment. He described the treatment program as very difficult because inmates were encouraged to "spy" on each other and report anyone breaking the rules ("everybody would dog you, and you'd get punished"). He said he was in the "hot seat" often for not writing "tickets" on other inmates. After completing the treatment program, which involved daily counseling and classes, his sentence was shortened.

In late 2002, he was arrested with his wife Veronica Evans for credit card fraud. He said he was "on the run" at the time "from parole and probation in Indiana." The arrest occurred three weeks after he had gotten a job as a welder with Coachman RV. While driving to work one day, he sped 100 mph in a 25 mph zone without a driver's license. When he noticed the police car's flashing lights behind him, the "first thing that run through my head was thinking I could get away from him." After his arrest, his father and uncle bailed him out of jail and from that point on, he and Veronica were "on the run" with Veronica's three-year-old son in the car, traveling from state to state and stealing "to survive."

At one point, he broke into a car and found an FBI uniform, badge, and gun. He kept the items "like a dummy," thinking he could get drugs "for free" by "pretending to be a Fed." His plan ended when Veronica went into a Walmart one day, phoned the police, and reported he was holding her and her son hostage. Unaware she had summoned the authorities, he became alarmed when he saw police cars pulling into the Walmart parking lot ("thought they'd busted her"). He put on the FBI uniform with the idea of fooling the police into releasing Veronica to him ("dumb idea") and was surrounded by police with guns as soon as he got inside the store. They found the FBI badge when they looked at his wallet. Eventually, Veronica "turned" on him and "made up stories" about him to make it appear she was his hostage, and he alone was charged. Veronica later sent him a letter of apology, indicating she had lied to the police so she could regain custody of her son, who had been placed in foster care by that point. However, when he

gave Veronica's letter to the police, a detective told him they hadn't believed her in the first place. By this point, he was charged with so many crimes that he believed he was looking at spending the rest of his life in prison.

After Mr. Fulks was moved to a maximum security unit, Brandon Basham was placed in the same cell. Basham told him he was "kicking it" with one of the female officers, which Mr. Fulks observed firsthand. The officer was in charge of their unit and began bringing them everything they asked for. One day, she let them go out in the yard and adjust the angle of the cameras. Basham showed him there were cameras facing both directions on the back wall and a hole in the fence at the top of the roof where they could escape. A week later, the same officer let them go out to the yard at night. They had constructed a rope by that point and had several filled water bottles to use as weights, which they tied to the end of the rope. They swung the rope over a beam, climbed to the top of the jail, pulled the cage apart with a pair of pliers the officer had given them, and climbed four stories down the rope. They ran through the woods, where Basham seemed to know how to find the items they needed. For example, they came upon an old school bus that Basham's family had converted into a trailer. The bus had clothes, a gun, and a bottle of Jack Daniels inside. After changing out of their jail uniforms, they walked for days though woods and swamps, stealing whatever food they could find and ultimately committing the crimes of record.

Mr. Fulks spontaneously stated he had done "a lot of stupid things" in his life, including running from the police "a lot" because he always thought he could get away. He said he was in "constant trouble" with the authorities, often for credit card fraud ("that's how I survived"). He frequently stole cars, after which he would just keep the vehicles and drive them for months. Not long after his son died, he went to a party where a friend had a 100-pound snake ("my worst fear"). Deciding to "show off," he put the snake on his shoulders, thinking people would be impressed at how "cool" he was. He had been drinking all day by that point and didn't realize how his behavior was coming across. Two men at the party got annoyed at his behavior, began cursing at him, and called him over. When he got closer, one of them pointed a gun at him and shot him. [He revealed the scar on his shoulder and said the bullet came out through his neck.] After he was shot, he tried to pull the snake off, but it was squeezing his face by that point, and he passed out. He awoke to the sight of a medic and police officers all around him and was told later the snake had crawled off when he passed out.

Mr. Fulks reported two suicide attempts in his life. He said he was 15 when he ingested all the pills he found in his mother's medicine cabinet and ended up in the hospital. In June 2015, he slashed his wrists and tried to hang himself after a new unit manager had confiscated his and other inmates' possessions. His possessions included some mice he had been raising for seven or eight years ("it gave me something to care for"). Although the warden and officers were aware of his mice and tacitly approved, when the new unit manager discovered them, he killed the animals, which devastated him ("that was the only thing I had left").

Asked if he considered himself impulsive, Mr. Fulks acknowledged impulsivity was one of his worst problems. He explained that he always reacted emotionally without thinking about consequences. He noted that as soon as a police officer turned on the lights to pursue him, running "was automatic." If he was in an argument, he automatically exploded emotionally rather than thinking things through. He said he had been working on this problem for the past seven years with his spiritual advisor.

Mr. Fulks said he was bullied "all the time" in childhood, typically for a lisp that required daily speech therapy in school. He said he was in many fights growing up but never bullied anyone, although he would defend himself. If he wasn't being taunted for having a lisp, it was for wearing dirty clothes to school or for his family being "poor." Because of the fighting, he often received sanctions at school (suspensions and paddling), all of which seemed "normal" to him. He noted his father told him repeatedly, even into his adult years, "If you let them do it to you once, they'll keep doing it." He said he was in several fights while in jail in South Carolina and also was stabbed "a bunch." He noted that other inmates constantly "tested" him. One time, after meeting with someone from his legal team, he returned to his cell to find his canteen and clothing had been stolen. He knew he had to stand up for himself, or the harassment would never stop. Consequently, when he saw an inmate eating his canteen, "flaunting it in my face," he grabbed the canteen and they began fighting. Several inmates jumped on him, and he was stabbed 32 times, with one of the shanks breaking off in his stomach. He noted other inmates "always" wanted to fight him over his case, and one time he was beaten by police officers.

Asked if he ever felt manipulated or taken advantage of, Mr. Fulks described being sexually abused at age 14. He went to a friend's house, and the friend asked him if he wanted to help his stepfather set up a fruit stand. When he accepted the offer, the stepfather took him into the woods to find some wooden posts for the fruit stand. As they walked into the woods, the man walked up behind him, put his arm around his throat, and the next thing he remembered was feeling his pants being pulled off. He tried to scream, but the man covered his mouth. He escaped and ran through the woods with the man chasing him. After getting away, he called some friends from a pay phone, and they showed up with bats to protect him. Eventually, police arrived and summoned his mother. When she showed up, she refused to press charges against the man and said it was probably her son's fault. She told the police she couldn't handle him anymore and was going to send him to his grandparents' house. Because of his mother's reaction, he started believing the sexual abuse was his fault. It was shortly after this incident that he attempted suicide with his mother's medications.

Mr. Fulks noted that the above incident was a turning point in his life. He recalled feeling he was on his own and homeless, which had been the case since he was 13 and left his father's care. From age 15 on, his life reportedly was unstable. He would stay with his mother for a week or two and then find somewhere else to stay. He was

homeless many times in his adult years and committed crimes in order to pay for motel rooms. During his second marriage, he and his wife lived in a car for a month. He said he was on state and federal probation at the time and getting conflicting instructions from his two probation officers. He said he failed probation "miserably." They wanted him to work, but he could find no one willing to hire him because of his convicted felon status. He described the probation process as "constant pressure" ("I would look for a job all day long, every day"). When he finally found a job selling perfume, he was "like the worst salesman ever." Back then, he thought there was no better place to sell perfume than a strip club, which was where he met his second wife, Veronica Evans. He kept the perfume job for a month but made no money because he had to buy the perfume in order to sell it.

Responding to a question about what he regretted most in his life, Mr. Fulks said he believed he failed everyone and could have done a lot of things differently in life: "If I would have just stayed at that jail and not escaped, Samantha Burns would be alive."

Asked if he had ever been dishonest in the past with a mental health evaluator, he admitted he once tried to "fool" doctors in a 1998 evaluation.


### COLLATERAL WITNESS INTERVIEWS

[Mr. Fulks is referred to by his first name in this section to be consistent with how he is referred to by collateral witnesses.]

**Linda Adkins** (neighbor in West Virginia)

Interviewed in person on 7/12/17 for 2.0 hours, Ms. Adkins reported:

- She had a good memory of Chad as a child because he grew up with her children and was close in age to her second oldest daughter Michelle.

- The Adkins family lived two houses away from the Fulks residence on Pine Street in the Beverly Hills section of Huntington, West Virginia. Chad was 16 months old when his family moved to the street. Linda and Diana became friends, and Linda saw Chad nearly every day for five or six years until the Fulks family moved to their Leeward Avenue house. Although the Leeward house was "right around the corner" from Linda's house, Linda stopped visiting Diana daily at that point because Diana "drank too much" and there was "too much going on over there." The Leeward house had a pool table in the basement, and everyone from the neighborhood gathered there to drink and party ("it was the party house on the block"). The house was cluttered and messy.

- Linda never observed Diana or Roger show any affection to their children, who were "just there in the background." They gave their children no attention or

praise, and there was "very little directing when they were wrong." She said because the Fulks neglected their children, at one point Linda encouraged Diana not to have any more children after Shannon was born: "I was concerned about her parenting. She was always yelling at the kids, not feeding them."

- Diana often complained to Linda that her children were hungry, and she didn't know what to feed them because there was no food in the house. When Linda would give Diana money to buy food for the children, she often saw Roger getting into his car and returning to the house later with a 12-pack of beer in hand. After this went on for a while, Linda started giving Diana food instead of money, and at that point, Diana stopped going to Linda's house.

- Linda initially went to some of the parties at the Fulks home on Pine Street and observed the drinking that went on there. The parties occurred at least once a week. Roger was always drinking, party or not. He drank at night when he got off work and drank all the time he wasn't working. Diana drank mainly on the weekends. Their beverage at the time was usually beer. Linda typically observed their drinking during her daily visits.

- The Fulks had parties in their Pine Street home "but not as bad in terms of drinking and fighting" as in the Leeward Avenue home. The parties tended to start on Friday evening and last through the weekend. Neighbors would go to the Fulks home carrying their own alcohol and food. At the Leeward house, the men usually played pool while the women socialized. Every now and then, people at the parties would get drunk and fight.

- Linda frequently saw both Diana and Roger intoxicated.

- When asked whether she knew Diana had been arrested before Chad's birth for being drunk and disorderly, Linda said she was not surprised: "It wouldn't take many beers for her to get mouthy." She said Diana didn't have much tolerance for alcohol, and after three or four beers, "her mouth would start going." That was how Linda knew Diana was intoxicated.

- Linda saw Diana occasionally when she was pregnant with Shannon and observed that Diana drank alcohol throughout the pregnancy.

- Chad was two years old and still in diapers when his younger brother Shannon was born. He was finally potty-trained about a year after Shannon was born.

- Chad was slow in developing and talked and moved slowly. She compared him to her children and to his brothers: "Chad was more a loner, standoffish, shy." He was around three years old when he said his first words. He lisped and mispronounced words, and it was hard to understand him. When he was around four, she sometimes could understand what he was saying, but he continued to have a lisp throughout childhood.

- Chad also was slow in learning to read ("he wasn't at the level where my kids were at his age"), and he didn't seem to understand things. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. He also was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball or kick it at the wrong time. He couldn't hit the ball with a bat when the children were playing baseball.

- Chad also had trouble understanding verbal communication. Linda had to repeat information over and over because he didn't understand what she was saying to him. He kept saying "huh?" Linda had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go into the kitchen and bring her something from inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

- Chad was a quiet and withdrawn child. When he did play with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. If Linda's daughters told him to do something, he'd do it. He would follow Dewayne around and do whatever Dewayne told him to do. Dewayne tended to tell Chad to do things that would get him in trouble. Chad also was sensitive. He cried a lot and whined. When the other children were rough, he screamed like they were going to hurt him. His behavior was different than the others. He was sweet and seemed much younger than his age. He was close to his mother and seemed like a momma's boy. He had no friends his age.

- Asked if Chad was exposed to domestic violence, Linda reported observing domestic violence between Diana and Roger. One time, Linda saw Diana pick up an object and start to strike Roger's car with it, at which point he pushed her. She often saw bruises on both Diana and Roger. She said the police showed up at the Fulks home "plenty of times."

- Chad did not get into fights as a child more than other children his age. However, he was suspended a lot at school. Other children picked on him and manipulated him.

- Dewayne and Roger were "hell-raisers." Whenever Dewayne earned some money, his parents would take it away from him. Ronnie was "pure bad-ass, always into something." One time he painted a motorcycle that belonged to Linda's husband.

- Asked about Chad's strengths, Linda responded that he was ""good at just being Chad" and was "a sweet little boy." She viewed him as "more vulnerable than his brothers."

**Christina Kirkman Holbrook** (maternal cousin)

Interviewed in person for 1.0 hour in West Virginia on 7/10/17, Christina reported:

- She was older than Chad by five or six years. She lived with the Fulks for six months when she was around twelve, and Chad was six. She recalled he was receiving speech therapy at the time and also had to repeat first grade. She also spent some time with Chad when he lived on Pine Street in Huntington and when her family lived with the Fulks for a short time on Leeward Street.

- The Fulks home was known in the neighborhood as the party house. There were kegs of beer there, and neighbors gathered to party at the house every weekend.

- Diana and Roger neglected their children "emotionally, spiritually, physically" and did not express love to them. Christina recalled that when Sherry broke her arm, her parents kept saying it wasn't broken and wouldn't take her to the doctor, even though Christina could see the bone "sticking up wrong."

- Christina observed that Chad was neglected as a baby when the family lived on Pine Street because Diana had trouble keeping up with her three older children.

- Chad was physically abused by his parents. Diana would pull Chad's hair and throw things at him; Roger spanked him harshly with a belt or switch to the point of causing welts. They punched him in the head. The physical abuse was "pretty regular." The Fulks children tended to stay away from home all day to avoid their parents.

- One time when the family lived on Pine Street, Diana took the children to a shelter. Because Christina was there playing at the time, she went with them to the shelter. Christina recalled seeing "some sort of a fight" before they all had to get in the car. Later, her mother or aunt picked her up at the shelter.

- She recalled seeing Roger and Diana drinking alcohol throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks would spend money on beer and cigarettes before buying clothes for their children.

- When Christina's family stayed with the Fulks, the house was filthy. There were dead rats in the cabinets, fleas everywhere, trash under the beds, and the place stunk so badly Christina's mother cleaned it. Diana sometimes cooked and did laundry, but things tended to be thrown into closets and hidden instead of cleaned.

- Christina observed in childhood that Chad had a speech problem: "He talked funny and sounded younger than he was." He couldn't pronounce words and talked like a two year old. He was very hard to understand. Christina noted Chad sounded just like her granddaughter, who had a cleft palate. His upper lip almost looked like he had a cleft palate. His tongue also didn't work right. Sometimes, Christina had to ask Sherry what he was saying. Chad also stuttered but grew out of it. She recalled one of his brothers teasing him for stuttering. Other children teased him about the way he talked. They would say he talked "funny," "like a baby." Peers called him "retarded."

- His siblings called him "stupid" a lot, and his mother called him "retarded" as well as "stupid."

- Chad always seemed to be alone. He was shy and quiet and didn't fit in. He didn't know how to play sports with the other children. He was very small for his age, and the other children were bigger and tougher.

- Chad didn't get as much attention from his parents as his siblings. Unless he did something bad to get their attention, they ignored him.

- Ronnie had a growth problem, but Chad was the "ghost child." He was very quiet compared to his brothers and was ignored by his siblings as well as his parents. He was left out of many family activities. He typically was present but not involved.

- She didn't recall Chad ever having a close friend at school or in the neighborhood, although his brothers had friends. One time, she observed Chad playing ball with the neighbor children. The children started teasing him because he was uncoordinated, and he just wandered off with his head down and a sad expression on his face.

- People around him knew Chad was slow and needed help understanding basic schoolwork. When he was in second grade, Christina – a good student in school - was asked a few times to help him with his homework and found he couldn't add and subtract. She recalled sitting on the front porch helping him, and he would get real frustrated because he didn't understand. He was behind on homework, and she recalled reading one of his school books with him to help him catch up. However, he had a short attention span and couldn't stay focused. He couldn't repeat back what she was saying. Sometimes, Chad would get stuck on a word or phrase and repeat it over and over again.

- Christina thought that Chad was born brain-damaged because he was "so slow at everything." She said he was delayed in talking and didn't start talking in sentences until kindergarten and even then he was hard to understand. He also seemed more like a three year old when he was seven. He didn't know how to connect socially with people.

- She thought Chad might have started drinking alcohol in childhood. She described the pool table in the basement with beer kegs, noting that the children could get into the beer because "it was right in front of them all the time."

- Christina often observed Diana encouraging her children to steal. One time, Christina and her mother were with the Fulks at a store ("Hecks"), and Chad was in a stroller. Diana was encouraging Sherry to steal something.

- Asked to describe Chad's strengths, Christina could not think of anything.

**Gayle Wolfe** (Chad's fifth grade Behavioral Disorder teacher at Peyton Elementary in West Virginia)

Interviewed in person for 2.5 hours on 7/10/17, Ms. Wolfe reported she had a master's degree in Elementary Education and was trained and certified in Intellectual Disability and Behavior Disorders. She reported:

- In 1988/89, which was the year Chad was in her classroom, Gayle was the only special education teacher at Peyton Elementary. She was asked by school district administrators to "clean up" problems in the school regarding staff attitudes. Although the law pertaining to special education instruction had passed in 1973, it took a long time for teachers to understand the importance of keeping behaviorally disordered children in a special group because teachers were not knowledgeable about special education at that point. Consequently, she had to teach the teaching staff about special education as well as teach the children. The teaching staff also didn't understand what a 'less restrictive environment' was. Consequently, one of Gayle's primary goals was to help mainstream the children into a regular classroom ("they had had several years of a neglectful teacher, and no one would take these children into their classes").

- There were seven children in Chad's Behavioral Disorder classroom, which included third- through fifth-grade students. Because the 1988/89 school year was the first time she taught behaviorally disordered children (prior to 1988/89, she had taught severely intellectually deficient children), she connected well with each of the students and remembered them well. Chad, whom she remembered "very well" as one of her favorite students, was one of her older children in her classroom. She did a lot of counseling with him, and 50 percent of her time with him was spent reminding him of his decisions.

- Five of the seven children in her classroom had intellectual problems and were "slow" like Chad, although there was one autistic child who was "very bright." Noting that behavioral problems typically were associated with intellectual problems, she indicated that the 'BD' (Behavioral Disorder) label took precedence because the school "incorrectly" viewed behavior problems as the primary issue interfering with the student's education. She explained that many

students with intellectual problems also had behavioral problems because they were so frustrated with academics.

- Chad was "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in a lot of other academic tasks.

- She recalled specifically how Chad ended up in her classroom: "Where he lived was an area called Beverly Hills. If you were on one side of the street, there were very wealthy and beautiful doctors' homes. On the other side of the road, the houses were pretty trashy. Gallaher Elementary was on the hill where Chad lived, which is where he went to school. Gallaher had a mix of very rich and very poor kids. Peyton was on the other side of the hill." Gayle noted Peyton was the closest BD school, which is how Chad ended up there. She noted that Chad didn't constantly misbehave, but she recalled one incident in particular. Children were on the playground, and Chad "supposedly pulled down the underwear of a doctor's child, and this is what landed him in a BD program, although he probably had some behaviors before that."

- The academic curriculum in Gayle's BD classroom included everything from kindergarten up, which allowed her to use whatever the test results showed was the right grade level for a child. She recalled that Chad couldn't "get" phonetics, and his reading skills were at the first-grade level. He was a sight reader and also used picture cues. She worked more with him on math skills than reading because math was easier to mainstream and "hands-on." She noted that Chad was a hands-on learner. She worked with him specifically on addition and subtraction, which were second-grade skills, but not multiplication, a third-grade skill. Although she worked all year with him on writing, he did not learn how to write a sentence. Nonetheless, she was able to get him mainstreamed for some activities toward the end of the academic year, at which point he spent part of the school day in the BD classroom and the rest of the day in the regular classroom.

- Once a student was placed in the special education program, the school's policy was to keep promoting the child each year rather than retention. A 'C' grade on a BD child's report card did not represent actual academic performance but rather meant there had been an effort to learn. Chad had significant trouble learning, although he tried. Gayle recalled going through the same reading lessons over and over with him.

- When Chad wasn't frustrated with his schoolwork, he functioned well in the regular classroom. However, when he got frustrated, he cried. He wasn't a child who taunted, teased, or provoked other kids, but he tattled a lot. The self-contained BD environment was a benefit in terms of Gayle's getting more one-on-one time academically with Chad and getting to know him. The problem was, the other children in Chad's class had behavior problems as well, and they all tended to copy each other. He seemed very concerned about looking good. Even

though she doubted he had a bath every night, he always wore tight jeans and had his blonde hair slicked back. He was very thin. Classmates would tease him because of his lisp and tight jeans.

• She noted there was something unusual about Chad's face: "It was almost like he had a cleft lip on his upper lip. There was a flat look to the groove above his lip. When he smiled, a bit of his lip would go out like it couldn't stretch long enough for a smile. I always questioned whether he had something wrong at birth." She indicated that when she was in court at the time of his trial, she recognized him by his unusual upper lip. She recalled he also had a broad space between his eyes and low-set ears.

• Chad never caused a problem on his own because he was always a follower. When he was teased and got angry, he cried rather than getting aggressive. There was one boy in particular ("Rodney") who occasionally coerced Chad into misconduct. A typical BD child, Rodney was more cognitively sophisticated than Chad and had much more street sense. He frequently started problems on the playground and liked to get other children in trouble. She tried to keep Chad away from Rodney because Chad was a "copycat." Watching from her classroom window, she would see Chad remain aloof for a while, but Rodney would "eventually fish him in." Other children would draw him into mischief as well: "There wasn't hardly a day that I didn't talk to him about not following other kids." She never had to talk to Chad about something he instigated, because it was always something that someone else had instigated and gotten him involved in. She added that Chad was one of her favorites because he always broke down and cried when he was in trouble: "He genuinely felt remorse for getting in trouble."

• Although he was 10 years old during the year he was in her classroom, Chad acted like a five or six year old. He was very weak in reciprocal social interaction skills and had no friends. He couldn't explain what started problems, why he got involved, or why he did things. He was very insecure about his speech. He'd hide his face at times and was quiet. Gayle had to talk to him on a very primitive level.

• Chad's parents were not involved in his schooling. She didn't recall either of them ever coming to meetings at the school or calling her about his grades or behavior. She went to the Fulks home at least five times, "mostly for the fact that Chad had followed someone's lead and gotten into trouble at school." She tried to counsel his parents about how to work with him on his tendency to follow other children into trouble, and they would nod their heads, but she didn't think they understood or cared.

• She described her memories of the Fulks residence: "It was one of those houses that had indoor furniture on the outside." There was a couch on the porch. In the yard there were tires and old, broken-down cars. There was a refrigerator out back. The Fulks, who knew she was going to visit with them about Chad's

behavior, would remain outside to meet with her. She described the appearance of the yard as "chaos," noting it was possible to see around the house into the backyard because it was on the corner. When she would arrive at the house, Chad's mother always offered her a beer. Sometimes, both parents would have beers in their hands. Sometimes, a neighbor or two would be there, and they would join in on the conversation.

- She noted the Brigance test results in Chad's records were the wrong scores: "I was working with him at a much lower level in math and reading. We never felt the Brigance was a good test because we didn't think it gave accurate information, even though this was the test that was used at Peyton." She said she recopied the scores from the previous year into Chad's file rather than test him with the Brigance. The teacher she had replaced at Peyton had a poor reputation, so they moved him out when they brought her in and told her to recopy his records. The staff member who did the testing in the 1987-88 and 1988-89 school years (fourth and fifth grade) was a backup teacher with no degree in school psychology who did not know how to administer testing.

**Joy Krug (school psychologist at Westview Junior High in Indiana)**

Interviewed in person for 1.0 hours on 7/13/17, Ms. Krug referred to Mr. Fulks' school records during the interview and reported:

- Westview Junior High, where Chad enrolled as an eighth grader while living with his father, was "one of the top schools in the state." The school offered numerous services to its students (e.g., nurses, special education teachers, counselors, social workers, and a psychiatrist). Ms. Krug followed each child through every year of their schooling. However, when children like Chad entered the school during junior high, she performed testing and recommended services if appropriate. She indicated that test administration at Westview required a significant amount of training, which she had received.

- Chad attended Westview for only four months. He enrolled on 8/21/91, which was the first day of school. It was clear as soon as he enrolled that he had disabilities for which he needed supports, and by 9/10/91, he had been placed in a remedial reading support program.

- Ms. Krug administered a battery of tests to Chad, who was age 14 at the time:

  o On the Slosson Intelligence Scale, a brief test of intellectual functioning, he obtained a score that was equivalent to a Verbal IQ of 66 (mental age of 9 years, 6 months, or the mildly mentally handicapped range). She noted that this score was lower than previous test records showed, which likely was due to his being in a new school, which obviously was "traumatizing" to him. She noted he also had visual perceptual deficits, so this would have made the Slosson more difficult.

- On the Peabody Picture Vocabulary Test (PPVT), he achieved a standard score of 73, which was equivalent to a mental age of 9 years, 8 months. She noted the PPVT was a verbally-loaded test like the Slosson and added that she viewed his functional capacity to be in the Intellectually Deficient range.

- On the Kauffman Brief Form Achievement Test, he obtained scores on the math, reading, and spelling subtests that were consistent with the Slosson and Peabody scores, all within the borderline to mildly impaired range.

- On the Test of Nonverbal Intelligence (TONI), his score of 84 fell in the low average range. Taken together with his performance on the Wechsler Intelligence Scale for Children-Revised (WISC-R), results indicated verbal skills were significantly more impaired than nonverbal skills. This was confirmed by scores on the Test of Written Language (TOWL), where all his scores were more than 2 standard deviations below the mean, and on four of six subtests, scores were 4 standard deviations below the mean.

- On the WISC-R, Chad obtained a Verbal IQ of 85, Performance IQ of 105, and Full Scale IQ of 93. His scores on four of the six verbal subtests were 2 or more standard deviations below the mean (Information, Similarities, Arithmetic, Vocabulary). Digit Span and Comprehension were within normal limits. These scores indicated Chad was not prepared to function and communicate in the world he was expected to live in. He performed better on performance subtests, with relative strength in identifying visual detail. She noted he was eventually determined to be Learning Disabled.

- Scores on the Wide Range Achievement Test (WRAT) fell in the mildly impaired to low average range. On the Woodcock Johnson Achievement Test, scores fell in the borderline to low average range.

- On the Adaptive Behavior Evaluation Scale (ABES), scores reflected significant limitations in academic and social domains. On the Environmental/Interpersonal Behavior Scale, which assessed social skills, communication, and functioning, Chad's scaled score of 7 fell significantly below the mean. On a Task Related Behavior scale, a measure of functional academics, his score was 0, which was several standard deviations below the mean.

- Chad's test results showed he needed a great deal of help to survive in school. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience was very limited. He was impulsive and tended to act before thinking.

- A case conference on Chad was called on 10/3/91, which was unusual because typically it took six months for a case conference to be called on a student.

- Although Chad obtained scores on intellectual tests that fell in the range of mild handicap (i.e., mild intellectual disability), he also demonstrated a significant discrepancy between IQ and achievement. As a result, in order to keep him in regular classrooms with accommodations and be consistent with the criteria used and services provided, the team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies.

- His primary weakness was language and sequencing his verbal thoughts, which she attributed to frontal lobe problems.

- After completing her psychological evaluation of Chad, Ms. Krug referred him to Dr. Otto Klassen for psychiatric evaluation. Dr. Klassen ultimately prescribed imipramine for depression, but a follow-up with the psychiatrist never happened because Chad left the school.

- The school was unable to address Chad's behavioral issues because his home life was so unstable, and the principal suspended him when he got in trouble.

- Functionally, Chad was intellectually disabled when one considered all his test scores ("he didn't have the mental tools to compensate"). His strengths included "street smarts" and "survival skills," as indicated by testing showing he was immediately able to perceive details and respond behaviorally.

- Ms. Krug said that while she likely wouldn't have been able to recognize FASD when she encountered it in a child in 1991, she now knew Chad's test scores were consistent with FASD.

**Marilyn Lauver** (counselor at Westview Junior High in Indiana)

Interviewed in person for 1.5 hours on 7/13/17, Ms. Lauver reported:

- Ms. Lauver's role at Westview was to work with the special education team and liaison with the students' families and teachers regarding discipline.

- She remembered Chad's blonde hair, "hacked up" haircut, unkempt and disheveled appearance, and ill-fitting clothes. She said he didn't seem healthy to her. Asked about his face, she said he was "like a feral animal with a fearful expression. He was sullen, had no manners, didn't know to shake hands, and was very withdrawn." She remembered that when he appeared in her office with his father, he "clearly was not looking forward to school." She could tell he was scared.

- She recalled knowing at the time that Chad was "kind of thrust into his father's home," and neither seemed comfortable with the other: "Dad looked like he'd been hit by a truck the whole time during the enrollment. Chad just cowered." There was no contact between the school and Chad's father after enrollment.

- When Chad arrived at Westview, he was in a grade lower than he should have been for his age, so they found a way to make him age/grade appropriate by skipping him to the next grade.

- Because Chad "escalated so quickly," she didn't have time to work with him much, although she saw him about 10 times over the months he was in the school. She noted behavior issues on the school bus and recalled he was taunted, noting "he clearly came from poverty." When he was taunted, he'd spit on his peers in response. She did not know why he left Westview.

- Comparing Chad to others his age at Westview, she said that emotionally, he seemed much younger than 14. In addition to spitting on other children on the school bus, he pouted, hung his head and "folded up." She noted that most of the other children would sit up and have some eye contact, but Chad was unable to acknowledge and respect authority. For example, one time he became very agitated and explosive with the principal, who later said he was afraid of what was "inside that child."

- Chad was unable to perform academically like other children his age due to intellectual deficits and emotional disorganization. He was reading well below grade level and was way behind in math.

- Interpersonally, he never looked comfortable anywhere. He had problems fitting in with the other students and had no friends. He initially tried to reach out to some peers but wasn't successful. He seemed "absolutely depressed, fearful, suspicious, and highly anxious." Athletics were really important at Westview, as was membership in a church and a church group. Chad didn't have those activities. He also stood out because of his unkempt appearance and poor social skills. She thought his classmates were "wary" of him. You could see in his body language that he knew he wasn't well accepted. He did not know how to solve problems with peers. When he did not like how they were making him feel, he acted out towards them rather than talking to them. For example, he was put off the bus for spitting on other children.

- His social problems included not knowing how to greet people politely (e.g., standing up and shaking hands when meeting an adult). He didn't say 'thank you,' and he had no social graces. He did not understand humor or jokes. He was serious about everything and never smiled or laughed.

- It was important to be very concrete and literal with Chad. In many ways, he acted like a seven year old, even though he was 14.

- Except when he acted out, Chad was very emotionally guarded, with flat affect, his body folded up, and no eye contact. He seemed to work really hard to control himself, but he was impulsive. It seemed like he simmered for a while and then erupted.

- She said the school received a report that Chad had been sexually abused by an older man. She noted the report was consistent with the way he behaved and consistent with the way children who were being physically and sexually abused typically behaved (e.g., constant vigilance, apparent need for self-protection, haunted expression in his eyes, fear, and anxiety). She could feel him always ready to defend himself.

- The school moved toward special education placement for Chad very quickly. The typical practice was for a teacher to observe a student in class and then request testing. Chad's teacher Renee Morales and her aide Roberta Markley completed rating scales to assess his functioning and behavior, which found he had significant problems with learning, depression, physical symptoms, and fears as well as inappropriate behaviors. He was remarkable for having been retained in school, his truancy in West Virginia, and sexual victimization. They perceived his spitting and not fitting in were symptoms of this problematic history. They were aware that the probation department had been involved with Chad before he got to Westview. She noted, "There were so many red flags."

- Chad qualified for special education at Westview as Learning Disabled (LD). Many students who received LD services or were emotionally handicapped (EH) also had intellectual disabilities. She explained that the LD designation indicated a significant discrepancy between ability and performance: "It was all about the adaptive behavior and his ability to learn." She noted there was no difference between Chad and children diagnosed with Intellectual Disability with respect to social, practical, and communication skills, adding that his coping capacity was "almost non-existent."

- He had come to the school with the label Behaviorally Disordered (BD), which was one of the reasons Westview staff acted so quickly to get him tested and classified. For example, he was referred immediately for evaluation to Dr. Klassen, a psychiatrist, which was unusual. Dr. Klassen ultimately prescribed antidepressant medication for him.

- During the four months Chad was enrolled at Westview, he was unable to keep up with his classmates in either special education or regular classes, despite many supports ("my memory was he was failing almost everything").

- Chad's strengths at the time were "his willingness to defend himself and survive."

**Russell Spears** (childhood friend)

Interviewed by phone for .3 hours on 9/17/18, Russell reported:

- Born in 1967, Russell indicated he was approximately 10 years older than Chad. They met in Chesapeake, Ohio, when Chad was 12 and living with his brothers in

a trailer next to Russell and his wife Jennifer. After a year or so, Chad moved in with Russell and Jennifer.

- Russell and his adult friends spent a lot of time partying, and several young adolescents – including Chad – "ran around" with them, drinking alcohol and smoking marijuana like the adults. When Russell and Jennifer moved to Huntington, Chad moved with them.

- When Chad was around 15 or 16, he moved in with Russell's sister-in-law Tammy. Meanwhile, the partying (i.e., alcohol and marijuana use) had continued and at one point, Chad began snorting crushed Tuinal (barbiturate).

- According to Russell, Chad couldn't "hold his liquor" and did "stupid" things when intoxicated (e.g., yelling and arguing, crashing a car that had bad brakes). Russell noted, "There were several little boys like Chad running with us. They would get drunk and run their mouths. If they insisted on coming with us, they would get whupped if they wouldn't listen." Russell said he hit Chad in the head on a few occasions whenever Chad got "unruly" and "needed to calm down." Although Chad was knocked unconscious several times from these punches, Russell indicated there was never any medical attention. After regaining consciousness and sobering up, Chad seemed fine, and there was no perceptible change in his functioning.

**Ronnie Fulks** (older brother)

Interviewed in person for 2.0 hours in West Virginia on 7/10/17, Ronnie presented as someone obviously physically affected by years of methamphetamine use. His teeth were missing, and his face was gaunt. He was very thin and appeared to be no taller than five feet. He had facial abnormalities consistent with Fetal Alcohol Syndrome (i.e., thin upper lip, smooth philtrum, small eye openings). He reported:

- Diana and Roger physically abused their children and often fought physically with each other in front of the children. Regarding the physical abuse, their mother was the "more harsh" of the two because she hit them with objects, whereas their father "just" used a switch or belt. Adding that their mother not only could hold her own with their father, she could "beat him up" and also "won" a lot of fistfights with other men. He noted she fought "like a man."

- Ronnie described both parents as alcoholics and said his mother never stopped drinking during his childhood, even for a day, which included drinking throughout her pregnancy with Shannon. Eventually, she abruptly stopped drinking when she discovered religion, after which she became as addicted to church as she had been to alcohol. She also was a constant smoker.

- Diana cooked for her children and did laundry, but she neglected them emotionally, as did their father. Neither parent was involved in their schooling or helped them with homework. There was no parental supervision or monitoring.

- Ronnie described the family home on Leeward Avenue as a "party house" where alcohol and marijuana were freely available to the children. He described the pool table in the basement and said neighbors partied at their house every night. Often, there would be fighting, which sometimes involved his parents. At age six, he started taking marijuana roaches out of the ashtrays and smoking them. A bit later, he started drinking alcohol and huffing paint and gasoline fumes.

- Ronnie and Dewayne introduced Chad to methamphetamine. Chad started drinking and using marijuana at an early age, and by age 14, he was drinking and smoking marijuana daily.

- Ronnie and his brothers were in trouble a lot in childhood for fighting and stealing. The first time he got in trouble at school was in kindergarten for beating up a sixth grader.

- At age 15, Chad got involved with an older woman in the neighborhood who had a reputation for going after teenage boys and lived with her for a few months.

**Roger Fulks** (father)

Interviewed in person in Indiana for 1.0 hour on 7/13/17, Roger described his marriage to Diana but acknowledged limited memories of Chad in childhood. He reported:

- He ran a gas station for eight years in the 1970s and worked eight years for Orkin Exterminators in the 1980s. [According to collateral reports, his employment was quite sporadic, and he was unemployed periodically.]

- Describing his relationship with Diana when their children were young, he said "things were all right as long as Diana didn't get drunk." He acknowledged his own drinking but said he never got so drunk that he passed out, which was not the case with Diana. He said they always ended up fighting when they drank, which was several times a week.

- He and Diana both drank alcohol throughout her pregnancies with Ronnie, Chad, and Shannon. Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone. During the time she was pregnant with Chad, they both drank alcohol at least every weekend. When they moved to Pine Street in Huntington, they began drinking daily and continued drinking daily when they lived on Leeward Avenue. Diana drank with the next-door neighbor while he was at work, and he would find her drunk when he got home at night. This was a daily scenario.

- One time, Diana was arrested and had to go to jail for being "drunk and disorderly."

- Roger never saw Diana cut back on her drinking, and she never told him she was cutting down due to pregnancy. He observed no change in her drinking pattern before, during, and after her pregnancy with Chad or with any of their children.

- Diana never received prenatal care for any of her pregnancies. The older children, including Chad, were born in Dr. McClelland's office.

- He and Diana smoked cigarettes when they drank. Typically, they shared a pack-and-a-half of cigarettes between the two of them daily. Diana did not reduce or stop smoking during her pregnancies. She was pretty healthy during the pregnancies and did not use any medications or illegal drugs.

- He remembered one time when Diana was sitting on the front steps talking to a neighbor. When Roger opened the front door, he heard Diana tell the neighbor that he wasn't Sherry's father. Diana was drunk at the time.

- He was unaware of any head injuries Chad might have received in childhood or adolescence.

- He did not know if Chad was delayed in talking, but he knew Chad "didn't say stuff real plain."

- He did not know if Chad had problems in school prior to age 14 and said there were no parent-teacher conferences during those years.

- When Chad moved to Indiana to join him and his wife Marcia, they couldn't handle him because he was misbehaving in school. After a few months, he had to send Chad back to his mother. He had no contact with his son after his 18th birthday.

- When Chad was an adolescent, he got involved sexually with an adult neighbor who was old enough to be his mother.

- Chad was a follower and wanted to do everything his brothers were doing. He was pretty close to Dewayne.

- Asked if Chad was ever arrested as a juvenile, Roger said "they pulled up someone's flowers once and had to pay a $300 fine." He was unaware of any other arrests.

**PSYCHOLOGICAL TESTING**

Three tests were administered to screen for posttraumatic stress disorder, which was noted in some of Mr. Fulks' records. The third test (TSI-2) contains validity scales to determine response style.

Early Trauma Inventory Self Report-Short Form (ETISR-SF)

The ETISR-SF is a self-report checklist that assesses a range of traumas, including childhood physical, sexual, and emotional abuse as well as general traumas.

Mr. Fulks endorsed numerous traumatic experiences on this measure (general traumas, harsh physical punishment, emotional abuse, and sexual abuse). Abuse experiences included parental alcoholism/drug abuse and witnessing violence in and out of the home.

## PTSD and Suicide Screener (PSS)

The PSS is a 14-item test derived from the Detailed Assessment of Posttraumatic Stress (DAPS). The PSS is designed to quickly screen individuals for posttraumatic stress disorder (PTSD) and suicide risk. The PSS has good sensitivity and specificity for a DSM diagnosis of PTSD, as determined by longer measures such as the DAPS and the Clinician-Administered PTSD Scale (CAPS). The PSS consists of two scales: PTSD Risk (PR) and Suicide Risk (SR). PR taps into aspects of all PTSD symptom clusters in both the DSM-IV-TR and DSM-5 and best predicts PTSD status. The SR scale consists of four items that index suicidal thoughts and behaviors and indicate a significant risk of suicide.

Mr. Fulks' scores of 31 and 10 on the PR and SR scales, respectively, indicated a risk of PTSD and suicide. In his interview and on the ETISR-SF, he described multiple traumas during childhood, including his parents' drinking and physical abuse.

## Trauma Symptom Inventory – Second Edition (TSI-2)

The TSI-2 was administered in order to screen for symptoms of posttraumatic stress and other psychological sequelae of traumatic events, including possible ongoing effects of sexual and physical assault in childhood. Two validity scales on the TSI-2 assess tendencies to deny symptoms that are commonly endorsed, over-endorse unusual or bizarre symptoms, or respond in an inconsistent or random manner. T-scores over 75 on the Response Level scale and raw scores 15 or higher on the Atypical Response scale invalidate the TSI-2.

Mr. Fulks' scores on the TSI-2 validity scales fell within normal limits (Response Level T-Score = 54; Atypical Response T-Score = 83). Clinical scale T-scores at or above 65 (mean = 50, standard deviation = 10) are considered clinically elevated.

Scores on the following TSI-2 scales fell within the clinically elevated range: Anxious Arousal (T = 69), Depression (T = 78), Intrusive Experiences (T = 82), Dissociation (T = 68), Somatic Preoccupations (T = 69), Suicidality – Ideation but not Behavior (T = 69), Impaired Self-Reference (T = 70), and Tension Reduction Behavior (T = 68).

The following scales fell within normal limits: Anger (T = 59), Defensive Avoidance (T = 60), Sexual Disturbance (T = 46), and Insecure Attachment (T = 62).

Three of four broad domain areas were clinically significant: Self Disturbance (T = 72), Posttraumatic Stress (T = 71), and Somatization (T = 69). A fourth broad domain, Externalization (T = 61) fell within normal limits.

Overall, Mr. Fulks' TSI-2 profile was consistent with PTSD, suggesting symptoms that likely reach the clinical threshold for diagnosis.

### FORMAL ADAPTIVE BEHAVIOR ASSESSMENT

**Vineland Adaptive Behavior Scales – Third Edition (Vineland-3)**

Brain development from infancy into the adult years is significantly delayed in FASD,[1] which along with congenital brain damage explains the substantial adaptive delays in this population.[2] The American Association of Intellectual and Developmental Disabilities (AAIDD) describes what adaptive assessment measures: "The assessment of adaptive behavior focuses on the individual's typical performance, not their best or assumed ability or maximal performance. Thus, what the person typically does, rather than what the individual can or cannot do, is assessed when evaluating the individual's adaptive behavior."[3] In other words, adaptive assessment involves the measurement of *everyday behavior* rather than performance in the formal structured context of a cognitive testing situation.[4]

Per DSM-5, adaptive functioning may be assessed using individualized, culturally appropriate, psychometrically sound measures. Measuring adaptive functioning via standardized measures such as the Vineland Adaptive Behavior Scales is the standard of care in the mental health and education fields[5, 6, 7] as research supports the reliability of the Vineland.[8, 9, 10] The AAIDD recognizes the Vineland as a valid formal measure for the assessment of adaptive behavior.[11]

---

[1] Streissguth, A. P., Aase, J. M., Clarren, S. K., Randels, S. P., LaDue, R. A., & Smith, D. F. (1991). Fetal alcohol syndrome in adolescents and adults. *Journal of the American Medical Association, 265,* 1961-1967.
[2] Ibid.
[3] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[4] Edwards, W.J., & Greenspan, S. (2014). Adaptive behavior and fetal alcohol spectrum disorders. *Journal of Psychiatry and Law, 38,* 419-447.
[5] Tasse, M.J. (2009). Adaptive behavior assessment and the diagnosis of mental retardation in capital cases. *Applied Neuropsychology, 16,* 114-123.
[6] Greenspan, S., & Switzky, H.N. (2006). Forty-four years of AAMR manuals. In *What is mental retardation?: Ideas for an evolving disability in the 21st century.* Switzky, H.N., & Greenspan, S. (Eds.). Washington, DC: American Association of Mental Retardation.
[7] Edwards & Greenspan, op. cit.
[8] Tasse, op. cit.
[9] Greenspan & Switzky, op. cit.
[10] Edwards & Greenspan, op. cit.
[11] Schalock et al., op. cit.

Vineland-3 items focus on specific tasks individuals typically perform at different stages of development. Rather than asking whether the person is *capable* of performing a particular task, the Vineland-3 assesses whether the person *regularly performs* the task without prompting or assistance.

Vineland-3 items are divided into three broad categories of adaptive behavior: Communication, Daily Living, and Socialization skills, which correspond to the three adaptive criteria for Intellectual Disability (i.e., Conceptual, Practical, and Social).

In the current assessment, two individuals who observed Mr. Fulks from different perspectives were administered the Vineland-3: **Gayle Wolfe** (teacher) and **Linda Adkins** (neighbor).

The Vineland-3 test publisher indicates that in the case of retrospective assessment, two or more raters with similar responses increases confidence in the reliability of the results.

In addition to assessing responses for consistency between raters, additional methods were used to increase reliability: comparison of ratings with anecdotal reports, documented history, and administration of a second standardized behavior rating measure containing three reliability scales (i.e., Behavior Rating Inventory of Executive Function (BRIEF). Results of the BRIEF are shown below:

Reliability Scales: Behavior Rating Inventory of Executive Function

| Validity Scale | Clinical Threshold Score | Gayle Wolfe [teacher] | Linda Adkins [neighbor] |
|---|---|---|---|
| Negativity | $\geq 6$ | 4 | 0 |
| Infrequency | $\geq 3$ | 0 | 0 |
| Inconsistency | $\geq 8$ | 1 | 3 |
| RESULTS | | **VALID** | **VALID** |

Results of the BRIEF indicated that both respondents exhibited a straightforward unbiased approach to behavior rating, thereby supporting the validity of their Vineland ratings (as did the consistency between their ratings).

Vineland-3 results, shown in the table below, were scored by computer from an algorithm created by the test developer (Pearson). Ratings of specific adaptive behaviors were converted to standard scores for major domains (Mean = 100, Standard Deviation = 15) and v-scale scores for subdomains (mean = 15, standard deviation = 3) and then compared to age-based norms. Results were the following:

Vineland Adaptive Behavior Scales-3

| Subdomain / DOMAIN | Gayle Wolfe [teacher] Target Age: 10 | | Linda Adkins [neighbor] Target Age: 13 | |
|---|---|---|---|---|
| | v-Scale Score / Std Score | Std Dev / Percentile | v-Scale Score / Std Score | Std Dev / Percentile |
| Receptive | 3 | - 2.3 | 3 | -2.0 |
| Expressive | 1 | - 3.0 | 6 | -1.3 |
| Written | 8 | - 0.7 | 9 | -0.3 |
| COMMUNICATION | 38 ss | <1 %ile | 50 ss | <1 %ile |
| Personal | 10 | 0 | 8 | -0.7 |
| Domestic | 6 | -1.3 | 6 | -1.3 |
| Community | 5 | -1.7 | 7 | -1.0 |
| DAILY LIVING SKILLS | 63 ss | 1 %ile | 63 ss | 1 %ile |
| Interpersonal Relationships. | 1 | -3.0 | 8 | -0.7 |
| Play/Leisure Time | 7 | -1.0 | 9 | -0.3 |
| Coping Skills | 3 | -2.3 | 7 | -1.0 |
| SOCIALIZATION | 38 ss | <1 %ile | 63 ss | 1 %ile |
| GLOBAL COMPOSITE | 48 ss | <1 %ile | 60 ss | <1 %ile |

The Vineland-3 results above provide reliable and convergent data that quantify the nature and severity of Mr. Fulks' adaptive behavior in childhood and adolescence. Results of the assessment administered to Ms. Wolfe show that compared to other ten-year-olds, his adaptive functioning was significantly deficient. Results of the assessment administered to Ms. Adkins, who observed his development during his early teens, reflect that Mr. Fulks' adaptive functioning remained significantly deficient in adolescence. The level of deficiency reported by both respondents is consistent with the FASD research.[12]

**Behavior Screening**

Four individuals completed behavior screens of Mr. Fulks: **Gayle Wolfe** (teacher), **Linda Adkins** (neighbor), **Christina Kirkman Holbrook** (cousin), and **Marilyn Lauver** (junior high counselor). The behavior screen is comprised of behaviors associated with FASD in the literature. As was the case with Gayle Wolfe and Linda Adkins (see previous section), BRIEF validity scores from Christina Holbrook (2, 0, 4) and Marilyn Lauver (2, 0, 1) also indicated valid behavioral observations.

These four individuals differed in the amount of contact they had with Mr. Fulks: Linda Adkins had regular, frequent contact from his toddler years to age 13; Christina Holbrook saw him frequently throughout childhood into his early adult years; Gayle Wolfe had one academic year of daily contact with him when he was 10; and Marilyn Lauver had a few school counseling sessions with him when he was 14. Their

---

[12] Streissguth et al., op. cit.

observations of Mr. Fulks' behaviors during the time they had regular contact with him are shown in the table below:

Behavior Screen

| BEHAVIOR | Gayle Wolfe [teacher] Target Age: 10 | Linda Adkins [neighbor] Target Age: 13 | Marilyn Lauver [jr hi counselor] Target Age: 14 | Christina Kirkman Holbrook [cousin] Target Age: 21 |
|---|---|---|---|---|
| Disorganized | X | X | | X |
| Immature | X | X | X | X |
| Superficial friendships | X | X | X | X |
| Socially inept/peer problems | X | X | X | X |
| Unaware of consequences | X | X | X | X |
| Difficulty following directions | X | X | X | X |
| Inattentive | X | X | | X |
| Transition difficulties | X | X | X | X |
| Inflexible, stubborn | X | X | X | |
| Follower/easily led by others | X | X | | X |
| Indistinct or unusual speech | X | X | | X |
| Tendency to overreact | X | X | X | |
| Poor impulse control | X | X | X | |
| Oppositional, disobedient | X | X | X | |
| Gave up easily | X | X | X | X |
| Aggressive peer behavior | X | X | X | |
| Developmentally delayed | X | X | X | X |
| Difficulty with teamwork | X | X | | X |
| Moody, emotional outbursts | X | X | X | |
| Poor judgment | X | X | | X |
| Difficulty learning from experience | X | X | | X |
| Poor coordination | | X | X | X |
| Couldn't take a hint | X | X | X | X |
| Easily confused | X | X | | X |

Concordance in the raters' observations indicated numerous behaviors associated with the executive and adaptive dysfunction found in FASD.

**Fetal Alcohol Behavior Scale (FABS)**

The FABS[13] was developed by researchers at the University of Washington to describe the "behavioral essence" of adaptive/functional deficits associated with Fetal Alcohol Spectrum Disorders. The FABS, which contains 36 items that differentiate FASD from non-FASD persons, are imbedded within the Personal Behaviors Checklist, which contains 71 items. The behaviors addressed by the FABS are controlled by the prefrontal

---

[13] Streissguth, A.P., Bookstein, F.L., Barr, H.M., Press, S., & Sampson, P.D. (1998). A Fetal Alcohol Behavior Scale. *Alcoholism: Clinical and Experimental Research, 22,* 325 – 333.

cortex (i.e., executive functions). Using a reference sample of 472 patients aged 2 to 51 diagnosed with Fetal Alcohol Syndrome (FAS) or Fetal Alcohol Effects (FAE), the FABS demonstrated high item-to-scale reliability and good test-retest reliability over an average interval of five years in identifying subjects with known or presumed prenatal alcohol exposure in detection studies. FABS scores also predicted dependent living among adult patients with FASD. The FABS assesses the following domains: Communication and Speech, Personal Manner, Emotions, Motor Skills and Activities, Academic/Work Performance, Social Skills/Interactions, and Bodily/Physiologic Functions.

A cut-score of 15 or higher on the FABS distinguishes persons with FASD from those without FASD. The same individuals who completed the Behavior Screen (above) also completed the FABS, producing the following scores:

### Fetal Alcohol Behavior Scale (FABS)

| Rater | Relationship | Target Age | Raw Score |
|---|---|---|---|
| Gayle Wolfe | Fifth grade teacher | 10 | 17 |
| Linda Adkins | Neighbor | 13 | 17 |
| Marilyn Lauver | Junior high counselor | 14 | 20 |
| Christina Kirkman Holbrook | Cousin | 21 | 15* |

* Christina Kirkman Holbrook responded "don't know" to 16/36 FABS items, rendering her total FABS score invalid.

All respondents' behavior ratings fell at or above the threshold level of 15, indicating that based upon their observations, Mr. Fulks displayed the "signature" behavior profile in childhood that is unique to individuals with FASD.

### DATA ANALYSIS and OPINION

The purpose of this evaluation was to address specific consultative questions from habeas counsel regarding Chad Fulks' life history and functioning.

***Consultative Question #1: Does Mr. Fulks have significant impairments in his adaptive functioning that would meet the second diagnostic criterion for a diagnosis of intellectual disability (ID)?***

The second criterion (i.e., Criterion B) in DSM-5 for a diagnosis of Intellectual Disability (ID) is the following:

Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility.

Evaluation: Chadrick Fulks
Page 36 of 137

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0335

Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community....Criterion B is met when at least one domain of adaptive functioning – Conceptual, Social, or Practical – is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one of more life settings at school, at work, at home, or in the community. (p. 33, 38)

Similarly, the AAIDD indicates that the adaptive behavior criterion for the ID diagnosis is met when there are significant deficits in at least one of the following domains: conceptual, social, or practical.[14]

DSM-5 defines the three domains as follows: *conceptual* (e.g., competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations), *social* (e.g., awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; social judgment), and *practical* (e.g., learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, school and work task organization).

Assessments of adaptive behavior are to be comprehensive and drawn from multiple sources of information. In addition to formal tests of adaptive behavior discussed above, the AAIDD notes that comprehensive assessments likely will include review of the individual's family and medical history, education and employment records, and other relevant records and information, as well as clinical interviews with third-party reporters.[15]

According to DSM-5, adaptive functioning may be assessed in two ways: clinical evaluation and/or individualized, culturally appropriate, psychometrically sound measures.

In the current evaluation, Mr. Fulks' adaptive functioning was assessed using both methods recommended by DSM-5 and AAIDD: comprehensive (i.e., multi-source, multi-method) clinical evaluation and standardized adaptive assessment with the Vineland-3, with accuracy verified in numerous ways including comprehensive review of other sources relevant to Mr. Fulks' adaptive behavior.

Given possible self-presentation bias due to the forensic nature of this evaluation, the potential for the individual being assessed to mask impairments, and numerous inconsistencies in self-reported information in previous evaluations (see Appendix B), I

---

[14] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[15] Ibid.

did not rely on Mr. Fulks' self-report unless it was corroborated by at least one reliable source.

**Formal Assessment of Adaptive Behavior**

Retrospective assessment with the Vineland-3 was conducted to focus on Mr. Fulks' childhood functioning. The Vineland-3 test publisher permits retrospective assessment with the instrument if an individual has been out of the community for some time. The accuracy of retrospective adaptive ratings on measures such as the Vineland has been endorsed by the American Association of Intellectual and Developmental Disabilities (AAIDD) and American Psychological Association.[16, 17]

Both DSM-5 and the Vineland-3 manual recommend that family members or those who know the subject well function as adaptive behavior respondents. In the current case, the Vineland-3 was administered in person to two respondents: Mr. Fulks' fifth grade teacher *Gayle Wolfe* and childhood neighbor *Linda Adkins*, both of whom had frequent and regular contact with Mr. Fulks during his childhood. In Ms. Wolfe's case, she saw Mr. Fulks on a daily basis for a full academic year when he was 10 years old. Ms. Adkins saw him regularly and often throughout his elementary school years and last saw him when he was 13. Each respondent independently rated Mr. Fulks' behavior at the time of last regular contact (age 10 for Gayle Wolfe and age 13 for Linda Adkins). To ensure against bias, the accuracy of their behavior ratings was verified with validity scales on a second behavior-rating measure administered in the same setting (i.e., BRIEF).

As noted previously, items on the Vineland-3 are divided into three broad categories of adaptive behavior that correspond to DSM-5's Criterion B requirements for ID: Communication (*'Conceptual'* in ID), Daily Living Skills (*'Practical'* in ID), and Socialization (*'Social'* in ID).

The AAIDD states that scores of approximately 2 SDs below the mean on formal measures of adaptive functioning such as the Vineland-3, accounting for the standard error of measurement, fall within the presumptive range for ID. DSM-5 sets no presumptive range for ID on standardized tests of adaptive functioning.

Vineland-3 results, summarized below in Exhibit A, indicate that Mr. Fulks exhibited significant adaptive deficits in childhood:

---

[16] Schalock, R.L., et al. (2010). *Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.
[17] Baker, B.L. (2006). Message from the President (of the American Psychological Association). *Psychology in Mental Retardation and Developmental Disabilities, 32,* 1-4.

| Subdomain / DOMAIN | Gayle Wolfe [5th grade teacher] Target Age: 10 | | | Linda Adkins [neighbor] Target Age: 13 | | |
|---|---|---|---|---|---|---|
| | Standard Score | Percentile | SD | Standard Score | Percentile | SD |
| COMMUNICATION | 38 | <1 | < -4.0 | 50 | <1 | < -3.3 |
| DAILY LIVING SKILLS | 63 | 1 | -2.5 | 63 | 1 | -2.5 |
| SOCIALIZATION | 38 | <1 | < -4.0 | 63 | 1 | -2.5 |
| GLOBAL COMPOSITE | 48 | <1 | < -3.5 | 60 | <1 | < -2.7 |

EXHIBIT A. Vineland Adaptive Behavior Scales-3

Specifically, Vineland-3 results show that compared to normally developing children, Mr. Fulks' Communication, Daily Living, and Socialization skills fell at or below the 1st percentile (i.e., 2.5 standard deviations below the mean), and his Global Composite scores fell below the 1st percentile. Such results indicate that compared to age-peers, Mr. Fulks' adaptive functioning was severely deficient – both in childhood and in his early teens.

**Multi-Method Clinical Assessment of Adaptive Functioning**

*CONCEPTUAL* (competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations)

(a) <u>Functional Academics / Learning and Memory</u>

- *Academic History:* Records in Appendix B show that Mr. Fulks repeated first grade and did not complete his seventh, eighth, or ninth grade school years. He initially was enrolled in eighth grade after moving to Indiana without having completed seventh grade, and approximately two months later he was promoted to ninth grade to keep him with age-peers. Ultimately, he never completed ninth grade. He received special education services from his second year of first grade through junior high. At first, special education services involved speech and language therapy. In third grade (1987), he was referred for comprehensive multidisciplinary assessment because of deficits in self-direction, work habits, and basic academic skill development. From that point on, he received special education support for the remainder of his school career, which encompassed all academic subjects at one point or another in his history. Much of this support was provided in the form of individualized or small group supports within a self-contained classroom. Despite the special education supports that Mr. Fulks received throughout his school years, he fell further behind over time as age-peers progressed while his performance stalled. Attendance was not a significant issue until seventh grade.

- *Report Cards:* School records contained the following academic marks:

| Year | Grade | Age | Reading | Spelling | Writing | Lang/English | Math | Gen Ed |
|---|---|---|---|---|---|---|---|---|
| 82/83 | K | 5 | | | | | | |
| 83/84 | 1 | 6 | S- | U | S- | | U | S- |
| 84/85 | 1 | 7 | S | S+ | S | | S | |
| 85/86 | 2 | 8 | S | S- | S | | S | |
| 86/87 | 3 | 9 | S- | S | S | S- | S- | |
| 87/88 | 4 | 10 | A | A | B | A | B | |
| 88/89 | 5 | 11 | C | C | C | C | D | C: Science, Soc Std |
| 89/90 | 6 | 12 | B: Computer Lit.<br>C: Art, Music<br>D: PE, Foreign Language<br>F: Health, Home Economics | | | D | C | D: Science, Soc Std |
| 90/91 | 7 | 13 | Chesapeake Union Exempted Village (Ohio) – entered 4/3/91<br><br>Semester 1:<br>F: Health<br><br>Semester 2:<br>F: Ohio History, English, Science, Reading/Literature<br>D: Math<br><br>Summer School:<br>F: Science<br>D: Ohio History, English, Reading/Literature<br>C: Math | | | | | |
| 91/92 | 9 | 14 | Westview Jr/Sr High - Indiana<br>Semester 1:<br>"Incomplete" in all subjects, including SPED English, Math and Science<br><br>Drift Creek Alternative School - Ohio<br>Semester 2:<br>C-: Social Studies<br>D+: Applied Math<br>C+: Applied Science<br>A-: Work and Family<br>C: Natural Resources | | | | | |
| 92/93 | 9 | 15 | Andis Alternative School (formerly Drift Creek) – Ohio<br>Semester 2:<br>B: Nat Resources/Lab, Nat Resources/Related, Vocational English, Vocational Social Studies, Work & Family<br><br>Earned 1.75 high school credits: did not advance to tenth grade | | | | | |

- *Academic Testing:* Beginning in kindergarten, achievement testing during Mr. Fulks' school years (Appendix C) indicated learning deficiency in all academic domains. The special education multidisciplinary team at Peyton Elementary

concluded he had a "learning disability" when he was in third grade, after which he received special education services throughout the balance of his school years. Yet, even with these special supports and the additional year of cognitive development he had due to retention in first grade, he fell increasingly behind his classmates as he progressed in school.

For example, although the Comprehensive Test of Basic Skills (CTBS) was a group-administered test of questionable validity, testing in kindergarten suggested problems in Word Recognition (10th percentile), Vocabulary (12th percentile), and Math Concepts (7th percentile), and testing in first grade suggested problems in Word Recognition (13th percentile) and Language Expression (10th percentile). [Group testing in second grade found significantly higher scores, which was inconsistent with later individualized testing with more reliable measures but may have reflected performance increases due to the extra year of first grade.]

Achievement testing with multiple measures in third grade found deficient scores in Reading (9th percentile) and Math Calculation (12th percentile) on the Wide Range Achievement Test (WRAT) and in Spelling (14th percentile) on the Kaufman Test of Educational Achievement (KTEA). Testing with the group-administered Cognitive Achievement Test-3 (CogAT-3) found deficiencies in Comprehension (5th percentile), Spelling (11th percentile), and Writing (5th percentile), which generally was consistent with individually administered tests.

According to Gayle Wolfe, testing with the Brigance in fourth and fifth grades was unreliable (see Collateral Interview earlier in this report).

In sixth grade, testing with the KTEA found deficient scores in Reading Comprehension (14th percentile), Spelling (16th percentile), and Math Calculation (3rd percentile).

By the time Mr. Fulks was in eighth grade in 1991, testing at Westview Junior High found skills at the third-grade level (2nd percentile) in Reading on the Kaufman Brief Form Achievement Test (KBFAT), fourth-grade level (9th percentile) in Writing on the Woodcock Johnson Test of Achievement (WJTA), fourth-grade level (5th percentile) in Spelling on the KBFAT, and fourth- and fifth-grade levels (4th and 10th percentiles) in Math Calculation on the KBFAT and WJTA, respectively. Testing with the Test of Written Language (TOWL) also found deficits: Word Reading (2nd percentile), Spelling (16th percentile), and Writing (2-5th percentile).

Forensic achievement testing in Mr. Fulks' adult years indicated little improvement. For example, testing with the WRAT-3 generally found deficits, with some variability:

Reading skills fell at the fifth-grade level (5th percentile) at age 25-11, at the eighth-grade level (14th percentile) at age 26-2, and at the sixth-grade level (65th percentile) at age 26-6.

Spelling skills fell at the fifth-grade level (5th percentile) at age 25-11 and at the same level and percentile at age 26-2.

Math Calculation skills fell at the sixth-grade level (8th percentile) at age 25-11 and at the sixth-grade level (6th percentile) at age 26-2.

Testing with the Woodcock Johnson Tests of Achievement-3 (WJTA-3) at age 26-9 found Word Reading skills at the eighth-grade level (8.0 GE, 21st percentile) and Reading Fluency at the seventh grade level (7.6 GE, 16th percentile), Reading/Passage Comprehension and Spelling skills at the seventh-grade level (7.7 GE, 27th and 26th percentiles, respectively), Writing Samples at the second-grade level (2.3 GE, 3rd percentile) and Writing Fluency at the fifth-grade level (5.7 GE, 20th percentile), Math Calculation at the fifth-grade level (5.7 GE, 14th percentile), Applied Problems at the sixth-grade level (6.4 GE, 12th percentile), and Math Fluency skills at the sixth-grade level (6.1 GE, 6th percentile).

In addition, school testing of visuomotor skills at age nine indicated a two-year developmental delay. Later testing at age 12 found ongoing problems in visuomotor and perceptual skills. Testing at age 14 indicated visual-motor skills that fell 1.3 standard deviations below the mean (12th percentile). (See Appendix C)

- *Behavior Rating:*
  o Results on the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordance on trouble learning from experience.

  o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following: difficulty learning and performing precise tasks.

- *Collateral Witness Reports:* Generally, collateral witnesses reported during their collateral interviews that Mr. Fulks was consistently behind age mates in all subjects and that he received significant special education support for much of his academic career but still had learning difficulties despite this heightened level of support. Witnesses also reported the following:

  o <u>Linda Adkins</u> (neighbor): Ms. Adkins reported in her interview that compared to her own children and his brothers, Chad Fulks exhibited multiple developmental delays in early childhood (i.e., motor skills, speech and language, practical skills, and reading skills). For example, he

was delayed in potty-training (age three) and was especially slow in learning to speak. He couldn't say many words, and the words he did say were difficult to understand because he mispronounced them. He used few words but was very hard to understand. He also had trouble understanding things. Ms. Adkins had to repeat things over and over because he didn't understand what she was saying and kept saying "huh?" She also had to keep reminding him to do things because he didn't remember what she told him.

o Christina Kirkman Holbrook (cousin): Ms. Kirkman reported in her interview that Mr. Fulks had to repeat first grade and needed help understanding basic schoolwork. When he was in second grade, Ms. Kirkman sometimes helped him with his homework and found he couldn't add and subtract. She recalled sitting on the front porch helping him. He would get really frustrated because he didn't understand. He was behind in his homework, and she recalled reading one of his school books with him to help him catch up. However, he had a short attention span and couldn't stay focused. He also couldn't repeat back what she was saying. Sometimes, he would get stuck on a word or phrase and repeat it over and over again.

o Cindy Harper (kindergarten teacher): Ms. Harper reported in trial testimony that Mr. Fulks had difficulty with learning.

o Gayle Wolfe (fifth grade Behavioral Disorder teacher at Peyton Elementary): Ms. Wolfe reported in her interview that she remembered Chad Fulks "very well" as one of her favorite students. He also was one of her older students (because he had been retained in first grade). She did a lot of counseling with him, and 50 percent of her time was spent reminding him of his decisions. His special education category was "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in many other academic tasks. He also couldn't "get" phonetics. His reading skills were at the first-grade level. He was a sight reader and also used picture cues. She worked more with him on math skills than reading because math was easier because it was "hands-on" and easier to mainstream. He was a hands-on learner. She worked with him on addition and subtraction, which were second-grade skills, but not multiplication, a third-grade skill. Although she worked all year with him on writing, he did not learn how to write a sentence. Regarding the Cs he received in most of his fifth-grade subjects (except for an F in Math), she indicated that a grade of 'C' on a BD child's report card did not represent actual academic performance but rather meant the student had made an effort to learn. She noted that the Brigance test results in his records (see Appendix C) were the wrong scores: "I was working with him at a much lower level in math and reading. We never

felt the Brigance was a good test because we didn't think it gave accurate information, even though this was the test that was used at Peyton." She said she recopied the scores from the previous year into his file rather than testing him with the Brigance, noting the staff member who did the testing in 1987 and 1988 was a backup teacher with no degree in school psychology and no knowledge on how to administer testing.

o   Laura Cooper (sixth-grade special education math teacher at Peyton Elementary): Ms. Cooper reported in a declaration that Mr. Fulks had to be taught slowly and repetitively because he struggled so much and was so far behind his classmates. His math skills were far below grade level. She worked with him on basic practical skills such as counting money or telling time rather than sixth-grade math. She indicated that she tended to pass her students if they made some effort and were able to make a little progress. Although Mr. Fulks received a C in her Math class, the grade only represented the individualized work he did with her, not that he could do math at a sixth-grade level. In her declaration, she indicated that although Mr. Fulks was classified as Behaviorally Disordered (BD), this did not mean he did not suffer from intellectual problems. Rather, the BD label took precedence over other categories such as MI (Mentally Impaired) because the school viewed the behavioral problems as the main issue interfering with a student's education.

o   Martha Floyd (sixth-grade special education teacher at Peyton Elementary) reported in trial testimony that Mr. Fulks was a slow learner.

o   Joy Krug (school psychologist at Westview Junior High): Ms. Krug reported in her interview that Mr. Fulks attended Westview for only four months. He enrolled in eighth grade on 8/21/91, which was the first day of school. It was clear as soon as he enrolled that he had disabilities for which he needed supports, and by 9/10/91, he had been placed in a remedial reading support program. She reviewed the battery of tests she administered to him (see Appendix C) and noted that his test results showed he needed a great deal of help to survive in school. She reviewed some of his testing she had administered to him. On achievement tests, his scores in math, reading, and spelling fell in the moderately to mildly impaired range (68 – 75 SS) on the Kauffman Brief Form Achievement Test (KBFAT), in the moderately impaired to low average range (66 – 81 SS) on the Wide Range Achievement Test (WRAT), and in the low average to average range (80 – 95 SS) on the Woodcock Johnson Tests of Achievement (WJTA). [With the exception of the Reading subtest on the WJTA, all achievement test scores were below grade level.] Regarding communication skills, his standard score of 73 on the Peabody Picture Vocabulary Test (i.e., expressive language) was equivalent to a mental age of 9 years, 8 months, and he produced moderately to mildly impaired scores (2nd – 16th percentile) on the Test of Written Language (TOWL). She asked his

teachers to complete an adaptive behavior scale (ABES) because he demonstrated such difficulty in academic and social domains. His scores on the ABES reflected significant limitations, particularly on the Task Related Behavior scale, a measure of functional academics, and on the Environmental / Interpersonal Behavior scale, which assessed social skills, communication, and functioning. Overall, his test scores showed he did not have the skills to survive in school without "a lot of extra help." He had a wide span of problems. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience were very limited. The pattern he exhibited was troubling because the discrepancy between his verbal and performance skills led to him to act before thinking. Although he obtained scores on tests of intellectual ability that fell into the range of mild intellectual disability, he also demonstrated a significant discrepancy between IQ and achievement, as indicated by the difference between his WISC-R IQ score and scores on the achievement tests. As a result, it was recommended that he receive services for learning disabilities in English, Math, Science, and Social Studies.

o   Marilyn Lauver (counselor at Westview Junior High): Ms. Lauver reported in her interview that when Mr. Fulks arrived at Westview, he was in a grade lower than he should have been for his age, so they eventually found a way to make him age/grade appropriate by placing him in ninth grade. He qualified for special education as Learning Disabled (LD). She explained that the LD designation indicated a discrepancy between ability and performance: "It was all about the adaptive behavior and his ability to learn." Many LD or emotionally handicapped (EH) students had intellectual disabilities. She noted that there was no difference between Mr. Fulks and children with Intellectual Disability with respect to his social, practical, and communication skills. One of the reasons why Westview staff acted so quickly with him was because he came to the school with the label Behaviorally Disordered and was unable to perform like other children his age due to his intellectual deficits and emotional disorganization. He was reading well below grade level and was way behind in math. He did not keep up with his classmates in either his special education classes or his regular classes ("my memory was he was failing almost everything"). She noted that Mr. Fulks acted like a seven-year-old, even though he was 14.

(b) Executive Functioning (e.g., problem solving and judgment in novel situations)

* *Behavior Rating:*

o   Standardized behavior rating with the Devereux when Mr. Fulks was in third grade (2/11/87) found Significantly High scores in Classroom Disturbance and Inattentive-Withdrawn, which indicated lack of self-regulatory control (i.e., executive dysfunction).

- o Results on the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordance on numerous aspects of executive dysfunction that they observed in Mr. Fulks: disorganized, unaware of consequences, difficulty following directions, inattentive/trouble concentrating, transition problems, tendency to overreact, poor impulse control, gave up easily, poor judgment, couldn't take a hint, and easily confused.

- o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) in the current evaluation found concordance among the above individuals on the following relevant behaviors: unaware of the consequences of his behavior, had trouble completing tasks, poor judgment, poor attention control, and poor organization skills (i.e., messiness and tendency to lose or misplace things frequently).

- *Collateral Witness Reports:*

- o <u>Linda Adkins</u> (neighbor): Ms. Adkins reported in a declaration that "everything" was slow about Mr. Fulks in childhood, including his pace of speaking and moving. He was "especially slow" in learning to speak.

- o <u>Kelly Perry</u> (neighbor/Linda Adkins' daughter): Ms. Perry reported in a declaration that it was difficult to play with Mr. Fulks in childhood because his thinking was so slow. His younger brother Shannon was more advanced in development. She observed that when his mother spoke to Mr. Fulks, she had to repeat herself in order for him to understand. He could not control his distress and threw dramatic temper tantrums.

- o <u>Christina Kirkman Holbrook</u> (cousin): Ms. Kirkman Holbrook reported in a declaration that Mr. Fulks was "slow," did not understand things he should have known for his age and could not comprehend basic school work.

- o <u>Dottie Thompson</u> (third grade teacher): Ms. Thompson reported that Mr. Fulks was unable to self-direct and indicated he needed adult guidance "at all times." [School records reflect that Dottie Thompson referred Mr. Fulks for assessment due to his distractibility and behavior control problems.]

- o <u>Joy Krug</u> (school psychologist at Westview Junior High): Ms. Krug reported in her interview that she tested and evaluated Mr. Fulks when he arrived at Westview in 1991. Test results indicated that his verbal impairments prevented him from reasoning, that his abilities to think abstractly and learn from experience were very limited, and that he was impulsive and tended to act before thinking. He obtained scores on intellectual tests that fell in the range of mild intellectual disability and also demonstrated a significant discrepancy between IQ and

achievement. As a result, in order to keep him in regular classrooms with accommodations, the school's multidisciplinary team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies. His primary weaknesses were language and sequencing verbal thoughts, which she attributed to frontal lobe problems. Functionally, he was intellectually disabled when one considered all his test scores, and he "didn't have the mental tools to compensate." His strengths included "street smarts" and "survival skills," as indicated by testing showing he was able to immediately perceive details and respond behaviorally.

o   Marilyn Lauver (counselor at Westview Junior High): Ms. Lauver reported in her interview that Mr. Fulks was impulsive. She said that although he tried hard to control his impulses, he often was unsuccessful.

(c) Communication

- *School Records/Testing:*

   o   Achievement testing in first grade found writing skills at the 10th percentile (mild impairment). In eighth grade, writing skills fell between the 2nd to 5th percentiles, which was four years below grade level. When tested in the forensic context at age 26-9, Mr. Fulks' writing skills fell at the 3rd percentile.

   o   Assessment with the Peabody Picture Vocabulary Test found a two-year developmental delay when Mr. Fulks was nine and nearly a five-year delay when he was 14. Forensic testing at age 26-9 found a standard score of 77 (i.e., 6th percentile).

   o   School records (Appendix B) reflect that Mr. Fulks received speech therapy throughout his school years.

- *Behavior Rating:*

   o   Rating by his teacher with the Devereux when Mr. Fulks was in third grade (2/11/87) found a Significantly Low score in Comprehension, which indicated significant receptive communication problems (i.e., adaptive dysfunction).

   o   Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) indicated concordant observations on 'indistinct speech.'

   o   Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: communicates with poor timing/interrupts and communicates about unusual/unrealistic conversation topics.

- *Collateral Witness Reports:*

  o <u>Linda Adkins</u> (neighbor) reported in her interview that Mr. Fulks did not begin speaking until he was around three years old. She indicated that because he lisped and mispronounced words, it was hard to understand him. When he was four, she still had trouble understanding him. He continued to lisp throughout childhood. He also had trouble understanding what others were saying to him. For this reason, she had to repeat things over and over to him because he didn't understand and kept saying "huh?" She said she had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go in the kitchen and bring her something inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

  o <u>Kelly Perry</u> (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks had trouble speaking because he could not pronounce words. It was hard to understand him when he talked, and in conversations, he did not respond much. He smiled but could not follow conversations. When his mother talked to him, she had to say things more than once for him to understand. His younger brother Shannon was smarter than he was and understood things Mr. Fulks could not grasp.

  o <u>Roger Fulks</u> (father) reported in his interview that Chad "didn't say stuff real plain" in childhood.

  o <u>Kevin Holbrook</u> (maternal uncle) reported in a declaration Mr. Fulks had a speech impediment as a child.

  o <u>Christina Kirkman Holbrook</u> (maternal cousin) reported in her interview that that she thought Mr. Fulks was born brain-damaged because he was "so slow at everything." He was delayed in talking and didn't start talking in sentences until kindergarten, at which point he was hard to understand. He couldn't pronounce words and sounded like a two-year-old whenever he spoke. He also stuttered but eventually grew out of it. Other children teased him about sounding "like a baby" when he spoke and called him "retarded." His siblings called him "stupid." His mother called him "stupid" and "retarded." She remembered that he received speech therapy. In her declaration, Christina reported that she sometimes had to ask his older sister Sherry to translate what he was saying because she couldn't understand him. Because of his speech problems, he seemed more like a three-year-old when he was seven.

  o <u>Gayle Wolfe</u> (fifth grade Behavioral Disorder teacher at Peyton Elementary) reported in her interview that classmates teased Mr. Fulks because of his lisp. He was very insecure about his speech and would

hide his face at times and remain quiet. To communicate with him, she had to talk to him on a very primitive level.

(d) Neuropsychological Testing

Neuropsychological testing of Mr. Fulks' *Conceptual* skills in academics, memory, attention, processing speed, communication, and executive functioning (see analysis in Question #3 below) reflected impairments that were consistent with the adaptive deficits identified in his Vineland-3 assessments and multi-source data summarized above.

*SOCIAL* (e.g., awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; social judgment)

(a) Coping

- *Behavior Rating:*
  - Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) found concordance with respect to the following observed behaviors: immature, inflexible and stubborn, and moody/emotional outbursts.
  - Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: deficient mood control: rapid mood swings with changes triggered by seemingly small things and tendency to overreact.

- *Trial Testimony:*

  Testimony from women Mr. Fulks lived with (i.e., Amber Fowler, Heather Goodman, and Veronica Evans) indicated that during his adult years he was emotionally unstable.

- *Collateral Witness Reports:*
  - Linda Adkins (neighbor) reported in her interview that Mr. Fulks cried a lot and whined in childhood. When the other children were rough, he screamed like they were going to hurt him.
  - Gayle Wolfe (fifth grade Behavioral Disorder teacher at Peyton Elementary) reported in her interview that Mr. Fulks couldn't explain what started problems, why he got involved, or why he did things. However, he never caused a problem on his own because he was always a follower. When he was teased and got angry, he cried rather than getting aggressive. He was a "copycat," and other children would draw him into mischief: "There wasn't hardly a day that I didn't talk to him

about not following other kids." In contrast, she never had to talk to him about something he instigated, because it was always something that someone else had started and gotten him involved in.

- o Marilyn Lauver (counselor at Westview Junior High) reported in her interview that emotionally and socially, Mr. Fulks seemed much younger than fourteen. In addition to spitting on other children on the school bus when he was upset, he pouted, hung his head, and "folded up." He did not know how to solve problems with peers. When he did not like how the other children were treating him, he acted out towards them rather than talking to them. His coping capacity was "almost non-existent." At one point, he had to be put off the bus for spitting on other children.

## (b) Interpersonal

- • *Behavior Reports:*

  - o Results of the Behavior Screen administered to Gayle Wolfe (teacher), Linda Adkins (neighbor), Christina Kirkman Holbrook (cousin), and Marilyn Lauver (school counselor) found concordance with respect to the following: superficial friendships, socially inept/problems with peers, follower/easily led by others, oppositional/disobedient, aggressive behavior with peers, difficulty with teamwork, and developmentally delayed.

  - o Standardized behavior rating with the Fetal Alcohol Behavior Scale (FABS) found concordance among the above individuals on the following relevant behaviors: had trouble playing on a team, established superficial friendships easily but had no close friends, and seemed unaware of 'good manners.'

- • *Collateral Witness Reports:*

  - o Linda Adkins (neighbor) reported in her interview that when Chad played with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. Other children picked on him and manipulated him. He followed Dewayne around and did whatever Dewayne told him to do. Dewayne tended to tell him to do things that would get him in trouble. He was sweet and seemed much younger than his age. He was close to his mother and seemed like a momma's boy. He had no friends his age

  - o Kelly Perry (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks walked funny, was quite clumsy, and tripped on himself when running. When playing baseball, he was uncoordinated. He had a hard time hitting the ball when batting or catching the ball when fielding. He also didn't understand the rules of the games. He was slow in his thinking, which made playing with other children difficult for him.

- o Christina Kirkman Holbrook (cousin) reported in her interview that she did not recall Mr. Fulks ever having a close friend at school or in the neighborhood. She said he didn't know how to connect socially with people and seemed more like a three-year-old when he was seven.

- o Roger Fulks (father) reported in his interview (and declaration) that his son was a follower.

- o Mark Thompson (family friend) also reported in a declaration that Mr. Fulks was a follower.

- o Gayle Wolfe (fifth grade special education teacher) noted in her interview that Mr. Fulks was a follower. She reported that he did not instigate problems but often was led into misconduct by other children. He was vulnerable to being led. When confronted for his behavior, he was unable to explain why he started problems, why he got involved, or why he did things. She described him as quiet, socially withdrawn, and immature, indicating that he acted like a five or six-year-old even though he was 11 at the time he was in her classroom. She noted he was weak in social reciprocity and had no friends. In her declaration she indicated that he had no sense of caution and got caught up in some serious fights on the playground. He was "very backward socially" and not someone who would go up to another child to make a friend.

- o Marilyn Lauver (counselor at Westview Junior High) reported in her interview that interpersonally, Mr. Fulks never looked comfortable anywhere. Although he initially tried to reach out to some peers, he couldn't fit in because he lacked social skills and consequently had no friends. He seemed "absolutely depressed, fearful, suspicious, and highly anxious." He had no social judgment. She thought his classmates were "wary" of him. His social deficits included a lack of basic social graces. For example, he did not know how to greet people politely (e.g., standing up and shaking hands when meeting an adult), and he didn't say 'thank you.' He did not understand humor or jokes, and it was important to be very concrete and literal with him. In many ways, he acted like a seven-year-old, even though he was fourteen.

PRACTICAL (learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, school and work task organization)

(a) Recreation

- • School Testing:

    Visuomotor testing (i.e., ability to coordinate behavior with visual information) at age nine indicated a two-year developmental delay. Testing

at age twelve found visuomotor and perceptual problems. Testing at age fourteen indicated visuomotor skills that fell 1.3 standard deviations below the mean (12th percentile).

- *Collateral Witness Reports:*
  - Linda Adkins (neighbor) reported in her interview that Chad didn't seem to understand things when he was a child. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. Then, he would kick it at the wrong time. He was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball. He couldn't hit the ball with a bat when the children were playing baseball. He was a quiet and withdrawn child.

  - Kelly Perry (neighbor / Linda Adkins' daughter) reported in a declaration that Mr. Fulks had difficulty playing games with peers in childhood because he was clumsy and did not understand the rules. She noted he was "slower in thinking, and that made playing with us hard."

  - Christina Kirkman Holbrook (maternal cousin) reported in her interview that Chad didn't know how to play sports with the other children. One time, she observed him playing ball with the neighbor children. The children started teasing him because he was uncoordinated, and he just wandered off with his head down and a sad expression on his face.

- Mr. Fulks' leisure activities during adolescence and adulthood primarily consisted of drinking and drug use.

(b) Self-Management Across Life Settings

- School records, collateral witness interviews (see earlier section in this report), and witness declarations referenced above show that Mr. Fulks was unable to keep up with peers academically despite special education supports throughout his school years.

- Mr. Fulks was unable to sustain productive work in his adult years despite having a GED and welding certificate, and he supported himself largely by breaking into cars or check fraud.

- There is no evidence that Mr. Fulks ever lived independently for any length of time. For example, within a month of his release from Davis Center to his mother's home at age 18, he married Amber Fowler. The two then lived with her son in his mother-in-law's home. After his brief relationship with Amber ended, he moved in with his oldest brother Dewayne and Dewayne's wife Carly. Following multiple arrests in Tennessee in early 1998, he left Indiana and moved to Myrtle Beach, South Carolina, where he lived at the beach and began working for a construction company. Two or three months later, he

was arrested and charged in federal court with car theft and related offenses. He was incarcerated in federal prison until December 1999, at which point he was arrested immediately and charged with burglary. Released from jail on bond, he worked for three or four weeks as a welder and fiberglass installer while living with Dewayne and Carly and then was incarcerated in federal prison for two years. Released on federal probation in March 2002, he moved in with a counselor he had met in a prison substance abuse program (Tina Severance), and she helped him get a job selling perfume. He immediately began a relationship with Veronica Evans, which led to Tina evicting him from her residence. He moved in with Veronica and married her two months later. Two months after that, they were arrested when he directed her to use a stolen credit card to buy jewelry at a Walmart. When he was apprehended by police in the Walmart parking lot, police found stolen credit cards and a stolen pistol in his vehicle. Detained in jail, he escaped with Brandon Basham, which began the chain of events resulting in the deaths of Samantha Burns and Alice Donovan.

- The assessment of adaptive functioning focuses on an individual's typical functioning in the community. The AAIDD indicates that intellectual disability determinations are *not based on prison functioning*.[18] Similarly, DSM-5 notes that adaptive functioning may be difficult to assess in a controlled setting such as prison.[19] The only times Mr. Fulks accomplished something positive in his life was when he lived in highly structured environments where he was not reliant on his own cognitive functioning to organize and structure his behavior. For example, although he had left school in ninth grade, he was able to obtain a GED and welding certificate at age 17 when he was in a structured juvenile residential program. Although he initially failed the test for the welding certificate, he was able to pass it the second time around with one-on-one support from his instructor, who reportedly was committed to ensuring Mr. Fulks passed the test. While in prison, another highly structured environment, he participated in anger management and stress management groups, received another GED in 2001, and completed a substance abuse treatment program in 2002.

In summary, retrospective Vineland-3 results in this evaluation found impairments in all three domains (i.e., conceptual, social, and practice), which were consistent with:

Contemporaneous cognitive testing in childhood,

Contemporaneous academic performance in school,

Contemporaneous behavior rating in school,

---

[18] Schalock, R.L., et al. (2012). *User's Guide, Intellectual disability: Definition, classification, and systems of supports.* Eleventh Ed. Washington, DC: AAIDD.

[19] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (5th ed.).* Arlington, VA: Author, p. 38.

Contemporaneous records in Appendix B,

Retrospective witness declarations and testimony,

Retrospective behavior screening in the current evaluation,

Retrospective standardized behavior assessment,

Retrospective collateral witness interviews, and

2003/04 forensic neuropsychological testing.

Thus, in addition to reliability assessment with the BRIEF, data from nine different sources provided convergent support that the Vineland-3 results were valid and that Mr. Fulks exhibited significant deficits in adaptive behavior throughout childhood and adulthood.

**OPINION: Data from multiple, independent, convergent sources indicate that Mr. Fulks exhibited significant impairments in childhood and adult adaptive functioning in three domains (i.e., Conceptual, Practical, and Social), which meets the second diagnostic criterion for a DSM-5 and AAIDD diagnosis of ID.**

**_Consultative Question #2: Were any impairments in Mr. Fulks' adaptive functioning present before the age of 18, as required by the adaptive behavior component of the third diagnostic criterion for a diagnosis of ID?_**

Although Mr. Fulks has displayed adaptive impairments his entire life, Question #1 enumerates pre-age 18 deficits in all three domains (conceptual, social, and practical).

**OPINION: Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited significant adaptive deficits _prior to age 18_, which meets the third diagnostic criterion for a diagnosis of ID as it relates to adaptive behavior.**

**_Consultative Question #3: Is Mr. Fulks' lifelong cognitive, intellectual, and adaptive functioning consistent with FASD?_**

**Neuropsychological Assessment**

The Centers for Disease Control (CDC) quantified the protocol for measuring the cognitive deficits in FAS in its 2004 publication containing diagnostic guidelines.[20] Namely, deficits that fall one or more standard deviations below the mean (i.e., 16th percentile or lower) in standardized testing are considered deficient except for IQ testing, which requires deficits that fall two or more standard deviations below the

---

[20] Bertrand et al., 2004, op. cit.

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0353

mean (i.e., 2nd percentile or lower). Under the 4-Digit Code, which is used by many practitioners in the clinical setting (and used by Dr. Davies in diagnosing Mr. Fulks), central nervous system dysfunction is designated Rank 3 (i.e., "Significant Dysfunction") when there is evidence from standardized testing of significant impairment (i.e., 2 or more standard deviations below the mean) in three or more domains of brain functioning (e.g., executive function, memory, cognition, social/adaptive skills, academic achievement, language, motor, attention or activity level).[21]

Neuropsychologist Paul Connor prepared Exhibit B below based on prior neuropsychological testing of Mr. Fulks (Dr. Venn in 2003, Dr. Evans in 2003/04, Dr. Gourley in 2004, and Dr. Hilkey in 2003). In Exhibit B, Dr. Connor converted standard scores from the test batteries administered to Mr. Fulks in adulthood to z-scores (i.e., standard deviations from a mean of "0"), with the direction of deficit made constant (i.e., lower scores reflecting poorer performance, and higher scores reflecting better performance). The horizontal green line in Exhibit B depicts the z-score mean or average score for each test administered, and the horizontal red line depicts the cut-point for a "deficit" finding.

---

[21] Astley, S.J. (2004). *Diagnostic guide for Fetal Alcohol Spectrum Disorders: The 4-digit diagnostic code, 3rd Ed.* Seattle: FAS Diagnostic and Prevention Network.



EXHIBIT B. Adult Neuropsychological Testing by Forensic Experts

Absent significant brain damage, Mr. Fulks' neurocognitive test results should fall in line with the mean for each test in Exhibit B, or "0" standard deviation line (reflected by the horizontal green line). However, most of his scores fall well below that line and even below the dotted green line depicting his full-scale IQ scores (77 per Dr. Venn, 79 per Dr. Gourley, 78 per Dr. Hilkey).

Overall, the test profile in Exhibit B is quite variable or scattered, with the large majority of scores falling one or more standard deviations below the mean and relatively few scores falling at or above the mean, indicating a broad patchwork of significant impairments reflecting severe pervasive brain damage. A variable or "patchy" neuropsychological profile such as this is prototypical in FASD and predicts that Mr. Fulks will tend to perform better in structured situations (e.g., cognitive testing) compared to situations that rely solely on his deficient executive processing. His documented life history (e.g., obtaining a GED as well as a welding certificate with support from his instructor while living in a structured juvenile facility, obtaining another GED while incarcerated in prison) is consistent with such a prediction.

Widespread deficits of the type seen in Mr. Fulks' cognitive profile have a *profound* effect on adaptive behavior. While it may be possible for a person to compensate for

Evaluation: Chadrick Fulks
Page 56 of 137

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0355

one or two mild impairments in a single cognitive domain, when there are multiple mild to severe impairments in several areas of the brain as in Mr. Fulks' case, compensation is impossible without external structure and supports.

As Exhibit B illustrates, neuropsychological testing by four different psychologists, using a variety of tests, found significantly impaired cognitive functioning (i.e., 1 or more standard deviations below the mean) in **nine** domains per CDC guidelines for neurocognitive disability in FAS or **eight** domains (excluding Academics) under more stringent 4-Digit Code guidelines (i.e., 2 or more standard deviations below the mean). In either case, the *number of deficient domains is consistent with ID* as well as *consistent with the central nervous system abnormality found in FASD*. According to Dr. Connor, 80 percent of the test scores in Exhibit B (82/102) fell 1 or more standard deviations below the mean in the following deficient domains:

- Intellectual Functioning (variable results)
- Academics (all academic areas)
- Memory and Learning (verbal and visual)
- Visuospatial Processing
- Attention
- Processing Speed
- Motor Skills
- Executive Functioning
- Communication

(a) Intellectual Functioning (variable results)

Although IQs in FASD have been found to range from the 20s to 140s[22], research generally tends to find borderline to average intellectual functioning in this population.[23, 24] Mean IQ in persons diagnosed with FAS is approximately 79, and mean IQ in those with other medical conditions under the FASD umbrella is approximately 90.[25] In addition, often there is variability among index/subtest scores on IQ tests.[26, 27]

---

[22] Streissguth et al., 1996, op. cit.

[23] Streissguth, A.P., Barr, H.M., & Sampson, P.D. (1990). Moderate prenatal alcohol exposure: effects on child IQ and learning problems at age 7 ½ years. *Alcoholism: Clinical and Experimental Research, 14*, 662–669.

[24] Mattson, S.N., Riley, E.P., Gramling, L., et al. (1997). Heavy prenatal alcohol exposure with or without physical features of fetal alcohol syndrome leads to IQ deficits. *Disability Rehabilitation, 131*, 718–721.

[25] Streissguth et al., 1996, op. cit.

[26] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychological Reviews, 21*, 81-101.

[27] Woods, G.W., Greenspan, S., & Agharkar, B.S. (2011). Ethnic and cultural factors in identifying Fetal Alcohol Spectrum Disorders. *Journal of Psychiatry and Law, 39*, 9-37.

Mr. Fulks' IQ was tested in adulthood by three different psychologists, who found the following results:

**IQ TESTING**
[Standard Scores]

| Date | Age | Test | Source | VIQ / VCI | PIQ / PRI | WMI | PSI | FSIQ |
|------|-----|------|--------|-----------|-----------|-----|-----|------|
| 3-5/03 | 25-11 | WAIS-III | Dr. Venn, PhD | 79 / 76 | 78 / 84 | 86 | 79 | 77* |
| 8/03 | 26-2 | WAIS-III | Dr. Hilkey, PhD | 79 | | | | 81 |
| 2/04 | 26-9 | WJCS-III | Dr. Gourley (Federal Medical Center at Butner, NC) | Visual-Auditory Learning: 75 SS  Analysis/Synthesis: 76 SS  Verbal Comprehension: 77 SS  Incomplete Words: 100 SS  Sound Blending/Decision Speed: 99 SS  Auditory Working Memory: 98 SS | | | | 79* |

* statistically-significant differences

Testing by Drs. Venn, Gourley, and Hilkey found full-scale IQ scores ranging from 77 to 79, with statistically significant discrepancies between VCI-PRI (8 points) and VCI-WMI (10 points) in Dr. Venn's testing as well as significant discrepancies between the first and last three domain subtests in Dr. Gourley's testing.

Adult IQ testing was significantly lower than childhood testing with the WISC-R (i.e., 90 at age nine, 96 at age 12, and 93 at age 14). Such age-related decline in functioning is typical in FASD.[28, 29] Statistically significant discrepancies between verbal and nonverbal skills at ages twelve and fourteen (with relative weakness in verbal skills) suggested the possibility of brain damage.

Overall, the variability in Mr. Fulks' IQ scores across his lifespan is consistent with FASD.[30]

(b) Academic Achievement (all academic areas)

Learning difficulties are among the cognitive deficits typically associated with FASD, especially in the areas of math and/or visual-spatial processing.[31] Deficits in arithmetic are consistently documented in FASD, although some students show relative deficits in

---

[28] Jirikowic, T., Kartin, D., & Carmichael Olson, H. (2008). Children with fetal alcohol spectrum disorders: A descriptive profile of adaptive function. *Canadian Journal of Occupational Therapy, 75,* 238-248.

[29] Streissguth et al., 1996, op. cit.

[30] Ali, S., Kerns, K.A., Olson H.C., & Astley, S.J. (2018). An investigation of intra-individual variability in children with fetal alcohol spectrum disorder (FASD). *Child Neuropsychology, 24,* 617-637.

[31] Kerns, K.A., Don, A., Mateer, C.A., & Streissguth, A.P. (1997). Cognitive deficits in nonretarded adults with fetal alcohol syndrome. *Journal of Learning Disabilities, 30,* 685-693.

reading or spelling.[32, 33, 34] Arithmetic involves complex cognitive functioning that is markedly sensitive to alcohol exposure in utero.[35, 36, 37, 38]

Drs. Venn, Evans, and Hilkey administered the Wide Range Achievement Test – Third Edition (WRAT-3) to Mr. Fulks between April 2003 and November 2003, and Dr. Gourley administered the Woodcock Johnson Tests of Achievement – Third Edition (WJTA-III) in February 2004:

## ACHIEVEMENT TESTING
[SS = Standard Score, % = Percentile, GE = Grade Equivalence]]

| DATE | AGE | TEST | READING | COMP | SPELL | WRITING | MATH CALC | MATH ANAL |
|------|-----|------|---------|------|-------|---------|-----------|-----------|
| 4/03 | 25-11 | WRAT-3 Venn | **75 SS** 5% 5 GE | | **76 SS** 5% 5 GE | | **79 SS** 8% 6 GE | |
| 8/03 | 26-2 | WRAT-3 Hilkey | **84** **14%** **8 GE** | | **75** **5%** **5 GE** | | **77** **6%** **6 GE** | |
| 11/03 | 26-6 | WRAT-3 Evans | **77 SS** 6 GE | | | | | |
| 2/04 | 26-9 | WJTA-III Gourley | 88 SS 21% 8.0 GE | 91 SS 27% 7.7 GE | 91 SS 26% 7.7 GE | **72 SS** **3%** **2.3 GE** | **84 SS** **14%** **5.7 GE** | **76 SS** **6%** **6.1 GE** |

\* **Bold type = 1 or more SD below the mean**

WRAT test results generally were consistent, although by May 2004 Reading showed modest improvement, and the Spelling score on Dr. Gourley's WJTA-III was significantly different than the scores obtained on the WRAT-3 by Drs. Venn and Hilkey. Although the two tests involved different spelling words, the significant test-retest, intertest, and intratest variability in FASD better explains the discrepancy.[39, 40, 41] Overall, achievement

---

[32] Rasmussen, C., & Bisanz, J. (2009). Exploring mathematics difficulties in children with fetal alcohol spectrum disorders. *Child Development Perspectives, 3*, 125–130.

[33] Kopera-Frye, K., Dehaene, S., & Streissguth, A.P. (1996). Impairments of number processing induced by prenatal alcohol exposure. *Neuropsychologia, 34*, 1187 – 1196.

[34] Jacobson, S.W., Dodge, N., Dehane, S., Chiodo, L.M., Sokol, R.J., & Jacobson, J.L. (2003). Evidence for a specific effect of prenatal alcohol exposure on "number sense." *Alcoholism: Clinical and Experimental Research, 27*, A121.

[35] Streissguth et al., 1991, op. cit.

[36] Goldschmidt, L., Richardson, G.A., Stoffer, D.S., Geva, D., & Day, N.L. (1996). Prenatal alcohol exposure and academic achievement at age six: a nonlinear fit. *Alcoholism, Clinical and Experimental Research, 20*, 763–770.

[37] Streissguth, A.P., Barr, H.M., Carmichael-Olson, H., Sampson, P.D., Bookstein, F.L., & Burgess, D.M. (1994) Drinking during pregnancy decreases Word Attack and Arithmetic scores on standardized tests: Adolescent data from a population-based prospective study. *Alcoholism, Clinical and Experimental Research, 18*, 248–254.

[38] Kodituwakku, 2009, op. cit.

[39] Kodituwakky, 2009, op. cit.

[40] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychological Reviews, 21*, 81-101.

[41] Ali, S., Kerns, K.A., Mulligan, B.P., Carmichael Olson, H., & Astley, S.J. (2018). An investigation of intra-individual variability in children with fetal alcohol spectrum disorder (FASD). *Child Neuropsychology, 24*, 617-637.

testing in the adult years found deficits in most academic domains, which was consistent with childhood academic testing (see Appendix C).

(c)  Memory and Learning (verbal and visual)

The hippocampus, a brain region serving memory, appears to be particularly vulnerable to the harmful effects of alcohol during brain development.[42] Literature review found those with FASD typically show deficits in memory processes involving *conscious effort*, such as free recall and organization.[43] In contrast, concrete hands-on learning does not appear to be impaired in FASD.[44, 45]

Testing of Mr. Fulks' memory and learning skills found deficits as low as 2.5 standard deviations below the mean in verbal and visual memory skills, which was consistent with childhood testing in this domain (see Appendix C).

(d)  Visuospatial Processing

Spatial processing measures have been found to discriminate alcohol-affected individuals from nonaffected persons[46] and are associated with learning disabilities in mathematics.[47]

Testing of Mr. Fulks' visuospatial processing skills found deficits as low as 2.5 standard deviations below the mean.

(e)  Attention (visual sustained attention)

Attention deficits are common in FASD[48, 49] and often are associated with attention deficit disorders, with or without hyperactivity. In fact, a number of studies have found

---

[42] Berman, R.F., & Hannigan, J.H. (2000). Effects of prenatal alcohol exposure on the hippocampus: Spatial behavior, electrophysiology, and neuroanatomy. *Hippocampus, 10,* 94-110.

[43] Kodituwakku, 2009, op. cit.

[44] Coles, C.D., Strickland, D.C., Padgett, L., & Bellmoff, L. (2007). Games that "work": Using computer games to teach alcohol-affected children about fire and street safety. *Research in Developmental Disabilities, 28,* S18–530.

[45] Kodituwakku, P.W. (2010). A neurodevelopmental framework for the development of interventions for children with fetal alcohol spectrum disorders. *Alcohol, 44,* 717-728.

[46] Mattson, S.N., Roesch, S.C., Fagerlund, A., Autti-Ramo, I., Jones, K.L., May, P.A., Adnams, C.M., Konovalova, V., & Riley, E.P. (2010). Toward a neurobehavioral profile of fetal alcohol spectrum disorders. *Alcoholism: Clinical and Experimental Research, 34,* 1640–1650.

[47] Kable, J.A., Coles, C.D., & Taddeo, E. (2007). Sociocognitive habilitation using the Math Interactive Learning Experience (MILE) program for alcohol-affected children. *Alcoholism: Clinical and Experimental Research, 31,* 1425–1434.

[48] Nanson, J.L., & Hiscock, M. (1990). Attention deficits in children exposed to alcohol prenatally. Alcoholism: Clinical and Experimental Research, 14, 656–661.

[49] Lee, K.T., Mattson, S.N., & Riley, E.P. (2004). Classifying children with heavy prenatal alcohol exposure using measures of attention. *Journal of the International Neuropsychological Society, 10,* 10:271–277.

that attention-deficit/hyperactivity disorder (ADHD) is the most prevalent comorbid mental health disorder in individuals with FASD,[50, 51, 52] regardless of IQ.[53]

Testing of Mr. Fulks' ability to sustain attention found deficits as low as 4.0 standard deviations below the mean.

(f)  Processing Speed

Studies that have examined cognitive processing in FASD have consistently found this population is significantly slower to process information than age-matched controls.[54] A literature review found that children with FASD show greater difficulty with executive control tasks requiring rapid processing of relatively complex information in domains such as language, visual construction, memory, and number processing.[55] Although this population does not show deficits on tasks involving automatic processing (e.g., 'motor memory'), research shows that when task demands increase or require interhemispheric transfer of information, performance in those with FASD declines at a faster rate compared with controls under speeded conditions.[56, 57, 58]

Testing of Mr. Fulks' processing speed skills found deficits as low as 3.3 standard deviations below the mean.

(g)  Motor Coordination

Research reviews have found a variety of fine and gross motor impairments in the FASD population, especially with respect to integrating discrete motor functions into complex coordinated motor movements (i.e., coordination).[59, 60] Those with FASD tend to have little difficulty with simple perceptual tasks and instead show impairments in tasks involving complex visual-motor integration[61] or inter-hemispheric transfer of

---

[50] Streissguth et al., 1996, op. cit.

[51] Bhatara, V., Loudenberg, R., & Ellis, R. (2006). Association of attention deficit hyperactivity disorder and gestational alcohol exposure. *Journal of Attention Disorders, 9,* 515–522.

[52] Fryer, S.L., McGee, C.L., Matt, G.E., Riley, E.P., & Mattson, S.N. (2007). Evaluation of psychopathological conditions in children with heavy prenatal alcohol exposure. *Pediatrica, 199,* e733–e741.

[53] Lee, K.T., Mattson, S.N., & Riley, E.P. (2004). Classifying children with heavy prenatal alcohol exposure using measures of attention. *Journal of the International Neuropsychological Society, 10,* 271–277.

[54] Kodituwakku, 2009, op. cit.

[55] Kodituwakku, 2009, op. cit.

[56] Burden, M.J., Jacobson, S.W., & Jacobson, J.L. (2005). Relation of prenatal alcohol exposure to cognitive processing speed and efficiency in childhood. *Alcoholism: Clinical and Experimental Research, 29,* 1473–1483.

[57] Roebuck et al., 2002, op. cit.

[58] Kodituwakku, 2009, op. cit.

[59] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychology Review, 21,* 81-101.

[60] Connor, P.D., Sampson, P.D., Streissguth, A.P., Bookstein, F.L., & Barr, H.M. (2006). Effects of prenatal alcohol exposure on fine motor coordination and balance: A study of two adult samples. *Neuropsychologia, 44,* 744-751.

[61] Ibid.

---

information.[62] Such findings are consistent with the general information processing/integration deficit in FASD (i.e., as cognitive work becomes more complex and challenging, impairments increase).[63, 64, 65, 66]

Testing of Mr. Fulks' motor skills found deficits that fell as low as 2.5 standard deviations below the mean, which was consistent with visuomotor deficiencies in childhood testing (see Appendix C).

(h) Executive Functioning

Executive dysfunction is *the* hallmark deficit in FASD.[67] Of all the cognitive deficits known to be associated with the central nervous system abnormality in FASD, executive dysfunction is by far the most debilitating because it affects capacity to function adequately *and* independently. Research consistently finds this population is impaired in executive control involving *conscious effort and supervisory attention.*[68, 69, 70, 71] Specifically, those with FASD tend to have problems on neuropsychological tests that assess cognitive planning[72, 73], conceptual set shifting[74, 75], nonverbal and verbal fluency[76, 77], and multiple measures of concept formation.[78] In addition, there is

---

[62] Roebuck, T.M., Mattson, S.N., & Riley, E.P. (2002). Interhemispheric transfer in children with heavy prenatal alcohol exposure. *Alcoholism: Clinical and Experimental Research, 26,* 1863-1871.

[63] Kodituwakku, 2009, op. cit.

[64] Uecker, A., & Nadel, L. (1996). Spatial locations gone awry: object and spatial memory deficits in children with fetal alcohol syndrome. *Neuropsychologia, 34,* 209–223.

[65] Mattson, S.N., Gramling, L., Riley, E.P., et al. (1996). Global-local processing in children prenatally exposed to alcohol. *Child Neuropsychology, 2,* 165–175.

[66] Aragon, A.S., Kalberg, W.O., Buckley, D., Barela-Scott, L.M., Tabachnick, B.G., & May, P.A. (2008). Neuropsychological study of FASD in a sample of American Indian children: Processing simple versus complex information. *Alcoholism: Clinical and Experimental Research, 32,* 2136-2148.

[67] Mattson, S.N., Crocker, N., & Nguyen, T.T. (2011). Fetal alcohol spectrum disorders: Neuropsychological and behavioral features. *Neuropsychology Review, 21,* 81-101.

[68] Kodituwakku, P.W., Handmaker, N.S., Cutler, S.K., et al. (1995). Specific impairments in self-regulation in children exposed to alcohol prenatally. *Alcoholism: Clinical and Experimental Research, 19,* 1558–1564.

[69] Mattson, S.N., Goodman, A.M., Caine, C., et al. (1999). Executive functioning in children with heavy prenatal alcohol exposure. *Alcoholism: Clinical and Experimental Research, 23,* 1808–1815.

[70] Kodituwakku, P.W., Kalberg, W., May, P.A. (2001). The effects of prenatal alcohol exposure on executive functioning. *Alcohol Research & Health, 25,* 192–198.

[71] Rasmussen, C. (2005). Executive functioning and working memory in fetal alcohol spectrum disorder. *Alcoholism: Clinical and Experimental Research, 29,* 1359–1367.

[72] Kodituwakku et al., 1995, op. cit.

[73] Mattson et al., 1999, op. cit.

[74] Coles, C.D., Platzman, K.A., Raskind-Hood, C.L., et al. (1997). A comparison of children affected by prenatal alcohol exposure and attention deficit, hyperactivity disorder. *Alcoholism: Clinical and Experimental Research, 21,* 150–161.

[75] Carmichael Olson, H., Feldman, J.J., Streissguth, A.P., et al. (1998). Neuropsychological deficits in adolescents with fetal alcohol syndrome: clinical findings. *Alcoholism: Clinical and Experimental Research, 22,* 1998–2012.

[76] Schonfeld, A.M., Mattson, S.N., Lang, A.R., et al. (2001). Verbal and nonverbal fluency in children with heavy prenatal alcohol exposure. *Journal of Studies on Alcohol, 62,* 239–246.

[77] Kodituwakku, P.W., Adnams, C.M., Hay, A., et al. (2006). Letter and category fluency in children with fetal alcohol syndrome from a community in South Africa. *Journal of Studies on Alcohol, 67,* 502–509.

[78] McGee, C.L., Schonfeld, A.M., Roebuck-Spencer, T.M., et al. (2008). Children with heavy prenatal alcohol exposure demonstrate deficits on multiple measures of concept formation. *Alcoholism: Clinical and Experimental Research, 32,* 1388–1397.

consistent empirical evidence of impairments in working memory, response inhibition, and executive control.[79, 80, 81, 82] For example, investigation of orbitofrontal functioning (i.e., shifting stimulus-reward associations) found children with FASD were impaired at affective set shifting[83], which was associated with parent-rated behavior control problems.[84] Overall, a robust body of research shows that people with FASD display greater difficulty with complex tasks of executive functioning that are cognitively more demanding than less complex tasks requiring relatively little mental effort.[85]

Testing of Mr. Fulks' executive function skills found deficits that fell as low as 2.0 standard deviations below the mean and in one case more than 4.0 standard deviations below the mean.

(i)  Communication

Deficient communication skills are often seen in FASD.[86, 87] Literature review found children with FASD showed deficits in relatively complex language tasks involving phonological working memory and social pragmatics but not on less taxing tasks.[88] The language impairments in FASD are associated with learning problems, information processing, social reasoning, and difficulties initiating and maintaining conversations, handling peer interactions and following social norms.[89, 90]

Testing of Mr. Fulks' communication skills found deficits that fell as low as 2.0 standard deviations below the mean, which was consistent with childhood deficits in this domain (see Appendix C).

---

[79] Green, C.R., Mihic, A.M., Nikkel, S.M., et al. (2009). Executive function deficits in children with fetal alcohol spectrum disorders (FASD) measured using the Cambridge Neuropsychological Tests Automated Battery (CANTAB). *Journal of Child Psychology and Psychiatry, 50,* 688–697.
[80] Mattson, S.N., Riley, E.P., Auti-Ramo, I., et al. (2009). Discrimination of nondysmorphic children with prenatal alcohol exposure from nonexposed controls. *Alcoholism: Clinical and Experimental Research Supplement, 33,* 37A.
[81] Noland, J.S., Singer, L.T., Arendt, R.E., et al. (2003). Executive functioning in preschool-age children prenatally exposed to alcohol, cocaine, and marijuana. *Alcoholism: Clinical and Experimental Research, 27,* 647–656.
[82] Green, C.R., Munoz, D.P., Nikkel, S.M., et al. (2007). Deficits in eye movement control in children with fetal alcohol spectrum disorders. *Alcoholism: Clinical and Experimental Research, 31,* 500–511
[83] Rolls, E.T., Hornak, J., Wade, D., et al. (1994). Emotion-related learning in patients with social and emotional changes associated with frontal lobe damage. *Journal of Neurological Neurosurgical Psychiatry, 57,* 1518–1524.
[84] Kodituwakku, P.W., May, P.A., Clericuzio, C.L., et al. (2001). Emotion-related learning in individuals prenatally exposed to alcohol: an investigation of the relation between set shifting, extinction of responses, and behavior. *Neuropsychologia, 39,* 699–708.
[85] Kodituwakku, 2009, op. cit.
[86] Conroy, J.L., & Lane, K.A.(2009). *Characteristics of youth with FASD on adjudicated probation orders.* Final Report to the Department of Justice Canada and British Columbia Ministry of Children and Family Development.
[87] Mattson, S.N., & Riley, E.P. (1998). A review of the neurobehavioral deficits in children with Fetal Alcohol Syndrome or prenatal exposure to alcohol. *Alcoholism: Clinical and Experimental Research, 22,* 279–94.
[88] Kodituwakku, 2009, op. cit.
[89] Shaywitz, S.E., Caparulo, B.K., & Hodgson, E.S. (1981). Developmental language disability as a consequence of prenatal exposure to ethanol. *Pediatrics, 68,* 850–5 8-10
[90] Carmichael Olson, C. (1994). The effects of prenatal alcohol exposure on child development. *Infants and Young Children, 6,* 10–25.

## Consistency with Childhood Functioning

The deficient cognitive domains listed above are consistent with standardized testing during the school years (see Appendix C), which found deficiencies in the following domains:

    (a) deficient Academic Achievement scores in first, third, sixth, and eighth grades;

    (b) deficient Memory and Learning scores in third grade;

    (c) deficient Communication scores in third and eighth grades; and

    (d) deficient Visuomotor Integration scores in third, sixth, and eighth grades.

The deficient cognitive domains listed above are consistent with Mr. Fulks' history of childhood adaptive deficits, as described in Consultative Question #1.

## Consistency with the Fetal Alcohol Behavior Profile

Three individuals Gayle Wolfe (fifth grade teacher), Linda Adkins (neighbor), and Marilyn Lauver (junior high counselor) completed the Fetal Alcohol Behavior Scale (FABS) with respect to Mr. Fulks' behavior in childhood. In all three cases, results exceeded the threshold distinguishing those with FASD from those without, indicating Mr. Fulks displayed the "signature" behavior profile unique to children with FASD.

## Generalized Processing and Integration Deficit

According to Dr. Connor, although Mr. Fulks demonstrated *at least mild impairment* (i.e., < -1 SD) in the nine functional domains described above in this section, he exhibited *at least moderate impairment* (i.e., < -2 SD) in 30 percent of the tests shown in Exhibit B (i.e., 31/102 tests), typically on complex unstructured tasks where he had to problem-solve without external guidance. This type of profile reflects a *generalized processing and integration deficit* in executive functioning.

Executive function skills are responsible for making decisions about how to act. Referred to as 'higher order' cognitive processing because the executive center of the brain receives and then integrates, analyzes, and makes decisions based on neural input from other brain regions, the executive system in an *intact* brain will conduct a complex reasoning process that includes considering consequences, weighing risks/benefits, and linking cause and effect while resisting inappropriate impulses from the limbic system – *all before communicating with the body about how to act*. The executive system relies on neural input below the level of consciousness to do the conscious 'thinking' work of the brain. If neural input to the executive system is impaired, then executive skills will be working with flawed data. If executive functioning also is impaired, then the process of conscious cognitive processing will be faulty and produce adaptive dysfunction. Test results in Mr. Fulks' situation indicate marked executive dysfunction in conjunction with

pervasive deficits in neural input, which largely explains why his adaptive functioning was so impaired when he had to make decisions on his own in complex situations.

The generalized information processing and integration deficit found in Mr. Fulks' test profile is unique to FASD and operates in the following way: environmental complexity overwhelms already-impaired executive capacity, which deteriorates further *in direct proportion to task complexity and the corresponding mental challenge required to cope with the situation*. Task complexity involves numerous environmental factors such as novelty, ambiguity and lack of structure, unpredictability, distraction, simultaneous task demands, and/or time pressure. Of course, additional extraneous environmental factors such as stress, acute intoxication, or influence from others will exacerbate the decline in executive control. Generally, the more structured the environment, the less need for independent thinking and problem-solving in the face of contextual complexity. In Mr. Fulks' case, neuropsychological testing occurred in highly structured environments (i.e., privacy, minimal distraction) where he was given specific instructions for each test, varying degrees of examiner guidance depending on the test, and opportunities to practice, which removed important elements of environmental complexity from the situation (e.g., distractions, ambiguity, unpredictability, lack of structure). Nonetheless, he still obtained some test results that were severely deficient.

The generalized processing deficit does not mean a person with FASD cannot learn, but typically the process of learning is slow and requires a great deal of repetition. Hands-on modalities and regular practice significantly improve capacity to learn in this population, which explains why Mr. Fulks could pass his GED and earn a welding certificate in a structured boys' facility when the instructor worked closely with him and gave him special help. Conversely, the generalized processing deficit also explains why, when he had to make decisions and organize his life on his own, he did not support himself with stable employment and maintain a stable independent life course.

The generalized processing deficit in FASD explains why Mr. Fulks cannot think quickly (i.e., deficient processing speed) or generalize (i.e., deficient executive functioning) in the context of a 'new' experience that doesn't exactly resemble an old event. Consistent with the generalized processing deficit, Mr. Fulks' history was replete with examples of situations where he made bad decisions, showing he did not learn from experience or cope adequately when left to his own devices.

The generalized processing deficit in FASD does not mean someone like Mr. Fulks cannot manipulate others because manipulating others does not require cognitive sophistication.

The generalized deficit does not mean a person with FASD cannot lead others or plan or make choices. However, it does mean that the capacity to lead, plan, and make choices will be *flawed* by deficient executive processing. That is, executive processes such as considering consequences and weighing options will be biologically derailed by strong

emotions and urges from the limbic system that the individual does not have the executive capacity to override. Dr. Evans' testimony in 2004 essentially conveyed the same message: Mr. Fulks has impaired impulse control due to brain impairment, which is demonstrated by reliable test results obtained within a highly controlled setting with examiner guidance and specific rules about what needs to be done. There are no strong emotions or urges in such a situation. However, in the real world, particularly in stressful situations that may or may not involve influence from others and intoxication among other things, Mr. Fulks' capacity to make choices is even more impaired than his testing shows, which is clearly evident in his behavioral history.

**OPINION: Data from multiple, independent, convergent sources indicate Mr. Fulks exhibited cognitive, intellectual, and adaptive impairments across his lifespan that are consistent with FASD. FASD is a medical defect that impairs judgment and ability to consider consequences and control behavior, including criminal behavior.**

### _Consultative Question #4: Aside from fetal alcohol exposure, are there other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18?_

Apart from Mr. Fulks' cognitive and adaptive functioning, other risk factors documented in the records were postnatal brain trauma, his own substance abuse, and environmental adversity. The latter involved physical abuse, sexual abuse, emotional abuse, neglect, exposure to domestic violence, and caregiver instability.

**Postnatal Brain Trauma**

Mr. Fulks reported a head injury at age ten although records indicate his first head injury occurred at age seven and three additional head injuries in adolescence. He reported no functional sequelae from any of these head injuries. Childhood records document only one head injury: in 1984, his brother Dewayne knocked over a can of paint that hit Mr. Fulks (age seven) in the head and knocked him unconscious. There is no report of functional sequelae following this event.

**Substance Abuse**

Mr. Fulks told several mental health experts (Drs. Melikian, Venn, Hilkey) that he began drinking alcohol/moonshine and using marijuana at age 10. He told Dr. Venn that by age twelve, he was drinking regularly, sometimes to the point of blackouts. He told Dr. Hilkey that he huffed petrochemicals around age 10 but told Dr. Dr. Melikian he was fourteen when he began huffing. He told Dr. Melikian that he used LSD and abused pain medication at age 16. A drug screen following his suicide attempt at age 13 found no illegal drugs in his system.

**Childhood Adversity**

Records from numerous sources establish that Mr. Fulks was exposed to significant childhood adversity at different points in his life (e.g., physical, sexual, and emotional abuse; exposure to domestic violence; neglect; residential and caregiver instability; exposure to familial substance abuse and criminality; poverty).

**Differential Diagnosis**

Although the above experiences may have affected Mr. Fulks' behavior, several events *prior to age 10 when he started using substances* rule out the causative influence on cognitive functioning of any of these factors:

(a) EARLY DEVELOPMENTAL DELAYS: Mr. Fulks was delayed in walking and talking per collateral witnesses and when he did start speaking, he had articulation problems that resulted in speech and language services throughout elementary school and into seventh grade (i.e., ongoing communication delay).

(b) EARLY LEARNING PROBLEMS: Testing in kindergarten with the Comprehensive Test of Basic Skills (CTBS) suggested Mr. Fulks had learning problems (Word Recognition at the 10th percentile, Vocabulary at the 12th percentile, and Math Concepts at the 7th percentile). Testing with the CTBS in first grade also found problems (Word Recognition at the 13th percentile and Language Expression at the 10th percentile). After he was retained and completed an additional year of first grade, his CTBS scores improved significantly. Although the CTBS had questionable reliability (e.g., group administration, multiple-choice format, frequent score inflation), the deficiencies in kindergarten and first grade test results were consistent with scores Mr. Fulks later received on more reliable tests in third grade. Deficient scores on the CTBS in kindergarten and first grade also were consistent with academic marks in first grade (S- in Reading, Writing, and General Education and U in Spelling and Math), which constituted another sign he was having considerable difficulty keeping up with peers in academic performance. Attendance was not the problem as he was absent only 9 of 176 days that school year. First-grade teacher Suzanne Walker (nee Welker) reported in an interview with Mr. Fulks' trial attorneys that retention in her first-grade class meant a child had significant deficits because she typically was opposed to retention.

(c) SPECIAL EDUCATION: In his second year of first grade, Mr. Fulks received special education services that involved speech and language support. Academically, he obtained Satisfactory marks in all subjects but Spelling, where he received S-. Again, attendance was not the problem as he was absent 10 out of 175 days.

(d) ONGOING ACADEMIC WEAKNESS AND SPEECH DELAY IN SECOND GRADE: Academic marks in second grade were S in Reading, Writing, and Math and S- in Spelling and Language, with absences totaling 13 of 178 days. His IEP continued

speech and language services due to his articulation problem (i.e., communication delay).

(e) SELF-CONTAINED CLASSROOM: In third grade, Mr. Fulks was placed in a self-contained resource room, to be mainstreamed as his behavior and academic progress permitted. His IEP continued speech services for articulation problems (i.e., ongoing communication delay) and added services for all academic subjects. Nonetheless, he continued having problems with academic performance (i.e., S in Spelling and Writing but S- in Reading, Language, and Math), with absences totaling 21 out of 178 days.

(f) INDIVIDUALLY-ADMINISTERED TESTING: The first individualized achievement test administered to Mr. Fulks during his school years was the Wide Range Achievement Test (WRAT) in third grade. Results on the WRAT found deficits in Reading (9th percentile) and Math Calculation (12th percentile). Another individualized test, the Kaufman Test of Educational Achievement (KTEA) found a deficiency in Spelling (14th percentile), with weakness in Math Calculation (18th percentile). Individualized testing of Mr. Fulks' learning capacity at age 9-8 with the Jordan Reversal Test found a two-year delay in developmental age (7-9), and testing of his receptive communication skills with the Peabody Picture Vocabulary Test (PPVT) found a similar two-year delay (7-10). His special education classification was Specific Learning Disability, according to Gayle Wolfe.

(g) EXECUTIVE DYSFUNCTION: A third-grade IEP referral in January 1987 noted executive function impairments (i.e., "Does not complete tasks. Is not self-directing. Needs guidance at all times...") as well as weakness in Reading, Arithmetic, English, Spelling, Work Habits, Distractibility, No Self-Discipline. In February 1987, Mr. Fulks was referred for testing because of behavior problems, deficits in self-direction, and poor achievement. Third-grade teacher Dottie Thompson indicated in school records that Mr. Fulks had no self-discipline and needed to be in a controlled situation at all times. Standardized behavior assessment with the Devereux by Ms. Thompson indicated clinically high elevations on Classroom Disturbance, Inattentive, and Withdrawn and a significantly low elevation on Comprehension. Mr. Fulks' report card in third grade reflected weakness (S-) in Reading, English, and Math.

(h) As discussed in detail above in Consultative Question #1, third-party witnesses consistently reported that Mr. Fulks exhibited impairments in learning, memory, executive functioning, communication, and social skills prior to age 10.

In summary, postnatal head injury at age seven (for which no functional sequelae were ever reported) and substance abuse (which reportedly did not begin until age 10) are ruled out as causative factors in Mr. Fulks' cognitive, intellectual, and adaptive functioning *prior to age 10*. Environmental trauma also is ruled out because he was able to perform adequately on some tests/subtests in his early school years in the context of

Evaluation: Chadrick Fulks
Page 68 of 137

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0367

performing poorly on other tests. This is not to say that ongoing environmental trauma, head injuries, and substance abuse in adolescence had no effect on his functioning, but if there were negative cognitive effects, it is likely their influence would not have manifested until his teen years.

**OPINION: Aside from fetal alcohol exposure, other risk factors in Mr. Fulks' life history for poor cognitive, intellectual, or adaptive functioning that were present before the age of 18 include postnatal head injury, substance abuse, and environmental traumas, most of which occurred after age 10. While such experiences may have had an additive and cumulative influence on his functioning from adolescence on, there is abundant evidence of significant functional problems very early in his life that preceded these events.**

## _Consultative Question #5: Did Mr. Fulks experience any secondary disabilities that are associated with FASD?_

Since the 1980s, a robust body of research has determined that the negative developmental trajectory in FASD is due largely to executive dysfunction, which causes maladaptive social behavior and deficient coping capacity.[91, 92, 93] For example, in 1996 a large research study commissioned by the Centers for Disease Control[94] identified the eight "secondary disabilities" or negative developmental outcomes associated with FASD in the context of childhood adversity.

Exhibit C below depicts the secondary disabilities found in the CDC research. In the Exhibit, "FAE" (Fetal Alcohol Effects) reflects the outdated term for FASD conditions that did not include all three of the primary facial features found in FAS (i.e., flattened philtrum, small upper lip circumference, and short palpebral fissures). The term 'FAE' was replaced in the 1996 Institute of Medicine diagnostic guidelines[95] with two conditions: Partial Fetal Alcohol Syndrome (pFAS) and Alcohol Related Neurodevelopmental Disorder (ARND).

---

[91] Streissguth et al., 1996, op. cit.
[92] Gibbard, W.B., Wass, P., & Clarke, M.E. (2003). The neuropsychological implications of prenatal alcohol exposure. _Conadion Acodemy of Child ond Adolescent Psychiotry, 12_, 72-76.
[93] Schonfeld, Paley, Frankel, & O'Connor, op. cit.
[94] Streissguth et al., 1996, op. cit.
[95] Stratton, K., Howe, C., Battaglia, F. (1996). _Fetol olcohol syndrome: Diognosis, epidemiology, prevention, ond treotment._ Washington, DC: National Academy Press.



EXHIBIT C. Negative Developmental Trajectory in FASD ("Secondary Disabilities")

As Exhibit C shows, individuals with FASD who are raised in adverse environments have extraordinarily negative developmental trajectories, including criminal conduct. In addition, persons diagnosed with ARND (such as Mr. Fulks) tend to have worse outcomes than those diagnosed with FAS. This is because those with FAS are more 'visible' due to facial abnormalities and tend to receive a diagnosis and services early in life. Exhibit D below illustrates that prior to the instant offense, Mr. Fulks' life history matched the negative secondary disabilities trajectory:

| Secondary Disability | Chad Fulks' Developmental History |
| --- | --- |
| Disrupted Education | Retained in first grade, Mr. Fulks never completed seventh or eighth grades before being placed in ninth grade, which he also did not complete despite special education services throughout his school years. He earned a GED at age 17 while in a structured juvenile setting (i.e., Davis Center) and subsequently earned another GED in prison at age 24. |
| Mental Health Problems | After Mr. Fulks' behavior control problems brought him to the attention of the juvenile authorities, he was diagnosed with conduct disorder shortly before his tenth birthday.<br><br>Although he was later seen by a psychiatrist at age fourteen, he was not evaluated for his pervasive learning disability or developmental delays. |

| | |
|---|---|
| | Instead, his behavior problems were the focus, and he was diagnosed with major depression and prescribed an antidepressant. |
| | During competency evaluation at age 21, he was diagnosed with malingering and antisocial personality disorder. |
| | At age 23 he was diagnosed in prison with PTSD. |
| Substance Abuse | After his arrest for the instant offense, Mr. Fulks told forensic mental health experts his substance abuse began around age 10, although contemporaneous records reflected somewhat inconsistent self-reports: |
| | Age 13: After an arrest for assault, he was required to participate in substance abuse counseling with random drug screens. There was **no indication of a positive drug screen during his court-ordered Improvement Period** prior to moving to Indiana to live with his father. |
| | Age 14: During a psychiatric evaluation in Indiana, he **denied substance use**. |
| | Age 17: After being shot in the shoulder while sitting in his vehicle, medical staff described him as **intoxicated**. He reported at the time that he had **dipped snuff** as well as consumed alcohol. |
| | Age 18: According to his self-report and declarations from siblings, after his 'son' Devon's death, he began **drinking daily and taking "whatever drugs he could get."** He reported that when he was living briefly with Dewayne and his wife Carly, he **tried crystal meth for the first time** with Dewayne and then **began using the drug daily**. |
| | Age 19: When seen in a hospital after running from the police, he was observed to be **intoxicated**. He told medical staff he **drank occasionally**, and this episode was the **first time he had consumed alcohol in seven months**. |
| | Age 19: Arrested in Myrtle Beach, he was charged with **marijuana possession**. He also was **in possession of hashish** at the time. |
| | Age 20: He reported in a competency evaluation at Butner that he **smoked marijuana but denied any other drug use**. |
| | Age 22: He reported to a pre-sentence investigator that he **did not drink alcohol**, that he **used marijuana "experimentally,"** and that he had **used cocaine three times daily from 1996/97 to December 1999 but no longer used the drug**. |
| | Age 22: He reported in a prison interview that he **used drugs heavily** and **occasionally drank alcohol** prior to his incarceration. In a mental health screen, he reported that prior to his arrest, he **drank alcohol, smoked marijuana "occasionally," and used cocaine regularly (3-4 times per week)**. |
| Trouble with the Law | Juvenile Arrest History |
| | Age 9 (1986): **Battery** (striking elderly woman with a stick) → 12-month Improvement Period |

Age 9 (1987): **Assault and Battery** (pulling down the pants of a four-year-old girl → one year of **probation**

Age 12 (1989): **Brandishing/Assault** (pointing handgun at another boy) → committed to a 6-month Improvement Period

Age 13 (1990): **Destruction of Private Property** (car prowl) → one year of probation + substance abuse treatment

Age 17 (1994): **Transferring/Receiving Stolen Property, Bringing Stolen Property into State, Fugitive from Justice** → committed to DOC/Davis Center

Adult Arrest History

Age 19 (1997): **Operating a Motor Vehicle Without a License** and **Refusal to Provide Identification Data** → convicted, fined and given a suspended sentence with one year of probation, violated probation on technical grounds after three months and then failed to appear in court

Age 19 (1997): **Simple Possession of Marijuana** → convicted and fined

Age 20 (1997): **Worthless Checks, Attempted Forgery, Burglary, Fraud, Attempted Aggravated Criminal Trespassing** → convicted and sentenced to nine months in prison

Age 20 (1998): **Burglary** → convicted and sentenced to ten years in prison, with four years suspended; after serving 25 months in prison (Butner report dated 2/19/04 indicated 28 months), he was released and placed on probation, which he violated

Age 20 (1998): Charged with **Forgery of Checks, Possession of Two or More Credit Cards, Fraud, Burglary, Use of Vehicle Without Permission, Grand Larceny**

Age 21 (1998): **Transportation of a Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft, Aiding and Abetting Theft of Property, Evading Arrest** → convicted of these federal charges and sentenced to 12 months in prison, followed by three years of supervision

Age 21 (1998)- **Non-Sufficient Funds**

Age 24 (2001) - Bench warrant issued for **Resisting Law Enforcement** and **Use/Possession of Drug Paraphernalia**

Age 25 (2002) - Warrant issued for **failure to comply with the conditions of release**

Age 25 (2002) - Indicted for **Unlawfully Dispensing Legend Drugs Without a License**

Age 25 (2002) - Charged with **First Degree Abuse of a Child Aged Twelve or Under** → dismissed after arrest on capital case

Age 25 (2002) — At the time of his arrest for the instant offense, he had been charged with **First Degree Robbery** and had active bench warrants for **Receiving Stolen Property, Possession of Marijuana,** and **Theft of a Legend Drug,** all of which occurred in October 2002. In addition, a 12-count charge for **Fraudulent Use of a Credit Card** was pending at the time of the instant offense. After his arrest, he pled guilty to all 12 counts of credit card fraud

|  | and received five years on each count, to run concurrently with each other. Age 25 (2002): **INSTANT OFFENSE** |
|---|---|
| Confinement | Juvenile commitment for approximately nine months at age 17 Confinement in prison at least three times prior to instant offense |
| Inappropriate Sexual Behavior | Age 9: Arrested and charged with battery for pulling down the pants of a four-year-old girl Age 18: A nurse discovered him having sexual intercourse with his wife in his hospital bed |
| Employment Problems | No confirmed evidence of gainful employment |
| Dependent Living | No confirmed evidence of living independently and successfully on his own |

EXHIBIT D. Secondary Disabilities Prior to Instant Offense

As can be seen in Exhibit D, by age 25 when Mr. Fulks was arrested for the instant offense, his developmental trajectory involved all eight of the secondary disabilities associated in the research with FASD: disrupted education, mental health problems, substance abuse, trouble with the law, confinement, inappropriate sexual behavior, employment problems, and dependent living.

**OPINION: Mr. Fulks' developmental history reflects all eight secondary disabilities associated with FASD.**

***Consultative Question #6:*** *Were there risk factors present in Mr. Fulks' life history that made these secondary disabilities more likely?*

Risk of secondary disabilities is reduced if children with FASD are raised in protective, nurturing, and structured homes where they receive an early FASD diagnosis and developmental disabilities services across the school years. Thus, environmental factors either *moderate* or *exacerbate* the adaptive expression of the cognitive impairments in FASD.[96, 97, 98]

In Mr. Fulks' case, records establish that his early childhood years were spent in a nonprotective and unstructured caregiving environment where he received very little nurturing and almost no response to his developmental needs. He also was exposed in childhood to multiple traumas (e.g., parental neglect, physical/sexual/emotional abuse,

---

[96] Stratton, K., Howe, C., Battaglia, F. (1996). *Fetal alcohol syndrome: Diagnosis, epidemiology, prevention, and treatment.* Washington, DC: National Academy Press.
[97] Streissguth et al., 1996, op. cit.
[98] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Kogan Young, J. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. *Journal of Developmental and Behavioral Pediatrics, 25,* 228–238.

alcoholism and drug abuse, criminality, and domestic violence; sibling substance abuse and criminality; environmental/caregiver instability; and chronic environmental chaos). Role modeling throughout childhood included deception, manipulation, violence, and coping to stress by abusing substances.

Although Mr. Fulks received special education and speech therapy services in school and psychiatric evaluation at age fourteen for 'behavior problems,' he received no documented interventions that directly addressed his FASD and traumatic experiences. Consequently, he entered his adult years having received none of the protective factors found to reduce the risk of secondary disabilities in FASD.

For children such as Mr. Fulks who reach adulthood without having received any of the protective factors identified in the FASD research, a stable life situation in the adult years as well as behavioral treatment and comprehensive supervision have been found to attenuate some of the negative developmental consequences associated with FASD.[99] For example, assisted living and supported employment protect adults with FASD from social and emotional distress, trouble with the law, and health risks.[100]

Mr. Fulks received none of the adult interventions that might have made a difference in his functioning.

**OPINION: Because all of the risk factors associated with adverse developmental outcomes in FASD were present in Mr. Fulks' life history, and he received none of the protective factors, this significantly increased his risk of secondary disabilities.**

Based on the FASD literature and convergent data from six independent sources (i.e., records, previous neuropsychological testing, in-person interview, current adaptive assessment, behavior questionnaires, and collateral witness interviews), I hold the above opinions to a reasonable degree of psychological certainty.

Thank you for the opportunity to assist in this matter.

Natalie Novick Brown, PhD

---

[99] Freunscht & Feldman, op. cit.
[100] Streissguth et al., 2004, op. cit.

## Appendix A
## RECORDS

| Transcripts |
| --- |
| Trial Testimony of Dewayne Fulks - Volume IV, June 4, 2004 |
| Trial Testimony of Ronnie Fulks - Volume VII, June 9, 2004 |
| Trial Testimony of Ronnie Fulks, cont'd - Volume VIII, June 10, 2004 |
| Trial Testimony of Ruben Gur - Volume XII, June 16, 2004 |
| Trial Testimony of Tina Severance, Jury Trial Transcript, Vol. III, June 3, 2004 |
| Trial Testimony of Tina Severance, cont'd., Jury Trial Transcript, Vol. IV, June 4, 2004 |
| Trial Testimony of Beth McGuffin, Jury Trial Transcript, Vol. VI, June 8, 2004 |
| Trial Testimony of Veronica Evans, Jury Trial Transcript, Vol. XIII, June 17, 2004 |
| Trial Testimony of Heather Goodman, Jury Trial Transcript, Vol. XIV, June 18, 2004 |
| Trial Testimony of Amber Fowler, Jury Trial Transcript, Vol. XV, June 21, 2004 |
| Trial Testimony of Paula Lybrand, Jury Trial Transcript, Vol. XV, June 21, 2004 |
| Jury Trial Transcript - Volume I, June 1, 2004 |
| Jury Trial Transcript - Volume XVI, June 22, 2004 |
| Jury Trial Transcript - Volume XVII, June 23, 2004 |
| Jury Trial Transcript - Volume XVIII, June 24, 2004 |
| Jury Trial Transcript - Volume XIX, June 25, 2004 |
| Jury Trial Transcript - Volume XX, June 28, 2004 |
| Jury Trial Transcript - Volume XXI, June 29, 2004 |
| Jury Trial Transcript - Volume XXII, June 30, 2004 |
| Hearing Testimony of James Hilkey, Ph.D., February 23, 2010 |
| Hearing Testimony of James Hilkey, Ph.D., February 24, 2010 |
| Hearing Testimony of Margaret Melikian, D.O., February 24, 2010 |
| |
| **Reports and Declarations** |
| Cabell County Board of Education Psychological Evaluation, March 2, 1990 |
| Otto Klassen, M.D., Psychiatric Report, December 3, 1991 |
| Report of David Bachman, M.D., July 31, 2003 |
| Report of Arlene Andrews, Ph.D., May 13, 2004 |
| Report of James Evans, Ph.D., undated |
| Report of Fred Bookstein, Ph.D., February 9, 2004 |
| Report of Christos Davatzikos, Ph.D. |
| Report of Ruben Gur, Ph.D., June 13, 2004 |
| Report of James Hilkey, Ph.D., May 7, 2004 |
| Report of Jonathan Venn, Ph.D., March 30, 2004 |
| Report of Elin Berg, M.D., Ph.D., August 2, 2003 |
| Report of Jonathan Walker, M.D., January 14, 2004 |
| Forensic Evaluation, Federal Medical Center, February 19, 2004 |
| Forensic Report, Federal Medical Center in Lexington Kentucky, August 5, 1998 |

| |
|---|
| Declaration of Andrea Lyon, June 19, 2008 |
| Declaration of Seymour Halleck, M.D., May 9, 2008 |
| Declaration of Margaret Melikian, D.O., May 27, 2008 |
| Declaration of James Hilkey, Ph.D., June 2, 2008 |
| Declaration of William Alexander Morton, June 3, 2008 |
| Declaration of Mark Cunningham, Ph.D., May 20, 2008 |
| Declaration of James Aiken, June 18, 2008 |
| Declaration of Mark Thompson, June 9, 2008 |
| Declaration of Mark Fulks, June 16, 2008 |
| Declaration of Martha Floyd, June 5, 2008 |
| Declaration of Tim Kane, June 3, 2008 |
| Declaration of Tracy Graybeal, June 4, 2008 |
| Declaration of Monica Wolowinski, June 4, 2008 |
| Declaration of Ronnie Fulks, June 4, 2008 |
| Declaration of Linda Adkins, June 3, 2008 |
| Declaration of Linda Adkins, January 27, 2017 |
| Declaration of Matthew Rawlings, June 4, 2008 |
| Declaration of Andrea Roddy, May 14, 2008 |
| Declaration of Nathan Fulks, June 4, 2008 |
| Declaration of Elvin Taylor, June 18, 2008 |
| Declaration of Harry Tyree, June 18, 2008 |
| Declaration of Sharon Dotson, June 18, 2008 |
| Declaration of Beth McGuffin, June 16, 2008 |
| Declaration of Christina Kirkman (Holbrook), June 20, 2008 |
| Declaration of Christina Kirkman (Holbrook), January 27, 2017 |
| Declaration of Laura Cooper, September 15, 2016 |
| Declaration of Joy Krug, November 15, 2016 |
| Declaration of Marilyn Lauver, November 14, 2016 |
| Declaration of Kelly Perry, January 27, 2017 |
| Declaration of Gayle Wolfe, September 15, 2016 |
| Declaration of Russell Spears, May 22, 2018 |
| |
| **Court Opinions** |
| Opinion, 4th Circuit Court of Appeals, July 27, 2006 |
| Opinion, 4th Circuit Court of Appeals, June 26, 2012 |
| |
| **Imaging and Photos** |
| Brain Imaging |
| PET scans from the file of Ruben Gur |
| Brain Imaging Reports, December 5, 2003 |
| Photos |
| Photo of Chad Fulks |

| Photo of Ronnie Fulks from the file of David Bachman |
|---|
| Photo of Fulks Children |
| |
| **Records** |
| Cabell County School Records |
| Northeast Indiana Special Education Records |
| Andis Alternative Education Center Records |
| Cabell Huntington Hospital Records |
| John Marshall University Pediatrics Records |
| LaGrange Community Hospital Records |
| St. Mary's Hospital Records |
| Prison Records for Federal Medical Center at Butner, NC |
| Lexington County Prison Records |
| Psychometric Data Report, Indiana Department of Corrections, March 20, 2000 |
| Diagnostic and Classification Summary, Indiana Department of Corrections, April 4, 2000 |
| Record of GED from Davis Center Education Dept, July 11, 1995 |
| GED Transcript, West Virginia Department of Education |
| Trial Team Chronology – Government Exhibit 31 at the 2010 Evidentiary Hearing |
| Indiana DOC GED Report, November 29, 2001 |
| Davis Center Records |
| Davis Center Correspondence & Court Order |
| Hopkins County Circuit Court Judgment, December 30, 2002 |
| Cabell County Court Records for Chadrick Fulks |
| Todd Circuit Court File for Commonwealth of Kentucky v. Chadrick Fulks, 02-CR-64 |
| Order, Commonwealth of Kentucky v. Chadrick Fulks, 02-CR-63, 02-CR-64, 02-CR-65, January 5, 2004 |

**Appendix B**
**DOCUMENTED LIFE HISTORY**

[Source of data: records listed in Appendix A. For ease of identification, Mr. Fulks and others referenced in this section are referred to by their first names, and information involving offense history is boxed.]

**Family History** for Chadrick Evan Fulks (DOB: 5/16/77)

Mother: Diana Lynn Holbrook Thompson (DOB: 4/16/49)
Father: Herman Roger Fulks ("Roger"; DOB: 3/19/48)
Siblings:
       Sherry Lynn Fulks (DOB: 2/18/70)
       Roger Dwayne Fulks ("Dewayne"; DOB: 9/3/71)
       Ronald Dale Fulks ("Ronnie"; DOB: 3/18/74)
       Shannon Ray Fulks (DOB: 7/1/79)
Stepmother: Marcia Fulks
Stepfather: Dean Thompson
Maternal Grandparents: Wilda Maynard Holbrook and Leon Holbrook
Paternal Grandparents: Nancy Jane McClellan Fulks and Herman Fulks

Paternal Uncles/Aunts:
       Regina Fulks Adkins (DOB: 11/17/49)
       Inetta Marie Fulks McCallister (DOB: 4/28/52)
       Roy Fulks (DOB: 10/14/54)
       Mark Keith Fulks (DOB: 3/3/56)
       Edith Faye Fulks Stacey (DOB: 10/12/59)
       Gregory Fulks (DOB: 12/28/62)

Maternal Uncles/Aunts:
       Sharon Holbrook Dotson (DOB: 1/7/53)
       Robin Louise Holbrook Payton (DOB: 2/2/54)
       James R. Holbrook ("Buddy"; DOB: 7/29/55)
       Gail Sue Beatty (DOB: 9/24/56)
       Kevin Holbrook (DOB: 12/6/57)
       Leroy Holbrook, Jr. (DOB: 11/15/60; DOD: 6/28/84)

Current Wife: Veronica Evans (Date of Marriage: 6/11/02)
Former Wife: Amber Denise Fowler (Dates of Marriage: 7/6/95 – 4/97)
Children:
       Devon Christopher Fulks (DOB: 5/28/95; DOD: 11/10/95 – died of injuries
       received when four-year-old cousin jumped on his abdomen)

PA0377

## Parents' History

Roger Fulks (father) was born in 1948 to Nancy and Herman Fulks. He was the oldest of seven children. His father worked in the coal mines for 15 years and died right after learning he qualified for Black Lung disease benefits. He was unable to complete the paperwork process before he died, and his wife Nancy did not receive the benefits. Roger recalled that during his childhood his father Herman drank alcohol all the time and argued with his mother about the drinking and money. The family was poor and did not celebrate birthdays. Herman was rarely home. He punished the children by whipping them or placing them on restriction. The children had to walk three miles to and from school every day. His sister Edith (paternal aunt) is the only sibling who completed high school. Roger dropped out of school in the first semester of eleventh grade.

Diana (birth mother) also was raised in a poor family. Her father Leon had a drinking problem and could not keep a job. The family moved frequently because of financial problems. Leon was a violent alcoholic. He once knocked his wife Wilda down the stairs in one of their homes when he came home drunk. She was pregnant at the time, and he constantly beat her until she had bruises and black eyes. Leon beat Diana, Buddy, and Robin the worst. When Diana was eleven, she ran away to a neighbor's house to avoid a beating, but her father found her and took her home. He once beat her with poison ivy vines, which cut into her legs and caused infection. She nearly died as a result. This was the only time she could recall getting medical care. Leon once cut Robin's back so badly with a switch that he paid her money to not tell anyone about it. Leon went to jail a couple times. There were many nights when her parents went out together and drank, leaving the children to care for themselves. When they returned home after drinking, they usually had brutal fights. Leon played guitar and often invited friends to the house to play music, drink, and party all night. When Diana was six or seven, one of Leon's drunk buddies came into the bedroom and tried to kiss and touch the girls. Leon caught him and made him leave the girls alone that night, but he invited the man back to the house many times after that. Leon called his children names and told them he wasn't really their father. Their mother cleaned houses to have money for food. Leon sold things in the house to buy alcohol, so Wilda would take money from his pockets when he slept in order to pay the bills. Leon did sporadic work repairing televisions, but he spent most of his money drinking. People donated food and clothing to the family. Diana was picked on because she was poor, and she got into a lot of fights at school. She eventually was expelled for fighting. Her sister Sharon was picked on as well because she had paralysis as a result of polio.

In 1965, both Roger and Diana dropped out of school. Roger was in eleventh grade and had obtained As, Bs, and Cs from fifth through eighth grades, Cs and Ds in ninth grade, and mostly Ds and Fs in tenth grade. He missed between 17 and 40 days of school each year. Diana was in tenth grade when she dropped out of school in 1965. She had received Fs in all subjects at the time.

In 1967, Roger (age 19) and Diana (age 17) married and moved in with Roger's parents. They followed his uncle to Michigan so Roger could work in the same factory as his uncle and lived there until Roger was drafted into the Army. Diana remained with Roger's parents after he was drafted and got a job in a local bar. Soon, she was staying out late and socializing with other men. In 1968, Roger was shipped to Vietnam. When his mother Nancy wrote him about what Diana was doing, Roger filed for divorce with his mother's help. His Complaint alleged Diana was engaging in multiple extramarital affairs, and several people testified about her adultery at the hearing, which she did not attend. Roger was granted a divorce on the grounds of adultery. After Roger returned home on vacation after a year in Vietnam, he and Diana remarried on 6/17/69. In January 1970, Roger was honorably discharged from the Army and transferred to the Army Reserve. He received several medals.

Oldest sibling Sherry was born in February 1970. Diana has reported the pregnancy was normal, and there were no birth complications. Sherry believes she is not Roger's daughter. Birth records are unavailable as she was born in an obstetrician's office.

Dewayne, the second of the couple's five children, was born in September 1971.

In 1973, the couple moved from West Virginia where Roger's parents lived to Kentucky so Roger could find work. Around this time, Diana's youngest brother Kevin (around age 16 at the time) quit school and came to live with them. Kevin moved in and out of their house numerous times during the years the Fulks children were growing up. Kevin described the heavy drinking and constant fighting in the home. His older brother and wife also lived with Diana and Roger numerous times. Both Roger and Diana would be drinking, and their fights would start "over nothing." Kevin described getting in the middle of fistfights, trying to stop them. Kevin reported that Diana drank heavily around this time, including drinking throughout her pregnancies. He observed her going to bed drunk many times when she was pregnant.

The drinking and partying continued as usual in 1974. While pregnant with their third child Ronnie that year, Diana caught Roger making out with another woman named Sandy (i.e., the sister of Roger's current wife) and chased them with a shotgun. A few days later, Diana and Sandy got into a fight, and Diana was beaten so badly she had to eat with a straw.

In March 1974, the couple's third child Ronnie was born. Diana admitted drinking heavily during the pregnancy with Ronnie. He was born premature with many health problems and never developed normally. He was always under weight and height and as an adult is under five feet tall. During the pregnancy, Diana wouldn't admit to family that she was pregnant and instead told them she had a tumor.

In 1975, the couple moved back to Lincoln County, West Virginia.

## Childhood History

5/16/77    **_Birth_**

Chadrick Evan Fulks was born this date to Diana and Roger Fulks in Lincoln County, WV. He was born in a local doctor's office in the town of West Hamlin. [Birth records were requested but evidently no longer existed.] Diana reported in a defense interview that Dr. McClellan had a small clinic for examinations and another room for delivering babies. She reported a normal pregnancy and delivery and said she took Chad home the day of his birth.

1/16/78    **_Age 1_**

Shortly after moving to Pine Street, Diana and Roger met their neighbor Linda Adkins. Linda was married to an alcoholic and had three daughters. Sherry became close to Linda and her daughters and remained very close to Linda today. She called Linda her "second mother." Linda described the amount of heavy drinking by Roger and Diana, the fighting which took place, and the general neglect of the children. When Roger worked a real job, he drank heavily on the weekends. When he wasn't working at all, he drank heavily all the time. Diana drank right along with him. Diana sometimes came to Linda's house complaining she had no food to feed her children. On several occasions Linda gave her cash but stopped this practice after seeing Roger walking up his front steps carrying a 12-pack of beer shortly after Diana left her house with money. From that point on, Linda only gave Diana food when she complained there was nothing for her children to eat. Linda remained puzzled as to how the Fulks always found money to buy beer, even at times when Roger was not working, but didn't have money to buy food. According to Linda, the Fulks had no phone and sometimes had no electricity, their children were on the free-lunch programs, and churches donated clothing for the children, yet Roger and Diana always had a steady supply of alcohol to drink.

5/16/79    **_Age 2_**

According to Kevin Holbrook and Linda Adkins, Chad was developmentally delayed in walking and talking. His parents expressed no concern and did not take him to a doctor. When he did learn to talk, he had a speech impediment (stuttering, lisping). Later, he would receive speech and language services in school.

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0380

7/1/79          Shannon Ray Fulks was born (fifth and last child). Linda Adkins convinced
                Diana to have her tubes tied after this pregnancy.

                Sherry reported she was very afraid when her parents fought, and sometimes she
                and the boys tried to break them up, but it never helped. Sherry hid and covered
                her ears until the fighting was over. She is convinced today that if their neighbor
                Linda Adkins hadn't helped them, they would have been placed in foster care.
                Sherry was teased at school because she was poor, and her clothes weren't
                stylish or clean. Peers used to tease her because she was skinny and had stringy
                hair.

                Linda Adkins remembered a fight between Roger and Diana, which moved from
                the house onto the street. Linda heard a lot of yelling and went outside to see
                Diana in the yard. Diana was drunk and swinging a two-by-four board. Roger
                also was drunk and cussing at Diana. Diana threatened to break out the
                windows in Roger's car, which he had named "Bandit." The Fulks children were
                outside crying. Linda went outside and ordered Diana and Roger to go back
                inside their house.

9/4/79          Sherry enrolled in fourth grade at Gallaher Elementary School. She was absent
                four days and received Cs or C- in all subjects except Math, where she received a
                D.

                Dewayne enrolled in third grade and was absent three days. He received S in
                Reading, Spelling, and General Ed but U in Writing, English, and Math. He was
                *retained in third grade*.

                Ronnie enrolled in kindergarten and was absent 20 days. He was *retained in
                kindergarten*.

5/16/80         ***Age 3***

9/2/80          Sherry enrolled in fifth grade at Gallaher Elementary School. She was
                absent three days. Her grades for the school year were the following: A in
                Music; Bs in Spelling, Writing; Cs in Reading, Language, Science; D in
                Math.

                Dewayne repeated third grade. He was absent 12 days. He received S in
                all subjects except English and Math where he received U. He was
                promoted to fourth grade. His achievement test results showed
                improvement from the prior year in Reading (79 percentile) and Language
                (72 percentile), but Math scores remained extremely low (11 percentile).

Ronnie repeated kindergarten at Gallaher Elementary School. He was absent 29 days.  He was promoted to the first grade.

According to Dewayne, Ronnie, and Chad, their parents never expressed any interest in their grades or school activities and never asked for report cards. When their grades were bad, the school contacted the parents. Diana was the parent who attended school meetings, but she did so sporadically. At times, teachers noted alcohol on her breath. Roger never met with the teachers or the principal.

5/16/81    *Age 4*

6/9/81    Dewayne's teacher Hazel Flynn put a note in his school file indicating that while she was promoting him to fourth grade, he had not mastered Math skills and had failed that subject. She said his English grade also was not satisfactory because he had failed to turn in a significant number of assignments.

9/1/81    Sherry enrolled in sixth grade at Gallaher Elementary School. She was absent for nine days. Her grades for the school year were B in Spelling, C+ in Writing, C in Reading, C- in Language and Math, D+ in Social Studies, D- in Science.

Dewayne enrolled in fourth grade at Gallaher Elementary School. He was absent nine days. He obtained a B in Spelling, Cs in Writing and Math, C- in Reading, and Ds in Science, Language, and Social Studies. At the end of the school year, he failed Math.

Ronnie enrolled in first grade at Gallaher Elementary School. He was absent 8 days. He received S- in all subjects.

5/16/82    *Age 5*

Defense interviews with Diana, Sherry, and Chad indicated that Roger and Diana drank and fought regularly, and the police were called by neighbors. Sometimes, Diana and the children were taken to the "Family Mission" downtown for a "cooling off" period. The children had to miss school and remain very quiet, and there was no place they could play.

9/1/82    Chad enrolled in kindergarten at Gallaher Elementary School.  He attended 144 days and was absent 35 days.

Interviewed by defense staff in June 2003, Chad's kindergarten teacher Cindy Harper recalled he was a very quiet child. She recalled one time when Chad "became sick in class" and soiled his pants. She cleaned him up

as best she could, but he needed a change of clothes. He was very embarrassed and ashamed because he soiled himself. He went to the principal's office to wait for someone for bring him some clean clothes. Although his parents were called, nobody ever came to bring him clothes, so he never returned to class.

Sherry enrolled in the seventh grade at Lincoln Jr. High School. Her final grades were all Ds and Fs. She failed the school year and received only four credits for the year. In a defense interview, Sherry reported that it was around this time she began drinking, smoking cigarettes, and hanging out with the wrong crowd ("they were the only crowd I fit into").

Dewayne enrolled in fifth grade at Gallaher Elementary School. He was absent a total of seven days, and his grades were: B in Math, Spelling, Music; C in Reading and Health; D in Language, Science, Social Studies. In a defense interview, Dewayne reported he was 12 years old when he began accepting drinks and pills offered to him by people hanging out with his parents in their basement: "We did whatever we wanted, our parents were too busy fighting and drinking to care what we were doing." He said he and his siblings were unhappy: "We all growed up too fast. I tried to protect Chad from dad. I felt sorry for him. He cried a lot as a kid and Dad beat him for it…. It was like every man for himself…. What goes on in the house, stays in the house." All through childhood, Dewayne had thoughts of killing himself, and his parents never knew about it.

Ronnie enrolled in second grade at Gallaher Elementary School. He was absent three days. He received S- in all subjects and was promoted.

Nancy Fulks reported in an interview that around this time, Diana phoned her and requested transportation to pay a fine for shoplifting.

1983    After several years of living on Pine Street, the Fulks decided to move "around the corner" and rent a house on the corner of Pine Street and Leeward Avenue. Roger immediately converted the basement area into a "pool room" and hung graphic pornography on the walls. This became a gathering place for adults in the neighborhood to drink and party. The parties occurred every night and lasted into the early morning hours. Usually, there was a fight between those in attendance, which often spilled out into the yard or street. The police often were called. The Fulks children sometimes wandered downstairs where the adults were drinking and fighting or stayed upstairs to watch hard-core pornographic movies that belonged to Roger. Both David Kiser (neighbor) and Mark Fulks reported finding children ages six and seven watching these movies.

**5/16/83**      *Age 6*

**9/1/83**      Chad enrolled in first grade at Gallaher Elementary School. He was present 167 days and absent nine days. He received S- in Reading, Writing, and General Education and U in Spelling and Math. He was not promoted to second grade.

Chad's first-grade teacher Suzanne Walker (nee Welker) initially had no recall of Chad but stated that if he was retained, he clearly demonstrated significant deficits or she never would have agreed to retain him as she typically was opposed to retention.

Paternal Uncle Roy Fulks lived a wild life of drinking and drugs. He was shot two or three times and stabbed on a few occasions. He would take Chad with him when he hung out with the Hell's Angels, at which time Chad would observe the adults drinking, doing drugs, and naked women walking around or riding motorcycles.

**1983/84**      Sherry repeated seventh grade at Lincoln Junior High. She was absent 17 days and failed seventh grade again. Her grades were all Fs and Ds, and she received three credits for the school year.

Dewayne enrolled in sixth grade at Gallaher Elementary School. He was absent 14 days, and he received the following grades: C (Writing, Math), D (Reading, Spelling, Language, Science, Social Studies, Health). He was promoted to seventh grade.

Sherry reported that sometimes when he was drunk, Roger talked to her about his Vietnam experiences and always ended up crying. There were times when he sat around all day without bathing for two or three days at a time. Sherry also recalled that her mother had peculiar hygiene: Diana rarely wore makeup but always made sure her hair was bleached blonde and her skin was tanned. Diana used toilet paper instead of tampons during her period and wasn't clean in general.

Around this time, Diana was arrested for being Drunk and Disorderly. She reported that after a fight with Roger, she left her house to walk to Geno's Pizza to use the pay phone. She was going to call her mother to see if she could stay with her for a few days. However, she was picked up by the Huntington Police after they saw her staggering down the street, and she spent the remainder of the night in the drunk tank at the jail.

**3/84**      Achievement testing for Chad in first grade indicated Word Attack skills at the 13th percentile, Vocabulary at the 18th percentile, Comprehension at the 27th percentile, and Language Expression at the 10th percentile.

5/16/84    *Age 7*

5/19/84    The School Placement and Advisory Committee determined that due to Chad's "articulation problems," the next school year he would receive Speech and Language assistance twice weekly for an hour each day.

6/15/84    Chad received special education multidisciplinary assessment, and his Individualized Education Program (IEP) contained a recommendation for Speech and Language services "to improve articulation" beginning in September 1984. Eventually, he began receiving Speech Therapy as recommended for his Communication Disorder. A Personal Data Sheet completed by Chad's mother indicated one of his older brothers also had received Speech Therapy.

9/4/84    Chad re-enrolled in first grade at Gallaher Elementary School. He attended 165 days and was absent 10 days. He received S in all subjects with an S- in Spelling.

Sherry repeated seventh grade for the third time. Her grades were all Fs and two Ds, and she received two credits for the year. Nonetheless, she was promoted to eighth grade.

Dewayne enrolled in seventh grade at Lincoln Junior High. His grades were all Fs, and he received NO credit for the school year. He was absent a total of 24 days.

Ronnie enrolled in fourth grade at Gallaher Elementary School. After two months, he was transferred to Peyton Elementary School where he was placed in a Behaviorally Disordered class. At the time of the transfer, his grades were Cs and Ds.

1984    According to an interview with Chad, he was fondled and undressed around this time by a babysitter named Shelly. Dewayne, who had a crush on her, followed them into the basement where he observed Shelly fondling Chad. Dewayne, who was in the crawl space at the time, knocked over a can of paint that hit Chad in the head and knocked him unconscious. Shelly made Chad promise not to tell anybody about her fondling him, so he never told his parents about being knocked out.

According to an interview with Shannon, Diana argued with one of the men drinking at their home, grabbed him by his hair, and began banging his head against the washer until he was bleeding.

According to Chad, because the house was so small and the space in the basement had been converted into a pool hall, Roger built an extra room for the children in the attic. The space was very cramped and cold in the winter; in the summer the attic was sweltering hot, and the smell of sewage from a ditch next to the house was sickening. Roger hooked up the house illegally to the gas line, which eventually was disconnected after it was discovered.

12/3/84    Ronnie enrolled in fourth grade at Peyton Elementary School in the Behaviorally Disordered Class. He was absent three days. His grades improved to Cs and B in Science and Health.

Shannon had seizures in childhood, for which he received medication. However, because the medicine made him a "zombie," Diana took him off it. From that point on, whenever he had a seizure, Diana and Roger stayed close to him and tried to make sure he didn't "swallow his tongue." The hospital accused Diana of giving him seizures with blows to the head because they couldn't find another reason for the problem. Social workers investigated but did not discover anything.

4/85    According to Mental Health records written in 1987, Chad's father lost his job around this time and was unemployed for the next two years. He did not work again until Spring 1987.

The pool hall downstairs and Roger's unemployment resulted in round-the-clock drinking by Roger and Diana. The children were completely unsupervised, and the neighbors would see them in the streets at all hours of the night. All of the children learned to shoplift from their parents, who frequently asked them to steal beer and bring it home. Neighbors reported the children stole bicycles from all over town. At times, their yard was cluttered with stolen bicycles. Diana showed Linda Adkins a new diamond ring that she claimed Dewayne "found" and gave to her. Dewayne, Ronnie, and Chad all reported that their parents never confronted them about the stolen items they brought home.

According to Linda Adkins, Roger liked to work on old cars and then sell them for a small profit. He taught Dewayne to work on cars and after telling Dewayne what parts he needed, Dewayne would leave and then return home with the parts. His father never asked him any questions about how he got the parts. Ronnie learned to steal from Dewayne, and Chad learned to steal from them both. The boys understood that if Roger asked them to get something for him, that meant they would have to steal it.

According to Chad, he went along when his father took a woman named Rhonda to pick up her car. Diana didn't want Roger to help Rhonda but agreed provided Roger took Chad with him. During the ride, Roger kept giving Chad beer, but

Chad didn't fall asleep. After dropping Rhonda off at her car, she "accidently" drove her car into a small ditch, so Roger got out of the car to help. He was gone a long time and left Chad in the car. Chad knew what they were doing because he'd seen them kissing before. He kept the secret for a while but eventually told Diana about it.

| | |
|---|---|
| 5/15/85 | ***Age 8*** |

5/15/85      ***Age 8***

9/3/85      Chad enrolled in second grade at Gallaher Elementary School. He attended 165 days and was absent 13 days. He received S in Reading, Writing, and Math and S- in Spelling and Language. He was promoted.

Sherry enrolled in eighth grade at Lincoln Junior High. She dropped out of school in March 1986.

Dewayne enrolled in seventh grade again at Lincoln Junior High. He was absent 55 days and failed every subject, receiving no credit. Nonetheless, he was promoted to eighth grade.

Ronnie enrolled in fifth grade at Peyton Elementary School. He was absent 18 days. He received C in Music and Bs in all other subjects except Spelling, where he obtained a D.

10/85      Chad's evaluation report in second grade at Gallaher Elementary indicated results of testing showed an articulation problem in speech. Speech and language services were recommended.

10/14/85      IEP (Second Grade)
Chad was placed in the Resource Room for Speech Therapy two times per week to address articulation problems.

3/19/86      When Sherry dropped out of eighth grade, she was getting Fs in English, Science, and Music and D in US History.

According to Sherry, around the time she dropped out of school, she was dating Brian Messinger, a truck driver who had lived with the Fulks family for a year. Brian was 35 years old, and Sherry was 16. They eventually ran away together to New York. Diana was livid when Sherry returned home and placed her in counseling.

Brian Messinger described the Fulks home as "filthy." He described the parents as alcoholics who drank every day while their children ran wild. He said Roger and Diana were abusive to the children (e.g., always yelling at them, cursing at them, calling them names). There usually wasn't any food around, so he'd sometimes

bring something home to feed everybody. Roger and Diana always had brutal physical fights when they were drinking, which was more often than not. Brian said it was a pretty fair fight between the two of them. They always had black eyes, bloody noses, and bruises. He described Chad as a "follower" and said he always tried to keep up with Dewayne and the older boys: "If you put him up to something, he'd do it. He was always trying to prove he was a man."

| | |
|---|---|
| 5/15/86 | ***Age 9*** |

| | |
|---|---|
| 9/3/86 | Chad enrolled in third grade at Gallaher Elementary School. He attended 157 days and was absent 21 days. He received S- in Reading, Language and Math and S in Spelling and Writing. |

In a 2003 interview, teacher Dottie Thompson remembered Chad as a "cute little blonde-haired boy who looked like a choir boy." She described him as quiet. She also recalled he had a tattoo on his arm, which she always thought was strange on such a young boy. She remembered he had "sticky fingers" but said other children did as well. She knew he had older brothers and remembered thinking he was probably negatively influenced by them.

According to Chad, the principal at Gallaher paddled children who misbehaved, and he was paddled often for fighting. He got into fights when other children teased him about his clothes. Instead of paddling children one at a time, the principal would bring all of them in together and make them wait and watch while their peers were being paddled. The paddle itself had holes in it so it stung badly. Chad began to dread class so much that he hid out in the gym and empty classrooms. Diana eventually spoke with the principal, after which Chad was never paddled again.

Neighbor Laurie Messinger (married to Brian Messinger) used to spend time at the Fulks' home when she was around 12 years old. She observed that Diana and Roger fought all the time and *always* had some sort of bruise or cut on them. Roger used to make inappropriate comments to Laurie (e.g., the size of her breasts) and tried to touch her once, but she got away. The Fulks boys also made inappropriate comments about her body. She ended up dating Dewayne for a while when he was in high school and she was in middle school. He stole gifts for her on Valentine's Day and Christmas. She said Roger and the whole family were known as thieves. She recalled Roger asking Dewayne to steal beer for him once. She said most of the neighbors didn't like the Fulks because they were two-faced, but they continued to come over and shoot pool and drink anyway. The Fulks house was always filthy, and there were holes in the walls all over the place. The walls of the basement where everybody played pool were covered in pornography "and not just regular Playboy

stuff either, but real nasty stuff." About Chad, Laurie said, "If somebody put him up to it, he'd do it. He was always trying to prove he's a man, even when he was a kid .... He never got approval from anybody."

9/3/86 — Dewayne enrolled in eighth grade at Lincoln Junior High School. He was absent for 37 days and received mostly Fs. At the end of the year, his GPA was .45, and he received two credits. He failed the school year.

Ronnie enrolled in sixth grade at Peyton Elementary School. He was absent seven days. He received As in Social Studies and Music, Bs in Reading and Writing, B- in Math, and C in Spelling.

11/20/86 — IEP (Grade 3)
Chad was placed in the Resource Room for Speech Therapy to address articulation problems (i.e., a lisp).

11/25/86 — Results of academic assessment (Grade 3) for Chad showed Reading at the second-grade level and Spelling and Math at the third-grade level. Results of the Peabody Picture Vocabulary Test (receptive language skills) indicated a developmental delay of two years. An IEP in November 1986 indicated ongoing Speech Therapy.

11/30/86 — **Battery** of Elva Sullivan occurred in Huntington. Chad and Ronnie were arrested, and Petitions 86-J-621 and 86-J-622 were filed in Cabell County Circuit Court (Huntington, WV) alleging that Chad (age 9) and Ronnie (age 12) committed battery by striking an elderly woman, Elva Sullivan, with a stick. Chad's attorney entered a plea of not guilty on 12/5/86. On 12/18/86, a motion requesting a 12-month Improvement Period was granted.

1/6/87 — Chad's third-grade teacher Dottie Thompson referred Chad for a Multidisciplinary Assessment. She noted Chad had no self-discipline and needed to be in a controlled situation at all times. She wrote that he complained of stomach problems, did not complete tasks, was not self-directing, and needed guidance at all times.

Mr. Thompson indicated Chad's weaknesses were in Reading, Arithmetic, English, Spelling, Work Habits, Distractibility, and No Self-Discipline, and his had relative strengths in Writing, Social Studies, and Science.

2/10/87 — Chad and another boy were arrested for an incident on the at Gallaher Elementary. Petition 87-J-116 alleged Chad (age 9) and John Frank Flynn grabbed a four-year-old girl's pants on the playground and pulled them down. On 2/13/87, Chad was arrested by Huntington Police and charged with **Battery**.

At an Adjudicatory Hearing on 4/1/87, Chad admitted responsibility for the allegations in the petition and was adjudicated a juvenile delinquent. The Court ordered a Predisposition Report be completed and submitted to all parties 72 hours before the Dispositional Hearing. On 5/4/87, the Court ordered that Chad be placed on probation for one year plus an 8 pm curfew.

2/4/87    An academic Evaluation Report (Grade 3) indicated Chad was referred because of behavior problems and poor achievement. It was noted that his behavior and general demeanor during individual testing sessions were exemplary, but reports from school staff indicated little regard for social convention and school rules when he was not directly under adult supervision. He was under the supervision of juvenile authorities at the time.

Psychometric Summary [see Appendix C for abbreviations]:
- SIT: 9-7 CA, 8-10 MA, 92 IQ
- PPVT: 9-7 CA, 7-10 MA, 82 SS
- WRAT:
  o Reading: 80 SS, 2E GE
  o Spelling: 89 SS, 3B GE
  o Arithmetic: 82 SS, 3B GE
- KTEA:
  o Reading Decoding: 91 SS, 3.2 GE, 8-9 AE
  o Reading Comprehension: 95 SS, 3.7 GE, 9-3 AE
  o Spelling: 84 SS, 2.6 GE, 8-0 AE
  o Math Computation: 86 SS, 3.3 GE, 8-9 AE
  o Math Application: 95 SS, 3.7 GE, 9-0 AE
  o Reading Composite: 93 SS, 3.4 GE, 8-9 GE
  o Math Composite: 89 SS, 3.4 GE, 8-9 AE
  o Battery Composite: 89 SS, 3.3 GE, 8-6 AE
- Jordon Left/Right Reversal: 7-9 Developmental Age
- Devereux: clinically High elevations on Classroom Disturbance, Inattentive, Withdrawn; significantly Low elevation on Comprehension
- TOWL: unable to complete due to length of story
- Spache Diagnostic Reading Scales: 3.5 Auditory Comprehension Level

Chad's teacher reported that in the last two or three weeks, Chad had been changing the names on other students' papers and writing his name on the papers. During the assessment, he communicated well with the examiner. He said he had stayed up until midnight watching movies on the VCR. His teacher said he was fine on a one-to-one basis, but he had difficulty in group situations or when trusted to be responsible when he was alone.

The evaluator reported that "[o]n the Test of Written Language he seemed to preplan his story before writing. After he began to write he would proof read after every 2-3 sentences and think about the story before continuing. He appeared to have a lot of difficulty with the Jordan Left Right Reversal Test. It took him a long time to complete this test. The KTEA math subtests were also very difficult for him. To add groups, he drew boxes and put dots in each box, then counted the total. With subtraction problems he drew marks on paper and then crossed out the number he was subtracting. He had extreme difficulty with abstract reasoning."

3/3/87  A Psychological Evaluation Report (Grade 3), by School Psychologist Rodney Pardue, covered testing conducted on 2/4/87. In the referral, Chad's teacher noted: "Chad 'lacks self-discipline' and 'needs to be under a controlled situation at all times.' He shows poor work habits and deficits in basic academic skill development. He previously repeated 1st grade."

Test Results:
- WISC-R: 87 VIQ, 95 PIQ, 90 FSIQ (Information, Similarities: 6; Picture Completion: 12) – The evaluator noted the 8-point difference between VIQ and PIQ was "not significant."
- Draw-A-Person: age appropriate
- Devereux Behavior Rating Scale: Significantly High ratings were found on Classroom Disturbance, Inattentive-Withdrawn; Significantly Low ratings were found on Comprehension, Need for Closeness to Teacher
- Bender-Gestalt: within normal limits

"Comparisons among subtest scores and general test factors suggest a relatively poor language and experiential background. Despite these limitations, Chad shows an ability to make appropriate judgments. His abstract reasoning skills are poor, both verbally and nonverbally."

"Reports from school staff indicate that he may show little regard for social convention and school rules when he is not directly subject to adult supervision."

4/87  Testing with the CogAT-3 (Cognitive Abilities Test) found Verbal reasoning at the 32nd percentile and Non-Verbal reasoning at the 7th percentile. [The CogAT is a group-administered K-12 assessment that estimates learned reasoning and problem-solving abilities through a battery of verbal, quantitative, and nonverbal test items.] Achievement testing indicated Vocabulary at the 22nd percentile, Comprehension at the 5th percentile, Spelling at the 11th percentile, Language Mechanics at the 5th percentile, Math Concepts/Applications at the 21st percentile, Reference

Skills at the 11th percentile, Science at the 1st percentile, and Social Studies at the 6th percentile.

4/27/87    Chad was referred to Prestera Mental Health Center by Probation Officer Sue Hatcher for behavioral problems while he was awaiting sentencing for the incident where he pulled down the pants of a six-year-old girl.[101] Psychologist Michael Nuce conducted an intake interview with Chad and Diana. Nuce's subsequent report indicated that Chad's two older brothers were on juvenile probation and improvement plans. Diana reported that she and Roger had control over their children, that Chad was not a "mean boy" but was merely "mischievous." Diana also reported that none of the children was a behavioral problem at home and that they picked up their clothes, etc. She acknowledged that her sons fought, characterized Chad as an instigator, and indicated that they disciplined their children by sending them to their rooms. Diana characterized the incident with the six-year-old as unintentional and a joke. Chad admitted fighting during recess but denied misbehavior elsewhere in school. He also made inconsistent statements regarding parental drinking, alternatively indicating and then denying that his parents had a drinking problem. Both Diana and Chad indicated that he was being blamed without sufficient cause.

Following the intake interview, Nuce contacted Probation Officer Hatcher, who indicated that Diana and Chad were minimizing and/or denying behavioral issues. Chad was reportedly "roaming the streets" and cursing at adults, there were significant behavioral concerns at school, and Ms. Hatcher was considering placement outside the home.

Nuce noted that Chad came for only one session and no further appointments were made or kept. Diana expressed concern about the cost of services.

Diagnosis:
| | |
|---|---|
| Axis I | Conduct Disorder, socialized |
| Axis II | None |
| Axis III | None reported |
| Axis IV | Moderate psychosocial stressors, recent court involvement |
| Axis V | Poor |

4/29/87    Probation Officer Sue Hatcher completed a Pre-Disposition Report regarding Petition 87-J-I 16 (Battery). Ms. Hatcher reported that Chad was accused of pulling the victim's pants down on the playground while Chad and a second male student held her. He was reportedly fumbling with her underwear when the recess bell rang. Chad reported that he and the

---

[101] Other records indicate the child was four years old.

other student were only playing with the victim, that he went to tag her, and her pants fell down when he touched them.

Officer Alan Meeks (arresting officer) told Ms. Hatcher that when visiting the Fulks' home, he had observed Chad's parents drinking on multiple occasions. He believed the parents were not providing adequate supervision and recommended that Chad be removed from the home for his own benefit. Ms. Hatcher noted that members of the Fulks family denied alcohol abuse in the home, but collateral reports contradicted this. At the time of the report, Chad's brothers Ronnie and Dewayne were in the Behavior Disorder program in school and had arrest histories. Dewayne was on an Improvement Period for assaulting an elderly neighbor.

Ms. Hatcher reported that the Fulks family house was dirty and run down on the outside, but that housekeeping standards were acceptable. She also stated that Chad had problems in the neighborhood and was reportedly hitting other children, cursing at parents, and bullying and hitting one child at school. A neighbor indicated that many other neighbors were afraid of the Fulks children, and she did not allow her children to play with them. Another neighbor reported that the Fulks children frequently carried alcohol into their home.

Dottie Thompson, Chad's third grade teacher, reported to Ms. Hatcher that she believed Chad had a severe behavior disorder but that he could be handled with supervision. She also indicated that he denied wrongdoing when confronted. The school principal reported he had smelled alcohol on the breath of both parents. Indicating he had received complaints that the Fulks children were running the streets at night unsupervised, he said he had recommended that Chad be removed from the home. The principal also reported that Chad had a history of fighting in school, assaulting other students, and being verbally abusive to children and adults.

5/12/87    Annual IEP (Grade 3; School Year 1987/88)
- SPED Classification: Behavior Disorders (Resource Room – "Mainstream as behavior and academic progress permit"; regular classroom for Art, Music, PE)
- Additional Services: Speech and Language Therapy twice weekly, Counseling at Prestera Center, and Probation Officer Sue Hatcher
- Teacher Reports: "Threatens other students. Can't be unsupervised. Has been spitting at other students."
- Observation: "Answered questions in class, interacted appropriately with peers. Didn't always follow directions."

**5/16/87**    *Age 10*

**5/21/87**    Chad and his mother were seen by Michael Nuce at Prestera Mental Health Center. They discussed a reward program and contract with Chad's teacher. There was mention of Chad spending the summer with his grandparents.

According to Roger, Chad had a crush on an adult female neighbor who lived across the street and would become very angry if he saw anyone else talking to her.

Ronnie reported that Diana began attending church around this time, became "born again," and suddenly stopped drinking. She started spending much of her time away from the house helping Romey Swanson in his home for unwed mothers. Arguments between her and Roger escalated.

**9/1/87**    Chad enrolled in fourth grade at Peyton Elementary School. He attended 161 days and was absent 19 days. He had been transferred to Peyton for placement in a Special Education Classroom for Behaviorally Disordered children. His grades for the school year were As in Reading, Spelling, Language, Art & PE; Bs in Writing and Music; and Cs in Science and Social Studies.

Ronnie enrolled in seventh grade at Lincoln Junior High and was absent 34 days. He received B in Language Arts; Cs in World Geography, Home Economics, Health; and Ds in English, Math, Science, and PE. He had completed 6.67 credits, and his GPA was 1.60.

**10/29/87**    Chad's case was officially closed at the Prestera Mental Health Center.

**5/4/88**    Probation Officer Sue Hatcher went before the Cabell County Circuit Court on Petition 87-J-116 to report Chad had successfully completed the 12-month Improvement Period. The Court ordered Chad be released from probation.

**5/16/88**    *Age 11*

**5/25/88**    Medical Record, John Marshall Medical Services
- Height: 56 ¾ inches, Weight: 83 pounds
- Mother reported he had headaches in the evening behind his eyes. The headaches lasted three to four hours.

6/7/88          IEP (Grade 5)
- SPED Category: Behavioral Disorder ("BD") Monitoring (Regular classroom with BD monitoring and placement if needed)
- Services: Speech Therapy, BD Resource Room and monitoring in regular classroom
- Weaknesses: tattles, agitates others

9/1/88          Chad enrolled in fifth grade at Peyton Elementary School. He attended 174 days and was absent 16 days. He received Bs in Art and PE and Cs in all other classes.

Ronnie enrolled in eighth grade at Lincoln Jr. High School. He was absent 46 days. He received B in Math; Cs in Language Arts, Science, and Home Ec; Ds in English, Industrial Arts, PE, Music; and Fs in American Government, West Virginia Studies. He completed 5.67 credits, and his GPA was 1.50.

10/30/88        A Herald Dispatch newspaper article featured Chad. In the article, Diana reported that her husband had been unemployed since August when "he had to quit his job after he hurt his arm."   She said they often did not have enough food and that the local food bank had been a tremendous resource for her family. Chad (age 11 at the time) was quoted as saying, "School is the hardest thing about being poor …. they say stuff about me, they laugh at me, they say their clothes are better than mine. They cuss me out and they call us welfare bums."

11/22/88        IEP (Grade 5)
- Special Ed: Speech and Language Services, BD Resource Room and monitoring, mainstreaming in Music, Art, PE
- Strengths: average functioning
- Weaknesses: tattles, agitates others

1/18/89         Chad presented at Children's Medical Center at Marshall University, where records indicated he complained of pain above his eyes and headaches for the preceding six months. He said he had to leave school twice and that he had one episode of nausea. A sibling (likely Ronnie) saw the doctor because of short stature and intense headaches. Chad was assessed to have "Headaches – probably secondary to eye strain."

3/1/89          School records indicated Chad participated in regular Science and Health classes but was not keeping up. He continued to receive speech therapy. Recommendations for the following school year were a BD classroom due to his low functioning level and continuation in a speech program for

remediation of the "S, Z, Sh, Ch, J, Th" sounds. Reading and conversation were target areas.

5/15/89     IEP (Grade 6)
- SPED category: Behavioral Disorders
- SPED Services: speech therapy, resource room for academics
- Strengths: pleasant personality
- Weaknesses: Math, Spelling, Language – needs very concrete in learning
- Brigance:
    o Word Reading: 4th grade level
    o Reading Comprehension: 4th grade level
    o Spelling: 4th grade level
    o Math: 4th grade level

5/16/89     **Age 12**

According to Chad, his mother cracked a ketchup bottle over his father's head during a fight. Roger grabbed her and tried to throw her out of a second story window. Chad was afraid his father would kill his mother, but his Uncle Kevin stopped him. Chad was very embarrassed by his parents' behavior. They usually kept pre-mixed Screwdrivers in the refrigerator and would *try* to wait until after noon to begin drinking but were not always successful. They drank anything alcoholic they could get their hands on.

9/5/89      Chad enrolled in sixth grade at Beverly Hills Middle School. His grades were B in Comparative Literature; Cs in Math and Art; Ds in Language Arts, Foreign Language, Social Studies, Science, PE; and Fs in Health and Home Economics.

1989        According to Shannon, he got into fights at school because he was poor, his clothes weren't stylish, and the reputations of his older siblings preceded him. The other children picked on him. He said Chad got into fights trying to protect him. Shannon and Ronnie were close for a while and played GI Joes together, but after a while Ronnie got caught up in drugs and he and Shannon drifted apart.

| 11/29/89 | Chad pointed a handgun at an 11-year-old boy named Robert Keefer and was arrested for **Brandishing**. On 3/14/90, the charge was amended to **Assault**. The court accepted Chad's guilty plea, adjudicated him a juvenile delinquent, and sentenced him to a six-month Improvement Period. |

3/2/90     A Psychological Evaluation Report (Grade 6) by School Psychologist Eric King indicated Chad was referred by his teacher Laura Cooper for triennial assessment. A speech problem was noted under "Observations."

Test Results (conducted 3/2/90):
- WISC-R: 88 VIQ, 105 PIQ, 96 FSIQ - The 17-point difference between verbal and performance IQ scores was statistically significant.
  - Verbal Comprehension Factor: mean score of 75 (specific weakness on the Information subtest, which measured general fund of knowledge and past formal education)
  - Perceptual Organization Factor: mean score of 11.25
  - Freedom from Distractibility Factor: mean score of 8.66
- Bender Gestalt Visual Motor Test of Integration: 3 errors (2 distortions, 1 dictation) - suggested visual/motor/perceptual difficulty
- Burks' Behavior Rating Scales: no significant behavior problems per teacher ratings

Conclusion: Chad had behavior problems that indicated placement in the Emotional and Behavioral Disorders ("EBD") program. However, a complete academic evaluation was recommended to determine if a learning disability existed.

5/16/90     **Age 13**

Around this point in time, Roger abruptly left Huntington and moved to Shipshewana, Indiana, where his younger brother Mark Fulks lived and worked. Roger didn't discuss the move with his family and instead left them a letter notifying them of the move. Now on her own, Diana struggled to parent and make ends meet. She and the children received welfare support and food stamps. Eventually, Roger found employment in a local factory but did not voluntarily send money to Diana to support the children. Roger soon began dating Mark's sister-in-law Marcia and eventually married her.

Diana moved with the children to a rental house in the Guyandotte section of Huntington after losing the house on Leeward Avenue because she was too far behind in house payments. They were only in Guyandotte a few months when Diana moved her family to 609 Rear Buffington Street in Huntington.

5/30/90     Around this time, an arrangement was made for Ronnie to join Roger and his future wife Marcia in Indiana.

6/11/90     Specific Learning Disability Team Report (Grade 6)
Observations: Examiner noted that Chad had difficulty with word meaning at times, and this affected his reading comprehension.
Testing:

- KTEA:
  - Reading Decoding: 92 SS
  - Reading Comprehension: 84 SS
  - Spelling: 85 SS
  - Math Calculation: 72 SS
  - Math Reasoning: 83 SS
- Bender-Gestalt: perceptual deficits

6/13/90    School personnel met to discuss Chad's IEP and continued placement in the Behavior Management class for the upcoming school year. Despite multiple attempts, they were unable to reach his mother and held the meeting without her. It was noted that the home phone had been disconnected, and there was no answer at the mother's place of work.

IEP (Grade 6)
- SPED services: Math (multiplication/division, fractions, plus basic geometry skills), Speech therapy (errors of S and Z)
- Study Skills: poor organization skills
- Peer Interaction: fair
- Classroom Behavior: average
- Motor Skills: age appropriate
- Content Skills: poor math skills
- SPED: Behavior Management, speech therapy

8/28/90    Ronnie enrolled in Westview Junior High in Topeka, Indiana.

9/14/90    Sue Hatcher (Probation Officer) told the court that Chad had successfully completed his six-month Improvement Period. The court ordered discharge from the Improvement Period.

9/14/90    IEP (Grade 7)
Present level of educational performance:
  - Reading: 5.3 GE [source of testing not listed]
  - Math: 4.3 GE [source of testing not listed]
  - Written Language: below average
  - Oral Language: receives speech (services)
  - Study Skills: below average – Learning Disabled, Resource 2x/week
  - Peer Interaction: satisfactory
  - Classroom Behavior: average
  - Motor Skills: average
  - Perceptual Skills: below average
  - Content Skills: below average

- Chad met eligibility criteria for special education services. He was placed in a resource class for Math (four hours per week) and Speech and Language (two hours per week).

12/4/90     A Probation Report indicated Chad was cited for Truancy because of habitual absences from school without good cause.

12/4/90     Chad was arrested for **Destruction of Private Property** after he and another juvenile were seen climbing out of the broken car door window. He also was charged with Truancy. He admitted the truancy charges on 2/13/91 and was adjudicated delinquent. The property destruction charges were held in abeyance and then dismissed on 3/21/91. The predisposition report indicated Chad had truancy problems and had missed 12 days of school. He was in the BD classroom but was taking several regular classes. At the time of the report, Chad's parents were in the process of divorcing. Diana reported that the divorce was causing Chad and Ronnie to act out. Roger was reported to have alcohol problems.

Sherry (21) was managing a TCBY, Dewayne (19) was incarcerated, Ronnie (17) had left school and was living with his youth minister, Shannon (11) was in the fifth grade.

The court ordered placement in Pressley Ridge School in Ona, West Virginia, but suspended this sentence in lieu of probation for one year and conditions that included drug treatment, drug screening, a curfew, and court-ordered school attendance.

2/5/91     Chad was treated at St. Mary's Hospital Emergency Department. His mother reported he had been in a fight at Enslow Middle School and received a head injury and injury to his nose. Diana reported she was unemployed. The treating physician wrote: "Patient is a 13 yr old white male. Patient was assaulted earlier today at school. Patient's mother reported he came home from school with a bloody nose and a contusion on the left back of his head. Patient denies LOC or any other pain. Chad reported that he was having difficulty breathing from his nose and that his nose had bled from both nostrils earlier. The nurse noted contusions on left temporal area. X-rays were taken of skull, cervical spine, facial bones and nasal bones - all x-rays were normal."

4/26/91     Chad was hospitalized at St. Mary's Hospital in Huntington after being found unresponsive in his home. The medical record noted that the cause was "(p)robably drug ingestion" and described the incident as a possible suicide attempt. Diana indicated that she had an argument with Chad

about visiting his girlfriend. Chad denied suicidal ideation but was unable or unwilling to explain when he took the pills. Toxicology screening was positive for antihistamine and acetaminophen. Chad was released the same day.

5/3/91      Chad later reported to defense staff prior to trial that he scheduled a follow-up appointment with the psychiatrist but did not attend.

5/6/91      The divorce between Chad's parents was finalized, and Roger married Marcia one week after the divorce was final.

5/16/91     *Age 14*

8/91        Chad was sent to Indiana to join Ronnie and live with his father and stepmother.

8/21/91     After arriving in Indiana, Chad enrolled in eighth grade at Westview Junior High School although he had never completed seventh grade.

            According to Chad, the transition to Indiana was difficult because the other children made fun of his clothes and the way he talked. He started getting into fights and cutting classes. Transition at home also was difficult. Chad perceived Marcia didn't want him there. She would lock him in his room when he got home from school and tell Roger, "It's either him or me." She accused Chad of stealing one of her dresses and held it against him the whole time he lived there, even though he denied it and she never found the dress. She checked all of the letters Diana sent to Chad and read them before he did.

9/10/91     Chad was placed in a remedial reading support program. Testing by School Psychologist Joy Krug found the following results:
            - SIT: 66 SS, 9-6 MA
            - PPVT: 73 SS, 9-8 AE
            - Analytical Reading Instructional: 4th grade
            - KBFAT:
                - Math 73 SS, 4.8 GE
                - Read 68 SS, 3.5 GE
                - Spell 75 SS, 4.6 GE

9/25/91     Jan Hardesty, Chad's teacher at Westview, referred him for evaluation because he was failing every class and had social problems, had few friends, and had been involved in two fights in the past week.

9/30/91    Psychometric Evaluation conducted by School Psychologist Joy Krug at Westview Junior High School found:
- WISC-R: 85 VIQ, 105 PIQ, 93 FSIQ
- WJTA:
  - Written: 80 SS, 4.0 GE
  - Reading 95 SS, 8.0 GE
  - Math: 81 SS, 5.7 GE
  - Knowledge: 79 SS, 4.4 GE
- WRAT:
  - Reading: 74 SS, 4E GE
  - Math: 66 SS, 4E GE
  - Spelling: 81 SS, 5B GE
- Adaptive Behavior Evaluation Scale
  - Environmental/interpersonal Behavior: 7 ss
  - Self-Related Behavior: 12 ss
  - Task-Related Behavior: 0 ss
  - Adaptive Behavior Quotient: 81 SS (12th percentile
- TOWL:
  - Vocabulary: 2%
  - Thematic Maturity: 2%
  - Spelling: 16%
  - Word Usage: 5%
  - Style: 2%
  - Hand Writing: 2%
  - Written Language Quotient: 59 SS
- Analytical Reading Inventory: 4th Frustration

As a result of the testing shown above, the special education team recommended a classification of 8th Grade Learning Disability for all academic subjects (English, Science, Social Studies, Math).

10/3/91    Learning Disability Certification indicated Chad had normal or near normal potential, and there was a severe discrepancy between his potential and his academic achievement in Word Reading, Reading Comprehension, Writing, Expressive Language, Listening Comprehension, Math Calculation, and Math Reasoning. He was found to have disorders in:
- Understanding language,
- Using language, and
- Written language,
with imperfect ability to:
- Listen,
- Read,
- Write,

- Spell, and
- Do math calculations.

It was determined that Chad's learning problem was not primarily the result of: environmental disadvantage, cultural disadvantage, economic disadvantage, visual handicap, hearing handicap, motor handicap, mental retardation, or emotional disturbance.

10/4/91    An Educational Evaluation Report Form contained the following Woodcock-Johnson test scores, followed by a recommendation that Chad be placed in the Learning Disability program:
- Reading: 4th grade
- Math: 5th grade
- General Knowledge: 4th grade

10/10/91    After receiving several complaints from students concerning Chad's behavior on the school bus, Principal Stan Shopa met with Chad. Students had complained Chad was blowing his nose in his hands and then wiping his hands on other students. Chad initially denied the incidents and became "surly and defensive." Another student later reported that Chad had pushed, intimidated, and threatened him. The principal again met with Chad, who denied the accusation. The bus driver reported later that Chad had threatened several students and physically blocked another student from exiting the bus. As a result of his behavior, Chad was suspended from school for five days and his bus riding privileges were revoked indefinitely. The principal sent Chad's father a letter with the above information, and Joy Krug (school psychologist) was sent a copy of the letter. Another member of the school staff contacted Welfare to arrange a meeting which would "hopefully lead to family counseling." Mr. Shopa wrote in a memo to his file: "It is my feeling that Chad Fulks is a highly disturbed and lethally disturbed young man. He goes from person to person with the intent of intimidating and frightening each of his victims. He is very quick to anger and becomes verbally and physically abusive. I would hope that he could be tested immediately for [Emotionally Handicapped] placement before he seriously hurts someone."

10/22/91    A summary of Chad's history in Indiana school records indicated:
- Placed in Behavior Disordered class since second grade, with Learning Disability placement (qualified LD with Math SS 72)
- "Scapegoat"/placed on probation because of truancy, several battering misdemeanors, behavior disorder
- Drugs in home (emotional, physical abuse)
- Molested by adult male
- Made ward of WV court

10/29/91    Another letter was sent to Chad's father from the principal of Westview. The letter indicated that per Mr. Fulks' request, Chad would be reinstated on the school bus with the condition that if there were future problems, he would forfeit his bus riding privileges.

11/13/91    Principal Shopa again wrote to Chad's father, indicating he had recently been in touch with Chad's juvenile probation officer in West Virginia. Mr. Shopa informed Mr. Fulks that Chad had been attending Westview Junior High "illegally," and they would be withdrawing him immediately and recommending Mr. Fulks return him to West Virginia. [Apparently, the principal had learned Chad was a ward of the State of West Virginia, and his father only had visitation rights.] Mr. Fulks was notified that Chad was not considered a resident of Indiana, and the father's signature for special education placement was nullified due to the fact he was not the custodial parent. Attached to the letter was a Notice of Suspension Letter indicating Chad had been suspended for five days for causing a fight. A typed note at the bottom of the form stated Chad would not be able to return to Westview Junior High School until legal residency was established.

11/15/91    A Petition filed by the Juvenile Referee in Cabell County Circuit Court alleged Chad had violated the terms of a Court Order dated 3/21/91 by being verbally abusive and intimidating other students in school and by being suspended from school on the following dates: 9/27/91, 10/11-10/18/91, and 11/11/91. The petitioner requested the Dispositional Order be modified to a more restrictive alternative.

11/20/91    A Case Conference Report (Grade 9) for Westview Junior High School indicated Chad's special education category was Learning Disabled and that he should be placed in a "sp class" as the least restrictive alternative.

11/22/91    Following a hearing in Cabell County Circuit Court, the court awarded custody of Chad to Roger and ruled that the petition awarding temporary custody to the State be dismissed. Chad's probation also was terminated, and he was ruled a resident of Indiana.

11/25/91    IEP (Grade 9) – Westview Junior High School
Present levels of educational performance: 4th-5th grade level in Language Arts.

Annual Goals:
- To provide a sequential Language Arts, Math, Science Program
- To monitor mainstream classes
- To guide Chad in emotional-social skills

Regular classes: PE, Agriculture, Mechanics, Art

11/25/91    A Case Conference at school established a behavioral contract for Chad. LD tight supervision on a probationary basis was recommended until the second semester, at which time he would be considered an LD ninth grader (placed per his "social awareness level" [not defined] to allow for more "hands on" prevocational support). Therapy with Dr. Klassen was recommended.

11/26/91    A memo to Dr. Klassen from School Psychologist Joy Krug indicated: (1) Chad had been placed him the LD program and grade-skipped to ninth grade; (2) his father had just regained custody, but the stepmother presented "more hope" than the father as she was the one seeking counseling for Chad; (3) Chad had been a ward of the state in West Virginia; (4) he had a history of being molested by an older man; and (5) he had a "sociopathic pattern." [Ms. Krug did not define this term.]

12/3/91    A Psychiatric Report prepared by Dr. Klassen after meeting with Chad, Roger, and Marcia contained the following relevant information: Chad was referred because of behavioral issues at home and school. Marcia reported that "Chad would get very angry if things didn't go his way and tear things up. 'He can be happy, but his feelings get hurt.'" Roger reported past alcohol abuse and admitted being drunk the night before the evaluation after having consumed three quarts of beer. Roger described Diana as an alcoholic until her religious conversion. Roger also described their 23-year marriage as involving a great deal of fighting, including physical fights.

Chad reported that his stepmother Marcia was "picking" on him, "mocking" him, and falsely accusing him of wrongdoing and that he wished to return to West Virginia as a result.

Dr. Klassen had been informed that Chad was in a split eighth/ninth grade classroom. He had been recently placed in LD, had skipped to the ninth grade, and required LD support in all major subjects. He had behavioral problems on the bus with a school suspension and a bus suspension. A tight behavioral contract was developed and tight supervision on a probationary basis was imposed.

Dr. Klassen noted that Chad had a reported history of being sexually abused by an older man, which Chad did not report during this evaluation and that a sociopathic pattern of behavior was reportedly observed in the previous psychological evaluation.

Chad reported sleep disturbance, depression, loss of appetite, and being unable to "find pleasure." Chad denied drug and alcohol use, but Dr. Klassen was skeptical of this report.

Chad's ability to read a paragraph was at the sixth-grade level, with errors coming from a lack of attention. Perseveration was noted on the drawing of geometric patterns. The Map Test reflected "reasonabl(y) adequate" capacity to learn but "a spotty fund of information suggesting learning disruption." The Draw-A-Person Test reflected unmet dependent needs and a lack of trust.

Initial impressions included Major Depression and to "remain alert to the possibility of developing sociopathic traits." Imipramine 100mg was prescribed. Dr. Klassen made an appointment to see Chad and Roger again in nine days.

| | |
|---|---|
| 1/92 | Around this time, Chad returned to his mother's care in Chesapeake, Ohio. |
| 1/9/92 | Roger Fulks signed an Authorization for Release of Information allowing Chad's records to be sent from Westview High School in Topeka, Indiana, to Chesapeake High School in Chesapeake, Ohio. |
| 1/10/92 | Chad was officially withdrawn from Westview Junior High. |
| 3/2/92 | A court order in Lawrence County, Ohio, gave Diana temporary legal custody of Chad so she could enroll him in school. |
| 3/9/92 | Chad enrolled in ninth grade at Chesapeake High School. Shortly before his fifteenth birthday, Chad began leaving his mother's home and staying off and on with various friends. Eventually, he left Chesapeake High School after being suspended and enrolled in an alternative school to complete ninth grade. Diana told defense staff that as far as she could remember, Chad never really lived at home with her after the age of "thirteen or so." |
| 5/16/92 | *Age 15* |
| 9/3/92 | Chad was treated in the Emergency Department at St. Mary's Hospital for stomach pain, dizziness, and weakness. X-rays of his abdomen were negative. |
| 3/1/93 | Chad enrolled in Andis Alternative Education Center (formerly known as the Drift Creek Alternative School). He was present 45 days and absent 14 days. He received Incomplete marks in all classes (Natural Resources, Vocational English, Vocational Social Studies, Work and Family) during the third semester and Bs in all classes during the fourth semester. He earned a total of 1.75 credits. |

**5/16/93**      ***Age 16***

[There are no contemporaneous records for this year of Chad's life. Based on a current collateral interview with Linda Adkins, it appears Chad was living with a 28-year-old female in the neighborhood (Rhonda) at the time.]

**5/16/94**      ***Age 17***

| | |
|---|---|
| 7/9/94 | Chad was arrested and charged with **Transferring and Receiving Stolen Property** (1990 Chevrolet S-10 Pickup truck). The truck was stolen from Wyoming County in West Virginia. On 8/14/94, he was arrested and charged with **Bringing Stolen Property into the State**. A Detention Order was filed, and it was determined Chad was a **Fugitive from Justice** (for stealing the vehicle on 4/22/94). Chad was detained at the Kanawha Home for Children in Dunbar, West Virginia, pending further proceedings. On 9/1/94, the court ordered that the latter charge be dismissed, and Chad admitted to the allegations in the first petition (Transferring and Receiving Stolen Property). He was adjudicated a juvenile delinquent and committed to the custody of the Department of Corrections. It was ordered he be held at the Kanawha Home for Children pending his transfer to the Industrial Home for Youth in Salem, West Virginia, and then transferred to Davis Center, a juvenile Correctional Center in Davis, West Virginia. |

**9/21/94**      According to Diana, she married Dean Thompson in Greenup, Kentucky, on this date. Dean called himself a "preacher" although he had no formal education and had never been ordained. He had an almost nonexistent work history. He reportedly told Diana that God told him he should not work, so she was the sole provider in their new family. Diana's job involved "sitting with old people." She had no health insurance for herself or Dean.

**9/24/94**      Chad was committed to the Davis Center.

**11/1/94**      The Davis Center sent a progress report to Judge Cummings at Cabell County Circuit Court. Chad was reported to be doing well in all areas and had good work habits. The progress report indicated Chad had "good work habits" but needed to work on leadership abilities. He had taken three of five tests required for his GED, obtaining an average score on those tests of 43. An average score of 45 was required to obtain a GED.

1/10/95     In another progress report from Davis Center, the court was informed Chad needed to pass his GED. His group leader, Paul Komtop, wrote that Chad was doing better but needed to focus attention on long-term goals.

2/23/95     Chad's Medical Discharge Summary from Davis Center indicated cigarette smoking since age 15 and a history of marijuana abuse.

3/8/95      Davis Center informed the court that Chad had completed his GED with a 45.6 average. The record indicated that a GED required an average score of 45.0. Group leader John Dressier wrote: "Chad has shown an adult attitude both with his peers and with adults. Good resident." The GED transcript indicated the following scores from 10/13/94 to 3/2/95: Language Arts Writing 44, Social Studies 45, Science 52 (after having taken the test a second time), Language Arts Reading 44, and Mathematics 43.

3/29/95     Correspondence to the court from Davis Center indicated a commitment date of 9/1/94 and an anticipated release date of 5/11/95 (i.e., a little over eight months). Chad's Aftercare Plan indicated completion of 162 hours in Food Preparation, 261 hours in Auto Mechanics, and 672 hours in education classes preparing him for the GED. He had completed a Substance Abuse Education class. Through the "modified group program," he had shown improvement in judgment/impulse control, maturity, responsible decision making, motivation, adult relationships, and social skills/relationships. Chad wanted to reside with his mother upon release. Service needs included transition counseling and probation "until Chadrick has a successful return to the community." The Plan indicated Chad would be seeking employment as a welder upon release.

3/29/95     Correspondence from Davis Center School Counselor Betty Riley indicated that Chad had completed his GED and was interested in "Continuing his welding training at the Cabell County Vo-Tech school.

4/19/95     David Hockman, Superintendent of Davis Center, informed the court that Chad had just completed his program at Davis Center and was ready to return to court for further disposition.

School records contained the following academic marks over the course of Chad's academic career:

## Report Cards

| Year | Grade | Reading | Spelling | Writing | Lang/Eng | Math | Gen Ed |
|---|---|---|---|---|---|---|---|
| 1982/83 | K | | | | | | |
| 1983/84 | 1 | S- | U | S- | | U | S- |
| 1984/85 | 1 | S | S+ | S | | S | |
| 1985/86 | 2 | S | S- | S | | S | |
| 1986/87 | 3 | S- | S | S | S- | S- | |
| 1987/88 | 4 | A | A | B | A | B | |
| 1988/89 | 5 | C | C | C | C | D | C (Sci, Soc Std) |
| 1989/90 | 6 | Computer Lit. = B<br>Art, Music = C<br>PE, For. Lang. = D<br>Health, Home Ec. = F | | | D | C | D (Sci, Soc Std) |
| 1990/91 | 7 | Reading: D<br>Ohio History: D<br>Fs in Ohio History, English, Science, Reading before summer school credit | | | D | C | F (Sci) |
| 1991/92 | 9 | Social Studies: C-<br>Applied Math: D+<br>Applied Science: C+<br>Work and Family: A-<br>Natural Resources: C | | | | | |
| 1992/93 | 9<br>(alt school) | Nat Resources/Lab: B<br>Nat Resources/Related: B<br>Voc English: B<br>Voc Social Studies: B<br>Work & Family: B | | | | | |

## Adult History

**5/16/95**      ***Age 18***

**5/28/95**      Devon Christopher Fulks was born in Cabell Huntington Hospital to Amber Fowler, whom Chad had dated prior to his commitment to Davis Center. Records contain Amber's report that she was on welfare at the time of the birth. Devon was born with a cardiac murmur, atrial septal defect, and ventriculseptal defect. Amber denied drinking but admitted smoking cigarettes during the pregnancy. She was not married at the time of Devon's birth but was dating a man named John Akers.

**5/30/95**      Probation Officer Mike Lacy informed the Cabell County Circuit Court that Chad successfully completed the program at Davis Center and was eligible for release. Chad had successfully completed all sections of the GED while incarcerated. [He had to re-take the Science test a second time.] The Court ordered that Chad be released and delivered to the

home of his aunt Sharon Dotson, where his mother could pick him up. [Chad was not in fact released on this date.]

6/2/95    Probation Officer Mike Lacy informed the court that contrary to his 5/30/95 statement, Chad had failed to pass the test for his welding certification, which was required for completion of the program at Davis Center. He asked that Chad be released to the care of his mother on the scheduled release date but that another hearing be held to deal with the certification issue.

6/26/95    Chad was released from the Davis Center to the care and control of his mother.

7/6/95    Chad married Amber Denise Fowler. Both were 18 years old. She reported no occupation on the marriage license; Chad reported he was a welder.

Sherry reported that Chad and Amber brought their infant son to visit her. Sherry noticed that when Amber picked up Devon he began crying and screaming right away, and Amber became frustrated and angry when she was unable to soothe him. When Sherry offered to take him, she noticed his diaper was dirty and hadn't been changed in a while. When Devon would begin crying, Chad would tell Amber to pick him up.

11/10/95    Amber's son Devon (five months old) was transported by ambulance to the ER at Cabell Huntington Hospital where he later died of cardiopulmonary arrest due to trauma.

According to Shannon, Chad changed dramatically after Devon's death. He began drinking heavily, was quick to anger, avoided people, and cried frequently. He often talked with Shannon about suicide.

Chad and his siblings reported that eventually, he began drinking all day long, every day, and taking whatever drugs he could get. He reportedly attempted suicide but got ill and vomited. [This suicide attempt is not documented.] He was unable to sleep, and when he did sleep, he dreamed about Devon. Sometimes, he saw visions of Devon as if he was really there. He forgot to bathe for days at a time and began spending most of his time at a riverbank to avoid people. Everyone noticed the change in him, but they weren't able to help. He and Amber began arguing regularly, and he stayed away from the house more and more to avoid her.

12/16/95    Medical records indicated EMTs found Chad sitting semiconscious, with a bullet wound to his left shoulder. Chad, described as "intoxicated," said he had been drinking but hadn't eaten that day. He reported he was unemployed

when he got to the hospital. The "History" portion of the record indicated he had been sitting in his vehicle, and someone had shot him in the left shoulder. It was noted that he dipped snuff and drank "some alcohol."

| | |
|---|---|
| 12/18/95 | Nursing notes indicated staff found Chad and his wife together in his hospital bed, "apparently performing sexual intercourse," which interfered with his IV. Chad said if his wife couldn't sleep in his bed, he would leave and signed himself out against medical advice. After signing the paperwork to leave AMA, he changed his mind. He was discharged later that morning. |
| 12/24/95 | Chad returned to the ER at St. Mary's Hospital with sharp pain in his right shoulder. X-rays were read as normal. He said he had never gotten his prescription filled for Lortab upon release from the hospital. He was discharged home with OTC medication for pain. |
| 1/25/96 | Amber Fulks filed for divorce from Chad, checking the box indicating "No Children" born into the marriage. |
| 1996 | Chad reported he was living with Dewayne and his wife Carly around this time. He smoked crank (crystal meth) for the first time with Dewayne and then began using crank every day. |
| 5/16/96 | **_Age 19_** |
| 6/12/96 | Chad was transported by emergency medical staff to the Cabell Huntington Hospital and admitted for observation. He complained of pain in his ribs and was coughing up blood. Alcohol was noted on his breath. The History and Physical Exam record noted: "A 19-year-old old white male who was intoxicated earlier this evening and was fighting with some other men at which time the police showed up. The patient ran from the police and ran into a gate with the left side of his abdomen. He was then caught by the police who subsequently kicked him in the same spot in the left upper abdomen and left lower chest. He arrived here in stable condition. Vital signs were stable throughout. He was complaining of left upper abdominal pain." He reported drinking only occasionally, and this episode was the first time he had consumed alcohol in seven months. The Assessment noted: "A 19-year-old old white male status post blunt abdominal trauma with impaired sensorium." |
| 1/10/97 | Chad was arrested by the Myrtle Beach Police Department and charged with Simple **Possession** of Marijuana. He had in his possession 28 grams of marijuana and 10 grams of hashish. He was convicted. |
| 4/2/97 | The divorce between Chad and Amber, granted this date on the grounds of irreconcilable differences, ended their brief marriage. There was no |

property to divide and no marital debt. According to Chad, he was in jail in West Virginia at the time, and Amber's aunt, a secretary for the Wayne County Prosecutor, came to him in the jail saying she could arrange to have the charges dropped against him if he would just agree to the divorce from Amber. Chad agreed and signed the papers, and the charges were dropped.

5/16/97    ***Age 20***

1997    Chad met Heather Goodman at a Christmas party, and they began a year-long relationship. According to Heather, she perceived Chad wasn't "all there." She reported that he drank a lot during their relationship.

| 12/3/97 | Chad was arrested in Hamilton County, TN, and charged with **Passing Worthless Checks** (Case #0813478). |
|---|---|

| 12/27/97 | Chad was charged in Hamilton County, TN, with **Attempted Forgery** (Case #802268). |
|---|---|

| 1/10/98 | Chad was charged with **Attempted Aggravated Criminal Trespassing** (Case #0802269). |
|---|---|

| 1/26/98 | A **Burglary,** for which Chad was later arrested and convicted, occurred this date at the home of Lula W. Jones in Shipshewana, Indiana. Ms. Jones stated that on this date, her daughter arrived at her residence at 10:30 am to take her to the grocery store. Upon returning home several hours later, they observed a dark red car in the driveway. As they approached, they observed a Caucasian male, thin build, with long blonde hair, running to the car, getting in, and driving quickly down the driveway. As the car passed, they were able to observe the driver and a female passenger. Upon entering the home, they discovered a checkbook lying on the floor in the hallway. The checks were printed with the names Chad and Amber Fulks. Missing was a jewelry box containing several rings including a diamond ring, emerald ring, ruby ring, two sapphire rings, four watches, a small black safe containing personal papers, and a prescription for heart medication. On 3/5/98, an Affidavit for Probable Cause was filed in LaGrange Superior Court after interviews with the victim. After finding Chad's checkbook in the victim's home, police obtained his photograph and conducted a photo line-up for the victim and her daughter. Ms. Jones identified Chad immediately without hesitation; however, her daughter could not decide between Chad and another individual in the line up. An Order for an Arrest Warrant was entered. |
|---|---|

| 4/25/98 | Chad was arrested by the Myrtle Beach Police Department and charged with **Receiving Stolen Goods**. He told police his name was Shannon Ray Fulks at the time of his arrest. According to Chad, he was with Heather Goodman when he was arrested, and she also was charged. Her mother Garnett Goodman bonded her out of jail within a week or so, but Chad stayed in jail. Heather met another man and moved in with him. Each was using cocaine at the time. The place they were living in was raided, and she was arrested again and charged with possession of cocaine. Her mother and stepfather traveled to South Carolina and bonded her out of jail. Chad was released around the same time, and they all traveled to West Virginia. According to Heather's mother, Chad and Heather followed her to West Virginia in a vehicle Chad said he had borrowed from the mother of a man he met in the detention center. Chad told the woman he needed to borrow her car to return to West Virginia to check on his sick child and would return the car in five days. Chad reported the woman gave him a handwritten note explaining she had loaned the car to him. The note included insurance information. They returned to Huntington and stayed one night. Heather was acting "wild" and wanted to see the Smokey Mountains on their return trip to Myrtle Beach. Chad was driving the car in Tennessee when he was stopped by the highway patrol. The woman who owned the car had reported the car stolen, and Chad was charged in federal court. |
|---|---|
| | On 7/8/98 (age 21), Chad was received at the Federal Medical Center in Lexington, Kentucky, on charges of Larceny of a Motor Vehicle. |

| 8/5/98 | Competency Evaluation, Federal Medical Center, Lexington, KY (Butner) |
|---|---|
| | Chad was referred for a competency assessment after having been charged with Interstate Transportation of a Stolen Vehicle. He represented himself as his younger brother Shannon. Statements from Chad's cellmate Robert Lee and Lee's mother were reviewed as well as statements from Amber Fowler (former wife) and Diana Thompson (mother). Amber Fowler, Diana Thompson, Robert Lee, Bill Acres (investigator), and Robert Simpson (Assistant US District Attorney) were interviewed. The following tests were administered: Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2), Wechsler Memory Scales – Third Edition (WMS-III), Rey Fifteen-Item Test, WAIS-III, and the Structured Interview of Reported Symptoms (SIRS). The individual scores of the testing were not reported. |
| | Chad was found to be competent at the time of the evaluation and was not found to be insane at the time of the offense. He also was found to be an unreliable historian, malingering, and attempting to feign cognitive impairment and mental illness. |

During the evaluation, Chad presented with "odd mannerisms" when interviewed, such as dramatic eye-blinking, head-twitching, hand-rubbing, and rocking back and forth. He claimed to have been treated for psychiatric problems in the past but could not recall where, when, what his diagnosis was, or what type of treatment he received. He initially denied experiencing hallucinations but later indicated that he received messages from the TV and heard the voices of his dead uncle and son calling him stupid. Staff reported that Chad did not present with these odd behaviors when he was unaware staff was watching him, that he gradually stopped showing the presence of abnormal behaviors in the presence of staff, and that he began showing the odd mannerisms discussed above again when interviewed by psychological or social work staff.

Chad also claimed not to know a number of basic facts about his background, including why he was incarcerated other than saying he had broken a car window in Tennessee, whether he had graduated from high school, what town he grew up in, if he was presently married, or what his mother's phone number was. He had written his mother's phone number on prison forms. He was administered an EEG but failed to remain still during the administration, claiming that his movements were involuntary.

MMPI results reflected an invalid profile. The SIRS reflected an unreliable reporting of symptoms. On measures designed to assess cognitive functioning, his performance was consistently equivalent to that typically seen in individuals who were moderately intellectually disabled, which was not found to be consistent with his observed ability to write or function independently. Evaluators noted that Chad cared for his personal needs independently, such as bathing, eating, and cleaning his cell. The evaluators also noted that he had no difficulty following the rules of the unit.

Diagnoses included Antisocial Personality Disorder and Malingering.

Relevant reports of his social history were as follows:

Chad's mother Diana reported that his birth, infancy, and elementary school years were unremarkable. His parents divorced when he was 14, and he moved with his mother and siblings to Chesapeake, Ohio. Diana reported that Chad had "multiple suspensions in junior high," but she was vague about why he was suspended. She "assumed Chad was using drugs but did not know what drugs he was using." Chad acknowledged marijuana use but denied any other drug use apart from social drinking.

Diana denied any significant family history of mental illness but did report Chad's father was an alcoholic and was physically abusive to Chad. She denied Chad had ever received mental health treatment. She further

reported that when Chad was 15, he left home and moved in with a 28-year-old woman for approximately five months. During or shortly after that time, he was involved in a burglary with his older brother. Guns and a VCR were stolen. Chad's older brother was sentenced to five years in prison, but Chad was sent to a youth facility in Ohio. He escaped from the youth facility and remained at large for over a year. Ultimately, he returned home, and Diana turned him in to the police. He was then sent to a youth facility in West Virginia.

Diana reported that Chad "did well" in the youth facility, earning a GED and welding certificate. He was released from the facility when he was 18 and moved home. Shortly thereafter, he married Amber Fowler. The couple lived with Amber's mother and had a son together (Devon).

Amber Fowler reported that Chad was often physically abusive to her. When Amber's son Devon was five months old, her three-year-old nephew jumped on the infant's stomach and killed him.

Diana reported that during the time Chad was married to Amber, he "used his younger brother Shannon's driver's license to write a number of bad checks." As a result, Chad was arrested and jailed for six months in Huntington, West Virginia. While incarcerated, Amber divorced him. Shortly thereafter, Chad became involved with another woman (Heather Goodman) and spent time in Florida and South Carolina with her. Diana reported that Chad was incarcerated for theft in South Carolina.

According to collateral information, while incarcerated in South Carolina, Chad engaged in "deceitful and antisocial behavior." His bond was posted by another inmate's mother, who also loaned him her automobile. Chad gained sympathy from other inmates in the prison by lying to them and telling them that his wife and daughter had been in a serious car accident. Collateral information further suggested he told this story with great emotion and in a convincing manner. As soon as Chad was released on bond, he drove the car out of South Carolina and was apprehended in Great Smokey Mountain National Park in Tennessee several days later.

| 3/23/99 | Chad was sentenced in U.S. District Court, Eastern District of Tennessee, to a 12-month term of imprisonment and three-year term of supervised release for the offenses of **Transportation of Stolen Vehicle, Aiding and Abetting Burglary of a Vehicle with Intent to Commit Theft**, and **Aiding and Abetting the Theft of Property Less Than $1,000.** |

5/16/99     *Age 22*

6/2/99      Chad was released by the Federal Bureau of Prisons.

| 6/3/99 | Chad was arrested and charged in Hamilton County, Tennessee, with **Burglary, Fraud, and Passing Worthless Checks**. He was convicted on 6/10/99 and sentenced to nine months in prison. He was incarcerated in Crown City, Ohio. |
|---|---|

| 12/7/99 | Chad was arrested and charged with **Burglary**, a class B felony. On 1/24/00, he pled guilty to the charge. |
|---|---|

1/3/00    Medical records reflect that Chad was transported to Vencor Hospital in LaGrange, Indiana, after falling in jail. He complained of pain in his head, neck and back and was "not sure" if he lost consciousness. He reported he was prescribed Valium and Vistaril at the time. A CT head and neck scan without contrast was read as normal. X-rays of the cervical, thoracic, and lumbar spine also were normal.

1/4/00    Chad was released from jail after his uncle posted $20,000 bond.

1/21/00    Chad was hired as a welder and fiberglass installer at US Cargo, where he earned $9.00 per hour. According to Dewayne, Chad moved in with him and his wife Carly around this time, and they were confused by some of his behaviors. For example, he took four or five showers a day, shaved his chest and other body hair, constantly combed his hair and checked his appearance in the mirror, and washed and waxed his car two or three times a week, and never left their home.

2/7/00    A Pre-sentence Investigation Report contained the following information:
- Chad completed up to the eleventh grade and received his Welding Certificate at the Davis School in 1993.
- He had a pending Probation Violation.
- He was currently on medication for "nerves due to his son's death" and pain reducers but was not sure why those were prescribed to him by the attending physician at the LaGrange County Sheriff Department.
- He admitted experimental use of marijuana and no use of alcohol. He reported using cocaine three times daily from 1996/97 until his arrest on 12/7/99. He reported he no longer used cocaine.

The report concluded: "It appears that the defendant has a history of criminal and delinquent activity. Probation records indicate a pending probation violation. It appears the defendant is remorseful for his actions. It appears the defendant has a strong family network and an effort is being made on their part to support him."

2/15/00    A DOC Diagnostic and Classification Summary indicated that Chad pled guilty to Burglary and was sentenced to 10 years in prison, with four years

suspended to probation. He was sentenced to a concurrent term of 60 days for violating probation on a conviction of Operating a Motor Vehicle without a License, a Class A misdemeanor. He told DOC staff that he committed the offense in order to get money.

He reported in a Social History that his father was an alcoholic and physically abused him. He reported that he was a welder who had completed eleventh grade. He reported no mental health history and indicated occasional use of alcohol and heavy use of drugs prior to his incarceration. He was determined to not be a threat to himself or others during his incarceration.

Test results (TABE):
- Reading: 8.9 GE
- Math: 6.0 GE
- Language: 10.3

3/15/00    While incarcerated, Chad underwent Mental Health Screening but was not seeking counseling services at the time. He had been prescribed Lorazepam at the county jail for approximately three months but had not taken the medicine since his arrival in prison. He said he was trying to cope on his own without the medication. He denied ever receiving mental health treatment prior to his incarceration and reported that no member of his family had ever received mental health treatment. He denied ever trying to hurt himself or any suicide attempts in the past. He reported that prior to his arrest, he used alcohol and marijuana "occasionally" and used cocaine regularly (three to four times per week). He said he completed eleventh grade at Westview High School in Lagrange, Indiana. [This was inaccurate. He did not complete or go beyond ninth grade.] He said was a Certified Welder after completing 16 months of training in a vocational school. He reported receiving his GED in 1996. He denied ever repeating a grade in school [inaccurate] and reported he was never in Special Education [inaccurate]. He reported one school suspension for smoking cigarettes and no expulsions [inaccurate – he was expelled from school in Indiana for burning a school plaque]. He denied he was ever placed in a juvenile detention center [inaccurate] or Group Home [inaccurate]. He admitted he had been on Juvenile Probation but was unsure of the charges.

3/20/00    A Psychometric Data Report, Psychology Unit (DOC) contained the following information:
- Age: 22; Grade Completed: 11
- TABE Level: D
- Reading Vocabulary: 8.7 GE [2/15/00 records indicated 8.9 GE]
- Comprehension: 9.1 GE
- Language Expression: 10.3 GE
- Math Comprehension: "did not do this test" [same record indicates 4.9 GE]

| 5/16/00 | *Age 23* |
|---|---|
| 7/9/00 | Chad was assaulted by two other inmates in the dorm and suffered "blunt trauma to his left side." He was transported to the ER at the Appalachian Regional Hospital. A form noted he was hit on his left side by an unknown object. He had a small cut over his left eye and a large abrasion on his left rib area. |
| 2/7/01 | Chad was seen by a prison psychologist, who wrote: "Five yrs ago infant son died in a household accident while P/O was at work. Blames self; blames wife, blames God. Began drinking, lost wife. Can see infant but can't touch him. Has slow speech, looking at floor, oriented x 3; depressed mood & constricted affect. Thoughts were logical & relevant with blame & guilt. No suicide / homicide ideation. Limited insight, fair judgment. Diagnosis: PTSD; unresolved grief. Will Follow-up." |
| 2/27/01 | The prison psychologist saw Chad again and wrote: "Ruminating and blaming self, wife, and God for infant son's death. Can see son right in front of P/O. Previously been in treatment. Will follow." |
| 2/28/01 | Chad attended an Anger Management group. The session note indicated: "Reason for referral: Difficulty with adjustment resulting in depression, anger, increased stress. Inadequate coping skills. Self-defeating behaviors & poor self-esteem." |
| 4/3/01 | Chad attended a Stress Management group. |
| 5/8/01 | The prison psychologist saw Chad and wrote: "continues to ruminate over son's death, blaming self for not being there, continues to report depression, be downcast, and to slowly respond when spoken to. Evaluate for medication." |
| | Chad attended a Stress Management group. |
| 5/9/01 | Chad attended a Stress Management group. |
| 5/16/01 | *Age 24* |
| 6/29/01 | Celexa was prescribed. |
| 11/29/01 | A State of Indiana GED transcript indicated the following scores (Writing 45 (33rd percentile), Social Studies 53 (67th percentile), Science 48 (45th percentile, Interpreting Literature and the Arts (52 (64th percentile), and |

Mathematics 45 {25<sup>th</sup> percentile}. Average score was 48.6, which was above the passing threshold of 45.

12/4/01      Chad completed his GED at Westville Correctional Institution.

12/17/01     A US Probation Officer in the Eastern District of Tennessee informed Westville Correctional Institution (Indiana) that Chad would have a three-year term of federal probation to begin immediately after his release from prison. The probation would be supervised out of the Knoxville, Tennessee, office.

2/1/02       Chad completed a Substance Abuse program. While in that program, Chad met Tina Severance, who worked in the program. They became friends, and she invited him to live with her after his release from prison.

3/22/02      After completing the non-suspended portion of his original 10-year sentence, Chad was released from prison and ordered to report to his Federal Probation officer within three days of release.

             Chad moved in with Tina Severance immediately after his release and began looking for a job. Tina eventually got him a job selling perfume. While living with Tina, Chad met Veronica Evans, who was an exotic dancer at a local strip club. The two began an affair. Tina discovered the affair and burned all of Chad's belongings in anger. Chad left her and moved in with Veronica and her three-year-old son Myles.

5/11/02      Chad presented at LaGrange Community Hospital in LaGrange, Indiana, complaining of a sharp pain in his chest, accompanied by vomiting. Chad reported he had been under a lot of stress, was really concerned about finances, and was rather upset at the time of the hospital visit. Impression: "most likely an anxiety attack, acute, now resolved."

5/16/02      *Age 25*

6/10/02      According to Chad and his mother, Chad introduced Veronica to Diana and told her that he and Veronica were getting married the next day.

6/11/02      Chad Fulks and Veronica Jean Evans married in Catlettsburg, Kentucky. Veronica reported she was a college student; Chad reported he was a welder.

| 8/25/02 | Chad directed Veronica to use a stolen credit card to buy a necklace at a Walmart in Madisonville, Kentucky. Upon entering the store, Veronica informed police Chad was in the parking lot with a gun, and she was afraid he would kill her. The police responded, searched, and discovered stolen credit cards and a pistol among other things. The officers subsequently arrested the couple and transported them to the Hopkins County Detention Center. Veronica's three-year-old son was placed in foster care. On 8/27/02, Veronica agreed to cooperate with the government and was released from detention. On the basis of evidence seized from their home, Chad Fulks was charged with **12 counts of Credit Card Fraud** in Hopkins County, Kentucky. He was convicted on 12/30/02 of all 12 counts and sentenced to five years in prison for each count, each count to run concurrently. |
|---|---|

| 11/3/02 | Kentucky State Police served Chad with an indictment charging him with **First Degree Abuse of a Child aged 12 years or younger** (Veronica's son). |
|---|---|

| 11/4-20/02 | **INSTANT OFFENSE:** Chad Fulks and Branden Basham, whom he met in the detention center, committed a series of crimes that resulted in the deaths of two female victims: Samantha Burns and Alice Donovan. Mr. Fulks was arrested on November 20, 2002. |
|---|---|

## Appendix C
## STANDARIZED TESTING ACROSS THE LIFESPAN
[Bold type = ≥1 standard deviations below the mean / ≥2 grades below classmates]

**Abbreviations:**
FSIQ = Full Scale IQ Score
VIQ = Verbal IQ
PIQ = Performance IQ
GE = Grade Equivalence
AE = Age Equivalence
% = percentile
MA = Mental Age
CA = Chronological Age
DA = Developmental Age
SS = Standard Score (Mean = 100, SD=15)
ss = Scaled Score (mean = 10, sd = 3)
wnl = within normal limits

**Test Names:**
WISC = Wechsler Intelligence Scales for Children
WJCS = Woodcock Johnson Test of Cognitive Skills
TONI = Test of Nonverbal Intelligence
SIT = Slosson Intelligence Test (verbal screening)
WRAT = Wide Range Achievement Test
KTEA = Kaufman Test of Educational Achievement
KBFAT = Kaufman Brief Form Achievement Test
WJTA= Woodcock Johnson Test of Achievement
BAT = Brigance Achievement Test
TOWL = Test of Written Language
PPVT = Peabody Picture Vocabulary Test
CTBS* = Comprehensive Test of Basic Skills
CogAT* = Cognitive Abilities Test
TABE* = Test of Adult Basic Education

* These tests are group-administered, multiple choice, frequently prone to inflation, and of questionable reliability.

## Intellectual Testing
[Standard Scores – Mean = 100, SD = 15]

| DATE | GR | AGE | TEST | SOURCE | VIQ / VCI | PIQ / PRI | WMI | PSI | FSIQ |
|---|---|---|---|---|---|---|---|---|---|
| 11/86 | 3 | 9-6 | SIT | Selective Screening for Gallaher Elementary School, undated | 90 | | | | |
| 2/87 | 3 | 9-8 | WISC-R | Psychological Evaluation Report, Rodney Pardue, PhD, 3/3/87 | 87 | 95 | | | 90 |
| 2/87 | 3 | 9-8 | SIT | Psychometric Summary, Gallaher Elementary School, 2/24/87 | 92 | | | | |
| 4/87 | 3 | 9-10 | CogAT-3[102] | WV State-County Testing Program, Student Test Record | 32% | **7%** | | | |
| 3/90 | 6 | 12-9 | WISC-R | Psychological Evaluation Report, Eric King, MA, 3/2/90 | 88 | 105 | | | 96* |
| 9/91 | 9 | 14-4 | SIT | Data Sheet, Joy Krug, undated | **66** | | | | |
| 9/91 | 9 | 14-4 | TONI | Data Sheet, Joy Krug, undated | | **84** | | | |
| 9/91 | 9 | 14-4 | WISC-R | Data Sheet, Joy Krug, undated | **85** | 105 | | | 93* |

---

[102] The CogAT is not an intelligence test but rather a group-administered multiple-choice test that estimates learned reasoning and problem solving abilities through a battery of verbal, quantitative, and nonverbal test items.

| 3-S/03 | ~ | 2S-11 | WAIS-III | Jonathan Venn, PhD | 79 / 76 | 78 / 84 | 86 | 79 | 77 |
|---|---|---|---|---|---|---|---|---|---|
| 8/03 | ~ | 28 | WAIS-III | James Hilkey, PhD | 79 | | | | 81 |
| 2/04 | ~ | 26-9 | WJCS-III | Dr. Gourley (Federal Medical Center at Butner, NC) | Visual-Auditory Learning: **75 SS** <br> Analysis/Synthesis: **76 SS** <br> Verbal Comprehension: **77 SS** <br> Incomplete Words: **100 SS** <br> Sound Blending/Decision Speed: **99 SS** <br> Auditory Working Memory: **98 SS** | | | | 79* |

* statistically-significant difference between indices

## Achievement Testing
[Excludes Composite scores, which are averages of specific underlying scores]

| DATE | GR | AGE | TEST | WORD READ /ATTCK | COMP | SPELL | LANG/ WRITING | MATH CALC | MATH ANAL/ FLU |
|---|---|---|---|---|---|---|---|---|---|
| 3/83 | K | S-10 | CTBS[103] | Recog **10%** | Vocab **12%** <br><br> Passage S3% | | | | 7 % |
| 3/84 | 1 | 6-10 | CTBS[104] | **13%** | Vocab **18%** <br><br> Passage 27% | | Expres **10%** | | |
| 4/86 | 2 | 8-11 | CTBS[105] | **50%** | Vocab 67% <br><br> Passage 64% | 38% | Mech 46% <br><br> Expres 70% | 23% | 23% |
| 11/2S/86 | 3 | 9-6 | WRAT[106] | **80 SS** <br> **9%** <br> 2E GE | | 89 SS <br> 23% <br> 3B GE | | **82 SS** <br> **12%** <br> 3B GE | |
| 2/11/87 | 3 | 9-8 | WRAT[107] | **80 SS** <br> **9%** <br> 2E GE | | 89 SS <br> 23% <br> 3B GE | | **82 SS** <br> **12%** <br> 3B GE | |
| 2/11/87 | 3 | 9-8 | KTEA[108] | 91 SS <br> 27% <br> 8-9 AE <br> 3.2 GE | 9S SS <br> 37% <br> 9-3 AE <br> 3.7 GE | **84 SS** <br> **14%** <br> 8-0 AE <br> 2.6 GE | | 86 SS <br> 18% <br> 8-9 AE <br> 3.3 GE | |
| 2/11/87 | 3 | 9-8 | TOWL[109] | Unable to complete due to length of story | | | | | |
| 4/87 | 3 | 9-10 | CogAT-3[110] | 22% | 5% | 11% | 5% | | 21% |

---

[103] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 4/1/83
[104] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 4/26/84
[105] Student Interpretive Report for Comprehensive Test of Basic Skills, Cabell County School District, 6/6/86
[106] Results of Selective Screening for Gallaher Elementary School, undated
[107] Psychometric Summary for Gallaher Elementary School, 2/24/87
[108] Academic Assessment, Peggy Blatt, 2/26/87
[109] Academic Assessment, Peggy Blatt, 2/26/87
[110] WV State-County Testing Program, Student Test Record, 4/87

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3/1S/88 | 4 | 10-10 | BAT[111] | 4.7 GE* | | S.0 GE* | | 4.5 GE* | |
| 5/15/89[112] | 5 | 11-11 | BAT[113] | 4 GE* | 4 GE* | 4 GE* | | 4 GE* | |
| 3/90 | 6 | 12-9 | CogAT-3[114] | S8% | 26% | 20% | | | |
| 4/90 | 6 | 12-10 | BAT[115] | 6 GE* | | | | 3 GE* | |
| 4/90 | 6 | 12-10 | WRAT[116] | 6B GE | | | | 7B GE | |
| 5/16/90 | 6 | 13-0 | KTEA[117] | 92 SS<br>30%<br>11-6 AE<br>S GE | 84 SS<br>14%<br>10-0 AE | 85 SS<br>16%<br>10-6 AE | | 72 55<br>3%<br>9-9 AE<br>4 GE | |
| 9/10/91 | 8 | 14-4 | KBFAT[118] | 68 SS<br>2%<br>3.5 GE | | 75 SS<br>5%<br>4.6 GE | | 73 SS<br>4%<br>4.6 GE | |
| 9/30/91 | 8 | 14-4 | WJTA[119] | | 9S SS<br>37%<br>GE 8.0 | | 80 SS<br>9%<br>4.4 GE | 81 SS<br>10%<br>5.7 GE | |
| 9/30/91 | 8 | 14-4 | WRAT[120] | 74 SS<br>4%<br>4E GE | | 81 SS<br>10%<br>5B GE | | 66 SS<br>1%<br>4E GE | |
| 9/30/91 | 8 | 14-4 | TOWL[121] | 2% | | 16% | 2-5% | | |
| 3/20/00 | ~ | 22 | TABE[122]** | 77%<br>8.7 GE | 75%<br>9.1 GE | | 89%<br>10.3 GE | 2S%<br>4.9 GE | |
| 4/28/03 | ~ | 2S-11 | WRAT-3[123] | 75 SS<br>5%<br>5 GE | | 76 SS<br>5%<br>5 GE | | 79 SS<br>8%<br>6 GE | |
| 8/12/03-<br>8/13/03 | ~ | 26-2 | WRAT-3[124] | 84 SS<br>14%<br>8 GE | | 75 SS<br>5%<br>5 GE | | 77 SS<br>6%<br>6 GE | |
| 11/26/03 | ~ | 26-6 | WRAT-3[125] | 77 SS<br>6%<br>6 GE | | | | | |
| 2/16/04 | ~ | 26-9 | WJTA-3[126] | 88 SS<br>21%<br>8.0 GE | 91 SS<br>27%<br>7.7 GE | 91 SS<br>26%<br>7.7 GE | 72 SS<br>3%<br>2.3 GE | 84 SS<br>14%<br>5.7 GE | 76 SS<br>6%<br>6.1 GE |

Shaded rows = group-administered tests of questionable reliability

---

[111] IEP, Cabell County Schools, 6/9/88

[112] Date of report containing test scores. Date of testing not listed.

[113] IEP, Cabell County Schools, 5/15/89

[114] WV State-County Testing Program, Student Test Record, 3/90

[115] IEP, Cabell County Schools, 6/13/90

[116] IEP, Cabell County Schools, 6/13/90

[117] Specific Learning Disability Team Report, Cabell County Schools, Beverly Hills, MS, 6/11/90

[118] Data Sheet, Joy Krug

[119] Data Sheet, Joy Krug; Case Action Summary Sheet, Westview Jr, H.S. (also included Knowledge SS: 79, GE 4.4)

[120] Data Sheet, Joy Krug

[121] Data Sheet, Joy Krug

[122] Department of Corrections

[123] Report, Jonathan Venn, PhD, 3/30/04

[124] Report, James Hilkey, PhD, 5/7/04

[125] Report, James Evans, PhD

[126] Report, Dr. Gourley, Fed Med Center at Butner, NC, 3/25/04 – This testing also included Reading Fluency (85 SS, 16%, 7.6 GE), Writing Fluency (87 SS, 20%, 5.7 GE), and Applied Problems (82 SS, 12%, 6.4 GE).

\* In her collateral interview, Gayle Wolfe (fifth grade teacher) questioned the validity of BAT results in 1988 and 1989 (fourth and fifth grades) and also said testing in the 1987-88 and 1988-89 school years (fourth and fifth grades) was administered by a back-up teacher with no training in test administration.

\*\* As noted above, the TABE is a group-administered test with questionable validity. In this case, TABE results (except for math computation) were significantly inconsistent with scores on tests preceding and following its administration.

## Learning/Memory

| DATE | GR | AGE | TEST | SOURCE | VISUAL | AUDITORY |
|------|-----|------|------|--------|--------|----------|
| 2/11/87 | 3 | 9-8 | Jordan L-R Reversal | Psychometric Summary for Gallaher Elementary School, 2/24/87 | **7-9 DA** | |
| 2/16/04 | ~ | 27-9 | WJCS-III | Forensic Evaluation, MH Division, Federal Medical Center at Butner, NC, 3/25/04 | Visual-Auditory Learning: **75 SS (5%)** | |

## Visuomotor Integration

| DATE | GRADE | AGE | TEST | SOURCE | RESULTS |
|------|-------|------|------|--------|---------|
| 2/4/87 | 3 | 9-8 | Bender | Psychological Evaluation Report, Rodney Pardue, PhD, 3/3/87 | wnl |
| 2/11/87 | 3 | 9-8 | Jordan Reversal Test | Psychometric Summary, Gallaher Elementary School, 2/24/87 | **7-9 AE** |
| 3/1/90 | 6 | 12-9 | Bender Gestalt | Psychological Evaluation Report, Eric King, M.A., 3/2/90 | **3 errors (2 distortions, 1 rotation) - suggests visual/motor/ perceptual deficiency** |
| 9/91 | 8 | 14-4 | Visual Motor Integration Test | Data Sheet, Joy Krug | **82 SS 12%** |

Northwest Forensic Associates, LLC
Natalie Novick Brown, PhD

PA0423

## Communication

| DATE | GRADE | AGE | TEST | SOURCE | EXPRESSIVE | RECEPTIVE |
|------|-------|-----|------|--------|------------|-----------|
| 2/11/87 (re 11/25/96) | 3 | 9-8 | PVVT | Academic Assessment, Peggy Blatt, 2/26/87, Results of Selective Screening for Gallaher Elementary School, undated | . | **82 SS** **12%** **3 GE** **7-10 MA** |
| 9/30/91 | 8 | 14-4 | PPVT | Data Sheet, Joy Krug | | **73 SS** **4%** **9-8** AE |
| 2/16/04 | ~ | 27-9 | WJCS-III | Forensic Evaluation, MH Division, Federal Medical Center at Butner, NC, 3/25/04 | | 77 SS[127] 6% |

## Adaptive Behavior Assessment

| DATE | GRADE | AGE | TEST | SELF-RELATED | TASK-RELATED | INTERPERSONAL | AB QUOTIENT |
|------|-------|-----|------|--------------|--------------|---------------|-------------|
| 9/30/91 | 8 | 14 | ABES | 12ss | **0ss** | 7ss | **81 SS** **10%** |

## Behavior Rating (by teachers)

| DATE | GRADE | AGE | TEST | SOURCE | SIGNIFICANTLY HIGH RESULTS | SIGNIFICANTLY LOW RESULTS |
|------|-------|-----|------|--------|----------------------------|---------------------------|
| 2/11/87 | 3 | 9 | Devereux | | **Classroom Disturbance** **Inattentive-Withdrawn** | **Comprehension** **Need for Closeness to** Teacher |
| 3/1/90 | 6 | 12-9 | Burks | Psychological Evaluation Report, Eric King, MA, 3/2/90 | wnl | wnl |

[127] Verbal Comprehension score

**Appendix D**
**Resume**

**Natalie Novick Brown, PhD, SOTP**
**Northwest Forensic Associates, LLC**
Office: 524 Tacoma Ave. South   Tacoma, WA  98402
**Mailing Address: 31811 Pacific Hwy South, B-341**
Federal Way, WA 98003
Phone: (425) 275-1238
drnataliebrown@gmail.com

**Curriculum Vitae**

**Licensed Psychologist** (Washington State: #PY1965)

Certified Psychologist (CPQ #3258), Association of State & Provincial Psychology Boards

Certified Sex Offense Treatment Provider (Washington State SOTP #FC112)

Certified Psychologist/Evaluator for Department of Corrections, Division of Developmental Disabilities, Department of Social & Health Services (Washington State)

Certified Parenting Evaluator, University of Washington Department of Psychiatry and Behavioral Sciences

National Register of Health Service Providers in Psychology, #49892

Certified Polygraph Examiner / Post-conviction Sex Offender Testing (PCSOT)


## EDUCATION

| | |
|---|---|
| 2003-04 | International School of Polygraph (Fort Lauderdale, FL) and Post-Conviction Sex Offender Polygraph Training |
| 1995-96 | Internship, Sex Offense Treatment Provider (SOTP) |
| 1994-95 | Post-Doctorate in FASD, University of Washington Fetal Alcohol and Drug Unit, Department of Psychiatry and Behavioral Sciences, School of Medicine |
| 1993-94 | Parenting Evaluation Training Program, Department of Psychology, University of Washington |
| 1989-94 | Ph.D. in Clinical Psychology, University of Washington |
| 1978-79 | M.H.A. in Health Care Administration, University of Washington |
| 1974-75 | M.L.S. in Library and Information Sciences, University of Washington |
| 1964-68 | B.A. in Sociology (Psychology minor), University of California at Los Angeles (UCLA) |

## CLINICAL EXPERIENCE

| | |
|---|---|
| 1996 – present | **Clinical and Forensic Psychologist** |

Professional consultation/evaluation and related testimony in criminal and civil matters, including adult/juvenile sex offense/risk assessment evaluation (e.g., civil commitment under Sexually Violent Predator laws); adult, adolescent, and child psychological evaluation (general psychological assessment, competency, dependency, FASD, neurodevelopmental disabilities (e.g., autism spectrum disorder, ADHD, learning disabilities), child abuse/neglect); post-conviction/commitment treatment planning; parenting evaluation; and independent medical examination (IME)

Psychological assessment of recidivists referred by King County Mental Health Court and King County Drug Court

Seattle Police Department: victim assessment and consultation regarding neurodevelopmental impairment

Special Commitment Center (WA): community-based therapy for released Sexually Violent Predators

Group therapy (1996-2000)/individual therapy (1996-present)

Supervision of doctoral students and psychologists obtaining SOTP certification

**2005 – present**    **Clinical Assistant Professor** (courtesy staff), Department of Psychiatry and Behavioral Sciences, School of Medicine, University of Washington

Research involving FASD prevention and treatment of substance-abusing mothers, interventions, assessment, brain-behavior impairment, and suggestibility.

**1994 - 1995**    **Postdoctoral Fellowship / Faculty Appointment** (1994-2000), Fetal Alcohol and Drug Unit (Dr. Ann Streissguth), University of Washington

Training re FASD and other neurodevelopmental disorders, maternal alcohol use assessment, and lifelong adaptive assessment/secondary disabilities. Courtesy appointment as Clinical Instructor.

| 1992 - 1994 | **Pre-doctoral Internships** (University of Washington) |

(1) forensic evaluation and expert testimony

(2) individual psychotherapy

(3) pain management assessment/treatment

(4) rehabilitation psychotherapy (including traumatic brain injury)

## PRE-DOCTORAL WORK EXPERIENCE

| 1987-89 | Columbia Hospital / Omni Substance Abuse Clinic - CEO / Board of Directors |
| 1981-87 | Toppenish Hospital (WA) - CEO |
| 1979-81 | Virginia Mason – Assistant CEO / McLeary (WA) Hospital CEO |
| 1977-79 | Providence Medical Center - Medical Librarian |

## RESEARCH

| 2005 – present | Clinical Assistant Professor (courtesy appointment) - Fetal Alcohol and Drug Abuse Unit, Department of Psychiatry and Behavioral Medicine, University of Washington |

- Research on suggestibility and FASD prevention/treatment under Parent-Child Assistance Program (PCAP)

| 1994 - 1995 | Postdoctoral Fellow - Fetal Alcohol Unit, University of Washington |

- Research on FASD in Washington State prisons

| 1991 - 1994 | Dissertation |

- Relation Between Psychological Correlates of Alcoholism Risk and Stress-Response Dampening Across the Blood Alcohol Curve

| 1991 - 1993 | Research Coordinator |

- Prediction of High Risk Drinking in Young Adults

| 1990 - 1992 | Research Coordinator |

- Alcohol and Social Influence

| 1989 - 1991 | Research Coordinator |

- Self-Esteem in Young Adults

## PEER REVIEW

*Journal of Mental Health and Clinical Psychology*
Sciaccess Publishers

*Epigenetics*
Taylor & Francis

*Criminal Behaviour and Mental Health*
Wiley Online

*International Journal of Law and Psychiatry*
International Academy of Law and Mental Health, Harvard University

*Addiction*
Society for the Study of Addiction

## PUBLICATIONS

Novick Brown, N. (submitted). Fetal alcohol spectrum disorders (FASD): Intellectual disability equivalence. In G. Becker, K. Hennicke, & M. Klein (Eds.), *Adults with fetal alcohol spectrum disorders: Diagnosis, screening, intervention, and addiction prevention. Vol. 2.* Berlin, Germany: De Gruyter Publisher.

Novick Brown, N. (submitted). Fetal alcohol spectrum disorders (FASD) and risk of violence. In J.M. Fabian (Ed.), *Violence risk in criminal offender populations.* Oxford, UK: Wiley.

Grant, T.M., Graham, J.C., Carlini, B.H., Ernst, C.C., & Novick Brown, N. (2018). Use of marijuana and other substances among pregnant and parenting women with substance use disorders: Changes in Washington State after marijuana legalization. *Journal of Studies on Alcohol and Drugs, 79,* 79-87.

Brown, J.M., Haun, J., Zapf, P.A., & Novick Brown, N. (2017). Fetal alcohol spectrum disorder (FASD) and competency to stand trial (CST): Suggestions for a 'best practices' approach to forensic evaluation. *International Journal of Law and Psychiatry, 52,* 19-27.

Brown, J., Haun, J., Novick Brown, N., & Zapf, P.A. (2016). The deleterious effects of fetal alcohol spectrum disorder on competency to stand trial. *The Journal of Special Populations, 1,* 1-7.

Greenspan, S., Novick Brown, N., & Edwards, W. (2016). FASD and the concept of "intellectual disability equivalence." In M. Nelson & M. Trussler (Eds.), *Law and ethics in fetal alcohol spectrum disorder.* Amsterdam: Springer.

Grant, T.M., Novick Brown, N., & Dubovsky, D. (2015). Screening for Fetal Alcohol Spectrum Disorders: A critical step toward improving treatment success. In: G. Becker, K. Hennicke, & M. Klein (Eds), *Addicted adults with fetal alcohol spectrum disorders: Diagnosis, screening, and intervention*. Berlin, Germany: De Gruyter Publisher.

Novick Brown, N., Burd, L., Grant, T. M., Edwards, W., Adler, R., & Streissguth, A. (2015). Prenatal alcohol exposure: An assessment strategy for the legal context. *International Journal of Law and Mental Health*.

Novick Brown, N., & Connor, P.D. (2014). Executive dysfunction and learning in children with fetal alcohol spectrum disorders (FASD). *Cognitive Sciences, 8,* 47-105.

Novick Brown, N., & Connor, P.D. (2014). Impact of executive functioning on learning in fetal alcohol spectrum disorders (FASD). In: Bennett, K.P. (Ed.), *Executive functioning: Role in early learning processes, impairments in neurological disorders and impact of cognitive behavior therapy (CBT)*. Hauppauge, NY: Nova.

Grant, T., Graham, J.C., Ernst, C.C., Peavy, K.M., & Novick Brown, N. (2014). Improving pregnancy outcomes among high-risk mothers who abuse alcohol and drugs: Factors associated with subsequent exposed births. *Children and Youth Services Review, 46,* 11-18.

Novick Brown, N., Clarren, S., & Grant, T. (Winter 2014). Fetal alcohol spectrum disorders: What judges and other legal professionals need to know. *Judges' Page, Court Appointed Special Advocates*.

Rich, S.D., & Novick Brown, N. (2014). A case for a diagnostic code for neurodevelopmental disorder associated with prenatal alcohol exposure: A child/adolescent psychiatrist and forensic psychologist speak out. *Psychiatric News, http://psychnews.psychiatryonline.org/newsarticle.aspx?articleid=1792237*.

Novick Brown, N., & Rich, S.D. (Winter 2013). A neurodevelopmental paradigm for fetal alcohol spectrum disorder. *Judges' Page, Court Appointed Special Advocates*.

Grant, T.M., Novick Brown, N., Graham, J.C., & Ernst, C.E. (2013). Substance abuse treatment outcomes in women with fetal alcohol spectrum disorder. *International Journal of Alcohol and Drug Research,* http://ijadr.org/index.php/ijadr/article/view/112/213.

Brown, N.N., Wartnik, A., & Rich, S.D. (2013). Diagnosing FASD in the era of DSM-5: Good news for the forensic context. *Fetal Alcohol Forum, 10,* 34-37.

Grant, T.M., Novick Brown, N., Dubovsky, D., Sparrow, J., & Ries, R. (i2013). The impact of prenatal alcohol exposure on addiction treatment. *Journal of Addiction Medicine, 7,* 87-95.

Grant, T.M., Novick Brown, N., Graham, J.C., Whitney, N., Dubovsky, D., & Nelson, L.A. (2013). Screening in treatment programs for Fetal Alcohol Spectrum Disorders that could affect therapeutic progress. *International Journal of Alcohol and Drug Research, 2,* 37-49.

Novick Brown, N., Adler, R.S., & Connor, P.D. (2012). Conduct-disordered adolescents with fetal alcohol spectrum disorder: Intervention in secure treatment settings. *Criminal Justice and Behavior, 39,* 789-812.

Novick Brown, N., O'Malley, K., & Streissguth, A.P. (2012). FASD: Diagnostic dilemmas and challenges for a modern transgenerational management approach. In S. Adubato & D. Cohen (Eds.), *Prenatal Alcohol Use and Fetal Alcohol Spectrum Disorders: Diagnosis, Assessment, and New Directions in Research and Multimodal Treatment.* Bentham Online Publishing.

Novick Brown, N., Gudjonsson, G., & Connor, P. (2011). Suggestibility and Fetal Alcohol Spectrum Disorders (FASD): I'll tell you anything you want to hear. *Journal of Psychiatry and Law, 39,* 39-71.

Novick Brown, N. (Spring 2011). Evidence-based interventions in children with Fetal Alcohol Spectrum Disorders. *Paradigm, 16,* 12-17.

Novick Brown, N., Wartnik, A.P., Connor, P.D., & Adler, R.S. (2010). A proposed model standard for forensic assessment of FASD. *Journal of Psychiatry and Law, 38,* 383-418.

Novick Brown, N. (June 2008). FASD Experts: Multidisciplinary forensic assessment for a multidimensional condition. *Iceberg, 18.*

Novick Brown, N. (2007). ADHD and FASD: Comorbidity and its effect on sexual behavior problems. In K O'Malley (Ed.), *ADHD and FASD: Diagnosis, natural history, and therapeutic issues across the lifespan.* Hauppauge, NY: Nova Pub.

Novick (Brown), N. (1998). FAS: Preventing and treating sexual deviancy. In A.P. Streissguth & J. Kanter (Eds.), *The challenge of fetal alcohol syndrome: Overcoming secondary disabilities.* Seattle: University of Washington Press.

Novick (Brown), N.J. (1996). *Sexual victimization and inappropriate sexual behavior in children: Recommendations for evaluation and treatment.* Proceedings of 1996 International Conference on Fetal Alcohol Syndrome, Seattle, Washington.

Novick (Brown), N.J., & Streissguth, A.P. (1995). Identifying clients with possible fetal alcohol syndrome: Fetal alcohol effects in the treatment setting. *Treatment Today, 7(3),* 14-15.

Novick (Brown), NJ, & Streissguth, AP (1995). Some thoughts on the treatment of adults and adolescents impaired by fetal alcohol exposure. *Treatment Today, 7(4),* 20-21.

Novick (Brown), N.J., Cauce, A.M., & Grove, K. (1994). Competence self-concept.  In B.A. Bracken (Ed.), *Handbook of self-concept.*  New York: Wiley.

Novick (Brown), N.J., & Brown, J.D. (1992).  *The influence of self-esteem on response to mood.* Paper presented, 100th Annual Convention of the American Psychological Association, Washington, D.C., August, 1992.

Brown, J.D., Novick (Brown), N.J., Lord, K.A., & Richards, J.M. (1992).  When Gulliver travels: Social context, psychological relatedness, and self-appraisals.  *Journal of Personality and Social Psychology, 62,* 717-727.

Norris, J, Novick (Brown), N.J., & Kerr, K.L. (1992).  *Alcohol and violent pornography: Impact of social influence on sexual arousal.*  Poster presented at the Research Society on Alcoholism Meeting, San Diego, California, June, 1992.

Brown, J.D., & Novick (Brown), N. (1991).  *Social context, psychological relatedness, and self-appraisals.* Paper presented at the 99th Annual Convention of the American Psychological Association, San Francisco.

## INVITED PRESENTATIONS, WORKSHOPS, TRAININGS

0920/18      FASD: Screening and Assessment. LOPD. Albuquerque, NM.

05/11/17      FASD in the Capital Context. Capital Habeas Seminar, Chattanooga, TN.

06/03/16      Fetal Alcohol Spectrum Disorders in the Parenting Context. 53rd Annual Conference, Association of Family and Conciliatory Courts. Seattle, WA.

05/18/16      FASD and Sexual Offending in Indian Country. Webinar, Health and Human Services.

04/29/16      Confabulation, Malingering, Memory, and Suggestibility: Clinical and Forensic Considerations. American Institute for the Advancement of Forensic Studies, St. Paul, MN.

09/11/15      FASD: Identification, Assessment, and Treatment. Co-presented with Therese Grant and Paul Connor. Western State Hospital, Tacoma, WA.

08/20/15      FASD and Sexually Inappropriate Behavior. FASD Train-the-Trainer Workshop for Casey Family Programs, Indian Child Welfare, University of Washington, Seattle, WA.

07/13/15      (1) One Size Does Not Fit All: Forensic Assessment of Sex Offenders with FASD. XXXIV International Conference on Law and Mental Health, Vienna, Austria (2) FASD in the Courtroom: FASDExperts Approaches Its Eighth Year

(3) Panel: The Central Role of Neuropsychology in Forensic FASD Assessment (4) Panel: Forensic Assessment of FASD: The Impact of Suggestibility. XXXIV International Conference on Law and Mental Health, International Academy of Law and Mental Health, Vienna, Austria.

06/25/15    (1) Plenary: Identifying Fetal Alcohol Syndrome (2) Panel: Fetal Alcohol Syndrome: Experts and Presentation at Evidentiary Hearing. Capital Habeas Unit (CHU) National Conference, Denver, CO.

05/29/15    FASD: What You Should Know. Court Improvement Training Academy (CITA), University of Washington Law School, Suquamish Nation, Poulsbo, WA.

10/23/14    Insights from Poverty to Death Row: ND-PAE Diagnosis and DSM-5. American Academy of Child and Adolescent Psychiatry Annual Meeting, San Diego, CA.

05/23/14    Plenary: Forensic Assessment of FASD: Update on Diagnosis and Latest Research. FASD and the Law Conference, Woodbury, MN

05/14/14    FASD: Diagnosis and Intervention. Washington State Developmental Disabilities Administration, Seattle, WA

04/29/14    Sex Is *Not* a Four-Letter Word: FASD and Sexuality. Living With FASD: 2014 Summit Conference (international webinar)

02/05/14    FASD: Dawn of a New Era in Diagnosis. Minnesota Organization on FAS (MOFAS), MN (webinar)

11/26/13    Fetal Alcohol Spectrum Disorder. Washington State Developmental Disabilities Administration, Kent, WA

10/16/13    Neurodevelopmental Disorders in the DSM-5. Skype workshop for Pathways Counseling Center, St. Paul, MN

09/27/13    FASD: Back (and to) the Future: 1973 – 2013. 40th Anniversary Professional Summit, New Jersey Task Force on FASD, Atlantic City, NJ

09/25/13    FASD: Practical Supports for the Legal Context. 2013 FASD Summit, The Arc of Arkansas, Little Rock, AR

08/28/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Missoula, MT

08/22/13    Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Fargo, ND

| 08/04/13 | FASD: Moving Beyond Prevention to Practical Supports. The Arc: 2013 National Convention. Bellevue, WA |
|---|---|
| 07/26/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Boise, ID |
| 07/15/13 | FASD and Criminal Justice: Cognitive and Social Deficits Associated With FASD. 33rd International Congress on Law and Mental Health, Amsterdam, Netherlands. |
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center. Cheyenne, WY |
| 06/25/13 | Developmentally Delayed Offenders in the Criminal Justice System. Frontier Regional FASD Training Center, Cheyenne, WY |
| 05/03/13 | Understanding and Treating Developmentally Delayed Sex Offenders. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 04/06/13 | Seeking the Standard of Care in Custody Assessments in WA State. AFCC-WA Spring Conference; Seattle, WA |
| 09/06/12 | Understanding the Link Between FASD and Sexual Offending. Indian Health Service; Seattle, WA |
| 07/20/12 | Forensic Assessment of Developmental Disabilities. American Institute for the Advancement of Forensic Studies; St. Paul, MN |
| 07/13/12 | FASD and Competency. WI Association of Criminal Defense Lawyers; Stevens Point, WI |
| 04/19/12 | Changing Public Policy in the Juvenile Courts: What Works? Fifth National Biennial Conference on Adolescents and Adults with FASD: It's a Matter of Justice, Vancouver, BC, Canada |
| 03/29/12 | Fetal Alcohol Spectrum Disorders. Death Penalty Institute, Lexington, KY |
| 02/03/12 | Alcohol Related Birth Disorders and the Law. Mid-year ABA Conference, Interagency Coordinating Committee on FASD in Collaboration with U.S. Dept. of Justice and Minnesota Organization on FAS, New Orleans, LA |
| 02/02/12 | FASD and Neurobehavioral Issues in the Criminal Justice System. Capital Defense Project of SE Louisiana, New Orleans, LA |

11/18/11    Assessing and Understanding Fetal Alcohol Spectrum Disorders in Capital Clients. Virginia Bar Assoc., 19th Annual Capital Defense Workshop, Richmond, VA

10/07/11    FASD and the Criminal Justice System. Seattle City Attorney's Office and University of Washington, Seattle, WA

09/21/11    FASD: Preventing and Treating Sexual Deviancy. Indian Health Service FASD Training, Seattle, WA

07/09/11    FASD and Competency. Capital Mitigation – Beyond Atkins, Center for American and International Law; Houston, TX

06/23/11    FASD in the Courtroom. Ninth Annual Statewide Conference, Arizona Public Defenders Association; Tempe, AZ

05/20/11    FASD and Intellectual Disability/Mental Retardation. Metropolitan Public Defender, Oregon Capital Resource Center, Oregon Criminal Defense Lawyers Association; Portland, OR

03/11/11    Forensic Aspects of Fetal Alcohol Spectrum Disorders. Sponsored by Pathways Counseling Center, MOFAS, Minnesota DOC, MN Community Corrections Association, & American Institute for the Advancement of Forensic Studies; St. Paul, MN

10/27/10    FASD: Its Relevance Throughout the Legal Process from Competency to Stand Trial to Clemency. 2010 Appellate Judicial Attorneys Institute, Burlingame, CA

10/02/10    Forensic Assessment of FASD in the Habeas Context. Federal Defenders Annual Death Penalty Conference, Boise, ID

07/16/10    Team Approach to Litigating FASD (plenary). Center for American and International Law, Plano, TX

07/10/10    Fetal Alcohol Spectrum Disorder in the Courtroom: The 20th Anniversary of Dr. Ann Streissguth (plenary + break-out). NAACP LDF, Airlie, VA

04/22/10    Forensic Assessment of FASD with State-of-the-Art Facial Analysis, Diffusion Tensor Imaging and MRIs. 7th National Seminar on the Development and Integration of Mitigation Evidence (plenary). American Bar Association, Seattle, WA

04/17/10    Suggestibility in FASD: Forensic Assessment and Implications. 4th International Conference on Fetal Alcohol Spectrum Disorder, Vancouver, BC, Canada

| | |
|---|---|
| 03/31/10 | Fetal Alcohol Spectrum Disorder and Justice. Alcohol Healthwatch, Parnell, New Zealand. (Abbreviated presentations also provided on 4-1-10 to New Zealand Ministry of Health and Ministry of Justice.) |
| 02/25/10 | Fetal Alcohol Spectrum Disorder (FASD). Texas Criminal Defense Lawyers Association, Austin, TX |
| 02/12/10 | FASD and Justice: A Multidisciplinary Assessment Model for Adults and Adolescents. CACJ/CPDA Capital Defense Seminar, Monterey, CA. |
| 02/06/10 | Fetal Alcohol Syndrome: Practical Tools. 3rd Interdisciplinary Program: UW School of Law & Washington Death Penalty Assistance Center, Seattle, WA. |
| 03/11/09 | FASD in the Legal System: A Multidisciplinary Assessment Model for Adults and Adolescents. 3rd International Conference on Fetal Alcohol Spectrum Disorder, Victoria, BC. |
| 11/18/08 | Screening for FASD in Family Practice. Family Practitioners, University of Washington/Swedish Hospital, Family Practice Medical Residents In-service. |
| 10/25/08 | Cross-Examination of Adverse Expert Witnesses in SVP Commitment Trials. Sex Offender Commitment Defense Association (SOCDA), Atlanta, GA |
| 05/30/08 | Fetal Alcohol Syndrome and Fetal Alcohol Effect: Identifying Clients and Understanding Consequences. Fifth National Seminar on the Development and Integration of Mitigation Evidence, Habeas Assistance & Training Counsel Project, Baltimore, MD |
| 11/03/07 | Direct and Cross Examination of Experts in SVP Cases. Sex Offender Commitment Defense Association (SOCDA), San Diego, CA |
| 08/18/07 | Fetal Alcohol Syndrome / Fetal Alcohol Effects. 12th Annual Federal Habeas Corpus Seminar, Nashville, TN |
| 05/23/07 | Fetal Alcohol Spectrum Disorders: History, Diagnosis, and Mitigation Issues. Capital Federal Public Defender Unit (capital habeas and trial attorneys, Federal District of Nevada) |
| 04/14/07 | What Attorneys and Policy Makers Need to Know About FAS and FASD. American Bar Association/Harvard Law School National Conference on Children and the Law, Cambridge, MA |
| 02/18/07 | Fetal Alcohol Spectrum Disorders (FASD). California Attorneys for Criminal Justice/California Public Defender Association (CACJ/CPDA) Annual Death Penalty Conference, Monterey, CA |

06/30/06    Sexually Violent Predator Evaluation, Risk Assessment, and Testimony, Florida Public Defenders Sexually Violent Predator Conference, Orlando, FL

04/19/06    Screening Protocol for Fetal Alcohol Spectrum Disorders (FASD). King County Mental Health / Drug Courts, Seattle, WA

02/26/05    FASD: Problems of Witness Suggestibility and False Confessions. International FASD Conference, Victoria, British Columbia, Canada


## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1990 – present | American Psychological Association (APA) |
| 2008 – present | American Society-Law Society (APA) |
| 2015 – present | International Association of Law and Mental Health (IALMH) |
| 2005 – present | Association for the Treatment of Sex Abusers (ATSA) |
| 2004 – present | Association of Family & Conciliatory Courts (AFCC – National) (WA-AFCC - Washington State; Board of Directors, Treasurer; Chair: Quality Assurance and Ethics Committee) |
| 2000 – present | American College of Forensic Examiners, Diplomate |
| 2011 – present | Midwest Alliance on Shaken Baby Syndrome (Board of Directors) |
| 2001 – 2003 | Jacksonville Youth Authority Advisory Board |
| 1996 – 2000 | Chairman, Social Issues Committee, Washington State Psychological Association |
| 1994 – 2000 | Washington State Psychological Association, Board of Directors |

JULIAN DAVIES, MD | 4245 ROOSEVELT WAY NE
SEATTLE, WA 98105

T 206-313-0252
F 206-598-3040
JOOLIAN@UW.EDU

MARCH 4, 2019

# CHADRICK FULKS - MEDICAL EXPERT REPORT

Chadrick Evan Fulks (DOB 5/16/77) is a 41-year-old man referred to me by the Capital Habeas Unit of the Federal Community Defender for the Eastern District of Pennsylvania. His counsel asked me to evaluate whether Mr. Fulks has a Fetal Alcohol Spectrum Disorder and to consider other neurodevelopmental risks in his history.

## FASD BACKGROUND

Fetal Alcohol Spectrum Disorder (FASD) is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. One diagnosis under this umbrella is Static Encephalopathy / Alcohol Exposed, also known as Alcohol-Related Neurodevelopmental Disorder (ARND). This describes a pattern of brain damage associated with prenatal alcohol exposure.

The brain injuries caused by drinking during pregnancy are variable, but can include such outcomes as lower IQ, ADHD (attention deficit/hyperactivity disorder), difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions - "higher-level" cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem-solving. Individuals with FASDs have daily functioning skills and life outcomes that are often more impaired than their IQ alone would predict.[1]

Fetal Alcohol Syndrome (FAS) is the most familiar diagnosis on the fetal alcohol spectrum. FAS is a permanent birth defect syndrome caused by prenatal alcohol exposure, characterized by prenatal and/or postnatal growth deficiency, a unique cluster of minor facial anomalies, and central nervous system (CNS) abnormalities.

A diagnosis of FAS requires all of the above features (growth, face, brain) to be confirmed. For alcohol-exposed individuals who lack one or more of the criteria (such as growth deficiency or the facial features of FAS), diagnoses on the broader fetal alcohol spectrum like Static Encephalopathy / Alcohol Exposed may be appropriate.

---

[1] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. Journal of Developmental & Behavioral Pediatrics, 25(4), 228–238.

Such non-FAS diagnoses are actually associated with a higher risk of adverse life outcomes than FAS is, which is thought to be caused by lack of early recognition and supports.

The field of FASD is over 40 years old, and uses well-established diagnostic criteria, most notably the Institute of Medicine (IOM) guidelines,[2] the University of Washington 4-Digit Code,[3] the Centers for Disease Control (CDC) definition of FAS,[4] and the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5).[5]

I am a board-certified pediatrician licensed in the State of Washington, and a Fellow of the American Academy of Pediatrics. I was trained at Yale, UCSF, and the University of Washington. I am a Clinical Professor of Pediatrics at the University of Washington School of Medicine, where for the past fifteen years I have evaluated children and adults at the longest-running FAS diagnostic clinic in the country. Since FAS is a birth defect syndrome, many experts in the field have pediatric backgrounds; the diagnostic criteria for FAS are the same for children and adults.

I have published articles in the peer-reviewed literature on prenatal alcohol/drug exposures, and present on these topics at regional and national conferences. I have been been retained in cases relating to FASDs by defense counsel in Arizona, California, Georgia, Illinois, Louisiana, Nebraska, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington. I have qualified as an expert witness in state court in Nevada, Oregon, Pennsylvania, and Washington. A copy of my resume is attached as Exhibit A.

## MEDICAL EXPERT OPINION

It is my opinion to a reasonable degree of medical certainty that Mr. Fulks has Static Encephalopathy / Alcohol Exposed, also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND). This is a diagnosis under the umbrella of Fetal Alcohol Spectrum Disorders (FASD).

In layman's terms, Mr. Fulks has structural and functional evidence of significant brain damage that is consistent with prenatal alcohol injuries. His brain was further impacted by childhood adversity, head injuries, and extensive substance abuse, but it is my opinion to a reasonable degree of medical certainty that prenatal alcohol exposure was a primary cause of his disabilities.

---

[2] Stratton, K. R., Howe, C. J., Battaglia, F. C., Institute of Medicine (U.S.). Committee to Study Fetal Alcohol Syndrome, National Institute on Alcohol Abuse and Alcoholism (1996). Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment. National Academies Press.

[3] Astley, S. J., & Clarren, S. K. (1997). Diagnostic Guide for Fetal Alcohol Syndrome and Related Conditions: The 4-Digit Diagnostic Code, 1st edition. Seattle, WA. University of Washington Publication Services.

[4] Bertrand, J., Floyd, R., Weber, M., O'Connor, M., Riley, E., Johnson, K., & Cohen, D. (2004). Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis. Centers for Disease Control and Prevention, Atlanta, GA.

[5] American Psychiatric Association DSM-5 Task Force (2013). Diagnostic and Statistical Manual of Mental Disorders : DSM-5. American Psychiatric Association, Washington, DC.

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies    Page 2

PA0438

## MATERIALS RELIED UPON

Available for my review at the time of this report were the following materials:

VOLUME I

Cabell County Board of Education Psychological Evaluation, March 2, 1990

Otto Klassen, M.D. Psychiatric Report, December 3, 1991

Cabell County School Records

Northeast Indiana Special Education Records

Andis Alternative Education Center Records

Report of David Bachman, M.D., July 31, 2003

Trial Testimony of David Bachman, M.D., June 24, 2004

Report of Arlene Andrews, Ph.D., May 13, 2004

Trial Testimony of Arlene Andrews, Ph.D., June 24, 2004

Report of James Evans, Ph.D.

Trial Testimony of James Evans, Ph.D., June 23, 2004

Report of Dr. Fred Bookstein, February 9, 2004

Trial Testimony of Dr. Fred Bookstein, June 24, 2004

Report of Christos Davatzikos, Ph.D.

Testimony of Christos Davatzikos, Ph.D.

VOLUME II

Draft Report of Ruben Gur, Ph.D., June 13, 2004

Trial Testimony of Ruben Gur, Ph.D., June 16, 2004

Trial Testimony of Howard Becker, Ph.D., June 23, 2004

Report of James Hilkey, Ph.D., May 7, 2004

Report of Jonathan Venn, Ph.D., March 30, 2004

Report of Elin Berg, M.D., Ph.D., August 2, 2003

Report of Jonathan Walker, M.D., January 14, 2004

Forensic Evaluation by the Federal Medical Center, February 19, 2004

Testimony of James Hilkey, Ph.D., February 23, 2010

Testimony of James Hilkey, Ph.D., February 24, 2010

Testimony of Margaret Melikian, D.O., February 24, 2010

Declaration of James Hilkey, Ph.D., June 2, 2008

Declaration of Margaret Melikian, D.O., May 21, 2008

VOLUME III

Brain Imaging Reports

PET scans from the file of Ruben Gur Brain Imaging Reports, December 5, 2003

PA0439

Photo of Chad Fulks

Photo of Ronnie Fulks from the file of David Bachman

Photo of Fulks Children

VOLUME IV

Cabell Huntington Hospital Records

John Marshall University Pediatrics Records

LaGrange Community Hospital Records

St. Mary's Hospital Records

Federal Medical Center Prison Records

Lexington County Prison Records

VOLUME V

Psychological Evaluation by Natalie Novick Brown, Ph.D., February 11, 2019

Cabell County School Records, received in 2016 from Cabell County Schools

Trial Testimony of Kevin Holbrook, June 22, 2004

Comprehensive Test of Basic Skills scores

Woodcock-Johnson Summary and Score Report, February 16, 2004

VOLUME VI

Northeast Indiana Special Education Cooperative Records

Declaration of Joy Krug, November 15, 2016

As is standard in an FASD evaluation, at the beginning of my engagement I requested any available family history, pregnancy and prenatal exposure history, childhood and adult medical records, social history, school and developmental records, occupational history, criminal justice history, and client mental health records, as well as the results of any neurologic or neuropsychological testing. I have rendered my opinion based on materials available to me at this time and retain the right to revise my opinion should new information become available.

I have conducted my own independent records review and in-person clinical interview of Mr. Fulks in 2016. I will summarize items from records review relevant to my analysis, interspersed with information I obtained directly from the client. For a more comprehensive social history and summaries of academic testing I would refer the reader to the very thorough report of Dr. Natalie Novick Brown.

Childhood-era information will refer to the client as "Chad," with adult references as "Mr. Fulks." Numbers in parentheses are Bates numbers from the records I received.

PA0440

## PRENATAL EXPOSURES AND PREGNANCY HISTORY

1.  Dr. Brown interviewed Chad's father Roger Fulks, who reported witnessing Chad's mother Diana use alcohol in a high-risk pattern during her pregnancy with Chad:

He and Diana both drank alcohol throughout her pregnancies with Ronnie, Chad, and Shannon. Diana drank beer and wine, typically until she became intoxicated or the alcohol was gone. During the time she was pregnant with Chad, they both drank alcohol at least every weekend. When they moved to Pine Street in Huntington, they began drinking daily and continued drinking daily when they lived on Leeward Avenue. Diana drank with the next-door neighbor while he was at work, and he would find her drunk when he got home at night. This was a daily scenario.

One time, Diana was arrested and had to go to jail for being "drunk and disorderly."

Roger never saw Diana cut back on her drinking, and she never told him she was cutting down due to pregnancy. He observed no change in her drinking pattern before, during, and after her pregnancy with Chad or with any of their children.

Diana never received prenatal care for any of her pregnancies. The older children, including Chad, were born in Dr. McClelland's office.

He and Diana smoked cigarettes when they drank. Typically, they shared a pack-and-a-half of cigarettes between the two of them daily. Diana did not reduce or stop smoking during her pregnancies. She was pretty healthy during the pregnancies and did not use any medications or illegal drugs. (Psychological Evaluation by Natalie Novick Brown, Ph.D., 1636-7)

2.  Diana's youngest brother Kevin came to live with them in 1973:

Kevin moved in and out of their house numerous times during the years the Fulks children were growing up. Kevin described the heavy drinking and constant fighting in the home. His older brother and wife also lived with Diana and Roger numerous times. Both Roger and Diana would be drinking, and their fights would start "over nothing." Kevin described getting in the middle of fistfights, trying to stop them. Kevin reported that Diana drank heavily around this time, including drinking throughout her pregnancies. He observed her going to bed drunk many times when she was pregnant. (Dr. Brown, 1687)

3.  In testimony, Chad's uncle Kevin described babysitting for Chad's parents so they could go out to bars, including the night Diana went into labor with Chad. He affirmed that he witnessed Diana drinking during her pregnancies with Chad and his other siblings, and that she drank "a lot of whiskey, a lot of it" during that time. (Testimony of Kevin Holbrook, 1830)

4.  A neighbor on Pine Street described Diana drinking "too much" when Chad was a toddler, getting frequently intoxicated, mainly on the weekends. (Dr. Brown, 1623)

5.  Chad's maternal cousin described Diana's drinking habits when Chad was young:

She recalled seeing Roger and Diana drinking alcohol throughout her childhood, adding they both were "addicted" to alcohol. She saw Diana so intoxicated once, she urinated on herself. Another time, Diana vomited and "just sat in it." This was around 1982/83 when Christina was 12 or 13. She recalled Diana drinking and smoking cigarettes during the pregnancy with Shannon but said she was too young to be aware of Diana's alcohol use during the pregnancy with Chad. The Fulks would spend money on beer and cigarettes before buying clothes for their children. (Dr. Brown, 1625)

6. Dr. Andrews testified that based on family interviews, Chad's father and mother "both started drinking heavily early, and she drank through her pregnancies with all of the sons." (Trial Testimony of Arlene Andrews, 239)

## BIRTH HISTORY

1. Chad's father reported a normal pregnancy, with delivery in the doctor's office. (Otto Klassen, M.D. Psychiatric Report, 5) Mother reported birthweight of 9 lbs 4 oz on a school form. (Personal Data Sheet - Speech and Language, Cabell County School Records, 30) However, Dr. Andrews found the parents' early memories of Chad to be remarkably vague, so this may be incorrect.

2. Mr. Fulks did not recall his birth weight precisely but thought it might have been ten pounds. He did not know of any birth complications.

## GROWTH HISTORY

1. At age 11 his height was measured at 56 3/4" (53rd percentile) with weight of 83 pounds (59th percentile). (John Marshall Medical Services, 997)

2. At 12 years and 9 months his height was 61" (54th percentile), weight 103 pounds (60th percentile). (Children's Medical Center of Marshall University, 999)

3. At 14 years and 3 months his height was 5'7.5" (73rd percentile), weight 131 pounds (73rd percentile). (Lincoln County School Records, 114)

4. At age 26 his height was reported to be 6'0" (81st percentile) with a weight of 225 pounds (97 percentile). (Report of Jonathan Venn, Ph.D., 712)

5. None of these available adolescent and adult measures are growth deficient, but we lack reliable early childhood measures.

## MEDICAL HISTORY

1. Mr. Fulks denied a childhood history of birth defects, seizures, loss of milestones, and pediatric heart, kidney, gastrointestinal, or orthopedic problems. He reported some ear infections when young, but no history of hearing loss or ear tubes. He and his siblings were rarely taken to the doctor.

2. Elementary school vision testing was in the 20/25-30 range. Hearing screening passed most evaluations except in 3rd grade. (Cabell County Schools, page 12) Vision at age 14 was 20/50 on the right, 20/30 on the left. (Lincoln County Schools, 114)

3. Mr. Fulks described childhood onset of motor and vocal tics. His motor tics have involved eye blinking and right neck/shoulder contractions that he suppresses by holding and squeezing his right trapezius muscle a lot. In childhood he would purse his lips and make a repeated airy sound that annoyed his siblings; he denied more complex tics. These tics were better in his teens, but the motor tics recurred during his trial prep and in the year preceding my interview, which he ascribed to stress.

He thought the recent Artane prescription has helped his tics a bit but wanted to try a higher dose.

4.  Records described multiple episodes of head injury resulting in loss of consciousness (not consistently evaluated by medical professionals, no report of emergent head imaging or prolonged loss of consciousness/coma). (Report of James Evans, Ph.D., 311; Dr. Venn, 711)

5.  Mr. Fulks also reported an extensive history of closed head injuries. These started in middle childhood, with various bike wrecks and a tree fall, with brief periods of unconsciousness but no ED evaluations or post-concussive symptoms. At age 12 his brother dropped a paint can onto his left forehead which resulted in loss of consciousness and an ED visit for stitches. His brother knocked him out when boxing at least once. At age 15 the brakes went out and he sustained a head injury in the resulting crash; he did not seek medical attention as he was "on the run." He feels this was his worst head trauma, and he suffered headaches, dizzy spells and balance issues in the months that followed. At age 17 he was knocked out in a police chase and needed stitches for the top of his head.

6.  Mr. Fulks suffered stab wounds to his abdomen while incarcerated, with urinary retention. (Federal Medical Center Prison Records, 738)

7.  Bell's palsy was diagnosed at age 25. (Dr. Venn, 708)

8.  A medical evaluation by Dr. Bachman in 2003 noted unusual mouth and nasolabial fold asymmetry, subtle findings on neurological examination, abnormal performance on Mini Mental State Exam (especially frontal motor findings), with overall initial impression:

All things taken together, Mr. Fulks is of borderline intelligence, if not with actual mild mental retardation. There are a number of possible etiologies for this including possible fetal alcohol syndrome, early life lead exposure from moonshine, inhaled solvent exposure, chronic alcohol use, and recurrent head injuries as described above. Particularly striking were the frontal motor findings described above, particularly difficulty with motor sequencing and inhibition. (Report of David Bachman, M.D., 121)

9.  Dr. Bachman's testimony following subsequent review of MRI, PET, EEG, and neuropsychological testing was that "fetal alcohol effect syndrome" moved to the top of the list of hypotheses. He testified that Dr. Bookstein's corpus callosum analysis supported fetal alcohol effects, as did consultation with Sterling Clarren, M.D. ("Caroff" in transcription). (Trial Testimony of David Bachman, M.D., 147)

10. Dr. Melikian testified that upon phone consultations with Dr. Bachman and Dr. Clarren she concluded that Mr. Fulks had fetal alcohol effects (growth 1, face 1, brain 3 or 4, alcohol 3 using 4 Digit Code analysis contributed by Dr. Clarren). Her statement that "I spoke with Dr. Clarren regarding fetal alcohol effects, and formed my opinion that Mr. Fulks did suffer from fetal alcohol effects, while he did not meet the criteria for fetal alcohol spectrum disorder" is internally inconsistent; she appears to mean that he did not meet criteria for Fetal Alcohol Syndrome. Fetal Alcohol Spectrum Disorder (FASD) is the umbrella term that replaced Fetal Alcohol Effects. (Testimony of Margaret Melikian, D.O., 908)

PA0443

11. In his adult years Mr. Fulks described suffering from disc pathology in his back that disrupted his sleep with electric pain. It was formerly treated with gabapentin but when USP stopped using this drug Mr. Fulks was eventually prescribed Lyrica, which helped somewhat.

12. Mr. Fulks recalled being hospitalized for a left-sided facial infection and described skin infections at the top of his back and base of his spine. Recently he noted itchy/blustery rashes on his trunk and behind his legs. In the preceding year his dentition had seemed unusually fragile, with 1-2 broken teeth. He was diagnosed with "low calcium;" he reported taking supplemental calcium and Vitamin D.

13. Mr. Fulks also reported feeling knots in his throat when he swallows, swollen anterior cervical lymph nodes, and various tender but non-inflamed and non-purulent sub-dermal lumps in his upper throat, behind his ear, on his legs, and on his scrotum (he was prescribed an antifungal for the latter which didn't make sense to him).

14. He also described new-onset "kidney problems," consisting of new-onset nocturnal enuresis and a diagnosis of proteinuria, which was being worked up with renal ultrasound and 24-hour urine collection. He also reported frank and occult blood in his stool, with an endoscopy that removed some growths (polyps?) but no other identified cause that Mr. Fulks was aware of.

15. In the year preceding my interview Mr. Fulks claimed to have lost 91 pounds (in the context of depression), but he had regained 6 or so at the time of interview. He reported occasional fevers, headache, and a sense of smelling nasty things but denied sinus drainage or congestion; he also denied anosmia. He admitted to night sweats that soak his sheets. He denied chronic cough and thought he had been screened annually for TB. He was not sure when he was last tested for HIV or other infectious diseases.

16. Mr. Fulks also mentioned being told by other inmates that he passed out in his shower after screaming unintelligibly for about 10 minutes. He denied palpitations, chest pain, or other recent presyncopal or fainting events.

17. Mr. Fulks described a surgical history including a shank removal after a stabbing, and surgical repair of gunshot wound to the back/neck. Hospitalizations included the above facial infection and suicide attempt, as well as a more distant episode while incarcerated where he "passed out and bashed his head open."

18. Per medication list that Mr. Fulks shared with me, at the time of the interview he was taking aspirin 81g daily; calcium 625mg twice a day; docusate 100mg twice a day; pregabalin 75mg daily; trihexphenidyl 1mg daily; venlafaxine XR 225mg daily; vitamin D 1,000 IU daily; clotrimazole cream as needed. He was listed as having rashes to niacin and amoxicillin.

## SOCIAL HISTORY

1. Mr. Fulks described a childhood where he and his siblings were poor, on welfare, with two alcoholic parents. His dad hardly worked much, earning cash fixing neighborhood cars; he was handy at turning the gas and electric back on after it was shut off. After the gas meter itself was removed from their house, his father would burn wood in the basement to heat the house through vents, making things quite smoky at home. His father had a "hillbilly bar" in the basement, where they would host up to 20 people for parties. The kids would sit on the stairs and watch the adults drink and fight, or watch drunks playing gravel basketball in the driveway. The cops were there so much his dad got a police scanner to stay ahead of their visits.

2. Mr. Fulks also recalled that "Dad beat the crap out of us" daily. Punches, belt buckles, pool sticks, and thick tree limbs were used in beatings, worse when he was drunk. These beatings lefts marks, cuts, and bruises, and broke his brother's eardrum. His mother could be abusive when drunk, but usually tried to protect the children. Domestic violence was "constant," and his parents got in fistfights frequently.

3. Mr. Fulks remembered that one day his mother came back from church reformed and replaced substance abuse with church-going. Soon thereafter his father moved to Indiana with his brother, sent divorce papers, and married his sister-in-law's sister. That left Chad's mother "alone on welfare with four to five of us hellions." Between daily church-going and a cleaning job his mother wasn't at home much, leaving the children without supervision until 10-11 at night.

4. Mr. Fulks stated that "I was out on my own at thirteen," as his mother moved them around a lot, and "wound up dating a child molester." Chad and his younger brother shared a bed and were both fondled by his mother's boyfriend, who would threaten them with their mother's happiness and stability. The abuse ended when Chad left, but he blamed himself for not staying to protect his younger brother. Chad also reported being sexually abused at age 10 by an older 16-year-old neighbor who babysat them. He didn't know it was abuse at the time, but thought she was his "secret girlfriend."

5. In his mid-teens, Chad was sexually molested by a male stranger and wasn't supported by his mother in his report to police. He was also reportedly sexually abused by other adults who partied with his parents, followed by a marked change in his behavior per family friends and neighbors. (Dr. Brown, 1614)

6. Mr. Fulks described his employment history as "not many." He'd been taught welding in a juvenile placement but couldn't hold down welding jobs. He made sandwiches at one job, and worked in a friend's restaurant.

7. Mr. Fulks reported being married twice, and that his infant child was killed by a cousin's fall, causing internal injuries. His substance use escalated after losing his son. (Dr. Brown, 1619)

PA0445

8.  A summary by Arlene Andrews, Ph.D., "found evidence that these factors were present: a) chaos and profound psychological neglect; b) exposure to alcoholism in both parents and prenatal alcohol exposure; c) exposure to chronic violence in the home and parental scorn for one another; d) physical child abuse; e) nourishment insecurity; f) corrupting influence by parents and older siblings; g) educational neglect; h) stigma in the community because of family problems; i) sexual abuse; and j) poor coping resources." (Report of Arlene Andrews, Ph.D., 208)

## DEVELOPMENTAL AND ACADEMIC HISTORY

1.  Chad's mother reported walking at 10 months, first words at 1 year, and sentences at 18 months on a school form completed for a speech and language evaluation when Chad was 8. (Personal Data Sheet - Speech and Language, Cabell County School Records, 30) "Sentences" at 18 months seems unlikely based on typical developmental timing and Chad's subsequent speech/language disabilities, and her report is inconsistent with reports from other declarants. Dr. Andrews found Chad's parents' memories of his childhood to be remarkably vague, which may help explain this inconsistency.

2.  Linda Adkins, who lived 2 doors down and had a daughter close in age to Chad recalled the following to Dr. Brown:

He was around three years old when he said his first words. He lisped and mispronounced words, and it was hard to understand him. When he was around four, she sometimes could understand what he was saying, but he continued to have a lisp throughout childhood.

Chad also was slow in learning to read ("he wasn't at the level where my kids were at his age"), and he didn't seem to understand things. For example, he didn't understand volleyball and would get confused when he tried to play. The ball would come at him, and he would just stand there and not do anything. He also was clumsy and had poor coordination. When the children were playing kickball, he would miss the ball or kick it at the wrong time. He couldn't hit the ball with a bat when the children were playing baseball.

Chad also had trouble understanding verbal communication. Linda had to repeat information over and over because he didn't understand what she was saying to him. He kept saying "huh?" Linda had to keep reminding him to do things because he couldn't remember what she had requested. For example, she would tell him to go into the kitchen and bring her something from inside the refrigerator, and he would look around but not understand what she wanted. She had to repeat the instruction multiple times and narrow down her instructions to one thing at a time.

Chad was a quiet and withdrawn child. When he did play with his brothers and the neighborhood children, he was a follower and pleaser. He did what the other children wanted him to do and didn't initiate anything. (Dr. Brown, 1623-4)

3.  According to his maternal cousin Christina who lived with Chad when he was 6, Chad was teased by mother, brothers, and peers for the way he talked, saying he talked "like a baby" and calling him "stupid" and "retarded." He was uncoordinated, inattentive, slow, and needed help understanding basic schoolwork in early elementary school.

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies                    Page 10

PA0446

Christina thought that Chad was born brain-damaged because he was "so slow at everything." She said he was delayed in talking and didn't start talking in sentences until kindergarten and even then he was hard to understand. He also seemed more like a three-year-old when he was seven. He didn't know how to connect socially with people. (Dr. Brown, 1626)

4.  Mr. Fulks was not aware of early developmental milestones but reported a speech impediment for which he received speech therapy in school.

5.  Chad repeated 1st Grade, despite reasonable attendance. (Cabell County School Records, 8)

6.  In Chad's second time through the 1st grade, it was noted that speech and language evaluation was warranted. (Cabell County School Records, 1825) Chad was due to receive special education speech support for articulation twice a week on a 1985 IEP form in 2nd grade. (Cabell County School Records, 31) In 2nd grade, other records reflected that he was enrolled in speech services. (Cabell County School Records, 12)

7.  Chad was referred for multidisciplinary school assessment for behavioral problems that included failure to complete tasks, lack of self-direction, needing guidance at all times, lack of self-discipline, distractibility, weaknesses in most academics. (Cabell County School Records, 41, 46)

8.  He was in a BD special education program for Behavior Disorders at age 10. (Cabell County School Records, 59) His special education teacher Ms. Wolfe from 1988-89 (5th grade) recalled that Chad would be more accurately described as "SLD" (Specific Learning Disability) because he couldn't write a sentence, couldn't spell, and was weak in a lot of other academic tasks (1st grade reading skills, 2nd grade math). His C grades were more reflective of effort (special education) and did not reflect his true academic performance. Chad was an unsophisticated follower, easily led astray by more sophisticated peers. At age 10 he acted like a 5-6 year-old and was very weak in social skills. (Dr. Brown, 1628-9)

9.  His grades declined in 5th Grade (stable attendance) and got even worse in 6th (worse attendance). (Cabell County School Records, 8)

10. At age 12 his school psychologist suggested a complete academic evaluation to evaluate for learning disability. (Cabell County School Records, 3)

11. In the fall of 1990 at age 13 IEP records indicated that math goals had been added to his special education objectives. (Cabell County School Records, 80) His eligibility for special education expanded to behavior disorder, speech, and specific learning disability (SLD). (Cabell County School Records, 86)

12. A school record card shows him leaving Enslow Middle School in April 1991 (almost age 14). (Cabell County School Records, 10)

13. At age 14 Chad was referred to Dr. Klassen for a behavioral evaluation.

14. In late 1991 Chad was promoted to grade 9 and placed in LD (learning disabled) category, with a behavioral contract, tight supervision, and LD support for all major subjects. (Cabell County School Records, 6)

15. In 1992-93 year (again in grade 9) he appeared to be taking vocational classes and having poor attendance. (Cabell County School Records, 111)

16. Mr. Fulks eventually earned a GED in custodial care at Davis Center at age 17. (Dr. Brown, 1715). He also got a welding certificate that year with considerable extra support from his instructor. (Dr. Brown, 1618)

17. Mr. Fulks summarized his academic history as follows. "I couldn't do good in school, since the beginning." He found it hard to focus and learn. He felt this made his teachers mad, because "they just didn't get it." Math was his hardest subject. He recalled being tested in about 5th grade and being placed in Special Education for learning problems. Ms. Wolfe, his Special Education teacher "took them in," feeding him and his siblings lunch and bringing them clothes. His Special Education classification changed to behavioral in middle school, when he was "always in fights" over being bullied badly for his speech, clothes, smell, and poverty. He remembered a behavioral classroom teacher Mr. Sheets as another caring teacher that took good care of him in school.

## CHILDHOOD PHOTOGRAPH REVIEW

1. Childhood photographs were reviewed and were congruent with my in-person evaluation.

## PSYCHIATRIC HISTORY

1. Chad attempted suicide by pill overdose in early adolescence after his parents separated. He was unconscious when ambulance arrived and was treated at a hospital. (Otto Klassen, M.D. Psychiatric Report, 4; Trial Testimony of Arlene Andrews, 251; St. Mary's Hospital records, 1028)

2. He was diagnosed with major depression at age 14, and prescribed imipramine. (Dr. Klassen, 7)

3. There were reports of Panic Disorder in adolescence, as well as compulsive behaviors. (Federal Medical Center Prison Records, 737)

4. Dr. Simcox diagnosed Chad with Malingering and ASPD during an evaluation at Lexington in 1998. This evaluator also claimed that Mr. Fulks is "likely of average/above average intelligence" and "has no previous history of mental illness." (Federal Medical Center Prison Records, 1436-8) However, these assertions are contradicted by IQ testing and records demonstrating previous significant mental illness.

5. Mr. Fulks received diagnoses of PTSD, Major Depressive Disorder, Generalized Anxiety Disorder, and Tic Disorder. (Dr. Venn, 708)

6. Antisocial Personality Disorder (ASPD) and polysubstance dependence were diagnosed at Butner. (Federal Medical Center Prison Records, 746)

7. Dr. Hilkey diagnosed Mr. Fulks with poly-substance dependence, dysthymic disorder, and cognitive disorder not otherwise specified. (Report of James Hilkey, Ph.D., 941)

8. Dr. Melikian diagnosed Mr. Fulks with Cognitive Disorder, Not Otherwise Specified (affected by fetal alcohol spectrum disorder, chronic substance abuse, and multiple head injuries), Major Depressive Disorder, Adjustment Disorder with Anxiety, Amphetamine Dependence, Cannabis Dependence, Alcohol Dependence, and Anti-Social Personality Disorder (qualified by comments about showing remorse, influence of upbringing, and diminished cognitive ability). (Dr. Melikian, 951-4)

9. In Mr. Fulks's interview he did not recall being tested for ADHD but noted that in his family he "was the hyper one." He also had a lot of trouble with focus, and was very impulsive and reactive, like his father. School counselors kept recommending that his mother take him to a doctor or specialist, and she did take him to a psychiatrist once at age 14 or so. He was prescribed a medication of uncertain benefit, which he only took for one month because his mother couldn't afford it.

10. Mr. Fulks recalled "a lot of depression growing up." He also reported a childhood-onset history of "bad anxiety" and panic attacks (can't breathe and feels like his insides are going to explode). This anxiety was worse in solitary confinement, and once he moved all his belongings out of his cell because he felt crowded and that the walls were closing in.

11. Around the time of his trial Mr. Fulks recalled being on "a bunch of meds" but could not recall his precise diagnoses. He became acutely depressed in the previous year, as he was out of appeals and awaiting an execution date. He claimed that his new unit manager killed two mice that Mr. Fulks had enjoyed caring for (he had raised 4 generations in his cell). He dropped from 249 pounds to 158 in 7 months. Mr. Fulks reported that he cut his wrists and hung himself in June 2015, was found unconscious in his cell, and awoke in the ambulance.

12. Since getting a chance to appeal, a new legal team, and more medical attention Mr. Fulks felt that his depression had improved. A new medication (Effexor) was helping at the time of our interview in 2016.

13. Mr. Fulks stated that he used to have visions of his deceased infant son but denied other visual or auditory hallucinations. He denied mania. It was hard for him to leave his cell when he was more depressed, and he still noted stress and anxiety/situational paranoia when "out in the open" but he denied other paranoid ideation.

## SUBSTANCE USE HISTORY

1. Mr. Fulks reported that he and his brothers "always stole beer," as it was readily available. From age 7-8 and up they would drink a few times per week, to intoxication at times. His drinking progressed in adolescence and adulthood.

2. Chad's older brother liked to huff gasoline, which Chad did for about 6 months when he was 10-11 years old, on a daily basis. He was not sure if the gas was unleaded. A neighbor child self-immolated while they were huffing, which may have curbed Chad's inhalant abuse. He did try huffing paint a few times but didn't like it.

3. Mr. Fulks reported that his marijuana use started at age 9-10, and "wasn't as bad." He found that it helped him deal with his family life and was a "de-stresser." His dad grew it in the basement and his brother grew some in the woods.

4. Mr. Fulks reported that at age 14-15 he started abusing pills and cocaine. His meth use started at age 16 and escalated later. In the time leading up to the instant offense, Mr. Fulks described a lot of methamphetamine, alcohol, and marijuana consumption - "enough meth to kill a normal person." He claimed to have robbed a series of meth houses posing as FBI prior to the incarceration from which he escaped, so they had quite a supply.

## LEGAL HISTORY

1. Extensive, starting at age 9, and well-summarized by Dr. Brown in her report. (Dr. Brown, 1615-6)

## FAMILY HISTORY

1. Chad's father, mother, maternal and paternal grandparents, a paternal uncle, and maternal uncle have histories of problematic alcohol use. (Various)

2. Dr. Andrews testified that his younger brother Shannon developed a seizure disorder. (Trial Testimony of Arlene Andrews, 177)

3. Dr. Bachman had the opportunity to evaluate Ronnie Fulks, Chad's brother. He noted growth retardation (5'2.5", 116 pounds), a small head, history of congenital heart defect, and all of the physical/facial features of FAS. He testified with "great confidence" that Ronnie has Fetal Alcohol Syndrome. (151) Dr. Brown, a psychologist with considerable expertise in FAS, interviewed Ronnie Fulks and reported "He was very thin and appeared to be no taller than five feet. He had facial abnormalities consistent with Fetal Alcohol Syndrome (i.e., thin upper lip, smooth philtrum, small eye openings)." (Dr. Brown, 1635)

4. Mr. Fulks described his birth mother Diana as Caucasian and thought she may be around 5'4" tall. She had a brain aneurysm after his sentencing and was placed in care due to paralysis.

5. His father Roger was described by Mr. Fulks as Caucasian and perhaps 5'8". Mr. Fulks was not sure if his parents had learning problems or finished high school. Both parents were described as alcoholics.

6. Older brother Dewayne was six years his elder and was the family member Chad felt closest to growing up, according to our interview. Dewayne reportedly killed himself in 2009, which Mr. Fulks thought was due to meth abuse and blaming

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies          Page 14

himself for Chad's life outcome. Dewayne was reported by Mr. Fulks to have some learning problems in school.

7.  Ronnie was the second oldest (3 years older), and they were also close. Mr. Fulks also described Ronnie as having "full FAS," being 5'2" as an adult, born with a hole in his heart, having an unusual head shape, and "bad developmental problems." Both Ronnie and Dewayne abused substances.

8.  Mr. Fulks reported that his younger brother Shannon had "a lot" of epilepsy from age 7. Shannon did not get into the sort of trouble his brothers did, and now is a foreman at a potato chip factory. His sister Sherry also had less delinquency than her brothers.

9.  Mr. Fulks told me that his son was born with a hole in his heart, which was monitored by a pediatrician until his son's death. Dr. Brown's records list this as an atrial septal defect and ventricular septal defect. (Dr. Brown, 1716)

10. Mr. Fulks was not aware of any other significant family history, including other birth defects, intellectual disability, ADHD, other neurological disease, other mental illness, vision/hearing problems, genetic syndromes, or tic disorders.

## STRUCTURAL EVIDENCE OF BRAIN DAMAGE

1.  Emergency room non-contrast CT scan of head and neck in 2000 was read as normal during an evaluation after a fall at jail.

2.  A head CT and MRI were read clinically as "normal" at Columbia Care Center in late 2003/early 2004. (Federal Medical Center Prison Records, 1103)

3.  Dr. Bachman testified about a brain MRI with right temporal cyst, and a PET scan that was diffusely abnormal, as well as diffuse slowing on 1998 EEG. (Trial Testimony of David Bachman, M.D., 141-4)

4.  Clinical read of 2003 brain MRI with and without contrast: 1. Right sylvian fissure/arachnoid cyst. 2. Otherwise unremarkable MRI of the brain.

5.  Clinical read of a 2003 brain PET scan showed "diffusely decreased cortical metabolic activity." Literature search for Zoloft, Elavil, Klonopin, and Inderal did not reveal citations which would implicate these medications as responsible for the altered cerebral perfusion.

6.  Quantitative EEG (QEEG) analysis in 2004 was abnormal. Dr. Walker concluded:

The focal slow activity in the left frontal region and with multiple coherence abnormalities in the right hemisphere and multiple phase abnormalities in both the left and right hemisphere, this QEEG is consistent with the residual effects of brain damage. (Report of Jonathan Walker, M.D., 729)

7.  Dr. Evans summarized the QEEG as follows:

Results of a QEEG evaluation provided further support for a diagnosis of neurological dysfunction. This was especially in the form of central and posterior right hemisphere abnormalities of neural timing, and excessive power at frontal sites in a slower frequency band and at certain posterior sites in higher frequency bands. The QEEG findings as interpreted

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies                    Page 15

independently by two different persons related closely to specific neuropsychological test findings. (Dr. Evans, 316)

8.  Dr. Bookstein analyzed MRI images of Mr. Fulks's corpus callosum and found that aspects of its shape were a lot more like an FASD experimental sample than non-exposed controls; the reported odds ratio was that Mr. Fulks would have been at least 15 times more likely to be from the FASD set than the non-exposed set. (Report of Dr. Fred Bookstein, 384)

9.  Dr. Davatzikos used volumetric MRI analysis to examine the volumes of different brain structures in Mr. Fulks's brain. He noted an overall "highly abnormal profile," most notably from significant atrophy in the region of the left insula and inferior frontal gyrus. In testimony he noted the subarachnoid cyst but opined that there were also more widespread abnormalities in the frontal and temporal lobes "whose combinations suggest that they are probably congenital." (Testimony of Christos Davatzikos, Ph.D., 437)

10. Dr. Gur integrated quantitative functional brain imaging based on Positron Emission Tomography (PET) scanning with neuropsychological testing, and concluded in his report that:

As indicated in the report of Dr. Davatzikos, Mr. Fulks has a highly abnormal brain anatomy with reduced volume in frontal and limbic regions. The PET results indicate focal reduction in neuronal activity in fusiform gyms and thalamus, areas that are central for complex visual processing and signal modulation. At the same time there is abnormal elevation of activity in several fronto-temporal regions and limbic structures including the entire cingulate gyms. The elevated metabolic activity in regions of tissue loss indicates an active pathological process that could be epileptogenic if cerebral perfusion is compromised. The pattern of abnormalities is consistent with results of neuropsychological testing, which shows deficits in functions related to these regions. This includes deficits in abstraction, flexibility, attention and impulse control, as well as affect processing and the olfactory deficit. His right hand tremor may relate to relative reduction in cerebellar activity on the right. His deficits in visual sensorimotor functioning likely relates to reduced metabolism in fusiform gyms and visual sensorimotor areas. Reduced thalamic activity likely interferes with signal modulation and the process of assigning meaning to the environmental cues.

This pattern is consistent with head injuries, where bony structures in the orbital regions produce tissue injury and the force of the blow produces shearing in medially located regions. However, other factors may have exacerbated the deficit including poor prenatal and perinatal conditions and extensive substance abuse. Most substances of abuse affect frontal regions and may add to tissue loss and abnormal physiologic landscape. (Report of Ruben Gur, Ph.D., 456)

11. In his testimony Dr. Gur noted dystrophy at the base of the brain and opined that fetal alcohol exposure was the most likely cause, as well as orbital frontal lack of grey matter of probable prenatal onset. (Trial Testimony of Ruben Gur, Ph.D., 510-1) He described quantitative PET abnormalities in thalamus, basal ganglia, and cerebellum that are very much associated with fetal alcohol exposure. (520-1) In summary, Dr. Gur testified that the structural imaging, functional imaging, and neuropsychometric testing were congruent in showing damage consistent with fetal alcohol exposure, with superimposed abnormalities thought due be due to environmental stress, head injuries, and substance abuse. (565-8)

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies                    Page 16

## BRAIN DOMAINS WITH EVIDENCE OF DYSFUNCTION

1. Intellectual Functioning:

   At age 9 a COGAT/3 Reasoning Skills assessment showed Verbal national grade percentile of 32, Non Verbal 07 (compared to younger children since he repeated 1st Grade).

   Slosson Intelligence Test (SIT) at 9y9m: mental age 8y10mo, IQ 92. (Cabell County School Records, 53)

   At 9y8m his Wechsler Intelligence Scale for Children - Revised (WISC-R) had Verbal IQ 87, Performance IQ 95, Full Scale IQ 90. (Cabell County School Records, 64)

   Wechsler Intelligence Scale for Children - Revised (WISC-R) at age 12 with Verbal IQ 88, Performance IQ 105, Full Scale 96. This 17 point "split" between Verbal and Performance scales was noted to be statistically significant by the testing psychologist. He had specific weakness on Information, representing fund of knowledge and formal education. (Cabell County Board of Education Psychological Evaluation, pages 1-3)

   At age 14, his school psychologist Joy Krug reported a Slosson Intelligence Test with a Verbal IQ of 66 (mental age 9 years, 6 months), and thought being in a new school may have impacted his scores. On the WISC-R, Chad obtained a Verbal IQ of 85, Performance IQ of 105, and Full Scale IQ of 93. His Test of Nonverbal Intelligence (TONI) score was 84. Adaptive testing at the time revealed significant limitations in academic and social domains. Ms. Krug did view his functional capacity to be in the Intellectually Deficient range. (Declaration of Joy Krug, 1892-4; Dr. Brown 1630-2)

   Weschler Adult Intelligence Scale, Third Edition (WAIS-III) at age 25 with Verbal IQ 79, Performance IQ 78, Full Scale IQ 77. (Dr. Venn, 715)

   WAIS-III at age 26 with Verbal IQ 79, Performance IQ 81, Full Scale IQ 78. (Dr. Hilkey, 703)

   Woodcock-Johnson Test of Cognitive Abilities at age 26 with General Intellectual Ability of 79. This and other Butner testing may have been impacted by health and stress factors; he did pass a malingering test (the TOMM) per Drs. Gourley and Landis. (Federal Medical Center Prison Records, 741-4)

2. Academic Achievement:

   In 3rd grade achievement testing showed Vocabulary 22, Comprehension 05, Spelling 11, Language Mechanics 05, Language Expression 00, Math Computation 00, Math Concepts/Applications 21, Reference Skills 11, Science 01, Social Studies 06 (all scores in national grade percentiles compared to younger children). Zero

PA0453

scores likely represented missed or skipped portions, although they could represent getting all questions wrong in that section. (Cabell County School Records, 18)

Screening in 3rd grade with the Wide Range Achievement Test (WRAT) showed Reading at 80, Spelling at 89, Math at 82. Math subtests on the Kaufman Test of Educational Achievement (KTEA) were "very difficult for subject" but math computation was at the 18th percentile. Spelling was at the 14th percentile. (Cabell County School Records, 50)

In 5th grade his Brigance academic testing showed reading at 5.6, spelling 4, math 4.2 - presumably grade levels. (Cabell County School Records, 55) His special education teacher from that year says these scores were wrong, as they were administered by a backup teacher lacking experience and recopied from previous year. "I was working with him at a much lower level in math and reading." (Dr. Brown, 1635)

In 6th grade achievement testing showed Vocabulary 55, Comprehension 26, Spelling 20, Language Mechanics 00, Language Expression 00, Math Computation 00, Math Concepts/Applications 00, Reference Skills 00, Science 00, Social Studies 00 (all scores in national grade percentiles compared to younger children). (Cabell County School Records, 9)

Other Comprehensive Test of Basic Skills (CTBS) scores are summarized in Dr. Brown's report, where she notes that "these tests are group-administered, multiple choice, frequently prone to inflation, and of questionable reliability." Dr. Brown also notes that the group-administered tests from 3rd and 6th grade have the same issues. (Dr. Brown, 1728-30)

Chad received special education services under SLD, apparently for math learning disability, with additional deficits in basic learning processes of Perception and Conceptualization. (Cabell County School Records, 86, 89) In Fall of 1990 his math was at a 4th grade level, and many other skill areas were below average. (Cabell County School Records, 87) His KTEA for math computation was a 72; this was noted to be a severe discrepancy from his IQ, and not primarily the result of "emotional disturbance; cultural environment or economic disadvantage." (Cabell County School Records, 89)

In Fall of 1991 he was documented to have a more diffuse learning disability, with severe discrepancy for all domains of academic achievement (4-5th grade level), also not primarily due to emotional or environmental factors. (Cabell County School Records, 98) In Spring of 1992 he failed Ohio proficiency tests in writing and reading. (Cabell County School Records, 107)

WRAT-3 at age 25 with Reading 5th percentile, Spelling 5th percentile, Math 8th percentile. (Dr. Venn, 716)

WRAT-3 at age 26 with Reading 14th percentile, Spelling 5th percentile, Math 6th percentile. (Dr. Hilkey, 703)

WRAT-3 at age 26 with Reading standard score of 77. (Dr. Evans, 313)

Woodcock-Johnson results at age 26 ranged "from scaled scores of 72 on the Writing Samples and 76 on the Math Fluency subtests to 91 on the Spelling and Passage Comprehension subtests." (Drs. Gourley and Landis, 1106).

Essentially, Chad's academic career was notable for global academic needs, with support needed in all areas at one time or another. As summarized by his school psychologist:

Chad's test results showed he needed a great deal of help to survive in school. His verbal impairments prevented him from reasoning, and his ability to think abstractly and learn from experience was very limited. He was impulsive and tended to act before thinking ...

Although Chad obtained scores on intellectual tests that fell in the range of mild handicap (i.e., mild intellectual disability), he also demonstrated a significant discrepancy between IQ and achievement. As a result, in order to keep him in regular classrooms with accommodations and be consistent with the criteria used and services provided, the team recommended he receive services for Learning Disabilities in English, Math, Science, and Social Studies ...

Functionally, Chad was intellectually disabled when one considered all his test scores (he didn't have the mental tools to compensate"). His strengths included " street smarts" and "survival skills," as indicated by testing showing he was immediately able to perceive details and respond behaviorally.

Ms. Krug said that while she likely wouldn't have been able to recognize FASD when she encountered it in a child in 1991, she now knew Chad's test scores were consistent with FASD. (Dr. Brown, 1631-2)

3. Memory:

At 25 years of age Visual Immediate Memory 2nd percentile, Immediate Memory 3rd percentile, General Memory 12th percentile. (Dr. Venn, 717) Multiple areas of CVLT-II at or below -2 SD. Concept formation, learning, and memory (BCT) in the severe impairment range. (Dr. Venn, 717-20)

Relative deficits in visual memory were noted at Butner, as well. (Federal Medical Center Prison Records, 744)

4. Language:

Speech articulation problems were documented at 8 years of age, with Arizona Articulation Proficiency Scale showing age-inappropriate errors in sh, ch, j, s, and z; Chad qualified for IEP speech support to work on those sounds as well as frontal lisp. (Cabell County School Records, 36) Peabody Picture Vocabulary Test (PPVT) at age 9y7m showed a developmental age 7y10m, LQ 82. (Cabell County School Records, 37) A PPVT was given again at age 14 with a standard score of 73, mental

age of 9 years, 8 months. (Joy Krug, 1892). Spache test of auditory comprehension was listed at 3-5 at age 9-10. (Cabell County School Records, 59)

Luria receptive and expressive speech skills exceeding critical level. Receptive language skills (BDAE) at the 7th percentile. Boston Naming Test below the 1st percentile. (Dr. Venn, 719). Verbal fluency at the 5th percentile (COWAT). (Dr. Venn, 719)

Butner evaluation also found expressive vocabulary (BNT) at ~1st percentile. (Federal Medical Center Prison Records, 743)

5.   Attention:

Dr. Evans administered an Integrated Visual and Auditory Continuous Performance Test (IVA) in 2003, with very low scores: Full Scale Attention Quotient of 40 (average is 100), Full Scale Response Control Quotient of 48. (Dr. Evans, 314)

Dr. Hilkey concluded that Mr. Fulks had Probable Attention Deficit Hyperactivity Disorder by History. (Dr. Hilkey, 704)

Dr. Venn found visual scanning and attention errors at <1st percentile and 4th percentile when repeated. (Dr. Venn, 718)

Evaluations at Butner showed attention and concentration scores at <1st-2nd percentile, possibly impacted by other factors. (Federal Medical Center Prison Records, 743)

6.   Executive Functions:

At 9 years of age an academic assessment reported "extreme difficulty with abstract reasoning." (Cabell County School Records, 46)

Dr. Venn found scores at 1st and 2nd percentile on visual scanning and cognitive flexibility testing, and 9th-12th percentile when repeated. He also documented a highly unusual number of intrusions on CVLT-II, indicating significant failure to regulate his behavior in response to stimuli. (Dr. Venn, 718, 721)

Rey Complex Figure testing at Butner showed Copy and Recall scores below the 1st percentile, possibly impacted by other factors. (Federal Medical Center Prison Records, 743)

7.   Visual-Motor:

"He appeared to have a lot of difficulty with the Jordan Left Right Reversal Test. It took him a long time to complete this test." (Cabell County School Records, 46) He was at a 7y9m developmental age at 9y9m on this test of visual receptive functioning. (Cabell County School Records, 49)

A Bender Gestalt Visual Motor Test of Integration had 3 errors. "This suggests that Chad has some visual/motor/perceptual difficulty." (Cabell County School Records, 75) Prior testing had been within normal limits. (Cabell County School Records, 65) Testing at age 26 showed only minor errors. (Federal Medical Center Prison Records, 703)

8.  Motor Skills:

    Manual Finger Tapping Test at 4th percentile for right and left hand, with unusual symmetry indicating mild-moderate impairment. Grooved Pegboard with right hand 4th percentile, left hand 13th percentile. (Dr. Venn, 719-20)

9.  Adaptive Functioning:

    Dr. Brown administered the Vineland Adaptive Behaviors Scales - 3rd Edition (Vineland-3) to Chad's teacher (target age 10) and neighbor (target age 13). Both respondents rated Chad as significantly deficient in adaptive behavior categories of Communication, Daily Living, and Socialization, with global composite scores of 48 (worse than -3.5 SD, <1st percentile) and 60 (worse than -2.7 SD, <1st percentile) respectively. (Dr. Brown, 1641)

    On the Fetal Alcohol Behavior Scale (FABS), all 4 respondents rated Chad at or above the threshold for having the behavioral profile of FASD (even with incomplete responses from Christine Holbrook). (Dr. Brown, 1643)

## A NOTE ON MALINGERING

When Mr. Fulks was referred for competency assessment at Federal Medical Center (Lexington) at age 21, he was reported to be an unreliable historian, to be attempting to feign medical and mental health symptoms, and to be malingering. (Federal Medical Center Prison Records, 1433-38)

Conversely, when he underwent mental health screening while incarcerated at age 22, Mr. Fulks minimized his history of academic challenges (denying repeating a grade, being in special education, history of expulsion), mental health history, and juvenile detention. (Dr. Brown, 1724) And when he was evaluated at Federal Medical Center (Butner) at age 26 he was considered to be a "good and reliable historian," gave adequate effort, and passed the Test of Memory Malingering. (Federal Medical Center Prison Records, 0732-44)

Thus, Mr. Fulks has a history of both exaggerating mental health and cognitive difficulties in young adulthood, as well as minimizing/masking them at times. For this reason, I have sought to corroborate Mr. Fulks' statements to me with historical records and other informants.

In the broader context of his lifelong history of developmental and behavioral challenges, it is difficult to imagine that Mr. Fulks could have consistently malingered his performance on repeated standardized testing from early childhood to adulthood. This would be challenging even for individuals with advanced training in neuropsychology. It would also assume that the younger Chad wanted special education

PA0457

services he didn't need at ages when children are highly motivated to *avoid* this stigma. Finally, it would also be physically impossible for Mr. Fulks to have malingered his neuroimaging results. His testing results are also consistent with multiple third-party reports of his functioning.

## IN-PERSON EVALUATION

I had the opportunity to interview and examine Mr. Fulks during a 150-minute contact visit on 10/24/16, in a semi-private interview room at the United States Penitentiary, Terre Haute. I explained the scope of my evaluation, my background and licensure, that his participation was optional, and that I could not maintain my typical level of confidentiality. He appeared to understand and agreed to proceed.

### MENTAL STATUS EVALUATION

Mr. Fulks was cooperative with the interview and exam. We were allowed to meet in a contact visit room with him shackled for the majority of the exam, with an inaccurate scale and stadiometer.

Mr. Fulks was responsive to questions and on-topic, with a nervous air. His mood was not overtly depressed, flat, or labile during our interview. There was no evidence of pressured speech, flight of ideas, or responding to internal stimuli. His speech was simpler, with what sounded like a combination of Southern rural accent and residual articulation issues.

Mr. Fulks failed the Montreal Cognitive Assessment (MoCA, version 7.1),[6] which is a medical clinician screening tool for cognitive dysfunction, used in this case for a brief qualitative evaluation. It is not intended to supersede the type of neuropsychometric testing performed by psychologists, as many of the tasks are easier than those found on formal diagnostic tests.

His total score on the MoCA was 22 out of 30 (in the abnormal range, even with one point added for abbreviated education), with a normal score being 26 or above. He appeared to give good effort. He talked to himself to an unusual degree on certain subtests, repeating the instructions out loud; he was audibly self-critical when his performance was poor. Subtest results are listed below.

Visuospatial/Executive: Mr. Fulks's alternate trail-making was correct but very laboriously so; his 3-D cube copy was very disorganized and incomplete; his "draw-a-clock" had almost correct number placement (credit given) and hands that were very close to the same length (credit not given). He achieved 3 out of 5 points in this section.

---

[6] Nasreddine, Z. S., Phillips, N. A., Bédirian, V., Charbonneau, S., Whitehead, V., Collin, I., et al. (2005). The Montreal Cognitive Assessment, MoCA: a brief screening tool for mild cognitive impairment. Journal of the American Geriatrics Society, 53(4), 695–699.

Naming: He was able to correctly identify a lion, rhino, and camel. (3/3 points)

Attention: A 5-digit list was recalled correctly on forward order, and he was correct with 3-digit list in backward order; he was slow to respond and had excessive errors of omission on a vigilance task; serial 7 subtractions was accurate but notably slow and effortful. (5/6 points)

Language: He failed to accurately repeat the second sentence - "The cat always hid under the couch when dogs were in the room" became "The cat always hid under the couch when the dog was in the room." Language fluency (maximum number of words he could produce that start with F) was poor, only 9 words in one minute. (1/3 points)

Abstraction: He was able to describe a similarity between train & bicycle ("transportation") but failed watch & ruler ("both got numbers"). (1/2 points)

Delayed Recall: He recalled 3 of 5 words at 5 minutes, got one remaining word with category prompts, and the last word was still incorrect with multiple choice. (3/5 points)

Orientation: Intact to month, year, day of week, place, and city; off by one on the date. (5/6 points)

His performance on this screening evaluation indicated potential problems in visuospatial/executive skills, attention, language, abstract thinking, and memory. It was also consistent with the 23 out of 30 score on a similar test reported by Dr. Bachman (139). Had this been the first testing he'd received, I would have recommended thorough testing by a psychologist. Indeed, such testing confirmed deficits in these areas of concern.

## PHYSICAL EXAMINATION

Weight: 184 pounds on facility exam room scale; Mr. Fulks reported that his weight several weeks prior was 168 pounds.

Height: 70.25 inches on facility stadiometer, but Mr. Fulks reported his height to be six feet, which matches other adult records.

Occipitofrontal head circumference (OFC): Measured by me at 55.5 cm (45th percentile).

General: Clothed in prison garments, clean-shaven, with thin, close-cut hair. Slumped posture.

Head, Eyes, Ears, Nose, Throat (HEENT): Upper lip was a 3 (just below the FAS range), using the in-person guide appropriate for his ethnicity. Philtrum (vertical groove between nose and lip) depth was a 3 on the lip-philtrum guide (below the FAS range).

Palpebral fissure lengths (width of visible eye openings) were measured manually at 28 mm on the right, and 27 mm on the left.

Typical head shape. No midface flattening. Typical ear position and rotation; small nodule vs prominent cartilage behind left ear. Conjunctivae clear. Poor dentition, with missing and cracked teeth, intact palate. Posterior pharynx mildly erythematous without exudate. Flatter/softer left nasolabial fold with mild droop to left corner of mouth; facial expression otherwise symmetric.

Neck: No notable cervical lymphadenopathy or thyromegaly, but tender 2mm firm nodule palpated under the skin just about the cricoid.

Heart: Regular rate and rhythm, without murmur.

Chest: Lungs clear to auscultation, typical respiratory rate.

Abdomen: Soft, non-tender, without palpable organomegaly. Genitourinary and rectal exam deferred.

Skin: No notable birthmarks or rash on face, trunk, arms, or lower legs. Small scattered moles, none alarming in appearance. Tattoos on back. Incomplete list of scars includes left forehead, top of head, and occiput, as well as left lateral spine at T2. Small (5mm or smaller) subtle subcutaneous nodules on left anterior distal thigh and left shin.

Extremities: No clinodactyly, elbow valgus or evidence of radio-ulnar synostosis. No jaundice or edema noted.

Neurologic: Right-handed by self-report. Cranial nerves II-XII intact. Visual fields intact. Sensation intact to light touch, but palmar digit recognition was inconsistent (2 out of 3). Strength 5/5 in upper and lower extremities. Normal rapid alternating movements, but fingertip touching was clumsy. Finger-nose-finger accurate. Intact tandem gait and one-leg stance, considering leg shackles. Mr. Fulks did have prominent motor tics: eye blinking and right neck/shoulder contractions. No verbal tics or other unusual motor movements were appreciated.

## PHOTOGRAPHIC ANALYSIS OF FACIAL FEATURES[7]

The University of Washington FAS Facial Photographic Analysis Software is used by clinics around the world to analyze the sentinel facial features of FAS, and has been shown to be more accurate and reliable than manual evaluations, particularly in eye measurements.[8]

---

[7] Astley S. J. Fetal Alcohol Syndrome Facial Photographic Analysis Software, version 2.0.

[8] Astley, S. J. (2015). Palpebral fissure length measurement: accuracy of the FAS facial photographic analysis software and inaccuracy of the ruler. Journal of Population Therapeutics and Clinical Pharmacology, 22(1), e9–e26.

PA0460

Palpebral fissure lengths (eye widths): Mean palpebral fissure lengths (PFL) of 31.3 mm, which is 1.12 standard deviations (SD) above the mean on the Stromland PFL chart, which is a Caucasian-normed chart.

Lip: Lip circularity 57.9, rank of 3 on the University of Washington Lip-Philtrum Guide (which is not in the FAS range on a scale of 1-5, with 5 being the most severe).

Philtrum: Rank of 3 (not in the FAS range on a scale of 1-5, with 5 being the most severe) on the University of Washington Lip-Philtrum Guide.

## DIAGNOSIS AND OPINION

Based on my examination of Chadrick Fulks and review of relevant ancillary materials, it is my opinion to a reasonable degree of medical certainty that Mr. Fulks has Static Encephalopathy / Alcohol Exposed, using the University of Washington 4-Digit Code.[9] This is equivalent to Alcohol-Related Neurodevelopmental Disorder (ARND) using the Institute of Medicine (IOM) criteria,[10] and is a diagnosis under the umbrella of Fetal Alcohol Spectrum Disorders (FASD).

When evaluating for a Fetal Alcohol Spectrum Disorder, there are 4 main areas to explore: evidence of growth deficiency, degree of FAS facial features, level of brain dysfunction, and history of prenatal alcohol exposure. A process of differential diagnosis is also important, to consider other genetic, prenatal, postnatal, medical, and psychiatric explanations for a patient's outcomes.

FASD diagnosis is multi-disciplinary, and it is typical for medical professionals to rely on the reports of colleagues such as psychologists and social workers when evaluating level of brain dysfunction, adaptive functioning, alcohol exposure, and life history.

### GROWTH

Birth and early pediatric growth records are currently unavailable, which is unfortunate as the growth impairments in FAS are often most evident in the newborn and early childhood period, and often "catch up" in adolescence.[11] Mr. Fulks's middle childhood and adult growth data do not show deficits in weight or height.

---

[9] Astley, S. J., & Clarren, S. K. (2000). Diagnosing the full spectrum of fetal alcohol-exposed individuals: introducing the 4-digit diagnostic code. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(4), 400–410.

[10] Stratton, K. R., Howe, C. J., Battaglia, F. C., Institute of Medicine (U.S.). Committee to Study Fetal Alcohol Syndrome, National Institute on Alcohol Abuse and Alcoholism (1996). Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment. National Academies Press.

[11] Carter, R. C., Jacobson, J. L., Sokol, R. J., Avison, M. J., & Jacobson, S. W. (2013). Fetal alcohol-related growth restriction from birth through young adulthood and moderating effects of maternal prepregnancy weight. Alcoholism Clinical and Experimental Research, 37(3), 452–462.

## FACIAL FEATURES

Mr. Fulks does not have the face of FAS. His upper lip, philtrum, and eye widths are all in the normal range. Research suggests that the facial features of FAS require an alcohol exposure during a very narrow window of opportunity, perhaps on days 19-20 of pregnancy. Thus, the majority of alcohol-affected individuals do not have the facial features; in fact, only 9% of patients in our FAS clinic have "the face" of FAS.[12]

## BRAIN

In an FASD evaluation, we look for structural and/or functional (psychometric testing) evidence of brain damage. One or the other can independently satisfy this brain criterion. Mr. Fulks has both.

On routine clinical MRI a 1.5 by 1.5 cm arachnoid cyst was seen along the right sylvian fissure. Such cysts represent about 1% of identified intracranial lesions and can be incidentally noted on imaging; the sylvian fissure is a common location for such a cyst. Depending on size and growth trends, arachnoid cysts may or may not be associated with symptoms.[13] This finding alone is insufficient evidence of structural damage.

Volumetric analysis (using computer analysis to compare volumes of specific brain structures to a normal control group) showed a highly abnormal profile, with widespread abnormalities in the frontal and temporal lobes that were thought to be congenital in origin by Dr. Davatzikos. The shape of Mr. Fulks's corpus callosum (a thick bundle connecting left and right brain that is notorious for being sensitive to prenatal alcohol damage) was analyzed by Dr. Bookstein and found to be much more consistent with his FASD group than his normal controls.

Routine clinical reading of a brain PET scan showed diffusely decreased cortical metabolic activity. Furthermore, Dr. Gur integrated quantitative functional brain imaging (based on PET scanning) with neuropsychological testing and opined in his testimony that Mr. Fulks has quantitative PET abnormalities in the thalamus, basal ganglia, and cerebellum that are highly associated with fetal alcohol exposure, with superimposed abnormalities thought to be due to environmental stress, head injuries, and substance abuse.

Other more functional neurodiagnostic testing included EEG and quantitative EEG. A 1998 EEG was reported to show diffuse slowing by Dr. Bachman. A QEEG was read as

---

[12] Astley, S. J. (2010). Profile of the first 1,400 patients receiving diagnostic evaluations for fetal alcohol spectrum disorder at the Washington State Fetal Alcohol Syndrome Diagnostic & Prevention Network. The Canadian Journal of Clinical Pharmacology = Journal Canadien De Pharmacologie Clinique, 17(1), e132–64.

[13] Gelabert-González, M., Santín-Amo, J. M., Aran-Echabe, E., & García-Allut, A. (2015). [Imaging diagnosis of arachnoid cysts]. Neurocirugia (Asturias, Spain), 26(6), 284–291.

abnormal by two specialists, consistent with residual effects of brain damage and providing support for neurological dysfunction.

These brain findings are certainly consistent with the research literature on FASD but are not caused only by prenatal alcohol exposure.[14,15,16,17] There is not yet a pattern of brain damage that is as unique to prenatal alcohol injury as the face of FAS, but such structural evidence of brain damage satisfies the brain criterion. As in much of medicine, pattern recognition and differential diagnosis (weighing possible etiologies) play an important role in diagnosis.

It is also unusual in the clinical practice of FASD to have this much neurodiagnostic testing to integrate. This is due to many factors: cost, feasibility for a typically younger and wriggly clinic population, evolving standards of what is a clinical versus research tool (doctors and insurance companies can be quite conservative in this regard), and the plain fact that for the majority of FASD clinical evaluations the neuropsychometric testing data is sufficient and more relevant to that patient's clinical recommendations. In forensic practice where it is common to have concerns of malingering (it's hard to fake an MRI) and the desire for additional evidence to support a diagnosis in an inherently adversarial process, such neurodiagnostic testing is more common. In this case, the wide range of testing information available to me strengthens my conclusions.

The cumulative impression of both routine clinical testing and research-informed analyses here is that Mr. Fulks has a structurally abnormal brain in a pattern consistent with the FASD literature, with some findings quite suggestive of congenital defects as well as the probability of further damage from environmental stress, head injuries, and substance abuse. This is sufficient to meet the brain criterion.

Turning to functional evidence of brain damage, Mr. Fulks has ample evidence on neuropsychometric testing to qualify for a 4-Digit Code diagnosis of Static Encephalopathy, which is a non-progressive brain injury diagnosable in the presence of significant impairments (-2 standard deviations or worse on standardized testing) in 3 or more functional domains. He shows such impairments in multiple domains of brain function on standardized testing: Academic Achievement, Memory, Language, Attention, and Executive Functioning.

---

[14] Guerri, C., Bazinet, A., & Riley, E. P. (2009). Foetal Alcohol Spectrum Disorders and alterations in brain and behaviour. Alcohol and Alcoholism (Oxford, Oxfordshire), 44(2), 108–114.

[15] Astley, S. J., Aylward, E. H., Olson, H. C., Kerns, K., Brooks, A., Coggins, T. E., Davies, J. K. et al. (2009). Magnetic resonance imaging outcomes from a comprehensive magnetic resonance study of children with fetal alcohol spectrum disorders. Alcoholism Clinical and Experimental Research, 33(10), 1671–1689.

[16] Treit, S., Lebel, C., Baugh, L., Rasmussen, C., Andrew, G., & Beaulieu, C. (2013). Longitudinal MRI Reveals Altered Trajectory of Brain Development during Childhood and Adolescence in Fetal Alcohol Spectrum Disorders. The Journal of Neuroscience : the Official Journal of the Society for Neuroscience, 33(24), 10098–10109.

[17] Sowell, E. R., Thompson, P. M., Mattson, S. N., Tessner, K. D., Jernigan, T. L., Riley, E. P., & Toga, A. W. (2002). Regional brain shape abnormalities persist into adolescence after heavy prenatal alcohol exposure. Cerebral Cortex (New York, NY : 1991), 12(8), 856–865.

Furthermore, he has additional evidence of delay or dysfunction in the following domains: Intelligence (unusual VIQ/PIQ "split" at age 12, later intelligence scores in the upper 70s), Visual-Motor, and Motor skills. The uneven performance on testing (some scores in the average range and some that are markedly impaired) is a hallmark of FASD, as is a decline in academic performance after about 4th grade, as academic demands increase.

Such widespread mild to severe impairments would predict very poor real-world functioning without substantial external supports and structure. This is reflected in Mr. Fulks's life history and very poor adaptive functioning described in Dr. Brown's report. On the fetal alcohol spectrum, Mr. Fulks's brain injuries and overall functioning qualify as severe.

Notably, a number of Mr. Fulks's deficits were present in childhood before head injuries and substance abuse became significant comorbid risk factors, such as early childhood speech/language problems, poor coordination, social/emotional concerns, failing first grade despite reasonable attendance, qualifying for speech services in first grade, and a referral at age 9 for multidisciplinary school assessment for behavioral problems that included failure to complete tasks, lack of self-direction, needing guidance at all times, lack of self-discipline, distractibility, and weaknesses in most academics.

These domains are congruent with the areas that he struggled with on the Montreal Cognitive Assessment during my evaluation. They are consistent with patterns of dysfunction seen in FASD. They also meet Institute of Medicine ARND criteria for:

B. Evidence of a complex pattern of behavior or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone, such as learning difficulties; deficits in school performance; poor impulse control; problems in social perception; deficits in higher level receptive and expressive language; poor capacity for abstraction or metacognition; specific deficits in mathematical skills; or problems in memory, attention, or judgment

### ALCOHOL

Mr. Fulks was exposed to alcohol prenatally in a pattern that is consistent with the medical literature placing the fetus at high risk for fetal alcohol damage (generally high peak blood alcohol concentrations delivered at least weekly in early pregnancy).

This was recently documented in Dr. Brown's interview of Chad's father and is consistent with the reports of other family members and neighbors who were witnesses to his mother's excessive drinking during Chad's pregnancy and early childhood.

Previously, Dr. Andrews had interviewed multiple family members and concluded that Mr. Fulks's mother drank alcohol during her pregnancy with Chad. It is typical in the field of FASD to rely on social work or psychology colleagues for confirmation of prenatal alcohol exposure, whether from records review or interviews with family members and other witnesses to drinking.

Medical Expert Evaluation of Chadrick Fulks (DOB 5/16/77) - Dr. Davies                    Page 28

Mr. Fulks meets 4-Digit Code criteria for "high risk" prenatal alcohol exposure, as well as the following IOM criteria:

a A pattern of excessive intake characterized by substantial, regular intake or heavy episodic drinking. Evidence of this pattern may include frequent episodes of intoxication, development of tolerance or withdrawal, social problems related to drinking, legal problems related to drinking, engaging in physically hazardous behavior while drinking, or alcohol-related medical problems such as hepatic disease.

b As further research is completed and as, or if, lower quantities or variable patterns of alcohol use are associated with ARBD or ARND, these patterns of alcohol use should be incorporated into the diagnostic criteria.

## DIAGNOSIS

Thus, Mr. Fulks meets criteria for Static Encephalopathy / Alcohol Exposed, also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND).[18] This diagnosis is a Fetal Alcohol Spectrum Disorder (FASD). It is also worth noting that Mr. Fulks would receive a DSM-5 diagnosis of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure (ND-PAE, code F88).[19]

This diagnosis is congruent with prior expert testimony. Terminology has evolved, but Dr. Bachman and Dr. Melikian both diagnosed Mr. Fulks with Fetal Alcohol Effects, an older term for ARND. My conclusion also matches that of Dr. Clarren (one of the co-developers of 4-Digit Code and my predecessor at the University of Washington), with the added confidence of a more thorough records review and an in-person evaluation.

I have used 4-Digit Code in my analysis for consistency with prior evaluations of Mr. Fulks and with my routine clinical practice. 4-Digit Code is known for generally having the most specific and stringent of the diagnostic criteria for FASDs. The thresholds for facial features and brain injury (for Static Encephalopathy) are higher in 4-Digit Code than in other criteria in clinical use.

However, there are published protocols for forensic use of IOM criteria.[20] I am knowledgeable in and comfortable working with both criteria, and I will note here that Mr. Fulks also meets IOM criteria for Alcohol-Related Neurodevelopmental Disorder (ARND).

[18] Astley, S. J., & Clarren, S. K. (2000). Diagnosing the full spectrum of fetal alcohol-exposed individuals: introducing the 4-digit diagnostic code. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(4), 400–410.

[19] American Psychiatric Association DSM-5 Task Force (2013). Diagnostic and Statistical Manual of Mental Disorders : DSM-5. American Psychiatric Association, Washington, DC.

[20] Brown, N. N., Wartnik, A. P., Connor, P. D., & Adler, R. S. (2010). Proposed Model Standard for Forensic Assessment of Fetal Alcohol Spectrum Disorders, Journal of Psychiatry & Law 38, 383.

PA0465

## DIFFERENTIAL DIAGNOSIS

Other adverse pre- and post-natal factors also contributed to the brain dysfunction displayed by Mr. Fulks.

Chad's mother used tobacco during pregnancy, which increases risk for low birthweight, ADHD, and antisocial behaviors.[21] However, the research is clear that alcohol is the most worrisome prenatal exposure compared to other substances of abuse.

His available family history contains drug and alcohol abuse, a younger sibling with epilepsy, an older brother with FAS, a sibling and son with congenital heart defects, and delinquency, but the known family history is not notable for a clear-cut pattern of inheritable intellectual disability or other developmental disabilities.

Mr. Fulks described a number of medical symptoms to me which were outside of the scope of my evaluation and expertise. These symptoms did not fall into a pattern that clearly matched a medical or genetic syndrome that would better explain his brain dysfunction.

Mr. Fulks does have evidence of a tic disorder, which can co-occur with ADHD and anxiety disorders such as OCD. Prenatal alcohol exposure is one of the known risk factors for tic disorders,[22] and a constellation of FAS, ADHD, and Tourette syndrome has been described.[23]

Postnatal adverse risk factors are extensive and include caregiver substance abuse; domestic violence; physical abuse; sexual abuse; poverty; academic neglect; lack of appropriate structure and supervision at home; older siblings involved in substances and delinquency; parental divorce; and extensive early onset substance use. This life history multiplied his risk of adverse outcomes such as disrupted school experience, trouble with the law, confinement, mental health diagnoses, drug/alcohol problems, as these risk factors increase the odds of such "secondary disabilities" in FASD 2- to 4- fold.[24]

---

[21] Davies, J. K., & Bledsoe, J. M. (2005). Prenatal alcohol and drug exposures in adoption. Pediatric Clinics of North America, 52(5), 1369–93, vii.

[22] Mathews, C. A., Scharf, J. M., Miller, L. L., Macdonald-Wallis, C., Lawlor, D. A., & Ben-Shlomo, Y. (2013). Association between pre- and perinatal exposures and Tourette syndrome or chronic tic disorder in the ALSPAC cohort. The British Journal of Psychiatry : the Journal of Mental Science, 204(1), bjp.bp.112.125468–45.

[23] Fernández-Mayoralas, D. M., Fernández-Jaén, A., Muñoz-Jareño, N., Calleja Pérez, B., & Arroyo-González, R. (2010). Fetal Alcohol Syndrome, Tourette Syndrome, and Hyperactivity in Nine Adopted Children. Pediatric Neurology, 43(2), 110–116.

[24] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. Journal of Developmental & Behavioral Pediatrics, 25(4), 228–238.

Childhood mistreatment, also known as complex or developmental trauma, has been shown to affect the life outcomes displayed by Mr. Fulks. "The organization and functional capacity of the human brain ... is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences."[25]

Adults like Mr. Fulks who have ≥4 adverse childhood experiences (ACEs) such as emotional abuse, physical abuse, sexual abuse, parental substance abuse, domestic violence, and separation of parents have been shown to have a risk of panic reactions, depressed affect, anxiety, and hallucinations that are increased 2.5-, 3.6-, 2.4-, and 2.7-fold, respectively. The risk of smoking, alcoholism, illicit drug use, and injected drug use is increased 1.8-, 7.2-, 4.5-, and 11.1-fold, respectively. High perceived stress, difficulty controlling anger, and the risk of perpetrating intimate partner violence is increased 2.2-, 4.0-, and 5.5-fold, respectively.[26]

Lead exposure is possible but not formally documented. Early childhood lead exposure can lower IQ but not typically by more than 5-10 points.[27] Later lead exposure (a possible risk from moonshine consumption) is unlikely to impact IQ to that degree but could have impacting his cognitive functioning to some degree.

Traumatic brain injury (TBI) is another prominent risk factor in Mr. Fulks's case, with more minor injuries in middle childhood and more significant but still technically "mild" closed head injuries in adolescence. In general, the prognosis for children with TBI is better than for adults with comparable TBI. A recent systematic review of pediatric mild TBI found that "most studies show that post-concussion symptoms and cognitive deficits resolve over time. Limited evidence suggests that post-concussion symptoms may persist in those with lower cognitive ability and intracranial pathology on neuroimaging [at the time of injury]."[28] Since Mr. Fulks indeed had pre-injury lower cognitive functioning (lower "cognitive reserve"), he was at increased risk for lingering post-concussion cognitive, somatic, emotional, and behavioral symptoms.[29] Furthermore, pediatric TBI has also been linked to an approximately 2-fold increased

[25] Anda, R. F., Felitti, V. J., Bremner, J. D., Walker, J. D., Whitfield, C., Perry, B. D., et al. (2005). The enduring effects of abuse and related adverse experiences in childhood. European Archives of Psychiatry and Clinical Neuroscience, 256(3), 174–186.

[26] Ibid.

[27] Lanphear, B. P., Hornung, R., Khoury, J., & Yolton, K. (2005). Low-level environmental lead exposure and children's intellectual function: an international pooled analysis. Environmental Health Perspectives, 113(7), 894–899.

[28] Hung, R., Carroll, L. J., Cancelliere, C., Côté, P., Rumney, P., Keightley, M., et al. (2014). Systematic review of the clinical course, natural history, and prognosis for pediatric mild traumatic brain injury: results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. Archives of Physical Medicine and Rehabilitation, 95(3 Suppl), S174–91.

[29] Fay, T. B., Yeates, K. O., Taylor, H. G., Bangert, B., Dietrich, A., Nuss, K. E., et al. (2010). Cognitive reserve as a moderator of postconcussive symptoms in children with complicated and uncomplicated mild traumatic brain injury. Journal of the International Neuropsychological Society, 16(1), 94–105.

PA0467

risk of premature mortality, psychiatric inpatient admission, psychiatric outpatient visits, disability pension, welfare recipiency, and low educational attainment.[30]

Substance abuse starting at an early age and continuing during the adolescent developmental period is another notable risk factor for Mr. Fulks: alcohol, marijuana, a relatively brief period of inhalant abuse, "pills," cocaine, and methamphetamine abuse were described. The literature on long-term impacts of substance use during the developmental period is emerging and as yet poorly controlled for other risk factors (such as preexisting impairments like FASD), but substance abuse in adolescence has been implicated in cognitive deficits and brain structural impacts. However, there is also evidence of at least partial recovery from deficits after a period of abstinence. Onset of use before age 18 has been linked with the greatest neurocognitive deficits, for alcohol and marijuana at least.[31] The literature on inhalant impacts is limited in adolescent recreational users (versus occupational exposures), but inhalant abuse appears to cause some impacts that may improve with abstinence.[32] Research on methamphetamine abuse and cognitive decline has been mixed, but meth appears to cause mild (on average) cognitive decline, of unknown duration, in at least some users of the drug.[33]

It is my opinion that Mr. Fulks's head injuries and early onset substance abuse aggravated his underlying FASD, impacted his academic and behavioral issues, and contributed to his declining IQ scores over time, but are unlikely to be the sole cause of his imaging and neuropsychometric findings. His pre-existing developmental and behavioral concerns, the diffuse nature of brain abnormalities reported, and the highly abnormal volumetric analysis implicate an early, likely congenital insult more than childhood to adolescent-era damage.

Finally, Mr. Fulks has a mental health history that includes depression, suicide attempts, anxiety, PTSD, ASPD, and poly-substance dependence. Mental health problems are frequently comorbid with FASDs. In one study of adults with FASD, 92% met criteria for an Axis-I disorder such as alcohol or drug dependence (60%), depression (44%), psychotic symptoms (40%), and anxiety or bipolar disorder (20% each). In addition, 48% met criteria for at least one personality disorder, with 19% having antisocial personality disorder.[34]

---

[30] Sariaslan, A., Sharp, D. J., D'Onofrio, B. M., Larsson, H., & Fazel, S. (2016). Long-Term Outcomes Associated with Traumatic Brain Injury in Childhood and Adolescence: A Nationwide Swedish Cohort Study of a Wide Range of Medical and Social Outcomes. PLoS Medicine, 13(8), e1002103–18.

[31] Lisdahl, K. M., Gilbart, E. R., Wright, N. E., & Shollenbarger, S. (2013). Dare to Delay? The Impacts of Adolescent Alcohol and Marijuana Use Onset on Cognition, Brain Structure, and Function. Frontiers in Psychiatry, 4.

[32] Lubman, D. I., Yücel, M., & Lawrence, A. J. (2008). Inhalant abuse among adolescents: neurobiological considerations. British Journal of Pharmacology, 154(2), 316–326.

[33] Dean, A. C., Groman, S. M., Morales, A. M., & London, E. D. (2013). An Evaluation of the Evidence that Methamphetamine Abuse Causes Cognitive Decline in Humans. Neuropsychopharmacology, 38(2), 259–274.

[34] Famy, C., Streissguth, A. P., & Unis, A. S. (1998). Mental illness in adults with fetal alcohol syndrome or fetal alcohol effects. The American Journal of Psychiatry, 155(4), 552–554.

It is vanishingly rare to see a patient in FAS clinic who does not have some combination of at-risk family history, prenatal alcohol exposure, other prenatal influences, and adverse childhood experiences. It is not possible to scientifically tease apart the negative influences of all of these factors with precision, particularly in an adult who has also abused multiple substances and suffered head injuries. In Mr. Fulks's case, however, his history of early childhood developmental delays, school failure, and behavioral challenges, as well as having both functional and structural evidence of brain damage in a pattern consistent with FASD, implicate prenatal alcohol as a primary cause. I consider the later risk factors as co-occurring rather than competing etiologies.

One final piece of evidence points to FASD: his older brother. Dr. Bachman had the opportunity to evaluate Ronnie, and noted growth retardation, microcephaly (a small head), congenital heart defect, and all of the physical/facial features of FAS. He testified with "great confidence" that Ronnie has Fetal Alcohol Syndrome. Ronnie's reported findings, Dr. Brown's impressions, and the available photos are indeed consistent with this diagnosis.

What does this mean for Chad, Ronnie's younger brother? One of the strongest known predictors of FASD is the presence of an older sibling with FAS: Ronnie's FAS diagnosis increases the risk of Chad having an FASD as much as 400-fold compared to the general population risk.[35] What's more, "FAS studies consistently report that women who have had one child with FAS, and who continue to drink, have progressively more severely affected children with subsequent pregnancies."[36]

## SUMMARY

Chadrick Fulks has Static Encephalopathy / Alcohol Exposed, a severe Fetal Alcohol Spectrum Disorder. This birth defect syndrome was compounded by adverse life experiences, head injuries, and substance abuse.

Based on my review of the available records and my in-person examination, I hold the above opinions to a reasonable degree of medical certainty. The analysis I have conducted could have been conducted by any qualified FASD professional at the time of Mr. Fulks's trial and conviction.

Thank you for the opportunity to examine Mr. Fulks.

Julian Davies, MD
Signed on March 4, 2019

---

[35] Abel, E. L. (1988). Fetal alcohol syndrome in families. Neurotoxicology and Teratology, 10(1), 1–2.

[36] Astley, S. J., Bailey, D., Talbot, C., & Clarren, S. K. (2000). Fetal alcohol syndrome (FAS) primary prevention through fas diagnosis: II. A comprehensive profile of 80 birth mothers of children with FAS. Alcohol and Alcoholism (Oxford, Oxfordshire), 35(5), 509–519.

PA0469

# Barry M. Crown, Ph.D. and Associates, P.A.

## 105 E. Gregory Square – Suite 2A

## Pensacola, Florida 32502

## Telephone: (850) 439-5550   Fax: 1 (877) 483-4856

bmcrown@barrycrown.com

**In Miami:**
**9990 S.W. 77th Avenue – Suite 301**
**Miami, Florida 33156**
**(305) 665-0771**

## NEUROPSYCHOLOGICAL CONSULTATION
## and REVIEW

**FULKS, Chadrick**            **Date Seen: 4-18-18**
DOB: 05-16-77
CA:    40

Mr. Chadrick "Chad" Fulks, a 40 year old Caucasian male, was seen at the United States Penitentiary at Terre Haute, Indiana on April 18, 2018. He is being held there after a murder conviction and death sentence in the United States District Court, District of South Carolina, Florence Division. The underlying offense(s) occurred in November 2002 when he was 25 years old. I was asked to determine if Mr. Fulks meets the criteria for the diagnosis of Intellectual Disability.

### IDENTIFYING DATA FROM THE DEFENDANT

Mr. Fulks underwent an extensive mental status examination and clinical interview with me. He is a rambling historian and is imprecise in details. The following information is derived from the April 18, 2018 visit.

Mr. Fulks was born in Lincoln County, West Virginia on May 16, 1977. His mother worked in care facilities. His father, a Vietnam veteran, "worked on

cars," had a "hillbilly bar," and received SSI. Mr. Fulks reported two male siblings – Ronnie and Shannon. He also had another brother Dewayne, who committed suicide in 2009. He had one sister - Sherry. The parents were heavily alcohol involved. This continued through mother's pregnancy with Mr. Fulks. Mr. Fulks reported that his mother eventually became religious and stopped drinking.

Mr. Fulks grew up in West Virginia, Kentucky, and Indiana and experienced continuing problems in schooling. Additionally, there were problems that involved the juvenile justice system. He also reports setting fire to a trophy at one of his schools. He last attended formal schooling in the 10th grade, but eventually received a GED while being held in a juvenile facility in West Virginia.

After leaving school, Mr. Fulks said that he "ran the streets," drinking and doing drugs. He would break into cars and had a dream of going to Myrtle Beach. He reported living with his brother Dewayne and his brother's wife during adolescence. He reported living with his sister and her boyfriend at ages 15-16.

Mr. Fulks and a girlfriend had a child - Devon. They married at age 18. The child died of cardiac problems when he was 5 months old.

Mr. Fulks reported having a job making sandwiches at a sandwich shop named "Maderight" and working at a Snyder's Restaurant in Tennessee. He also reported that he worked stripping and waxing floors at age 16.

He has made suicide attempts by wrist slicing and also attempted to hang himself. Over the years, he has been placed on various psychotropic medications. First psychiatric involvement began in early adolescence. Prior to that, he had been given psychoeducational interventions.

He reports various activities while in prison. Examples include watching TV, writing, drawing, arts and crafts, and caring for small mice/frogs that are present in prison.

Drinking behavior began at age 9 or 10 with vodka and moonshine. He also inhaled ("huffed") gasoline and paint at that age as well as some sort of "embalming fluid." He also described drinking moonshine made by his Uncle Roy at ages 13-14. He also drank "Mad Dog 20/20." He reported

skipping school and getting drunk in abandoned houses. By 15, he was snorting cocaine and using meth and pills. He was also stealing cars and not just breaking into them.

There is a long history of head trauma with several incidents of loss of consciousness. At the age of 8 or 9, he fell over while playing on a motorcycle in a neighbor's garage and lost consciousness. During that same age-range, while riding a tiny motorcycle, he ran into a station wagon and lost consciousness. He was knocked out fighting with a brother when he was 9 or 10. At age 11, he flew off a bike and "busted my head on the sidewalk." He was hit on the head with a paint can at age 11 or 12 and lost consciousness. He was hit in the head with a rock at ages 13-14, with no loss of consciousness. At 14, he reported attempting suicide by taking Tylenol and losing consciousness. He was in car accidents at ages 15 and 16 with no loss of consciousness, but experienced post-concussive symptoms such as headaches, blurry vision, and/or disorientation afterwards. He was in a car accident at 17 and lost consciousness. He was also bitten in the face by a snake and shot at age 17.

Starting in youth, he has had headaches, which he describes as being in the left frontal area, around the orbit of the left eye, and "on the top near the back of the head." He would break out into cold sweats and would sometimes see things like spiders. His mother would call on "old preachers to come over and pray on me." At 17, he was stabbed with a butcher knife.

He reports that his home life was always dysfunctional to the point that teachers would buy him clothes. He also reports having difficulty reading, suffering from a speech impediment, and receiving special education services. Medical care was minimal at best. Parents were involved in sexual acting out.

## RECORD REVIEW

I have also had the benefit of reviewing several volumes of assembled records containing educational and medical records, reports of psychoeducational, psychological, neuropsychological, psychiatric, medical and neurological evaluations, and transcripts of testimony. I have also reviewed numerous declarations from third parties who knew Mr. Fulks containing recollections of his conditions and behaviors.

I have had the benefit of a detailed report prepared by Natalie Novick Brown, Ph.D., a fetal alcohol expert. Dr. Brown reports that Julian Davies, M.D., has diagnosed Mr. Fulks with Alcohol Related Neurodevelopmental Disorder (ARND) and Static Encephalopathy, Alcohol Exposed. Under DSM-5, Dr. Davies found Neurodevelopmental Disorder associated with Prenatal Alcohol Exposure.

Dr. Novick-Brown conducted an assessment of Mr. Fulks' adaptive behavior, and concluded that Mr. Fulks had significant deficits in the Conceptual, Social, and Practical Domains that were present before the age of 18. She further conducted an assessment of his lifelong functioning as it related to Mr. Fulks' FASD diagnosis, and found it to be consistent with this diagnosis.

I have noted certain relevant elements of Mr. Fulks' assessment history below, but rely on Dr. Novick-Brown's report for a comprehensive description of Mr. Fulks' history.

A Fetal Alcohol Spectrum Disorder was first found by neurologist David Bachman, M.D. Dr. Bachman suggested the possibility of Fetal Alcohol Syndrome in his report of July 31, 2003, and later concluded in his 2004 testimony that Mr. Fulks had an FASD. Dr. Bachman also suggested a borderline range of intelligence to mild retardation. A Mini-Mental Status Examination at the time was 23/30, which is in the impaired range. After issuing his report, Dr. Bachman reviewed an MRI, a PET scan, and an EEG. He noted the presence of a cyst in the right temporal area of the brain visible in the MRI and diffuse abnormality reflected by the PET scan and the EEG.

Analysis of Mr. Fulks' MRI by Fred L. Bookstein, Ph.D., indicated brain abnormalities that were suggestive of FASD.

Christos Davitzikos, Ph.D., independently confirmed abnormalities on imaging using a quantitative analysis of Mr. Fulks' MRI. Dr. Davatzikos identified the presence of a subarachnoid cyst and more widespread abnormalities in the frontal and temporal lobes that were likely to be congenital.

Ruben Gur, Ph.D., using quantitative analysis of PET imaging, found "highly abnormal brain anatomy with reduced volume in the frontal and

limbic region." Dr. Gur concluded that these abnormalities were consistent with an FASD.

[Dr. Gur's findings strongly suggest a Sensory Limbic Hyperconnexion Syndrome. This condition impairs the development and use of the frontal lobes and limbic system.]

Howard Becker, Ph.D., did not evaluate Mr. Fulks, but described the impairments associated with FASD

On March 30, 2004, Dr. Jonathan Venn issued a report describing a neuropsychological assessment taking place from March to May 2003. He made clinical findings of attentional problems and poor language skills, and noted low scores on the neuropsychological testing, including low scores that outstripped Mr. Fulks' IQ in severity. Dr. Venn noted borderline intellectual functioning based on a Full Scale IQ of 77 on the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III). Adjusted for the Flynn Effect, the WAIS-III score would fall within the intellectually disabled range (75). Dr. Venn also found movement problems.

In a report dated May 7, 2004, Dr. James Hilkey, Ph.D., described testing administered in August 2003. Dr. Hilkey found Cognitive Disorder NOS, Dysthymia and Polysubstance Abuse Disorder, and Personality Disorder NOS (Dependent, Schizotypal, and Antisocial). As a part of his battery, Dr. Hilkey administered a WAIS-III in August 2003. A Full Scale IQ of 78 was reported. Corrected for the Flynn Effect, this score falls to a Full Scale IQ of 76.

James Evans, Ph.D., administered neuropsychological testing in November 2003 and in January 2004 and found impairments. He reported the presence of impairments, including frontal lobe damage in addition to other areas, indicating brain dysfunction that was "diffuse in nature." Dr. Evans also conducted a quantitative EEG (QEEG), which reflected brain abnormalities and "provided further support for a diagnosis of neurologic dysfunction."

In a January 14, 2004 report, Jonathan E. Walker, M.D., described his review of Mr. Fulks' quantitative EEG and found slowness in the left frontal region of the brain, with multiple coherence abnormalities in the right hemisphere and multiple phase abnormalities in both the left and right hemisphere.

A February 19, 2004 report described a forensic evaluation conducted at the Federal Medical Center at Butner, N.C., by psychiatrist Ralph Newman, M.D., psychologist Edward Landis, III, Ph.D., and neuropsychologist Eugene V. Gourley, Ph.D. Drs. Newman, Landis, and Gourley reported borderline to low average intellectual and cognitive functioning based on intelligence testing and neuropsychological functioning. Intelligence testing included the Woodcock-Johnson Tests of Cognitive Abilities, Third Edition, which returned a Full Scale IQ of 79. Corrected for the Flynn Effect, this score would fall to a 77. Other diagnoses included Antisocial Personality Disorder, Adjustment Disorder, and Amphetamine, Cannabis, and Alcohol Dependence.

Margaret Melikian, D.O., former head of the forensic unit of the Medical University of South Carolina, identified Cognitive Disorder NOS beginning in the developmental period stemming from FASD, substance abuse, and head injuries. She also identified Major Depressive Disorder, Adjustment Disorder, Amphetamine, Alcohol and Cannabis Dependence, and Antisocial Personality Disorder.

## FINDINGS

Having interviewed Mr. Fulks and had the benefit of multiple records, testimony, and reports, it is my opinion that he meets the definition of Intellectual Disability and that he satisfies all three criteria of the diagnosis: deficits in intellectual and adaptive functioning, and onset before the age of 18.

In April 2003, he was administered a WAIS-III by Dr. Venn and received a Full Scale IQ of 77. When corrected for the Flynn Effect, this score drops to 75, which is within the range for intellectual disability. He received slightly higher scores on two additional IQ tests given in the following year: a Full Scale IQ of 78 on the WAIS-III in August 2003 and a Full Scale IQ of 79 on the Woodcock-Johnson in February 2004. (These scores fall to 76 and 77 when corrected for the Flynn Effect.) Given their proximity to the first IQ test and other neuropsychological testing, the one and two point increases are explainable by practice effect. Overall, this pattern of test results is within the range for intellectual disability.

Mr. Fulks also has deficits in adaptive functioning. As noted above, Dr. Novick-Brown has conducted an assessment of Mr. Fulks' adaptive behavior. Dr. Brown concluded that he has significant deficits in the Conceptual, Social, and Practical Domains, and that these deficits were present before the age of 18. I have reviewed her report and agree with her findings.

Test results on all three batteries of neuropsychological testing (Drs. Venn, Evans, and Gourley) reflect the presence of cognitive impairments. These impairments are consistent with the abnormalities observed on the imaging studies, the EEG, and the QEEG described above.

Mr. Fulks was administered three Wechsler Intelligence Scales for Children – Revised (WISC-R) at the ages of 9, 12, and 14. On these tests, he received FSIQ scores of 90, 96, and 93, which drop to 86, 91, and 87 when corrected for the Flynn Effect.

However, scores on childhood IQ testing are unstable, particularly in individuals such as Mr. Fulks who have been born with brain dysfunction. Cognitive abilities develop more slowly as these individuals age. Over time, these impairments become more pronounced as compared to peers and IQ scores fall.

It is also notable that Mr. Fulks' adaptive deficits were broad, spanned all three domains of functioning, were apparent early in his development, and were consistent with the brain dysfunction reflected in neuropsychological testing, imaging studies, the EEG, and the QEEG. Functioning at that level is consistent with the IQ scores from adulthood.

Mr. Fulks has suffered from brain dysfunction since birth. Prenatal alcohol exposure is the predominant cause of Mr. Fulks' cognitive impairments. His history also has a number of other contributory factors that correlate with a decline in intellectual functioning and are risk factors for Intellectual Disability. These factors include a history of childhood abuse, potential head injuries incurred during the developmental period, polysubstance abuse beginning in childhood, and a dysfunctional environment and impaired parenting during childhood.

I also note that Mr. Fulks' adult IQ testing reflects consistent, similar scores across multiple test administrations that are below the scores from childhood and early adolescence.

Given all of these factors, it is my opinion that Mr. Fulks' deficits in both his intellectual functioning and adaptive functioning were present before the age of 18.

It is my opinion that he falls psychologically and neuropsychologically within the Fetal Alcohol Spectrum and that his functioning is consistent with an FASD. Under the DSM-5, he also fits the diagnostic category of Neurocognitive Disorder with multiple etiologies. Under the ICD-10-CM, he fits the diagnostic category of Frontal Lobe and Executive Function Deficit. There is indication of both Verbal and Non-verbal Learning Disabilities by history based on disparities in his childhood testing. This is characteristic of and explained by cognitive deficits associated with an FASD. By history, there is also polysubstance dependence and abuse. Additionally, there is a chronic Dysthymia with a history of Major Depressive Episodes.

Toxic exposure (prenatal alcohol exposure), head trauma, and substance abuse will typically delay neurodevelopment and can cause significant neuropsychological impairment. An already significantly damaged brain additionally hampers the development of the frontal lobes. This appears to be the case for Mr. Fulks.

I hold all of the opinions discussed above to a reasonable degree of neuropsychological certainty.

If you have any questions, please don't hesitate to contact me.

*Barry M. Crown, Ph.D.*
FL PY002131

Barry M. Crown, Ph.D.
Diplomate, American Board of
Professional Neuropsychology

Added Qualifications in Rehabilitation
Neuropsychology, Forensic Neuropsychology,
and Neuroimaging in Neuropsychology

Diplomate (Certified Pain Practitioner)
American Academy of Integrative
Pain Management

Electronically signed by Barry M. Crown, Ph.D. on March 6, 2019 at 5:59PM, CST

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®

# AMERICAN PSYCHIATRIC ASSOCIATION

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

# DSM-5®

# American Psychiatric Association

*Officers 2012–2013*
PRESIDENT DILIP V. JESTE, M.D.
PRESIDENT-ELECT JEFFREY A. LIEBERMAN, M.D.
TREASURER DAVID FASSLER, M.D.
SECRETARY ROGER PEELE, M.D.

*Assembly*
SPEAKER R. SCOTT BENSON, M.D.
SPEAKER-ELECT MELINDA L. YOUNG, M.D.

*Board of Trustees*
JEFFREY AKAKA, M.D.
CAROL A. BERNSTEIN, M.D.
BRIAN CROWLEY, M.D.
ANITA S. EVERETT, M.D.
JEFFREY GELLER, M.D., M.P.H.
MARC DAVID GRAFF, M.D.
JAMES A. GREENE, M.D.
JUDITH F. KASHTAN, M.D.
MOLLY K. McVOY, M.D.
JAMES E. NININGER, M.D.
JOHN M. OLDHAM, M.D.
ALAN F. SCHATZBERG, M.D.
ALIK S. WIDGE, M.D., PH.D.

ERIK R. VANDERLIP, M.D.,
MEMBER-IN-TRAINING TRUSTEE-ELECT

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5®





AMERICAN
PSYCHIATRIC
ASSOCIATION
PUBLISHING

PA0482

Copyright © 2013 American Psychiatric Association

DSM and DSM-5 are registered trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-554-1 (Hardcover) 2nd printing June 2013

ISBN 978-0-89042-555-8 (Paperback) 4th printing July 2017

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-5. — 5th ed.
  p. ; cm.
DSM-5
DSM-V
Includes index.
ISBN 978-0-89042-554-1 (hardcover : alk. paper) — ISBN 978-0-89042-555-8 (pbk. : alk. paper)
I. American Psychiatric Association. II. American Psychiatric Association. DSM-5 Task Force.
III. Title: DSM-5. IV. Title: DSM-V.
[DNLM: 1. Diagnostic and statistical manual of mental disorders. 5th ed. 2. Mental Disorders—classification. 3. Mental Disorders—diagnosis. WM 15]
RC455.2.C4
616.89'075—dc23

2013011061

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Tammy J. Cordova

Manufacturing—LSC Communications

# Contents

DSM-5 Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xli

## Section I
### DSM-5 Basics

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Use of the Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Cautionary Statement for Forensic Use of DSM-5 . . . . . . . . . . . .25

## Section II
### Diagnostic Criteria and Codes

Neurodevelopmental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Schizophrenia Spectrum and Other Psychotic Disorders . . . . . .87

Bipolar and Related Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . .123

Depressive Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155

Anxiety Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

Obsessive-Compulsive and Related Disorders . . . . . . . . . . . . .235

Trauma- and Stressor-Related Disorders . . . . . . . . . . . . . . . . . .265

Dissociative Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291

Somatic Symptom and Related Disorders . . . . . . . . . . . . . . . . .309

Feeding and Eating Disorders . . . . . . . . . . . . . . . . . . . . . . . . . .329

Elimination Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

Sleep-Wake Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .361

Sexual Dysfunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .423

Gender Dysphoria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .451

PA0484

Disruptive, Impulse-Control, and Conduct Disorders . . . . . . . . 461

Substance-Related and Addictive Disorders . . . . . . . . . . . . . . . 481

Neurocognitive Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

Paraphilic Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

Other Mental Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Medication-Induced Movement Disorders
  and Other Adverse Effects of Medication . . . . . . . . . . . . . . . . 709

Other Conditions That May Be a Focus of Clinical Attention . . 715

## Section III
### Emerging Measures and Models

Assessment Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Cultural Formulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

Alternative DSM-5 Model for Personality Disorders . . . . . . . . . 761

Conditions for Further Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

## Appendix

Highlights of Changes From DSM-IV to DSM-5 . . . . . . . . . . . . . 809

Glossary of Technical Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Glossary of Cultural Concepts of Distress . . . . . . . . . . . . . . . . . 833

Alphabetical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM and ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . 839

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-9-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863

Numerical Listing of DSM-5 Diagnoses and Codes
  (ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 877

DSM-5 Advisors and Other Contributors . . . . . . . . . . . . . . . . . . 897

Index. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917

# DSM-5 Task Force

DAVID J. KUPFER, M.D.
*Task Force Chair*

DARREL A. REGIER, M.D., M.P.H.
*Task Force Vice-Chair*

William E. Narrow, M.D., M.P.H.,
   *Research Director*

Susan K. Schultz, M.D., *Text Editor*
Emily A. Kuhl, Ph.D., *APA Text Editor*

Dan G. Blazer, M.D., Ph.D., M.P.H.
Jack D. Burke Jr., M.D., M.P.H.
William T. Carpenter Jr., M.D.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Jan A. Fawcett, M.D.
Bridget F. Grant, Ph.D., Ph.D. *(2009–)*
Steven E. Hyman, M.D. *(2007–2012)*
Dilip V. Jeste, M.D. *(2007–2011)*
Helena C. Kraemer, Ph.D.
Daniel T. Mamah, M.D., M.P.E.
James P. McNulty, A.B., Sc.B.
Howard B. Moss, M.D. *(2007–2009)*

Charles P. O'Brien, M.D., Ph.D.
Roger Peele, M.D.
Katharine A. Phillips, M.D.
Daniel S. Pine, M.D.
Charles F. Reynolds III, M.D.
Maritza Rubio-Stipec, Sc.D.
David Shaffer, M.D.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.
B. Timothy Walsh, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kimberly A. Yonkers, M.D.
Kenneth J. Zucker, Ph.D.
Norman Sartorius, M.D., Ph.D., *Consultant*

## APA Division of Research Staff on DSM-5

Darrel A. Regier, M.D., M.P.H.,
   *Director, Division of Research*
William E. Narrow, M.D., M.P.H.,
   *Associate Director*
Emily A. Kuhl, Ph.D., *Senior Science
   Writer; Staff Text Editor*
Diana E. Clarke, Ph.D., M.Sc., *Research
   Statistician*

Lisa H. Greiner, M.S.S.A., *DSM-5 Field
   Trials Project Manager*
Eve K. Moscicki, Sc.D., M.P.H.,
   *Director, Practice Research Network*
S. Janet Kuramoto, Ph.D. M.H.S.,
   *Senior Scientific Research Associate,
   Practice Research Network*

Amy Porfiri, M.B.A.
   *Director of Finance and Administration*

Jennifer J. Shupinka, *Assistant Director,
   DSM Operations*
Seung-Hee Hong, *DSM Senior Research
   Associate*
Anne R. Hiller, *DSM Research Associate*
Alison S. Beale, *DSM Research Associate*
Spencer R. Case, *DSM Research Associate*

Joyce C. West, Ph.D., M.P.P.,
   *Health Policy Research Director, Practice
   Research Network*
Farifteh F. Duffy, Ph.D.,
   *Quality Care Research Director, Practice
   Research Network*
Lisa M. Countis, *Field Operations
   Manager, Practice Research Network*

Christopher M. Reynolds,
   *Executive Assistant*

## APA Office of the Medical Director

JAMES H. SCULLY JR., M.D.
*Medical Director and CEO*

## Editorial and Coding Consultants

Michael B. First, M.D.                    Maria N. Ward, M.Ed., RHIT, CCS-P

## DSM-5 Work Groups

### ADHD and Disruptive Behavior Disorders

DAVID SHAFFER, M.D.
*Chair*

F. XAVIER CASTELLANOS, M.D.
*Co-Chair*

Paul J. Frick, Ph.D., *Text Coordinator*      Luis Augusto Rohde, M.D., Sc.D.
Glorisa Canino, Ph.D.                         Rosemary Tannock, Ph.D.
Terrie E. Moffitt, Ph.D.                      Eric A. Taylor, M.B.
Joel T. Nigg, Ph.D.                           Richard Todd, Ph.D., M.D. (*d. 2008*)

### Anxiety, Obsessive-Compulsive Spectrum, Posttraumatic, and Dissociative Disorders

KATHARINE A. PHILLIPS, M.D.
*Chair*

Michelle G. Craske, Ph.D., *Text*            Scott L. Rauch, M.D.
   *Coordinator*               H. Blair Simpson, M.D., Ph.D.
J. Gavin Andrews, M.D.                        David Spiegel, M.D.
Susan M. Bögels, Ph.D.                        Dan J. Stein, M.D., Ph.D.
Matthew J. Friedman, M.D., Ph.D.             Murray B. Stein, M.D.
Eric Hollander, M.D. (*2007–2009*)           Robert J. Ursano, M.D.
Roberto Lewis-Fernández, M.D., M.T.S.        Hans-Ulrich Wittchen, Ph.D.
Robert S. Pynoos, M.D., M.P.H.

### Childhood and Adolescent Disorders

DANIEL S. PINE, M.D.
*Chair*

Ronald E. Dahl, M.D.                          James F. Leckman, M.D.
E. Jane Costello, Ph.D. (*2007–2009*)        Ellen Leibenluft, M.D.
Regina Smith James, M.D.                      Judith H. L. Rapoport, M.D.
Rachel G. Klein, Ph.D.                        Charles H. Zeanah, M.D.

### Eating Disorders

B. TIMOTHY WALSH, M.D.
*Chair*

Stephen A. Wonderlich, Ph.D.,                Richard E. Kreipe, M.D.
  *Text Coordinator*               Marsha D. Marcus, Ph.D.
Evelyn Attia, M.D.                            James E. Mitchell, M.D.
Anne E. Becker, M.D., Ph.D., Sc.M.           Ruth H. Striegel-Moore, Ph.D.
Rachel Bryant-Waugh, M.D.                     G. Terence Wilson, Ph.D.
Hans W. Hoek, M.D., Ph.D.                     Barbara E. Wolfe, Ph.D. A.P.R.N.

## Mood Disorders

JAN A. FAWCETT, M.D.
*Chair*

Ellen Frank, Ph.D., *Text Coordinator*
Jules Angst, M.D. *(2007–2008)*
William H. Coryell, M.D.
Lori L. Davis, M.D.
Raymond J. DePaulo, M.D.
Sir David Goldberg, M.D.
James S. Jackson, Ph.D.

Kenneth S. Kendler, M.D.
  *(2007–2010)*
Mario Maj, M.D., Ph.D.
Husseini K. Manji, M.D. *(2007–2008)*
Michael R. Phillips, M.D.
Trisha Suppes, M.D., Ph.D.
Carlos A. Zarate, M.D.

## Neurocognitive Disorders

DILIP V. JESTE, M.D. (2007–2011)
*Chair Emeritus*

DAN G. BLAZER, M.D., PH.D., M.P.H.
*Chair*

RONALD C. PETERSEN, M.D., PH.D.
*Co-Chair*

Mary Ganguli, M.D., M.P.H.,
  *Text Coordinator*
Deborah Blacker, M.D., Sc.D.
Warachal Faison, M.D. *(2007–2008)*

Igor Grant, M.D.
Eric J. Lenze, M.D.
Jane S. Paulsen, Ph.D.
Perminder S. Sachdev, M.D., Ph.D.

## Neurodevelopmental Disorders

SUSAN E. SWEDO, M.D.
*Chair*

Gillian Baird, M.A., M.B., B.Chir.,
  *Text Coordinator*
Edwin H. Cook Jr., M.D.
Francesca G. Happé, Ph.D.
James C. Harris, M.D.
Walter E. Kaufmann, M.D.
Bryan H. King, M.D.
Catherine E. Lord, Ph.D.

Joseph Piven, M.D.
Sally J. Rogers, Ph.D.
Sarah J. Spence, M.D., Ph.D.
Rosemary Tannock, Ph.D.
Fred Volkmar, M.D. *(2007–2009)*
Amy M. Wetherby, Ph.D.
Harry H. Wright, M.D.

## Personality and Personality Disorders[1]

ANDREW E. SKODOL, M.D.
*Chair*

JOHN M. OLDHAM, M.D.
*Co-Chair*

Robert F. Krueger, Ph.D., *Text
  Coordinator*
Renato D. Alarcon, M.D., M.P.H.
Carl C. Bell, M.D.
Donna S. Bender, Ph.D.

Lee Anna Clark, Ph.D.
W. John Livesley, M.D., Ph.D. *(2007–2012)*
Leslie C. Morey, Ph.D.
Larry J. Siever, M.D.
Roel Verheul, Ph.D. *(2008–2012)*

---

[1] The members of the Personality and Personality Disorders Work Group are responsible for the alternative DSM-5 model for personality disorders that is included in Section III. The Section II personality disorders criteria and text (with updating of the text) are retained from DSM-IV-TR.

## Psychotic Disorders

WILLIAM T. CARPENTER JR., M.D.
*Chair*

Deanna M. Barch, Ph.D., *Text Coordinator*
Juan R. Bustillo, M.D.
Wolfgang Gaebel, M.D.
Raquel E. Gur, M.D., Ph.D.
Stephan H. Heckers, M.D.

Dolores Malaspina, M.D., M.S.P.H.
Michael J. Owen, M.D., Ph.D.
Susan K. Schultz, M.D.
Rajiv Tandon, M.D.
Ming T. Tsuang, M.D., Ph.D.
Jim van Os, M.D.

## Sexual and Gender Identity Disorders

KENNETH J. ZUCKER, PH.D.
*Chair*

Lori Brotto, Ph.D., *Text Coordinator*
Irving M. Binik, Ph.D.
Ray M. Blanchard, Ph.D.
Peggy T. Cohen-Kettenis, Ph.D.
Jack Drescher, M.D.
Cynthia A. Graham, Ph.D.

Martin P. Kafka, M.D.
Richard B. Krueger, M.D.
Niklas Långström, M.D., Ph.D.
Heino F.L. Meyer-Bahlburg, Dr. rer. nat.
Friedemann Pfäfflin, M.D.
Robert Taylor Segraves, M.D., Ph.D.

## Sleep-Wake Disorders

CHARLES F. REYNOLDS III, M.D.
*Chair*

Ruth M. O'Hara, Ph.D., *Text Coordinator*
Charles M. Morin, Ph.D.
Allan I. Pack, Ph.D.

Kathy P. Parker, Ph.D., R.N.
Susan Redline, M.D., M.P.H.
Dieter Riemann, Ph.D.

## Somatic Symptom Disorders

JOEL E. DIMSDALE, M.D.
*Chair*

James L. Levenson, M.D., *Text Coordinator*
Arthur J. Barsky III, M.D.
Francis Creed, M.D.
Nancy Frasure-Smith, Ph.D. *(2007–2011)*

Michael R. Irwin, M.D.
Francis J. Keefe, Ph.D. *(2007–2011)*
Sing Lee, M.D.
Michael Sharpe, M.D.
Lawson R. Wulsin, M.D.

## Substance-Related Disorders

CHARLES P. O'BRIEN, M.D., PH.D.
*Chair*

THOMAS J. CROWLEY, M.D.
*Co-Chair*

Wilson M. Compton, M.D., M.P.E., *Text Coordinator*
Marc Auriacombe, M.D.
Guilherme L. G. Borges, M.D., Dr.Sc.
Kathleen K. Bucholz, Ph.D.
Alan J. Budney, Ph.D.
Bridget F. Grant, Ph.D., Ph.D.
Deborah S. Hasin, Ph.D.

Thomas R. Kosten, M.D. *(2007–2008)*
Walter Ling, M.D.
Spero M. Manson, Ph.D. *(2007-2008)*
A. Thomas McLellan, Ph.D. *(2007–2008)*
Nancy M. Petry, Ph.D.
Marc A. Schuckit, M.D.
Wim van den Brink, M.D., Ph.D. *(2007–2008)*

# DSM-5 Study Groups

### Diagnostic Spectra and DSM/ICD Harmonization

STEVEN E. HYMAN, M.D.
*Chair (2007–2012)*

William T. Carpenter Jr., M.D.
Wilson M. Compton, M.D., M.P.E.
Jan A. Fawcett, M.D.
Helena C. Kraemer, Ph.D.
David J. Kupfer, M.D.

William E. Narrow, M.D., M.P.H.
Charles P. O'Brien, M.D., Ph.D.
John M. Oldham, M.D.
Katharine A. Phillips, M.D.
Darrel A. Regier, M.D., M.P.H.

### Lifespan Developmental Approaches

ERIC J. LENZE, M.D.
*Chair*

SUSAN K. SCHULTZ, M.D.
*Chair Emeritus*

DANIEL S. PINE, M.D.
*Chair Emeritus*

Dan G. Blazer, M.D., Ph.D., M.P.H.
F. Xavier Castellanos, M.D.
Wilson M. Compton, M.D., M.P.E.

Daniel T. Mamah, M.D., M.P.E.
Andrew E. Skodol II, M.D.
Susan E. Swedo, M.D.

### Gender and Cross-Cultural Issues

KIMBERLY A. YONKERS, M.D.
*Chair*

ROBERTO LEWIS-FERNÁNDEZ, M.D., M.T.S.
*Co-Chair, Cross-Cultural Issues*

Renato D. Alarcon, M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Javier I. Escobar, M.D., M.Sc.
Ellen Frank, Ph.D.
James S. Jackson, Ph.D.
Spiro M. Manson, Ph.D. *(2007–2008)*
James P. McNulty, A.B., Sc.B.

Leslie C. Morey, Ph.D.
William E. Narrow, M.D., M.P.H.
Roger Peele, M.D.
Philip Wang, M.D., Dr.P.H. *(2007–2012)*
William M. Womack, M.D.
Kenneth J. Zucker, Ph.D.

### Psychiatric/General Medical Interface

LAWSON R. WULSIN, M.D.
*Chair*

Ronald E. Dahl, M.D.
Joel E. Dimsdale, M.D.
Javier I. Escobar, M.D., M.Sc.
Dilip V. Jeste, M.D. *(2007–2011)*
Walter E. Kaufmann, M.D.

Richard E. Kreipe, M.D.
Ronald C. Petersen, Ph.D., M.D.
Charles F. Reynolds III, M.D.
Robert Taylor Segraves, M.D., Ph.D.
B. Timothy Walsh, M.D.

### Impairment and Disability

JANE S. PAULSEN, PH.D.
*Chair*

J. Gavin Andrews, M.D.
Glorisa Canino, Ph.D.
Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Michelle G. Craske, Ph.D.

Hans W. Hoek, M.D., Ph.D.
Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

### Diagnostic Assessment Instruments

JACK D. BURKE JR., M.D., M.P.H.
*Chair*

Lee Anna Clark, Ph.D.
Diana E. Clarke, Ph.D., M.Sc.
Bridget F. Grant, Ph.D., Ph.D.

Helena C. Kraemer, Ph.D.
William E. Narrow, M.D., M.P.H.
David Shaffer, M.D.

## DSM-5 Research Group

WILLIAM E. NARROW, M.D., M.P.H.
*Chair*

Jack D. Burke Jr., M.D., M.P.H.
Diana E. Clarke, Ph.D., M.Sc.
Helena C. Kraemer, Ph.D.

David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.
David Shaffer, M.D.

## Course Specifiers and Glossary

WOLFGANG GAEBEL, M.D.
*Chair*

Ellen Frank, Ph.D.
Charles P. O'Brien, M.D., Ph.D.
Norman Sartorius, M.D., Ph.D.,
   *Consultant*
Susan K. Schultz, M.D.

Dan J. Stein, M.D., Ph.D.
Eric A. Taylor, M.B.
David J. Kupfer, M.D.
Darrel A. Regier, M.D., M.P.H.

# DSM-5
# Classification

Before each disorder name, ICD-9-CM codes are provided, followed by ICD-10-CM codes in parentheses. Blank lines indicate that either the ICD-9-CM or the ICD-10-CM code is not applicable. For some disorders, the code can be indicated only according to the subtype or specifier.

ICD-9-CM codes are to be used for coding purposes in the United States through September 30, 2015. ICD-10-CM codes are to be used starting October 1, 2015. For DSM-5 coding and other updates, see the DSM-5® Update on www.PsychiatryOnline.org.

Following chapter titles and disorder names, page numbers for the corresponding text or criteria are included in parentheses.

**Note for all mental disorders due to another medical condition:** Indicate the name of the other medical condition in the name of the mental disorder due to [the medical condition]. The code and name for the other medical condition should be listed first immediately before the mental disorder due to the medical condition.

## Neurodevelopmental Disorders (31)

### Intellectual Disabilities (33)

| | | |
|---|---|---|
| \_\_\_.\_\_ (\_\_.\_\_) | Intellectual Disability (Intellectual Developmental Disorder) (33) | |
| | *Specify* current severity: | |
| 317 | (F70) | Mild |
| 318.0 | (F71) | Moderate |
| 318.1 | (F72) | Severe |
| 318.2 | (F73) | Profound |
| 315.8 | (F88) | Global Developmental Delay (41) |
| 319 | (F79) | Unspecified Intellectual Disability (Intellectual Developmental Disorder) (41) |

### Communication Disorders (41)

| | |
|---|---|
| 315.32 (F80.2) | Language Disorder (42) |
| 315.39 (F80.0) | Speech Sound Disorder (44) |
| 315.35 (F80.81) | Childhood-Onset Fluency Disorder (Stuttering) (45) |
| | **Note:** Later-onset cases are diagnosed as 307.0 (F98.5) adult-onset fluency disorder. |
| 315.39 (F80.82) | Social (Pragmatic) Communication Disorder (47) |
| 307.9 (F80.9) | Unspecified Communication Disorder (49) |

PA0492

cians an opportunity to document factors that may have played a role in the etiology of the disorder, as well as those that might affect the clinical course. Examples include genetic disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical conditions such as epilepsy; and environmental factors, including very low birth weight and fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome).

# Intellectual Disabilities

# Intellectual Disability (Intellectual Developmental Disorder)

## Diagnostic Criteria

Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

**Note:** The diagnostic term *intellectual disability* is the equivalent term for the ICD-11 diagnosis of *intellectual developmental disorders.* Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover, a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability,* and research journals use the term *intellectual disability.* Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.

*Specify* current severity (see Table 1):

    **317 (F70)    Mild**
    **318.0 (F71) Moderate**
    **318.1 (F72) Severe**
    **318.2 (F73) Profound**

## Specifiers

The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required. Moreover, IQ measures are less valid in the lower end of the IQ range.

PA0494

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder)

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Mild | For preschool children, there may be no obvious conceptual differences. For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired. There is a somewhat concrete approach to problems and solutions compared with age-mates. | Compared with typically developing age-mates, the individual is immature in social interactions. For example, there may be difficulty in accurately perceiving peers' social cues. Communication, conversation, and language are more concrete or immature than expected for age. There may be difficulties regulating emotion and behavior in age-appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility). | The individual may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child-care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family. |

34

Neurodevelopmental Disorders

**TABLE 1** Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Moderate | All through development, the individual's conceptual skills lag markedly behind those of peers. For preschoolers, language and pre-academic skills develop slowly. For school-age children, progress in reading, writing, mathematics, and understanding of time and money occurs slowly across the school years and is markedly limited compared with that of peers. For adults, academic skill development is typically at an elementary level, and support is required for all use of academic skills in work and personal life. Ongoing assistance on a daily basis is needed to complete conceptual tasks of day-to-day life, and others may take over these responsibilities fully for the individual. | The individual shows marked differences from peers in social and communicative behavior across development. Spoken language is typically a primary tool for social communication but is much less complex than that of peers. Capacity for relationships is evident in ties to family and friends, and the individual may have successful friendships across life and sometimes romantic relations in adulthood. However, individuals may not perceive or interpret social cues accurately. Social judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions. Friendships with typically developing peers are often affected by communication or social limitations. Significant social and communicative support is needed in work settings for success. | The individual can care for personal needs involving eating, dressing, elimination, and hygiene as an adult, although an extended period of teaching and time is needed for the individual to become independent in these areas, and reminders may be needed. Similarly, participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing supports will typically occur for adult-level performance. Independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from co-workers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management. A variety of recreational skills can be developed. These typically require additional supports and learning opportunities over an extended period of time. Maladaptive behavior is present in a significant minority and causes social problems. |

PA0495

**TABLE 1   Severity levels for intellectual disability (intellectual developmental disorder)** *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Severe | Attainment of conceptual skills is limited. The individual generally has little understanding of written language or of concepts involving numbers, quantity, time, and money. Caretakers provide extensive supports for problem solving throughout life. | Spoken language is quite limited in terms of vocabulary and grammar. Speech may be single words or phrases and may be supplemented through augmentative means. Speech and communication are focused on the here and now within everyday events. Language is used for social communication more than for explication. Individuals understand simple speech and gestural communication. Relationships with family members and familiar others are a source of pleasure and help. | The individual requires support for all activities of daily living, including meals, dressing, bathing, and elimination. The individual requires supervision at all times. The individual cannot make responsible decisions regarding well-being of self or others. In adulthood, participation in tasks at home, recreation, and work requires ongoing support and assistance. Skill acquisition in all domains involves long-term teaching and ongoing support. Maladaptive behavior, including self-injury, is present in a significant minority. |
| Profound | Conceptual skills generally involve the physical world rather than symbolic processes. The individual may use objects in goal-directed fashion for self-care, work, and recreation. Certain visuospatial skills, such as matching and sorting based on physical characteristics, may be acquired. However, co-occurring motor and sensory impairments may prevent functional use of objects. | The individual has very limited understanding of symbolic communication in speech or gesture. He or she may understand some simple instructions or gestures. The individual expresses his or her own desires and emotions largely through nonverbal, nonsymbolic communication. The individual enjoys relationships with well-known family members, caretakers, and familiar others, and initiates and responds to social interactions through gestural and emotional cues. Co-occurring sensory and physical impairments may prevent many social activities. | The individual is dependent on others for all aspects of daily physical care, health, and safety, although he or she may be able to participate in some of these activities as well. Individuals without severe physical impairments may assist with some daily work tasks at home, like carrying dishes to the table. Simple actions with objects may be the basis of participation in some vocational activities with high levels of ongoing support. Recreational activities may involve, for example, enjoyment in listening to music, watching movies, going out for walks, or participating in water activities, all with the support of others. Co-occurring physical and sensory impairments are frequent barriers to participation (beyond watching) in home, recreational, and vocational activities. Maladaptive behavior is present in a significant minority. |

PA0496

## Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype*, which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

others (e.g., San Phillippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. Thus, it is common practice when assessing infants and young children to delay diagnosis of intellectual disability until after an appropriate course of intervention is provided. For older children and adults, the extent of support provided may allow for full participation in all activities of daily living and improved adaptive function. Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

## Risk and Prognostic Factors

**Genetic and physiological.**   Prenatal etiologies include genetic syndromes (e.g., sequence variations or copy number variants involving one or more genes; chromosomal disorders), inborn errors of metabolism, brain malformations, maternal disease (including placental disease), and environmental influences (e.g., alcohol, other drugs, toxins, teratogens). Perinatal causes include a variety of labor and delivery-related events leading to neonatal encephalopathy. Postnatal causes include hypoxic ischemic injury, traumatic brain injury, infections, demyelinating disorders, seizure disorders (e.g., infantile spasms), severe and chronic social deprivation, and toxic metabolic syndromes and intoxications (e.g., lead, mercury).

## Culture-Related Diagnostic Issues

Intellectual disability occurs in all races and cultures. Cultural sensitivity and knowledge are needed during assessment, and the individual's ethnic, cultural, and linguistic background, available experiences, and adaptive functioning within his or her community and cultural setting must be taken into account.

## Gender-Related Diagnostic Issues

Overall, males are more likely than females to be diagnosed with both mild (average male:female ratio 1.6:1) and severe (average male:female ratio 1.2:1) forms of intellectual disability. However, gender ratios vary widely in reported studies. Sex-linked genetic factors and male vulnerability to brain insult may account for some of the gender differences.

## Diagnostic Markers

A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.

## Differential Diagnosis

The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met. A diagnosis of intellectual disability should not be assumed because of a particular

genetic or medical condition. A genetic syndrome linked to intellectual disability should be noted as a concurrent diagnosis with the intellectual disability.

**Major and mild neurocognitive disorders.**   Intellectual disability is categorized as a neurodevelopmental disorder and is distinct from the neurocognitive disorders, which are characterized by a loss of cognitive functioning. Major neurocognitive disorder may co-occur with intellectual disability (e.g., an individual with Down syndrome who develops Alzheimer's disease, or an individual with intellectual disability who loses further cognitive capacity following a head injury). In such cases, the diagnoses of intellectual disability and neurocognitive disorder may both be given.

**Communication disorders and specific learning disorder.**   These neurodevelopmental disorders are specific to the communication and learning domains and do not show deficits in intellectual and adaptive behavior. They may co-occur with intellectual disability. Both diagnoses are made if full criteria are met for intellectual disability and a communication disorder or specific learning disorder.

**Autism spectrum disorder.**   Intellectual disability is common among individuals with autism spectrum disorder. Assessment of intellectual ability may be complicated by social-communication and behavior deficits inherent to autism spectrum disorder, which may interfere with understanding and complying with test procedures. Appropriate assessment of intellectual functioning in autism spectrum disorder is essential, with reassessment across the developmental period, because IQ scores in autism spectrum disorder may be unstable, particularly in early childhood.

## Comorbidity

Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population. The prognosis and outcome of co-occurring diagnoses may be influenced by the presence of intellectual disability. Assessment procedures may require modifications because of associated disorders, including communication disorders, autism spectrum disorder, and motor, sensory, or other disorders. Knowledgeable informants are essential for identifying symptoms such as irritability, mood dysregulation, aggression, eating problems, and sleep problems, and for assessing adaptive functioning in various community settings.

The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder; stereotypic movement disorder (with or without self-injurious behavior); impulse-control disorders; and major neurocognitive disorder. Major depressive disorder may occur throughout the range of severity of intellectual disability. Self-injurious behavior requires prompt diagnostic attention and may warrant a separate diagnosis of stereotypic movement disorder. Individuals with intellectual disability, particularly those with more severe intellectual disability, may also exhibit aggression and disruptive behaviors, including harm of others or property destruction.

## Relationship to Other Classifications

ICD-11 (in development at the time of this publication) uses the term *intellectual developmental disorders* to indicate that these are disorders that involve impaired brain functioning early in life. These disorders are described in ICD-11 as a metasyndrome occurring in the developmental period analogous to dementia or neurocognitive disorder in later life. There are four subtypes in ICD-11: mild, moderate, severe, and profound.

The American Association on Intellectual and Developmental Disabilities (AAIDD) also uses the term *intellectual disability* with a similar meaning to the term as used in this

manual. The AAIDD's classification is multidimensional rather than categorical and is based on the disability construct. Rather than listing specifiers as is done in DSM-5, the AAIDD emphasizes a profile of supports based on severity.

# Global Developmental Delay

## 315.8 (F88)

This diagnosis is reserved for individuals *under* the age of 5 years when the clinical severity level cannot be reliably assessed during early childhood. This category is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning, and applies to individuals who are unable to undergo systematic assessments of intellectual functioning, including children who are too young to participate in standardized testing. This category requires reassessment after a period of time.

# Unspecified Intellectual Disability (Intellectual Developmental Disorder)

## 319 (F79)

This category is reserved for individuals *over* the age of 5 years when assessment of the degree of intellectual disability (intellectual developmental disorder) by means of locally available procedures is rendered difficult or impossible because of associated sensory or physical impairments, as in blindness or prelingual deafness; locomotor disability; or presence of severe problem behaviors or co-occurring mental disorder. This category should only be used in exceptional circumstances and requires reassessment after a period of time.

# Communication Disorders

Disorders of communication include deficits in language, speech, and communication. *Speech* is the expressive production of sounds and includes an individual's articulation, fluency, voice, and resonance quality. *Language* includes the form, function, and use of a conventional system of symbols (i.e., spoken words, sign language, written words, pictures) in a rule-governed manner for communication. *Communication* includes any verbal or nonverbal behavior (whether intentional or unintentional) that influences the behavior, ideas, or attitudes of another individual. Assessments of speech, language and communication abilities must take into account the individual's cultural and language context, particularly for individuals growing up in bilingual environments. The standardized measures of language development and of nonverbal intellectual capacity must be relevant for the cultural and linguistic group (i.e., tests developed and standardized for one group may not provide appropriate norms for a different group). The diagnostic category of communication disorders includes the following: language disorder, speech sound disorder, childhood-onset fluency disorder (stuttering), social (pragmatic) communication disorder, and other specified and unspecified communication disorders.

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

THE 11TH EDITION OF THE AAIDD DEFINITION MANUAL

**aaidd**

PA0502

# Intellectual Disability

PA0503

Case: 20-1900    Document: 21-2    Filed: 10/21/2020    Pages: 232

# Intellectual Disability

## Definition, Classification, and Systems of Supports

*The AAIDD Ad Hoc Committee on*
*Terminology and Classification*

11th Edition



aaidd

American Association
on Intellectual and
Developmental Disabilities

PA0504

Copyright © 2010 by the American Association on Intellectual and Developmental
Disabilities

Published by
American Association on Intellectual and Developmental Disabilities
501 3rd Street, NW, Suite 200
Washington, DC 20001-2760

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Intellectual disability : definition, classification, and systems of supports / The AAIDD
Ad Hoc Committee on Terminology and Classification.—11th ed.
    p. cm.
 Includes bibliographical references and index.
 ISBN 978-1-935304-04-3 (alk. paper)
 1.  Mental retardation—Classification.  I. American Association on Intellectual and
Developmental Disabilities.
 RC570.C515 2010
 616.85'88—dc22                                    2009040030

PA0505

# CHAPTER 1

## DEFINITION OF INTELLECTUAL DISABILITY

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

## OVERVIEW

*Defining* refers to precisely explaining the term and establishing the meaning and boundaries of the term. Significant consequences can result from the way a term is defined. As discussed by Gross and Hahn (2004), Luckasson and Reeve (2001), and Stowe, Turnbull, and Sublet (2006), a definition can make someone eligible or ineligible for services, subjected to something or not subjected to it (e.g., involuntary commitment), exempted from something or not exempted (e.g., from the death penalty), included or not included (as to protections against discrimination and equal opportunity), and/or entitled or not entitled (e.g., as to Social Security benefits or other financial benefits). Our purpose in this chapter is to review briefly the historical approaches to defining *intellectual disability* (ID), present the current definition of ID and the assumptions that are essential to the application of the definition, discuss the historical consistency in regard to the three criteria used to operationally define the construct, and summarize how the boundaries of the construct have been operationalized over the past 50 years.

## HISTORICAL APPROACHES TO DEFINING INTELLECTUAL DISABILITY

Historically, four broad approaches (i.e., social, clinical, intellectual, and dual-criterion) have been used to define the construct now referred to as ID. Remnants of these four approaches are still evident in current discussions regarding who is (or should be) diagnosed as an individual with an ID (see, for example, Switzky & Greenspan, 2006a, 2006b).

### Social Approach

Historically, persons were defined or identified as having ID because they failed to adapt socially to their environment. Because an emphasis on intelligence and the role of intelligent people in society was to come later, the oldest historical definitional approach

PA0506

# CHAPTER 5

## ADAPTIVE BEHAVIOR AND ITS ASSESSMENT

Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.

For the diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills. The assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores.

## OVERVIEW

The inclusion of the concept of adaptive behavior in the diagnosis of persons with *intellectual disability* (ID) has a long history. Nihira (1999), for example, cited early leaders, such as Itard, Seguin, Voison, and Howe, who referred to signs of ID that included the absence of social competency, a need for skill training, an inability to meet social norms, and difficulty with fending for one's self. Although adaptive behavior did not play a formal role in the diagnosis of ID during the first half of the 20th century, the construct's importance to understanding ID was not completely abandoned. Doll, for example, introduced the Vineland Social Maturity Scale in 1936, an instrument that included 117 items focused on practical skills used in everyday situations.

When the intelligence test, resulting in an IQ score, was introduced in the early 1900s, it was embraced as an efficient and objective means to distinguish individuals with ID from the general population (Scheerenberger, 1983). The intelligence test not only produced a highly reliable score, but because it was normed on the general population, it yielded an unambiguous indicator of how much a person deviated from others. However, dissatisfaction with the IQ score as the sole indicator of ID emerged over time. Among the greatest concerns about intelligence testing was that IQ scores only provided a narrow measure of intellectual functioning related to academic tasks (i.e., linguistic, conceptual,

PA0507

# CHAPTER 6

## ROLE OF ETIOLOGY IN THE DIAGNOSIS OF INTELLECTUAL DISABILITY

Etiology represents a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time and affect the individual's overall functioning. Diagnostic assessment and classification of the etiology consists of a description of all of the risk factors that are present in a particular individual and that contribute to the individual's present functioning and potential diagnosis of intellectual disability. Genotype-phenotype correlations may be useful, but caution is needed when applying these data to individual circumstances.

## OVERVIEW

In this chapter we describe the multifactorial nature of the etiology of *intellectual disability* (ID) and how etiology is determined and classified based on biomedical, social, behavioral, and educational risk factors. The five sections of the chapter cover (a) the importance of etiology, (b) the multifactorial nature of etiology, (c) etiologic assessment, (d) etiologic diagnosis and classification, and (e) etiology and performance. These five sections incorporate genetic research advances and research about behaviors that are associated with specific etiologies. Additionally, the system for etiologic diagnosis and classification presented in the chapter is consistent with the multidimensional approach to ID presented in this *Manual* and facilitates the design and implementation of strategies for prevention and support (see chapter 10).

## IMPORTANCE OF ETIOLOGY

Consideration of the etiology of ID is important for several reasons. Chief among these are the following:

1. The etiology may be associated with other health-related problems that may influence physical and psychological functioning.

© American Association on Intellectual and Developmental Disabilities

PA0508

2. The etiology may be treatable, which could permit appropriate treatment to minimize or prevent ID.
3. Accurate information is needed for the design and evaluation of programs to prevent specific etiologies of ID.
4. Comparison of individuals for research, administrative, or clinical purposes may depend on formation of maximally homogeneous groups composed of individuals with the same or similar etiologies.
5. The etiology may be associated with a specific behavioral phenotype that allows anticipation of actual, potential, or future functional support needs.
6. Information about the etiology facilitates genetic counseling and promotes family choice and decision making, including preconception counseling.
7. Individuals and families can be referred to other persons and families with the same etiologic diagnosis for information and support.
8. Knowing the etiology facilitates self-knowledge and life planning for the individual.
9. Understanding the etiology may clarify clinical issues for service providers.
10. Clarification of biomedical, social, behavioral, and educational risk factors that contribute to the etiology offers opportunities for prevention of the disability.

Performing a diagnostic evaluation to determine the etiology may be questioned by some providers. They may argue that the cost of testing is excessive and that the results will not change the individual's treatment. If the parents do not plan to have any more children, they may argue that testing for an inherited disorder is pointless. When the individual with ID is an adult, the parents may no longer have any interest in finding the etiology. Adult service providers may feel that the etiology is irrelevant to the development of the individual's plan of supports and services. These objections can be answered by considering the reasons for establishing the etiology listed earlier, and the cost of diagnostic testing can often be justified in specific situations. For example, knowing that an adult with cognitive decline has Down syndrome should alert the provider to look for hypothyroidism or depression. Knowing that a child with cognitive decline has Angelman syndrome should alert the provider to look for subclinical seizures. Knowing that an individual with new neurological findings has tuberous sclerosis should alert the provider to look for the characteristic brain tumor associated with this diagnosis. Knowing that an adult man has fragile X syndrome should alert the provider to offer genetic testing to the man's sisters who may be carriers and could have affected sons. Knowing that a child has a particular condition allows the family to search the Internet and to contact other families affected by this diagnosis, thereby learning more about it than their health care provider may know. These examples illustrate why testing to establish the etiologic diagnosis may be important for many individuals with ID.

## Multifactorial Nature of Etiology

In this chapter we build on the approach to etiology described in previous AAMR *Manuals* (Luckasson et al., 1992, 2002). Etiology is conceptualized as a multifactorial

PA0509

construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the life of the individual and across generations from parent to child. This construct replaces prior approaches that divided the etiology of ID into two broad types: ID of biological origin and ID due to psychosocial disadvantage (Grossman, 1983). The two-group approach (biological and cultural-familial) was defended on the basis of developmental theory (Hodapp, Burack, & Zigler, 1990). Different developmental pathways were associated with ID due to identified biological disorders compared to ID for which no organic etiology is apparent (due to cultural-familial factors or psychosocial disadvantage). These researchers recommended a biological or genetic classification of etiology, in which there is either a demonstrated biological cause or there is not. This approach is consistent with the approach presented in this chapter. In fact, the risk factor approach can be seen as a fine-tuning of the developmental (two-group) approach. What was called "ID of biological origin" can be seen as involving individuals for whom biomedical risk factors predominate, while "ID of cultural-familial origin" can be seen as involving individuals for whom social, behavioral, or educational risk factors predominate.

The two-group distinction is often blurred in real life, however. The multiple risk factor approach correctly notes that biomedical risk factors may be present in persons with ID of cultural-familial origin, and social, behavioral, and educational risk factors may be present in persons with ID of biological origin. For example, individuals with the same biomedical genetic etiology often vary widely in functioning, presumably as the result of other modifying risk factors. The multiple risk factor approach to etiology thus is the logical extension of previous work in this area and provides a more comprehensive explanation of the many interacting causes of impaired functioning in persons with ID (Chapman, Scott, & Stanton-Chapman, 2008).

There has been an explosion of new genetic information in the past decade (cf. Butler & Meaney, 2005). This explosion has led some to consider the etiology of ID primarily in genetic terms. The recommendations of the American College of Human Genetics for the etiologic evaluation of ID (Curry, Stevenson, Aughton, & Byrne, 1997) emphasized genetic testing, as did the recommendations of the Committee on Genetics of the American Academy of Pediatrics (Moeschl & Shevell, 2006). The Child Neurology Society's practice parameter on the evaluation of children with global developmental delay (Shevell et al., 2003) also emphasized biomedical causes and included evidence-based recommendations for genetic testing. Although in a recent textbook on ID, Harris (2006) mentions AAIDD's multifactorial risk factor approach presented in the 2002 *Manual* (Luckasson et al.), the author discusses in depth primarily genetic and other biomedical causes.

Clearly, genetics cannot explain the cause of ID in every case. Individuals may be born with perfectly normal DNA and still develop ID due to a birth injury, malnutrition, child abuse, or extreme social deprivation. Understanding the cause of ID in these cases requires consideration of other biomedical, behavioral, and social risk factors. The guidelines reviewed above all note that even the most extensive and up-to-date genetic and biomedical testing will identify an etiology in less than half of all cases. Indeed, even if one could measure the entire genome in patients with ID (which should become

PA0510

feasible within the next 10 years), the results would not explain the cause when ID is due primarily to social or behavioral risk factors. On the other hand, at least one or more of the risk factors shown in Table 6.1 will be found in every case of ID. Thus a multifactorial approach to etiology (which incorporates all of the above genetic and biomedical testing,

TABLE 6.1

**Risk Factors for Intellectual Disability**

| Timing | Biomedical | Social | Behavioral | Educational |
|---|---|---|---|---|
| Prenatal | 1. Chromosomal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to prenatal care | 1. Parental rejection of caretaking<br>2. Parental abandonment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoencephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver interaction<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutionalization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early intervention services<br>4. Inadequate special education services<br>5. Inadequate family support |

PA0511

as well as consideration of all of the other potential risk factors that might be operative) provides the most thorough way to evaluate the etiology of ID in a particular case.

The multifactorial approach to etiology presented in this chapter expands the list of causal factors in two directions: types of factors and timing of factors. The first direction expands the types or categories of factors into four groupings:

1. *Biomedical*: biologic processes, such as genetic disorders or nutrition
2. *Social*: social and family interaction, such as stimulation and adult responsiveness
3. *Behavioral*: potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse
4. *Educational*: availability of educational supports that promote mental development and the development of adaptive skills

The second direction concerns the timing of the occurrence of causal factors according to whether these factors affect the parents of the person with ID, the person with ID, or both. This aspect of causation is termed *intergenerational* to describe the influence of factors present during one generation on the outcome in the next generation. The modern concept of intergenerational effects must be distinguished from the historical concept that ID was related to "weak genes" due to psychosocial, cultural, or familial factors (Scheerenberger, 1983). This modern concept recognizes that reversible environmental factors in the lives of some families may be related to the etiology of ID and stresses that the understanding of these factors should lead to enhanced individual and family supports. Because of the relationship to prevention and supports, these intergenerational effects are considered further in chapter 10 (see Table 10.1 in particular).

Table 6.1 lists risk factors for ID by category and by the time of occurrence of the risk factor in the life of the individual. Unlike classification systems based primarily on biomedical conditions (such as the *ICD-10* [World Health Organization, 1993]), the classification system outlined in Table 6.1 represents a multifactorial approach to the etiology of ID. It incorporates biomedical risk factors but places them in context by including other risk factors that may be of equal or greater importance in determining the individual's level of functioning. The list of risk factors in Table 6.1 is not exclusive and can be expanded as new risk factors are discovered. Research should result in continual revision and updating of these specific risk factors, but the basic structure of the table should be relevant for the foreseeable future.

Because ID is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning. A biomedical risk factor may be present but by itself may not cause ID (as, for example, when a patient with a genetic disorder has average intelligence). Any risk factor causes ID only when it results in impaired functioning sufficient to meet the criteria for a diagnosis of ID as described in this *Manual*. Table 6.1 emphasizes that the impairment of functioning that is present when an individual meets the three criteria for a diagnosis of ID usually reflects the presence of several risk factors that interact over time. Thus, the search for the etiology of ID in a particular individual must consist of a search for all of the risk factors that might have resulted in impaired functioning for that person. This search involves obtaining as much historical medical

PA0512

information as possible, performing psychological and physical examinations, and pursuing sufficient laboratory investigations to consider reasonable possibilities.

## ETIOLOGIC ASSESSMENT

### Medical History

Diagnostic assessment begins with a complete history and physical examination to uncover all of the potential risk factors that may be present in each of the four categories shown in Table 6.1. The medical history begins at conception and includes detailed information about the prenatal, perinatal, and postnatal periods. Information needed about the prenatal period includes maternal age; parity and health (including maternal infections such as hepatitis, HIV, rubella, cytomegalovirus, group B streptococcus, etc.); the adequacy of maternal nutrition; the amount and quality of prenatal care (including results of prenatal screening, ultrasound examinations, and amniocentesis if performed); maternal use of drugs, alcohol, and other substances; maternal exposure to potential toxins or teratogens (such as lead or radiation); and occurrence of any significant maternal injuries during the pregnancy. Information needed about the perinatal period includes growth status at birth (gestational age at birth, birthweight, length, and head circumference); labor and delivery experiences (including onset, duration, route of delivery, presence of fetal distress prior to delivery, Apgar scores after birth, need for resuscitation); and the occurrence of any neonatal disorders after birth (such as seizures, infections, respiratory distress, brain hemorrhage, and metabolic disorders). Information needed about the postnatal period includes the history of any significant head injuries, infections, seizures, toxic and metabolic disorders (such as lead poisoning), significant malnutrition or growth impairment, and any indication of loss of previously acquired developmental skills that could indicate the presence of a progressive or degenerative disorder or a disorder on the autism spectrum.

A detailed family history is necessary to identify potential genetic etiologies (Curry et al., 1997). A detailed three-generation pedigree is recommended that includes information about the health status, medical and psychological disorders, and level of functioning of all known relatives. In particular, relatives who were affected by conditions that may be associated with ID (such as autism) or who were diagnosed with ID should be noted. Additional records concerning these individuals may be requested to provide further details. The occurrence of ID in other family members does not necessarily imply a genetic mechanism however. Multiple individuals in a family may be affected by fetal alcohol syndrome, for example, or ID in a relative may be due to childhood infections or head trauma. Results of genetic testing performed previously on any relatives should be sought and examined for completeness because testing performed more than 5 to 10 years earlier may have missed conditions diagnosable with current methods.

PA0513

## Psychosocial Evaluation

The psychosocial evaluation includes detailed information about the individual, family, school or work setting, and community or cultural milieu. Information about the psychosocial environment is needed to evaluate possible social, behavioral, and educational risk factors that may have contributed to the occurrence of ID. When an intergenerational perspective is used, information is needed about the parents' social, educational, and psychological history. Information is also needed about the structure, stability, and functioning of the immediate and extended family of the person with ID. Information about the roles and expectations of the person with ID and relatives within the extended community or culture may also be useful. The sociocultural milieu in which the individual develops is important because it may influence the psychosocial environment, including the local community; the country of origin; and specific ethnic, cultural, or religious factors that may affect environmental experiences and interactions.

The developmental history of the individual with ID includes early milestones, such as the age when the person started walking or talking. The age at entry into the educational system, the adequacy of the educational experience, and the duration of formal education should also be noted. The occurrence of other mental disorders, such as attention deficit/hyperactivity disorder, specific learning disability, or anxiety disorder should be noted because this may provide clues to a behavioral phenotype associated with a specific etiology.

Evaluation of the psychosocial environment may not yield any relevant information about causal factors in a particular individual. Even when the etiology appears straightforward, however, psychosocial factors may prove to be contributory. Reflecting the multiple risk factor approach to causation, known biomedical factors may be affected by social, behavioral, or educational factors. The ultimate etiology of ID in such cases reflects the interaction of all of these factors. For example, whether or not an individual with fetal alcohol syndrome develops ID may be influenced by environmental influences in early childhood, and the individual's level of functioning will likely reflect the adequacy of educational interventions.

## Physical Examination

The physical examination serves several distinct purposes. The usual purpose is to assist in the diagnosis of a medical problem, such as pneumonia or back pain, for which the individual has sought attention and that may require specific medical treatment. The purpose considered in this chapter is to assist in the identification of the etiology of ID. A single physical examination may serve both purposes, but the conceptual distinction between them needs to be retained.

The physical examination may provide evidence of an obvious etiology, such as Down syndrome. More often, however, it will provide only supportive evidence for an etiology suspected from other data (such as spastic diplegia associated with a history of premature birth), or it will not provide any useful information about etiology at all. For most

PA0514

individuals whose etiology of ID is obscure or unknown, the physical examination may well be normal or noncontributory. Thus, one cannot expect to discover the etiology solely from the physical examination in most cases. Physical examination is necessary, but it is only one component in the diagnostic assessment and in many cases will not be the most important component.

Information needed from the physical examination includes measurements of growth (height, weight, and head circumference), which should be plotted against age on graphs that are appropriate for the individual's status. Additional measurement of specific body structures (such as the distance between the eyes or the arm span) also may be useful (Jones, 2005). Detailed examination of the head, eyes, ears, nose, throat, glands, heart, blood vessels, lungs, abdomen, genitalia, spine, extremities, and skin should be conducted. Any major or minor malformations should be noted (Jones, 2005). A detailed neurologic examination should include evaluation for any focal or generalized deficits (Campbell, 2005). Specific neurologic findings will rarely indicate the etiology directly, but certain findings (such as hypotonia, tremor, or ataxia) could be important clues to the etiology. In some instances, examination of parents, siblings, or other relatives may be helpful.

## Laboratory Investigation

All of the data derived from the history and physical examination is then evaluated to determine whether additional laboratory testing is indicated. Table 6.2 provides a guide to the evaluation of these data. In some cases the diagnosis may be fairly obvious (e.g., when the child meets all of the clinical criteria for fetal alcohol syndrome). In most cases, however, the available data are sufficient only to provide clues or ideas about the etiology that warrant further investigation. When the etiology is not obvious, it is often helpful to list the most likely possibilities. This list, which is often referred to as *the differential diagnosis of the problem*, can be considered as a series of hypotheses regarding possible etiologies. For example, the clinical finding of microcephaly (small head) may suggest several hypotheses, such as cerebral malformation or birth injury. Clinicians can then identify a strategy for testing each hypothesis to increase or decrease the probability of it being correct. In the example of microcephaly, a hypothesis of cerebral malformation might be tested by looking for other malformations, performing neuroimaging (CT or MRI scanning of the brain) or pursuing genetic testing for a chromosome disorder. A hypothesis of birth injury might be tested by examining birth records and determining whether the head circumference was normal at birth. This example is not intended to be a complete analysis of the possible causes of microcephaly. It is described here only to illustrate the process of generating and testing hypotheses regarding possible etiologies.

The purpose of evaluating several competing hypotheses is to optimize the probability of making the correct diagnosis. In some cases, the evaluation of these hypotheses will consist of obtaining additional historical information or more extensive physical examination. In many cases, however, the evaluation will necessitate the performance of properly selected laboratory tests and procedures. Table 6.2 suggests some laboratory tests

## TABLE 6.2

### Hypotheses and Strategies for Assessing Etiologic Risk Factors

| Onset | Hypothesis | Social |
|---|---|---|
| Prenatal | Chromosomal or single gene disorder | Extended physical examination<br>Referral to clinical geneticist<br>Chromosomal and DNA analyses |
| | Syndrome disorder | Extended family history and examination of relatives<br>Extended physical examination<br>Referral to clinical geneticist |
| | Inborn error of metabolism | Newborn screening using tandem mass spectrometry<br>Analysis of amino acids in blood, urine, and/or cerebrospinal fluid<br>Analysis of organic acids in urine<br>Blood levels of lactate, pyruvate, very long chain fatty acids, free and total carnitine, and acylcarnitines<br>Arterial ammonia and gases<br>Assays of specific enzymes in cultured skin fibroblasts<br>Biopsies of specific tissue for light and electron microscopy and biochemical analysis |
| | Cerebral dysgenesis | Neuroimaging (CT or MRI) |
| | Social, behavioral, and environmental risk factors | Intrauterine and postnatal growth<br>Placental pathology<br>Detailed social history of parents<br>Medical history and examination of mother<br>Toxicological screening of mother at prenatal visits and of child at birth.<br>Referral to clinical geneticist |
| Perinatal | Intrapartum and neonatal disorders | Review of maternal records (prenatal care, labor, and delivery)<br>Review of birth and neonatal records |

© American Association on Intellectual and Developmental Disabilities

TABLE 6.2 (*continued*)

| Onset | Hypothesis | Social |
|-------|-----------|--------|
| Postnatal | Head injury | Detailed medical history<br>Brain X-rays and neuroimaging |
|  | Brain infection | Detailed medical history<br>Cerebrospinal fluid analysis |
|  | Demyelinating disorders | Neuroimaging<br>Cerebrospinal fluid analysis |
|  | Degenerative disorders | Neuroimaging<br>Specific DNA studies for genetic disorders<br>Assays of specific enzymes in blood or cultured skin fibroblasts<br>Biopsies of specific tissue for light and electron microscopy and biochemical analysis<br>Referral to clinical geneticist or neurologist |
|  | Seizure disorders | Electroencephalography<br>Referral to clinical neurologist |
|  | Toxic-metabolic disorders | See "Inborn errors of metabolism" above<br>Toxicological studies<br>Lead and heavy metal assays |
|  | Malnutrition | Body measurements<br>Detailed nutritional history<br>Family history of nutrition |
|  | Environmental and social disadvantage | Detailed social history<br>History of abuse or neglect<br>Psychological evaluation<br>Observation in new environment |
|  | Educational inadequacy | Early referral and intervention records<br>Review of educational records |

PA0517

and procedures that might be helpful in evaluating the hypotheses listed in the table. This table should not be considered complete or prescriptive because the evaluation must be tailored to the facts in an individual case. The clinician is responsible for identifying the appropriate hypotheses, devising strategies for testing them, and evaluating the results of whatever tests and procedures are performed.

Reasonably current guidelines have been published to assist clinicians in selecting appropriate laboratory tests (Moeschler & Shevell, 2006; Shevell et al., 2003). These guidelines are generally valid but need to be updated in light of subsequent research. Two areas of investigation deserve special comment. Chromosomal microarray technology (comparative genomic hybridization) is continually improving, and patients who were studied even a few years ago may need to be studied again using the newer techniques. Eventually (probably within the next 10 years), the technology will be available to sequence the entire human genome as a routine clinical test in a particular case. Genetic technology is already ahead of clinical knowledge (i.e., we can test for things we do not yet completely understand), so clinicians should be careful when assessing all of this information.

Several computerized databases exist that provide a list of possible etiologies when all of the available clinical data for a particular individual are entered. These proprietary databases are updated continually and are generally utilized by clinical geneticists. The National Library of Medicine maintains an online database that is open to the public called "Online Mendelian Inheritance in Man" that contains up-to-date genetic information about many disorders that can cause ID. Indeed, the pace of genetic research is such that any guidelines will be outdated by the time they are published, and referral to a clinical geneticist is often the best way to ensure an up-to-date evaluation of genetic etiologies.

Intellectual disability begins before age 18, but individuals with ID may first present a need for services during adulthood. If the diagnosis of ID was not made previously, it may be difficult to gather all of the relevant information needed to make the diagnosis in an adult (see chapter 8 for guidelines regarding a retrospective diagnosis). This is also true for assessment of the etiology in such cases. Much of the information described here, such as details of the pregnancy, birth history, early developmental milestones, and family functioning during childhood, as well as details of the family history or pedigree, may simply be unavailable. Similar problems often arise when individuals present a need for services following immigration from another country. The physical examination becomes more important as the clinician looks for clues about the etiology. The list of possible hypotheses or differential diagnosis becomes longer and more tentative when the available data are limited. Laboratory tests and procedures are often needed to examine these hypotheses. In the end many risk factors may be more suspected than confirmed, and a degree of uncertainty or imprecision about the etiologic diagnosis may be expected.

# ETIOLOGIC DIAGNOSIS AND CLASSIFICATION

The formulation of an etiologic diagnosis follows from the multifactorial model shown in Table 6.1. All of the information derived from the history, examinations, and laboratory testing is evaluated carefully. These data are then organized into risk factor categories (biomedical, social, behavioral, and educational), and a judgment is made as to whether the risk factors were present before (prenatal), during (perinatal), or after (postnatal) the individual's birth. All relevant risk factors are identified, including those that are thought to be most important (such as trisomy 21 or Down syndrome) as well as those that are thought to be less important (such as social deprivation or lack of timely educational intervention). The presence of interactions between risk factors are then evaluated and described. Etiologic diagnosis and classification thus consists of a comprehensive list of all of the risk factors and interactions among risk factors for which the available data provide sufficient evidence. In some cases this list may be fairly short and tentative, while in other cases it may be long and confirmed. Most cases will fall somewhere in the middle. Nonetheless, at least one reasonably plausible risk factor will usually be present in every case if sufficient diligence is applied. This multifactorial, etiologic diagnostic, and classification system for determining the etiology thereby eliminates the category of ID of unknown cause.

An example of what such an etiologic diagnosis might look like for a child with fetal alcohol syndrome (as well as other issues) would likely include the following risk factors:

- Biomedical risk factors might include the presence of fetal alcohol syndrome and congenital heart disease.
- Social risk factors might include family poverty, homelessness, and inadequate parenting skills.
- Behavioral risk factors might include parental substance abuse and abuse or neglect of the child.
- Educational risk factors might include lack of adequate early intervention services.
- Interactions among risk factors might include maternal poverty and substance abuse causing lack of prenatal care and fetal alcohol syndrome, and homelessness causing lack of adequate early intervention services.

This example is considered further in chapter 10 (see Table 10.2). The intent of this multifactorial approach to etiology is to describe all of the risk factors that contribute to the individual's present functioning. This approach then allows providers to identify strategies for supporting the individual and the family so that these risk factors might be prevented or ameliorated.

Case: 20-1900    Document: 21-2    Filed: 10/21/2020    Pages: 232

# USER'S GUIDE

# INTELLECTUAL DISABILITY

Definition, Classification, and Systems of Supports

I ITH EDITION



PA0520

TABLE 3.3

## Guidelines for Synthesizing Obtained Information

1. Show clearly that the obtained information is aligned to the critical diagnostic question: "Does the person meet the three criteria necessary for a diagnosis of intellectual disability?"

2. Integrate information from multiple data sources (i.e. broad-based assessments and a thorough history). A valid diagnosis of ID is based on multiple data points that not only include giving equal weight to significant limitations in adaptive behavior and intellectual functioning, but also requires evaluating the pattern of test scores and factors that affect the standard error of measurement of the standardized assessment instruments used.

3. Be aware that some factors might artificially inflate test scores, thus inaccurately suggesting higher scores than the individual's true score. These misleading factors include anomalies in the structural features of the norming sample, gaps in the development of spacing of item difficulties or sub-tests of a comprehensive adaptive behavior measure, and pure error variance (Jacobson & Mulick, 2006).

4. Be aware of the potential 'false positive' (where the person is diagnosed as an individual with ID but in actuality is not) and 'false negative' (where the person's true ID is not diagnosed as such) (Greenspan, 2006). To overcome a potentially incorrect diagnosis, clinicians need to: (a) equally consider (that is, equate the relative importance of) adaptive behavior and intellectual functioning in making a diagnosis of ID; (b) factor in the standard error of measurement of the assessment instrument as well as other technical properties of the instrument used; and (c) incorporate information from multiple sources, including a thorough history.

5. When a series of scores differ while purporting to measure the same construct, thoroughly explore and analyze the possible reasons for differences in data. Possible reasons include poorly trained examiner(s), improper generalizations of test scores administered for other purposes, improper selection of tests, making mistakes in scoring, administration of the same test too close in time, using different editions of the same test and not using the most recent version, examiner bias, and so forth. For example, there is evidence that IQ score estimates obtained from the WAIS may not be precisely equivalent to those obtained from the Stanford Binet (Lukens & Hurrell, 1996; Nelson & Dacey, 1999, Silverman et al., (2010).

6. Consider possible effects of personal characteristics and environmental factors that can affect test results.

7. In the synthesis of school related factors, determine whether the assessment(s) included classroom functioning and academic performance.

8. In the synthesis of information related to the evaluation of social competence, the focus should be whether the person: (a) interprets accurately others' emotions and intentions

PA0521

Case: 20-1900     Document: 21-2     Filed: 10/21/2020     Pages: 232

TABLE 3.3  (*continued*)

based on available cues; (b) generates appropriate social strategies in response to social problems, and (c) demonstrates knowledge and use of social skills such as anticipating the consequences of one's behavior or resolving particular social problems in a given social situation.

9. Recognize the impact of practice effects, which refer to gains in IQ scores that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items. In addition, practice effects do not reflect growth or other improvement on the skills being assessed (Kaufman, 1994).

10. Recognize that self-ratings have a high risk of error, since people with ID are more likely to attempt to look more competent and 'normal' than they actually are, as well as frequently exhibit an acquiescence bias. In addition, having ID is often a stigmatizing status that is tied closely to how a person is perceived by peers, family members, and others in the community; therefore, many people with ID and their families attempt to avoid the diagnosis and thus the stigma.

11. Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior. The diagnosis of intellectual disability is based on meeting three criteria: significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age of onset prior to age 18. The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.'

12. Recognize that a number of reasons might explain the lack of an earlier, official diagnosis of ID including: (a) the individual was excluded from a full school experience; (b) the person's age precluded their access to specialized services such as special education programs; (c) the person was given no diagnosis or a different diagnosis for 'political purposes' such as protection from stigma or teasing, avoidance of assertions of discrimination, or because of the potential impact on benefits of a particular diagnosis; (d) the school's concern about over-representation for data reporting purposes of specific diagnostic groups within their student population; (e) parental concerns to avoid a label; (f) school-based political issues such as availability or non-availability of services and potential funding streams at that time; and (g) the lack of entry referral into the diagnostic-referral process due to cultural and linguistic differences or for other reasons.

## RETROSPECTIVE DIAGNOSIS GUIDELINES

*The careful synthesis of information is required when a retrospective diagnosis is made.* Such a diagnosis should be based on multiple data points that not only give equal consideration to adaptive behavior and intelligence scores, but also reflect an evaluation of the pattern

PA0522

## FOSTERING JUSTICE WHEN DEALING WITH FORENSIC ISSUES

Clinicians in the field of ID may be involved in forensic issues that arise when persons with ID are involved with the civil or criminal justice system. The more common of these forensic issues center around personal competence, guardianship, property and financial management, victimization in crime, or accusations of committing a crime. This section of the *User's Guide* discusses best practices and clinical judgment guidelines that address how clinicians can foster justice when dealing with these forensic issues. These practices and guidelines relate to: (1) interpreting assessment information, (2) understanding foundational aspects of ID that are critically important in fostering justice for people with ID, and (3) overcoming common stereotypes.

## Interpreting Assessment Information

There are five critical areas involving the valid interpretation of assessment information that have emerged from clinical experiences dealing with forensic issues. These five areas involve understanding the following: (1) the concept of a confidence interval (CI), (2) the concept of a cutoff score, (3) that corrections need to be made in an obtained IQ score if the score was based on aging norms (i.e., the Flynn effect; Flynn, 2006), (4) the influence of practice effects on test results, and (5) the potential effect on test results attributable to faking.

*Confidence interval (CI).* A score obtained on a standardized psychometric instrument that assesses intellectual functioning or adaptive behavior is not absolute because of variability in the obtained score because of factors such as limitations of the instrument used, examiner's behavior and expertise, personal factors (e.g., health status of the person), or environmental factors (e.g., testing environment or testing location). Thus, an obtained score may or may not represent the individual's actual or true level of intellectual functioning or adaptive behavior because of these aforementioned factors. *Standard error of measurement (SEM)*, which varies by test, subgroup, and age group, is used to quantify the variability that is attributable to the test itself and *provides the basis for establishing a statistical CI within which the person's true score is likely to fall.*

- For well-standardized measures of general intellectual functioning, the SEM is approximately 3 to 5 points. As reported in the respective test's standardization manual, the test's SEM can be used to establish a *statistical confidence interval (CI) around the obtained score.* From the properties of the normal curve, a range of confidence can be established with parameters of at least one standard error of measurement (i.e. scores of about 66 to 74, 66% probability) or parameters of two standard error of measurement (i.e. scores of about 62 to 78, 95% confidence).
- For well-standardized measures of adaptive behavior the SEM for obtained scores is comparable to that of standardized tests of intelligence. Thus, the use of plus/minus one standard error of measurement yields a statistical confidence interval (around the obtained score) within which the person's true score will fall 66% of the time; the use of plus/minus two standard error of measurement yields a sta-

22

tistical confidence (around the obtained score) in which the person's true score will fall 95% of the time. Thus, an obtained score on an adaptive behavior scale should be considered as an approximation that has either a 66% or 95% likelihood of accuracy, depending on the confidence interval used. There is no evidence suggesting that the population mean on standardized tests of adaptive behavior is increasing at a rate comparable to that observed on standardized tests of intelligence (i.e., Flynn effect). Because of the differences in test construction and administration between intellectual functioning and adaptive behavior, practice effect is not an issue with standardized adaptive behavior scales. One source of measurement error may be specific to measures of adaptive behavior and that is the concern that individuals may exaggerate their adaptive skills when asked to self-report their adaptive behavior. For this reason, numerous sources (e.g. Edgerton, 1967; Finlay & Lyons, 2002; Greenspan & Switzky, 2006; Schalock et al., 2010) have recommended against relying on self-reported measures of adaptive behavior when ruling-in or -out a diagnosis of ID.

*Cutoff score.*    A cutoff score is the score(s) that determines the boundaries of the "significant limitations in intellectual functioning and adaptive criteria" for a diagnosis of ID.

- For both criteria, the cutoff score is approximately 2 standard deviations (SD) below the mean of the respective instrument, considering the SEM (see *Confidence interval*) for the specific instrument used, and the strengths and limitations of the instrument.
- A fixed point cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.

*Flynn Effect.*    The *Flynn Effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn Effect effects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted (Fletcher et al., 2010; Gresham & Reschly, 2011; Kaufman, 2010; Reynolds et al., 2010; Schalock et al., 2010). For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July, 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, on the basis of Flynn's data (2006), the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years $\times$ 0.30 = 2.7). Hence, using the significant limitations of approximately 2 SDs below the mean, the Full-Scale IQ cutoff would be approximately 73 and not approximately 70 (plus or minus the SEM).

*Practice effect.*    The practice effect refers to gains in IQ scores on tests of intelligence that result from a person being tested on the same instrument. The established clinical best practice is to avoid administering the same intelligence test within a year to the same individual because it will often lead to an overestimation of the examinee's true intelligence.

PA0524

*Claims of faking.*   Sometimes in a contested legal case an allegation of intentional "faking bad" is made, asserting that the individual is attempting to gain a benefit by deliberately faking a disability. Such claims of faking, when they are made, are usually in cases involving mental disorders because mental illness can have a later-life onset, subjective symptoms, and waxing and waning symptoms.

Allegations that an individual is intentionally faking bad, by faking ID, occur in some legal cases. The cases in which such allegations occur are cases in which rights such as eligibility for financial supports or exemption from the death penalty would come into play if the individual has an ID (Keyes, 2004). The term *malingering* is often used to refer to "faking bad." The *DSM-IV-TR* (APA, 2000) defined malingering as intentionally and purposefully feigning an illness to achieve some recognizable goal or tangible benefit (e.g., feigning ID to be spared the death penalty). Such allegations that a person is faking ID must be analyzed cautiously, however, for several reasons. First, the elements required for a diagnosis of ID must have been present from an early age (ID must originate before the age of 18), so there is almost always a documented lifetime history, usually beginning at birth or early childhood and extending through the school years, of significant limitations in intellectual functioning and adaptive behavior. Second, in cases in which an earlier diagnosis of ID cannot be documented because the individual grew up in another country and/or there are no assessment records, a clinician may conduct or access a current assessment of intellectual functioning and adaptive behavior, including a history, to determine current functioning, and together with clinical judgment make a retrospective diagnosis if indicated. Third, the more common faking direction when an individual with ID attempts to fake is to "fake good" so as to hide their ID and try to convince others that he or she is more competent (Edgerton, 1967).

Claims of faking ID in an individual should be addressed by a clinician in ID conducting a thorough evaluation for ID using the diagnostic and clinical strategies outlined in the 11th edition of the AAIDD manual and in this *User's Guide.* The authors of this *User's Guide* are aware of the concern that some (e.g., Doane & Salekin, 2008) have expressed about the potential to feign deficits on currently used adaptive behavior scales. Clinicians need to be aware of this potential and ensure that they interview multiple individuals who know the person well and who have had the opportunity to directly observe the person engaging in his or her typical behaviors across multiple contexts (i.e., home, community, school, and work).

Clinicians who similarly attempt to use specific "malingering" tests in individuals with ID must use considerable caution because of two factors: (1) the lack of a research base supporting the accuracy of such tests for persons with ID (Hayes et al., 1997; Hurley & Deal, 2006); and (2) the documented misuse of common malingering tests even when the test manual explicitly precludes use with individuals with ID (Keyes, 2004). Standardized assessment instruments used to inform the clinician whether the person is putting forth his or her best effort (i.e., malingering) have not, for the most part, been normed for persons with ID (MacVaugh & Cunningham, 2009). In addition, recent studies have documented unacceptable error rates (i.e., false positive for malingering) when used with persons with IQ scores from 50 to 78 (Dean et al., 2008; Hurley & Deal, 2006). Thus, the assessment of "faking bad" with individuals with low IQs (i.e., below 80) should be conducted with great prudence when relying on standardized measures that are not strictly normed or validated with persons being assessed for ID.

24

## Foundational Aspects of ID

Terminology and concepts used within one field or profession (such as ID) are frequently not understood clearly by members of another field or profession. As a result, confusion and misunderstanding can occur within the courtroom and impact legal decisions. Successfully addressing forensic issues requires that all key players understand the following foundational aspects of ID that are critically important in fostering justice for people with ID. First, limitations in the individual's present functioning must be considered within the context of community environments typical of the individual's age peers and culture. Thus, the standards against which the individual's functioning are compared are typical community-based environments, not environments that are isolated or segregated by ability or current placement. Typical community environments include homes, neighborhoods, schools, businesses, and other environments in which people of similar age ordinarily live, play, work, and interact.

Second, within an individual, limitations often coexist with strengths. Individuals may have capabilities and strengths that are independent of ID such as strengths in social or physical capabilities, some adaptive-skill areas, or in one aspect of an adaptive skill in which they otherwise show an overall limitation. Third, ID is not the same as an LD. An ID is characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18 (Schalock et al., 2010, p. 1). In distinction, a learning disability (LD) is characterized by a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia (34 CFR sec. 300.8 [10]).

The fourth critically important foundational aspect is that adaptive behavior is conceptually different from maladaptive or problem behavior. This is true despite the fact that many adaptive behavior scales contain assessment of problem behavior, maladaptive behavior, or emotional competence. To be specific, (1) there is general agreement that the presence of clinically significant levels of problem behaviors found on adaptive behavior scales does not meet the criterion of significant limitations in adaptive functioning, (2) behaviors that interfere with the person's daily activities, or with the activities of those around him or her, should be considered problem behavior rather than the absence of adaptive behavior, and (3) the function of problem behavior may be to communicate an individual's needs, and in some cases, may even be considered an adaptive response to environmental conditions.

## Overcoming Common Stereotypes

Stereotypes are not unique to persons with ID. Indeed, most individuals or groups who are perceived as different on some basis are stereotyped based on the perceiver's mental model or image of such persons or groups. In reference to persons with ID, historical terminology contributes to stereotyping as reflected in such terms as idiot, imbecile, or moron. Physical appearance can also contribute to stereotypes as reflected in the state-

© American Association on Intellectual and Developmental Disabilities

PA0526

ment that "if you don't have the look (as in Down syndrome) then you are not intellectu-
ally disabled." It should be noted that the vast majority of persons with an ID have no
dysmorphic feature and generally walk and talk like persons without an ID.

Regardless of their origin, a number of incorrect stereotypes can interfere with justice.
These incorrect stereotypes must be dispelled:

- Persons with ID look and talk differently from persons from the general popula-
tion
- Persons with ID are completely incompetent and dangerous
- Persons with ID cannot do complex tasks
- Persons with ID cannot get driver's licenses, buy cars, or drive cars
- Persons with ID do not (and cannot) support their families
- Persons with ID cannot romantically love or be romantically loved
- Persons with ID cannot acquire vocational and social skills necessary for independ-
ent living
- Persons with ID are characterized only by limitations and do not have strengths
that occur concomitantly with the limitations

These incorrect stereotypes are unsupported by both professionals in the field and
published literature. Stereotypes are best addressed by understanding the characteristics
of persons with ID, and especially those common characteristics of persons with ID with
higher IQs that were summarized in Tables 3.1 and 3.2.

PA0527

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing volume of Petitioner/Appellant's Appendix with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


/s/ *Peter Williams*
Peter Williams

Dated: October 21, 2020