No. 20-1900

CAPITAL HABEAS CASE

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————

CHADRICK FULKS,
Petitioner–Appellant,

v.

T.J. WATSON, Warden,
Respondent–Appellee.

———————————————

On Appeal from the United States District Court for the
Southern District of Indiana, No. 2:15-CV-33 (Hon. James R. Sweeney, II)

———————————————

**RESPONSE BRIEF FOR APPELLEE T.J. WATSON**

———————————————

JOHN C. CHILDRESS
Acting United States Attorney
Southern District of Indiana

ROBERT FRANK DALEY, JR.
KATHLEEN MICHELLE STOUGHTON
Assistant United States Attorneys
District of South Carolina

BRIAN C. RABBITT
Acting Assistant Attorney General

ROBERT A. ZINK
Acting Deputy Assistant Attorney
General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES .....................................................................iii

GLOSSARY ........................................................................................ vii

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION............................................................. 2

ISSUES PRESENTED ............................................................................. 2

STATEMENT OF THE CASE.................................................................... 3

    A.    Procedural History........................................................... 3

    B.    Relevant Facts ................................................................ 4

        1.    Fulks escaped from a detention facility and went on a multi-state crime spree that left two women dead. .............. 4

        2.    Fulks pleaded guilty and was sentenced to death on two of the eight offenses of conviction. ............................ 8

        3.    Fulks raised a claim of intellectual disability for the first time in 2019 in a petition for habeas corpus............... 12

        4.    The district court denied Fulks's habeas petition. ............. 14

SUMMARY OF ARGUMENT ................................................................. 18

ARGUMENT ...................................................................................... 22

I.    Fulks May Not Raise His *Atkins* Claim Under Section 2241 Because He Cannot Satisfy Section 2255(e)'s Saving Clause. .............. 22

    A.    Standard of review.................................................................. 22

    B.    Section 2255's remedy is inadequate or ineffective only in limited circumstances............................................................ 22

C.  Section 2255 was not inadequate or ineffective based on the Supreme Court's later refining of the legal standards applicable to intellectual disability claims. .................................. 29

    1.  Background: *Hall*, *Moore I*, and *Moore II* ........................... 30

    2.  The possibility that Fulks would not have prevailed under Fourth Circuit law does not show that § 2255 was inadequate or ineffective to test the legality of his sentence. ................................................................................. 32

    3.  Fourth Circuit precedent did not prevent Fulks from raising his *Atkins* claim when he brought his § 2255 motion. ................................................................................. 34

D.  Section 2255 was not inadequate or ineffective based on updates to the diagnostic manuals. ........................................... 39

    1.  *Bourgeois* forecloses the claim that updates to diagnostic manuals allow recourse to the saving clause. ................................................................................. 40

    2.  The updates did not alter the definition of intellectual disability, and the prior versions did not prevent Fulks from bringing an *Atkins* claim. ........................................ 42

E.  Fulks's additional arguments are unavailing. ............................. 51

F.  Because he is challenging the legality of his sentence, and not just its execution, Fulks cannot avoid the saving clause. ........ 54

II.  Fulks's Alternative Argument That He Is Functionally Equivalent to an Intellectually Disabled Person Is Also Barred by the Saving Clause. ...................................................................................... 56

CONCLUSION ...................................................................................... 61

CERTIFICATE OF COMPLIANCE ........................................................... 62

CERTIFICATE OF SERVICE ............................................................... 63

ii

# TABLE OF AUTHORITIES

## Cases

*Atehortua v. Kindt*,
   951 F.2d 126 (7th Cir. 1991) ................................................................ 54

*Atkins v. Virginia*,
   536 U.S. 304 (2002) ..................................................................... passim

*Bailey v. United States*,
   516 U.S. 137 (1995) ............................................................................ 24

*Bourgeois v. Watson*,
   977 F.3d 620 (7th Cir.), *cert. denied*, 2020 WL 7296816 (Dec. 11,
   2020) ....................................................................................... passim

*Bourgeois v. Watson*,
   980 F.3d 1190 (7th Cir. 2020) ............................................................ 42

*Bourgeois v. Watson*,
   No. 20-6500, 2020 WL 7296816 (U.S. Dec. 11, 2020) ....................... 42, 53

*Camacho v. English*,
   872 F.3d 811 (7th Cir. 2017) ........................................................... 22, 57

*Delo v. Stokes*,
   495 U.S. 320 (1990) ............................................................................ 56

*Ford v. Wainwright*,
   477 U.S. 399 (1986) ......................................................................... 21, 57

*Fulks v. United States*,
   875 F. Supp. 2d 535 (D.S.C. 2010) ............................................... passim

*Garza v. Lappin*,
   253 F.3d 918 (7th Cir. 2001) ....................................................... 24, 25, 26

*Glaser v. Wound Care Consultants, Inc.*,
   570 F.3d 907 (7th Cir. 2009) .............................................................. 42

*Green v. Johnson*,
   515 F.3d 290 (4th Cir. 2008) ...................................................... 35, 36, 38

*Hall v. Florida*,
  572 U.S. 701 (2014) .................................................................... passim

*Hall v. Watson*,
  829 F. App'x 719 (7th Cir. 2020) ............................................ 27

*In re Davenport*,
  147 F.3d 605 (7th Cir. 1998) ................................................15, 24, 25, 33

*In re Johnson*,
  935 F.3d 284 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2521 (2020) .............. 44

*Johnson v. United States*,
  576 U.S. 591 (2015) ................................................................. 12

*Lee v. Watson*,
  964 F.3d 663 (7th Cir.), *cert. denied*, 2020 WL 3964235 (July 14,
  2020) ..................................................................................... 27

*Madison v. Alabama*,
  139 S. Ct. 718 (2019) ...................................................... passim

*McCleskey v. Zant*,
  499 U.S. 467 (1991) .................................................................. 56

*McManus v. Neal*,
  779 F.3d 634 (7th Cir. 2015) ............................................45, 50

*Moore v. Texas*,
  137 S. Ct. 1039 (2017).................................................... passim

*Moore v. Texas*,
  139 S. Ct. 666 (2019) .......................................................28, 32

*Morales v. Bezy*,
  499 F.3d 668 (7th Cir. 2007) ................................................ 41

*Panetti v. Quarterman*,
  551 U.S. 930 (2007).............................................................57, 58

*Poe v. LaRiva*,
  834 F.3d 770 (7th Cir. 2016) ........................................ 15, 17, 33

iv

*Prevatte v. Merlak*,
865 F.3d 894 (7th Cir. 2017) ....................................................................... 2

*Prieto v. Zook*,
791 F.3d 465 (4th Cir. 2015) ............................................................... 36, 38

*Purkey v. United States*,
964 F.3d 603 (7th Cir.), *cert. denied*, 2020 WL 4006838 (July 16,
2020) ....................................................................................................... passim

*Richardson v. Branker*,
668 F.3d 128 (4th Cir. 2012) ............................................................... 34, 35

*Roper v. Simmons*,
543 U.S. 551 (2005) .................................................................................... 26

*Roundtree v. Krueger*,
910 F.3d 312 (7th Cir. 2018) ..................................................................... 23

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) ............................................................................... 12

*Taylor v. Gilkey*,
314 F.3d 832 (7th Cir. 2002) ......................................................... 24, 25, 33

*Trenkler v. United States*,
536 F.3d 85 (1st Cir. 2008) ........................................................................ 41

*United States v. Davis*,
139 S. Ct. 2319 (2019) ............................................................................... 12

*United States v. Fulks*,
454 F.3d 410 (4th Cir. 2006), *cert. denied*, 551 U.S. 1147 (2007) ......... passim

*United States v. Fulks*,
683 F.3d 512 (4th Cir. 2012), *cert. denied*, 571 U.S. 941 (2013) .............. 4, 11

*United States v. Hayman*,
342 U.S. 205 (1952) .................................................................................... 22

*Valona v. United States*,
138 F.3d 693 (7th Cir. 1998) ..................................................................... 55

*Vialva v. Watson*,
   975 F.3d 664 (7th Cir. 2020) ............................................................... 27

*Walker v. Kelly*,
   593 F.3d 319 (4th Cir. 2010) ..........................................................36, 37

*Webster v. Daniels*,
   784 F.3d 1123 (7th Cir. 2015) (en banc)........................................... passim

*Wilson v. Cook County*,
   937 F.3d 1028 (7th Cir. 2019), *cert. denied*, 2020 WL 3146694 (June
   14, 2020) ....................................................................................... 42

**Statutes**

18 U.S.C. § 371 ....................................................................................3

18 U.S.C. § 922 ....................................................................................3

18 U.S.C. § 924 .......................................................................... 3, 12, 24

18 U.S.C. § 1201 ...................................................................................3

18 U.S.C. § 2119 ...................................................................................3

18 U.S.C. § 2312 ...................................................................................3

28 U.S.C. § 2241 ........................................................................... passim

28 U.S.C. § 2254 ................................................................................. 34

28 U.S.C. § 2255 ........................................................................... passim

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No.
   104-132, 110 Stat. 1214....................................................................... 23

# GLOSSARY

AAIDD      American Association on Intellectual and Developmental Disabilities

AAIDD-11 American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports,* 11th Edition (2010)

AAMR      American Association on Mental Retardation (now the AAIDD)

AAMR-9    American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports*, Ninth Edition (1992)

AAMR-10   American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports*, Tenth Edition (2002)

DSM-4     American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (2000)

DSM-5     American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* Fifth Edition (2013)

**INTRODUCTION**

Chadrick Fulks received the death penalty in 2004 after he pleaded guilty to killing two women with his co-defendant Brandon Basham. Although his defense at the trial's penalty phase focused on his low intelligence, he never claimed that he suffered from an intellectual disability that would prevent the imposition of the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). Indeed, both his trial counsel and his expert witnesses specifically disclaimed the view that Fulks was intellectually disabled. He subsequently sought collateral relief under 28 U.S.C. § 2255, raising dozens of claims, but none based on *Atkins*.

Fulks now attempts to raise an *Atkins* intellectual disability claim for the first time in a habeas corpus petition under 28 U.S.C. § 2241. The district court correctly held that Fulks could not satisfy the "saving clause" in 28 U.S.C. § 2255(e) because he could not show that his remedy under § 2255 was inadequate or ineffective to test the legality of his capital sentence. Fulks's reliance on recent Supreme Court cases addressing intellectual disability and updates to the relevant diagnostic manuals is unavailing because neither demonstrates a structural deficiency in § 2255 that prevented him from raising his claim in his § 2255 motion. Indeed, this Court rejected arguments nearly indistinguishable from Fulks's in *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir.),

1

*cert. denied*, 2020 WL 7296816 (Dec. 11, 2020). The same result necessarily follows here. Because nothing prevented Fulks from raising his *Atkins* claim in his § 2255 motion—or even at the time of trial—he cannot avail himself of § 2241.

