No. 20-1900

CAPITAL HABEAS CASE

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

───────────────────────

CHADRICK FULKS,
Petitioner–Appellant,

v.

T.J. WATSON, Warden,
Respondent–Appellee.

───────────────────────

On Appeal from the United States District Court for the
Southern District of Indiana, No. 2:15-CV-33 (Hon. James R. Sweeney, II)

───────────────────────

**APPELLEE'S SUPPLEMENTAL APPENDIX**

───────────────────────

JOHN C. CHILDRESS
Acting United States Attorney
Southern District of Indiana

ROBERT FRANK DALEY, JR.
KATHLEEN MICHELLE STOUGHTON
Assistant United States Attorneys
District of South Carolina

BRIAN C. RABBITT
Acting Assistant Attorney General

ROBERT A. ZINK
Acting Deputy Assistant Attorney
General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

Excerpts of Trial Transcript Vol. 12, June 16, 2004
(pages 1, 133-34, 138-39) ............................................................................ 1

Excerpts of Trial Transcript Vol. 17, June 23, 2004 (pages 1, 10) .................... 6

Excerpts of Trial Transcript Vol. 18, June 24, 2004 (pages 1, 18, 74-75) .......... 8

Excerpts of Trial Transcript Vol. 21, June 29, 2004
(pages 1, 144, 187, 213-14) ....................................................................... 11

Excerpt, American Psychiatric Association, *Diagnostic and Statistical
Manual of Mental Disorders,* 4th Edition, Text Revision (2000)
(pages 41-49)............................................................................................ 16

Excerpts, American Association on Mental Retardation, *Mental Retardation:
Definition, Classification, and Systems of Supports*, 10th Edition (2002)
(pages 1, 5-17)......................................................................................... 26

Excerpts, American Association on Intellectual and Developmental
Disabilities, *User's Guide: Mental Retardation: Definition, Classification and
Systems of Supports*, 10th Edition (2007) (pages 8, 16, 20-21)........................ 41

Excerpts, American Association on Intellectual and Developmental
Disabilities, *Intellectual Disability: Definition, Classification, and Systems of
Supports,* 11th Edition (2010) (pages 6, 37-38) .............................................. 47

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,  )    CR. NO. 4:02-992
                           )    COLUMBIA, SC
                           )    JUNE 16, 2004
                           )
   VERSUS                  )
                           )
CHADRICK E. FULKS          )
        DEFENDANT.         )
                                )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XII

APPEARANCES:
FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201
FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503

                             JOHN H. BLUME, III, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211

                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

**Supp. App. 1**

DIRECT EXAM OF RUBEN GUR

RIGHT UNDER THE ORBITAL LOBE, SO IT IS IMPOSSIBLE TO GET --
DAMAGE THE ORBITAL CORTEX WITHOUT DAMAGING SOMEWHAT OF THE
OLFACTORY BULB.   THAT TEST INDICATED THAT HE HAS DIFFICULTIES
SMELLING,  WHICH IS EXACTLY WHAT YOU WOULD EXPECT, BASED ON
THAT SPECIFIC REGION.

SO,  WHEN YOU PUT ALL OF IT TOGETHER,  IT IS CLEAR THAT HE
HAS AN ABNORMAL ANATOMY.  AND THE MAIN REGIONS THAT ARE
INVOLVED ARE THE FRONTAL EXECUTIVE PART,  THE TEMPORAL MEMORY
PART,  THE CORPUS CALLOSUM, WHICH IS AN AREA THAT
DR. BOOKSTEIN WILL FOCUS ON.   HE HAS ABNORMAL PHYSIOLOGY AND,
AGAIN, WE SEE IN THE SAME REGIONS,  IN THE FRONTAL,  TEMPORAL,
AND THEN THE PHYSIOLOGY SHOWS,  ALSO,  REDUCED ACTIVITY IN THE
THALAMUS,  THE SWITCHBOARD,  THE FUSIFORM GYRUS,  THE PART
THAT LOOKS AT FACES AND COMPLEX FACIAL ASPECTS, AND THE RIGHT
CEREBELLUM, WHICH IS RESPONSIBLE FOR THE TREMOR,  FOR THE
RIGHT HAND TREMOR, AND THOSE KINDS OF SIGNS.

MR. GASSER:  YOUR HONOR,  MAY WE APPROACH,  PLEASE?
(WHEREUPON, A BENCH CONFERENCE WAS HELD.)
MR. GASSER:  WE HAD, SPECIFICALLY, ON THE RECORD, MR.
SCHOOLS AND MR. THURMOND AND I, WE HAD SPECIFICALLY DISCUSSED
WHEN WE WERE DISCUSSING ALL OF THESE MENTAL HEALTH ISSUES
WHETHER THEY WOULD HAVE ANY EXPERTS COME IN HERE TALKING ABOUT
MENTAL RETARDATION.
MR. BLUME:  I WILL NOT SAY HE IS MENTALLY RETARDED.
THE COURT:  YOU THOUGHT HE WAS HEADING IN?

**Supp. App. 2**

DIRECT EXAM OF RUBEN GUR

MR. BLUME:  I'M SORRY.   I WILL HAVE HIM AFFIRMATIVELY SAY HE IS NOT.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

MR. GASSER:  THANK YOU,  YOUR HONOR.

THE WITNESS:  AND IF YOU LOOK AT THE BEHAVIORAL ABNORMALITIES, THE DEFICITS ARE EXACTLY WHAT YOU WOULD EXPECT IF YOU PUT THESE IN EXECUTIVE FUNCTIONING MEMORY,  IN THE VIGILANTS, THAT IS THE SWITCHBOARD PART, AND SENSORY MOTOR FUNCTION.

Q.    SO, BASICALLY, THAT IS REAFFIRMING YOUR POINT ANATOMICALLY,  PHYSIOLOGY, AND BEHAVIORALLY, HIS BRAIN IS BAD?

A.    AND IN ABOUT THE SAME PLACES.

Q.    AND SO, THEN YOU PREVIOUSLY DISCUSSED, AS I UNDERSTAND IT, THAT HIS BRAIN IS DAMAGED IN WAYS WHICH ARE CONSISTENT WITH FETAL EXPOSURE TO ALCOHOL?

A.    YES.   YOU CAN TRY TO GAUGE THE AGE AT WHICH DAMAGE OCCURRED.   THE DIFFERENT STAGES OF DEVELOPMENT, THE DAMAGE WOULD RESULT IN A DIFFERENT WAY OF ADJUSTING.   AS THE BRAIN IS GROWING,  IN SOME WAYS, IT IS GOOD IF THE DAMAGE OCCURS TO A YOUNG BRAIN BECAUSE THE SAME DAMAGE OCCURRED TO A YOUNG AND ELDERLY BRAIN COULD KILL THE ELDERLY, AND THE YOUNG WOULD STILL SURVIVE.   BUT THE FLIP SIDE OF THAT SAME COIN IS THAT, THE EARLIER THE DAMAGE,  THE MORE THERE WILL BE ABNORMALITIES DOWN THE STREET, AND THE BRAIN WILL JUST LOOK MISSHAPED.

IT IS THE SAME WAY IF YOU TAKE THE ANALOGY OF A TREE THAT

**Supp. App. 3**

DIRECT EXAM OF RUBEN GUR

EXECUTIVE TO MAKE GOOD DECISIONS, THEY NEED TO HAVE THE INFORMATION COME FROM THE RIGHT PLACES.  AND WHEN THE SWITCHBOARD IS SENDING INFORMATION TO THE WRONG PLACES, IT IS HARD FOR THE EXECUTIVE TO GAUGE, EVEN IF THE EXECUTIVE WAS INTACT, IT IS HARD FOR THE EXECUTIVE TO COME UP WITH APPROPRIATE DECISIONS.  AND SO, ALONG WITH THE EXECUTIVE IS IMPAIRED, AND IT IS WORKING ON BAD INFORMATION THAT, INEVITABLY, WILL LEAD TO A LOT OF BAD DECISIONS.

Q.    THAT IS A DOUBLE WHAMMY TO THE THINKING PROCESS?

A.    YES.

Q.    AFFECT?

A.    THAT IS THE ABILITY TO UNDERSTAND AND COMMUNICATE EMOTION.  WE MEASURE THE VERY NARROW FACET OF THAT IS THE ABILITY TO INTERPRET FACIAL EXPRESSIONS OF EMOTION.  HE WAS IMPAIRED IN THAT.

Q.    NOW, JUST TO MAKE CLEAR HERE, YOU ARE NOT SAYING THAT MR. FULKS IS LEGALLY INSANE? IN OTHER WORDS,  THAT HE DIDN'T KNOW THE DIFFERENCE BETWEEN RIGHT AND WRONG?

A.    NO.  HE IS MORE LIKE THAT ADOLESCENT.  IF YOU ASKED HIM, AFTER THE FACT,  DID YOU KNOW THAT WHAT YOU DID WAS WRONG?  YEAH.  THEY CAN EXPLAIN BETTER THAN YOU CAN EXPLAIN WHAT IS RIGHT AND WHAT IS WRONG, EXCEPT AT THE MOMENT THE BRAIN DOESN'T WORK EFFICIENTLY ENOUGH TO RELAY THAT INFORMATION TO THE EXECUTIVE AND ALLOW THE EXECUTIVE TO MAKE AN INFORMED DECISION OF THAT TOPIC.

**Supp. App. 4**

DIRECT EXAM OF RUBEN GUR

Q.    AND YOU ARE NOT SAYING THAT MR. FULKS IS MENTALLY RETARDED?

A.    WELL, NO, I DON'T. I AM NOT SAYING HE IS RETARDED. HE IS CLEARLY NOT A VERY BRIGHT INDIVIDUAL. HE IS LESS INTELLIGENT THAN THE AVERAGE PERSON.

Q.    AS I UNDERSTAND, HIS OVERALL IQ FALLS IN THE HIGH SEVENTIES, WHICH PUTS IT IN THE SORT OF THE BORDERLINE RANGE?

A.    JUST AT THE BORDERLINE. A FEW MORE POINTS -- LESS POINTS, HE WOULD HAVE PASSED THE THRESHOLD; A FEW MORE POINTS, HE WOULD BE IN THE NORMAL RANGE. THE IQ, ITSELF, IS SORT OF A FRUIT SALAD. YOU TAKE ALL OF THE ABILITIES, YOU MEASURE AND MIX THEM TOGETHER AND COME UP WITH ONE NUMBER. WHEN REALLY, AS WE ALL KNOW, THERE ARE DIFFERENT THINGS THAT WE HAVE TO DO FOR OUR INTELLIGENCE. AND EVERYBODY HAS SOME STRENGTH AND SOME WEAKNESSES.

