No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**REPLY BRIEF OF APPELLANT**

**THIS IS A DEATH PENALTY CASE**

**ORAL ARGUMENT REQUESTED**

Peter Williams
   *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

February 1, 2021

## RULE 26.1 DISCLOSURE STATEMENT

The full name of Petitioner/Appellant is Chadrick Evan Fulks. Attorneys Claudia Van Wyk and Peter Williams, of the Federal Community Defender Office for the Eastern District of Pennsylvania, represent Mr. Fulks before this Court and represented him in the 28 U.S.C. § 2241 proceedings below in the United States District Court for the Southern District of Indiana. Petitioner/Appellant is not a corporation.

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT................................................................ i

TABLE OF CONTENTS....................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iv

GLOSSARY........................................................................................................ vi

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.  CHANGES IN THE LEGAL AND DIAGNOSTIC STANDARDS GOVERNING *ATKINS*
    CLAIMS REQUIRE § 2241 REVIEW FOR MR. FULKS'S CLAIM OF INTELLECTUAL
    DISABILITY. ..............................................................................................3

    A. Review Is Appropriate Under § 2241 Because Newly Available
       Developments in Legal and Diagnostic Standards Satisfy the Savings
       Clause...................................................................................................3

    B. Mr. Fulks Is Entitled to § 2241 Review Because He Challenges the
       Execution of His Sentence..................................................................11

    C. The Government's Arguments Regarding the Development of the Legal and
       Diagnostic Standards and the Merits of Mr. Fulks's *Atkins* Claim Should Be
       Rejected. .............................................................................................13

        1. The Court Should Refrain from Reviewing the Government's Waived
           Arguments Regarding the Legal and Diagnostic Developments
           Governing *Atkins* Claims and the Merits of Mr. Fulks's Claim of
           Intellectual Disability. ..........................................................14

        2. Prior to *Moore-I*, the Fourth Circuit Endorsed Scientifically Invalid
           Practices in the Adjudication of *Atkins* Claims that Barred Relief for
           Defendants with Mild Intellectual Disability....................................16

        3. The Evolution of Diagnostic Standards Supports Mr. Fulks's Request
           for § 2241 Review. ..................................................................23

        4. The Government's Arguments on the Merits of Mr. Fulks's *Atkins*
           Claim Should Be Rejected. ...................................................32

II. BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE
    FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS
    CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY . ..............................35

CONCLUSION ..............................................................................................41

## TABLE OF AUTHORITIES

**Federal Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) .......................................................... *passim*

*Basham v. United States*, 109 F. Supp. 3d 753 (D.S.C. 2013) ............................. 31

*Corcoran v. Wilson*, 651 F.3d 611 (7th Cir. 2011)................................................ 15

*In re Davenport,* 147 F.3d 605 (7th Cir. 1998).................................................... 10

*Ford v. Wainwright*, 477 U.S. 399 (1986) ...................................................... 36, 38

*Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008) ........................................ 16, 19, 21

*Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010)............................................. 18, 20, 21

*Hall v. Florida*, 572 U.S. 701 (2014)............................................................... 4, 17

*Madison v. Alabama*, 139 S. Ct. 718 (2019)............................................ 2, 35, 36, 37

*Marbury v. Madison*, 5 U.S. 137 (1803)............................................................... 5

*Matter of Excello Press, Inc.*, 967 F.2d 1109 (7th Cir. 1992) ................................ 14

*McCleskey v. Zant*, 499 U.S. 467 (1991) ............................................................ 13

*Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003) ........................... 14

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore-I*") .................................... *passim*

*Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore-II*") ........................................... 22

*Moser v. Ind. Dep't of Corr.*, 406 F.3d 895 (7th Cir. 2005)................................... 14

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2019) ...................... 3, 6, 7-8, 12, 37

*Panetti v. Quarterman*, 551 U.S. 930 (2007)................................................. 36, 37

*Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015)............................................ 18, 20, 21

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) ............................................... 15

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2019)................................. 3, 7, 8, 9

*Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012)..................................... 16, 18

*McManus v. Neal*, 779 F.3d 634 (7th Cir. 2015)........................................ 24, 26, 27

*Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) .................................................. 10

*Valona v. United States*, 138 F.3d 693 (7th Cir. 1998) ................................... 11, 12

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (*Webster-I*")................... *passim*

**Federal Statutes**

28 U.S.C. § 2241 ................................................................................ *passim*

28 U.S.C. § 2255 ................................................................................ *passim*

**Other**

Fed. R. Civ. P. 59 ...................................................................................15

## GLOSSARY

| | |
|---|---|
| AOB | Appellant's Opening Brief, Filed Oct. 21, 2020 |
| AAIDD | American Association on Intellectual and Developmental Disabilities |
| AAIDD–2010 | American Association on Intellectual and Developmental Disabilities, *Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition* (2010) |
| AAIDD–2012 | American Association on Intellectual and Developmental Disabilities, *User's Guide to Intellectual Disability— Definition, Classification, and Systems of Supports—11th Edition* (2012) |
| AAIDD–2015 | American Association on Intellectual and Developmental Disabilities, *The Death Penalty and Intellectual Disability* (2015) |
| AEDPA | Anti-Terrorism and Effective Death Penalty Act |
| APA | American Psychiatric Association |
| DSM-5 | American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (2013) |
| DSM-IV-TR | American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision* (2000) |
| FDPA | Federal Death Penalty Act |
| ID | Intellectual Disability |

PA                          Petitioner/Appellant's Appendix[1]

RB                          Government's Response Brief, filed Dec. 21, 2020

Supp. App.                  Government's Supplemental Appendix, filed Dec. 21, 2020

---

[1] Cites to Petitioner/Appellant's Appendix include cites to Volumes I–III of the Appendix filed with the Opening Brief on October 21, 2020 (collectively encompassing pages PA0001-PA0527) and the Supplemental Appendix containing additional documents filed with this Reply Brief (encompassing pages PA0528-PA0582).

Additionally, in preparing this reply brief, Petitioner's counsel noted a number of citation errors—most of which are that the ECF Nos. 55-1 through 55-4 were erroneously cited as attachments to ECF Nos. 50 or 51. Petitioner's Supplemental Appendix also includes an errata sheet correcting these errors at PA0582.

## INTRODUCTION

Chadrick Fulks is intellectually disabled and ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Because the current legal and diagnostic standards which form the basis for Mr. Fulks's claim of intellectual disability were unavailable at the time he initially pursued relief from his sentence under 28 U.S.C. § 2255, Mr. Fulks is simultaneously ineligible to be executed, but unable to vindicate this right under § 2255. Failure to grant review under 28 U.S.C. § 2241 would pave the way to an unconstitutional execution.

The Government would deny Mr. Fulks an evidentiary hearing and dismiss his claim without any opportunity to prove that he is ineligible for the death penalty under current standards. In the Government's view, no legal or diagnostic development, no matter how significant, would justify § 2241 review on an *Atkins* claim.

The Government's position cannot stand. In *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore-I*"), the Supreme Court held that *current* diagnostic standards are binding in *Atkins* proceedings and that the use of outdated clinical standards or no clinical standards at all would create an "unacceptable risk" that an intellectually disabled person will be erroneously denied relief and executed. *Moore-I*, 137 S. Ct. at 1051–53. By barring all litigation based on additional legal or medical developments, the Government's position would confine review of a defendant's

intellectual disability to the standards in place at the time of his initial § 2255 proceedings, regardless of what has happened since then. Such a rule would violate the "substantive restriction" on the Government's power to "take the life" of intellectually disabled defendants imposed by *Atkins*. 536 U.S. at 321. It should be rejected.

