No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**SUPPLEMENTAL APPENDIX TO REPLY BRIEF
OF APPELLANT
PAGES PA0528-PA0582**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
    *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

February 1, 2021

# INDEX TO SUPPLEMENTAL APPENDIX

McGrew, K., Norm Obsolescence: The Flynn Effect, *The Death Penalty and Intellectual Disability*, American Association on Intellectual and Developmental Disabilities ....................................................................................... PA0528

Excerpt, Trial Testimony of James Evans, Ph.D., June 23, 2004, *United States v. Fulks*, 4:02-cr-992 (D.S.C.) ............................................................. PA0544

Excerpt, Trial Testimony of Ruben C. Gur, Ph.D., June 13, 2004, *United States v. Fulks*, 4:02-cr-992 (D.S.C.) ............................................................. PA0557

Declaration of James H. Hilkey, Ph.D., June 2, 2008 .................................... PA0568

Declaration of Margaret Melikian, D.O., May 27, 2008 ................................ PA0575

Errata for Appellant's Opening Brief ............................................................ PA0582

i

Case: 20-1900    Document: 38    Filed: 02/01/2021    Pages: 58

# The DEATH PENALTY and INTELLECTUAL DISABILITY

## Edward A. Polloway, Editor



aaidd

American Association
on Intellectual and
Developmental Disabilities

PA0528

# 10 | Norm Obsolescence: The Flynn Effect

Kevin S. McGrew

## Nature of the Problem

A person's IQ test score is based on the comparison of the person's tested performance to an age-appropriate norm reference group. The *norms* for an IQ test are developed to represent the snapshot of the general U.S. population (at each age level the test covers) at the time the norm or standardization data are collected (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education [AERA, APA, NCME], 1999). (VandenBos, 2007, defines a norm as "a standard or range of values that represents the typical performance of a group or of an individual [of a certain age, for example] against which comparisons can be made" [p. 631]). The person's test performance is compared to this standard reference group. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children ages 6 through 16 from 1971 through 1973 (Wechsler, 1974). (1972 is thus considered the official date of the WISC-R norm/ standardization sample.) Thus, a child who is 7 years, 2 months old who was administered the WISC-R in 1974 would have the calculation of his or her IQ test score based on a comparison to the performance of children from ages 7 years, 0 months through 7 years, 3 months in the year 1972. (The WISC-R norm tables are provided in 3 month intervals within each year of age.) If the WISC-R was administered to a child of the same age (7 years, 2 months) in 1984, rather than being compared to other children of the same age in 1984, this child's performance would still be evaluated against similarly aged children from 1972. This second comparison results in a test-date/test-norm *mismatch* of 12 years (1984 – 1972 = 12). As explained next, comparing an individual's performance on an IQ test with outdated test norms results in *a comparison to a historical reference group from the past—not the person's contemporary peers*. This *norm obsolescence* problem is more commonly referred to as the *Flynn effect* (Flynn, 1984,

155

1985, 2000, 2006, 2007a, 2009). The Flynn effect produces inflated and inaccurate IQ test scores.

In simple terms, psychologists and psychological measurement experts typically describe the Flynn effect as the result of a "softening" of IQ tests norms with the passage of time. That is, individuals tested today on an IQ test normed many years earlier will obtain artificially inflated IQ test scores, because the older test norms reflect a level of overall performance that is lower than that of individuals in contemporary society. This is one of the primary reasons why authors and publishers of IQ tests make every effort to periodically provide "freshened" norms by collecting new nationally representative sample data for IQ test batteries. The professional consensus among test developers is that the "shelf life" of an IQ test's norms is approximately 10 years. According to Weiss (2010), Vice President of Pearson Clinical Assessment, the company and division that develops and publishes the various Wechsler IQ batteries, "there is no definition of when a test becomes obsolete. When asked privately, most Flynn effect researchers have 10 years in mind" (p. 492). If new norms are not provided, individuals tested using IQ tests with outdated norms will typically obtain inflated and inaccurate IQ test scores.

The Flynn effect recognizes that the normal curve distribution of intelligence shifts upward over time. Thus, the same raw score performance on an IQ test, when compared to outdated norms, will produce a markedly different IQ score when it is compared to updated norms based on a contemporary sample of abilities for a person of the same age. The person's tested performance (i.e., the number of correct responses across all parts of the IQ test) does *not* change, but the person's relative standing in the distribution of IQ scores across the population *does* change as a function of which norm reference group his or her performance is compared against. The same performance that is considered average in the contemporary norm sample, yielding an IQ test score of 100 in the distribution, will result in a higher IQ test score when using older norms (Schalock, 2012).

As a result of the Flynn effect, it is possible that one or more IQ test scores reported for an individual being considered for a diagnosis of intellectual disability (ID) may be inaccurate and inflated estimates. Given the high-stakes nature of *Atkins,* ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, the impact of the Flynn effect must be recognized and an adjustment to the inflated scores is recommended.

## Summary of Related Research

### *Origins of the Flynn Effect*

Probably the first widely recognized scholarly report of IQ norm obsolescence was published by Lynn in 1983. Reflecting Lynn's early writings, some intelligence scholars refer to IQ norm obsolescence as the *Lynn-Flynn effect* (Woodley, 2012a). Recently, Lynn

Case: 20-1900     Document: 38     Filed: 02/01/2021     Pages: 58

(2013) provided evidence that 24 studies, the first being Runquist (1936), reported on the phenomenon of norm obsolescence before the "effect was rediscovered by Flynn" (1984). Lynn (2013) argued that the proper designation of IQ test norm obsolescence should be the "Runquist effect." Although Lynn (2013) provided a compelling argument (based on the customary practices in the history of science for naming phenomena), the term *Flynn effect* is used here given its prominent and frequent use in intelligence research and *Atkins* court cases.

Seventeen years prior to the 2002 *Atkins* decision, Flynn (1985) published an article in the *American Journal on Mental Deficiency* (now the *American Journal on Intellectual and Developmental Disabilities*). This article, titled "Wechsler Intelligence Tests: Do We Really Have Criterion of Mental Retardation?" first raised the issue of a possible "adjustment" in the context of an ID diagnosis. In hindsight, Flynn's 1985 article was the "canary in the coal mine" in that it first demonstrated that the Flynn effect may have a significant impact on the proportion of the population of individuals that would be identified as ID. At that time, Flynn proposed a form of adjusting for the softening of tests norms, although it was in a slightly different form than the current recommended Flynn effect adjustment procedure.

Flynn (1985) proposed that to account for the softening of test norms, an IQ test score of 70 on a "reference" IQ test (i.e., WAIS-R) would be set in as the *absolute criterion for mental retardation* (that is, on the intellectual functioning prong of the definition). Then, to account for norm obsolescence, each time a new IQ test was published there would be a lowering of the MR cutting line. Flynn's 1985 idea was that whenever a new IQ test was published, it would be given together with the established reference IQ test (e.g., WAIS-R) and the average mean IQ test score difference between the new test and the reference test would be used to "derive a new score equivalent to the old cutting line" (p. 243). Although different from what is now considered the standard Flynn effect adjustment approach (i.e., subtracting 3 IQ test score points from an individual's total IQ test score for every 10 years for which the test was administered to a person who was normed prior to the date of individual's testing), conceptually Flynn's 1985 proposal accomplished the same goal as the currently employed Flynn effect adjustment procedure.

Fifteen years later, and still 2 years prior to the *Atkins* decision, Flynn (2000) again sounded the alarm regarding the implication of norm obsolescence related to the diagnosis and classification of mental retardation:

> It is certain that over the past 50 years, literally millions of Americans evaded the label of mentally retarded designed for them by the test manuals. Whether this was good or bad depends on what one thinks of the label. Some will say millions avoided stigma. Others will say that millions missed out on needed assistance and classroom teachers were left unaided to cope with pupils for whom aid was needed (p. 197).

The potential impact of the Flynn effect on other diagnoses was also reported in 2001 and 2003. Truscott and colleagues (Sanborn, Truscott, Phelps, & McDougal, 2003; Truscott & Frank, 2001) reported on the impact of the Flynn effect on learning disability (LD) identification, not identification of individuals with ID. Although these authors did not offer or endorse any IQ test score adjustment procedure, these researchers concluded that

> A critical finding of this study is that the FE probably contributes to misdiagnosis of LD. If this research is combined with previous reports that academic achieve-ment may be unaffected by the FE (Neisser, 1998) it strongly suggests that, over the life of a test version, IQ-achievement discrepancies, the most salient LD criterion, are exaggerated. One potential result of such an exaggeration of IQ-achievement discrepancies would be that, as test norms aged, fewer students would score in the mentally retarded range (Flynn, 2000) and more students would qualify for LD based on inflated severe discrepancies (p. 300).

In conclusion, the recognition of the impact of *norm obsolescence* (i.e., the Flynn effect) on IQ test scores, and more importantly, the potential for misdiagnosis of ID and other conditions (e.g., LD), has been recognized and documented as early as the 1980s. It continued to be discussed prior to and after the 2002 ID-related *Atkins* decision by researchers and professionals who did not anticipate nor were influenced by the 2002 *Atkins* decision. For obvious reasons (i.e., the life-or-death implications of the *Atkins* decision), there has been increased interest in the Flynn effect adjustment procedure since the *Atkins* decision. The facts indicate that the recognition of the impact of norm obsolescence on IQ test scores (and the idea of a norm obsolescence IQ test score adjustment) was established prior to the *Atkins v Virginia* (2002) U.S. Supreme Court decision.

### Scientific Basis of the Flynn Effect

There is a scientific and professional consensus that the Flynn effect is a scientific fact. A complete reading of the extant Flynn effect research literature leads to the conclusion that, despite debates regarding the causes of the Flynn effect, differences in the rate of Flynn effect change in different countries. Whether the Flynn effect has started to plateau in Scandinavian countries or whether the Flynn effect differs by different levels of intelligence and different methodological issues in various studies, *the consensus of the relevant scientific community is that the Flynn effect is real* (Cunningham & Tassé, 2010; Fletcher, Stuebing & Hughes, 2010; Flynn, 2009; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010a, 2010b; McGrew, 2010; Rodgers, 1999; Trahan, Stuebing, Fletcher, & Hiscock 2014; Weiss, 2010; Zhou, Zhu, & Weiss, 2010). The robustness of this conclusion may best be represented by Rogers' (1999) statement where, after raising valid methodological issues regarding various statistical analysis and conclusions across Flynn effect studies, that even with a "healthy dose of

skepticism, the effect rises above purely methodological interpretation, and appears to have substantive import" (p. 354).

The research literature regarding the Flynn effect is extensive. Trahan et al. (2014) found over 4,000 articles in their comprehensive literature review. (Most all norm obsolescence references and articles can be found at the regularly updated *Flynn Effect Archive Project* [http://www.atkinsmrdeathpenalty.com/2010/01/atkins-mrid-capital-punishment-flynn_11.html]. As of 2014, this archive includes approximately 190 publications.) A thorough treatment of all this research is beyond the scope of the current chapter. Fortunately, key contemporary Flynn effect issues bearing on an ID diagnosis in the *Atkins* context were covered in a special 2010 issue of the *Journal of Psychoeducational Assessment (JPA)*. A variety of invited scholars confirmed the scientific consensus regarding the validity of the Flynn effect. For example, Dr. Alan Kaufman (2010a), arguably the most prominent scholar on intelligence testing and interpretation of the various Wechsler IQ tests, stated that

> The Flynn effect (FE) is well known: Children and adults score higher on IQ tests now than they did in previous generations (Flynn, 1984, 2007, 2009b). The rate of increase in the United States has apparently remained a fairly constant 3 points per decade since the 1930s (p. 382).

The consensus of almost all authors who contributed to the *JPA* Flynn effect issue (Fletcher et al., 2010; Flynn, 2010; Hagan, Drogin, & Guilmette, 2010a; Kaufman, 2010a, 2010b; Kaufman & Weiss, 2010; McGrew, 2010; Reynolds, Niland, Wright, & Rosenn, 2010; Sternberg, 2010; Weiss, 2010; Zhou et al. 2010) was that IQ test norm obsolescence (i.e., the Flynn effect) is an established scientific fact. The following select quotes from recent peer-reviewed articles capture the essence of the convergence of opinion regarding the validity of the Flynn effect.

> The Flynn effect (FE) is real. The FE has been shown to be nearly 3 points per decade on average across a large number of studies, countries, and tests (Weiss, 2010, p. 491).

> The point is that a person tested on an outdated test will earn spuriously high scores as each year goes by, and the amount of the spuriousness amounts to about 3 points per decade for Americans (Kaufman, 2010b, p. 503).

> The FE, whatever its cause, is as real as virtually any effect can be in the social sciences. Studies have observed an increase of 0.3 points per year in average IQs; thus, for a test score to reflect accurately the examinee's intelligence, 0.3 points must be subtracted for each year since the test was standardized (Reynolds et al., 2010, p. 478).

> The Flynn effect is a well-established psychometric fact documenting substantial increases in measured intelligence test performance over time (Gresham & Reschly, 2011, p. 131).

