In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 20-1900

CHADRICK FULKS,

*Petitioner-Appellant*,

*v.*

T.J. WATSON, Warden,

*Respondent-Appellee*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:15-cv-00033 — **James R. Sweeney, II**, *Judge*.

———————————

ARGUED JUNE 7, 2021 — DECIDED JULY 19, 2021

———————————

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Chadrick Fulks sits on federal
death row for his role in the 2002 carjacking, kidnapping, and
killing of Alice Donovan. He committed these crimes with
Brandon Basham after they escaped together from a Kentucky
jail. On two prior occasions—first, in his direct appeal and
then, in a postconviction petition under 28 U.S.C. § 2255—
Fulks challenged his capital sentence without success. Many
years later, he returned to the district court with a new request

for relief, this time invoking 28 U.S.C. § 2241 and the Supreme Court's decision in *Atkins v. Virginia*, and arguing that recent changes in clinical diagnostic standards show that he is (and since at least age 18 has been) intellectually disabled and ineligible for the death penalty. The district court concluded that Fulks cannot now pursue his *Atkins* claim under § 2241 and dismissed the petition. Guided in large measure by our recent decision in *Bourgeois v. Watson*, we agree and affirm.

## I

### A

In 2004 Chadrick Fulks pleaded guilty in the District of South Carolina to eight federal charges—including two death-eligible offenses—arising from the carjacking, kidnapping, and death of Alice Donovan. The district court then empaneled a jury to consider whether to impose the death penalty. See 18 U.S.C. § 3593(b)(2)(A).

Fulks advanced a mitigation defense grounded in his mental deficiencies and troubled childhood. His legal team, the district court later observed, "painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being." *Fulks v. United States*, 875 F. Supp. 2d 535, 568 (D.S.C. 2010). His defense counsel hired or consulted at least 11 experts, six of whom testified and explained, among other things, that Fulks suffered from borderline intelligence with IQ scores ranging from 75 to 79, along with moderate brain and cognitive impairments. See *id.* at 555–56, 558. But Fulks stopped short of arguing that he was

intellectually disabled and thereby ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).

The jury unanimously recommended, and the district court in turn imposed, two death sentences—one each for Fulks's convictions of carjacking and kidnapping that resulted in Donovan's death. The Fourth Circuit affirmed the death sentences on direct appeal and the Supreme Court declined review. See *United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006), cert. denied, 551 U.S. 1147 (2007) (mem.).

In 2008 Fulks returned to the district court in South Carolina and filed a motion to vacate his death sentences under 28 U.S.C. § 2255. He raised 33 claims, including allegations that trial counsel rendered ineffective assistance by failing to call additional mental health experts as part of his mitigation defense. But once again, Fulks did not raise an intellectual disability claim under *Atkins*, nor did he assert that his attorneys provided ineffective assistance by failing to raise such a claim. The district court held an evidentiary hearing and denied Fulks's petition but issued a certificate of appealability. The Fourth Circuit affirmed the denial of § 2255 relief, and the Supreme Court again denied a writ of certiorari. See *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012), cert. denied, 571 U.S. 941 (2013) (mem.).

B

This procedural history brings us to Fulks's most recent request for relief. In 2015 he filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the Southern District of Indiana, where he remains incarcerated at the U.S. Penitentiary in Terre Haute. After the district court appointed counsel to represent him, Fulks amended his habeas petition in 2019

No. 20-1900

advancing two claims. He claimed for the first time that he is intellectually disabled under current medical diagnostic and legal standards. He also contended that, even if he cannot meet the precise criteria for intellectual disability, he is functionally intellectually disabled and therefore ineligible for execution under the Supreme Court's decision and reasoning in *Madison v. Alabama*, 139 S. Ct. 718 (2019). Fulks supported his petition with a report from a neuropsychologist, Barry Crown, who evaluated him in April 2018 and diagnosed him as intellectually disabled under current clinical standards.