## STATEMENT OF JURISDICTION

In the government's view, the saving clause of 28 U.S.C. § 2255 is jurisdictional and therefore the district court lacked subject matter jurisdiction. *See* Petition for a Writ of Certiorari, *United States v. Wheeler*, 2018 WL 5017116, at *16-*17. This Court has held, however, that the saving clause is not jurisdictional, *see Prevatte v. Merlak*, 865 F.3d 894, 901 (7th Cir. 2017), and therefore Fulks's jurisdictional statement is complete and correct under this Court's precedent.

## ISSUES PRESENTED

1. Whether Fulks's remedy under 28 U.S.C. § 2255 was "inadequate or ineffective" to bring an intellectual disability claim—therefore allowing him to bring a habeas corpus petition under 28 U.S.C. § 2241—because the standards for diagnosing intellectual disability were further refined after he brought his § 2255 motion.

2. Whether Fulks can avail himself of § 2241 to raise his alternative argument that he is functionally equivalent to an intellectually disabled person.

## STATEMENT OF THE CASE

### A.    Procedural History

Following a guilty plea in the District of South Carolina, Chadrick Fulks was convicted of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count 1); kidnapping resulting in death, in violation of 18 U.S.C. § 1201 (Count 2); interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312 (Count 3); conspiracy to commit carjacking, kidnapping, and other crimes, in violation of 18 U.S.C. § 371 (Count 4); conspiracy to use firearms in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o) (Count 5); use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 6); possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g) (Count 7); and possession of stolen firearms, in violation of 18 U.S.C. § 922(j) (Count 8).  *United States v. Fulks*, 454 F.3d 410, 417 n.3 (4th Cir. 2006); Judgments, No. 4:02-CR-992, Docs. 853, 854 (D.S.C.).[1]  A jury recommended a sentence of death on Counts 1 and 2, and the district court imposed that sentence.  *Fulks*, 454 F.3d at 420.

---

[1] Docket entries in the case under review are cited as "Doc."  Docket entries from the district of conviction include the full docket citation.  Fulks's appendix is cited as "App."  The government's supplemental appendix is cited as "Supp.App."

The Fourth Circuit affirmed, *id.* at 413, and the Supreme Court denied certiorari, 551 U.S. 1147 (2007).

The district court subsequently denied Fulks's motion to vacate under 28 U.S.C. § 2255. *Fulks v. United States*, 875 F. Supp. 2d 535 (D.S.C. 2010). The Fourth Circuit affirmed, *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012), and the Supreme Court denied certiorari, 571 U.S. 941 (2013).

In 2015, Fulks filed a *pro se* habeas petition under 28 U.S.C. § 2241 in the Southern District of Indiana, the district of his confinement, Doc.1, followed by a counseled habeas petition in 2019, App.220-99. The district court denied that petition, Doc.73, as well as a motion to alter or amend the judgment, Doc.83. Fulks appeals from those orders.

### B.    Relevant Facts

#### 1.    Fulks escaped from a detention facility and went on a multi-state crime spree that left two women dead.

On November 3, 2002, Fulks was incarcerated at a detention center in Hopkins County, Kentucky, on credit-card fraud charges. *Fulks*, 454 F.3d at 414. Kentucky State Police served Fulks with an indictment for first-degree child abuse involving his three-year-old stepson. *Id.* at 413-14. The following day, Fulks and his cellmate Brandon Basham escaped from the detention center's recreation area and eluded recapture. *Id.* at 414. They made their way to James Hawkins's home, persuaded him to give them a ride, and then

4

carjacked him at knifepoint. *Id.* They took Hawkins to a remote location, where Fulks tied him to a tree. *Id.* Although Basham held the knife, Fulks gave the orders throughout the carjacking. *Id.*

Fulks and Basham left Hawkins (who managed to free himself 15 hours later) and drove Hawkins's truck to Indiana, where they met up with Fulks's acquaintance Tina Severance and another woman, Andrea Roddy. *Fulks*, 454 F.3d at 414. With the women's help, Fulks and Basham stole several firearms from Severance's friend's home. *Id.* at 415. The four then spent several days traveling across multiple states, staying in motels, doing drugs, and committing petty crimes. *Id.*

On November 11, 2002, Fulks and Basham left the women at a motel and drove Severance's car to a shopping mall near Huntington, West Virginia, "intending to break into cars and steal purses." *Fulks*, 454 F.3d at 415. According to Fulks's later statements to the FBI,

> [w]hen they arrived at the mall, they split up. The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name. In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns. After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car. They then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to find a place to rape Burns.

5

> Fulks then followed Basham in Severance's van to a secluded area by the Ohio River. Fulks parked some distance from Burns's car, and in such a way that his view of the passenger side of the car was obstructed. He observed Basham exit the driver's side of the car and walk around to the passenger's side. He saw nothing else until about twenty minutes later when Basham—alone—drove Burns's car to where Fulks was parked and informed Fulks that he wanted to burn the vehicle in order to remove any fingerprints. After buying gasoline, Basham set fire to Burns's car on a rural road near Lavalette, West Virginia . . . .

*Id.* at 415-16. "Although both Fulks and Basham have admitted that Burns is dead, her body has never been recovered." *Id.* at 416.

Fulks and Basham returned to the motel, picked up Severance and Roddy, and drove to South Carolina. *Fulks*, 454 F.3d at 416. After leaving the women at a motel in Myrtle Beach on November 14, Fulks and Basham broke into a home near Conway, South Carolina. *Id.* When the homeowner's father stumbled upon the burglary, "both Fulks and Basham fired gunshots at him" and chased him in Severance's van as he drove away. *Id.* Fulks and Basham "eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck." *Id.*

The men "then made their way to a Wal-Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car." *Fulks*, 454 F.3d at 416. This is what happened next:

> At 2:37 p.m. that same day, a Wal-Mart surveillance camera recorded a blue BMW driven by Alice Donovan enter the Wal-Mart parking lot, with Fulks and Basham following closely

6

behind.  As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW.  Both vehicles then began moving again, travelling outside the range of the cameras.  Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat.  After leaving the Wal-Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines.  At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan.  According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so.  They then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities.  Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car.  Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so.  Basham then led Donovan into the woods and out of Fulks's sight. He returned twenty minutes later, alone.

454 F.3d at 416-17.  Six years later, some of Donovan's bones were discovered in rural Horry County, South Carolina.  *Fulks*, 875 F. Supp. 2d at 623.

After returning to Myrtle Beach, Fulks and Basham told Severance and Roddy that the men needed to return to West Virginia alone.  *Fulks*, 454 F.3d at 417.  They then drove to Huntington, West Virginia, where they "spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a friend of Fulks.  McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did."  *Id.*

7

On November 17, Fulks and Basham drove to a mall in Ashland, Kentucky, "where they planned to break into cars." *Fulks*, 454 F.3d at 417. After Basham attempted to carjack a woman and her 15-year-old daughter, police chased him on foot and ultimately found him hiding near the Ohio River. *Id.* Fulks drove to his brother's home in Indiana, eluding police in a hide-speed chase along the way, and was ultimately arrested on November 20 at his brother's home where police were waiting. *Id.*

### 2. Fulks pleaded guilty and was sentenced to death on two of the eight offenses of conviction.

A grand jury in the District of South Carolina indicted Fulks and Basham on eight counts and set forth special findings supporting the imposition of the death penalty on Counts 1 and 2—carjacking resulting in Alice Donovan's death and kidnapping resulting in Alice Donovan's death. *Fulks*, 454 F.3d at 417 & n.3. The government filed a notice of intent to seek the death penalty. *Id.* at 417.

Six days before jury selection, Fulks decided to plead guilty to all eight counts. *Fulks*, 875 F. Supp. 2d at 548. "Fulks admitted in the plea colloquy to raping Donovan but disclaimed any knowledge of or participation in her murder." *Fulks*, 454 F.3d at 418. His admissions "tracked his 2003 statements to the FBI, in which he generally admitted his involvement in the crime spree

8

but claimed that Basham had killed both Burns and Donovan without his knowledge." *Id.*

At the penalty phase trial in June 2004, Fulks's defense counsel presented "as complete and exhaustive a mitigation defense as one could reasonably expect in capital cases." *Fulks*, 875 F. Supp. 2d at 568. "Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being." *Id.* The defense hired or consulted at least 11 experts when "developing its mental health case in mitigation." *Id.* at 555. The experts who testified at trial "fully explained" Fulks's "borderline range of intelligence." *Id.* at 558. Dr. James Evans "testified that Fulks suffers from borderline intelligence, ranging from 75-79, moderate brain impairment, and cognitive impairment." *Id.* Dr. Ruben Gur "explained that Fulks 'is clearly not a bright individual' and that his I.Q. test 'comes up on the borderline, slightly above the cut of retardation. But a lot of the measures that go into that fruit salad [that make up I.Q.] are below that, well below that threshold.'" *Id.* And Dr. Arlene Andrews "testified that having an I.Q. above 70 actually makes people with brain damage from

9

prenatal exposure more susceptible to breaking the law, being unemployable, being kicked out of school, and other problems." *Id.*

Fulks's counsel never claimed that Fulks was intellectually disabled (or "mentally retarded," as the condition was then known) or ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). Indeed, defense counsel unequivocally stated that Fulks was not raising an intellectual-disability claim. *See* Supp.App.2 ("I will not say he is mentally retarded."). The testifying experts did not indicate that Fulks was intellectually disabled. *See* Supp.App.7 (Evans) (observing that Fulks had "[b]orderline intellectual functioning" that "in terms of an IQ [intelligence quotient] score, would have been a 75 to 79 range"); Supp.App.9-11 (Bachman) (observing that Fulks was "in the borderline level of intellectual functioning" and had IQ between 77 and 79). And one expert specifically clarified that "I am not saying he is retarded." Supp.App.5 (Gur).

In closing argument, Fulks's counsel told the jury that there was "[n]ot a shred of contradiction that Mr. Fulks has an IQ between 77 and 79," which was "[j]ust the point above the level of mental retardation." Supp.App.13. And counsel unequivocally told the jury that Fulks was "not mentally retarded." Supp.App.15; *see* Supp.App.15 ("Though[] he is borderline mentally retarded, he is not insane."); Supp.App.14 ("He is not retarded, but

10

he is close. . . . If a person's IQ is 70 or less, they are retarded. Chad's IQ is between 77 and 79.").