AND SO, IN SOME AREAS, HE IS WEAK ENOUGH TO BE WELL BELOW WHAT WE WOULD CALL A THRESHOLD FOR RETARDATION. IF YOU DIVIDE THE INTELLIGENCE INTO THE DIFFERENT COMPONENTS, WELL ONLY ONE OF THEM IS EXECUTIVE, ANOTHER ONE IS MEMORY. ANOTHER ONE IS VISUAL SPATIAL PROCESSING. IN A REGULAR IQ MEASURE, YOU HAVE ALL OF THOSE MEASURES. YOU COME UP WITH ONE NUMBER. THAT ONE NUMBER, WHEN YOU DO IT WITH MR. FULKS, COMES UP ON THE BORDERLINE SLIGHTLY ABOVE THE CUT OF RETARDATION. BUT A LOT OF THE MEASURES THAT GO INTO THAT FRUIT SALAD ARE BELOW THAT, WELL BELOW THAT THRESHHOLD.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,  )   CR. NO. 4:02-992
                           )   COLUMBIA, SC
                           )   JUNE 23, 2004
                           )
   VERSUS                  )
                           )
CHADRICK E. FULKS          )
      DEFENDANT.           )
                              )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XVII

APPEARANCES:
FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201
FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503

                             JOHN H. BLUME, III, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211

                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***
INDEX

**Supp. App. 6**

DIRECT EXAM OF JAMES EVANS

HAVE YOU TALK TO THE JURY ABOUT ARE THE RESULTS OF THE TESTS THAT YOU ADMINISTERED.   AND SO, YOU ADMINISTERED THIS BATTERY.  FIRST, TELL THE JURY, WHAT WERE THE RESULTS OF YOUR TESTING?

A.    IN THE BROAD VIEW OF IT?

Q.    YES.

A.    OKAY.   WELL, I ADMINISTERED A FEW OF THE SUBTESTS FROM THE INTELLIGENCE TEST THAT HAD BEEN ADMINISTERED EARLIER BECAUSE EARLIER PERSONS HAD FOUND -- AND THEY HAVE WHAT WE OFTEN CALL BORDERLINE INTELLIGENCE, BETWEEN LOW TO NORMAL AND MENTAL RETARDATION.   AND SINCE HE HAD ALREADY HAD THIS TEST TWO TIMES, I THOUGHT THERE MAY BE SOME PRACTICE EFFECT.  I DIDN'T WANT TO GIVE THE WHOLE TEST RIGHT AWAY THAT QUICKLY. SO,  I JUST ADMINISTERED CERTAIN OF THE SUBTESTS.   THOSE SUBTESTS CAME OUT WITH THE SAME GENERAL RANGES BUT FOUND BY TWO EARLIER PEOPLE.

Q.    THAT WAS BORDERLINE INTELLECTUAL?

A.    BORDERLINE INTELLECTUAL FUNCTIONING, YES.   IT WOULD BE, IN TERMS OF AN IQ SCORE,  WOULD HAVE BEEN A 75 TO 79 RANGE.   THEN I ALSO GAVE HIM A READING TEST BECAUSE, ORDINARILY, PEOPLE, UNLESS THEY HAVE A SPECIFIC LEARNING DISABILITY,  A READING TEST WILL PROVIDE SOME INFORMATION REGARDING GENERAL ABILITY.  HE CAME OUT WITH QUOTIENT OF 7TH TO 6TH GRADE LEVEL.  SO, THAT QUOTIENT WAS IN LINE WITH IQ FINDINGS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,  )    CR. NO. 4:02-992
                           )    COLUMBIA, SC
                           )    JUNE 24, 2004
                           )
   VERSUS                  )
                           )
CHADRICK E. FULKS          )
       DEFENDANT.          )
                                )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XVIII

APPEARANCES:

FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503

                             JOHN H. BLUME, III, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211

                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201


STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

**Supp. App. 8**

A.    YEAH.    I THINK THAT, OVERALL, FOR INSTANCE, IF YOU LOOK AT THAT MINI MENTAL STATE EXAMINATION, WHERE NORMAL SCORE IS 30 OUT OF 30,  HE SCORES A 23.  AND ALSO IN LOOKING AT HIS ABILITY TO RESPOND TO VERY SIMPLE PROVERBS, I MEAN, THESE ARE KINDS OF TASKS THAT WE GIVE TO PEOPLE OF ALL DIFFERENT BACKGROUNDS,  ALL DIFFERENT EDUCATION,  ALL DIFFERENT CULTURAL BACKGROUNDS.  HIS DIFFICULTY WITH THESE KINDS OF TASKS SUGGESTED TO ME THAT HE WAS IN THE BORDERLINE LEVEL OF INTELLECTUAL FUNCTIONING.

Q.    OKAY.  NOW,  SO BASED UPON YOUR PHYSICAL EXAMINATION, YOUR MENTAL STATUS EXAMINATION,  AS I UNDERSTAND, YOU CONCLUDED, AT THIS POINT, THAT MR. FULKS LIKELY HAD SOME TYPE OF BRAIN IMPAIRMENT?

A.    CORRECT.

Q.    SO,  WHAT DID YOU DO NEXT?

A.    AS I WOULD DO WITH ANY PATIENT THEN,  YOU EXAMINE THE PATIENT,  YOU FOUND THAT THERE IS A PROBLEM, AND YOU FORM SOME HYPOTHESIS.  YOU FORM SOME GUESSES AS TO WHAT MIGHT BE CAUSING THE PROBLEM.

AND SO, I THEN ORDERED SOME ADDITIONAL TESTS TO SEE IF WE COULD PIN IT DOWN A LITTLE BIT MORE SPECIFICALLY.

Q.    WHAT TESTS DID YOU ORDER?

A.    I SPECIFICALLY ORDERED AN MRI SCAN OF THE BRAIN AND ALSO A PET SCAN.

Q.    OKAY.  AND SO THESE TESTS WERE SUBSEQUENTLY CONDUCTED?

**Supp. App. 9**

REDIRECT EXAM OF DAVID BACHMAN

OPINION FROM THE FOLKS FROM BUTNER WAS THAT MR. FULKS SEEMED TO BE MAKING AN EFFORT.  AT LEAST THERE WAS NO EVIDENCE OF MALINGERING ON THE SPECIALLY DESIGNED MALINGERING TEST THAT THEY GAVE HIM.

Q.    AND DO YOU RECALL THAT THE BUTNER REPORT SPECIFICALLY STATES THAT MR. FULKS DID NOT SHOW ANY EVIDENCE OF INTENTIONAL EXAGGERATION DURING THE TESTS?

A.    I BELIEVE THAT IS WHAT THE REPORT SAYS.

Q.    AND THEY GAVE HIM, NOT ONLY AS FAR AS MALINGERING GOES, IS IT FAIR TO SAY THAT THE RESULTS OF THE NEUROPSYCHOLOGICAL TESTING AT BUTNER WERE VERY CONSISTENT WITH THE NEUROPSYCHOLOGICAL RESULTS OF THE OTHER EXAMINERS?

A.    ONE OF THE THINGS THAT I THINK IS VERY STRIKING ABOUT, THERE IS NEUROPSYCHOLOGICAL TESTING THAT WAS DONE FOUR TIMES OVER THE COURSE OF ABOUT A YEAR.  AND ONE OF THE THINGS THAT I WAS VERY STRUCK BY WAS THAT THE TESTING WAS VERY CONSISTENT FROM TEST TO TEST.  SO THAT THE PATTERN OF DEFICITS FOUND BY ONE NEUROPSYCHOLOGIST WAS VERY SIMILAR TO THE PATTERN OF DEFICITS FOUND BY THE OTHER NEUROPSYCHOLOGIST.

THERE IS A LITTLE BIT OF FLUCTUATION BETWEEN INDIVIDUAL TESTS AS YOU WOULD EXPECT FROM ANYBODY WHO HAS BEEN TESTED ON MULTIPLE OCCASIONS.  BY AND LARGE, I THINK WHAT IS STRIKING, MORE THAN ANYTHING ELSE, IS THE CONSISTENCY ACROSS THOSE TESTS.

Q.    AND THEY MEASURED HIS GENERAL INTELLECTUAL ABILITY AT

REDIRECT EXAM OF DAVID BACHMAN

79?

A.    SEVENTY-SEVEN (77), 79.  I THINK, AGAIN, THERE WERE A COUPLE OF POINTS VARIABILITY.  I THINK THEY WERE ALL VERY SIMILAR.

Q.    OF COURSE, ANYBODY CAN TAKE AN IQ TEST AND COME OUT WITHIN A POINT OR TWO.  IT IS NOT GOING TO BE EXACTLY THE SAME SCORE EVERY TIME?

A.    EVEN WITH FIVE OR TEN POINTS.  FIVE POINTS PARTICULARLY VARIABILITY FROM TEST TO TEST WOULD NOT BE THAT UNUSUAL.

Q.    AND THEY ALSO, DID THEY NOT, GIVE HIM, IN ADDITION TO IQ TEST OR SORT OF INTELLIGENCE TESTING, DID SPECIFIC NEUROPSYCHOLOGICAL TESTS?

A.    YES.

Q.    AND ON MANY OF THOSE TESTS, NEUROPSYCHOLOGICAL TESTS EVEN ADMINISTERED BY BUTNER, HE CAME OUT IN THE IMPAIRED RANGE?

A.    YES, THAT IS WHAT THE REPORT SHOWS.

Q.    AND THE IMPAIRED RANGE WOULD BE -- YOU WOULD HAVE SOME TYPE OF NEUROLOGICAL IMPAIRMENT?

A.    YES.

Q.    NOW, I WANT TO ASK YOU, THERE WERE SOME OTHER QUESTIONS ABOUT TESTING, JUST TO CLEAR IT UP.  YOU WERE ASKED SOME QUESTIONS ABOUT THE PAI?