The Government also contends that the changes in legal and diagnostic standards were not significant, and offers a one-page challenge to the merits of Mr. Fulks's diagnosis of intellectual disability. Made for the first time in the Government's response brief before this Court, these claims have been waived. Even if these arguments are considered, they should be rejected as they are contrary to the documented evolution of *Atkins* jurisprudence, the diagnostic standards that govern claims of intellectual disability, and the extensive evidence of intellectual disability, brain damage, and Fetal Alcohol Spectrum Disorder that Mr. Fulks proffered before the district court in § 2241 proceedings.

The Government, in opposition to Mr. Fulks's second claim under *Madison v. Alabama*, 139 S. Ct. 718 (2019), attempts to establish that *Madison* decided nothing new and that Mr. Fulks cannot proceed under § 2241. Both lines of argument are unsound. It was not clear until *Madison* whether the type of mental illness mattered to the necessary Eighth Amendment analysis. And, contrary to the district court's ruling, its assessment of the cognizability of Mr. Fulks's *Atkins*

2

claim cannot dispose of the distinct question of whether his *Madison* claim was cognizable. Mr. Fulks's case should be remanded so that an evidentiary hearing can be held.

## ARGUMENT

I.     **CHANGES IN THE LEGAL AND DIAGNOSTIC STANDARDS GOVERNING *ATKINS* CLAIMS REQUIRE § 2241 REVIEW FOR MR. FULKS'S CLAIM OF INTELLECTUAL DISABILITY.**

   A.     **Review Is Appropriate Under § 2241 Because Newly Available Developments in Legal and Diagnostic Standards Satisfy the Savings Clause.**

Relying primarily on *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2019), and *Purkey v. United States*, 964 F.3d 603 (7th Cir. 2019), the Government argues that this Court's precedent precludes review under § 2255(e)'s "savings clause" of intellectual disability claims based on new legal and diagnostic developments. RB 32–34, 40–42. The Government further argues that it is not sufficient for savings clause review that Mr. Fulks "may not have *prevailed*" had he filed an *Atkins* claim in his initial § 2255 motion. *Id.* at 33 (emphasis in original). According to the Government, permitting savings clause review here would mean that § 2241 review would be available to petitioners with ID claims "every time the medical community updates its diagnostic standards" and that "the saving clause and § 2255(h)'s limitations on second-or-successive motions can never be interpreted to foreclose review of an *Atkins* claim." RB 52–53.

These arguments fail for a number of reasons.

3

*First*, the Government fails to address the structural problem that was identified in *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ("*Webster-I*"), and is also present in this case: denying savings clause review will result in the unlawful execution of the intellectually disabled. *See* AOB 32–36. This problem is particularly pronounced where, as here, the new developments include the issuance of *Moore-I* and new diagnostic manuals. *Moore-I* made clear that "[r]eflecting improved understanding over time, current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" 137 S. Ct. at 1053 (citations omitted) (citing AAIDD–2010 and quoting DSM-5 at xli).[2] "By design and operation," the use of diagnostically inappropriate practices "create[s] an unacceptable risk that persons with intellectual disability will be executed." *Id.* at 1051 (quoting *Hall v. Florida*, 572 U.S. 701, 704 (2014)). By barring all additional review based on legal and diagnostic developments, the Government would bind *Atkins* determinations to the legal and diagnostic standards in place at the time of the initial § 2255 proceedings, no matter how out-of-date or defective those old standards might presently be.

---

[2] The manuals published by the American Association on Intellectual and Developmental Disabilities ("AAIDD") shall be referred to by "AAIDD" followed by the year of publication. The Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association ("APA") shall be referred to by "DSM" followed by the edition. The full descriptions of these and other abbreviations used throughout this brief are given in the glossary.

Because *Atkins* places a "substantive restriction" on the Government's power to "take the life" of all intellectually disabled defendants, 536 U.S. at 321, this would violate *Atkins*, *Moore-I*, and their progeny.

The Government concedes that *Moore-I* mandates the application of current diagnostic standards in the evaluation of an *Atkins* claim on collateral review, but asserts that this change in the law has no bearing on Mr. Fulks's ability to use the savings clause. *See* RB 51–52. If, as the Government accepts, Mr. Fulks's *Atkins* claim is to be reviewed under current standards, there must be some vehicle by which he may obtain such review. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 147 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress."). Denying relief based on procedural bars might be permissible with other claims for relief, but here "the Constitution itself forbids the execution of certain people," including "those who satisfy the criteria for intellectual disability." *Webster-I*, 784 F.3d at 1139. Because it is impossible as a structural matter for Mr. Fulks to obtain review of his claim under constitutionally-mandated standards via a second § 2255 motion, he must be able to proceed under § 2241. To hold otherwise would lead to the "intolerable result of condoning an execution that violates the Eighth Amendment." *Id.* at 1139.

*Second*, the Government claims that *Bourgeois* precludes savings clause review in this case. *Bourgeois* addressed a federally death-sentenced prisoner's

5

request for savings clause review of his ID claim under the Federal Death Penalty Act and the Eighth Amendment. *Bourgeois*, 977 F.3d at 635–39. In an opinion focusing on the FDPA elements of that claim, the *Bourgeois* court denied Bourgeois § 2241 review because he had litigated an ID claim in the past. *Id.* According to the Government, the *Bourgeois* court substantively confronted the issue raised by Mr. Fulks because *Bourgeois* held that neither Bourgeois's FDPA claim nor his *Atkins* claim were cognizable and stated that its "analysis applie[d] equally" to the constitutional and statutory claims. RB 41–42.

This argument is unavailing. While *Atkins* and the FDPA establish the same right, the source of authority for *Atkins* is constitutional, and the source of authority for the FDPA is statutory. As this Court determined in *Webster-I*, this difference is significant. In virtually all situations involving the enforcement of a statutory right, "Congress has almost unlimited discretion to select the penalty, or the range of penalties, that go along with a particular crime." *Webster-I*, 784 F.3d at 1139. If a defendant receives a sentence that is illegal based on statutory law, "there is no doubt a problem, but it is likely not one of constitutional dimension." *Id.* For this reason, *Webster-I* "assume[d]" that new evidence supporting a claim of intellectual disability under the FDPA alone "would not be enough to trigger the savings clause," but still granted Webster's request for savings clause review of his *Atkins*

6

claim because a failure to do so "would (or could) lead to an unconstitutional punishment." *Id.*

Here, because he is relying on a constitutional protection, if § 2241 review is denied, Mr. Fulks will be subject to a procedural rule that "would (or could) lead to an unconstitutional punishment." *Id.* The *Bourgeois* court failed to address this structural problem: that the Constitution—which supersedes all procedural rules imposed by § 2255(h), § 2255(e), and the courts—prohibits the execution of all intellectually disabled people. *See* AOB 36–41; *Bourgeois*, 977 F.3d at 635–39. Because one cannot transfer the *Bourgeois* analysis of the statutory claim onto the constitutional one, the holding in *Bourgeois* does not apply to this Court's determination here.