Case: 20-1900     Document: 38     Filed: 02/01/2021     Pages: 58

Since the publication of the 2010 special *JPA* Flynn effect issue, many additional Flynn effect research and commentary articles have appeared (e.g., Battarjee, Khaleefa, Ali, & Lynn, 2013; Baxendale, 2010; Cunningham & Tassé, 2010; Hagan, Drogin, & Guilmette, 2010b; Kanaya & Ceci, 2011, 2012; Lynn, 2013; Nijenhuis, 2013; Nijenhuis, Cho, Murphy, & Lee, 2012; Nijenhuis, Murphy, & van Eeden, 2011; Nijenhuis & van der Flier, 2013; Pietschnig, Voracek, & Formann, 2011; Nijman, Scheirs, Prinsen, Abbink, & Blok, 2010; Rindermann, Schott, & Baumeister, 2013; Rönnlund, Carlstedt, Blomstedt, Nilsson, & Weinehall, 2013; Skirbekk, Stonawski, Bonsang, & Staudinger, 2013; Trahan et al., 2014; Wai & Putallaz, 2011; Woodley, 2011, 2012a, 2012b; Young, 2012). The continued flow of the Flynn effect related to peer-reviewed articles confirms the consensus that the Flynn effect is a scientifically important and studied phenomenon among intelligence scholars.

### *Adjusting IQ Test Scores for the Flynn Effect in* Atkins *Cases Is Best Practice*

Not only is there a scientific consensus that the Flynn effect is a valid and real phenomenon, there is also a consensus that individually obtained IQ test scores derived from tests with outdated norms must be adjusted to account for the Flynn effect, particularly in *Atkins* cases. (The use of a Flynn effect correction in clinical settings is less of an issue given that psychologists in such settings typically have more leeway to interpret scores as ranges, invoke clinical judgment, and incorporate information regarding measurement error in interpretation of the scores when making a diagnosis. In contrast, certain high stakes settings [e.g., *Atkins* cases; eligibility for Social Security Disability benefits] may have strict point-specific cut-scores [i.e., "bright line" criteria] where examiners, or the recipients of the scores [e.g., the courts], do not allow for such clinical interpretation. Thus, the Flynn effect adjustment is more relevant, appropriate, and primarily discussed in literature and law dealing with this type of high stakes IQ testing.) The most prominent and relevant professional consensus-based guidelines for ID diagnosis (Schalock et al., 2007, 2010, and 2012) support a Flynn effect adjustment for scores based on obsolete IQ test norms. *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed.; Schalock et al., 2010), based on an expert-consensus process, provides a written guideline that endorses the appropriateness of the Flynn effect adjustment in the diagnosis of ID. (The 11th edition was created using a group-based consensus process conducted by the AAIDD Ad Hoc Committee on Terminology and Classification [Schalock et al., 2010]). AAIDD recommends that psychologists use the most recent versions of IQ tests and, if scores are reported from an IQ test with outdated norms, a correction for the age of norms is warranted (Schalock et al., 2007). The 11th edition states

> As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. (p. 37)

As suggested
*and Systems of*

The main re
is that all int
administered
recent versi
where a test
warranted. (

The AAIDD's *tion, and Syste*

The *Flynn*
points per
on outdated
recommend
diagnosis o
norms is w

A consensu
ID scholars h
ID cases and
*a Flynn effect*
*standard prac*
researchers in
al., 2010; Flyn
& Reschly, 2(
2010; Schaloc
Reynolds et a
make the diff
effect must b
state that "th
to malpractic

A minori
IQ test score
validity of th
of what the
to apply it w
need to con
psychologis
over time" (
(2010) and
literature. N

As suggested in the *User's Guide to Mental Retardation: Definition, Classification, and Systems of Supports* (Schalock, 2007, pp. 20–21),

> The main recommendation resulting from this work [regarding the Flynn effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted. (p. 37)

The AAIDD's more recent *User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock et al., 2012) states

> The *Flynn effect* refers to the increase in IQ scores over time (i.e., about 0.30 points per year). The Flynn effect affects any interpretation of IQ scores based on outdated norms. Both the 11th edition of the manual and this *User's Guide* recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of 3 points per decade for age of norms is warranted. (p. 23)

A consensus among the professional and scientific community of intelligence and ID scholars has emerged. This consensus is that given the high-stakes nature of *Atkins* ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, *a Flynn effect correction to a person's scores in this setting is now considered best or standard practice.* This conclusion is supported by a significant number of scholars and researchers in the areas of intelligence and ID (Cunningham & Tassé, 2010; Fletcher et al., 2010; Flynn, 2006, 2007b; Flynn & Widaman, 2008; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010b; McVaugh & Cunningham, 2009; Reynolds et al., 2010; Schalock , 2007; Schalock, 2012). One example of this support is the statement of Reynolds et al. (2010) that "as a generally accepted scientific theory that could potentially make the difference between a constitutional and unconstitutional execution, the Flynn effect must be applied in the legal context" (p. 480). Reynolds et al. (2010) go as far as to state that "the failure to apply the Flynn correction as we have described it is tantamount to malpractice. No one's life should depend on when an IQ test was normed" (p. 480).

A minority of scholars have offered a different approach to the issue of correcting IQ test scores due to the Flynn effect. Weiss (2010), while acknowledging the scientific validity of the Flynn effect, advocates that experts should simply inform the fact finder of what the research shows and the trier-of-fact should evaluate and decide if and how to apply it when interpreting individual scores. Hagan et al. (2010b) also agree with the need to consider the Flynn effect in capital cases but their disagreement "lies in how psychologists should convey IQ scores in light of the observation that mean scores drift over time" (p. 420). It is important to note that the more conservative positions of Weiss (2010) and Hagan et al. (2010a, 2010b) represent a minority position in the professional literature. More importantly, they do not argue against the scientific validity of the Flynn

PA0535

Case: 20-1990    Document: 38    Filed: 02/01/2021    Pages: 58

effect or even the need to consider the effect in *Atkins* cases. Rather, their difference of opinion with the majority is only as to whether a specified score adjustment should be made to the original score or whether testifying experts should instead address the Flynn effect in narrative form.

Recently, legal scholars have also supported the application of the Flynn effect correction in *Atkins* cases. Young's (2012) recent law review article ("A More Intelligent and Just *Atkins:* Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation or Intellectual Disability") concluded that

> adjusting for the Flynn effect reflects a practice consistent with both *Atkins* and the known world of IQ measurements. While a freakish strike of lightning is difficult to avoid, the potentially deadly and unconstitutional consequences of refusing to account for the Flynn effect are wholly preventable. Thus, for the intelligent and just enforcement of *Atkins*, courts and juries should adjust IQ score from outdated tests for the Flynn effect. (p. 663)

### What Is the Correct Flynn Effect Adjustment for Norm Obsolescence?

The AAIDDs' *User's Guide* (Schalock, 2012) recommends a Flynn effect correction of 3 points per decade (0.3 points per year). The 3 points per decade rule-of-thumb is consistent with the previously cited comments of Kaufman (2010a, 2010b) and Weiss (2010), and is also consistent with the recommendation of most scholars in the areas of intelligence and ID (e.g., Fletcher et al., 2010; Gresham & Reschly, 2011; Trahan, et al., 2014; Widaman, 2007).

The 3 points per decade rule-of-thumb is based primarily on Flynn's (2009) seminal article where he synthesized the results of 14 estimates of IQ test score gains over time. Flynn reported an average IQ test score change, across the 14 studies, of 0.311 points per year. An average mean score of 0.299 points was reported for the Wechsler comparisons only. Flynn concluded that "the evidence suggests that a rate of 0.30 is about right, and varying it from case to case lacks any rationale" (p. 104).

More recently Fletcher et al. (2010) applied more precise quantitative meta-analytic procedures to Flynn's (2009) data and reported a weighted mean of 2.80 points per decade. After removing two outlier studies, the weighted mean per decade was 2.96. These researchers concluded that "the level of precision we reported of a mean of about 3 and a *standard error of the mean* (SEM) of about 1 supports the correction and is consistent with the Flynn correction of 3 points per decade" (p. 472). In the most comprehensive meta-analysis research synthesis of 285 studies, Trahan et al. (2014) found that for modern intelligence tests the Flynn effect size was a similar 2.93 points per decade. These researchers concluded that their "findings are consistent with previous research and with the argument that it is feasible and advisable to correct IQ scores for the Flynn effect in high-stakes decisions" (p. 22).

The best available research syntheses consistently converge on a Flynn effect rule-of-thumb of 3 IQ test score points per decade (of IQ test norm obsolescence). Although

Case: 20-1900     Document: 38     Filed: 02/01/2021     Pages: 58

scientific journals may report Flynn effect results to the second decimal place (e.g., 3.11 per decade or 0.311 per year), the psychometrics of IQ testing and research cannot partition human behavior with such precision. As noted by Widaman (2007), much of the variation between scores from different Flynn effect studies is due to sampling and measurement error. Using Flynn effect adjustment formulae that use numbers to the second decimal place would be akin to slicing butter with a laser beam. Consequently, the current best estimate of IQ norm obsolescence, and the recommended Flynn effect adjustment, is 3 IQ points per decade, or 0.3 points per year.

### Researching the Flynn Effect "Black Box": Implications for Practice

Recently a significant portion of Flynn effect research has shifted from a focus on the secular changes in the global IQ test scores over time to changes on more specific intellectual abilities, possible differential effects by level of intelligence, and a search for the cause of the Flynn effect (Kaufman, 2010a). Zhou et al. (2010) characterized this shift to a focus on the "black box" of the Flynn effect.

**The cause of the Flynn effect.** In the context of the special articles in the 2010 *JPA* Flynn effect issue, Weiss (2010) stated that "Except for Flynn, there is general agreement . . . that we know precious little about the causes of the effect" (p. 487). Explanations and theories have touched on such causative variables as genetics, environmental factors (e.g., nutrition, education, improved public health, increased use of computer games), ethnicity, and different societal risks and benefits associated with different generations (Kaufman & Weiss, 2010; Weiss, 2010). Flynn (2007a), in his book *What Is Intelligence? Beyond the Flynn Effect*, suggests that the effect that bears his name is due to systematic shift in societies from concrete to abstract scientific thinking. Confounding the search for the cause(s) of the Flynn effect has been idiosyncratic and armchair-based speculations (Weiss, 2010).

In the current context, knowing that the Flynn effect exists trumps a lack of consensus regarding causation. The impact of norm obsolescence on IQ test scores is real and the professional consensus is that it should be accounted for in *Atkins* ID determination. Understanding the "why" of the Flynn effect is beyond the scope of the current chapter and is not necessary for recognizing the scientifically and professionally based consensus that IQ test scores suffering from norm obsolescence need to be adjusted in *Atkins* cases. As stated by Kaufman (2010b), "The Flynn effect is a fact, even if its cause is elusive, and it must be considered carefully when making high stakes decisions such as the death penalty" (p. 503).

**Differential Flynn effects by specific intellectual abilities.** The foundation of Flynn's (2007a) theoretical explanation of the Flynn effect is based primarily on the interpretation of differential rates of score changes as a function of different specific intellectual abilities (e.g., smaller gains on verbal and crystallized ability tasks and larger changes on visual-spatial and abstract fluid reasoning tasks—not a singular focus on the global IQ test score). If differential specific ability Flynn effects are eventually found to be valid, the potential implication is that different Flynn effect adjustments

may be recommended for different composite or cluster "part" scores in IQ tests, and not just the global IQ score. This would introduce a new layer of complexity in the interpretation of IQ test scores (and part scores) in *Atkins* cases.

Although the recent methodologically sophisticated attempt by Zhou et al. (2010) to examine differential ability Flynn effects within the Wechsler tests represents an important step forward in this area of inquiry, their research produced inconsistent and contradictory findings. Although differential specific ability Flynn effect findings may eventually be identified, currently the supporting research results are sparse, mixed in results, and suffer from significant measurement and methodological flaws (McGrew, 2010). The foundation of Flynn effect causal theory, which hinges on the presence of differential specific ability Flynn effects, has been questioned on logical, theoretical, measurement and methodological grounds (Kaufman, 2010a, 2010b; McGrew, 2010; Weiss, 2010). Currently the extant research is not mature enough to support differential specific-ability Flynn effect adjustments in clinical or forensic contexts.

**Differential Flynn effects by level of intelligence.** The use of the 3 IQ test score points per decade Flynn effect adjustment rule-of-thumb has been questioned by research suggesting that the Flynn effect may not be uniform across all levels of general intelligence (Kanaya & Ceci, 2007; Kanaya, Ceci, & Scullin, 2003; Sanborn et al. 2003; Zhou et al., 2010). More important has been the suggestion that the Flynn effect may be larger at the IQ score range at the threshold for ID diagnosis. Cunningham and Tassé (2010) have referred to this research as the investigation of the Flynn effect in the "zone of ambiguity" (IQ test scores from 71–80). Studies reviewed by Cunningham and Tassé (2010) report IQ per decade changes ranging from roughly 4 to 5 points in the zone of ambiguity. Zhou et al. (2010) also reported differential Flynn effects by level of intelligence, but the results were inconsistent in the directions of the variation and may differ for different tests or age groups.

Similar to the differential Flynn effect by specific ability research, the ability-specific research has not been fully vetted through a sufficiently large number of studies and has been questioned on methodological grounds (McGrew, 2010; Widaman, 2007; Zhou et al., 2010). As summarized by Weiss (2010), "a small number of studies have suggested differential Flynn effect by ability level, but not enough is known about this at present" (p. 492). Reynolds et al. (2010) reinforce this conclusion, when after commenting on the Zhou et al. (2010 differential Flynn effects by levels of intelligence findings, that the results were inconsistent and "for now, best practice is the application of the Flynn correction as a constant by year across the distribution" (p. 480). Until more studies replicate the possibility of larger Flynn effects near the ID diagnostic threshold, the 3 points per decade Flynn effect rule-of-thumb should be employed across all levels of general intelligence.