Fulks asserted that the law allowed him to raise his intellectual disability claims in a § 2241 petition because § 2255 was "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). In Fulks's view, because his claims rested on new legal and factual bases unavailable to him at the time of his sentencing and § 2255 petition, he could seek relief under § 2241. More specifically, Fulks relied on the Supreme Court's decisions in *Hall v. Florida*, 572 U.S. 701 (2014), *Moore v. Texas* (*Moore I*), 137 S. Ct. 1039 (2017), and *Madison*, 139 S. Ct. 718 (2019)—all decided after the denial of his first § 2255 petition. Fulks also emphasized that his *Atkins* claim roots itself in the 2012 and 2013 updates to the User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports, 11th Edition (AAIDD–2012), a manual from the American Association on Intellectual and Developmental Disabilities, and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM–5).

## C

The district court denied Fulks's § 2241 petition as procedurally barred by 28 U.S.C. § 2255(e)—a provision

No. 20-1900                                    5

prohibiting petitioners from seeking habeas relief under § 2241 unless it appears that § 2255 "is inadequate or ineffective to test the legality of [the] detention." The district court concluded that because Fulks failed to show a structural problem with § 2255, he could not use § 2241 to raise his *Atkins* claim. Relying on our decision in *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc), the district court explained that something more than an anticipated lack of success with a § 2255 motion is required to satisfy the savings clause. And as the district court emphasized, Fulks had a fair opportunity to raise an *Atkins* claim in his initial § 2255 proceeding but did not do so.

Fulks now appeals.

## II

## A

In most cases, 28 U.S.C. § 2255 supplies the exclusive post-conviction means for federal prisoners to challenge their sentences. "Strict procedures govern" these motions. *Purkey v. United States*, 964 F.3d 603, 611 (7th Cir. 2020), cert. denied, 141 S. Ct. 196 (2020). Most relevant to this appeal, the statute limits a federal prisoner to a single attempt at filing a § 2255 motion unless the appropriate court of appeals grants permission to file a "second or successive motion." 28 U.S.C. § 2255(h). But that permission can come only if the motion contains "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense," or "a new rule of constitutional law, made retroactive

to cases on collateral review by the Supreme Court, that was previously unavailable." *Id.* § 2255(h)(1)–(2).

Fulks concedes that his *Atkins* claim does not satisfy either of these exceptions. This acknowledgement explains why he filed his petition under 28 U.S.C. § 2241 and invoked the so-called savings clause in § 2255(e)—a narrow pathway of last resort for prisoners to seek postconviction relief through the general federal habeas corpus statute codified in § 2241.

The savings clause provides:

> An application for a writ of habeas corpus in be-half of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the appli-cant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also ap-pears that the remedy by motion is *inadequate* or *ineffective* to test the legality of his detention.

28 U.S.C. § 2255(e) (emphasis added). The crucial point, clear from the text of the savings clause, is that Congress hinged access to § 2241 upon a showing that § 2255 is "inadequate" or "ineffective."

To date, we have identified three situations in which the remedy provided by § 2255 proved inadequate or ineffective. See *In re Davenport*, 147 F.3d 605 (7th Cir. 1998) (involving a claim alleging a miscarriage of justice and based upon a new rule of statutory interpretation made retroactive by the Su-preme Court); *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001) (in-volving a claim based on the ruling of an international tribu-nal issued after the prisoner's first round of § 2255 relief);

*Webster*, 784 F.3d 1123 (involving a claim that relied on new evidence that existed but was allegedly unavailable at trial despite counsel's diligent efforts, and where that new evidence could show that the petitioner had long been intellectually disabled); see also *Purkey*, 964 F.3d at 611–14 (providing a fulsome explanation of these central cases).

We explained in *Purkey* and reiterate today that our decisions in *Davenport*, *Garza*, and *Webster* do not "create rigid categories delineating when the [savings clause] is available." 964 F.3d at 614. But we also underscored that "the words 'inadequate' or 'ineffective,' taken in context, must mean something more than unsuccessful." *Id.* at 615. Rather, "there must be a compelling showing that, as a practical matter, it would be *impossible* to use section 2255 to cure a fundamental problem." *Id.* (emphasis added). In short, a petitioner must identify "some kind of structural problem with section 2255 before section 2241 becomes available." *Webster*, 784 F.3d at 1136.