The jury unanimously recommended that Fulks be sentenced to death on both capital counts. *Fulks*, 454 F.3d at 420. After denying Fulks's motion for a new trial based on a juror's failure to disclose her husband's murder, the district court imposed sentences of death on Counts 1 and 2, along with a total of 744 months of imprisonment on the remaining six counts. *Id.* The Fourth Circuit affirmed, rejecting Fulks's claims of juror bias and evidentiary error. *Id.* at 420-438. The Supreme Court denied certiorari. 551 U.S. 1147 (2007).

In 2008, Fulks filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Motion to Vacate, No. 4:02-CR-992, Doc.1090 (D.S.C.); *see Fulks*, 875 F. Supp. 2d at 549-51. Fulks asserted 33 claims in his petition, including an allegation that his trial counsel rendered ineffective assistance by failing to call additional mental health experts as part of his mitigation case. *Id.* at 553, 555-61. Fulks did not raise an intellectual disability claim under *Atkins*, nor did he assert that his attorneys were ineffective for failing to raise such a claim at trial. The district court denied Fulks's petition but issued a certificate of appealability. *Id.* at 632-33. Fulks raised seven claims on appeal, including six claims of ineffective assistance of counsel. *Fulks*, 683 F.3d 512. The Fourth Circuit rejected those claims and

11

affirmed the denial of § 2255 relief.  *Id.* at 515-25.  The Supreme Court denied certiorari.  571 U.S. 941 (2013).

In 2016, the Fourth Circuit authorized Fulks to file a second or successive § 2255 motion asserting that his non-capital § 924(c) convictions were invalid under *Johnson v. United States*, 576 U.S. 591 (2015).  *See* Second or Successive Motion to Vacate, No. 4:02-CR-992, Doc.1618 (D.S.C.).  The district court has held that motion in abeyance pending decision in several Supreme Court cases, including *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), *United States v. Davis*, 139 S. Ct. 2319 (2019), and, most recently, *Borden v. United States*, No. 19-5410 (cert. granted March 2, 2020).  *See* No. 4:02-CR-992, Docs. 1642, 1652, 1692 (D. S.C.).  The motion remains pending.

### 3.     Fulks raised a claim of intellectual disability for the first time in 2019 in a petition for habeas corpus.

In 2015, Fulks filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the Southern District of Indiana where he was (and remains) incarcerated.  Doc.1.  Fulks argued that his § 2255 counsel were ineffective for failing to raise four claims.  Doc.1 at 5-6.

In 2019, after he was appointed counsel, Fulks filed an amended habeas petition in which he argued for the first time that he is intellectually disabled and therefore ineligible for the death penalty under *Atkins*.  App.220-99.  Fulks attached voluminous documents to his petition, *see* App.224-27 (index),

12

including a report by neuropsychologist Barry Crown, who concluded that Fulks is intellectually disabled.  App.475-77.

Fulks argued (App.272) that he was entitled to bring a § 2241 petition under 28 U.S.C. § 2255(e)'s saving clause, which provides that a federal prisoner may not apply for habeas relief under § 2241 unless § 2255 is "inadequate or ineffective to test the legality of his detention."  Fulks argued that his claims rested on new "legal bases that were not available" at the time of his trial or § 2255 motion.  App.275.  Specifically, he relied on the Supreme Court's decisions in *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 137 S. Ct. 1039 (2017).  App.275.  Fulks also argued that his petition relied on "new factual evidence" in the form of new diagnostic criteria published after his trial and § 2255 proceedings.  App.278.  And he argued that, regardless of the saving clause, he could avail himself of § 2241 because his *Atkins* claim challenged "the execution, as opposed to the imposition, of [his] sentence." App.281.

Fulks argued in the alternative that "even assuming he is not intellectually disabled, his impairments satisfy all the requirements set forth in *Atkins*" because he "suffered from the same adaptive deficits . . . as the intellectually disabled."  App.283.  Fulks relied on *Madison v. Alabama*, 139 S. Ct. 718 (2019), which, he said, "adopted a functional, instead of a diagnostic,

13

test for determining whether an individual's limitations categorically exclude him or her from eligibility for capital punishment." App.285.  He argued that this claim, too, could be brought under § 2241 because it relied on a new decision (*Madison*) and "challenge[d] the execution of his sentence."  App.295-96.

In response, the government argued that Fulks's *Atkins* claim was barred by § 2255(e)'s saving clause because § 2255 was not "inadequate or ineffective" to test the legality of his detention.  Doc.66, at 16-33.

### 4.     The district court denied Fulks's habeas petition.

The district court (Sweeney, J.) denied Fulks's § 2241 motion in a 30-page opinion. App.2-31.  The court observed that Fulks's two claims were "essentially the same, at least for purposes of whether they can proceed under § 2241," because the "first is a traditional *Atkins* claim" and the second is a claim "that *Atkins* should be extended to cover" a prisoner who is "functionally equivalent to one who is intellectually disabled."  App.15.

The court first rejected Fulks's claim that he "need not meet the Savings Clause because he is challenging the execution of his sentence rather than its imposition."  App.15.  The court explained that execution-related challenges include, for example, claims relating to the denial of good time credits and of parole.  App.16.  "Unlike these examples," the court determined, "Mr. Fulks'

14

claims clearly fall within the ambit of § 2255(a)." App.16. "It is undisputed that *Atkins* claims generally are available in § 2255 proceedings," and "Mr. Fulks' request for relief makes clear that he is challenging the constitutionality of his sentence." App.16-17.

The court next held that Fulks could not satisfy saving clause. First, it rejected his claim that he "meets the Savings Clause because his claims rely on new legal developments that were previously unavailable." App.18. Under *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), a defendant may use the saving clause to bring a claim based on a "new case of statutory interpretation that is retroactive." App.18. But the cases on which Fulks relied "involve Eighth Amendment claims, not statutory ones." App.19. And "the Seventh Circuit has recently reiterated that *Davenport* does not apply to constitutional claims." App.19 (citing *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016)).

Second, the district court rejected Fulks's argument that updates to the medical community's diagnostic manuals were new factual developments that triggered the saving clause. App.21. The court discussed at length *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc), which held that a defendant satisfied the saving clause based on newly discovered records that supported a claim of intellectual disability. App.9-10, 21-24. The district court explained that *Webster*'s holding was limited to situations in which the evidence "existed

15

at the time of the original proceedings," was "unavailable at the time of trial despite diligent efforts to obtain it," and "show[ed] that the petitioner is constitutionally ineligible for the penalty he received." App.23-24 (quoting *Webster*, 784 F.3d at 1140 n.9). In this case, the court concluded, the updates to the diagnostic manuals were "not newly *discovered* evidence that Mr. Fulks specifically is intellectually disabled" but "newly *created* standards used to assess whether anyone is intellectually disabled." App.24. These updates failed the "critical" requirement under *Webster* of having "existed before the time of the trial." App.24-25 (quoting *Webster*, 784 F.3d at 1140).

Third, the district court rejected Fulks's argument that § 2241 relief was available more generally despite failing *Davenport*'s and *Webster*'s requirements. App.26-30. The court agreed "[a]s a general matter" that the saving clause could be satisfied outside of the "specific circumstances" in *Davenport* and *Webster*. App.26. But Fulks failed to "point to a new structural problem with § 2255 that prevented him from raising his claims during his § 2255 proceedings." App.26. Although Fulks argued that his claims were not "viable" at the time of his § 2255 motion, "the Savings Clause focuses on whether a prisoner had a reasonable opportunity to raise a claim, not whether that claim would have been successful." App.27.

16

The district court recognized that *Davenport* said § 2241 was available where the "law of the circuit was so firmly against" the defendant when he brought his § 2255 motion that it would have been futile to raise a claim. App.28 (quotation omitted).  But *Davenport*'s holding was limited to "new rules of *statutory* law made retroactive by the Supreme Court."  App.28 (quoting *Poe*, 834 F.3d at 773).  Additionally, the defendant's claim in *Davenport* "was obviously foreclosed as a legal matter" under binding circuit precedent at the time of his § 2255 motion, whereas Fulks claimed simply that his "*Atkins* claim would have failed because the facts supporting it did not meet the then-current legal standard."  App.29.  Accepting Fulks's argument "would require the [district] [c]ourt to assess the evidence supporting Mr. Fulks' *Atkins* claim, then speculate how another federal court would have treated that evidence."  App.29.  This would "stand[ ] in stark contrast to the *Davenport* analysis," which requires answering "relatively straightforward legal questions."  App.29.

Because Fulks's claims were "barred by the Savings Clause," the district court concluded that it could not "reach the merits of them in this § 2241 proceeding."  App.30.  The district court subsequently denied Fulks's motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), determining that Fulks had "failed to identify a manifest error of law or fact that warrant[ed] relief."  App.34.

17

## SUMMARY OF ARGUMENT

1. Fulks cannot bring a habeas petition under § 2241 because he cannot show that his remedy under § 2255 was inadequate or ineffective to test the legality of his capital sentence. This Court has made clear that § 2255(e)'s saving clause is "a narrow route to relief that exists only to prevent fundamental errors that § 2255 could not have corrected." *Bourgeois v. Watson*, 977 F.3d 620, 639 (7th Cir.), *cert. denied*, 2020 WL 7296816 (Dec. 11, 2020). Fulks cannot satisfy that standard.

Nothing prevented Fulks from raising an intellectual disability claim in his § 2255 motion, or even at trial. The Supreme Court held that the Eighth Amendment prohibits the death penalty for the intellectually disabled two years before Fulks's trial. *Atkins v. Virginia*, 536 U.S. 304 (2002). And Fulks does not dispute that *Atkins* claims are cognizable both at trial and in a § 2255 motion.

Instead, Fulks incorrectly asserts that he can bring an *Atkins* claim under § 2241 based on (a) the Supreme Court's refinement of the *Atkins* standard in three decisions decided after his § 2255 motion and (b) updates to the medical community's diagnostic manuals that post-date his § 2255 motion. But even if those developments might be marginally helpful to Fulks in proving an *Atkins*

18

claim, they do not show that anything *prevented* him from bringing an *Atkins* claim earlier.

This Court has explained that "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Bourgeois*, 977 F.3d at 633 (quotation omitted).  It has also specifically rejected the view that the saving clause is available "every time the Supreme Court clarifies the law" relating to *Atkins* claims.  *Id.* at 636.  Thus, even if Fulks could show that his *Atkins* claim would have failed if he had brought it in 2008 but would succeed now in light of the refinements in *Hall* and *Moore*—and, to be clear, he cannot make that showing—that would not suffice under the saving clause.