A.    YES.

**Supp. App. 11**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
                            )   COLUMBIA, SC
                            )   JUNE 29, 2004
                            )
   VERSUS                   )
                            )
CHADRICK E. FULKS           )
        DEFENDANT.          )
                               )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XXI

APPEARANCES:
FOR THE GOVERNMENT:          STROM THURMOND, JR., USA
                             SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201
FOR THE DEFENDANT:
                             WILLIAM F. NETTLES, IV, AFPD
                             FEDERAL PUBLIC DEFENDER'S OFFICE
                             MCMILLAN FEDERAL BUILDING
                             401 WEST EVANS STREET, ROOM 240
                             FLORENCE, SC 29503

                             JOHN H. BLUME, III, ESQ.
                             KEIR M. WEYBLE, ESQ.
                             BLUME AND WEYBLE
                             P. O. BOX 11744
                             COLUMBIA, SC  29211

                             SHERRI LYNN JOHNSON, ESQ.
                             1118 AUTUMN RIDGE LANE
                             ITHACA, NEW YORK 14850

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

Supp. App. 12

CLOSING ARGUMENT BY MR. BLUME

SAYS HE IS GOING TO HIS BROTHER RONNIE'S.  HE GOES THERE, AND THEY CATCH HIM.  JUST LIKE HE WRITES THE SAME LETTERS OVER AND OVER TO THE SAME AND DIFFERENT WOMEN, HE GOES TO THE SAME PLACES.  IT IS A MANIFESTATION OF HIS LIMITATIONS, NOT OF HIS CUNNING.

NOW, THE GOVERNMENT HAS POINTED TOWARD THE STATEMENTS THAT CHAD MADE.  AND SOME OF THE STATEMENTS AS BEING INCONSISTENT WITH THE EVIDENCE OR SIMPLY IMPLAUSIBLE OR UNBELIEVABLE ON THEIR FACE.  I GUESS YOU COULD SAY, TO A DEGREE, THEY WANT TO HAVE IT BOTH WAYS.  THEY WANT TO ARGUE THAT CHAD TRIED TO HONE HIS STATEMENTS TO SOME OF THE EVIDENCE THAT HE KNEW ABOUT.  BUT HE WAS OFF IN SOME OF THE DETAILS, AND THAT DEMONSTRATES THAT HE WAS LYING.  LET'S THINK ABOUT A FEW OTHER THINGS.

FIRST,  THE TESTIMONY BEFORE YOU IS UNDISPUTED.  NOT A SHRED OF CONTRADICTION THAT MR. FULKS HAS AN IQ BETWEEN 77 AND 79, BETWEEN THE 6TH PERCENTILE.  JUST THE POINT ABOVE THE LEVEL OF MENTAL RETARDATION.  TAKE SOMEONE WITH AN IQ OF 70, ASK THEM TO RECALL TO YOU ABOUT EVENTS THAT, IT IS UNDISPUTED, THEY WERE UNDER THE INFLUENCE OF DRUGS AND ALCOHOL AT THE TIME OF THOSE EVENTS,  SOME OF THOSE DETAILS WILL BE WRONG.  DOESN'T MEAN HE IS LYING.  ALSO, SOME OF THE DETAILS THEY ARE ATTACKING, IF THEY ARE NOT TRUE,  IT IS HARD TO PERCEIVE OF A REASON WHY HE WOULD LIE ABOUT IT.  MS. DONOVAN, BEING PARTIALLY NAKED, IT SOUNDS UNBELIEVABLE,  IMPLAUSIBLE.  WE

**Supp. App. 13**

ARE EVEN MORE IMPORTANT.   THE SECOND DIFFERENCE IS THE ONE THAT MR. BLUME TALKED TO YOU ABOUT.  I WILL BE BRIEFER.  I WILL BE LESS TECHNICAL.  I WILL NOT USE ANY OF THOSE PICTURES. I TOLD YOU ABOUT THE DIFFERENT TALENTS AND WEAKNESSES OF CHRIS AND ALEXANDRA AND ASKED YOU TO THINK ABOUT THAT WITH RESPECT TO CHILDREN THAT YOU KNOW.   BUT WHATEVER VARIATION THERE ARE IN YOUR KIDS OR MINE OR OTHER PEOPLE'S KIDS,  WE ARE STILL TALKING ABOUT NORMAL KIDS.   WHEN I THINK OF ALL OF THE NEUROLOGICAL EVIDENCE,  THE VARIOUS THINGS THE EXPERTS SAID ABOUT CHAD'S BRAIN AND HOW IT WORKS,  I HAVE DESPAIR.   I DIDN'T UNDERSTAND EVERYTHING THOSE EXPERTS SAID.  AND I MUST ADMIT, I DIDN'T LOOK AT EVERY SINGLE ONE OF THOSE PICTURES, BUT HERE IS WHAT I DO UNDERSTAND, AND WHAT I THINK IS PLAINLY TRUE.   CHAD'S BRAIN NEVER WORKED RIGHT.  AND THE OLDER HE GOT, THE WORSE IT WORKED, AT LEAST COMPARED TO OTHER PEOPLE.

LET'S START WITH CHAD'S IQ.   HE IS NOT RETARDED,  BUT HE IS CLOSE.   IF A PERSON'S IQ IS 100, HE IS AVERAGE.   IF A PERSON'S IQ IS 70 OR LESS, THEY ARE RETARDED.   CHAD'S IQ IS BETWEEN 77 AND 79.   THAT MEANS THAT NINE OUT OF TEN PEOPLE ARE SMARTER THAN HE IS.   NOW,  THAT IS NOT IMPOSSIBLE.   THAT IS NOT ANYTHING YOU CAN'T OVERCOME.   BUT IT IS A BIG DISADVANTAGE TO BE AT THE BOTTOM.   AND ANOTHER PROBLEM IS THAT CHAD'S SPECIFIC PROBLEM IS THAT CHAD'S BRAIN HAS TROUBLE STORING INFORMATION.  ONE OF THE THINGS IT DOES POORLY IS FIGURE OUT HOW OTHER PEOPLE FEEL.   NOW,  HEARING THAT ABOUT

**Supp. App. 14**

CLOSING ARGUMENT BY MS. JOHNSON

LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IS THE APPROPRIATE SENTENCE, OR WHETHER ONLY THE DEATH PENALTY WILL BE A SUFFICIENT PUNISHMENT.   AND HOW YOU PROCEED FROM HERE IS THAT YOU MEASURE WHAT IS THE APPROPRIATE SENTENCE,  NOT JUST BY WHAT CHAD FULKS HAS DONE,  BUT BY WHAT RESOURCES,  TALENTS, AND EXPERIENCES HE HAD.   THERE IS NO DOUBT THAT CHAD FELL SHORT OF EVEN THAT REALLY LOW STANDARD.   AS HAS BEEN REPEATEDLY POINTED OUT BY MR. GASSER,  NOT EVERYONE WITH BRAIN DAMAGE AND A TWISTED, WARPING CHILDHOOD DOES WHAT CHAD DID. BUT IT IS ALSO NOT LIKE ONE OF MY CHILDREN, OR A CHILD YOU KNOW, OR ANY CHILD WITH A NORMAL CHILDHOOD WENT OUT AND DID THESE THINGS.

I HAVE HEARD SOMETHING SIMILAR TO WHAT PAUL SAID IN PHILIPPIANS SAID IN A SECULAR CONTEXT.   "TO THOSE WHO MUCH IS GIVEN,  MUCH IS EXPECTED."   IF YOU WERE GIVEN A NORMAL BRAIN AND A NORMAL CHILDHOOD,  TO MAKE THE CHOICES CHAD MADE,  WELL, THAT WOULD BE PURE EVIL.   WHAT CHAD DID WAS WRONG.   IT WAS TERRIBLY WRONG.   BUT HE HAD BEEN TAUGHT ALL OF HIS LIFE TO DO WRONG.   AND HIS BRAIN DAMAGE MADE IT FAR HARDER FOR HIM TO RESIST THE IMPULSES PLANTED IN HIS CHILDHOOD TO UNLEARN ALL OF THOSE OLD PATTERNS TO MAKE THE RIGHT CHOICES.

NOW,  I AM NOT SAYING THAT CHAD FULKS WAS NOT HELD RESPONSIBLE FOR WHAT HE DID.   HE IS NOT MENTALLY RETARDED. THOUGH, HE IS BORDERLINE MENTALLY RETARDED, HE IS NOT INSANE. HE HAS BOTH, A SENSE OF RIGHT AND WRONG AND ABILITY TO CONTROL

CLOSING ARGUMENT BY MS. JOHNSON

IMPULSES IS IMPAIRED.  HE WAS NOT UNDER DURESS.  ALTHOUGH, CLEARLY, AS EVEN THE GOVERNMENT SAYS, WHAT HAPPENED WOULD NOT HAVE HAPPENED HAD CHAD NOT BEEN WITH BRANDON BASHAM.  BRANDON BASHAM'S VIOLENCE, AND PARANOIA, AND LOVE OF GUNS CLEARLY PLAYED A ROLE IN WHAT HAPPENED.  ALTHOUGH WE WILL NEVER KNOW WHAT THAT ROLE IS.

BUT NONE OF THAT EXCUSES CHAD.  IT IS NOT AN EXCUSE.  I AM NOT SAYING THAT CHAD FULKS'S CHILDHOOD OR HIS BRAIN EXCUSES WHAT HE DID.  IN FACT, BY PLEADING GUILTY, HE IS ASSURED THAT HE WILL PAY FOR WHAT HE DID WITH HIS FREEDOM FOR THE REST OF HIS LIFE.  NOW, MR. GASSER SAID, WELL, CHAD SAID HE WAS GOING TO NEVER GET OUT, SO THAT MEANS HE WOULD BE LETTING HIM ESCAPE.  I DON'T KNOW IF CHAD FULKS WROTE THAT OR HE BELIEVED IT, BUT HE WAS WRONG.  AT THE TIME HE LEFT JAIL, HE WAS NOT PAYING WITH HIS ENTIRE LIFE.  HE WAS NOT TALKING ABOUT LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.  IF YOU ASSIGN HIM THAT SENTENCE, THAT IS WHAT YOU WILL BE DOING.  YOU WILL BE GIVING THAT PUNISHMENT, NOT JUST NOTHING.