*Third*, the Government claims that Mr. Fulks was purportedly "*not* diligent" because, in contrast to Bourgeois, he did not raise an *Atkins* claim in his initial § 2255 proceedings. RB 41 (emphasis in original). This argument is meritless. Because the current medical standards upon which he relies now did not yet exist, Mr. Fulks had no expert opinion to proffer in support of an *Atkins* claim and could not have filed such a claim during his initial post-conviction proceedings. *See* AOB 32–36, 39. More to the point, the *Bourgeois* court denied Bourgeois savings clause review because "nothing formally prevented" him from raising an ID claim in § 2255 proceedings and he, in fact, did so. *Bourgeois*, 977 F.3d at 636–37 (quoting

7

*Purkey*, 964 F.3d at 615). Here, Mr. Fulks *was* formally prevented from proceeding on such a claim as he had no factual basis for making it until the new diagnostic standards were issued. *See* AOB 32–36.

*Fourth*, the Government argues that Mr. Fulks's position would make savings clause review newly available with every diagnostic update and that § 2255(h) would be a nullity. RB 52–53. This argument also fails. As the Government acknowledges elsewhere, *see id.* at 52, Mr. Fulks's claim is that, in his federal death penalty case, he did not meet the criteria for ID under the now-obsolete diagnostic and legal standards in place at the time of his initial § 2255 proceedings, but he does meet those criteria under the current ones. This is a highly specific set of circumstances that is unlikely to reoccur.

*Fifth*, the Government's argument that, under *Purkey*, "inadequate or ineffective" must mean "something more than unsuccessful," RB 33, ignores the fact that *Purkey* did not involve a categorical exemption like the one established by *Atkins* and did not address the structural problem that is present here. *Purkey* held that savings clause review is warranted when there is a "fundamental problem" that § 2255 cannot practically resolve and that "something more" than a lack of success in § 2255 proceedings was needed to reach this threshold. 964 F.3d at 615. Here, as in *Webster-I*, the "something more" is that intervening developments have enabled Mr. Fulks to establish that he is exempt from execution, but without a mechanism

8

to enforce that exemption under § 2255. Thus, just as in *Webster-I*, the structure of § 2255 has created the "Kafkaesque" result of a defendant who is unable to litigate a meritorious ID claim because of a procedural rule that "would (or could) lead to" an unconstitutional execution. 784 F.3d at 1139. Because he is simultaneously ineligible for execution, but unable to vindicate this right through a successive § 2255 motion, "as a practical matter, it would be impossible to use section 2255 to cure [this] fundamental problem." *Purkey*, 964 F.3d at 615.

*Sixth*, the Government attempts to distinguish this case from *Webster-I* by arguing that savings clause review is only available in *Atkins* cases where the petitioner relies on newly-discovered evidence that existed at the time of trial. RB 52–53. However, *Webster-I* did not hold that savings clause review could *never* be granted unless the petitioner re-created the precise facts present with Webster. Instead, it identified the defect present in § 2255(h) created by categorical exemptions such as *Atkins*, dealt with that structural problem given the circumstances before it, and granted review because "[t]o hold otherwise would lead in some cases—perhaps Webster's—to the intolerable result of condoning an execution that violates the Eighth Amendment." *Webster-I*, 784 F.3d at 1139. That Mr. Fulks relies on new legal and diagnostic standards, rather than newly discovered evidence, does not render him any less intellectually disabled. And,

9

because the same defect would lead to the same intolerable result, Mr. Fulks is entitled to the same review that Webster received.

*Seventh*, the Government challenges Mr. Fulks's argument that the district court denied him relief because his case "did not match the precise factual and procedural scenarios in [*In re*] *Davenport*, [147 F.3d 605, 609 (7th Cir. 1998)], *Garza* [*v. Lappin*, 253 F.3d 918 (7th Cir. 2001)], and *Webster-I*." RB 52–53. For support, the Government quotes a line from the opinion below acknowledging that this Court "has never held that the Savings Clause is only met in the specific circumstances" present in those cases. *Id.* at 53 (quoting PA0026). But despite agreeing "[a]s a general matter" that the savings clause cannot be confined to a narrow set of cases, PA0026, as a practical matter, the district court did just that by: (1) rejecting the "new legal bases on which Mr. Fulks' claims rely" because they "are not analogous to those relied on in either *Davenport* or *Garza*," PA0018; and (2) rejecting the new factual bases because Mr. Fulks does not present the precise "case-specific factors" that would "allow him to proceed on the course charted by Webster," PA0021, PA0025. The district court did not—and could not—provide any reasoned explanation why Mr. Fulks has failed to satisfy the savings clause except that his case is not identical to *Davenport*, *Garza*, or *Webster-I*.

**B.**     **Mr. Fulks Is Entitled to § 2241 Review Because He Challenges the Execution of His Sentence.**

Section 2241 review is also appropriate because Mr. Fulks challenges the *execution* of his sentence. AOB 54–57. The Government concedes that "§ 2241 provides a vehicle for attacking the 'execution' of a sentence." RB 54 (quoting *Atehortua v. Kindt*, 951 F.2d 126, 129 (7th Cir. 1991)). The Government also concedes that "*Atkins* held that the Eighth Amendment requires that those with intellectual disabilities "be categorically excluded from *execution*," and thus, "in one sense, the Eighth Amendment violation does not arise until the sentence is carried out." *Id.* (quoting *Atkins*, 536 U.S. at 318 (emphasis supplied by the Government)). Nevertheless, the Government posits that Mr. Fulks cannot attack the carrying out of his unconstitutional death sentence under § 2241 because an intellectually disabled defendant can *also* challenge the validity of his death sentence under § 2255(a). RB 54–55.

In support of its position, the Government first claims that "this Court has described" challenges to the *imposition* of a sentence and the *execution* of a sentence "as mutually exclusive." RB 55 (citing *Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998)). But *Valona* in no way established that a petitioner cannot challenge *both* the imposition *and* the execution of an unlawful sentence. Rather, *Valona* merely held that a petitioner cannot "use a petition under § 2241 to call into question the validity of a conviction or sentence *that has already been*

11

*subject to collateral review*," *Valona*, 138 F.3d at 694 (emphasis added), which is what is at issue here.

The Government also argues that, "if an *Atkins* claim could simply be recharacterized as a challenge to the sentence's execution, then *Bourgeois*'s savings-clause analysis was unnecessary and that case's result should have been different." RB 55. However, as described above, Bourgeois—like Valona, but unlike Mr. Fulks—had already received review of his *Atkins* claim under § 2255. The *Bourgeois* court made clear that the *only* relevant question in that case was "whether [petitioner] was able to litigate his intellectual-disability claim in his § 2255 motion." *Bourgeois*, 977 F.3d at 639. The answer—"[h]e was, and he did," *id.*—renders *Bourgeois* inapposite here. *Id.*

Next, the Government claims that Mr. Fulks is necessarily raising a challenge only to the validity of his sentence because intellectual disability must manifest by age eighteen. *See* RB 56 ("If Fulks is intellectually disabled, then his sentence violated *Atkins* when it was imposed. His claim is therefore directed at his sentence's validity, not its execution."). The Government misses the point. Although Mr. Fulks's *impairments* have not changed since the imposition of his sentence, the legal and diagnostic standards used to *analyze* those impairments have. *Atkins*'s holding that the intellectually disabled "be categorically excluded from execution," *Atkins*, 536 U.S. at 318, calls for an inquiry governed by present-

12

day legal and diagnostic standards, as outdated ones will lead to the erroneous denial of ID claims. *See supra* I.A. Because Mr. Fulks did not qualify as intellectually disabled under the legal and diagnostic standards applicable at the time of his trial and § 2255 proceedings, but does qualify now, he is challenging the *execution*, rather than the *imposition* of his sentence.