## Implications for Practice

The following implications are based on the integration of the content of the current chapter as well as the recommendations from the *User's Guide to the 10th edition*, the *11th edition*, and the *User's Guide to the 11th edition* (Schalock et al., 2007, 2010, 2012):

**First,**
eliminat(
When a
assessme
Assessm(
cation of
ferent IQ
of each p
selection

**Secon(**
obsolesce
of ID in *
norms sh(
norm obs

**Third,**
*ment = (I*
the date t
administe
Flynn effe
IQ score. '
treatment
of "roundi
employed
application
IQ tests or
profession;
the contra;
should be
across all l(

**Fourth,**
should be i
by assessm(

**Fifth,** th
supporting
as an autho

**Sixth,** v
reports, leg
of the term
a much m(
Flynn effec

**Seventh**
difference

**First,** the potential problem of norm obsolescence can be minimized, but not always eliminated, by assessment professionals using IQ tests with the most up-to-date norms. When a new version of an IQ battery is published (e.g., WAIS-IV replaces WAS-III), assessment professionals should use the newest version (WAIS-IV) in *Atkins* cases. Assessment professionals have an ethical responsibility to stay abreast with the publication of new versions of IQ batteries and when the option exists to select among different IQ tests to administer to an individual. The relative degree of norm obsolescence of each possible IQ test should be one important factor incorporated into the IQ test selection decision.

**Second,** in cases where current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn effect), and the scores are to be used as part of the diagnosis of ID in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence.

**Third,** the recommended formula for the Flynn effect adjustment is: *FE adjustment = (Date test administered – date test was normed) × 0.3*. Stated simply, subtract the date the IQ test was normed (see point seven below) from the date the test was administered to the individual, multiply the obtained difference by 0.3. The obtained Flynn effect adjustment value should then be subtracted from the inflated obtained IQ score. The final Flynn effect adjustment value should be an integer value. Thus, the treatment of decimals in the final value should adhere to standard mathematical rules of "rounding to the nearest integer." The rationale for the particular rounding strategy employed should be described in the report. Current research does not support the application of different Flynn effect adjustment values for different part scores on IQ tests or at different levels of general intelligence. The best scientific evidence and professional consensus is that until sufficient research evidence produces evidence to the contrary, the 3 points per decade (0.3 points per year) adjustment rule-of-thumb should be used only on the global IQ test score and should be employed uniformly across all levels of general intelligence.

**Fourth,** both the original obtained (unadjusted) and Flynn effect adjusted scores should be included in all reports or court related statements or declarations provided by assessment professionals.

**Fifth,** the rationale for employing a Flynn effect correction should be described with supporting references. This chapter is intended to serve this function and can be cited as an authoritative source for the use of the Flynn effect adjustment in reports.

**Sixth,** when writing and discussing the Flynn effect, such as in psychological reports, legal declarations, or expert testimony, professionals should make frequent use of the term *norm obsolescence* when explaining the Flynn effect. Norm obsolescence is a much more descriptive and understandable means for conveying the essence of the Flynn effect.

**Seventh,** the calculation of the years of norm obsolescence should be based on the difference between the year the test was administered to an individual and the best

estimate of the year the IQ test was *normed* (see also Chapters 7 and 8). The data of publication of an IQ test does not accurately capture the time period when the test norm data were gathered. For example, the WISC-R IQ test was published in 1974 and the WISC-R norm data was gathered on children from 6 through 16 years of age from 1971 through 1973 (Wechsler, 1974). Thus, the middle most year of the actual norm data collection period is 1972. For the WISC-R, the year 1972 should be subtracted from the date of testing to determine the number of years of norm obsolescence. The test norm years reported for the different IQ tests by Flynn (2009) are recommended for uniformity purposes. For tests not reported in Flynn (2009), professionals need to consult the technical manuals for the IQ test in question and establish the best year estimate that is at the middle of the norm data collection period. If not readily available, professionals should seek the expertise of the test authors, publisher, or other intelligence test experts who may possess this information.

This chapter concludes with an example from an *Atkins* case. In 1998 an individual was administered the WAIS-R and obtained a Full Scale IQ of 80. Despite knowing that the WAIS-R had been revised and published as the WAIS-III in 1997, the psychologist administered the WAIS-R despite 20 years of norm obsolescence. The WAIS-R was published in 1981 and the best estimate of the date the actual test norms were gathered, as per the recommended procedures above, is 1978. Thus, the difference between the date of WAIS-R testing (1998) and date of test norming (1978) was 20 years, Using the 0.3/year Flynn effect adjustment, the best estimate of the magnitude of IQ test score inflation due to norm obsolescence is 6 IQ test score points ($0.3 \times 20 = 6.0$). Thus, this individual's Flynn effect adjusted WAIS-R score is 74 ($80 - 6 = 74$). This example represents one of the most dramatic instances of norm obsolescence (20 years) and also reflects the fact that the examiner did not engage in proper practice by administering the WAIS-III which was available at the time the individual was assessed.

Refere:

America:
  Coun-
  *testin*
Atkins v.
Batterjee
  Arabi
Baxendal
  *tal Ne*
Cunning
  ing I(
  413–4
Fletcher,
  in hig
Flynn, J.
  *letin*,
Flynn, J.
  tion?
Flynn, J.
  *Psych*
Flynn, J.
  *Publi*
Flynn, J.
  Unive
Flynn, J.
  *Psych*
Flynn, J.
  appro
Flynn, J.
  datio:
  *reviev*
Greensp:
  MR, i
Greensp:
  Moor
Gresham
  penal
  1934-
Hagan, l
  the Fl
  474-
Hagan, l
  repor
Kanaya,
  intell
  doi: 1

e data of pub-
he test norm
1974 and the
ge from 1971
orm data col-
cted from the
The test norm
ed for unifor-
to consult the
stimate that is
professionals
ce test experts

an individual
knowing that
e psychologist
WAIS-R was
were gathered,
e between the
ears, Using the
f IQ test score
) = 6.0). Thus,
This example
years) and also
administering
d.

## References

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).

Batterjee, A. A., Khaleefa, O., Ali, K., & Lynn, R. (2013). An increase in intelligence in Saudi Arabia, 1977–2010. *Intelligence, 41*(2), 91–93. doi: 10.1016/j.intell.2012.10.011

Baxendale, S. (2010). The Flynn effect and memory function. *Journal of Clinical and Experimental Neuropsychology, 32*(7), 699–703. doi: 10.1080/13803390903493515

Cunningham, M. D., & Tassé, M. J. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. *Professional Psychology: Research and Practice, 45*(5), 413–419. doi: 10.1037/a0020226

Fletcher, J., Stuebing, K., & Hughes, L. (2010). IQ scores should be corrected for the Flynn effect in high stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469–473.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95,* 29–51.

Flynn, J. R. (1985). Wechsler Intelligence Tests: Do we really have a criterion of mental retardation? *American Journal of Mental Deficiency, 90*(3), 236–244.

Flynn, J. R. (2000). The hidden history of IQ and special education: Can the problems be solved? *Psychology Public Policy and Law, 6*(1), 191–198.

Flynn, J. R. (2006). Tethering the elephant: Capital cases, IQ, and the Flynn effect. *Psychology, Public Policy, and Law, 12,* 170–189. doi:10.1037/1076-8971.12.2.170

Flynn, J. R. (2007a). *What is intelligence? Beyond the Flynn effect.* New York: Cambridge University Press.

Flynn, J. R. (2007b). Capital offenders and the death sentence: A scandal that must be addressed. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 3–7.

Flynn, J. R. (2009). The WAIS-III and WAIS-IV: *Daubert* motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16,* 98–104. doi: 10.1080/09084280902864360

Flynn, J. R., & Widaman, K. F. (2008). The Flynn effect and the shadow of the past: Mental retardation and the indefensible and indispensible role of IQ. In L. M. Glidden (Ed.), *International review of mental retardation* (Vol. 35, pp. 121–149). Boston, MA: Elsevier.

Greenspan, S. (2006). Issues in the use of the "Flynn effect" to adjust IQ scores when diagnosing MR. *Psychology in Mental Retardation and Developmental Disabilities, 31*(3), 3–7.

Greenspan, S. (2007). Flynn-adjustment is a matter of basic fairness: Response to Roger B. Moore, Jr. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 7–8.

Gresham, F., & Reschly, D. J. (2011). Standard of practice and Flynn effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131–140. doi: 10.1352/1934-9556-49.3.131

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010a). IQ Scores should not be adjusted for the Flynn effect in capital punishment cases. *Journal of Psychoeducational Assessment, 28*(5), 474–476. doi: 10.1177/0734282910373343

Hagan, L. D., Drogin, E. Y., & Guilmette, T. J. (2010b). Science rather than advocacy when reporting IQ scores. *Professional Psychology Research and Practice, 41*(5), 420–423.

Kanaya, T., & Ceci, S. J (2007). Mental retardation diagnosis and the Flynn effect: General intelligence, adaptive behavior, and context. *Child Development Perspectives, 1*(1), 62–63. doi: 10.1111/j.1750-8606.2007.00013.x

PA0641

Kanaya, T., & Ceci, S. J (2011). The Flynn effect in the WISC subtests among school children tested for special education services. *Journal of Psychoeducational Assessment, 29*(2), 125–136. doi:10.1177/0734282910370139

Kanaya, T., & Ceci, S. (2012). The impact of the Flynn effect on LD diagnoses in special education. *Journal of Learning Disabilities, 45*(4), 319–326. doi: 10.1177/0022219410392044

Kanaya, T., Ceci, S. J., & Scullin, M. H. (2003). The rise and fall of IQ in special ed: Historical trends and their implications. *Journal of School Psychology, 41*(6), 453–465. doi:10.1016/j.jsp.2003.08.003

Kaufman, A. (2010a). "In what way are apples and oranges alike?": A Critique of Flynn's interpretation of the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 382–398. doi: 10.1177/0734282910373346

Kaufman, A. (2010b). Looking through Flynn's rose-coloured scientific spectacles. *Journal of Psychoeducational Assessment, 28*(5), 494–505. doi: 10.1177/0734282910373573

Kaufman, K., & Weiss, L. (2010). Guest editor's Introduction to the special issue of *JPA* on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 379–381. doi:10.1177/0734282910373344

Lynn, R. (1983). IQ in Japan and the United States shows a growing disparity. *Nature, 306*, 291–292.

Lynn, R. ( 2013). Who discovered the Flynn effect? A review of early studies of the secular increase in intelligence. *Intelligence,41*(6), 765–769. doi: 10.1016/j.intell.2013.03.004

McGrew, K. (2010). The Flynn effect and its critics: Rusty linchpins and "lookin' for *g* and Gf in some of the wrong places." *Journal of Psychoeducational Assessment, 28*(5), 448–468. doi:10.1177/0734282910373347

McVaugh, G. S., & Cunningham, M. D. (2009). Atkins v. Virginia: Implications and recommendations for forensic practice. *The Journal of Psychiatry and Law, 37*, 131–187.

Nijenhuis, J. T. (2013). The Flynn effect, group differences, and *g* loadings. *Personality and Individual Differences*, 55, 224–228. doi:10.1016/j.paid.2011.12.023

Nijenhuis, J. T., Cho, S. H., Murphy, R., & Lee., K. H. (2012). The Flynn effect in Korea: Large gains. *Personality and Individual Differences, 53*(2), 147–151. doi: 10.1016/j.paid.2011.03.022

Nijenhuis, J. T., Murphy, R., & van Eeden, R. (2011). The Flynn effect in South Africa. *Intelligence, 39*(6), 456–467.

Nijenhuis, J. T., & van der Flier, H. (2013). Is the Flynn effect on g? A meta-analysis. *Intelligence*, 41, 802–807.

Nijman, E. E., Scheirs, J. G., Prinsen, M. J., Abbink, C. D., & Blok, J. B. (2010). Exploring the Flynn effect in mentally retarded adults using a nonverbal intelligence test for children. *Research in Developmental Disabilities, 31*, 1404–1411. doi: 10.1016/j.ridd.2010.06.018

Reynolds, C., Niland, J., Wright, J., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. *Journal of Psychoeducational Assessment, 28*(5), 477–481.

Rindermann, H., Schott, T., & Baumeister, A. (2013). Flynn effect in Turkey: A comment on Kagitcibasi and Biricik (2011). *Intelligence, 41*, 178–180. doi: 10.1016/j.intell.2013.02.003

Rodgers, J. L. (1999). A critique of the Flynn effect: Massive IQ gains, methodological artifacts, or both? *Intelligence, 26*(4), 337–356.

Rönnlund, M., Carlstedt, B., Blomstedt, Y., Nilsson, L. G., & Weinehall, L. (2013). Secular trends in cognitive test performance: Swedish conscript data 1970–1993. *Intelligence, 41*(1), 19–24.

Runquist, E. A. (1936). Intelligence test scores and school marks in 1928 and 1933. *School and Society, 43*, 301–304.

Case: 20-1900    Document: 38    Filed: 02/01/2021    Pages: 58

Sanborn, K. J., Truscott, S. D., Phelps, L., & McDougal, J. L. (2003). Does the Flynn effect differ by IQ level in samples of students classified as learning disabled? *Journal of Psychoeducational Assessment, 21*(2), 145–159.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S. A., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's guide to mental retardation: Definition, classification, and systems of supports (10th ed.).* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Borthwick-Duffy, S. A., Bradley, V. J., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Gomez, S. C., Lachapelle, Y., Luckasson, R., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tassé, M. J., Thompson, J. R., Verdugo-Alonso, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and systems of supports (11th ed.).* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Luckasson, R., Bradley, V., Buntinx, W. H. E., Lachapelle, Y., Shogren, K. A., Snell, M. E., Thompson, J. R., Tassé, M. J., Verdugo-Alonso, M. A., and Wehmeyer, M. L. (2012). *User's guide to intellectual disability: Definition, classification, and systems of supports.* Washington, DC: American Association on Intellectual and Developmental Disabilities.