B

Fulks posits that he can channel his *Atkins* claim through the savings clause because the recent adjustments to today's legal and clinical diagnostic standards came after his sentencing and § 2255 petition, meaning he could not have pursued or prevailed on his intellectual disability claim until now. Evaluating this contention requires consideration of how the law and clinical standards have evolved over the last 20 years.

We begin with *Atkins*, where the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled persons. See 536 U.S. at 321. The Court's analysis drew upon clinical definitions of intellectual disability, which "require[d] not only subaverage intellectual functioning, but

also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318.

The Supreme Court refined the *Atkins* analysis 12 years later in *Hall*, striking down a Florida law that prohibited a finding of intellectual disability if a person's IQ score exceeded 70. See 572 U.S. 701. The Court concluded that such a rigid cutoff created an unacceptable risk that an intellectually disabled person would be executed. See *id.* at 704. Along the way the Court reaffirmed *Atkins*'s teaching that courts are to be "informed by the work of medical experts in determining intellectual disability." *Id.* at 710.

Taking into account the newly available DSM–5 and building on *Atkins*, the *Hall* Court reiterated that "the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id.* at 710. Because IQ tests entail certain imprecision, the Court further instructed that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723.

The Supreme Court returned to the *Atkins* standard three years later in *Moore I*, holding that the Texas Court of Criminal Appeals erred by disregarding the medical community's current definition of intellectual disability. See 137 S. Ct. 1039. The proper *Atkins* inquiry, the Court clarified, must follow the medical community's *current* diagnostic standards, not

outdated frameworks, judicially crafted factors, or layman's stereotypes. See *id.* at 1051–53. Because the margin of error for Bobby Moore's IQ score of 74 yielded a range of 69 to 79—therefore allowing the possibility of a true IQ below 70—the Texas court, in evaluating whether Moore was intellectually disabled, "had to move on to consider Moore's adaptive functioning." *Id.* at 1049.

Moore's case returned to the Supreme Court in 2019 after the Texas court, on remand, once again rejected his claim of intellectual disability. See *Moore v. Texas* (*Moore II*), 139 S. Ct. 666 (2019) (per curiam). The Supreme Court again reversed, concluding the Texas court repeated many of the same errors decried in *Moore I* and ultimately finding that Moore was indeed intellectually disabled. See *id.* at 670–72.

The Supreme Court's decisions in *Hall*, *Moore I*, and *Moore II* recognized that the medical diagnostic standards have not stood still since *Atkins*. And as the Court underscored in *Moore I*, intellectual disability determinations "must be 'informed by the medical community's diagnostic framework.'" 137 S. Ct. at 1048 (quoting *Hall*, 572 U.S. at 721). Updated editions of the leading diagnostic manuals—the AAIDD–2012 and the DSM–5, issued in 2012 and 2013 respectively—superseded earlier versions governing at the time of Fulks's sentencing and initial § 2255 motion. Fulks's newly asserted claim that he is intellectually disabled anchors itself in the modifications to the diagnostic standards.

Compared to the prior edition, the DSM–5 places enhanced emphasis on the need to assess both cognitive capacity and adaptive functioning. The AAIDD–2012 and DSM–5 also now include express recommendations for certain considerations when measuring intellectual disability: evaluators

should base diagnoses on both a clinical assessment and standardized testing, should not rely on stereotypes about intellectually disabled people, and may adjust IQ scores for the so-called Flynn effect. See *McManus v. Neal*, 779 F.3d 634, 652–53, 653 n.6 (7th Cir. 2015) (citing James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978*, 95 PSYCH. BULL. 29, 32–34 (1984)) (explaining the Flynn effect as a testing phenomenon where IQ scores increase on average 0.3 points per year from the time the test was standardized, but reasoning that the *Atkins* standard does not *require* adjusting IQ scores for this effect).