Moreover, contrary to Fulks's contentions, Fourth Circuit precedent at the time of his § 2255 motion did not conflict with the Supreme Court's later holding in *Hall v. Florida*, 572 U.S. 701 (2014), that the legislature may not foreclose intellectual disability claims based on a strict IQ cutoff.  Nor did the Fourth Circuit's decisions conflict with *Moore v. Texas*, 137 S. Ct. 1039 (2017), which clarified that courts must avoid certain errors in resolving *Atkins* claims. Fourth Circuit precedent therefore did not prevent Fulks from bringing an *Atkins* claim.

Nor can Fulks show that changes in the medical community's diagnostic manuals that post-date his § 2255 motion prevented him from bringing an

19

*Atkins* claim in his § 2255 motion. The saving clause requires a structural defect in § 2255 itself, not simply a change in the manuals that might be relevant to a claim. Indeed, this Court has specifically rejected the "sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature." *Bourgeois*, 977 F.3d at 638.

Fulks's reliance on the manuals is misplaced in any event. The medical community's definition of intellectual disability (or "mental retardation" as it was previously called) has not materially changed since *Atkins*. Contrary to Fulks's claim, earlier editions of the pertinent manuals did not adopt a rigid "actuarial" approach to diagnosing intellectual disability. One manual discussed the "Flynn Effect," meaning Fulks could have relied on that effect in his § 2255 motion. And although the earlier manuals did not address all the specific erroneous "stereotypes" that the current manuals address, they covered many of the same principles. So Fulks cannot show that any relevant diagnostic criteria were omitted in prior editions and prevented him from raising an *Atkins* claim at trial or in his § 2255 motion.

Fulks is also incorrect that his *Atkins* claim challenges the execution, rather than the imposition, of his sentence and can therefore be brought under § 2241 regardless of whether he satisfies § 2255(e)'s saving clause. Intellectual disability is a condition that must develop before age 18, and a death sentence

20

is therefore illegal under *Atkins* at the time it is imposed on an intellectually disabled person. And even if Fulks were correct that his § 2241 petition could avoid the saving clause, it would be proper to dismiss the petition as an abuse of the writ because it raises a claim that should have been, but was not, raised in an earlier collateral attack.

2. Fulks incorrectly argues in the alternative that, even if he is not intellectually disabled, his condition is functionally equivalent to an intellectual disability, entitling him to relief under the reasoning of *Madison v. Alabama*, 139 S. Ct. 718 (2019). *Madison* did not involve an *Atkins* claim, but rather a claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), that the defendant could not be *executed* because he lacked a "rational understanding" of the reasons for his execution. *Madison* did not adopt a new "functional approach" to the Eighth Amendment that broadens the standard for an *Atkins* claim. It simply held that the "rational understanding" standard that applies to a *Ford* claim could apply to those who suffered from dementia, even if they did not have psychotic delusions.

In any event, Fulks's claim that his adaptive impairments are "the same" as or "indistinguishable" from those of an intellectually disabled person, Br. 57-58, makes this alternative claim virtually indistinguishable from his *Atkins* claim. He points to no authority suggesting that lower courts can expand

21

*Atkins*'s categorical prohibition on the death penalty to prisoners with impairments that are less severe than intellectual disability.  And even if he could, he has not shown that a challenge to his sentence under *Madison*'s functional approach would satisfy the saving clause.

## ARGUMENT

### I.     Fulks May Not Raise His *Atkins* Claim Under Section 2241 Because He Cannot Satisfy Section 2255(e)'s Saving Clause.

Fulks contends that he can raise his intellectual disability claim in a habeas petition under § 2241 because (a) he satisfies § 2255(e)'s saving clause and (b) he challenges the execution, not simply the imposition, of his sentence. Br. 19-42.  Fulks is incorrect on both fronts.

### A.     Standard of review

This Court "review[s] *de novo* a district court's denial of relief under § 2241."  *Camacho v. English*, 872 F.3d 811, 813 (7th Cir. 2017).

### B.     Section 2255's remedy is inadequate or ineffective only in limited circumstances.

Congress adopted 28 U.S.C. § 2255 in 1948 to address significant administrative problems caused by federal prisoners filing habeas corpus petitions in the districts of their confinement, which was often not the districts of conviction.  *United States v. Hayman*, 342 U.S. 205, 211-14 (1952).  Section 2255 allows a federal prisoner to "move the court which imposed the sentence

22

to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  Congress also sought to make § 2255's remedy "the exclusive postconviction remedy" for federal prisoners "[i]n the great majority of cases," *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir.), *cert. denied*, 2020 WL 4006838 (July 16, 2020), by adopting § 2255(e), known as the "saving clause," *Boumediene v. Bush*, 553 U.S. 723, 776 (2008), or "savings clause," *Bourgeois v. Watson*, 977 F.3d 620, 624 (7th Cir.), *cert. denied*, 2020 WL 7296816 (Dec. 11, 2020).  That clause states that a habeas petition under § 2241 "shall not be entertained" unless the petitioner's remedy under § 2255 "is inadequate or ineffective to test the legality of his detention."  28 U.S.C. § 2255(e).

Until 1996, there was no limit on the filing of successive § 2255 motions "provided they did not abuse the writ."  *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018).  But Congress imposed limits on successive motions as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220.  Under AEDPA, a prisoner is ordinarily limited to a single § 2255 motion, and he can file a "second or successive" motion only if a panel of the court of appeals certifies that it contains "newly discovered evidence" showing the prisoner's actual innocence by clear and convincing evidence or relies on "a new rule of constitutional law,

23

made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2255(h).

This Court has found § 2255 to be inadequate or ineffective to test a prisoner's claim in three situations, as recognized in *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), and *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). First, in *Davenport*, a defendant unsuccessfully sought § 2255 relief, attacking his conviction under 18 U.S.C. § 924(c) before the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995), which adopted a narrow reading of the statute. *Davenport*, 147 F.3d 605. This Court determined that § 2255 was inadequate or ineffective in this situation because, although Congress provided a mechanism for raising new constitutional claims in a second or successive § 2255 motion, it did not provide a similar mechanism for claims that the statute no longer covered the defendant's conduct. *Davenport*, 147 F.3d at 610. As the Court later explained, its concern that "Congress may have overlooked the possibility that new and retroactive statutory decisions could support collateral review" led it to hold in *Davenport* that "for this small class of situations § 2255 is 'inadequate or ineffective to test the legality of [the] detention.'" *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002). *Davenport* clarified, however, that a defendant may seek relief under § 2241 only where he relies on a retroactive

24

decision of statutory interpretation and he raises "so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *Davenport*, 147 F.3d at 611; *see Taylor*, 314 F.3d at 835 (describing *Davenport* defect as one that "establishes the petitioner's actual innocence").

Second, in *Garza*, the defendant was convicted of operating a continuing criminal enterprise and sentenced to death based in part on evidence of uncharged murders he committed in Mexico. *Garza*, 253 F.3d at 919-20. After his appeal and § 2255 motion were unsuccessful, he sought relief from the Inter-American Commission on Human Rights. *Id.* at 920. "This was the earliest point at which [the defendant] could seek relief, because the Commission requires applicants to exhaust national remedies." *Purkey*, 964 F.3d at 612. The Commission determined that his death sentence "was a violation of international human rights norms to which the United States had committed itself." *Garza*, 253 F.3d at 920. The defendant then sought § 2241 relief on the ground that the United States was bound by treaty to abide by the Commission's decision. *Id.* This Court determined that the saving clause permitted the habeas petition because "it was literally impossible for [the defendant] to have raised [his claim] at any time earlier than . . . the date of the Commission's decision," and "[t]he argument therefore could not have been raised in his direct appeals or in his first § 2255 motion." *Id.* at 922-23. The

Court ultimately concluded, however, that the Commission's decision was not binding, and it denied a stay of execution. *Id.* at 925-26.

Third, in *Webster*, the defendant was convicted of kidnapping resulting in death and sentenced to death. *Webster*, 784 F.3d at 1124-25. While the defendant's § 2255 motion was pending, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which "held that the Eighth Amendment—not just a statute—prohibits the execution of the intellectually disabled." *Webster*, 784 F.3d at 1132. After the defendant's *Atkins*-based § 2255 motion was denied, he obtained new evidence in support of his intellectual-disability claim that existed at the time of his trial but had been unavailable to him because of missteps by the Social Security Administration. *Id.* at 1132-34. Because the defendant could not satisfy AEDPA's gatekeeping requirements for second or successive § 2255 motions, he sought relief under § 2241. *Id.* at 1134-35.

This Court, sitting en banc, concluded that Congress could not have "contemplated" the problem of constitutional ineligibility for the death penalty at the time it adopted § 2255(h)'s limits because "the Supreme Court had not yet held it unconstitutional to execute either an intellectually disabled person (*Atkins*) or a minor (*Roper v. Simmons*, 543 U.S. 551 (2005))." *Webster*, 784 F.3d at 1138. This "narrow set of cases presenting issues of constitutional ineligibility for execution" was a "lacuna in the statute" that allowed resort to

26

the saving clause. *Id. Webster* held that a prisoner claiming that the Constitution makes him "categorically ineligible for the death penalty, based on newly discovered evidence, may not be barred from doing so by section 2255." *Id.* at 1140. The Court clarified that the evidence must have "existed before the time of the trial" and been unavailable "despite diligence on the part of the defense," not because of "missteps by" the defense. *Id.* (emphasis omitted).

Although *Davenport*, *Garza*, and *Webster* do not "create rigid categories delineating when the safety valve is available," *Purkey*, 964 F.3d at 614, "they illustrate the limited kinds of structural defects that justify savings-clause relief," *Bourgeois*, 977 F.3d at 638. And this Court has rejected further expansion of the saving clause in several recent capital cases. *See Purkey*, 964 F.3d at 615; *Bourgeois*, 977 F.3d at 639; *Lee v. Watson*, 964 F.3d 663, 667 (7th Cir.), *cert. denied*, 2020 WL 3964235 (July 14, 2020); *Vialva v. Watson*, 975 F.3d 664, 666 (7th Cir. 2020) (per curiam); *Hall v. Watson*, 829 F. App'x 719, 720 (7th Cir. 2020) (unpublished). Two of those cases are particularly relevant here.