ALL I AM REALLY TALKING ABOUT IS PUNISHMENT.  NOT TALKING ABOUT RESPONSIBILITY.  YOU CAN AND YOU SHOULD GIVE LIFE BECAUSE CHAD NEVER HAD A CHANCE TO BE GOOD.  HE HAD A CHANCE TO BE BAD OR EVEN WORSE.  AND I WOULD AGREE HE WAS EVEN WORSE.  BUT IF YOU MEASURE HIM THE WAY PAUL MEASURED HIMSELF, BY HIS POTENTIAL GIVEN THE RESOURCES OF HIS BRAIN AND THE DESTRUCTIVE TRAINING OF HIS LIFE, YOU WILL CONCLUDE THAT LIFE

**Supp. App. 16**

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FOURTH EDITION

## TEXT REVISION

# DSM-IV-TR®



**Published by the
American Psychiatric Association
Arlington, VA**

**Supp. App. 17**

Copyright © 2000 American Psychiatric Association

DSM, DSM-IV, and DSM-IV-TR are trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, Inc., 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-024-9 9th Printing March 2010

ISBN 978-0-89042-025-6 14th Printing March 2010

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-IV.—4th ed., text revision.
    p.   ; cm.
  Prepared by the Task Force on DSM-IV and other committees and work groups of the American Psychiatric Association.
  Includes index.
  ISBN 0-89042-024-6 (casebound : alk. paper)—ISBN 0-89042-025-4 (pbk. : alk. paper)
  1. Mental illness—Classification—Handbooks, manuals, etc. 2. Mental illness—Diagnosis—Handbooks, manuals, etc. I. Title: DSM-IV. II. American Psychiatric Association. III. American Psychiatric Association. Task Force on DSM-IV.
  [DNLM: 1. Mental Disorders—classification. 2. Mental Disorders—diagnosis.
WM 15 D536 2000]
RC455.2.C4 D536 2000
616.89'075—dc21

                                                                    00-024852

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Anne Barnes
Manufacturing—R. R. Donnelley & Sons Company

separation from home or from those to whom the child is attached. **Selective Mutism** is characterized by a consistent failure to speak in specific social situations despite speaking in other situations. **Reactive Attachment Disorder of Infancy or Early Childhood** is characterized by markedly disturbed and developmentally inappropriate social relatedness that occurs in most contexts and is associated with grossly pathogenic care. **Stereotypic Movement Disorder** is characterized by repetitive, seemingly driven, and nonfunctional motor behavior that markedly interferes with normal activities and at times may result in bodily injury. **Disorder of Infancy, Childhood, or Adolescence Not Otherwise Specified** is a residual category for coding disorders with onset in infancy, childhood, or adolescence that do not meet criteria for any specific disorder in the Classification.

Children or adolescents may present with problems requiring clinical attention that are not defined as mental disorders (e.g., Relational Problems, Problems Related to Abuse or Neglect, Bereavement, Borderline Intellectual Functioning, Academic Problem, Child or Adolescent Antisocial Behavior, Identity Problem). These are listed at the end of the manual in the section "Other Conditions That May Be a Focus of Clinical Attention" (see p. 731).

DSM-III-R included two anxiety disorders specific to children and adolescents, Overanxious Disorder of Childhood and Avoidant Disorder of Childhood, that have been subsumed under Generalized Anxiety Disorder and Social Phobia, respectively, because of similarities in essential features.

# Mental Retardation

## Diagnostic Features

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*General intellectual functioning* is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests (e.g., Wechsler Intelligence Scales for Children, 3rd Edition; Stanford-Binet, 4th Edition; Kaufman Assessment Battery for Children). Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65–75). Thus, it is possible to diagnose Mental Retardation in

**Supp. App. 19**

individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. The choice of testing instruments and interpretation of results should take into account factors that may limit test performance (e.g., the individual's socio-cultural background, native language, and associated communicative, motor, and sensory handicaps). When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading.

Impairments in adaptive functioning, rather than a low IQ, are usually the present-ing symptoms in individuals with Mental Retardation. *Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality char-acteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute.

It is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmen-tal, and medical history). Several scales have also been designed to measure adaptive functioning or behavior (e.g., the Vineland Adaptive Behavior Scales and the Ameri-can Association on Mental Retardation Adaptive Behavior Scale). These scales gener-ally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains. It should be noted that scores for certain individual domains are not included in some of these instruments and that individual domain scores may vary considerably in reliability. As in the assessment of intellectual functioning, con-sideration should be given to the suitability of the instrument to the person's socio-cultural background, education, associated handicaps, motivation, and cooperation. For instance, the presence of significant handicaps invalidates many adaptive scale norms. In addition, behaviors that would normally be considered maladaptive (e.g., de-pendency, passivity) may be evidence of good adaptation in the context of a particular individual's life (e.g., in some institutional settings).

## Degrees of Severity of Mental Retardation

Four degrees of severity can be specified, reflecting the level of intellectual impair-ment: Mild, Moderate, Severe, and Profound.

| | | |
|---|---|---|
| 317 | **Mild Mental Retardation:** | IQ level 50–55 to approximately 70 |
| 318.0 | **Moderate Retardation:** | IQ level 35–40 to 50–55 |
| 318.1 | **Severe Mental Retardation:** | IQ level 20–25 to 35–40 |
| 318.2 | **Profound Mental Retardation:** | IQ level below 20 or 25 |

**319　Mental Retardation, Severity Unspecified,** can be used when there is a strong presumption of Mental Retardation but the person's intelligence is untestable by standard tests (e.g., with individuals too impaired or uncooperative, or with infants).

# 317　Mild Mental Retardation

Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

# 318.0　Moderate Mental Retardation

Moderate Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "trainable." This outdated term should not be used because it wrongly implies that people with Moderate Mental Retardation cannot benefit from educational programs. This group constitutes about 10% of the entire population of people with Mental Retardation. Most of the individuals with this level of Mental Retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care. They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects. They may learn to travel independently in familiar places. During adolescence, their difficulties in recognizing social conventions may interfere with peer relationships. In their adult years, the majority are able to perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce. They adapt well to life in the community, usually in supervised settings.

# 318.1　Severe Mental Retardation

The group with Severe Mental Retardation constitutes 3%–4% of individuals with Mental Retardation. During the early childhood years, they acquire little or no communicative speech. During the school-age period, they may learn to talk and can be trained in elementary self-care skills. They profit to only a limited extent from instruction in pre-academic subjects, such as familiarity with the alphabet and simple counting, but can master skills such as learning sight reading of some "survival" words. In their adult years, they may be able to perform simple tasks in closely supervised set-

**Supp. App. 21**

tings. Most adapt well to life in the community, in group homes or with their families, unless they have an associated handicap that requires specialized nursing or other care.

# 318.2   Profound Mental Retardation

The group with Profound Mental Retardation constitutes approximately 1%–2% of people with Mental Retardation. Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation. During the early childhood years, they display considerable impairments in sensorimotor functioning. Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver. Motor development and self-care and communication skills may improve if appropriate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

# 319   Mental Retardation, Severity Unspecified

The diagnosis of Mental Retardation, Severity Unspecified, should be used when there is a strong presumption of Mental Retardation but the person cannot be successfully tested by standardized intelligence tests. This may be the case when children, adolescents, or adults are too impaired or uncooperative to be tested or, with infants, when there is a clinical judgment of significantly subaverage intellectual functioning, but the available tests (e.g., the Bayley Scales of Infant Development, Cattell Infant Intelligence Scales, and others) do not yield IQ values. In general, the younger the age, the more difficult it is to assess for the presence of Mental Retardation except in those with profound impairment.

## Recording Procedures

The specific diagnostic code for Mental Retardation is selected based on the level of severity as indicated above and is coded on Axis II. If Mental Retardation is associated with another mental disorder (e.g., Autistic Disorder), the additional mental disorder is coded on Axis I. If Mental Retardation is associated with a general medical condition (e.g., Down syndrome), the general medical condition is coded on Axis III.

## Associated Features and Disorders

**Associated descriptive features and mental disorders.**     No specific personality and behavioral features are uniquely associated with Mental Retardation. Some individuals with Mental Retardation are passive, placid, and dependent, whereas others can be aggressive and impulsive. Lack of communication skills may predispose to disruptive and aggressive behaviors that substitute for communicative language. Some general medical conditions associated with Mental Retardation are characterized by certain behavioral symptoms (e.g., the intractable self-injurious behavior associated with Lesch-Nyhan syndrome). Individuals with Mental Retardation may be

**Supp. App. 22**

vulnerable to exploitation by others (e.g., being physically and sexually abused) or being denied rights and opportunities.

Individuals with Mental Retardation have a prevalence of comorbid mental disorders that is estimated to be three to four times greater than in the general population. In some cases, this may result from a shared etiology that is common to Mental Retardation and the associated mental disorder (e.g., head trauma may result in Mental Retardation and in Personality Change Due to Head Trauma). All types of mental disorders may be seen, and there is no evidence that the nature of a given mental disorder is different in individuals who have Mental Retardation. The diagnosis of comorbid mental disorders is, however, often complicated by the fact that the clinical presentation may be modified by the severity of the Mental Retardation and associated handicaps. Deficits in communication skills may result in an inability to provide an adequate history (e.g., the diagnosis of Major Depressive Disorder in a nonverbal adult with Mental Retardation is often based primarily on manifestations such as depressed mood, irritability, anorexia, or insomnia that are observed by others). More often than is the case in individuals without Mental Retardation, it may be difficult to choose a specific diagnosis and in such cases the appropriate Not Otherwise Specified category can be used (e.g., Depressive Disorder Not Otherwise Specified). The most common associated mental disorders are Attention-Deficit/Hyperactivity Disorder, Mood Disorders, Pervasive Developmental Disorders, Stereotypic Movement Disorder, and Mental Disorders Due to a General Medical Condition (e.g., Dementia Due to Head Trauma). Individuals who have Mental Retardation due to Down syndrome may be at higher risk for developing Dementia of the Alzheimer's Type. Pathological changes in the brain associated with this disorder usually develop by the time these individuals are in their early 40s, although the clinical symptoms of dementia are not evident until later.

Associations have been reported between specific etiological factors and certain comorbid symptoms and mental disorders. For example, fragile X syndrome appears to increase the risk for Attention-Deficit/Hyperactivity Disorder and Social Phobia; individuals with Prader-Willi syndrome may exhibit hyperphagia and compulsivity, and those with William's syndrome may have an increased risk of Anxiety Disorders and Attention-Deficit/Hyperactivity Disorder.

**Predisposing factors.**    Etiological factors may be primarily biological or primarily psychosocial, or some combination of both. In approximately 30%–40% of individuals seen in clinical settings, no clear etiology for the Mental Retardation can be determined despite extensive evaluation efforts. Specific etiologies are more likely to be identified in individuals with Severe or Profound Mental Retardation. The major predisposing factors include:

*Heredity:*    These factors include inborn errors of metabolism inherited mostly through autosomal recessive mechanisms (e.g., Tay-Sachs disease), other single-gene abnormalities with Mendelian inheritance and variable expression (e.g., tuberous sclerosis), and chromosomal aberrations (e.g., translocation Down syndrome, fragile X syndrome). Advances in genetics will likely increase the identification of heritable forms of Mental Retardation.