Lastly, the Government posits that "[e]ven if Fulks were correct that he could use § 2241 without satisfying the saving clause, his claim would constitute an abuse of the writ." RB 56. However, as the Government acknowledges, the "abuse-of-the-writ doctrine prevents a habeas petitioner from raising in a § 2241 petition a claim that '*could have been raised*' in an earlier petition." *Id.* (citing *Delo v. Stokes*, 495 U.S. 320, 321 (1990)) (per curiam) (emphasis added), and *McCleskey v. Zant*, 499 U.S. 467, 489–90 (1991)). But as Mr. Fulks has documented in his initial brief and below, his *Atkins* claim relies on legal and diagnostic standards that were unavailable at the time of his § 2255 proceedings. Hence, Mr. Fulks's claim *could not have been raised* in his earlier petition, and the abuse-of-the-writ doctrine is inapplicable.

### C. The Government's Arguments Regarding the Development of the Legal and Diagnostic Standards and the Merits of Mr. Fulks's *Atkins* Claim Should Be Rejected.

The Government argues that the Fourth Circuit precedent in place at the time Mr. Fulks's initial § 2255 motion was filed in 2008 did not embrace practices that

13

were later rejected by *Hall* and *Moore-I*. It also contends that the changes in diagnostic standards since that time do not justify savings clause review here. And, it challenges the merits of Mr. Fulks's claim of intellectual disability. *See* RB 34–39, 42–50, 50–51. Raised for the first time on appeal, these claims have been waived. Even if waiver is not found, the substantive arguments on all three issues are meritless.

>1.   **The Court Should Refrain from Reviewing the Government's Waived Arguments Regarding the Legal and Diagnostic Developments Governing *Atkins* Claims and the Merits of Mr. Fulks's Claim of Intellectual Disability.**

This Court has held that arguments not presented to a district court will not be reviewed on appeal, even if the new arguments are raised by the party that prevailed below. *E.g.*, *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 904 n.5 (7th Cir. 2005) (refusing to consider appellee's argument that appellant failed to exhaust remedies because appellee "waived this argument by not raising it before the district court"); *Matter of Excello Press, Inc.*, 967 F.2d 1109, 1115 (7th Cir. 1992) ("Because [appellee] raise[d] [its] 'vexatious' litigation argument for the first time in this Court, it has been waived and will not be addressed."); *cf. Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 292 (7th Cir. 2003) ("Although the district judge disagreed with [appellee's argument], and [appellee] did not file a cross-appeal, litigants may offer on appeal any *properly preserved argument* that supports the judgment.") (emphasis added).

14

Here, in his § 2241 petition, his reply in support of that petition, and his motion filed pursuant to Fed. R. Civ. P. 59(e), Mr. Fulks repeatedly argued that (1) he was intellectually disabled; (2) he was unable to pursue his *Atkins* claim based on the legal and diagnostic standards that were in place at the time of his initial § 2255 proceedings; and (3) he is entitled to *Atkins* relief under the legal and diagnostic standards in place now. *See* PA0223–81; ECF. No. 67 at 1–10; ECF No. 75 at 3–10. The Government failed to respond to all three of these claims, "moved to dismiss Fulks's § 2241 as a matter of law based on the allegations in his petition," and specifically declined to "address the numerous factual assertions made by Fulks in his § 2241 petition." *See* ECF No. 66 at 45 n.14. Although Mr. Fulks addresses the merits of each of the Government's newly-raised issues out of an abundance of caution, he respectfully requests that this Court refrain from reviewing any of them as they have been waived.

At a minimum, the Court should remand to the district court for consideration of these issues in the first instance. *See, e.g.*, *Pullman-Standard v. Swint*, 456 U.S. 273, 292 n.22 (1982) ("Where the trial court fails to make findings, or to find on a material issue, and an appeal is taken, the appellate court will normally vacate the judgment and remand the action for appropriate findings to be made."); *Corcoran v. Wilson*, 651 F.3d 611, 614 (7th Cir. 2011) (remanding for determination of unresolved habeas claims).

15

**2.      Prior to *Moore-I*, the Fourth Circuit Endorsed Scientifically Invalid Practices in the Adjudication of *Atkins* Claims that Barred Relief for Defendants with Mild Intellectual Disability.**

Prior to *Moore-I*, Fourth Circuit precedent endorsed the use of diagnostically inappropriate practices that would have precluded Mr. Fulks, and any other capital defendant with mild intellectual disability, from pursuing an *Atkins* claim during his initial § 2255 proceedings. These practices, which were later invalidated when *Moore-I* rendered current diagnostic standards binding, included: (1) the failure to find deficits in intellectual functioning ("prong one" of intellectual disability) when a defendant has an IQ score of 75 or below, placing him within the presumptive range for ID that is established by the standard error of measurement ("SEM") surrounding all IQ scores; (2) relying on the defendant's strengths for the assessment of adaptive behavior ("prong two" of intellectual disability), rather than relying on deficits as the diagnostic standards require; (3) basing an ID determination on erroneous stereotypes relating to the intellectual disabled; (4) employing the so-called "*Briseño* factors"; and (5) relying on prison, criminal, or verbal functioning. AOB 23–29.

The Government denies that the Fourth Circuit has employed diagnostically inappropriate analyses in the past.

As to *prong one*, citing *Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012), and *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008), the Government

16

contends that Fourth Circuit precedent did not impose the hard IQ cutoff of 70 that was rejected by the Supreme Court in *Hall*, 572 U.S. at 701, 704. RB 34–35. This is the case, it argues, because there were also rulings on adaptive behavior in these cases, in addition to the rulings on intellectual functioning. RB 34–35.

This argument is meritless. *Hall* and *Moore-I* establish that when a defendant has an IQ score in the diagnostically recognized range for intellectual disability of 75 and below that is established by the SEM surrounding all IQ scores, then prong one has been established. *Hall*, 572 U.S. at 714. In *Moore-I*, the lower court had reviewed Moore's intellectual *and* adaptive functioning and found that neither prong had been met. 137 S. Ct. at 1048–53. Because one of Moore's two valid IQ scores—a 74—was in the presumptive range for intellectual disability, the *Moore-I* court determined that prong one had been established, reversed the lower court's finding to the contrary as in conflict with *Hall*, and held that prong one has been met whenever "an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range of intellectual-functioning deficits." *Id.* at 1047–50. It does not matter that the *Green* and *Richardson* courts also considered adaptive behavior. Just as in *Moore-I*, because *Green* and *Richardson* failed to find prong one deficits to be present based on the presence of scores above 70, their analyses were scientifically invalid and later rejected by *Hall* and *Moore-I*.

The Government also relied on dicta in *Hall* speculating that the state capital sentencing statute in *Richardson* "would not necessarily" be interpreted as imposing the IQ cutoff that *Hall* found to be unconstitutional. RB 34–35. This does not salvage the Government's position. Regardless of possible interpretations of the state sentencing statute, the Fourth Circuit held that there was "no error" in applying a hard cutoff of 70 and that, for this reason, it "need not address the [state court's] conclusion concerning" adaptive functioning. *Richardson*, 668 F.3d at 151–53. Because Fourth Circuit precedent governed any *Atkins* claim that Mr. Fulks would have brought, it is the Fourth Circuit's determination that is relevant here.

As to *prong two*, the Government concedes that the Fourth Circuit repeatedly relied on a petitioner's strengths when conducting adaptive behavior analyses. RB 37–39. But, citing *Green*, *Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010), and *Prieto v. Zook*, 791 F.3d 465 (4th Cir. 2015), the Government argues that the Fourth Circuit's reliance on strengths was appropriate because "nearly all that evidence" was used to rebut a showing of deficits. RB 37–39. But reliance on strengths was one of several diagnostically inappropriate practices employed by the Fourth Circuit that would have precluded Mr. Fulks from pursuing a claim of intellectual disability in his initial post-conviction proceedings. *See* AOB 23–29. Even if the Fourth Circuit's reliance on strengths had been diagnostically

18

legitimate (and it was not), then its analyses would still have been later invalidated by *Moore-I*.