Skirbekk, V., Stonawski, Bonsang, E., & Staudinger, U. M. (2013). The Flynn effect and population aging. *Intelligence, 41*(3), 169–177. doi: 10.1016/j.intell.2013.02.001

Sternberg, R. (2010). The Flynn effect: So what? *Journal of Psychoeducational Assessment, 28*(5), 434–440. doi: 10.1177/0734282910373349

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014, June 30). The Flynn effect: A meta-analysis. *Psychological Bulletin.* Advance online publication. http://dx.doi.org/10.1037/a0037173

Truscott, S. D., & Frank, A. J. (2001). Does the Flynn effect affect IQ scores of students classified as LD? *Journal of School Psychology, 39*(4), 319–334.

Wai, J., & Putallaz, M. (2011). The Flynn effect puzzle: A 30-year examination from the right tail of the ability distribution provides some missing pieces. *Intelligence, 39*(6), 443–455. doi:10.1016/j.intell.2011.07.006

Wechsler, D. (1974). *The Wechsler Intelligence Scale for Children—Revised (WISC-R).* San Antonio,TX: Psychological Corporation.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment, 28*(5), 482–493. doi: 10.1177/0734282910373572

Widaman, K. (2007). Stalking the roving IQ score cutoff: A commentary on Kanaya and Ceci (2007). *Child Development Perspectives,1(1),*57–59. doi: 10.1111/j.1750-8606.2007.00011..x

Woodley, M. A. (2011). Heterosis doesn't cause the Flynn effect: A critical examination of Mingroni (2007). *Psychological Review, 118*(4), 689–693. doi: 10.1037/a0024759

Woodley, M. A. (2012a). A life history model of the Lynn-Flynn effect. *Personality and Individual Differences, 53*(2), 152–156. doi: 10.1016/j.paid.2011.03.028

Woodley, M. A. (2012b). The social and scientific temporal correlates of genotypic intelligence and the Flynn effect. *Intelligence, 40*(2), 189–204. doi:10.1016/j.intell.2011.12.002

Young, G. W. (2012). A more intelligent and just *Atkins:* Adjusting for the Flynn effect in capital determinations of mental retardation or intellectual disability. *Vanderbilt Law Review,* 615–755.

Zhou, X., Zhu, J., & Weiss, L. (2010). Peeking inside the "blackbox" of the Flynn effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment, 28*(5), 399–411.

Vandenbos, G. (2007). *APA dictionary of psychology.* Washington, DC: American Psychological Association.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

UNITED STATES OF AMERICA,  )   CR. NO. 4:02-992

)   COLUMBIA, SC

)   JUNE 23, 2004

)

VERSUS                     )

)

CHADRICK E. FULKS          )

DEFENDANT.            )

)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.

CHIEF UNITED STATES DISTRICT COURT JUDGE

JURY TRIAL

VOLUME XVII

APPEARANCES:

FOR THE GOVERNMENT:        STROM THURMOND, JR., USA

SCOTT SCHOOLS, AUSA

JONATHAN S. GASSER, AUSA

UNITED STATES ATTORNEY'S OFFICE

1441 MAIN STREET, SUITE 500

COLUMBIA, SC  29201

FOR THE DEFENDANT:

WILLIAM F. NETTLES, IV, AFPD

FEDERAL PUBLIC DEFENDER'S OFFICE

MCMILLAN FEDERAL BUILDING

401 WEST EVANS STREET, ROOM 240

FLORENCE, SC 29503

JOHN H. BLUME, III, ESQ.

BLUME AND WEYBLE

P. O. BOX 11744

COLUMBIA, SC  29211

SHERRI LYNN JOHNSON, ESQ.

1118 AUTUMN RIDGE LANE

ITHACA, NEW YORK 14850

COURT REPORTER:        DEBRA R. JERNIGAN, RPR, CRR

UNITED STATES COURT REPORTER

901 RICHLAND STREET

COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

*** *** *** *** ***

INDEX

JURY TRIAL TRANSCRIPT VOLUME XVII  6/23/2004

JAMES EVANS

    DIRECT EXAM BY MR. BLUME          5

    CROSS EXAM BY MR. SCHOOLS        29

    REDIRECT EXAM BY MR. BLUME      68

CINDY HARPER

    DIRECT EXAM BY MR. BLUME         72

GAYLE WOLFE

    DIRECT EXAM BY MR. BLUME         75

    CROSS EXAM BY MR. GASSER        80

MARTHA FLOYD

    DIRECT EXAM BY MR. BLUME         83

    CROSS EXAM BY MR. MASSER        87

SUE HATCHER

    DIRECT EXAM BY MS. JOHNSON      94

    CROSS EXAM BY MR. GASSER      104

HOWARD BECKER

    DIRECT EXAM BY MR. BLUME      109

    CROSS EXAM BY MR. SCHOOLS     151

    REDIRECT EXAM BY MR. BLUME    164

    RECROSS EXAM BY MR. SCHOOLS   167

JOSEPH JONES

    DIRECT EXAM BY MS. JOHNSON    180

    CROSS EXAM BY MR. GASSER    185

    REDIRECT EXAM BY MS. JOHNSON   188

                 INDEX

DINA JONES

DIRECT EXAM BY MS. JOHNSON                    192

CROSS EXAM BY MR. GASSER                       197

REDIRECT EXAM BY MS. JOHNSON                  203

HEATHER JACOBI

DIRECT EXAM BY MR. NETTLES                     203

CROSS EXAM BY MR. GASSER                       206

REDIRECT EXAM BY MR. NETTLES                   208

EXHIBITS

| DEFENDANT'S | ID | EVD |
|---|---|---|
| 9 EEG PRINTOUT (FOR DEMONSTRATIVE PURPOSES ONLY) | 23 | |
| 10 PHOTO OF FULK NOVEMBER 2002 | | 204 |

DIRECT EXAM OF JAMES EVANS

Q.    AND DID YOU -- SO DR. VENN, HUELKE, BUTNER. DID YOU ALSO REVIEW SOME TESTING THAT WAS CONDUCTED BY DR. RUBEN GUR?

A.    DR. RUBEN GUR, YES.

Q.    DID YOU ALSO REVIEW A REPORT WHICH WAS DONE BY THE FEDERAL MEDICAL CENTER IN LEXINGTON, KENTUCKY, IN 1998?

A.    YES.  THE OLDER ONE, YES.

Q.    SO, YOU ADMINISTERED A BATTERY OF TESTS TO MR. FULKS, AND THEN YOU REVIEWED THIS TESTING?

A.    THAT'S CORRECT.

Q.    AND WAS THE BATTERY OF TESTS YOU ADMINISTERED, WERE THESE SOME THAT YOU JUST THOUGHT UP, OR ARE THEY PART OF AN ACCEPTED -- COMMONLY ACCEPTED BATTERY OF TESTS?

A.    WELL, THEY WERE PARTS OF COMMONLY ACCEPTED BATTERY, AS WELL AS A COUPLE THAT I DIDN'T JUST THINK UP, THAT I HAVE BEEN USING FOR A LONG TIME, WELL-ESTABLISHED AS MEASURES OF NEUROPSYCHOLOGICAL FUNCTIONING.

Q.    WHEN WE TALK ABOUT -- I GUESS, WHAT DOES A BATTERY OF TESTS MEAN, IF YOU CAN EXPLAIN THAT TO THE JURY?

A.    A BATTERY OF TESTS? WELL, USUALLY IT WOULD BE LIKE IF YOU WERE GOING IN FOR A PHYSICAL AND THEY WOULD DO NOT ONLY A BLOOD TEST, BUT A URINE TEST, AND CHECK YOUR EKG, AND MAYBE EEG. IN OTHER WORDS, IT WOULD BE A LARGE GROUP OF TESTS THAT THEY WOULD DO TO TRY TO GET A LARGER PICTURE OF YOUR TOTAL SELF AS IF YOU WERE -- WHEN YOU GO FOR A PHYSICAL EXAM.

Q.    SO, CAN YOU -- WHAT I WANT TO FIRST START OUT AND JUST

**DIRECT EXAM OF JAMES EVANS**

**HAVE YOU TALK TO THE JURY ABOUT ARE THE RESULTS OF THE TESTS THAT YOU ADMINISTERED.   AND SO, YOU ADMINISTERED THIS BATTERY.  FIRST, TELL THE JURY, WHAT WERE THE RESULTS OF YOUR TESTING?**

A.    IN THE BROAD VIEW OF IT?

**Q.    YES.**

A.    OKAY.   WELL, I ADMINISTERED A FEW OF THE SUBTESTS FROM THE INTELLIGENCE TEST THAT HAD BEEN ADMINISTERED EARLIER BECAUSE EARLIER PERSONS HAD FOUND -- AND THEY HAVE WHAT WE OFTEN CALL BORDERLINE INTELLIGENCE, BETWEEN LOW TO NORMAL AND MENTAL RETARDATION.   AND SINCE HE HAD ALREADY HAD THIS TEST TWO TIMES, I THOUGHT THERE MAY BE SOME PRACTICE EFFECT.  I DIDN'T WANT TO GIVE THE WHOLE TEST RIGHT AWAY THAT QUICKLY. SO,  I JUST ADMINISTERED CERTAIN OF THE SUBTESTS.   THOSE SUBTESTS CAME OUT WITH THE SAME GENERAL RANGES BUT FOUND BY TWO EARLIER PEOPLE.

**Q.    THAT WAS BORDERLINE INTELLECTUAL?**

A.    BORDERLINE INTELLECTUAL FUNCTIONING, YES.   IT WOULD BE, IN TERMS OF AN IQ SCORE,  WOULD HAVE BEEN A 75 TO 79 RANGE.   THEN I ALSO GAVE HIM A READING TEST BECAUSE, ORDINARILY, PEOPLE, UNLESS THEY HAVE A SPECIFIC LEARNING DISABILITY,  A READING TEST WILL PROVIDE SOME INFORMATION REGARDING GENERAL ABILITY.  HE CAME OUT WITH QUOTIENT OF 7TH TO 6TH GRADE LEVEL.  SO, THAT QUOTIENT WAS IN LINE WITH IQ FINDINGS.

DIRECT EXAM OF JAMES EVANS

AND THEN I ADMINISTERED A GROUP OF TESTS WHICH ARE USUALLY QUITE EASY FOR MOST PEOPLE TO DO ALL RIGHT ON, PROVIDED THEY DON'T HAVE BRAIN DAMAGE OR SOME OTHER PROBLEM OF THE BRAIN. AND IF YOU DO HAVE CERTAIN BRAIN DISORDERS, THEN YOU DON'T DO WELL ON THEM. I DON'T MEAN TO SAY YOU DON'T DO WELL ON ANY OF THEM BECAUSE, ORDINARILY, WHEN YOU HAVE A PROBLEM WITH YOUR BRAIN, IT ISN'T COMPREHENSIVE UNLESS YOU ARE IN A COMA. SOME AREAS ARE SPARED, SOME ABILITIES THAT ARE SPARED, SOME WHICH ARE DEFECTIVE. AND SO, YOU TEND TO HAVE A PATTERN OF PASSING, FAILING -- PASSING OR FAILING OF THESE NEUROPSYCHOLOGICAL TESTS.

HE HAD SOME SPECIFIC PROBLEMS ON THOSE TESTS THAT WERE OF THE TYPE SUGGESTIVE THAT THE FRONTAL LOBES OF HIS BRAIN, THE FRONT PART OF THE BRAIN WAS MALFUNCTIONING, AS WELL AS LEFT TEMPORAL, BE RIGHT IN THIS AREA, AS WELL AS SOME POSSIBILITY FROM MY TESTING OF OCCIPITAL OR POSTERIOR ON THE BACK PART OF THE BRAIN MALFUNCTIONING.

**Q. DR. EVANS, LET ME ASK YOU, IF YOU CAN EXPLAIN TO THE JURY, WHAT IS THE HALSTEAD-REITAN NEUROPSYCHOLOGICAL BATTERY?**

A. THE HALSTEAD-REITAN NEUROPSYCHOLOGICAL BATTERY IS ONE OF THE -- NOT ONE OF THE, BUT IS THE OLDEST BATTERY USED FOR THIS TYPE TESTING. AND IT HAS BEEN AROUND SINCE, PROBABLY, IN THE SIXTIES. IT HAS BEEN REFINED SOME, AND IT WAS NAMED AFTER HALSTEAD, WHO WAS A NEUROLOGIST, AND REITAN, WHO IS A PSYCHOLOGIST, NOW BE CALLED A NEUROPSYCHOLOGIST. AND THEY

DIRECT EXAM OF JAMES EVANS

DEVISED THESE TESTS AND STARTED USING THEM CLINICALLY IN THE LATE FIFTIES OR EARLY SIXTIES FOR CHECKING PERSONS TO SEE IF THEY HAD BRAIN DAMAGE OR BRAIN DYSFUNCTION.

Q.   OKAY.   AND SO, THIS IS, BASICALLY, A BATTERY OF TESTS WHICH HAS BEEN DESIGNED BY EXPERTS TO DETERMINE, NOT ONLY IF SOMEONE HAS A BRAIN DAMAGE OR NEUROLOGICAL IMPAIRMENT,  BUT IN SOME CASES, IT CAN PROVIDE EVIDENCE OF WHERE THE DAMAGE MIGHT BE?

A.   RIGHT.   BECAUSE SOME OF THESE TESTS REQUIRES SKILLS WHICH ARE MEDIATED BY, SAY, THE FRONTAL LOBES, AND ANOTHER OF THE SUBTESTS OR PARTS OF THE BATTERY ARE REQUIRED SKILLS THAT ARE PRIMARILY MEDIATED BY THE TEMPORAL LOBES, MAY BE MEDIATED BY OCCIPITAL LOBES, AND SO ON.