## III

### A

All of this background brings us to Fulks's § 2241 petition. He opted for this procedural route to raise an *Atkins* claim because he did not meet the narrow requirements for filing a second or successive § 2255 petition. See 28 U.S.C. § 2255(h). But Fulks cannot satisfy the saving clause's requirements either, and this deficiency stops his § 2241 petition in its tracks. We reached the same conclusion on similar facts less than a year ago in the capital case of Alfred Bourgeois. See *Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020). We chart the same course today.

To begin, "*Atkins* was the watershed case on intellectual disability" decided by the Supreme Court in 2004—years before Fulks filed his § 2255 motion in 2008. *Id.* at 636. Fulks could have raised substantially the same argument he brings now—that he is intellectually disabled—in his initial § 2255 petition. But he did not do so, ostensibly because he believed

he would not have prevailed under the legal landscape and clinical diagnostic standards in effect at that time.

The probability that Fulks would not have prevailed on his *Atkins* claim in 2008 does not mean or show that § 2255 was inadequate or ineffective. We made this exact point in *Purkey*, reinforcing that "the words 'inadequate or ineffective' taken in context, must mean something more than unsuccessful." 964 F.3d at 615. Indeed, we have insisted, time and again, that satisfying the savings clause in § 2255(e) demands "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem." *Id.*; see, *e.g.*, *Higgs v. Watson*, 984 F.3d 1235 (7th Cir. 2021) (applying the savings clause analysis to a capital defendant's habeas petition and concluding he could not satisfy § 2255(e)'s demanding requirements); *Bourgeois*, 977 F.3d 620 (same); *Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020) (same). Right to it, "[i]t is not enough that proper use of the statute results in denial of relief." *Purkey*, 964 F.3d at 615.

Updates to the legal and diagnostic standards, which may now provide Fulks a stronger basis to prove an intellectual disability, do not expose any structural defect in § 2255. On the legal front, *Hall*, *Moore I*, and *Moore II* did not alter the law of intellectual disability to such a great extent that the remedy by a § 2255 motion was inadequate or ineffective to test the legality of Fulks's death sentence at the time he filed his petition in 2008. Although the Supreme Court in *Atkins* did not prescribe a specific test for determining when a person is intellectually disabled, it did rely on clinical definitions requiring both subaverage intellectual functioning and significant limitations in adaptive skills that manifest before age 18—the same three requirements governing the standard today. See

*Atkins*, 536 U.S. at 318. The trilogy of cases that followed—
*Hall*, *Moore I*, and *Moore II*—each represent course corrections
to state-court applications of *Atkins* that "further elaborated
on the measurements of intellectual function and the evalua-
tion of adaptive deficits." *Bourgeois*, 977 F.3d at 636. With or
without that trio, Fulks could have raised the same *Atkins*
claim in his initial § 2255 motion.

Nothing in the Supreme Court's jurisprudence prohibit-
ing the execution of intellectually disabled persons, moreo-
ver, suggests that a capital prisoner seeking to raise an *Atkins*
claim is exempt from the procedural limitations in § 2255. Nor
do *Hall*, *Moore I*, or *Moore II* create "new rule[s] of constitu-
tional law, made retroactive to cases on collateral review by
the Supreme Court," that would permit a second or succes-
sive motion under § 2255(h)(2). The observation that *Hall*,
*Moore I*, and *Moore II* refined the application of *Atkins* is not
enough to satisfy the savings clause in the circumstances be-
fore us here.

So, too, on the clinical front. Updates to the clinical diag-
nostic standards for intellectual disability likewise do not con-
vince us that the remedy available to Fulks in his original
§ 2255 motion was inadequate or ineffective. To be sure, Fulks
may have a marginally stronger case of proving intellectual
disability under today's standards. Under the DSM–5, for ex-
ample, Fulks's Flynn-adjusted IQ scores of 75, 76, and 77
could satisfy the first prong of showing intellectual disabil-
ity—subaverage intellectual functioning—because scores up
to 75 fall within the range for an intellectual disability. And
whereas no expert diagnosed Fulks as intellectually disabled
at sentencing or in his initial § 2255 motion, neuropsycholo-
gist Barry Crown concluded in 2018 that Fulks is intellectually

disabled under these updated standards—although he stopped short of saying that Fulks was *not* intellectually disabled under the older standards.