In *Purkey*, the defendant argued that § 2255 was inadequate or ineffective to test the legality of his death sentence because his counsel in the § 2255 proceedings rendered ineffective assistance by failing to raise a potentially

viable claim in those proceedings. *Purkey*, 964 F.3d at 614-15. The Court disagreed, concluding that "the words 'inadequate or ineffective,' taken in context, must mean something more than unsuccessful." *Id.* at 615. That is, "there must be a compelling showing that . . . it would be impossible to use section 2255 to cure a fundamental problem. It is not enough that proper use of the statute results in denial of relief." *Id.*

In *Bourgeois*, the defendant raised an *Atkins* claim in a § 2255 motion, and the district court rejected it, applying the then-current version of the diagnostic manuals. *Bourgeois*, 977 F.3d at 636. Bourgeois did not seek review of his *Atkins* claim in the Fifth Circuit, but later sought relief under § 2241, arguing that the district court had relied on diagnostic standards that the Supreme Court rejected in *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*), and *Moore v. Texas*, 139 S. Ct. 666 (2019) (per curiam) (*Moore II*). *Bourgeois*, 977 F.3d at 627-28.

This Court disagreed with Bourgeois's claim that "the district court 'eschewed medical standards' in denying his § 2255 motion," but observed that its "only role" was to determine "whether there was something 'structurally inadequate or ineffective about section 2255 as a vehicle'" for Bourgeois to challenge his sentence. *Bourgeois*, 977 F.3d at 635-36 (quoting *Purkey*, 964 F.3d at 617). The Court observed that "*Atkins* was on the books when Bourgeois

28

filed his § 2255 motion" and that "the § 2255 court set forth, and applied, the same three-part test for intellectual disability that now prevails." *Id.* at 636. Although "some aspects of the court's analysis would have looked different if the Supreme Court had decided *Moore I* by then," the "savings clause does not apply every time the Supreme Court clarifies the law that governed a prisoner's § 2255 motion, or, where intellectual disability is at issue, every time the medical community updates its diagnostic standards." *Id.* The Court held that Bourgeois could not avail himself of the saving clause's "narrow route to relief." *Id.* at 639.

> **C.** **Section 2255 was not inadequate or ineffective based on the Supreme Court's later refining of the legal standards applicable to intellectual disability claims.**

Fulks contends that § 2255's remedy was inadequate or ineffective because, "at the time of his initial § 2255 proceedings, . . . the Fourth Circuit employed diagnostically inappropriate practices that were later rejected in *Hall*, *Moore-I*, and *Moore-II*." Br. 29. Fulks's reading of Fourth Circuit law is incorrect. And, in any event, the possibility that his intellectual disability claim might have failed under Fourth Circuit law at the time does not show that § 2255's remedy was inadequate or ineffective.

29

### 1.    Background: *Hall*, *Moore I,* and *Moore II*

In holding that the Eighth Amendment prohibits the death penalty for the intellectually disabled, *Atkins v. Virginia* discussed the definitions of "mental retardation" in the American Psychiatric Association's (APA's) Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-4)[2] and the ninth edition of the American Association on Mental Retardation's manual (AAMR-9).[3] *Atkins*, 536 U.S. at 308 n.3. *Atkins* stated that these "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318. The Court observed that an intelligence quotient of "between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong" of this test. *Id.* at 309 n.5.

In *Hall v. Florida*, 572 U.S. 701, 704 (2014), the Supreme Court held that Florida's "rigid rule" foreclosing "all further exploration of intellectual disability" for a capital defendant with an IQ of 70 or above was

---

[2] The fourth edition was originally published in 1994 but was revised in 2000. All references to the DSM-4 in this brief are to the 2000 revision.

[3] The American Association on Mental Retardation (AAMR) was later renamed the American Association on Intellectual and Developmental Disabilities (AAIDD).

30

unconstitutional. The Court explained that "[a]n IQ score is an approximation," *id.* at 722, that is affected by the standard error of measurement, which is often plus or minus five points, *id.* at 713. In defining intellectual disability, the Court cited the fifth edition of the Diagnostic and Statistical Manual (DSM-5). *Id.* at 710. It also cited the 2012 *User's Guide: Mental Retardation* published by the AAIDD. *Id.* at 713.

In *Moore I*, 137 S. Ct. at 1044, the Court reversed the Texas Court of Criminal Appeals for applying a definition of intellectual disability that was "untied to any acknowledged source" and "[n]ot aligned with the medical community's information." The Court found several aspects of the Texas court's standard improper because it deviated from the medical community's prevailing diagnostic framework. First, the state court relied on Moore's IQ score of 74 without accounting for the standard error of measurement. *Id.* at 1049. Second, the court "overemphasized Moore's perceived adaptive strengths," including his "improved behavior in prison," rather than focusing on his adaptive deficits. *Id.* at 1050. Third, the state court suggested that factors such as Moore's abusive childhood or a personality disorder were the real cause of his adaptive deficits, failing to acknowledge that these factors can indicate intellectual disability. *Id.* at 1051.

31

In *Moore II*, 139 S. Ct. 666, the Supreme Court reversed the Texas Court of Criminal Appeals for failing to properly apply *Moore I*. Among other things, the lower court "again relied less upon the adaptive *deficits* . . . than upon Moore's apparent adaptive *strengths*," "relied heavily upon adaptive improvements made in prison," and required Moore to prove that his adaptive problems did not result from "emotional problems." *Id.* at 670-71.

> **2.    The possibility that Fulks would not have prevailed under Fourth Circuit law does not show that § 2255 was inadequate or ineffective to test the legality of his sentence.**

As explained below, Fourth Circuit precedent at the time of Fulks's trial and § 2255 motion did not foreclose an *Atkins* claim. But even if it did, Fulks could not satisfy the saving clause. As in *Bourgeois*, "*Atkins* was on the books when [Fulks] filed his § 2255 motion in [2008]." *Bourgeois*, 977 F.3d at 636. And no structural defect in § 2255 prevented him from raising an *Atkins* claim in his § 2255 motion or, for that matter, at trial. The possibility that a court's resolution of Fulks's potential *Atkins* claim "would have looked different if the Supreme Court had decided *Moore I* by then" is not enough. *Id.* As *Bourgeois* explained, "the savings clause does not apply every time the Supreme Court clarifies the law that governed a prisoner's § 2255 motion." *Id.*

Fulks is simply incorrect that he "could not have pursued an *Atkins* claim" before *Moore I* or that "it was 'literally impossible' for [him] to have raised his claim during initial § 2255 proceedings." Br. 29, 51. At most, he can show he may not have *prevailed* on such a claim. But this Court has explained that "the words 'inadequate or ineffective'" in § 2255(e) "must mean something more than unsuccessful." *Purkey*, 964 F.3d at 615.

True, *Davenport* held that a prisoner may use § 2241 to raise a statutory claim of actual innocence where the law was "firmly against him" at the time of his § 2255 motion and there has been a retroactive "change of law." *Davenport*, 147 F.3d at 610-11. But Fulks raises a constitutional claim, and this Court has limited *Davenport* to statutory claims. *See Taylor*, 314 F.3d at 835; *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016). And *Bourgeois* rejected the argument that adverse circuit precedent at the time of a § 2255 motion renders § 2255 inadequate or ineffective to bring an *Atkins* claim. The defendant in *Bourgeois* "suggest[ed] that binding Fifth Circuit precedent prevented the [district] court from properly analyzing his adaptive deficits." *Bourgeois*, 977 F.3d at 637. But this Court said that "even if that were true," it would "not demonstrate that it was 'impossible' for Bourgeois" to raise an *Atkins* claim. *Id.* Fulks cannot show that § 2255's remedy was inadequate to bring an *Atkins* claim in 2008 simply because the Supreme Court clarified *Atkins* in later cases.

33

**3.    Fourth Circuit precedent did not prevent Fulks from raising his *Atkins* claim when he brought his § 2255 motion.**

In any event, Fulks is incorrect that he "could not have pursued an *Atkins* claim" in his § 2255 motion "because the Fourth Circuit employed diagnostically inappropriate practices that were later rejected in *Hall*, *Moore-I*, and *Moore-II*." Br. 29; *see id.* at 49-50. None of the cases he cites applied *Atkins* or the Federal Death Penalty Act in a way that would have prevented Fulks from raising a claim of intellectual disability at the time of his § 2255 motion.

Fulks first cites *Richardson v. Branker*, 668 F.3d 128, 151 (4th Cir. 2012), a pre-*Hall* case in which the Fourth Circuit held that a North Carolina state court did not unreasonably apply *Atkins* in determining that a defendant with standardized IQ scores of 73 and 74 was not intellectually disabled. *See* 28 U.S.C. § 2254(d)(1). *Richardson* does not establish that Fulks's *Atkins* claim was foreclosed in the Fourth Circuit in 2008. To start, *Richardson* was decided well after Fulks's § 2255 motion and therefore presented no obstacle to Fulks raising an *Atkins* claim in that motion. Moreover, *Richardson* considered a state-law definition of intellectual disability that defined "subaverage general intellectual functioning" as "[a]n intelligence quotient . . . of 70 or below." *Richardson*, 668 F.3d at 150 (quoting N.C. Gen. Stat. § 15A-2005(a)(1)(c)). The Supreme Court later stated in *Hall* that the North Carolina statute "could be

34

interpreted to provide a bright-line cutoff," but that it would not necessarily "be so interpreted." *Hall*, 572 U.S. at 715. And indeed the North Carolina state court in *Richardson* did not apply the statute as a bright-line cutoff, instead finding that the defendant failed to satisfy *both* the "intellectual functioning" *and* the "adaptive functioning" prongs. *Richardson*, 668 F.3d at 150. *Richardson* was therefore consistent with *Hall*'s later requirement that "when a defendant's IQ test score falls within the test's . . . margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Hall*, 572 U.S. at 723.

The same is true of *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008). *See* Br. 26. There, the Fourth Circuit held that the Virginia Supreme Court did not "appl[y] *Atkins* in an objectively unreasonable manner" by discrediting one of the defendant's four IQ scores as an outlier and "concluding under state law that [he] failed to present sufficient credible evidence" of intellectual disability. *Green*, 515 F.3d at 300. The Fourth Circuit did not stop with the intellectual functioning prong, even though the Virginia Supreme Court had. *Id.* at 296, 301; *id.* at 306 (Motz, J., concurring). Instead, it went on to hold that the defendant had failed to satisfy *Atkins*'s adaptive function prong as well. *Id.* at 301-02. Thus, neither *Richardson* nor *Green* were inconsistent with *Hall*.

35

Furthermore, *Richardson* and *Green* did not delineate the precise bounds of an intellectual disability claim under *Atkins* and instead applied AEDPA's deferential standard to determine whether state courts applied Supreme Court precedent in an objectively unreasonable manner. *Richardson* simply applied AEDPA deference to a state-court decision that had itself properly avoided a bright-line IQ cutoff. And *Green* properly considered adaptive functioning even though the state court had stopped at the defendant's IQ score. Neither case came close to suggesting that a strict IQ cutoff applied to federal prisoners bringing *Atkins* claims.