*Early alterations of embryonic development:*    These factors include chromosomal changes (e.g., Down syndrome due to trisomy) or prenatal damage due to toxins (e.g., maternal alcohol consumption, infections).

*Environmental influences:*   These factors include deprivation of nurturance and of social, linguistic, and other stimulation.

*Mental disorders:*   These factors include Autistic Disorder and other Pervasive Developmental Disorders.

*Pregnancy and perinatal problems:*   These factors include fetal malnutrition, prematurity, hypoxia, viral and other infections, and trauma.

*General medical conditions acquired in infancy or childhood:*   These factors include infections, traumas, and poisoning (e.g., due to lead).

**Associated laboratory findings.**   Other than the results of psychological and adaptive behavior tests that are necessary for the diagnosis of Mental Retardation, there are no laboratory findings that are uniquely associated with Mental Retardation. Diagnostic laboratory findings may be associated with a specific accompanying general medical condition (e.g., chromosomal findings in various genetic conditions, high blood phenylalanine in phenylketonuria, or abnormalities on central nervous system imaging).

**Associated physical examination findings and general medical conditions.** There are no specific physical features associated with Mental Retardation. When Mental Retardation is part of a specific syndrome, the clinical features of that syndrome will be present (e.g., the physical features of Down syndrome). The more severe the Mental Retardation (especially if it is severe or profound), the greater the likelihood of neurological (e.g., seizures), neuromuscular, visual, auditory, cardiovascular, and other conditions.

## Specific Culture, Age, and Gender Features

Care should be taken to ensure that intellectual testing procedures reflect adequate attention to the individual's ethnic, cultural, or linguistic background. This is usually accomplished by using tests in which the individual's relevant characteristics are represented in the standardization sample of the test or by employing an examiner who is familiar with aspects of the individual's ethnic or cultural background. Individualized testing is always required to make the diagnosis of Mental Retardation. The prevalence of Mental Retardation due to known biological factors is similar among children of upper and lower socioeconomic classes, except that certain etiological factors are linked to lower socioeconomic status (e.g., lead poisoning and premature births). In cases in which no specific biological causation can be identified, the Mental Retardation is usually milder (although all degrees of severity are represented) and individuals from lower socioeconomic classes are overrepresented. Developmental considerations should be taken into account in evaluating impairment in adaptive skills because certain of the skill areas are less relevant at different ages (e.g., use of community resources or employment in school-age children). Mental Retardation is more common among males, with a male-to-female ratio of approximately 1.5:1.

## Prevalence

The prevalence rate of Mental Retardation has been estimated at approximately 1%. However, different studies have reported different rates depending on definitions used, methods of ascertainment, and population studied.

## Course

The diagnosis of Mental Retardation requires that the onset of the disorder be before age 18 years. The age and mode of onset depend on the etiology and severity of the Mental Retardation. More severe retardation, especially when associated with a syndrome with a characteristic phenotype, tends to be recognized early (e.g., Down syndrome is usually diagnosed at birth). In contrast, Mild Retardation of unknown origin is generally noticed later. In more severe retardation resulting from an acquired cause, the intellectual impairment will develop more abruptly (e.g., retardation following an encephalitis). The course of Mental Retardation is influenced by the course of underlying general medical conditions and by environmental factors (e.g., educational and other opportunities, environmental stimulation, and appropriateness of management). If an underlying general medical condition is static, the course is more likely to be variable and to depend on environmental factors. Mental Retardation is not necessarily a lifelong disorder. Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation.

## Familial Pattern

Because of its heterogeneous etiology, no familial pattern is applicable to Mental Retardation as a general category. The heritability of Mental Retardation is discussed under "Predisposing Factors" (see p. 45).

## Differential Diagnosis

The diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder. In **Learning Disorders** or **Communication Disorders** (unassociated with Mental Retardation), the development in a specific area (e.g., reading, expressive language) is impaired but there is no generalized impairment in intellectual development and adaptive functioning. A Learning Disorder or Communication Disorder can be diagnosed in an individual with Mental Retardation if the specific deficit is out of proportion to the severity of the Mental Retardation. In **Pervasive Developmental Disorders,** there is qualitative impairment in the development of reciprocal social interaction and in the development of verbal and nonverbal social communication skills. Mental Retardation often accompanies Pervasive Developmental Disorders.

Some cases of Mental Retardation have their onset after a period of normal functioning and may qualify for the additional diagnosis of **dementia.** A diagnosis of dementia requires that the memory impairment and other cognitive deficits represent a significant decline from a previously higher level of functioning. Because it may be difficult to determine the previous level of functioning in very young children, the diagnosis of dementia may not be appropriate until the child is between ages 4 and 6 years. In general, for individuals under age 18 years, the diagnosis of dementia is

made only when the condition is not characterized satisfactorily by the diagnosis of Mental Retardation alone.

**Borderline Intellectual Functioning** (see p. 740) describes an IQ range that is higher than that for Mental Retardation (generally 71–84). As discussed earlier, an IQ score may involve a measurement error of approximately 5 points, depending on the testing instrument. Thus, it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation. Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

## Relationship to Other Classifications of Mental Retardation

The classification system of the American Association on Mental Retardation (AAMR) includes the same three criteria (i.e., significantly subaverage intellectual functioning, limitations in adaptive skills, and onset prior to age 18 years). In the AAMR classification, the criterion of significantly subaverage intellectual functioning refers to a standard score of approximately 70–75 or below (which takes into account the potential measurement error of plus or minus 5 points in IQ testing). Furthermore, DSM-IV specifies levels of severity, whereas the AAMR 1992 classification system specifies "Patterns and Intensity of Supports Needed" (i.e., "Intermittent, Limited, Extensive, and Pervasive"), which are not directly comparable with the degrees of severity in DSM-IV. The definition of developmental disabilities in Public Law 95-602 (1978) is not limited to Mental Retardation and is based on functional criteria. This law defines *developmental disability* as a disability attributable to a mental or physical impairment, manifested before age 22 years, likely to continue indefinitely, resulting in substantial limitation in three or more specified areas of functioning, and requiring specific and lifelong or extended care.

# Mental Retardation

## Definition, Classification, and Systems of Supports

### 10th Edition

## AAMR
American Association on Mental Retardation

**Supp. App. 27**

## MENTAL RETARDATION:

Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

The following five assumptions are essential to the application of this definition:

1. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.

2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.

3. Within an individual, limitations often coexist with strengths.

4. An important purpose of describing limitations is to develop a profile of needed supports.

5. With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

© American Association on Mental Retardation

# CHAPTER 1

## DEFINITION, THEORETICAL MODEL, FRAMEWORK FOR ASSESSMENT, AND OPERATIONAL DEFINITIONS

### OVERVIEW

In this 2002 manual, *Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed.), the American Association on Mental Retardation (AAMR), through its Ad Hoc Committee on Terminology and Classification (T&C Committee), continues its history of contributing practical and up-to-date information on the definition and classification of the state of functioning currently known as mental retardation. With this work, the AAMR attempts to state, describe, organize, and extend the thinking in the field of mental retardation that has occurred over the past 10 years since the publication of the AAMR's 1992 manual, *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed.; Luckasson et al.). The present manual contains and describes the logical continuation in conceptualizing mental retardation as functional and contextual.

Often discussions of this disability become confusing because aspects of what is loosely referred to as "the definition" are not separated for consideration. Therefore, we begin this analysis of the current status of mental retardation by providing a framework for thinking about the three separate aspects of naming, defining, and classifying. Each of the aspects is distinct but related to the others.

### NAMING, DEFINING, AND CLASSIFYING

#### NAMING

In naming, a specific term is attached to something or someone. It is a powerful process that carries many messages about perceived value and human relationships. Currently people with mental retardation and others in the field are struggling to identify a new name for this disability. So far, no new consensus term has emerged. The history of the condition we now know as mental retardation is replete with name changes, including feebleminded, mentally defective, mentally deficient, and others. These new names arose as new theoretical frameworks appeared and older names came to signal stigma and distorted power relationships. It is likely that the name mental retardation will change in the near future.

**Supp. App. 29**

© American Association on Mental Retardation

Case: 20-1900    Document: 29    Filed: 12/21/2020    Pages: 54

Luckasson and Reeve (2001) suggested a list of guiding questions to ask when names or terms are considered:

- Does this term name this and nothing else?
- Does this term provide consistent nomenclature?
- Does this term facilitate communication?
- Does this term incorporate current knowledge and is it likely to incorporate future knowledge?
- Does this term meet the purposes for which it is being proposed?
- Does this term contribute positively to the portrayal of people with the disability? (pp. 48–49)

## DEFINING

In defining, the name or term is explained as precisely as possible. The definition should establish the boundaries of the term and separate who or what is included within the term from who or what is outside the term. The importance of a definition is that it establishes meaning, and should help meet the basic human drive for understanding. But this meaning function of a definition also explains some of the tensions over proposed definitions: reasonable people can disagree over what the meaning of mental retardation is. The meaning proposed in the 1992 manual was that the condition is functional and interactionist rather than statistical. That functional and interactionist meaning continues and is further extended in this 2002 manual. (See the definition, p. 1.)

Luckasson and Reeve (2001) suggested a list of guiding questions to ask when definitions are considered:

- Does this definition indicate the boundaries of the term, that is, who or what is inside the boundaries and who or what is outside the boundaries?
- Does this definition indicate the class of things to which it belongs?
- Does this definition differentiate the term from other members of the class?
- Does this definition use words that are no more complicated than the term itself?
- Does the definition define what something is, not what it is not?
- Does this definition allow some generalizations about characteristics of the individual or group named by the term?
- Is this definition consistent with a desired theoretical framework?
- Does this definition contribute positively to the portrayal of people included in the term? (p. 49)

## CLASSIFYING

In classifying, what has been included in the term by its definition is divided into subgroups according to stated principles. Many different types of classification sys-

©American Association on Mental Retardation

tems, based on many different criteria, are used in many different fields. For example, medical disease classification systems might be based on etiology or prognosis or even DNA analysis. Plant classification systems might be based on heredity patterns or even leaf shape. Historically mental retardation classification systems were based on designating the person into an IQ band as in the classification system of mild, moderate, severe, and profound. In the 1992 manual, AAMR proposed a new classification system based on the intensities of needed supports. This 2002 manual maintains this strong commitment for a supports-based classification system and also explains the use of multiple classification systems. (For a full discussion of the classification system, see chaps. 7 & 9.)