Furthermore, characterizing evidence of strengths as "rebuttal" evidence does not render the Fourth Circuit's diagnostically invalid practices acceptable. *Moore-I* prohibited courts from using strengths in an adaptive behavior determination regardless of whether the Government characterizes it as rebuttal. *Moore-I*, 137 S. Ct. at 1050. Making a prong-two finding based on what the defendant *could do* rather than what the defendant *did not do*, either by viewing certain strengths as inconsistent with a diagnosis of intellectual disability or by weighing the defendant's weaknesses against purported strengths, is invalid under *Moore-I*. *Id.*

In the type of analysis that would later be rejected by *Moore-I*, the *Green*, *Walker*, and *Prieto* courts based their determinations on what the petitioner *could do*, rather than what he *did not do*.

In *Green*, the Fourth Circuit credited the evidence of deficits *and* evidence of strengths, but found that the presence of strengths ruled out a finding that prong two was present. *Green*, 515 F.3d at 302–03 ("Green showed that his various jobs always required low-level skills and low education and that he was usually hired with help from family and friends. He was also shown to have difficulty retaining jobs."); *id.* at 303 ("Three former employers, however, described Green as an

19

average to above average employee. In fact, he received a merit-based promotion at one job, an accomplishment that does not suggest significant limitations in occupational skills.").

In *Walker*, the Fourth Circuit endorsed the lower court's finding that Walker had "below average mental intelligence, struggle[d] to perform some basic activities, exhibit[ed] anti-social behavior, and obtain[ed] financial support from others." 593 F.3d at 328. But the Fourth Circuit also endorsed the lower court's finding that, what Walker *could do*—which consisted of prison functioning, criminal functioning, engaging in sexual relationships and homemaking activities, and obtaining a driver's license—ruled out a finding of ID. *Id.*

In *Prieto*, the Fourth Circuit recited Prieto's deficits in functioning outside of prison and found that he had presented testimony "from a wide array of sources about the limits of his adaptive functioning," but found that the evidence of what he *could do* (much of which was inside of prison) was something that ruled out a finding of intellectual disability. 791 F.3d at 471–72.

Furthermore, the Fourth Circuit's determination that any of these purported "strengths" were inconsistent with a diagnosis of intellectual disability reflected reliance on erroneous stereotypes; *Briseño* factors; and consideration of prison, criminal, and verbal functioning. In *Green,* the Fourth Circuit determined that an intellectually-disabled person could not function in a job requiring low-level skills

20

and education. *Green*, 515 F.3d at 302–03. In *Walker*, the Fourth Circuit relied on prison functioning, criminal functioning, and the defendant's ability to have sexual relationships with others, engage in homemaking activities, and obtain a driver's license. *Walker*, 593 F.3d at 328. In *Prieto*, the Fourth Circuit relied on Prieto's prison and criminal functioning, as well as his ability to buy a car, get a driver's license, speak with others, get a job, have romantic relationships, and fly on a plane. *Prieto*, 791 F.3d at 471–72.

All of these analyses rely on some combination of the erroneous stereotypes listed in AAIDD–2012 and condemned in *Moore-I*, including the notions that the intellectually disabled: "look and talk" differently than the general population; "cannot acquire the social and vocational skills for independent living"; are "completely incompetent and dangerous"; cannot engage in "complex tasks"; cannot form romantic relationships; and cannot drive, buy a car, or obtain a driver's license. PA0527 (AAIDD–2012). The analysis in *Green* was similarly contradicted by the DSM-5's dictate that intellectually-disabled individuals with significant practical deficits frequently show "competitive employment in jobs that do not emphasize conceptual skills." PA0494 (DSM-5). And the analyses in *Walker* and *Prieto* relied on prison, criminal, and verbal functioning, and several *Briseño* factors, including whether the defendant: has "formulated plans and carried them through or is his conduct impulsive"; "respond[s] coherently,

21

rationally, and on point to oral or written questions or do his responses wander form subject to subject"; "[c]an . . . hide facts or lie effectively in his own or others' interests"; and has conduct that "show[s] leadership or does it show that he is led around by others." *Moore-I*, 137 S. Ct. at 1046 n.6.

The Government's claim that the § 2255 court in the case of Mr. Fulks's co-defendant, Brandan Basham, "applied the correct standard" in making a "fact specific resolution" of Basham's *Atkins* claim is similarly meritless. RB 39. In *Moore-I* and its second *Moore v. Texas* decision, the Supreme Court rejected *any* ID determination that was based on diagnostically invalid factors, regardless of whether they were fact-based or even if they involved credibility determinations. *Moore v. Texas*, 139 S. Ct. 666, 668–70 (2019) ("*Moore-II*"); *Moore-I*, 137 S. Ct. 1050-53. As set forth in Mr. Fulks's opening brief, the § 2255 court's assessment of Mr. Basham's adaptive behavior relied entirely on criminal and verbal functioning, erroneous stereotypes, and *Briseño* factors. AOB 28–29. Because it relied on inappropriate factors when making this determination, the "fact specific" nature of the § 2255 court's determination does not render its invalid analysis compliant with current diagnostic standards.

The Government also argues that Mr. Fulks was not precluded from pursuing an *Atkins* claim because *Richardson*, *Walker*, and the prong-one analysis in *Green* were reviewed under the Anti-Terrorism and Effective Death Penalty Act

and *Prieto* was conducted under an innocence-of-the-death-penalty standard to excuse a procedural default. RB 34-38. But regardless of what standard or procedural posture those cases were in, the *analysis* under which they were considered was contrary to the science, was later rejected by *Moore-I*, *Moore-II*, AAIDD–2012, and the DSM-5, and would have foreclosed Mr. Fulks from bringing a § 2255 claim.

That *Richardson*, *Walker*, and *Prieto* postdate the filing of Mr. Fulks's 2008 § 2255 motion, RB 34–38, only reinforces Mr. Fulks's argument. The Fourth Circuit's endorsement of contra-diagnostic standards, which began with *Green*, remained constant after Mr. Fulks's § 2255 proceedings had concluded. There was never a time during his initial round of post-conviction litigation when he could have raised an *Atkins* claim that was not rendered meritless by the Fourth Circuit's now-invalidated precedent.

### 3.     The Evolution of Diagnostic Standards Supports Mr. Fulks's Request for § 2241 Review.

The AAIDD and the APA issued AAIDD–2012 and the DSM-5, in 2012 and 2013, respectively, which were relied on extensively by the Supreme Court in *Moore-I*. Collectively, these updated standards identified and rejected a number of inappropriate stereotypes regarding the intellectually disabled; provided additional, significant guidance as to what level of functioning was needed to meet prong two of the diagnosis of intellectual disability; rejected the use of hard IQ cutoffs of any

23

type in an ID determination; and—with the advent of the DSM-5—saw the APA join the AAIDD to mandate correction for the Flynn Effect and bring unanimity on this issue. These developments changed the diagnostic requirements for prongs one and two under the diagnostic standards, and rendered Mr. Fulks exempt from execution under *Atkins*. AOB 29-32.

The Government argues the changes set forth in the new manuals for prongs one and two are insignificant. For the reasons set forth below, the Government's arguments are meritless.