Q.   YOU ADMINISTERED THIS BATTERY OF TESTS.  IT IS A PRETTY SET BATTERY OF TESTS?

A.   I DID NOT ADMINISTERE THE ENTIRE BATTERY.  I ADMINISTERED THE ONES THAT ARE AMONG THOSE SENSITIVE TO THE CORTICAL MALFUNCTIONING.

Q.   YOU TAKE THESE TESTS.  DO YOU THEN COME UP WITH SOMETHING CALLED AN IMPAIRMENT INDEX?

A.   YES.   TWO THINGS YOU DO.  FIRST, YOU COMPARE THE SCORES AGAINST A DATABASE,  A NORMAL DATABASE,  PERSONS WHO DID NOT HAVE ANY HEAD INJURY AND WITH A HISTORY OF BRAIN DAMAGE, AND THIS GIVES YOU AN IDEA OF HOW FAR OFF THEY WERE FROM NORMAL.   AND THEN THERE ARE SIX I BELIEVE OF THE  --

DIRECT EXAM OF JAMES EVANS

SEVEN OF THE SUBTESTS WHICH ARE ESPECIALLY SENSITIVE TO BRAIN DAMAGE.  AND THE SCORES ON THOSE ARE CONSIDERED AND CHECKED TO SEE IF THE SCORES FALL BELOW A CERTAIN CUTOFF POINT.  AND IF THEY DO, LET'S SAY THEY FALL BELOW A CERTAIN CUTOFF POINT ON FIVE OF THE SEVEN,  THEN YOU WOULD PUT FIVE OVER SEVEN AND DIVIDE IT OUT TO GET A SO-CALLED IMPAIRMENT INDEX.  AND IF YOU HAD THREE OVER SEVEN OR ONE, IT WAS ONLY ONE OVER SEVEN, THE IMPAIRMENT INDEX, IT WOULD BE CONSIDERED NOT REMARKABLE. IF YOU HAD FOUR OVER SEVEN, IT WOULD BE SOMEWHAT REMARKABLE, ET CETERA.  AND THE IMPAIRMENT INDEX RESULTS IN STATEMENTS SUCH AS NO SIGNIFICANT IMPAIRMENT,  MILD IMPAIRMENT,  MODERATE IMPAIRMENT,  SEVERE IMPAIRMENT.  HIS WAS A POINT SIX,  I BELIEVE THAT IS CORRECT ON HERE, AND IT WOULD BE IN THE MODERATE IMPAIRMENT RANGE.

Q.    AND THE MODERATE IMPAIRMENT RANGE?

A.    MODERATE BRAIN IMPAIRMENT.

Q.    SO THEN, TO SUMMARIZE WHERE WE ARE NOW,  YOU DETERMINED, BASED ON YOUR TESTING, HE TESTED IN THE BORDERLINE RANGE?

A.    YES.

Q.    WHICH IS CONSISTENT WITH WHAT YOU HAD SEEN FROM DR. VENN AND DR. HUELKE?

A.    YES.

Q.    AND THEN THE NEUROPSYCHOLOGICAL BATTERY YOU ADMINISTERED DETERMINED THAT, IN ADDITION TO THE BORDERLINE

**DIRECT EXAM OF JAMES EVANS**

**INTELLECTUAL FUNCTIONING, THERE WERE SOME AREAS OF SPECIFIC DAMAGE TO THE FRONTAL LOBE AND THE -- I'M SORRY, THE FRONTAL, AS WELL AS, LEFT REGION?**

A.    AS WELL AS THE OCCIPITAL,  YES, SIR.

**Q.    WHAT WOULD, BASED ON YOUR RESEARCH AND YOUR KNOWLEDGE OF HOW THE BRAIN WORKS AND, YOU KNOW, HOW YOU UNDERSTAND THESE TESTS WORK, WHAT WOULD BE THE EFFECTS ON AN INDIVIDUAL,  YOU KNOW,  REALLY,  THE RANGE OF EFFECTS YOU WOULD EXPECT TO SEE ON SOMEBODY WITH THIS TYPE OF BRAIN IMPAIRMENT?**

A.    RIGHT.  ONE OF THE MAIN EFFECTS WOULD BE THAT HE WOULD HAVE PROBLEMS WITH WHAT SOME PEOPLE REFER TO AS EXECUTIVE FUNCTIONS.

**Q.    CAN YOU DUMB THAT DOWN A LITTLE BIT?  THAT DOESN'T MEAN MUCH TO ME.   WHAT DOES IT MEAN WHEN YOU SAY THE "EXECUTIVE FUNCTIONS?"**

A.    MOST OF US CONSIDER THAT WE HAVE OUR OWN -- WE ARE OUR OWN CEOS.  WE ARE IN CHARGE OF OUR BEHAVIORS.  THAT WE DECIDE WE WILL DO THIS, AND WE DO IT.  WE PLAN TO DO SOMETHING, AND WE FOLLOW THROUGH WITH THE PLAN.  WE SAY IT IS BECAUSE WE DECIDED TO DO SO.  IF WE DON'T FOLLOW THROUGH, YOU MIGHT SAY, BECAUSE WE DECIDED NOT TO.   SO,  IN THAT SENSE, WE ARE OUR OWN CEO'S.  AND THAT IS THESE EXECUTIVE FUNCTIONS THAT ARE, SUPPOSEDLY, WHAT WE CALL EXECUTIVE FUNCTIONS.  THESE ARE IMPAIRED IN PERSONS WHO HAVE FRONTAL LOBE DAMAGE BECAUSE THE FRONTAL LOBE IS WHAT CONTROLS, LARGELY, OUR ABILITY TO BE OUR

DIRECT EXAM OF JAMES EVANS

OWN CEO'S.

Q.    OKAY.

A.    MORE SPECIFICALLY, WHAT HAPPENS IF YOU HAVE DAMAGE TO THE FRONTAL LOBES,  AT LEAST CERTAIN TYPES OF DAMAGE TO THE FRONTAL LOBES, IS THAT YOU HAVE A TENDENCY TO ACT IMPULSIVELY. THAT IS NOT THINKING ABOUT THE CONSEQUENCES OF YOUR ACTIONS, THAT IS ONE THING.

ANOTHER THING, IS YOU VERY LIKELY DON'T LACK FLEXIBILITY OF THOUGHT.  IN OTHER WORDS,  YOU HEAR PEOPLE SAYING, WELL, YOU HAVE TO THINK OUTSIDE THE BOX.  WELL,  THAT IS NOT POSSIBLE OR VERY,  VERY DIFFICULT FOR PERSONS WITH FRONTAL LOBE DAMAGE.  IN FACT, THEY MIGHT HAVE TROUBLE EVEN THINKING IN THE BOX.  SO,  THEY END UP HAVING SOME TROUBLE WITH SPEED OF LEARNING AND WITH BEING CREATIVE.  SOMETIMES YOU GET STUCK ON ONE AREA AND THEN CONTINUE TO ENGAGE IN SOME BEHAVIOR, EVEN THOUGH IT IS MALADAPTIVE,  EVEN THOUGH IT IS NOT GETTING ANYWHERE.  THEY MIGHT CONTINUE TO DO IT.

A THIRD THING IS THAT THEY OFTEN FAIL TO PLAN AHEAD.  IT DOESN'T MEAN THEY ALWAYS FAIL TO PLAN AHEAD BUT HAVE A TENDENCY TO FAIL TO PLAN AHEAD.

AND, FINALLY, THEY FAIL TO ATTEND TO OR THEY HAVE TROUBLE ATTENDING, GENERALLY, AND THAT INCLUDES FAILING TO ATTEND VERY WELL TO THEIR OWN BEHAVIORS.  SO,  IT IS ALMOST LIKE THEY DO SOMETHING AND THEN NOT AWARE THAT THEY DID IT.

AND THIS FAILURE TO ATTEND TO YOUR OWN BEHAVIORS AND ALL

DIRECT EXAM OF JAMES EVANS

OF THESE OTHER THINGS THAT I JUST MENTIONED AS EXECUTIVE CONTROL PROBLEMS, LEAD TO WHAT AN OUTSIDER MIGHT LOOK AT THE PERSON THAT HAS POOR JUDGMENT.  AND THAT IS WHAT IT IS,  POOR JUDGMENT.  THIS WILL BE MADE WORSE BY USE OF ALCOHOL.  IT CAN BE MADE A LOT WORSE WHEN YOU ARE UNDER STRESS.  AND IT CAN BE MADE WORSE IF YOU -- PERSONS IN YOUR ENVIRONMENT NEVER TAUGHT YOU HOW TO PUT ON THE BRAKES VERY WELL.

**Q.    SO THEN, AS I UNDERSTAND IT, IF YOU HAD THIS TYPE OF NEUROLOGICAL IMPAIRMENT, YOU EXPECT TO SEE IMPULSIVE ACTING, IMPULSIVE BEHAVIOR?**

A.    THAT IS FRONTAL LOBE PART, YES, SIR.

**Q.    AND BAD JUDGMENT,  BAD DECISION-MAKING?**

A.    YES, SIR.

**Q.    NOT TRYING TO PUT WORDS IN YOUR MOUTH?**

A.    THAT'S TRUE.

**Q.    AND YOU TALKED ABOUT COGNITIVE RIGIDITY OR FLEXIBILITY OR SOMETHING.  THAT IS A TWO-DOLLAR WORD.  WHAT DOES THAT MEAN?**

A.    WELL,  AS I WAS EXPLAINING EARLIER,  IT LOWERS ONE'S ABILITY TO THINK FLEXIBLY.  YOU START TO DO SOME TASK AND, INSTEAD OF BEING FLEXIBLE ABOUT IT AND THINKING, WELL,  IF I CAN'T DO IT THIS WAY, MAYBE I CAN DO IT THIS WAY, OR THIS WOULD BE A BETTER WAY TO DO IT.  I GET BETTER RESULTS IF I DO IT THAT WAY.  YOU JUST GET RIGID AND KEEP ON HAMMERING AT THE SAME -- TRYING TO DO IT THE SAME WAY, EVEN THOUGH IT IS NOT

DIRECT EXAM OF JAMES EVANS

SUCCEEDING.  WE CHECKED THAT.

ONE WAY WE CHECK IT IN THE REITAN TEST BATTERY, THE PERSON IS BLINDFOLDED, AND THEY ARE SUPPOSED TO PUT BLOCKS IN HOLES. AND SOMETIMES THEY, INSTEAD OF REACHING OUT AND FEELING THE HOLE AND THEN REACHING DOWN AND GETTING A BLOCK, THEY WILL KEEP TRYING TO PUT THE BLOCK IN THE SAME HOLE.  THAT IS ONE OF THE WAYS OF CHECKING IT.

**Q.    NOW,  DID YOU ALSO ADMINISTER TO MR. FULKS WHAT IS CALLED A QUANTITATIVE EEG?**

A.    YES,  I DID.

**Q.    AND CAN YOU TELL THE JURY WHAT A QUANTITATIVE EEG IS?**

A.    MOST PEOPLE REALIZE OR HAVE HAD SOMEBODY, OR HAD IT THEMSELVES, OR THEY REALIZE THAT IT EXISTS FROM HAVING A RELATIVE HAVING HAD TO GO AND GET AN EEG DONE.  AN EEG EVALUATION IS THE ELECTRICAL ACTIVITY OF YOUR BRAIN.  IT IS LIKE AN EKG, IN A SENSE, WHERE YOU HAVE ELECTRICAL ACTIVITY OF YOUR HEART BEING MEASURED WITH AN EKG,  BUT HERE, IT IS THE BRAIN ELECTRICAL ACTIVITY.  ORDINARILY, IN THE PAST, ONE WOULD GO TO A NEUROLOGIST, AND THEY WOULD SEND THEM OUT TO HAVE AN EEG DONE.  AND WHAT IT WOULD BE IS,  IT WOULD BE A CONTINUOUSLY MOVING PAPER WITH ALL OF THESE PENS ON THE TOP THAT ARE GOING UP AND DOWN, UP AND DOWN, UP AND DOWN IN CORRESPONDENCE TO THE BRAIN ELECTRICAL ACTIVITY, WHICH IS GOING POSITIVE, NEGATIVE,  POSITIVE, NEGATIVE.  IT CREATES A TRACING ON THIS PAPER.