Regardless, these recent updates to the AAIDD–2012 and DSM–5 fail to reveal anything inadequate or ineffective about § 2255 that made it impossible for Fulks to pursue an *Atkins* claim in his initial postconviction motion. See *Bourgeois*, 977 F.3d at 636 (rejecting this same argument and explaining "the savings clause does not apply every time … the medical community updates its diagnostic standards"). Fulks sought at sentencing to avoid the death penalty by relying on his cognitive impairments and fetal alcohol spectrum disorder—owing in no small part to his horrific upbringing—and he had every opportunity to take the next step and argue, whether measured more functionally or under a strict application of clinical standards (or both), that he was intellectually disabled.

Fulks begs to differ, insisting that any *Atkins* claim would have been futile when he filed his § 2255 petition in 2008, because the Fourth Circuit at that time employed standards for assessing intellectual disability that were later rejected in *Hall*, *Moore I*, and *Moore II*.

We disagree. Fulks's *Atkins* claim was not so squarely foreclosed by Fourth Circuit precedent that it would have been impossible or altogether futile for him to raise this claim during his first round of postconviction relief. To the contrary, the Fourth Circuit cases that Fulks identifies reflect specific applications of differing state-law intellectual disability standards to various capital defendants through the deferential lens of federal habeas review. See, *e.g.*, *Richardson v. Branker*, 668 F.3d 128 (4th Cir. 2012) (applying North Carolina's standard for

intellectual disability to a § 2254 motion and concluding the state court's decision was not based on an unreasonable determination of the facts); *Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010) (applying Virginia's definition for intellectual disability to a § 2254 petition and holding the district court did not clearly err in finding the petitioner was not intellectually disabled); *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008) (applying Virginia law and concluding the Virginia Supreme Court did not apply *Atkins* in an objectively unreasonable manner).

By our reading, though, not one of these cases suggests that the legal and diagnostic standards recognized in *Atkins* were etched in stone or would render frivolous any arguments for adapting the legal framework to include updated clinical standards about intellectual disability. To the contrary, in a 2004 case, the Fourth Circuit did not question the district court's reliance on a clinical standard established by the American Association on Retardation that an IQ of 75 or below placed an individual in the intellectually disabled category—thereby showing amenability to an argument that Fulks, with an IQ score of 75, is likewise intellectually disabled. See *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) (affirming the district court's rejection of an *Atkins* claim in a § 2255 motion).

Our point with all of this is to say that we are aware of no Supreme Court or Fourth Circuit case on the books at the time of Fulks's § 2255 petition that would have foreclosed him from raising an arguable *Atkins* claim. In the end, then, we are unable to identify any structural defect in § 2255 that rendered it an inadequate or ineffective device to challenge his capital sentence. The consequence is that Fulks cannot use

§ 2241 to claim for the first time that he is ineligible for the death penalty under *Atkins*.

B

Fulks invokes a second ground for habeas relief by relying on the Supreme Court's 2019 decision in *Madison v. Alabama*. See 139 S. Ct. 718. But *Madison* has no import to Fulks's intellectual disability claim.

*Madison* falls in the line of cases stemming from *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), in which the Court held that the Eighth Amendment prohibits executing an insane prisoner—meaning one who lacks a "rational understanding" of the reason for his execution. See *Panetti*, 551 U.S. at 958–60; *Ford*, 477 U.S. at 409–10. This prohibition on *carrying out* a death sentence is distinct from the holding in *Atkins*, which bars the *imposition* of a capital sentence in the first place. Compare *Ford*, 477 U.S. at 410, with *Atkins*, 536 U.S. at 321. Part of this distinction arises from the fact that a prisoner may become insane *after* being sentenced to death, whereas intellectual disability must manifest before age 18, such that the capital sentence cannot ever be imposed consistent with the Eighth Amendment. See *Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017).