Fulks also asserts that "Fourth Circuit precedent contradicted current diagnostic standards in its analysis of adaptive behavior." Br. 26. He cites three cases that, in his view, incorrectly focused on the defendant's "strengths," "prison functioning," and "criminal and verbal functioning" and employed "erroneous stereotypes," including the assumptions that intellectually disabled people cannot have romantic relationships, perform complex tasks, or acquire the vocational and social skills necessary for independent living. Br. 26-28 (citing *Green*, 515 F.3d at 300-03; *Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010); and *Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015)). Two of these cases (*Walker* and *Prieto*) were decided after Fulks filed his § 2255 motion, and therefore could not have foreclosed his *Atkins* claim. And although those decisions

36

might have looked slightly different under current standards, they do not establish that Fulks could not have brought an *Atkins* claim at the time of his trial or § 2255 motion.

In *Walker*, the Fourth Circuit found no clear error in a district court's determination that Walker's adaptive skills did not establish intellectual disability. *Walker*, 593 F.3d at 328-29. Although the Fourth Circuit recited evidence of Walker's adaptive strengths, nearly all that evidence directly rebutted Walker's claims of adaptive deficits in the exact same areas. For example, Walker "presented evidence that he [wa]s a loner who has always had difficulties maintaining appropriate relationships with his peers," but the government pointed to evidence that Walker had "plenty of friends" and "g[o]t[ ] along with his peers." *Id.* at 325-26 (quotation omitted). And in response to Walker's evidence that he never had a driver's license and could not remember easy directions, the government introduced evidence that he had driven a car, remembered addresses, and could "make his way from one place to another." *Id.* at 326-27. Based on the competing evidence, the Fourth Circuit found no clear error in the district court's determination that Walker did not suffer from "*significant* limitations in his adaptive behavior." *Id.* at 328. The court did not, like the state court in *Moore I*, engage in the "arbitrary

37

offsetting of [adaptive] deficits against unconnected strengths." *Moore I*, 137 S. Ct. at 1050 n.8.

Similarly, in *Green*, the Fourth Circuit found no error in the district court's determination that Green lacked significant limitations in his adaptive skills. *Green*, 515 F.3d at 303. Although the district court in *Green* considered evidence of adaptive strengths, much of it directly rebutted his claims of adaptive weaknesses. *See id.* at 302-03 (evidence that Green was an "average to above average employee" and "received a merit-based promotion at one job" rebutted evidence that "his various jobs always required low-level skills and low education"). The court did not simply offset adaptive deficits with "unconnected strengths," as *Moore I* found improper. *Moore I*, 137 S. Ct. at 1050 n.8.

Finally, in *Prieto*, 791 F.3d at 470-72, the Fourth Circuit did not consider the substantive question of whether the defendant was intellectually disabled but instead addressed whether the defendant could show "actual innocence" (in the form of intellectual disability) to excuse his procedural default of an *Atkins* claim. And, again, the adaptive strengths that the court recited were not arbitrary but provided "compelling evidence refuting the existence of any adaptive deficits." *Id.* at 472. In short, none of these cases established that a federal prisoner with an IQ above 70 and with certain adaptive strengths would

38

have been unable to seek *Atkins* relief in the Fourth Circuit before *Hall* and *Moore I*.

Fulks also claims that he "could not have pursued an *Atkins* claim" in his § 2255 motion because the district judge that denied his § 2255 motion "committed similar errors [to those discussed above] just two years earlier in denying § 2255 relief to Fulks's co-conspirator, Brand[o]n Basham."  Br. 28-29. The district court applied the correct standard, and its fact-specific resolution of Basham's *Atkins* claim cannot establish that Fulks was foreclosed from raising an *Atkins* claim in his own case.  Even if the district court had ruled against him, Fulks could have appealed to the Fourth Circuit.  *See Bourgeois*, 977 F.3d at 636 ("Bourgeois had the chance to appeal the court's denial of his intellectual-disability claim, yet he chose not to do so.").  The district court's analysis in Basham's case cannot excuse Fulks's failure to raise an *Atkins* claim in his own § 2255 motion.

> **D.   Section 2255 was not inadequate or ineffective based on updates to the diagnostic manuals.**

Fulks also contends that he can satisfy the saving clause because he "relies on new factual bases set forth in diagnostic criteria issued . . . in 2012 and 2013."  Br. 29.  As explained below, the updates to the diagnostic manuals did not change the clinical definition of intellectual disability.  Moreover, *Bourgeois* makes clear that, even if the updates might have made it marginally

39

easier to prove intellectual disability, they do not provide a basis for invoking the saving clause.

### 1. *Bourgeois* forecloses the claim that updates to diagnostic manuals allow recourse to the saving clause.

In *Bourgeois*, this Court rejected the "sweeping argument that a fresh intellectual-disability claim arises every time the medical community updates its literature." *Bourgeois*, 977 F.3d at 638. "Were that the case," this Court "would truly be facing 'a never-ending series of reviews and re-reviews.'" *Id.* at 636 (quoting *Purkey*, 964 F.3d at 615). Instead, the question is whether a structural defect in § 2255 "formally prevented" Fulks from raising an *Atkins* claim in his § 2255 motion. *Id.* (quoting *Purkey*, 964 F.3d at 615).

Fulks's attempts to distinguish *Bourgeois* are unpersuasive. He first points out that Bourgeois unsuccessfully raised an *Atkins* claim in his § 2255 proceedings, whereas "*no* court has adjudicated the merits of Fulks's [intellectual disability] claim." Br. 37. But that distinction does not help Fulks. It was Fulks's own failure to raise his claim at trial or in his § 2255 motion that prevented the claim from being "adjudicated [on] the merits." *Id.*

In fact, Fulks's failure makes his claim *less* compelling than Bourgeois's. "A prisoner cannot be permitted to lever his way into section 2241 by *making* his section 2255 remedy inadequate" such as "by failing to appeal from the

40

denial of his section 2255 motion." *Morales v. Bezy*, 499 F.3d 668, 672 (7th Cir. 2007). The same is true of failing to raise a claim altogether. *See Trenkler v. United States*, 536 F.3d 85, 99 (1st Cir. 2008) (observing that the defendant's "alleged claim of error was available to him on both direct and collateral review" and the fact "that he neglected to avail himself of these opportunities in no way detracts from their adequacy and effectiveness"). *Bourgeois* held that the saving clause was not available based on recent Supreme Court decisions and diagnostic manual revisions even where a defendant diligently pursued his *Atkins* claim. Under Fulks's argument, a prisoner who was *not* diligent in pursuing his rights would be put in a better position than one who was.

Fulks also wrongly asserts that *Bourgeois* "focused on the statutory requirements of the Federal Death Penalty Act" and "did not confront the structural defect created by the *constitutional* nature of the rights set forth [in] *Atkins*." Br. 37-38. In fact, *Bourgeois* said that it was "consider[ing] whether Bourgeois's *Atkins* and FDPA [Federal Death Penalty Act] claims are cognizable under the savings clause," and it held that "[t]hey are not." *Bourgeois*, 977 F.3d at 629. The Court observed that the FDPA "provides the same substantive protections as *Atkins*" and said that its "analysis applies equally to *both claims*." *Id.* at 634 (emphasis added). And the Court recognized that "*Atkins* was the watershed case on intellectual disability,"

41

because it held that "the Constitution prevents the execution of intellectually disabled offenders." *Id.* at 636.  Fulks is simply wrong that *Bourgeois* was limited to statutory claims and "did not substantively address the constitutional exemption."  Br. 39.

As a last resort, Fulks argues that "the *Bourgeois* opinion should be overruled."  Br. 40.  But "absent a compelling reason," this Court "will not overturn circuit precedent."  *Wilson v. Cook County*, 937 F.3d 1028, 1035 (7th Cir. 2019) (per curiam), *cert. denied*, 2020 WL 3146694 (June 14, 2020).  Fulks does not point to any compelling reason to do so, such as an intervening Supreme Court decision or contrary precedent from other circuits.  *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (noting circumstances in which the Court reconsiders its precedent).  Indeed, this Court denied rehearing en banc in *Bourgeois*, *see* 980 F.3d 1190 (7th Cir. 2020), and the Supreme Court denied certiorari, 2020 WL 7296816 (Dec. 11, 2020). *Bourgeois* is recent, correctly decided, and disposes of Fulks's claims.

### 2. The updates did not alter the definition of intellectual disability, and the prior versions did not prevent Fulks from bringing an *Atkins* claim.

Even if *Bourgeois* did not resolve the matter, Fulks cannot show that the updates to the diagnostic manuals materially changed the criteria for diagnosing intellectual disability or affected his ability to bring an *Atkins* claim.

42

*Atkins* observed that the medical community had defined intellectual disability as requiring (1) "subaverage intellectual functioning"; (2) "significant limitations in adaptive skills such as communication, self-care, and self-direction"; and (3) onset "before age 18." *Atkins*, 536 U.S. at 318; *see id.* at 308 n.3 (quoting DSM-4 and AAMR-9). This basic definition has not changed. *See* App.493 (DSM-5) (defining intellectual disability based on "[d]eficits in intellectual functions," "[d]eficits in adaptive functioning," and "[o]nset . . . during the developmental period"). Indeed, the most recent edition of the AAIDD manual observes that its 2002 definition "remains in effect" with "a minor edit that substitutes the term [intellectual disability] for mental retardation." Supp.App.49.

Fulks's claim that other updates to these manuals provided him "new factual bases" to challenge his capital sentence is unavailing. Br. 29. He first contends that "the DSM-5 rejected the notion of [intellectual disability] evaluations as actuarial determinations," and required both "clinical assessment" and "standardized testing." Br. 29-30 (quoting App.497). In fact, the previous version did not treat the diagnosis of intellectual disability as a rigid "actuarial determination[ ]," nor did it rely solely on "standardized testing." *Id.* The DSM-4 said that "intellectual functioning" (prong one) should be determined through "standardized, individually administered

43

intelligence tests" and that the assessment of "deficits in adaptive functioning" (prong two) should be based on "evidence . . . from one or more reliable independent sources." Supp.App.19-20. It said that "[s]everal scales" had been designed to "measure adaptive functioning" by "provid[ing] a clinical cutoff score," but it warned that these scales fail to include "certain individual domains" and that "individual domain scores may vary considerably in reliability." Supp.App.20. Thus, the DSM-4 was consistent with the DSM-5's requirement of both "standardized testing" *and* "clinical assessment." Br. 6, 30. And the 2007 *User's Guide* to the AAIDD manual specifically emphasized the "importance of clinical judgment" in diagnosing intellectual disability. Supp.App.44 (capitalization omitted).