Luckasson and Reeve (2001) suggested a list of guiding questions to ask when classification systems are considered:

- Does this classification system allow coding into groups, based on some consistent and meaningful criteria?
- Does this classification system facilitate record keeping?
- Does this classification system provide consistent nomenclature?
- Does this classification system facilitate communication?
- Does this classification system allow some generalizations about the individual or group?
- Does this classification system create a principled organizing system for incorporating new knowledge?
- Does this classification system promote planning and allocation of resources?
- Does this classification system contribute to meaningful predictions for individuals or groups?
- Is this classification system consistent with a desired theoretical framework?
- Does this classification system contribute positively to the portrayal of individuals or groups? (p. 51)

Defining and classifying are the focus of this manual. Naming, although an important aspect of thinking about the disability, is beyond the scope of this manual. Other groups, such as The Consortium on Language, Image, and Public Information and individual organizations, are exploring possible alternatives to the name "mental retardation." If changes occur, they are likely to occur in different settings according to different purposes and timetables. For example, the scientific name of the condition might remain the same; the common usage name might change over extended time; the term used in organizational titles might change, depending on the schedules and roles of the organizations; legislative language might remain constant; and so on. Some coordination of possible name changes is likely, but uniformity, if it occurs, is in the future.

**Supp. App. 31**

©American Association on Mental Retardation

Case: 20-1900    Document: 29    Filed: 12/21/2020    Pages: 54

# 2002 DEFINITION OF
# MENTAL RETARDATION

The 2002 AAMR definition of mental retardation is as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

This definition, like AAMR definitions of mental retardation of the recent past, includes the three broad elements of significant limitations in intellectual functioning, concurrent with and related to significant limitations in adaptive behavior, and manifested during the developmental period.

As in 1992, important assumptions are included as part of the application of the definition of mental retardation. In 2002 we specify the following five assumptions:

*Assumption 1:* "Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture." This means that the standards against which the individual's functioning must be measured are typical community-based environments, not environments that are isolated or segregated by ability. Typical community environments include homes, neighborhoods, schools, businesses, and other environments in which people of similar age ordinarily live, play, work, and interact. The concept of age peers should also include people of the same cultural or linguistic background.

*Assumption 2:* "Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors." This means that in order for assessment to be meaningful, it must take into account the individual's diversity and unique response factors. The individual's culture or ethnicity, including language spoken at home, nonverbal communication, and customs that might influence assessment results, must be considered in making a valid assessment.

*Assumption 3:* "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.

*Assumption 4:* "An important purpose of describing limitations is to develop a profile of needed supports." This means that merely analyzing someone's limitations is not enough, and that specifying limitations should be a team's first step in developing a description of the supports the individual needs in order to improve

8

©American Association on Mental Retardation

**Supp. App. 32**

functioning. Labeling someone with the name mental retardation should lead to a benefit such as a profile of needed supports.

*Assumption 5:* "With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation will generally improve." This means that if appropriate personalized supports are provided to an individual with mental retardation, improved functioning should result. A lack of improvement in functioning can serve as a basis for reevaluating the profile of needed supports. In rare circumstances, however, even appropriate supports may merely maintain functioning or stop or limit regression. The important point is that the old stereotype that people with mental retardation never improve is incorrect. Improvement in functioning should be expected from appropriate supports, except in rare cases.

## THEORETICAL MODEL

The theoretical model shown in Figure 1.1 is used throughout this manual to denote the relationship among individual functioning, supports, and the five dimensions encompassing a multidimensional approach to mental retardation. These five dimensions are very similar to the four dimensions found in the 1992 System. The 1992 System had included four dimensions (Intellectual Functioning and Adaptive Skills, Psychological and Emotional Considerations, Health and Physical Considerations, and Environmental Considerations). In contrast, the 2002 System has five dimensions (Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles; Health; and Context). The fifth was added to be consistent with the *International Classification of Functioning, Disability, and Health (ICF)* (World Health Organization [WHO], 2001) model of disability. By way of comparison:

The 1992 System:
>
> Dimension I:    Intellectual Functioning and Adaptive Skills
> Dimension II:   Psychological and Emotional Considerations
> Dimension III:  Health and Physical Considerations
> Dimension IV:   Environmental Considerations

The 2002 System:
>
> Dimension I:    Intellectual Abilities
> Dimension II:   Adaptive Behavior (conceptual, social, practical skills)
> Dimension III:  Participation, Interactions, and Social Roles
> Dimension IV:   Health (physical health, mental health, etiology)
> Dimension V:    Context (environments, culture)

**Supp. App. 33**

©American Association on Mental Retardation

Case: 20-1900    Document: 29       Filed: 12/21/2020    Pages: 54



*Figure 1.1.* Theoretical model of mental retardation.

The 2002 System's theoretical model (see Figure 1.1) continues the ecological focus on the key elements in understanding the condition of mental retardation and the individual's functioning: the person, environments, and supports. However, the model has been changed from the 1992 model (Luckasson et al., p. 10) to reflect the current understanding of the multidimensionality of mental retardation and the mediational role that supports play in individual functioning. As shown in Figure 1.1, each of the multidimensional influences on the individual's functioning is mediated through the supports available to the person. Also note in Figure 1.1 that the need for supports can reciprocally influence functioning.

# FRAMEWORK FOR DIAGNOSIS, CLASSIFICATION, AND PLANNING OF SUPPORTS

The 2002 System includes a framework for assessment that involves three functions: diagnosis, classification, and planning supports. As shown in Table 1.1 ("Frame-

©American Association on Mental Retardation

Case: 20-1900    Document: 29    Filed: 12/21/2020    Pages: 54

work for Assessment"), each function has a number of primary purposes and appropriate measures and tools. For example, for diagnosis, primary purposes might be to establish eligibility for services, benefits, and legal protections. The three required measures and tools are IQ tests, adaptive behavior scales, and documented age of onset. For classification, primary purposes might be to group for service reimbursement or funding, research, services, and communication about selected characteristics. Appropriate measures and tools might include support intensity scales, IQ ranges or levels, special education categories, environmental assessments, etiology-risk factor systems, levels of adaptive behavior, mental health measures, funding levels, or benefits categories. For planning supports, the primary purpose is to enhance personal outcomes related to independence, relationships, contributions, school and community participation, and personal well-being. Appropriate measures might include person-centered planning tools, self-appraisals, support intensity scales, and elements from individualized plans such as individualized education programs (IEPs).

The Framework for Assessment depicted in Table 1.1 also includes important considerations for assessment, such as a match between measures and purpose; the psychometric characteristics of measures selected; the qualifications of the examiner; sensitivity to the selection of informants, relevant context and environments, the individual's clinical and social history; team input; the individual's behavior in the assessment situation; and the individual's personal goals.

In summary, assessment should follow the following framework:

- There are three major functions of assessment: diagnosis, classification, and planning of supports for the person.
- Each function has a number of possible purposes ranging from establishing service eligibility and research, to organizing information, to the development of a plan for the provision of supports for the individual.
- Selection of the most appropriate measures or tools will depend on the function (diagnosis, classification, planning supports) and specific purpose to be fulfilled. Selection of measures or systems and interpretation of results should address the considerations found in Table 1.1.

## OPERATIONAL DEFINITIONS

Throughout the manual, readers will find reference to the terms *mental retardation, intelligence, adaptive behavior, supports, disability,* and *context.* Table 1.2 presents operational definitions for these terms. These operational definitions are used consistently throughout the manual to ensure a clear understanding of key issues involved in diagnosis, classification, and planning supports. These operational definitions are critically important in the assessment of intelligence and adaptive behavior and

**Supp. App. 35**

Case: 20-1900     Document: 29     Filed: 12/21/2020     Pages: 54

TABLE 1.1
### Framework for Assessment of Mental Retardation

| Function | Purposes | Measures and Tools | Considerations for Assessment |
|---|---|---|---|
| **Diagnosis** | Establishing eligibility:<br>• Services<br>• Benefits<br>• Legal protections | [a]IQ tests<br>[a]Adaptive behavior scales<br>[a]Documented age of onset | Match between measures and purpose<br>Psychometric characteristics of measures selected<br>Appropriateness for person (age group, cultural group, primary language, means of communication, gender, sensori-motor limitations)<br>Qualifications of examiner<br>Examiner characteristics and potential for bias<br>Consistency with professional standards and practices<br>Selection of informants |
| **Classification** | Grouping for:<br>• Service reimbursement or funding<br>• Research<br>• Services<br>• Communication about selected characteristics | Support intensity scales<br>IQ ranges or levels<br>Special-education categories<br>Environmental assessments<br>Etiology-risk factor systems<br>Levels of adaptive behavior<br>Mental health measures<br>Funding levels<br>Benefits categories | Relevant context and environments<br>Social roles, participation, interactions<br>Opportunities/experiences<br>Clinical and social history<br>Physical and mental factors<br>Behavior in assessment situation<br>Personal goals<br>Team input |
| **Planning Supports** | Enhancing personal outcomes:<br>• Independence<br>• Relationships<br>• Contributions<br>• School and community participation<br>• Personal well-being | Person-centered planning tools<br>Self-appraisal<br>Assessment of objective life conditions measures<br>Support intensity scales<br>Required individual plan elements (IFSP, IEP, ITP, IPP, IHP) | |

*Note.* IFSP = individualized family service plan; IEP = individualized education program; ITP = individualized transition plan; IPP = individualized program plan; and IHP = individualized habilitation plan.

[a]Required assessments to establish diagnosis of mental retardation.

©American Association on Mental Re

the subsequent diagnosis of mental retardation. Hence, readers should pay special attention to the following three operational definitions:

In reference to the *assessment of intelligence:* The criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations.

In reference to the *assessment of adaptive behavior:* For diagnosis, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

In reference to *context:* The assessment of context, although not typically accomplished with standardized measures, is a necessary component of clinical judgment and integral to understanding the individual's functioning.