### a.    Prong one

The Government concedes that the AAIDD and DSM-5 require correction for the Flynn Effect in an ID determination, but then questions the appropriateness of Flynn-correcting, citing to AAIDD–2010 and *McManus v. Neal*, 779 F.3d 634 (7th Cir. 2015). RB 45. Then, the Government argues that there was ample support for Flynn-correction that Mr. Fulks could have relied on in 2008 because the AAIDD mandated correction as early as 2007. RB 45–46. The Government also argues that the DSM-5's directive that intellectual functioning be assessed clinically was present in the DSM-IV-TR. This is so, the Government contends, because the DSM-IV-TR allowed for a margin of error in IQ scores based on the SEM and contained an adaptive behavior requirement. RB 43–44.

24

All of these arguments are meritless. To start with the Flynn Effect, the Government relies on a quote from AAIDD–2010 that mandates Flynn-correction, but also notes that this is "still a challenging issue" and that "some data" have shown that the Flynn Effect was slowing or reversing over time. RB 45. The Government ignores the fact that the diagnostic standards have changed since 2010. Two years later, the AAIDD issued AAIDD–2012, which continued to mandate Flynn-correction, but removed the 2010 language relied on by the Government in its argument. PA0527. In 2013, the DSM-5 mandated Flynn-correction, bringing unanimity between the APA and AAIDD on this issue. PA0497.

And, in 2015, AAIDD issued an additional manual: *The Death Penalty and Intellectual Disability*. Citing the authoritative research on this issue, AAIDD–2015 stated that: "[n]ot only is there a scientific consensus that the Flynn effect is a valid and real phenomenon, there is also a consensus that individually obtained IQ scores derived from tests with outdated norms must be adjusted to account for the Flynn effect, particularly in *Atkins* cases." PA0534–37; *see also* PA0535 ("A consensus among the professional and scientific community of intelligence and ID scholars has emerged. This consensus is that given the high-stakes nature of *Atkins* ID cases and their tendency to artificially focus on specific "bright line" cutoff

25

scores, *a Flynn effect correction to a person's scores in this setting is now considered best or standard practice*.") (emphasis in original).

The inconsistent nature of the Government's argument on this issue illustrates how the diagnostic standards, "[r]eflecting improved understanding over time," have changed over the years. Although the Flynn Effect was recognized and correction was mandated by the AAIDD as early as 2007, it was still a "challenging issue" in 2010. These challenges were resolved with the publication of AAIDD–2012 and the DSM-5 or, at the latest, when AAIDD–2015 confirmed professional consensus on this issue. This is relevant for two reasons. First, it demonstrates that the Government's attempt to rely on AAIDD-2010, which has since been updated by submissions from the AAIDD in 2012 and 2015, violates *Moore-I*'s requirement that *current* standards be employed. Second, it demonstrates how there was consensus supporting the Flynn-correction of scores in 2019 when Mr. Fulks filed his § 2241 petition, in contrast to 2008 when his § 2255 motion was submitted.

The Government's reliance on *McManus* suffers from a similar defect. Issued prior to *Moore-I*, the *McManus* court was not yet bound by current diagnostic standards and was therefore free to ignore the mandate to Flynn-correct set forth by the DSM-5 and AAIDD–2012. So, while "nothing in *Atkins* suggests that IQ test scores *must* be adjusted to account for the Flynn Effect," *McManus*,

26

779 F.3d at 653, by rendering current diagnostic standards binding, *Moore-I* required Flynn-correction the moment current diagnostic standards did. And, there is no reference to AAIDD–2015, AAIDD–2012, DSM-5, or AAIDD–2010 in *McManus* or any other indication that the *McManus* court considered any of these four manuals' mandates to Flynn-correct when making its ruling. 779 F.3d at 653–54. Even though *Moore-I* had not yet been issued and those manuals were not yet binding in 2015, they—at a minimum—contradict the *McManus* court's conclusion that "it is not common practice to adjust IQ scores by a specific amount to account for the phenomenon." *Id.* at 653.

The Government's argument regarding the DSM-5 and the clinical assessment of intelligence also fails. In accounting for the SEM, the DSM-IV-TR stated that scores of 75 and below are within the presumptive range for intellectual disability, imposing a hard cutoff of 75 on prong one determinations. Supp. App. 20. The DSM-5 expanded that definition by making clear that ruling prong one deficits in or out was a clinical endeavor and that hard cutoffs of any type were diagnostically inappropriate. PA0497 (DSM-5); *see also* PA0524 (AAIDD–2012) ("A fixed cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination."). This change is particularly significant here where Mr. Fulks's reported IQ scores, before Flynn-correction, are two to four points above the hard cutoff of 75 imposed

27

by the DSM-IV-TR. *See* AOB 7 (describing Mr. Fulks's IQ scores.) The Government fails to recognize that the new standards remove the hard cutoff of 75 and render Mr. Fulks eligible for an ID diagnosis even before a Flynn-correction is made.

The Government's reference to adaptive behavior in the DSM-IV-TR, RB 43–44, is similarly invalid. That the DSM-IV-TR required deficits in adaptive functioning to also be present in addition to an IQ score of 75 or below in no way provided the greater leeway for prong one determinations set forth in the DSM-5.

### b.    Prong two

The Government contends that earlier manuals addressed many of the stereotypes set forth and rejected by AAIDD–2012 and the DSM-5 and that, in any event, clinicians knew them to be false. RB 47–48. The Government further argues that the descriptions of functioning set forth by the DSM-5 were not new because there were similar descriptions in the DSM-IV-TR. RB 48–49.

But the rejection of specific stereotypes by the AAIDD and the DSM-5 was, in fact, new. The Government relies on the fact that prior AAIDD manuals referred to the long-acknowledged reality that strengths and weaknesses coexist in the intellectually disabled and that deficits in people with mild ID may be difficult to detect. RB 46. These valid, but general, assertions do not come close to the level of specificity present in AAIDD–2012 and the DSM-5, which itemize specific levels

28

of functioning that are consistent with intellectual disability and a finding of deficits in adaptive behavior. *See* PA0527 (AAIDD–2012); PA0494 (DSM-5).

Moreover, the DSM-IV-TR's description of functioning for mildly intellectually disabled individuals, RB 48–49, *demonstrates the difference* between the DSM-IV-TR and current standards. The level of functioning described by the DSM-IV-TR is much lower than the level set forth in AAIDD–2012 and the DSM-5. The DSM-IV-TR states that: "During their adult years, [the mildly intellectually disabled] usually achieve social and vocational skills for *minimum* self-support, *but may need supervision, guidance, and assistance,* especially when under unusual social or economic stress. *With appropriate supports*, individuals with [mild intellectual disability] live successfully in the community, either independently *or in supervised settings*." Supp. App. 21 (emphasis added). AAIDD–2012 and the DSM-5 rejected these descriptions and describe intellectual disability as encompassing a higher level of functioning by stating that individuals with ID can "support their families," "do complex tasks," get driver's licenses, drive cars, buy cars, "acquire vocational and social skills necessary for independent living," maintain romantic relationships, "function age-appropriately in personal care," have the same recreational skills as their age-mates, and maintain "competitive employment in jobs that do not emphasize conceptual skills." PA0527 (AAIDD–2012); PA0494 (DSM-5).