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF SOUTH CAROLINA
                          FLORENCE DIVISION

UNITED STATES OF AMERICA,  )    CR. NO. 4:02-992
                           )    COLUMBIA, SC
                           )    JUNE 16, 2004
                           )
   VERSUS                  )
                           )
CHADRICK E. FULKS          )
       DEFENDANT.          )
                              )

           BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
             CHIEF UNITED STATES DISTRICT COURT JUDGE
                            JURY TRIAL
                           VOLUME XII

APPEARANCES:

FOR THE GOVERNMENT:        STROM THURMOND, JR., USA
                           SCOTT SCHOOLS, AUSA
                           JONATHAN S. GASSER, AUSA
                           UNITED STATES ATTORNEY'S OFFICE
                           1441 MAIN STREET, SUITE 500
                           COLUMBIA, SC  29201

FOR THE DEFENDANT:
                           WILLIAM F. NETTLES, IV, AFPD
                           FEDERAL PUBLIC DEFENDER'S OFFICE
                           MCMILLAN FEDERAL BUILDING
                           401 WEST EVANS STREET, ROOM 240
                           FLORENCE, SC 29503
                           JOHN H. BLUME, III, ESQ.
                           BLUME AND WEYBLE
                           P. O. BOX 11744
                           COLUMBIA, SC  29211

                           SHERRI LYNN JOHNSON, ESQ.
                           1118 AUTUMN RIDGE LANE
                           ITHACA, NEW YORK 14850

COURT REPORTER:            DEBRA R. JERNIGAN, RPR, CRR
                           UNITED STATES COURT REPORTER
                           901 RICHLAND STREET
                           COLUMBIA, SC 29201
           STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                  *** *** *** *** ***

INDEX

RHONDA CRAIG

    DIRECT EXAM BY MR. SCHOOLS      4

    CROSS EXAM BY MR. NETTLES      28

RUBEN GUR

    DIRECT EXAM BY MR. BLUME      31

    CROSS EXAM BY MR. GASSER      141

    REDIRECT EXAM BY MR. BLUME      199

ASHLEY GAMBLIN

    DIRECT EXAM BY MR. SCHOOLS      223

    CROSS EXAM BY MS. JOHNSON      226

    REDIRECT EXAM BY MR. SCHOOLS      228

  RECROSS EXAM BY MS. JOHNSON      230

|                        | ID    | EVD   |
|------------------------|-------|-------|
| GOVERNMENT'S           |       |       |
| 351 PHOTO DNA DIAGRAM  |       | 8     |
| DEFENDANT'S            |       |       |
| 8 PET DIAGRAM OF FULKS |       | 140   |

EXHIBITS

DIRECT EXAM OF RUBEN GUR

MR. BLUME:  I'M SORRY.  I WILL HAVE HIM AFFIRMATIVELY SAY HE IS NOT.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

MR. GASSER:  THANK YOU,  YOUR HONOR.

THE WITNESS:  AND IF YOU LOOK AT THE BEHAVIORAL ABNORMALITIES, THE DEFICITS ARE EXACTLY WHAT YOU WOULD EXPECT IF YOU PUT THESE IN EXECUTIVE FUNCTIONING MEMORY,  IN THE VIGILANTS, THAT IS THE SWITCHBOARD PART, AND SENSORY MOTOR FUNCTION.

**Q.    SO, BASICALLY, THAT IS REAFFIRMING YOUR POINT ANATOMICALLY,  PHYSIOLOGY, AND BEHAVIORALLY, HIS BRAIN IS BAD?**

A.    AND IN ABOUT THE SAME PLACES.

**Q.    AND SO, THEN YOU PREVIOUSLY DISCUSSED, AS I UNDERSTAND IT, THAT HIS BRAIN IS DAMAGED IN WAYS WHICH ARE CONSISTENT WITH FETAL EXPOSURE TO ALCOHOL?**

A.    YES.   YOU CAN TRY TO GAUGE THE AGE AT WHICH DAMAGE OCCURRED.   THE DIFFERENT STAGES OF DEVELOPMENT, THE DAMAGE WOULD RESULT IN A DIFFERENT WAY OF ADJUSTING.   AS THE BRAIN IS GROWING,  IN SOME WAYS, IT IS GOOD IF THE DAMAGE OCCURS TO A YOUNG BRAIN BECAUSE THE SAME DAMAGE OCCURRED TO A YOUNG AND ELDERLY BRAIN COULD KILL THE ELDERLY, AND THE YOUNG WOULD STILL SURVIVE.   BUT THE FLIP SIDE OF THAT SAME COIN IS THAT, THE EARLIER THE DAMAGE,  THE MORE THERE WILL BE ABNORMALITIES DOWN THE STREET, AND THE BRAIN WILL JUST LOOK MISSHAPED.

IT IS THE SAME WAY IF YOU TAKE THE ANALOGY OF A TREE THAT

DIRECT EXAM OF RUBEN GUR

GETS STRUCK BY LIGHTNING.  IF IT IS AN OLD TREE, YOU WILL SEE THE SIGN OF THE LIGHTNING,  YOU WILL SEE THE BURNING,  YOU WILL ALWAYS LOOK AT THE TREE AND SAY, THIS IS A TREE HIT BY LIGHTNING.  IF THE TREE IS HIT WHEN IT IS YOUNG, IT WILL STILL GROW TO FULL SIZE, MAY LIVE AS LONG AS A NORMAL TREE. BUT BECAUSE OF IT, IT WOULD BE MISSHAPEN.  THE TRUNK WILL NOT BE QUITE WHERE IT SHOULD BE.  THE BRANCHES WILL COME OUT BEFORE THEY ARE SUPPOSED TO, OR AFTER THEY ARE SUPPOSED TO, AND YOU WILL SEE THAT THERE IS SOMETHING SERIOUSLY MISSHAPEN ABOUT THAT TREE.  AND YET, THE TREE HAS SURVIVED.

THE BRAIN IS THE SAME WAY.  IT KEEPS TRYING TO REPAIR ITSELF.  AND IN THAT PROCESS, PRODUCES ANOMALIES, SOME SUGGEST BEING LARGE, SOME BEING SMALL FOR THE KIND OF ENERGY THAT HAPPENS VERY EARLY.  THE REASON I AM THINKING OF FETAL ALCOHOL IS BECAUSE THE REGIONS ARE EXACTLY THOSE REGIONS THAT YOU SEE AFFECTED BY ALCOHOL.  THESE ARE PARTS OF THE BRAIN THAT ALCOHOL LIKES TO GO TO, AND ACTIVATE, AND DESTROY.

**Q.    AND THEN AS I TAKE IT,  BUT THERE WERE ALSO ABNORMALITIES,  AS I UNDERSTAND YOUR TESTIMONY, ABOVE AND BEYOND WHAT YOU WOULD, NECESSARILY, EXPECT FROM FETAL EXPOSURE TO ALCOHOL?**

A.    YES.

**Q.    AND THEN I BELIEVE YOU INDICATED THE TWO MOST LIKELY CAUSES OF THAT ARE HEAD INJURIES AND SUBSTANCE ABUSE?**

A.    CORRECT.

DIRECT EXAM OF RUBEN GUR

Q.    I MEAN, HEAD INJURIES WOULD RESULT IN LOSS OF CONSCIOUSNESS OR -- I GUESS ANY TYPE OF HEAD INJURY COULD CONCEIVABLY AFFECT THE BRAIN?

A.    WE USED TO THINK THERE IS NO LOSS OF CONSCIOUSNESS, THEN THERE WAS NO STRUCTURAL DAMAGE.  BUT THAT IS, CLEARLY, INCORRECT.  THERE ARE SOME, DEPENDING UPON WHERE YOU GET THE BLOW, SOME BLOWS WILL PRODUCE LOSS OF CONSCIOUSNESS MORE THAN OTHERS.  AS A RULE, IT IS,  YOU DON'T GET A LOT OF TISSUE DAMAGE IF THERE IS NO LOSS OF CONSCIOUSNESS, BUT THERE HAVE BEEN DOCUMENTED CASES WHERE NO LOSS OF CONSCIOUSNESS OCCURRED AND YET, THERE IS STRUCTURAL DAMAGE.

IN THE CASE OF MR. FULKS,  THERE WERE NUMEROUS INSTANCES OF HEAD INJURIES WITH LOSS OF CONSCIOUSNESS.  AND THOSE THAT ARE MOST WORRISOME ARE THOSE THAT WERE HIT STRAIGHT ON TOP OF HIS HEAD BECAUSE THEY WOULD AFFECT THE VERY SAME REGIONS THAT WERE ALREADY SUSCEPTIBLE BECAUSE OF THE FETAL ALCOHOL EXPOSURE.

Q.    BUT, AGAIN, THE BOTTOM LINE IS, BASED UPON THE MRI AND THE PET SCAN, YOU CAN CLEARLY SEE ABNORMALITIES IN THE BRAIN ABOVE AND BEYOND WHAT YOU WOULD EXPECT FROM FETAL ALCOHOL?

A.    YES.

Q.    AND YOU ALSO HAVE IMPOVERISHED, STRESSFUL ENVIRONMENT. WHY IS THAT AN ELEMENT?

A.    WE USED TO THINK THE ENVIRONMENT DOESN'T REALLY CHANGE THE BRAIN.  BUT THERE IS MORE AND MORE EVIDENCE THAT SOME

DIRECT EXAM OF RUBEN GUR

BRAIN STRUCTURES ARE HIGHLY SENSITIVE TO ENVIRONMENTAL STRESS. AND EVEN PEOPLE NOW THAT WE CAN LOOK AT PEOPLE WHEN THEY ARE ALIVE,  PEOPLE WERE STUDIED BEFORE AND AFTER STRESSFUL EVENTS, WAS A JAPANESE STUDY ON PEOPLE,  WITH FLOOD AND EARTHQUAKES. YOU CAN ACTUALLY SEE STRUCTURAL CHANGES AND, PARTICULARLY, SEE THEM IN THEIR REGION CALLED THE HIPPOCAMPAL.   PROLONGED STRESS DOES ALSO IMPACT THE BRAIN,  THE BRAIN FUNCTION.

**Q.    WHAT IS THE BOTTOM LINE.   HE HAS A HIGHLY ABNORMAL BRAIN?**

A.    THAT IS VERY CLEAR.

**Q.    AND AREAS THAT ARE MOST AFFECTED, THE EXECUTIVE FUNCTIONING AND, AGAIN, JUST BRIEFLY, WHAT IS THE EXECUTIVE FUNCTIONING?**

A.    IT IS THE PART THAT TELLS YOU STOP,  THINK ABOUT THE CONTEXT,  THINK ABOUT YOUR LONG-TERM GOALS, AND ACT IN ACCORDANCE WITH WHAT IS GOOD FOR YOU.

**Q.    SO, THAT WOULD AFFECT THINGS LIKE JUDGMENT,  IMPULSE CONTROL?**

A.    MOSTLY IMPULSE CONTROL, BECAUSE THAT IS THE PART THAT HOLDS THE ANALAGOUS LINE IN CHECK, AS WELL AS JUDGMENT.

**Q.    DECISION MAKING?**

A.    DECISION MAKING.

**Q.    THAT IS ONE AREA THAT IS AFFECTED.   THEN YOU TALK ABOUT SWITCHBOARD.   AGAIN, WHAT IS THAT?**

A.    THAT IS THE THALAMUS.   THE THALAMUS, IN ORDER FOR THE

DIRECT EXAM OF RUBEN GUR

EXECUTIVE TO MAKE GOOD DECISIONS, THEY NEED TO HAVE THE INFORMATION COME FROM THE RIGHT PLACES.   AND WHEN THE SWITCHBOARD IS SENDING INFORMATION TO THE WRONG PLACES, IT IS HARD FOR THE EXECUTIVE TO GAUGE, EVEN IF THE EXECUTIVE WAS INTACT, IT IS HARD FOR THE EXECUTIVE TO COME UP WITH APPROPRIATE DECISIONS.   AND SO, ALONG WITH THE EXECUTIVE IS IMPAIRED, AND IT IS WORKING ON BAD INFORMATION THAT, INEVITABLY, WILL LEAD TO A LOT OF BAD DECISIONS.

**Q.    THAT IS A DOUBLE WHAMMY TO THE THINKING PROCESS?**

A.    YES.

**Q.    AFFECT?**

A.    THAT IS THE ABILITY TO UNDERSTAND AND COMMUNICATE EMOTION.   WE MEASURE THE VERY NARROW FACET OF THAT IS THE ABILITY TO INTERPRET FACIAL EXPRESSIONS OF EMOTION.   HE WAS IMPAIRED IN THAT.

**Q.    NOW, JUST TO MAKE CLEAR HERE, YOU ARE NOT SAYING THAT MR. FULKS IS LEGALLY INSANE? IN OTHER WORDS,  THAT HE DIDN'T KNOW THE DIFFERENCE BETWEEN RIGHT AND WRONG?**

A.    NO.   HE IS MORE LIKE THAT ADOLESCENT.  IF YOU ASKED HIM, AFTER THE FACT,  DID YOU KNOW THAT WHAT YOU DID WAS WRONG?  YEAH.   THEY CAN EXPLAIN BETTER THAN YOU CAN EXPLAIN WHAT IS RIGHT AND WHAT IS WRONG, EXCEPT AT THE MOMENT THE BRAIN DOESN'T WORK EFFICIENTLY ENOUGH TO RELAY THAT INFORMATION TO THE EXECUTIVE AND ALLOW THE EXECUTIVE TO MAKE AN INFORMED DECISION OF THAT TOPIC.

DIRECT EXAM OF RUBEN GUR

**Q.    AND YOU ARE NOT SAYING THAT MR. FULKS IS MENTALLY RETARDED?**

A.    WELL,  NO,  I DON'T.  I AM NOT SAYING HE IS RETARDED. HE IS CLEARLY NOT A VERY BRIGHT INDIVIDUAL.  HE IS LESS INTELLIGENT THAN THE AVERAGE PERSON.

**Q.    AS I UNDERSTAND, HIS OVERALL IQ FALLS IN THE HIGH SEVENTIES, WHICH PUTS IT IN THE SORT OF THE BORDERLINE RANGE?**

A.    JUST AT THE BORDERLINE.  A FEW MORE POINTS -- LESS POINTS,  HE WOULD HAVE PASSED THE THRESHOLD; A FEW MORE POINTS, HE WOULD BE IN THE NORMAL RANGE.  THE IQ, ITSELF, IS SORT OF A FRUIT SALAD.  YOU TAKE ALL OF THE ABILITIES, YOU MEASURE AND MIX THEM TOGETHER AND COME UP WITH ONE NUMBER. WHEN REALLY, AS WE ALL KNOW, THERE ARE DIFFERENT THINGS THAT WE HAVE TO DO FOR OUR INTELLIGENCE.  AND EVERYBODY HAS SOME STRENGTH AND SOME WEAKNESSES.