Although defendants in *Ford* and *Panetti* suffered from paranoid schizophrenia and extreme psychosis, the Court took the next step in *Madison* by clarifying that a delusional disorder is *not* a prerequisite to relief from execution. See *Madison*, 139 S. Ct. at 728. The Court instead emphasized that it is "not the diagnosis of [a particular mental] illness, but a consequence—to wit, the prisoner's inability to rationally understand his punishment" that governs the inquiry. *Id.*

Fulks sees *Madison* as a newly recognized functional application of the Eighth Amendment that should apply equally to his *Atkins* claim. Put another way, he believes *Madison* allows him to contend that his limitations are functionally equivalent to those of an intellectually disabled person, making him ineligible for the death penalty even if he does not meet the technical diagnostic criteria for an intellectual disability. Going further, Fulks adds that *Madison* provides him a new ground for relief that was previously unavailable when he filed his initial § 2255 petition, thereby entitling him to pursue his claim under § 2241.

Not so in our view. In all practical respects, Fulks's *Madison* claim is the same as his *Atkins* claim: the crux of his contention remains that he is intellectually disabled and thus ineligible for a capital sentence. No aspect of *Madison* changes the reality that he could have raised this *Atkins* claim during his first round of postconviction relief under § 2255.

Our conclusion finds reinforcement in Fulks's own insistence that his *Madison*-based claim is an *Atkins* claim, not a *Ford* claim. And for good reason, as *Ford* claims ripen only once a prisoner's execution is imminent, and so far, the Executive Branch has not scheduled Fulks's execution. See *Holmes v. Neal*, 816 F.3d 949, 954 (7th Cir. 2016); see also *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644–45 (1998).

## IV

Today's decision is surely not our last word on the savings clause. If our prior cases show anything, it is the immense complexity in identifying the contours of the savings clause and its proper scope, including in capital litigation. See, *e.g.*, *Higgs*, 984 F.3d 1235 (analyzing the savings clause in a capital

case); *Bourgeois*, 977 F.3d 620 (same); *Lee*, 964 F.3d 663 (same); *Purkey*, 964 F.3d 603 (same); *Webster*, 784 F.3d 1123 (same).

Although Fulks has not prevailed today and cannot access § 2241 through the savings clause, he has identified—through the assistance of very able counsel—a potential structural limitation that may require additional assessment in a future case. The difficult question on the horizon is whether a capital prisoner can access § 2241 to vacate a death sentence in the face of a monumental change to the clinical definition of intellectual disability that occurs *after* the prisoner completed one round of § 2255 proceedings. Assuming a substantial change in the clinical standards allows a newfound diagnosis of intellectual disability, his execution would offend the Eighth Amendment. But the prisoner would have no way to raise his *Atkins* claim as a second or successive motion under § 2255(h)'s two express exceptions.

Identifying this issue is much easier than resolving it. And Fulks's appeal does not require us to take that second step. It is enough for us to observe that there is a serious question whether § 2255 is inadequate or ineffective when a sea change in clinical standards would allow a prisoner to make a substantial showing of intellectual disability that, despite all diligence, he could not have raised previously. Nor must we decide today how much evidence a prisoner would need to present to receive an evidentiary hearing and relief under § 2241 for such an *Atkins* claim. Cf. *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (assuming in another context "that in a capital case a *truly persuasive demonstration* of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no

state avenue open to process such a claim" (emphasis added)).

Fulks and his counsel had the necessary facts and every opportunity to present an *Atkins* claim—but did not pursue it during sentencing, on direct appeal, or in his § 2255 petition. And the subsequent changes in the DSM–5 and the AAIDD–2012 do not amount to the kind of substantial change necessary to present a close question of whether the savings clause could potentially apply. So we can save for another day difficult questions that lurk in our savings clause jurisprudence.

For all of these reasons, we AFFIRM.