Nor did the DSM-4 provide for a strict IQ cutoff of the sort that *Hall* rejected. The manual explained that all IQ tests have "a measurement error" that "may vary from instrument to instrument" and that it is "possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior."[4] Supp.App.19-20. *Compare*

---

[4] For this reason, the Fifth Circuit was incorrect to suggest in a recent case that the DSM-4 did not "recognize[ ] that an individual with an IQ score over 70 may still qualify as intellectually disabled." *In re Johnson*, 935 F.3d 284, 293 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2521 (2020).

44

App.497 (DSM-5) (stating that, accounting for the "margin of measurement error," those with intellectual disabilities have an IQ "score of 65-75").

Fulks next asserts that, "with the DSM-5, the APA joined the AAIDD in requiring that correction for the Flynn Effect be taken into account." Br. 30. In fact, the current manuals do not "requir[e]" clinicians to consider the Flynn Effect. The DSM-5 says the Flynn Effect "may affect test scores," App.497, and the 2012 AAIDD *User's Guide* "recommend[s]" correction for the Flynn Effect where "a test with aging norms is used," App.524. But, as the AAIDD manual explains, how to correct for the Flynn Effect "is still a challenging issue" because some data have shown a "slowing and eventual cessation of the Flynn Effect over time." Supp.App.50. And, as this Court has explained, "[a]lthough the Flynn Effect is acknowledged in the field, it is not common practice to adjust IQ scores by a specific amount to account for the phenomenon." *McManus v. Neal*, 779 F.3d 634, 653 (7th Cir. 2015). Moreover, "nothing in *Atkins* suggests that IQ test scores *must* be adjusted to account for the Flynn Effect in order to be considered reliable evidence of intellectual functioning." *Id.*

Most importantly, Fulks could have relied on the Flynn Effect when he filed his § 2255 motion in 2008. The 2007 AAIDD *User's Guide* explained how to calculate the effect and stated that "the clinician needs to . . . take into

45

consideration the Flynn Effect as well as the standard error of measurement when estimating an individual's true IQ score." Supp.App.46-47. Fulks cannot reasonably contend that he was prevented from relying on § 2255 to assert the Flynn Effect simply because it was discussed in only one organization's manual at the time he sought relief.

Fulks next argues that the 2012 AAIDD *User's Guide* and the DSM-5 "include new developments relating to prong two [adaptive functioning] as well," because they "made clear for the first time that it is critical to avoid the use of stereotypes in assessing adaptive functioning." Br. 30. But these additions do not establish that Fulks could not have raised an *Atkins* claim earlier. In fact, the earlier manuals addressed many of these stereotypes. For example, the 2002 AAMR manual said that "[w]ithin an individual, limitations often coexist with strengths" and that a person may have "strengths in some adaptive skill areas[ ] or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." Supp.App.28, 32, 37. This is consistent with the 2012 AAIDD *User's Guide*'s warning against the assumption that the intellectually disabled "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations." App.527; *see* Br. 31.

46

Nor do the current manuals' discussions of other improper stereotypes provide previously unavailable bases for Fulks's *Atkins* claim. As Fulks points out, Br. 30-31, the 2012 AAIDD *User's Guide* seeks to dispel the common stereotypes that people with intellectual disability "look and talk differently from persons from the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically love or be romantically loved," and "cannot acquire vocational and social skills necessary for independent living." App.527. The DSM-5 similarly recognizes that those with intellectual disability "can maintain romantic relationships in adulthood, maintain competitive employment in jobs that do not emphasize conceptual skills, function age-appropriately in personal care, arrange for their own transportation and manage money with support, raise a family with support, and develop a variety of age-appropriate recreational skills." Br. 31 (citing App.494-95).

As an initial matter, even before the 2012 AAIDD *User's Guide* and the DSM-5 were promulgated, many of these stereotypes would have been obviously false to clinicians familiar with the then-prevailing and long-standing medical definition of intellectual disability. Then, as now, that definition

47

focused on intellectual and adaptive deficits, not on how people "look and talk" or whether they are "dangerous." App.527.

Moreover, the prior manuals included specific information that would help clinicians avoid these stereotypes. For example, the DSM-4 stated that persons with mild intellectual disability can "achieve social and vocational skills adequate for minimum self-support" and "live successfully in the community, either independently or in supervised settings." Supp.App.21. It said that even those with moderate intellectual disability can, "with moderate supervision, . . . attend to their personal care"; "perform unskilled or semiskilled work under supervision"; and "adapt well to life in the community, usually in supervised settings." Supp.App.21. And the 2007 AAIDD *User's Guide* warned that intellectually disabled people with higher IQs "manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving and decision making, and social understanding and judgment." Supp.App.45. Because the earlier manuals accurately defined intellectual disability and provided specific guidance about how to diagnose it, Fulks cannot show that their failure to address each of the specific stereotypes identified in the current manuals prevented him from raising an *Atkins* claim in 2008 (or earlier).

48

Fulks next argues that the "DSM-5 also provided guidance as to what constituted deficits in adaptive functioning by setting forth clinical summaries as to what level of functioning satisfied prong two in each domain." Br. 31 (citing App.494-96). The section of DSM-5 that Fulks cites consists of a table summarizing the differences between the four severity levels of intellectual disability—mild, moderate, severe, and profound. *See* App.494-96. But the previous edition also included descriptions of these four severity levels, albeit with less detail. *See* Supp.App.21-22. Fulks does not explain how this expanded guidance constitutes a "previously unavailable basis for [his] *Atkins* claim," Br. 31, especially considering that he need not show (and has not claimed to have) anything beyond a *mild* intellectual disability. *See Atkins*, 536 U.S. at 308 n.3 (observing that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70").

Fulks finally asserts that, although the experts at his trial found him "just shy of [intellectual disability]" under the "standards applicable at the time," he satisfies the intellectual-disability definition "under current diagnostic standards" as evidenced by the fact that "Dr. Crown has diagnosed him as intellectually disabled." Br. 31-32. But Dr. Crown's 2018 diagnosis does not establish that the diagnostic manuals have changed in any relevant way. Dr. Crown did not opine that his diagnosis would have been different under the

49

earlier manuals, nor has Fulks cited any other evidence that Dr. Crown's

diagnosis is a result of changes to diagnostic standards.

Fulks repeatedly asserts that he "is intellectually disabled." Br. 1; *see* Br.

3, 17, 19, 33, 35. That claim, however, is supported by only a single

neuropsychologist's report (Dr. Crown's) attached to Fulks's § 2241 motion.

App.475-77. The district court made no factual findings related to Fulks's

intellectual disability. And, at the very least, there is reason to question this

diagnosis considering that it directly contradicts the conclusions of Fulks's own

trial experts. *See* Supp.App.5, 7, 9-11.

Moreover, even accounting for the Flynn Effect—which this Court said

is not required by *Atkins*, *see McManus*, 779 F.3d at 653—only one of Fulks's

three IQ tests is within the margin of error for intellectual disability, and even

then just barely. Specifically, his score of 77 in May 2003 falls slightly within

the standard error measurement after accounting for the Flynn Effect.[5] But his

other two scores of 78 and 79 fall outside the range. *See* App.474. And

contrary to Fulks's suggestion (Br. 7), his score of 79 in February 2004 cannot

be explained away by the "practice effect"; that score resulted from a different

---

[5] The test was "normed" in 1995. As a result, the Flynn Effect would provide an intellectual disability cutoff of 72.4 in 2004, yielding a qualifying IQ range of 67.4 to 77.4 based on the standard error measurement. *See* App.523-24.

test than his May 2003 score. *See* App.474-75 (summarizing Fulks's tests), 524 (explaining that "established clinical best practice is to avoid administering the same intelligence test within a year to the same individual").

Ultimately, however, "[t]he question in this appeal is not whether [Fulks] is intellectually disabled." *Bourgeois*, 977 F.3d at 639. Instead, it is whether he had the opportunity "to litigate his intellectual-disability claim in his § 2255 motion." *Id.* As explained, nothing in the diagnostic manuals at the time of his § 2255 motion prevented him from bringing such a claim.

### E.     Fulks's additional arguments are unavailing.

Fulks makes several unavailing arguments beyond those addressed above. *See* Br. 42-57. He first argues (Br. 43) that the district court was wrong to conclude that "newly created" evidence does not justify resort to the saving clause under *Webster*. *See* App.24. Fulks argues that *Moore I* "mandated that *current* diagnostic standards were binding on an *Atkins* determination" and that his reliance on "newly created" diagnostic standards "renders [his] claim *more* compelling than Webster's, not less." Br. 43-44.

Fulks misunderstands the interplay between the Supreme Court's *Atkins* jurisprudence and the saving clause. He is correct that, when considering an *Atkins* claim on collateral review, a federal court should apply current diagnostic standards. *See Moore I*, 137 S. Ct. at 1052-53. But that does not

51

answer the question of whether Fulks can bring a § 2241 petition under the saving clause in the first place. On *that* question, *Webster* made clear that its narrow exception for *Atkins* claims based on newly discovered evidence is limited to "previously existing evidence" and that the "evidence cannot be newly created." *Webster*, 784 F.3d at 1141. And *Bourgeois* confirmed, even after *Moore I* and *Moore II*, that the saving clause is not available "every time the medical community updates its diagnostic standards." *Bourgeois*, 977 F.3d at 636 (quotation omitted). Thus, the fact that current diagnostic standards would apply *if* Fulks could satisfy the saving clause does not establish that he *does* satisfy the clause.

In any event, Fulks agrees that even under the standard for the saving clause that he proposes he would have to show a "significant" change in the "diagnostic and legal" standards, Br. 54, and he has not done so. As already explained, "*Atkins* was on the books when [Fulks] filed his § 2255 motion" in 2008, *Bourgeois*, 977 F.3d at 636, and the medical community's basic definition of intellectual disability has not changed since then. The minor changes to the diagnostic manuals do not demonstrate that § 2255 was inadequate or ineffective to test the legality of his sentence.

Fulks's misunderstanding of *Atkins*' interplay with the saving clause goes even further. He asserts that "neither Congress nor the courts can impose

procedural hurdles that would lead to the execution of an intellectually disabled defendant." Br. 48. His view, apparently, is that the saving clause and § 2255(h)'s limitations on second-or-successive motions can *never* be interpreted to foreclose review of an *Atkins* claim. *See* Br. 48-49. But Fulks can muster no authority to support this sweeping claim, which flies in the face of this Court's precedent. *Webster* specifically explained that its rule did not "apply to all newly discovered evidence" related to *Atkins* claims, "or else there would never be any finality to capital cases involving . . . the intellectually disabled." *Webster*, 784 F.3d at 1140. And where a capital defendant could not satisfy the saving clause's "procedural hurdles," Br. 48, this Court enforced the procedural limitations without inquiring into the merits of his *Atkins* claim, *Bourgeois*, 977 F.3d at 639, and the Supreme Court denied certiorari, 2020 WL 7296816 (Dec. 11, 2020).