---

TABLE 1.2
**Operational Definitions**

> **MENTAL RETARDATION**
>
> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.
>
> The following five assumptions are essential to the application of this definition:
>
> 1. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
>
> 2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.
>
> 3. Within an individual, limitations often coexist with strengths.
>
> 4. An important purpose of describing limitations is to develop a profile of needed supports.
>
> 5. With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

*(table continues)*

**Supp. App. 37**

©American Association on Mental Retardation

Case 2:18-cv-00 Document: 29     Filed: 12/21/2020     Pages: 54

TABLE 1.2 *(continued)*

---

### INTELLIGENCE

Intelligence is a general mental capability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience.

Limitations in intelligence should be considered in light of four other dimensions: Adaptive Behavior; Participation, Interactions, and Social Roles; Health; and Context.

The measurement of intelligence may have different relevance, depending on whether it is being considered for purposes of diagnosis or classification.

Although far from perfect, intellectual functioning is still best represented by IQ scores when obtained from appropriate assessment instruments. The criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations.

---

### ADAPTIVE BEHAVIOR

Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives.

Limitations in adaptive behavior affect both daily life and the ability to respond to life changes and environmental demands.

Limitations in adaptive behavior should be considered in light of four other dimensions: Intellectual Abilities; Participation, Interactions, and Social Roles; Health; and Context.

The presence or absence of adaptive behavior can have different relevance, depending on whether it is being considered for purposes of diagnosis, classification, or planning supports.

For the diagnosis of mental retardation, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

---

*(table continues)*

©American Association on Mental Retardation **Supp. App. 38**

TABLE 1.2 *(continued)*

---

### SUPPORTS

Supports are resources and strategies that aim to promote the development, education, interests, and personal well-being of a person and that enhance individual functioning. Services are one type of support provided by professionals and agencies.

Individual functioning results from the interaction of supports with dimensions of Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles; Health; and Context.

The assessment of support needs can have different relevance, depending on whether it is done for purposes of classification or planning supports.

---

### DISABILITY

Disability is the expression of limitations in individual functioning within a social context and represents a substantial disadvantage to the individual.

---

### CONTEXT

Context describes the interrelated conditions within which people live their everyday lives. Context as used here represents an ecological perspective that involves at least three different levels: (a) the immediate social setting, including the person, family, and/or advocates (microsystem); (b) the neighborhood, community, or organizations providing education or habilitation services or supports (mesosystem); and (c) the overarching patterns of culture, society, larger populations, country, or sociopolitical influences (macrosystem or megasystem).

Context should be considered in light of four other dimensions: Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles; and Health.

Context can have different relevance depending on whether it is being considered for purposes of diagnosis, classification, or planning supports.

The assessment of context, although not typically accomplished with standardized measures, is a necessary component of clinical judgment and integral to understanding the individual's functioning.

---

**Supp. App. 39**

# SUMMARY

The 2002 System builds on and extends the 1992 System, incorporating recent developments in mental retardation. Comparing the 1992 and 2002 Systems, we note the following key aspects:

The 2002 System retains (a) the term *mental retardation*; (b) the essential features of the 1992 System, including its functional orientation and supports emphasis; (c) the three diagnostic criteria related to intellectual functioning, adaptive behavior, and age of onset; it also maintains a strong commitment that intensities of needed supports should be the primary focus of a classification system and the preferred direction for the field.

The 2002 System incorporates (a) a standard deviation criterion to the intellectual and adaptive behavior components; (b) a fifth dimension that involves participation, interactions, and social roles; (c) factor analytic and conceptual work on adaptive behavior — suggesting that conceptual, social, and practical skills can adequately represent this multidimensional component of the definition; (d) recent work on supports assessment and supports intensity determination; (e) an expansion of the previous three-step process into the Framework for Assessment (Table 1.1); (f) an expanded discussion regarding diagnostic and classification considerations and recommendations regarding other populations including "the forgotten generation"; (g) an expanded discussion of clinical judgment in reference to the circumstances in which it is required, its definition, and a number of clinical guidelines; and (h) discussion of the relationships between the 2002 System and other classification systems, such as the *Diagnostic and Statistical Manual (DSM–IV–TR)* (American Psychiatric Association, 2000), *International Classification of Diseases (ICD–10)* (WHO, 1993), and *International Classification of Functioning, Disability, and Health (ICF)* (WHO, 2001).

# EMERGING CONSENSUS
# IN THE FIELD

Based on the T&C Committee's analysis of recent work in the field, there seems to be consensus on the following aspects of the definition and classification of the condition of mental retardation:

- Mental retardation is an intellectual disability mirrored by significant limitations in everyday functioning that are present early in life and before age 18.

- A disability is conceptualized as a significant problem in functioning and is characterized in the *ICF* (WHO, 2001) model by marked and severe problems in the capacity to perform ("impairment"), the ability to perform ("activity limitations"), and the opportunity to function ("participation restrictions").

©American Association on Mental Retardation **Supp. App. 40**

- Adaptive behavior encompasses the application of conceptual, social, and practical skills to daily life. Its assessment should relate to an individual's typical performance during daily routines and changing circumstances, not to maximum performance.

- Although far from perfect, intellectual functioning is still best represented by IQ scores when obtained from appropriate assessment instruments. The criterion for diagnosis is approximately two standard deviations below the mean of a corresponding group of people considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and weaknesses.

- Classification systems may be used for a variety of purposes and based on a number of different factors to meet the varied needs of individuals and their families, researchers, clinicians, and practitioners. Aspects of an individual's mental retardation might be classified, for example, on the basis of intensities of needed supports, etiology, levels of measured intelligence, or levels of assessed adaptive behavior.

- The functions or reasons for applying a definition of mental retardation to a person are multiple and may include diagnosis, classification, and planning of supports. Within each function are multiple purposes. For example, the diagnosis function may be applied to determine eligibility for services, research, or legal purposes. Likewise, there are different purposes for classification: to organize information, to plan research, to evaluate, to plan intervention, for eligibility determination, and so forth. Supports planning for a given person should relate to that individual's strengths and needs in each of five dimensions (Intellectual Abilities; Adaptive Behavior; Participation, Interactions, and Social Roles; Health; and Context) and be focused on desired person-referenced outcomes.

- Clinical judgment may play a role in diagnosis, classification, and planning supports.

© American Association on Mental Retardation

# USER'S GUIDE:
## Mental Retardation
DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS—10th Edition

Applications for Clinicians, Educators,
Disability Program Managers, and Policy Makers

Developed by the
AAIDD 2002 System Implementation Committee,
User's Guide Work Group

Robert L. Schalock, Wil Buntinx, Sharon Borthwick-Duffy,
Ruth Luckasson, Marti Snell, Marc J. Tassé, and Michael Wehmeyer



American Association

Copyright © 2007 by the American Association on Intellectual and Developmental Disabilities

Published by
American Association on Intellectual and Developmental Disabilities
444 North Capitol Street, NW
Suite 846
Washington, DC 20001-1512

Printed in the United States of America

**Library of Congress Cataloging-in-Publication Data**

User's guide : mental retardation : definition, classification, and systems of supports, 10th edition : applications for clinicians, educators, disability program managers, and policy makers / developed by the AAMR 2002 System Implementation Committee, User's Guide Work Group.—1st ed.

p. ; cm.

Includes bibliographical references and index.

ISBN 0-940898-95-0 (alk. paper)

1. Mental retardation—Classification. I. AAMR 2002 System Implementation Committee. User's Guide Work Group. II. American Associatio on Intellectual and Developmental Disabilities. III. Mental retardation. [DNLM: 1. Mental Retardation—classification. WM 15 U84 2007]

RC570.U84 2007
616.85'880012--dc22

2006102872

*Effective January 1, 2007, the American Association on Mental Retardation will be called the American Association on Intellectual and Developmental Disabilities.*

USER'S GUIDE: MENTAL RETARDATION

Four aspects of supports are integrated into the 2002 System: (a) individual functioning results from the interaction of supports with aspects of disability to maximize independence and well-being; (b) the primary purpose for providing supports to people with MR/ID is to enhance personal outcomes related to independence, relationships, contributions, school and community participation, and personal well-being; (c) the assessment of support needs is based on life activity areas and exceptional medical and behavioral support needs and can have different relevance, depending on whether the assessment is done for purposes of classification or planning of supports; and (d) services are one type of support provided by professionals and agencies. A more detailed discussion of supports is found in chapters 2–5.

## Importance of Clinical Judgment

Best practices in the field of MR/ID are embedded in research-based knowledge combined with professional ethics, professional standards, and clinical judgment. Clinical judgment is required in a number of situations such as: (a) when formal assessment is less than optimal and cannot be improved, (b) when complex medical or behavioral conditions require multiple analyses, (c) when legal restrictions significantly impact opportunities to assess the person consistent with the definition's five operational assumptions, and (d) when cultural or linguistic diversity impacts or effects the information needed for decisions.

The 2002 System embraces the importance of clinical judgment and expands our understanding of its use as a critical part of best practices. As discussed more fully in chapter 2, clinical judgment is considered to be a special type of judgment rooted in a high level of clinical expertise and experiences that emerge directly from extensive data. It is based on the clinician's explicit training, direct experience with the person with whom the clinician is working, and familiarity with the person and the person's environment. Clinical judgment is characterized by its being systematic (i.e., organized, sequential, and logical), formal (i.e., explicit and reasoned), and transparent (i.e., apparent and communicated clearly). More specifically, clinical judgment involves the following six strategies (Schalock & Luckasson, 2005b): (a) conducting a thorough social history; (b) aligning data and data collection to the critical questions asked; (c) applying broad-based assessment strategies; (d) implementing best intervention strategies; (e) planning, implementing, and evaluating individualized supports; and (f) reflecting cultural competence and linguistic diversity.

8

often complicated due to two factors: diagnostic overshadowing and challenging behaviors. Diagnostic overshadowing refers to: (a) instances in which the presence of MR/ID decrease the diagnosis of an accompanying mental health disorder; or (b) instances in which there is an under-recognition of intellectual impairments among individuals with depression, psychosis, or anxiety disorders (Szymanski, 1988; Reiss, Levitan, & Szysko, 1982; Luckasson et al., 2002). An accurate MR/MI diagnosis can also be affected by challenges such as irritability, limited communication interaction, lack of skills, and interfering behaviors exhibited by the person during the interview/evaluation session.

**Guidelines.** Specific guidelines regarding the challenges to a valid MR/MI diagnosis include:

1. A comprehensive diagnostic process that includes: (a) person-referenced data sources such as personal interview, interviews with significant others, a thorough social history, behavioral observation in everyday environments, a developmental history, formal psychometric evaluation that includes intelligence and adaptive behavior measures, and medical and biological evaluations (including potential etiology); and (b) community-referenced data sources such as environmental assessments that include aversive situations, environmental stimulation opportunities, and the person's perception of change.