29

Similarly, the DSM-IV-TR states that "[b]y their late teens, [individuals with mild intellectual disability] can acquire academic skills of up to approximately the sixth-grade level." Supp. App. 21. The DSM-5 rejects the DSM-IV-TR's sixth grade cutoff, stating that to establish deficits in this area, "[f]or school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, *or* money, with support needed *in one or more areas to meet age-related expectations*." PA0494 (DSM-5) (emphasis added). In this way, the DSM-5 specifies that the operative issue is whether the individual is operating consistent with age-related expectations, and establishes that deficits in this area are present when support is needed to meet these expectations in only *one* area of academic functioning—as opposed to the entire universe of academic activities.

Furthermore, the DSM-5's descriptors are more extensive than those in the DSM-IV-TR. Divided into the three domains of adaptive functioning, the DSM-5 sets forth detailed clinical descriptions as to what level of functioning would establish significant deficits in each domain. PA0494. The DSM-IV-TR's description of mild intellectual disability consists of five sentences untied to any domain. Supp. App. 21. Indeed, the transition to a three-domain system of adaptive behavior marks another difference between the old and new manuals. The DSM-IV-TR organized its analysis of adaptive behavior into eleven skill areas, rather than the three domains of functioning that is now unanimously embraced by the

30

diagnostic standards. *Compare* PA0494–97 (DSM-5) *and* Supp. App. 19 (DSM-IV-TR).

The Government's claim that many of the now-rejected stereotypes would have been "obviously false" to clinicians, RB 47–48, misses the point. Regardless of whether clinicians would recognize these standards to embrace significant changes, reviewing courts—including the Fourth Circuit—would not recognize these beliefs as erroneous absent a directive from a diagnostic standard to that effect. *See supra* I.C.2. That the *Moore-I* court itself relied on AAIDD–2012's list of stereotypes in rejecting the lower court's *Atkins* standard, 137 S. Ct. at 1052, demonstrates the significance of that diagnostic development.

Similarly, the Government relied on a variety of diagnostically inappropriate factors when contesting Basham's claim of intellectual disability. *See Basham v. United States*, 109 F. Supp. 3d 753, 841 (D.S.C. 2013) (reciting the Government's reliance on purported strengths, criminal and verbal functioning, erroneous stereotypes and *Briseño* factors). The Government cannot now claim that the inappropriate nature of these stereotypes would have been obvious to anyone.

It is also not clear that these stereotypes would be "obviously false" to clinicians in 2008. As set forth in the preceding paragraphs, the DSM-IV-TR and the AAIDD manuals cited by the Government provided little guidance as to what level of real-world functioning constituted adaptive deficits, and the limited

31

information they did provide did not match the level of functioning described by the current standards set forth in the DSM-5 and AAIDD–2012.

### 4. The Government's Arguments on the Merits of Mr. Fulks's *Atkins* Claim Should Be Rejected.

The Government contests Mr. Fulks's claim that he is intellectually disabled, argues that the practice effect does not explain the one- and two-point increases in his IQ test results, contends that the diagnosis was supported only by the analysis of neuropsychologist Barry M. Crown, Ph.D., and claims "there is reason to question this diagnosis" as it differs from the conclusions made by Mr. Fulks's trial experts. RB 50.

In fact, Mr. Fulks's ID claim is not "supported only by a single neuropsychologist's report (Dr. Crown's)," RB 50, but rather by the extensive proffer made to the district court. In addition to Dr. Crown's analysis, Mr. Fulks relies on a newly-issued report from fetal alcohol specialist Julian Davies, M.D., who diagnosed Mr. Fulks with a Fetal Alcohol Spectrum Disorder, a known cause of intellectual disability; a second newly-issued report from psychologist and fetal alcohol specialist Natalie Novick-Brown, Ph.D., who assessed Mr. Fulks's adaptive functioning and found significant deficits in all three domains that have been present since early childhood; three separate IQ tests, all of which returned scores consistent with intellectual disability; three separate neuropsychological assessments, all of which reflected cognitive impairments; numerous imaging

32

studies showing brain damage; and pages of educational records, transcripts, and witnesses declarations describing Mr. Fulks's lifetime of impairments and the presence of risk factors known to cause intellectual disability. AOB 5–15; PA0230–72; ECF Nos. 55-1 through 55-4.

The district court reviewed these materials and found that Mr. Fulks had "present[ed] extensive evidence that he has an intellectual disability, has diminished cognitive functioning, and suffers from fetal alcohol spectrum disorder." PA0002 (footnote omitted). The Government offers nothing to undermine the district court's determination now.

Moreover, the Government declined to substantively contest Mr. Fulks's ID status before the district court, has failed to proffer a single expert opinion contradicting Mr. Fulks's claim of intellectual disability under current diagnostic standards, and offers no effective rebuttal to the detailed description of Mr. Fulks's diagnosis set forth in his § 2241 petition and summarized in his opening brief before this Court. Instead, in violation of *Moore-I*'s dictate and this Court's waiver rules, it belatedly relies on opinions rendered under old diagnostic standards that have since been updated, RB 50, and that are invalid in the wake of *Moore-I*'s directive that *current* diagnostic standards be employed, *Moore-I*, 137 S. Ct. at 1051. At a minimum, an evidentiary hearing is needed to resolve this dispute.

Nor is Dr. Crown's diagnosis called into question by the fact that Mr. Fulks's trial experts did not diagnose him as ID. That Mr. Fulks's diagnosis has changed is precisely the reason that he is entitled to proceed under § 2241. The trial experts found Mr. Fulks's impairments to be significant, but concluded that his reported IQ scores of 77, 78, and 79—uncorrected for the Flynn Effect—were just shy of the ID range. PA0560–66 (describing Mr. Fulks as brain damaged and significantly impaired, and having "borderline" IQ scores that were "slightly above the cut" of ID, and that with a "few less points," he would have passed this threshold); PA0549–56 (finding Mr. Fulks to be brain damaged, and having "borderline" intellectual functioning); PA0570, PA0573 (same); PA0576 (finding cognitive impairment and low IQ, but not reaching a diagnosis of intellectual disability). This conclusion would be different under current standards. When Flynn-corrected, these scores reduce to 75, 76, and 77, with the one- and two-point increases in score easily explainable by the practice effect—all of which establish prong one. PA0475. Even without correction for the Flynn Effect, the rejection of a hard IQ cutoff set forth by the DSM-5 would still have rendered Mr. Fulks's IQ scores consistent with intellectual disability. No expert discussion of this issue is needed to establish that the new diagnostic standards are meaningful. Simple arithmetic will suffice.

34

The Government's attempt to dispute the practice effect present in Mr. Fulks's last IQ score is similarly baseless. While AAIDD–2010 *prohibits* the administration of the same test within a twelve month period, Supp. App. 51, that does not mean that there is no cross-test effect with the administration of two other IQ tests and three separate neuropsychological batteries prior to the administration of the last IQ test, PA0475.

But more fundamentally, whether practice effect accounted for the one- and two-point increases does not matter. As experts have noted throughout this litigation, practice effect aside, the one- and two- point differences are easily explained by the fact that IQ tests vary from test administration to test administration. *See* Supp. App. 10–11. Mr. Fulks received effectively the same result on not only his IQ tests, but all of the neuropsychological batteries that were administered to him. *Id.* There is no question that Mr. Fulks's impairments are present. For these reasons and those in the opening brief, this Court should reverse the ruling below.