AND SO,  IN SOME AREAS, HE IS WEAK ENOUGH TO BE WELL BELOW WHAT WE WOULD CALL A THRESHOLD FOR RETARDATION.  IF YOU DIVIDE THE INTELLIGENCE INTO THE DIFFERENT COMPONENTS,  WELL ONLY ONE OF THEM IS EXECUTIVE, ANOTHER ONE IS MEMORY. ANOTHER ONE IS VISUAL SPATIAL PROCESSING.  IN A REGULAR IQ MEASURE, YOU HAVE ALL OF THOSE MEASURES.  YOU COME UP WITH ONE NUMBER.  THAT ONE NUMBER, WHEN YOU DO IT WITH MR. FULKS, COMES UP ON THE BORDERLINE SLIGHTLY ABOVE THE CUT OF RETARDATION.  BUT A LOT OF THE MEASURES THAT GO INTO THAT FRUIT SALAD ARE BELOW THAT,  WELL BELOW THAT THRESHHOLD.

DIRECT EXAM OF RUBEN GUR

Q.    SOME ARE ABOVE AND SOME ARE BELOW?

A.    YES.

Q.    THE OVERALL COMPONENT PUTS HIM IN THE BORDERLINE?

A.    EXACTLY.

Q.    NOW,  IF YOU -- I JUST WANTED TO SORT OF ASK YOU ONE MORE THING, WHICH I FORGOT TO ASK ABOUT AND GO BACK.   NOW, YOU WERE TALKING ABOUT THE EFFECTS OF THE STRESSFUL ENVIRONMENT.  IF MR. FULKS, LET'S SAY, HAD BEEN, YOU KNOW, BORN JUST LIKE HE WAS AND ADOPTED, AND JUST, HYPOTHETICALLY, ADOPTED AND PUT IN A LOVING,  SUPPORTING,  NURTURING FAMILY, WOULD HE LIKELY HAVE THE SAME BRAIN FUNCTION THAT HE DOES TODAY?

A.    IT IS UNLIKELY THAT IT WOULD BE ANYTHING DIFFERENT ABOUT THESE MRI OR HIS PET SCAN.  BUT BEHAVIOR IS, TOO, A LARGE EXTENT SHAPED BY YOUR UPBRINGING.  IT IS NOT ALL BIOLOGY.  YOU CAN TAKE THE SAME KID AND USE THE ENVIRONMENT IN ORDER TO GIVE HIM A BETTER EXECUTIVE.  WHEN THE EXECUTIVE IS NOT WORKING WELL, THEN, IN FACT, THOSE INDIVIDUALS TEND TO BE EVEN MORE LIKELY TO ACCEPT DIFFERENT STRUCTURES.  THEY LIKE STRUCTURE, AND THEY REALIZE THERE IS SOMETHING WRONG IN THEIR OWN EXECUTIVE, SO THEY ARE LOOKING FOR GUIDANCE.  IF YOU GUIDE THEM WELL, THEY CAN TURN OUT BEING FINE.  IF THEY ARE GUIDED OTHERWISE, THEY CAN TURN OUT TO BE VERY DIFFICULT.

Q.    JUST TO MAKE SURE I UNDERSTAND YOUR LAST STATEMENT. EVEN ASSUMING HE HAD BEEN,  YOU KNOW,  BORN IN AN ADOPTIVE

**CROSS EXAM OF RUBEN GUR**

**FAMILY, HE WOULD STILL HAVE DIFFICULTIES?**

A.    YES.

Q.    **THEY JUST PROBABLY WOULDN'T BE THE SAME MAGNITUDE THAT THEY ARE NOW?**

A.    THAT IS EXACTLY WHAT I AM TRYING TO SAY.

MR. BLUME:  I OFFER DEFENDANT'S EXHIBIT 8.

MR. GASSER:  NO OBJECTION.

THE COURT:  ALL RIGHT.  WITHOUT OBJECTION.

MR. BLUME: DR. GUR,  IF YOU WOULD PLEASE ANSWER ANY QUESTIONS THAT MR. GASSER MAY HAVE.

THE COURT:  CROSS-EXAMINATION.

CROSS EXAM

BY MR. GASSER:

Q.    **GOOD AFTERNOON,  DR. GUR.**

A.    GOOD AFTERNOON.

Q.    **MY NAME IS JOHNNY GASSER.  I WORK IN THE U. S. ATTORNEY'S OFFICE HERE IN COLUMBIA,  SOUTH CAROLINA.   AND YOU AND I HAVE NOT HAD AN OPPORTUNITY TO MEET; IS THAT CORRECT?**

A.    THAT'S CORRECT.  NICE TO MEET YOU.

Q.    **WE JUST HAD, ACTUALLY, WHEN WE GOT BACK FROM WORK YESTERDAY AFTER INTERVIEWING SOME WITNESSES,  ME AND MY COLLEAGUES LOOKED ON MR. SCHOOLS'S COMPUTER, AND WE JUST GOT YOUR REPORT E-MAILED TO US LAST NIGHT OR YESTERDAY MORNING, BUT WE DIDN'T GET TO LOOK AT IT UNTIL LAST NIGHT.   SO,  I WANT YOU TO BEAR WITH ME.  I MIGHT NOT BE UNDERSTANDING SOME**

Case 2:15-cv-00083-JRS-MJD Document 55-1 Filed 03/08/19 Page 214 of 325 PageID #:
Case 4:02-cr-00992-JFA Date Filed 06/23/2008 Entry Number 1090-6 Page 1 of 14
Case: 20-1900    Document: 38    504    Filed: 02/01/2021    Pages: 58

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:02-992 |
| | ) | |
| | ) | |
| CHADRICK E. FULKS | ) | |
| | ) | |

### DECLARATION OF JAMES H. HILKEY

1.      My name is James H. Hilkey.  My curriculum vitae is attached as Exhibit A.  I am a licensed practicing psychologist in Durham, North Carolina.  From 1980 to 1996, I was the Chief of Psychology Services with the Federal Bureau of Prisons in Butner, North Carolina.  I was responsible for the clinical and administrative supervision of twenty psychologists servicing the forensic/psychiatric in-patient unit, substance and sex offender programs, and general psychological services for the Federal Correctional Institution.  Prior to becoming the Chief of Psychology Services, I served as a supervisory clinical psychologist at FCI Butner from 1976 to 1980.  In this position, I was responsible for clinical and administrative services to an acute psychiatric in-patient population of mentally ill federal offenders.  I often conducted pre-trial forensic evaluations for the federal courts and the Witness Protection Program.  From 1973 to 1976, I was a staff psychologist for the substance abuse program at USP Terre Haute.

2.      In 1968, I received my B.A. degree in Psychology from Westmont College in Santa Barbara, California.  In 1970, I received my M.C. degree in Counseling Psychology from Arizona State University.  In 1975, I received my Ph.D. in Counseling Psychology from Indiana State University.

PA Document #4

PA0568

Case 2:15-cv-00083-JRS-MJD   Document 55-4   Filed 03/08/19   Page 215 of 325 PageID #:
Case 4:02-cv-00092-JFA-JRS   Date Filed 06/25/2008   Entry Number 1090-6   Page 2 of 14
Case: 20-1900   Document: 38   505   Filed: 02/01/2021   Pages: 58

3.      I have served on the Federal Bureau of Prisons Task Force for Correctional Medical Center Design, the Federal Bureau of Prisons Standing Committee for Psychological Testing, and the Federal Bureau of Prisons Task Force for Critical Incident Debriefing.  I have presented papers to the International Congress of Mental Health, the National Sheriffs' Association, the American Correctional Association, and the Southeastern Psychological Association.

4.      My research and clinical work has focused on assessing and evaluating federal prisoners in a psychiatric in-patient setting.

5.      I was asked by John Blume to perform a psychological evaluation on Chad Fulks to assess his psychological functioning as it pertains to the mitigating factors as defined in 18 U.S.C.A. § 3592.

6.      I initially examined Mr. Fulks on August 12, 2003 at the Alvin S. Glenn Detention Center in Columbia, South Carolina.  Mr. Fulks was further examined on August 13, 2003 at the Alvin S. Glenn Detention Center.  Mr. Fulks was also examined on January 5, 2004 at the Columbia Care Center in Columbia, South Carolina, and on February 18, 2004 at the Federal Medical Center in Butner, North Carolina.  Approximately fourteen hours were spent in direct examination of Mr. Fulks which included the administration of the following battery of psychological tests and assessment procedures:

    a.      Wechsler Adult Intelligence Scale, Third Edition;

    b.      Wide-Range Achievement Test, Third Edition;

    c.      Bender Gestalt Visual Motor Test;

    d.      Rey Fifteen Item Test;

    e.      Personality Assessment Inventory;

    f.      Millon Clinical Multiaxial Inventory, Third Edition;

PA0569

g.    Minnesota Multiphasic Personality Inventory, Second Edition;

h.    Rorschach Projective Technique, Structurally Scored; and

i.    Mental status examination and clinical interviews.

I also reviewed medical, school, mental health, and criminal records pertaining to Chad Fulks.

7.    On the four occasions I examined Mr. Fulks, he presented as a dependent and primitive young man. His insight and judgment appeared generally poor. His behavior was consistent with an individual with significant personality and neurological problems. During our meetings, Mr. Fulks was fully oriented and was cooperative. During several of our longer sessions, Mr. Fulks became distracted but was able to return to task with minimal encouragement. Mr. Fulks presented as an isolated and dependent young man who appeared socially younger than his chronological age.

8.    Mr. Fulks admitted to a pronounced lack of stability during his early years, stating that his parents were heavy abusers of alcohol and that both parents were "mean" when drinking. Poor parental guidance including abusive punishment and sexually inappropriate behavior was cited. Mr. Fulks' parents had a very violent relationship which only worsened over the years. His mother was often seen with black eyes, cut lips, bruises, and other marks of violence. The children in the Fulks home were often without supervision and basic necessities such as food. The parents' desire for alcohol took precedence over providing a proper home environment.

9.    As a child, Mr. Fulks indicated that he felt depressed and estranged from other children because of his speech impediment and tattered clothing. Mr. Fulks failed the first grade and continued to struggle academically until he dropped out of school in the tenth grade. Mr. Fulks exhibited learning disabilities and was placed in special education programs for learning disabled and behaviorally disturbed children.

PA0570

10. Mr. Fulks acknowledged a significant history of substance abuse beginning with inhaling petrochemicals and drinking moonshine liquor around the age of ten. Throughout his life, Mr. Fulks has used various drugs including LSD, prescription pain killers, marijuana, powder cocaine, crack cocaine, and methamphetamine.

11. As a teenager, Mr. Fulks attempted to commit suicide by a drug overdose and hanging.

12. Mr. Fulks has a history of head trauma and once suffered a gunshot wound to his shoulder.

13. The malingering assessment revealed no evidence of exaggeration of symptoms. This result increases the confidence placed in results of cognitive and personality testing.

14. Mr. Fulks was administered the Wechsler Adult Intelligence Scale, Third Edition, and the Wide-Range Achievement Test, Third Edition. These instruments were administered on August 12 and 13, 2003. Mr. Fulks obtained a full-scale IQ score of 78, placing him in the borderline range of intelligence. This is a global assessment of his problem-solving skills; a score in the range places him in the seventh percentile of his peers. There is a 95% chance that his true IQ falls between 74 and 83. Academic achievement is measured on the Wide-Range Achievement Test, Third Edition. It indicated that Mr. Fulks is able to read at an eighth grade level and spell at a fifth grade level, and complete arithmetic problems at a sixth grade level.

15. Mr. Fulks was initially administered three separate personality tests, the Millon Clinical Multiaxial Inventory, Third Edition, the Personality Assessment Inventory ("PAI"), and the Rorschach. The validity of Mr. Fulks' responses to the items on the PAI fell in the normal range suggesting that he did not over-report or under-report psychopatholgy. His PAI profile was marked by significant elevations across several scales, including a broad range of clinical features and increasing the possibility of multiple diagnoses. His profile type is associated with

4

PA0571

marked distress and severe impairment in functioning. Areas of clinical significance include drug-related problems, somatic concerns including rumination about physical problems, high levels of anxiety suggesting that he is easily overwhelmed, and difficulties consistent with a significant depressive experience. Mr. Fulks' responses to the PAI suggest marked suspiciousness and mistrust in his relationship with others. His image of himself is poorly established and fragile. Even minor slights from others result in real doubts about his worth.

16. The MCMI-III suggested that Mr. Fulks has marked deficiencies in the abilities to effectively manage his feelings, thinking, and behavior. He is likely to show signs of depression and dependent personality features. The modal diagnoses from the MCMI-III include dependent personality disorder with schizotypical personality features and depressive personality traits.

17. Mr. Fulks did not present with indicators of Antisocial Personality Disorder on objective personality testing.

18. The Rorschach test results confirm and extend the results from the MCMI-III and the PAI. Mr. Fulks gave nineteen responses to ten ambiguous ink blots. Results are valid with clinically significant results on two constellations, depression and coping deficit index. Mr. Fulks, based on the results from this projective test, is prone to episodes of affective disturbance that include depression that interferes with effective interpersonal functioning. He also has markedly difficult times mustering adequate psychological recourses to cope with the demands placed upon him. The Rorschach results also suggest that Mr. Fulks has marked impairment in his reality testing capacity, whereby he tends to misperceive events and to form mistaken impressions of people and the significance of their actions. Poor judgment is consistent with these findings.

5

PA0572

19. Based on the findings of my evaluation, the following Axis I diagnoses were tendered: poly-substance dependence, dysthymic disorder, and cognitive disorder not otherwise specified.