Finally, Fulks incorrectly asserts that the district court denied relief because this case "did not match the precise factual and procedural scenarios in *Davenport*, *Garza*, and *Webster-I*." Br. 47. In fact, the district court said it "agree[d]" with Fulks that this Court "has never held that the Savings Clause is only met in the specific circumstances" present in *Davenport* and *Webster*. App.26. And the court observed that "*Webster* itself represents a recent example of a § 2241 claim being permitted to proceed in a new context."

53

App.26. The court ruled against Fulks, not because this case did not perfectly match prior cases but because Fulks failed to "point to a new structural problem with § 2255 that prevented him from raising his claims during his § 2255 proceedings." App.26.

> **F.    Because he is challenging the legality of his sentence, and not just its execution, Fulks cannot avoid the saving clause.**

Fulks incorrectly argues that he need not satisfy the saving clause because "§ 2241 is the appropriate vehicle where a petitioner challenges the execution, as opposed to the imposition, of the sentence." Br. 41; *see* Br. 54-56. Although § 2241 provides a vehicle for attacking the "execution" of a sentence, § 2255 is the proper vehicle to "challenge . . . the validity of the sentence itself." *Atehortua v. Kindt*, 951 F.2d 126, 129 (7th Cir. 1991).

An *Atkins* claim challenges the death sentence's validity, not merely the time or manner in which it is executed. To be sure, *Atkins* held that the Eighth Amendment requires that those with intellectual disabilities "be categorically excluded from *execution*." *Atkins*, 536 U.S. at 318 (emphasis added). So in one sense, the Eighth Amendment violation does not arise until the sentence is carried out. But when an intellectually disabled defendant is sentenced to death in violation of *Atkins*, the sentence itself is illegal, and can therefore be challenged under § 2255(a), which authorizes motions to vacate sentence

54

"*imposed* in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a) (emphasis added).

Fulks does not (and could not) dispute that § 2255 is an appropriate vehicle to raise an *Atkins* claim. *See Bourgeois*, 977 F.3d at 639 (the defendant "was able to litigate his intellectual-disability claim in his § 2255 motion"). His position instead appears to be that his *Atkins* claim challenges both the validity *and* the execution of his sentence. *See* Br. 54. But this Court has described these types of challenges as mutually exclusive. *See Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998) (explaining that a challenge to the "execution but not the validity of the conviction and sentence . . . may not be brought under § 2255 and therefore falls into the domain of § 2241."). Indeed, if an *Atkins* claim could simply be recharacterized as a challenge to the sentence's execution, then *Bourgeois*'s saving-clause analysis was unnecessary and that case's result should have been different.

According to Fulks, he "is not claiming that his sentence violated *Atkins* at the time it was imposed" but that "his sentence is now unconstitutional under newly evolved diagnostic standards that were made binding by *Moore-I* and *Moore-II*." Br. 41-42. That is, "he is presently ineligible for the death penalty." Br. 42. But, as *Bourgeois* explained, "[i]ntellectual disability is a permanent condition that must manifest before the age of 18." *Bourgeois*, 977

F.3d at 637.  It would be "senseless" to speak of someone who was *not* intellectually disabled when his death sentence was imposed but *was* intellectually disabled when the sentence was executed.  *Id.*  If Fulks is intellectually disabled, then his sentence violated *Atkins* when it was imposed.  His claim is therefore directed at his sentence's validity, not its execution.

Even if Fulks were correct that he could use § 2241 without satisfying the saving clause, his claim would constitute an abuse of the writ.  The abuse-of-the-writ doctrine prevents a habeas petitioner from raising in a § 2241 petition a claim that "could have been raised" in an earlier petition.  *Delo v. Stokes*, 495 U.S. 320, 321 (1990) (per curiam); *see McCleskey v. Zant*, 499 U.S. 467, 489-90 (1991) (holding that the doctrine applies not only to "deliberate[ly] abandon[ed]" claims but also to those omitted through "inexcusable neglect").  As explained above, nothing prevented Fulks from raising his *Atkins* claim at sentencing or in his § 2255 motion.  For him to bring it now under § 2241 would be an abuse of the writ.

## II.    Fulks's Alternative Argument That He Is Functionally Equivalent to an Intellectually Disabled Person Is Also Barred by the Saving Clause.

Fulks makes the alternative argument that *Madison v. Alabama*, 139 S. Ct. 718 (2019), provides him "a second ground for relief that was not previously available" because it recognized a "functional application of the Eighth

Amendment." Br. 57. He is incorrect. As with the first issue, this Court's review is *de novo*. *Camacho*, 872 F.3d at 813.

The Supreme Court held in *Ford v. Wainwright*, 477 U.S. 399, 410 (1986), that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." The Court later clarified that the defendant must have a "rational understanding" of the reasons for his execution. *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007). The defendants in *Ford* and *Panetti* both suffered from "pervasive delusion[s]" or "gross delusions" arising from "[p]aranoid [s]chizophrenia" and "extreme psychosis." *Ford*, 477 U.S. at 402-03; *Panetti*, 551 U.S. at 936, 960.

In *Madison*, the Court addressed whether a person could be ineligible for execution under *Ford* where he "suffer[ed] from dementia, rather than psychotic delusions." *Madison*, 139 S. Ct. at 726. Alabama conceded that he could, and consistent with that concession, the Supreme Court stated that "[w]hat matters is whether a person has the 'rational understanding' *Panetti* requires—not whether he has . . . any particular mental illness." *Id.* at 727. As the Court explained, *Panetti*'s "standard focuses on whether a mental disorder has had a particular *effect*" regardless of the "precise *cause*." *Id.* at 728.

Fulks contends that *Madison* recognized for the first time a "functional application of the Eighth Amendment." Br. 57. He argues that, even if he

"does not meet the diagnostic criteria for intellectual disability, he has the same lifelong adaptive impairments and the same low adult intellectual functioning as an intellectually disabled person." *Id.* His Fetal Alcohol Spectrum Disorder, he says, is "comparable in severity" to intellectual disability and should be treated the same way under *Madison*'s "functional approach." Br. 58.

Fulks is wrong on several levels. First, *Madison* did not involve a "newly recognized functional application of the Eighth Amendment." Br. 57. It simply applied *Panetti*'s standard to a different mental disorder. Indeed, *Madison* said that "*Panetti* has already answered the question" whether a "delusional disorder" is a "prerequisite" to a *Ford* claim. *Madison*, 139 S. Ct. at 728. Thus, any "functional approach" that *Madison* applied was already recognized in *Panetti*, which was decided the year before Fulks filed his § 2255 motion.

Second, even if *Madison* recognized a "new" approach to *Ford* claims, nothing suggests that it adopted a new approach for *Atkins* claims. *Ford* and *Atkins* claims are subject to different standards, *Bourgeois*, 977 F.3d at 637, and ripen at different times, *Panetti*, 551 U.S. at 943-47. There is no reason to conclude that *Madison* expanded the intellectual disability standard.

58

Third, Fulks has not shown how his "functional approach" differs from the approach that already applies to *Atkins* claims. Just as the *Panetti* standard can be satisfied by conditions (such as dementia) that do not involve delusions, *Madison*, 139 S. Ct. at 728-29, intellectual disability may result from a variety of causes. *See Moore I*, 137 S. Ct. at 1051 (discussing "risk factors" for intellectual disability and stating that "[c]linicians rely on such factors as cause to explore the prospect of intellectual disability further"). Thus, Fulks does not explain why he could not bring a straightforward *Atkins* claim, without resort to a "functional approach," if he is correct that he "has *the same* lifelong adaptive impairments and the same low adult intellectual functioning as an intellectually disabled person," Br. 57-58 (emphasis added), or that his "functioning is *indistinguishable* from that of an intellectually disabled person," Br. 58 (emphasis added).

To the extent Fulks wants this Court to expand *Atkins*'s categorical bar on the death penalty to intellectual and adaptive impairments that are *less severe* than intellectual disability, he has pointed to no authority for doing so. *Atkins* drew the line at "mental retardation," now known as "intellectual disability," and it has not redrawn that line in subsequent cases. *See Hall*, 572 U.S. at 708; *Moore I*, 137 S. Ct. at 1044. *Madison* does not redraw that line and provides no basis for this Court to do so either.

59

Finally, even if Fulks were correct that *Madison* adopted a new approach to the Eighth Amendment that opened the door for an *Atkins*-based "functional" claim, he cannot show that the claim would fall within the saving clause. The claim would not satisfy *Davenport*, because *Madison* was a constitutional case, not a "retroactive statutory-interpretation case[ ]." *Bourgeois*, 977 F.3d at 637. And this claim is unlike the constitutional claims in *Garza* and *Webster* because there was nothing that prevented Fulks from raising it in his § 2255 motion. *See Purkey*, 964 F.3d at 615. Moreover, § 2255(h)(2) specifically provides a vehicle for raising constitutional claims based on new Supreme Court precedent. Fulks cannot use the saving clause simply because his claim fails to meet § 2255(h)(2)'s requirements.

Fulks also incorrectly claims that the district court "erroneously failed to address [his] *Madison*-based cognizability argument and argument on the merits" and that the Court should "remand" for further consideration. Br. 59. In fact, the district court specifically discussed Fulks's argument that an "extension of *Atkins* is appropriate based on . . . *Madison*," as well as the government's response that *Madison* "dealt exclusively with a *Ford* claim." App.14-15. The court determined that Fulks's "two claims are essentially the same, at least for purposes of whether they can proceed under § 2241," because they were both "rooted in *Atkins*." App.15. And the court said that it would

60

"not reach the merits of either claim" because neither could "be brought via § 2241." App.15. Fulks obviously disagrees with the district court's holding that his alternative claim was barred by the saving clause, but he cannot show that the court "failed to address" the claim. Br. 59.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

JOHN C. CHILDRESS
Acting United States Attorney
Southern District of Indiana

ROBERT FRANK DALEY, JR.
KATHLEEN MICHELLE STOUGHTON
Assistant United States Attorneys
District of South Carolina

BRIAN C. RABBITT
Acting Assistant Attorney General

ROBERT A. ZINK
Acting Deputy Assistant Attorney
General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

61

## CERTIFICATE OF COMPLIANCE

1.　　This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 13,951 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/ William A. Glaser<br>
WILLIAM A. GLASER

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, I electronically filed the

foregoing document with the United States Court of Appeals for the Seventh

Circuit using the CM/ECF system.  I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

s/ William A. Glaser<br>
WILLIAM A. GLASER