2. Identify potential causes (person-referenced or environmental-referenced) of the behavior rather than reducing the cause to a presumed mental illness.

## INDIVIDUALS WITH MENTAL RETARDATION WITH A HIGHER IQ

**Considerations.** These individuals, while meeting the three criteria of MR/ID and thus fitting the definition of a person with MR/ID, manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving and decision making, and social understanding and judgment. These limitations are frequently overlooked or not identified due to the ceiling effect of current adaptive behavior scales and the lack of relevance of many of the items and domains assessed in current adaptive behavior scales to the difficulties in daily functioning experienced by individuals who fall into this group (MacMillan & Siperstein, 2002).

In thinking about this group, it is important to consider the similarities between individuals with MR/ID with a higher IQ and individuals who are diagnosed as having a learning disability (LD). Both this group and those diagnosed as LD exhibit major problems in adaptation related to academic per-

16

(k) looking for difficulties in practical adaptive skills (e.g., poor grooming, unable to use money correctly, getting lost in school or on school grounds, unable to tell time, etc.)

(l) looking for evidence of difficulties in social adaptive skills (e.g., follows others, lack of self-direction, few friends, gullible, does not understand social humor, etc.).

In addition to the above, having contact with the teacher is also valuable, if possible, as a means of clarifying questions in the records and getting specific comments on the student or explanations about gaps in the records. Getting peer comments from the school years is another valuable source of anecdotal information.

3. In reference to the assessment of adaptive behavior: (a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behavioral skills, such as gullibility and naiveté, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; and (f) realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.

4. Recognize the "Flynn Effect." In his study of IQ tests across populations, Flynn (1984, 1987, 1999) discovered that IQ scores have been increasing from one generation to the next in all 14 nations for which IQ data existed. This increase in IQ scores over time has been dubbed the Flynn Effect. Flynn reported a greater increase in the Wechsler Performance IQ, which is more heavily loaded on fluid abilities than on the Wechsler Verbal IQs. On average, the Full-Scale IQ increases by approximately 0.33 points for every year elapsed since the test was normed (Flynn, 1999). The main recommendation resulting from this work is that all intellectual assessments must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted. For example,

Case: 20-1900    Document: 29    Filed: 12/21/2020    Pages: 54

**Supp. App. 46**

if the Wechsler Adult Intelligence Scale (WAIS–III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS–III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS–III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.33 = 2.9). Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" (Luckasson et al., 2002), the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement). Thus the clinician needs to use the most current version of an individually administered test of intelligence and take into consideration the Flynn Effect as well as the standard error of measurement when estimating an individual's true IQ score.

5. Recognize the impact of practice effect. Practice effect refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same test. Practice effect gains occur even when the examinee has not been given any feedback on his performance regarding test items; nor do they reflect growth or other improvement on the skills being assessed (Kaufman, 1994). For example, the WAIS–III manual (1997) presents data illustrating the potential artificial increase in IQ scores when the same instrument is readministered within short time intervals. The WAIS–III manual reports an average increase of 5 points on the Full-Scale IQ between administrations with intervals of 2 to 12 weeks (Wechsler, 1997, p. 56). Thus clinicians need to be sensitive to these practice effects and best practices in intellectual assessment recommendations against administering the same intelligence test to someone within the same year. Practice effects can apply as well to normal achievement tests and state tests to measure school and district performance.

6. Recognize that self-ratings have a high risk of error in determining "significant limitations in adaptive behavior." However, consistent with the need for multiple informants or respondents, self-ratings can be used under the following cautions: (a) people with MR/ID are more likely to attempt to look more competent and "normal" than they actually are (Edgerton, 1993)—which is sometimes incorrectly interpreted as "faking"; (b) people with MR/ID typically have a strong acquiescence bias

21

# Intellectual Disability

## Definition, Classification, and Systems of Supports

*The AAIDD Ad Hoc Committee on Terminology and Classification*

*Terminology and Classification*

11th Edition



American Association
on Intellectual and
Developmental Disabilities

**Supp. App. 48**

focused on social behavior and the natural behavioral prototype (Doll, 1941; Goodey, 2006; Greenspan, 2006a, 2006b).

## Clinical Approach

With the rise of the medical model, the definitional focus shifted to one's symptom complex and clinical syndrome. This approach did not negate the social criterion, but it gradually shifted toward a more medical model that included an increase in the relative role of organicity, heredity, and pathology and led to a call for segregation (De Kraai, 2002; Devlieger, Rusch, & Pfeiffer, 2003).

## Intellectual Approach

With the emergence of intelligence as a viable construct and the rise of the mental testing movement, the approach changed to an emphasis on intellectual functioning as measured by an intelligence test and reflected in an IQ score. This emphasis led to the emergence of IQ-based statistical norms as a way to both define the group and classify individuals within it (Devlieger, 2003).

## Dual-Criterion Approach

The first formal attempt to systematically use both intellectual functioning and adaptive behavior to define the class was found in the 1959 American Association on Mental Deficiency (AAMD) *Manual* (Heber, 1959), in which *mental retardation* was defined as referring to subaverage general intellectual functioning that originates during the developmental period and is associated with impairments in maturation, learning, and social adjustment. In the 1961 AAMD *Manual* (Heber, 1961), maturation, learning, and social adjustment were folded into a single, largely undefined new term, *adaptive behavior*, that has been used in all subsequent AAMR manuals. The dual-criterion approach also has included age of onset as an accompanying element.

## CURRENT DEFINITION AND ASSUMPTIONS

The authoritative definition of ID is that of the AAIDD (previously the AAMR). The definition in the 2002 AAMR *Manual* (Luckasson et al., 2002, p. 1), which remains in effect in this 11th edition of the *Manual*, is shown here with a minor edit that substitutes the term ID for mental retardation.

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

Assumptions are an explicit part of the definition because they clarify the context from which the definition arises and indicate how the definition must be applied. Thus, the definition of ID cannot stand alone. The following five assumptions, which are essential to the application of the definition of ID, are described more fully as follows:

## The Flynn Effect

Flynn's research (1984, 1987, 2006, 2007) as well as that of others (e.g., Kanaya, Scullin, & Ceci, 2003; Scullin, 2006) found that IQ scores have been increasing from one generation to the next in the United States as well as in all other developed countries for which IQ data are available. This increase in IQ scores over time was called the *Flynn Effect* by Hernstein and Murray (1994). The Flynn Effect refers to the observation (Flynn, 1984) that every restandardization sample for a major intelligence test (e.g., SBIS-4 and Wechsler) from 1932 through 1978 resulted in a mean IQ that tended to increase over time. Flynn (1987) reported that this effect was also observed in samples from other countries. Although the cause of this effect is unknown, Neisser et al. (1996) suggested that potential factors might well be improved nutrition, cultural changes, testing experience, changes in schooling, and changes in child-rearing practices.

The Flynn Effect raises potential challenges for the diagnosis of ID (Kanaya et al., 2003). Because Flynn (1984) reported that mean IQ increases about 0.33 points per year, some investigators (e.g., Flynn, 2006) have suggested that any obtained IQ score should be adjusted 0.33 points for each year the test was administered after the standardization was completed. For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.33 = 2.9). Hence, using the significant limitations of approximately two standard deviations below the mean, the Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

There are also data suggesting that the Flynn Effect may not be a purely linear function of time and that the impact of the effect may asymptote or even reverse. Teasdale and Owens (2005), for example, reported on a large sample of Danish males in which the Flynn Effect peaked and subsequently reversed. In a Norwegian sample, Sundet, Barlaug, and Torjussen (2004) reported a slowing and eventual cessation of the Flynn Effect over time. These data would seem to suggest that while the Flynn Effect is evident, how one corrects for it is still a challenging issue.

As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. As suggested in the *User's Guide* (Schalock et al., 2007, pp. 20, 21):

> The main recommendation resulting from this work [regarding the Flynn Effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted.

**Supp. App. 50**

## Comparability of Scores From Different Tests

Not all scores obtained on intelligence tests given to the same person will be identical. Specifically, IQ scores are not expected to be the same across tests, editions of the same test, or time periods (Evans, 1991). A number of studies have revealed significantly different results from appropriately selected tests. For example, Quereshi and Seitz (1994) reported that the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI), Wechsler Intelligence Scale for Children-Revised (WISC-R), and the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R) did not yield the same results when used on young children. Highest IQ scores were obtained on the WPPSI and lowest on the WPPSI-R. The SBIS-4 yielded significantly higher scores (by over 14 points) than did the WISC-R for students with lower IQ scores but yielded significantly lower scores for students with higher IQ scores. The two tests yielded similar scores for students with IQ scores between 70 and 90 (Prewett & Matavich, 1992). Scores on the WISC-III were significantly correlated with scores on the SBIS-4 with a population of students with mild mental retardation, but the average IQ on the WISC-III was 8 points lower (Lukens & Hurrell, 1996). Nelson and Dacey (1999) reported that in a sample of adults who had mild to moderate mental retardation an SBIS will yield a significantly lower score than a Wechsler test. Their results were consistent with earlier work published in the Stanford Binet Technical Manual (Thorndike, Hagen, & Sattler, 1986b).

Users of this *Manual* need to be aware of—and sensitive to—potential differences in scores obtained from two different tests. Sources of variation can result from (a) group versus individually administered tests; (b) the purposes for which the test was administered (e.g., administered initially to measure academic achievement but later used to derive an IQ score); (c) the properties of the test (e.g., using two tests with very disparate standard errors of measurement); (d) nonstandardized administration of the assessment instrument(s); (e) test content across different scales and between different age levels on the same scale; (f) scores obtained on verbal versus nonverbal tests; (g) differences in the standardization samples; (h) changes between different editions of the same scale/test; (i) use of an alternative scale as an individual's chronological age increases; and/or (j) variations in the person's abilities or performance.

## Practice Effect

The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument. Kaufman (1994) noted that practice effect can occur when the same individual is retested on a similar instrument. For example, the WAIS-III *Manual* presents data showing the artificial increase in IQ scores when the same instrument is readministered within a short time interval. The WAIS-III *Manual* also reports the average increase between administrations with intervals of 2 to 12 weeks (Wechsler, 1997). For this reason, established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence.

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, I electronically filed the foregoing document with the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div style="text-align: right;">

s/ William A. Glaser
WILLIAM A. GLASER

</div>