II.    **BECAUSE MR. FULKS HAS THE SAME COGNITIVE AND ADAPTIVE FUNCTIONING DEFICITS EXHIBITED BY THE INTELLECTUALLY DISABLED, HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY .**

Mr. Fulks argued in the district court that *Madison v. Alabama*, 139 S. Ct. 718 (2019), provided a second ground for relief that was not previously available to him: it held that the Eighth Amendment requires a reviewing court to take a

functional approach to determining a condemned prisoner's eligibility or ineligibility for execution, without regard to the specific diagnosis that renders him ineligible. Because the Court decided *Madison* long after Mr. Fulks's trial, direct appeal, and initial § 2255 proceedings, he could not previously have made the argument that *Madison* now supports—that even assuming he does not meet all the diagnostic criteria for intellectual disability, his lifelong adaptive impairments and low adult intellectual functioning make him functionally indistinguishable from an intellectually-disabled person. AOB 57–59. The district court never addressed the merits of this claim, and conflated it with the *Atkins* claim in ruling that it was not cognizable under § 2241. PA0030.

The Government, in opposition, attempts to establish that *Madison* decided nothing new and that Mr. Fulks cannot proceed under § 2241. Both lines of argument are unsound.

The Government first asserts that *Madison* did not newly recognize a functional approach to the Eighth Amendment, and that *Panetti v. Quarterman*, 551 U.S. 930 (2007), had already adopted that approach several years earlier. RB 58. In fact, the Supreme Court's 2019 decision in *Madison* represented a departure. Both *Panetti* and its predecessor, *Ford v. Wainwright*, 477 U.S. 399 (1986), involved prisoners who suffered from delusional disorders. *Madison*, 139 S. Ct. at 728. *Panetti* established that a prisoner's competency to be executed turned on

36

whether, because of mental illness, "he lacks a 'rational understanding' of 'the State's rationale for [his] execution.'" *Madison*, 139 S. Ct. at 723 (alteration in original) (quoting *Panetti*, 551 U.S. at 958–59). It was not clear until *Madison*, however, whether the type of mental illness mattered. The State of Alabama argued throughout Madison's lower court proceedings, and convinced the trial court and Alabama Court of Criminal Appeals, that the *Panetti* test only applied to cases of "delusion" or "psychosis." *Madison*, 139 S. Ct. at 724–25, 726. Justice Kagan acknowledged that the Court's previous opinion on Madison's habeas review had left this question undecided, and so "in that sense, the question is one of first impression" *Id.* at 728. In remanding to the Court of Appeals, she anticipated that the issue "should now be clear." *Id*. at 731. Until *Madison*, however, it was *not* clear that "[t]he *Panetti* standard concerns, . . . not the diagnosis of such illness, but a consequence—to wit, the prisoner's inability to rationally understand his punishment." *Id.* at 728.

The Government next argues that, even if *Madison* recognized a new approach to *Ford* claims, it did not adopt that approach for *Atkins* clams. It observes that *Ford* and *Atkins* claims apply different standards and ripen at different times. RB 58 (citing *Bourgeois*, 977 F.3d at 637, and *Panetti*, 551 U.S. at 943–47). What the two lines of authority share, though, is a grounding in the constitutionally-recognized purposes of punishment. The Eighth Amendment

37

forbids the execution of the incompetent, in part, because it would serve no retributive purpose. *See Panetti*, 551 U.S. at 958–59; *Ford*, 477 U.S. at 409. The Eighth Amendment forbids the execution of the intellectually disabled, in part, because it would serve neither retribution nor deterrence. *Atkins*, 536 U.S. at 319. *Madison* held that the Constitution would not allow the execution of any person so incompetent that retribution would not be served, regardless of the origin of that person's incompetence. The same analysis should apply in the *Atkins* context: if an individual's intellectual and adaptive deficits are such that his punishment would advance neither retribution nor deterrence, he should be ineligible for execution regardless of the etiology.

The Government argues that *Atkins* applied a "functional" approach long before *Madison*. RB 59. But a medical diagnosis of intellectual disability requires the establishment of three criteria, only one of which—adaptive deficits—is constitutionally relevant. *See Atkins*, 536 U.S. at 318 (indicating that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills," and describing how those adaptive impairments undermine retribution and deterrence). *Madison* makes clear that a condemned person who shares that constitutionally relevant criterion should be ineligible for execution even if the person has another diagnosis. Mr. Fulks is not, as the Government maintains, seeking to "expand" *Atkins* to

"impairments that are *less severe* than intellectual disability." RB 59 (emphasis in original). He argues that, after *Madison*, a prisoner whose adaptive deficits are *as severe* as those seen in intellectual disability should be constitutionally ineligible for execution even if the deficits proceed from another cause.

The Government also maintains that Mr. Fulks cannot establish that his claim is cognizable under § 2241 because *Madison* does not create a new, retroactive rule of statutory interpretation; there was allegedly nothing to prevent him from raising the claim in his initial § 2255 motion; and he cannot satisfy the savings clause in § 2255(h). RB 60 (citing *Davenport*, *Garza*, *Webster-I*, and *Purkey*). The Government did not advance this argument below, and the district court did not address it. The Government maintains that the district court adequately addressed his cognizability arguments by determining that the "two claims are essentially the same, at least for purposes of whether they can proceed under 2241." RB 60 (citing district court opinion, PA0015). The *Atkins* cognizability argument, however, required the district court to assess *Moore-I, Moore-II,* and the diagnostic standards of the AAIDD–2010 and DSM-5. The *Madison* claim required the court to consider the novelty of *Madison*. The arguments were distinct and required separate analysis. It does not matter that, as the Government argues, this is not a statutory interpretation case. *See Davenport*, 147 F.3d at 610. This Court has recognized that § 2241 can provide a vehicle for

39

other types of claims. Moreover, Mr. Fulks could not have raised his claim in earlier § 2255 proceedings because it did not become available until the Supreme Court decided *Madison*.

Contrary to the position taken by the Government, Mr. Fulks did explain below why he can satisfy the savings clause and his claim is cognizable under § 2241. PA0295–97. The Court should remand to the district court to address his arguments in the first instance or rule that the claim is cognizable. First, a "structural problem" prevents Mr. Fulks from seeking permission for a second § 2255 motion, *see Webster-I*, 784 F.3d at 1136, 1139, because the new evidence on which he relies does not establish that "no reasonable factfinder would have found [him] guilty," and the Supreme Court has not explicitly declared *Madison*'s retroactivity. He therefore could not satisfy the standards for authorization to file a successive § 2255 motion. *See* 28 U.S.C. § 2255(h)(1), (2). Second, as in *Webster-I*, 784 F.3d at 1124–25, Mr. Fulks challenges the "fundamental legality" of his sentence. He relies on a series of cases, beginning with *Atkins* and culminating in *Madison*, that establish its unconstitutionality, and allowing his execution to proceed, despite his categorical ineligibility, would be "Kafkaesque." *Webster-I*, 784 F.3d at 1139. Finally, he challenges not the imposition but the execution of his sentence. No matter what claims he raised or could have raised in earlier

40

proceedings, Mr. Fulks is constitutionally ineligible for execution. This Court should allow him to litigate that claim through § 2241.

## CONCLUSION

For the reasons set forth above and in Petitioner's opening brief, this Court should reverse the district court's opinion denying the Amended Petition and remand his case for an evidentiary hearing.

Respectfully submitted,

/s/ *Peter Williams*
Peter Williams
*Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West
Philadelphia, PA 19106
215-928-0520

*Counsel for Petitioner-Appellant*

Dated: February 1, 2021

## CERTIFICATE OF COMPLIANCE

This brief contains 9,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), which is compliant with this Court's January 29, 2021 order granting Petitioner leave to file a reply brief of up to and including 9,500 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ *Peter Williams*
Peter Williams

Dated: February 1, 2021

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing brief with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams

Dated: February 1, 2021