20. In sum, Mr. Fulks presents with multiple significant psychological problems. He is a young man who has a number of biological problems. Both parents have had significant substance abuse problems, which in itself drastically increases the likelihood that he will be more prone to have problems with substance abuse. Specialists in neuropsychology and neurology have identified cognitive problems most likely stemming from Mr. Fulks' mother's consumption of alcohol during pregnancy. Mr. Fulks has a history of head trauma with loss of consciousness. Environmentally, Mr. Fulks was raised in a highly chaotic home characterized by poverty and a history of drug abuse, inconsistent supervision and neglect, and physical abuse. He also reports being sexually abused. Psychologically, Mr. Fulks has never developed adequate coping mechanisms. This failure severely limited his ability to meet the demands of daily life. He has also been chronically depressed, lacks self esteem, and is easily influenced by those around him. Consistent with his neurological impairment and his socialization, Mr. Fulks' behavior has been marked by impulsivity and his thinking influenced by extremely poor judgment.

21. It is my opinion that the combination of Mr. Fulks' neurological impairment and his significant psychological problems result in a lack of capacity to fully appreciate the nature of his behavior and to anticipate the consequences of his actions. He is a young man with significant deficits and is highly malleable.

22. I have reviewed the testimony of Donna Ward given at Mr. Fulks' sentencing hearing wherein Ms. Ward described a November 17, 2004 phone call allegedly made by Mr. Fulks while Brandon Basham was hiding from the police in the Ohio River. I am further aware that the prosecution used this call to argue that Mr. Fulks, without the aid of Basham, attempted

PA0573

to lure Ms. Ward's daughter out for a faux job interview. Donna Ward's testimony would not have altered the opinions I was prepared to give at the sentencing hearing. In fact, the Ward incident supports my assessment Mr. Fulks has poor judgment, lacks the capacity to appreciate the consequences of his actions, and is cognitively impaired.

23. In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

James H. Hilkey, Ph.D.

Signed before me this 2nd day
of June , 2008.

Notary Public for Wake County , NC
My Commission Expires: March 4th, 2012

7

PA0574

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | )   CRIMINAL NO. 4:02-992 |
| | ) |
| | ) |
| CHADRICK E. FULKS | ) |
| | ) |

**DECLARATION OF MARGARET MELIKIAN**

1.      My name is Margaret Melikian.  My curriculum vitae is attached as <u>Exhibit A</u>.  I am an Assistant Professor of Psychiatry and Behavioral Sciences at the Medical University of South Carolina.  I have also served as the Program Director of Forensic Psychiatry at the Medical University of South Carolina.

2.      I received my Doctor of Osteopathic Medicine in 1997 from the Oklahoma State University College of Osteopathic Medicine.  I then did a residency in general psychiatry at the Medical University of South Carolina.  After my residency in general psychiatry, I completed a fellowship in forensic psychiatry at the University of South Carolina.

3.      My research and work has focused on forensic inpatient care, evaluation of competency of criminal defendants to stand trial, criminal responsibility evaluations, evaluation of sexually violent predators, and evaluation of criminal defendants scheduled to be executed.

4.      I was asked by John Blume to assess Chad Fulks for cognitive deficits and mental illness.  After I presented my findings to Mr. Blume, I was asked to testify at Chad Fulks' sentencing hearing.  I was present in the federal courthouse and was prepared to give my opinions on these matters to the jury.  I was not called by Mr. Blume at the sentencing hearing.

1

PA Document #3

PA0575

Case 2:15-cv-00083-JRS-MJD Document 55-1 Filed 03/08/19 Page 229 of 325 PageID #:
4:02-cv-00092-JFA-JRS Date Filed 06/23/2008 Entry Number 1096-5 Page 2 of 13
Case: 20-1900 Document: 38 519 Filed: 02/01/2021 Pages: 58

5. In preparation for my assessment, I interviewed and examined Chad Fulks on December 9, 2003 and December 11, 2003. I also reviewed various records, literature, and consulted with Mr. Fulks' trial counsel.

6. It is my opinion that Chad Fulks meets the diagnostic criteria for Axis I diagnosis of Cognitive Disorder, Not Otherwise Specified (NOS). Cognitive Disorder, NOS is diagnosed when a patient has a syndrome of cognitive impairment that does not meet the criteria for delirium, dementia, or amnesic disorders. The impairment is often due to a specific medical condition and/or a pharmacological reaction. Mr. Fulks' cognitive problems include low IQ, difficulties concentrating or paying attention, visual and motor abnormalities, and limited reasoning and problem solving skills. These deficits showed up very early in his childhood and in his poor performance in school. Mr. Fulks was slow to walk and talk, required special education placement by the fourth grade, had a speech impediment, and tested for a very low IQ. Mr. Fulks' cognitive dysfunction is due to the direct effect of general medical conditions. Medical conditions affecting his cognitive ability are fetal alcohol spectrum disorder, chronic substance abuse, and multiple head injuries.

7. It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Major Depressive Disorder. Major Depressive Disorder is a condition characterized by a long-lasting depressed mood or marked loss of interest or pleasure in activities. These symptoms are sufficiently severe to interfere with the patient's daily functioning. Mr. Fulks attempted suicide on two occasions at the ages of 13 and 16. During my evaluation, Mr. Fulks presented with a sad mood, decreased appetite, poor sleep, poor concentration, and feelings of worthlessness and guilt. He has been on antidepressant medication and has had improvement in his symptoms.

2

PA0576

Case 2:15-cv-00083-JRS-MJD Document 55-1 Filed 03/08/19 Page 230 of 325 PageID #:
Case: 4:02-cv-00092-JRS-MJD Date Filed 06/23/2008 Entry Number 1090-3 Page 3 of 13
Case: 20-1900 Document: 38 520 Filed: 02/01/2021 Pages: 58

8.     It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Adjustment Disorder with Anxiety.  Adjustment Disorder with Anxiety is a condition in which the patient continues to feel nervous, worried, or afraid after a stressful event or events. Mr. Fulks' required the medication Klonopin for his anxiety.  Klonopin is a benzodiazepine, which, in my experience, is rarely given to inmates unless they present with the most serious indicators of anxiety.  Mr. Fulks also reported a history of problems with anxiety prior to his incarceration.  He reported being diagnosed with panic disorder between the ages of 13 and 14. Mr. Fulks reported increased anxiety, believing others are talking about him and having trouble functioning in groups.  He described separation anxiety and would hide from the school bus to avoid leaving his mother.  Based on my observation and assessment, Mr. Fulks displayed an excessive amount of anxiety given his situation.

9.     Mr. Fulks used illicit substances in amounts or duration that did not meet the criteria for specific Axis I diagnosis.  Mr. Fulks began using LSD at age 16.  He used this approximately 2 times a week by placing it in eye drops.  He reported visual hallucinations while intoxicated and denied flashbacks.  Mr. Fulks began abusing Lortab (a narcotic) at age 16.  He used this narcotic approximately one time per week.  Mr. Fulks also reported inhaling gas and paint fumes on numerous occasions at age 14.

10.     Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Amphetamine Dependence.  Amphetamines are addictive stimulants and extensive use can result in both physical and psychological addiction.  This means that, without the substance, a person will feel that he cannot function properly.  Additionally, when abruptly stopping use, the person will also experience physical symptoms of withdrawal.  Mr. Fulks has a long history of amphetamine abuse.  At age 17 be began using crack cocaine and used it approximately two times per week.

3

PA0577

He also used powder cocaine for 2 to 3 months on a daily basis. He also reported snorting Ritalin on occasion. He began smoking crystal methamphetamine at age 21 and smoked on a daily basis for 2 years. He has built up a tolerance to the affect of amphetamines, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

11.     It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Cannabis Dependence and Alcohol Dependence. Mr. Fulks began using cannabis and alcohol at a young age and was eventually able to use large amounts with a lesser effect than most people. He began smoking marijuana at age 10 and would smoke approximately 10 joints per day. He would also lace his marijuana with embalming fluid. Mr. Fulks began drinking alcohol at age 10 and also consumed moonshine. He reported drinking on a daily basis starting at age 14. He has built up a tolerance to the affect of these substances, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

12.     Mr. Fulks meets the diagnostic criteria for Axis II diagnosis of Anti-Social Personality Disorder. Anti-Social Personality Disorder is a condition characterized by a persistent disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. Deceit and manipulation are central features of this disorder. Mr. Fulks exhibited disruptive behavior before the age of 15, such a lying, running away from home, fighting, and failing to conform to the social norms with respect to lawful behavior. As an adult, Mr. Fulks has continued these patterns formed in childhood. People who grow up in abusive or neglectful environments, such as Mr. Fulks, are at higher risk for this disorder. Mr. Fulks' substance abuse history contributes to his personality difficulties. While lack of remorse is significant factor in the diagnosis, it should be noted that Mr. Fulks does show

4

PA0578

remorse and due to his upbringing he was taught and encouraged to steal by his family. His childhood environment had little structure; his mother and father were frequently intoxicated and fought often in front of the children. The parents were often too hung over to make sure the children had food, were clean, and were in school. Further, because of his diminished cognitive ability, Mr. Fulks has many childlike, gullible, and suggestible qualities to his personality.

13. Mr. Fulks' below average intelligence and impulsivity make it unlikely that he would be a leader among his peers.

14. Mr. Fulks had several instances of sexual abuse by adults at a young age. A teenage babysitter performed oral sex on him at age 8 or 9. Around age 13 he was molested by a friend's father. At age 15 he moved in with a 28 year-old woman. At approximately at age 10, he was disciplined at school for pulling down the pants of another child, which may have been acting out due to his own sexual abuse. Mr. Fulks was raised in an environment with inappropriate sexual activity in the home and graphic sexual imagery adorning the walls.

15. Mr. Fulks gave a history of excessive substance use around the time of the incident. Mr. Fulks reported snorting Ritalin just prior to escaping from the Hopkins County Detention Center. Shortly after escaping, Mr. Fulks and Brandon Basham went to a trailer owned by a Basham family member. There they found clothes and consumed one liter of whiskey. They then spent several days in a hotel drinking and smoking marijuana. Mr. Fulks then traveled to the home of his brother where they began smoking crystal methamphetamine. He reported obtaining 8 eight balls (approximately 3.5 grams each) and using 6 while in the Michigan area. He began having visual hallucinations after smoking crystal methamphetamine. Fulks and Basham took 2 eights balls with them when they left for Huntington, West Virginia. While driving they consumed another liter of whiskey. After checking into a motel in

5

PA0579

Huntington, West Virginia, Mr. Fulks and his cohorts smoked $800.00 worth of crystal methamphetamine and smoked marijuana. After leaving Huntington and while driving to Little River, South Carolina, they consumed alcohol, marijuana and 2 eight balls. After leaving South Carolina, Mr. Fulks continued to use marijuana and crystal methamphetamine while driving. Upon arriving back in Huntington, West Virginia, Mr. Fulks and Basham went to Beth McGuffin's house where they continued to use various drugs. In addition, Mr. Fulks reported significant use of crack cocaine throughout the period after his escape. This continuous use of substances impaired his ability to sleep and he reported that he "didn't sleep for days on end." He reported using so many stimulants that the muscles in his jaw were clamped shut. He also reported visual hallucinations associated with his drug use. His significant use of substances made him more impulsive and impaired his judgment.

16.     I have reviewed the testimony of Donna Ward given at Mr. Fulks' sentencing hearing wherein Ms. Ward described a November 17, 2004 phone call allegedly made by Mr. Fulks while Brandon Basham was hiding from the police in the Ohio River. I am further aware that the prosecution used this call to argue that Mr. Fulks, without the aid of Basham, attempted to lure Ms. Ward's daughter out for a faux job interview. Donna Ward's testimony would not have altered the opinions I was prepared to give at the sentencing hearing. In fact, the Ward incident supports my assessment Mr. Fulks has cognitive deficits, poor judgment, and is not likely to be a leader among his peers.

6

PA0580

In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the

foregoing is true and accurate.

Margaret Melikian, D.O.

Signed before me this 27ᵗʰ day of
May          , 2008

Notary Public for South Carolina
My Commission Expires:   9-25-12

7

PA0581

### ERRATA FOR THE OPENING BRIEF OF APPELLANT

All citations for ECF Nos. 50-1, 50-2, 50-3, 50-4, and 51-1 on pages 7-10, 12, 14, and 31 (referring to the Appendix to the Amended Petition for Writ of Habeas Corpus Pursuant to 18 U.S.C. § 2241) should be corrected to citations to 55-1, 55-2, 55-3, 55-4, and 55-1, respectively, with the following four exceptions.

(1) The citation to "ECF No. 50-1 at App. 323-24, 334, 336-38, 341, 362" on page 9 should be corrected to "ECF No. **55-2** at App. 323-24, 334, 336-38, 341, 361" (change in bold).

(2) The citation to "ECF No. 50-1 at App. 339-41" on page 10 of the Opening Brief should be corrected to "ECF No. **55-2** at App. 339-41" (change in bold).

(3) The citation to "ECF No. 50-2 at App. 574-93" on page 12 of the Opening Brief should be corrected to "ECF No. **55-3** at App. 574-93" (change in bold).

(4) The citation to "ECF 50-1 at App. 364" on page 14 of the Opening Brief should be corrected to "ECF **No. 55-2** at App. 364" (change in bold).

(5) The citation to "ECF No. 50-1 at App. 632-36, 685-87" on page 31 of the Opening Brief should be corrected to "ECF No. **55-3** at App. 632-36, 685-87" (change in bold).

## CERTIFICATE OF SERVICE

I, Peter Williams, hereby certify that, on this date, I electronically filed the foregoing supplemental appendix with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams

Dated: February 1, 2021