No. 20-1900

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

CHADRICK FULKS,
*PETITIONER/APPELLANT,*

v.

SUPERINTENDENT,
USP-TERRE HAUTE,
UNITED STATES OF AMERICA,
*RESPONDENTS/APPELLEES.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:15–cv–00033, Hon. James R. Sweeney II

**PETITION FOR REHEARING EN BANC OR PANEL REHEARING**

**THIS IS A DEATH PENALTY CASE**

Peter Williams
   *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520
*Counsel for Petitioner-Appellant*

September 2, 2021

## RULE 26.1 DISCLOSURE STATEMENT

The full name of Petitioner-Appellant is Chadrick Evan Fulks. Attorneys Peter Williams and Claudia Van Wyk, of the Federal Community Defender Office for the Eastern District of Pennsylvania, represent Mr. Fulks before this Court and represented him in the 28 U.S.C. § 2241 proceedings below in the United States District Court for the Southern District of Indiana. Petitioner-Appellant is not a corporation.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.................................................................i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iii

GLOSSARY..........................................................................................iv

STATEMENT PURSUANT TO FED. R. APP. P. 35(b)(1) ....................................1

INTRODUCTION .................................................................................1

ARGUMENT ......................................................................................5

THE PANEL'S ANALYSIS IS CONTRARY TO THE DUE DILIGENCE STANDARD SET FORTH IN *WEBSTER I* AND *II* AND VIOLATES THIS COURT'S SAVINGS CLAUSE JURISPRUDENCE, *ATKINS*, AND *MOORE I*...5

    A. Introduction .................................................................................5

    B. There is a Structural Defect in Section 2255(h) that Renders § 2255 Inadequate and Ineffective in Mr. Fulks's Case. ..........................................8

    C. The Panel's Analysis Is Contrary to this Court's Savings Clause Jurisprudence and Violates *Atkins*, and *Moore I*. ......................................11

    D. *Bourgeois v. Watson* Does Not Apply to Mr. Fulks's Case........................19

    E. *United States v. Roane* Strengthens Mr. Fulks's Request for Review........20

CONCLUSION....................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002) ...................................................... 1, 4, 5, 10

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020) ........................................... 6, 22

*Fulks v. United States*, 875 F. Supp. 2d 535 (D.S.C. Aug. 20, 2010) ....... 13, 14, 15

*Fulks v. Watson*, 4 F.4th 586 (7th Cir. 2021) ..................................................... *passim*

*Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore I*")........................................ *passim*

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020) ............................. 1, 5, 7, 17

*Roper v. Simmons*, 543 U.S. 551 (2005) .................................................................10

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) ........................................ 8, 21

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ("*Webster I*") ................. *passim*

*Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020) ("*Webster II*") ............... 1, 12, 18

**Statutes**

28 U.S.C. § 2241 ...................................................................................... *passim*

28 U.S.C. § 2255 ...................................................................................... *passim*

**Other**

Fed. R. App. P. 32 ............................................................................................. 1

Fed. R. App. P. 35 ............................................................................................. 1

Fed. R. Civ. P. 11 ...................................................................................... 17, 22

**GLOSSARY**

| | |
|---|---|
| AAIDD | American Association on Intellectual and Developmental Disabilities |
| AAIDD–2012 | American Association on Intellectual and Developmental Disabilities, *User's Guide to Intellectual Disability—Definition, Classification, and Systems of Supports—11th Edition* (2012) |
| AAIDD–2015 | American Association on Intellectual and Developmental Disabilities, *The Death Penalty and Intellectual Disability* (2015) |
| AEDPA | Anti-Terrorism and Effective Death Penalty Act |
| DSM-5 | American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (2013) |
| ID | Intellectual Disability |
| PA | Petitioner/Appellant's Appendix[1] |
| RB | Government's Response Brief, filed Dec. 21, 2020 |
| Supp. App. | Government's Supplemental Appendix, filed Dec. 21, 2020 |

---

[1] Cites to Petitioner/Appellant's Appendix include cites to Volumes I–III of the Appendix filed with the Opening Brief on October 21, 2020 (collectively encompassing pages PA0001-PA0527) and the Supplemental Appendix containing additional documents filed with the Reply Brief (encompassing pages PA0528-PA0582).

iv

## STATEMENT PURSUANT TO FED. R. APP. P. 35(b)(1)

Petitioner-Appellant Chadrick Fulks, a death sentenced inmate, requests panel and en banc rehearing of the decision affirming the dismissal of his petition for relief under 28 U.S.C. § 2241. Because the Panel's decision conflicts with decisions of the United States Supreme Court and this Court, consideration by the full Court is necessary to secure and maintain uniformity of the Court's decisions. *See, e.g.*, *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore I*"); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ("*Webster I*"); *Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020); and *Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020) ("*Webster II*"). Additionally, this case presents a question of exceptional importance: is a federal death-sentenced prisoner who was found by six experts not to be intellectually disabled under the diagnostic standards prevailing at the time of his trial and initial 28 U.S.C. § 2255 proceedings but who is intellectually disabled under current diagnostic standards, entitled to review of his *Atkins* claim under § 2241; or is that prisoner condemned to be executed even though diligent counsel could not have raised the claim in any prior proceeding?

## INTRODUCTION

Chadrick Fulks is intellectually disabled and ineligible for execution under *Atkins*. He has proffered extensive evidence in his petition for relief under § 2241 that he meets all three prongs of intellectual disability ("ID") under current

1

diagnostic standards: (1) deficits in intellectual functioning as measured by IQ testing ("prong one"); (2) deficits in adaptive functioning ("prong two"); and (3) an age-of-onset in the developmental period ("prong three"). Because the current diagnostic standards which form the basis for Mr. Fulks's claim of intellectual disability were unavailable at the time he initially pursued relief from his sentence under § 2255, he could not have litigated his *Atkins* claim at that time. And, because § 2255(h) does not authorize the filing of a successive § 2255 motion based on factual developments that render a defendant ineligible for execution, Mr. Fulks is unable to pursue his claim of intellectual disability in a § 2255 motion now. That Mr. Fulks is simultaneously ineligible to be executed but unable to vindicate this right under § 2255 exposes a defect in the structure of § 2255 that renders it "inadequate or ineffective" under § 2255(e)'s "savings clause" and requires § 2241 review.

The Panel acknowledged the potential existence of the structural defect in § 2255(h) and the diagnostic advances that support Mr. Fulks's claim for relief, but nevertheless denied Mr. Fulks an evidentiary hearing and savings clause review. The Panel reasoned that, because it was not "impossible" for Mr. Fulks to have raised a claim of intellectual disability in his initial § 2255 proceedings and because Mr. Fulks "could have" raised an *Atkins* claim at that time, this defect did not render § 2255 inadequate or ineffective. For this reason, the Panel upheld the

2

district court's denial of merits review and an evidentiary hearing on Mr. Fulks's *Atkins* claim.

The Panel's opinion cannot stand. *Webster I* and *II* make clear that the savings clause standard for raising an *Atkins* claim based on new factual developments is whether *diligent counsel* could have raised the claim in prior proceedings. Mr. Fulks has met this threshold. Prior to the filing of his initial § 2255 motion in 2008, Mr. Fulks had been evaluated by six mental health experts. All six experts concluded that Mr. Fulks was on the cusp of being intellectually disabled, but that his IQ scores were just a few points too high for the diagnosis. Because a diagnosis of intellectual disability is a necessary predicate for an *Atkins* claim, prior counsel could not have raised such a claim in Mr. Fulks's initial § 2255 proceedings.

After Mr. Fulks's § 2255 proceedings had concluded, new diagnostic standards were issued. Because these new standards change the way in which IQ scores are interpreted, Mr. Fulks's IQ scores—the only element of the diagnosis that precluded him from being diagnosed as intellectually disabled before—now fall within the range for intellectual disability. Mr. Fulks has now been diagnosed as intellectually disabled under current diagnostic standards. The Panel's determination that Mr. Fulks "could have" filed an *Atkins* claim in his initial § 2255 motion reaches this conclusion irrespective of prior counsel's diligence.

3

The Panel thus raises a barrier to an evidentiary hearing and merits review that is insurmountable to *Atkins* petitioners and contrary to *Webster I* and *Webster II*.

The standard employed by the Panel also violates the Eighth Amendment. *Atkins* imposes a "substantive restriction" on the government's power to "take the life" of an intellectually disabled defendant. *Atkins*, 536 U.S. at 321. *Moore I* further held that *current* diagnostic standards are binding in *Atkins* proceedings and that the use of outdated standards creates an "unacceptable risk" that an intellectually disabled person will be erroneously denied relief and executed. *Moore-I*, 137 S. Ct. at 1051-53. Imposing the Panel's insurmountable standard would preclude review of *Atkins* claims based on new factual developments— regardless of how significant the developments might be. This standard would also confine the intellectual-disability analysis to the diagnostic standards in place at the time of the initial § 2255 proceedings—no matter how obsolete those outdated standards currently are. The Panel's standard creates an "unacceptable risk," *Moore I*, 137 S. Ct. at 1051, that intellectually disabled defendants would be erroneously denied relief and executed. In the case of Mr. Fulks—who the district court found proffered "extensive" evidence of his intellectual disability, PA0002— this standard violates the "substantive restriction" on the Government's power to "take the life" of an intellectually disabled defendant imposed by *Atkins*. 536 U.S.

4

at 321. The Panel's analysis is contrary to *Atkins*, *Moore I*, and this Court's savings

clause jurisprudence.

## ARGUMENT

### THE PANEL'S ANALYSIS IS CONTRARY TO THE DUE DILIGENCE STANDARD SET FORTH IN *WEBSTER I* AND *II* AND VIOLATES THIS COURT'S SAVINGS CLAUSE JURISPRUDENCE, *ATKINS*, AND *MOORE I*.

### A.    Introduction

Review under § 2241 is appropriate under the savings clause whenever

§ 2255 is "inadequate or ineffective" to test the legality of a defendant's conviction

or sentence. *See* § 2255(e). The savings clause is satisfied whenever there is "some

kind of structural problem with section 2255." *Webster I*, 784 F.3d at 1136. This

standard is met when there is "a compelling showing that, *as a practical matter*, it

would be impossible to use section 2255 to cure a fundamental problem." *Purkey*

*v. United States*, 964 F.3d 603, 615 (7th Cir. 2020) (emphasis added).

Here, the Panel acknowledged "a potential structural limitation" in § 2255(h)

that "may require additional assessment in a future case." *Fulks v. Watson*, 4 F.4th

586, 595 (7th Cir. 2021). It elaborated:

> The difficult question on the horizon is whether a capital prisoner can
> access § 2241 to vacate a death sentence in the face of a monumental
> change to the clinical definition of intellectual disability that occurs
> *after* the prisoner has completed one round of § 2255 proceedings.
> Assuming a substantial change in the clinical standards allows a
> newfound diagnosis of intellectual disability, his execution would
> offend the Eighth Amendment. But the prisoner would have no way to

5

raise his *Atkins* claim as a second or successive motion under §
2255(h)'s two express exceptions.

*Id.*

The Panel similarly recognized that there were new diagnostic developments

set forth in the American Association on Intellectual and Developmental

Disabilities' 2012 User's Guide ("AAIDD-2012") and the American Psychiatric

Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition

("DSM-5"), both of which are binding on *Atkins* determinations. *Moore I*, 137 S.

Ct. at 1051-53; *Fulks*, 4 F.4th at 591. The Panel noted that these new manuals

"now include express recommendations for certain considerations when measuring

intellectual disability," which included that "evaluators should base diagnoses on

both a clinical assessment and standardized testing" and "may adjust IQ scores for

the so-called Flynn effect."[2] The Panel further recognized that: "Fulks's Flynn-

adjusted IQ scores of 75, 76, and 77 could satisfy the first prong of showing

intellectual disability—subaverage intellectual functioning—because scores of up

to 75 fall within the range for an intellectual disability." *Fulks*, 4 F.4th at 592-93.

Nevertheless, "[g]uided in large measure by our recent decision in *Bourgeois

v. Watson*, [977 F.3d 620 (7th Cir. 2020),]" the Panel denied § 2241 review

---

[2] *Id.* at 591. The Flynn Effect refers to the spurious inflation of IQ scores that
occurs with every year that passes after the development of the data on which the
test is based. PA0524.

because "these recent updates to the AAIDD-2012 and DSM-5 fail to reveal anything inadequate or ineffective about § 2255 that made it *impossible* for Fulks to pursue an *Atkins* claim in his initial postconviction motion." *Fulks*, 4 F.4th at 587, 592-93 (emphasis added). The Panel reasoned that "Fulks sought at sentencing to avoid the death penalty by relying on his cognitive impairments and fetal alcohol spectrum disorder—owing in no small part to his horrific upbringing—and he had every opportunity to take the next step and argue … that he was intellectually disabled." *Id.*

The Panel did not address how prior counsel could have asserted an *Atkins* claim without the benefit of a diagnosis of ID from a mental health professional, or the fact that counsel consulted *six* experts who concluded that Mr. Fulks was not intellectually disabled under then-prevailing standards. In addition to contradicting the due diligence standard imposed by *Webster*, this elevated the *practical* impossibility test from *Purkey* into a *literal* impossibility test that punishes the prisoner for failing to assert a claim in his initial § 2255 proceedings that had no factual basis at that time. *Compare Purkey*, 964 F.3d at 615 (requiring proof that "as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem"), *with Fulks*, 4 F.4th at 593 (stating that updates to professional standards did not "ma[k]e it impossible for Fulks to pursue an *Atkins* claim in his initial postconviction motion").

7

Relying on *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which "did not question" the *Roane* district court's reliance on the hard IQ cutoff of 75 employed by the diagnostic standards in 2004, the Panel further determined that there was no precedent at the time of Mr. Fulks's initial § 2255 proceedings that would have rejected the use of then-current diagnostic standards and "foreclosed him from raising an arguable *Atkins* claim." *Fulks*, 4 F.4th at 593. But *Roane* actually *strengthens* Mr. Fulks's case for review. Regardless of whether the *legal* standards governing Mr. Fulks's initial § 2255 motion precluded him from filing an *Atkins* claim by rejecting the use of diagnostic standards, *Roane* confirms that the *diagnostic* standards in place at the time of Mr. Fulks's initial post-conviction proceedings precluded such a claim. *Roane* further confirms that any *Atkins* claim that Mr. Fulks would have filed during § 2255 proceedings would have been futile as he could present no expert diagnosing him as intellectually disabled at that time.

The Panel correctly identified the structural defect in § 2255(h). However, as set forth below, its analysis of whether that structural defect requires review in this case was contrary this Court's savings clause precedent and violated *Atkins* and *Moore I*.

**B.    There is a Structural Defect in Section 2255(h) that Renders § 2255 Inadequate and Ineffective in Mr. Fulks's Case.**

The Panel correctly concluded that there is a "potential structural defect" in § 2255(h). In *Webster I*, the petitioner re-raised a previously litigated claim of

8

intellectual disability based on newly discovered evidence relating to his impairments. Because this evidence did not satisfy § 2255(h), Webster was precluded from using § 2255 to establish his categorical ineligibility for a death sentence. Recognizing the "'Kafkaesque' nature of a procedural rule that, if construed to be beyond the scope of the savings clause, would (or could) lead to an unconstitutional punishment," this Court granted him § 2241 review and remanded his case for an evidentiary hearing. *Webster I*, 784 F.3d at 1125-36.

The same structural problem is present here. Mr. Fulks is intellectually disabled under current diagnostic standards and ineligible for the death penalty. He did not meet the diagnostic definition under the standards in place at the time of trial and his initial § 2255 proceedings, but does meet the definition under the diagnostic standards in place now. *See* Section C, *infra* (describing the development of Mr. Fulks's *Atkins* claim).

However, Mr. Fulks cannot pursue this claim through a successive § 2255 motion because such a motion can only be filed where it is based on (1) "newly discovered evidence" establishing the petitioner's innocence "of the offense" or (2) a new, previously unavailable, rule of constitutional law, that has been "made retroactive to cases on collateral review by the Supreme Court." § 2255(h). Diagnostic developments are not legal developments or newly discovered evidence that Mr. Fulks was innocent of the crime, but new evidence that he is ineligible for

9

execution. Just as in *Webster I*, Mr. Fulks is in the "Kafkaesque" position of being ineligible for execution, but unable to vindicate this right through § 2255(h).

Although failure to satisfy the procedural requirements for a successive motion may preclude a petitioner such as Purkey—who sought to raise an ineffective-assistance-of-counsel claim—from litigating intervening factual developments under § 2241, these procedural requirements cannot preclude review for claims involving a categorical exemption such as the one presented here. Just as *Roper v. Simmons*, 543 U.S. 551 (2005), barred the execution of individuals who committed capital crimes as juveniles, *Atkins* imposed a "substantive restriction" on the execution of the intellectually disabled. *Atkins*, 536 U.S. at 321. Moreover, *Atkins* not only bans the execution of the intellectually disabled, but also rejects any procedures that "creat[e] an *unacceptable risk* that persons with intellectual disability will be executed." *Moore I*, 137 S. Ct. at 1044 (alteration in original) (emphasis added) (internal quotation marks omitted).

This is a fundamental problem with § 2255: it fails to account for capital defendants who are categorically exempt from execution due to developments that occurred after their initial § 2255 proceedings that do not satisfy § 2255(h). "[T]he problem is that the Supreme Court has now established that the Constitution itself forbids the execution of certain people: those who satisfy the criteria for intellectual disability that the Court has established, and those who were below the

10

age of 18 when they committed the crime." *Webster I*, 784 F.3d at 1139. Section 2255(h) was adopted as a part of the Anti-Terrorism and Effective Death Penalty Act of 1996. *Id.* at 1138-39. That Congress failed to address this defect when § 2255(h) was adopted is hardly surprising as "the Supreme Court had not yet decided *Atkins* and *Roper* at the time AEDPA was passed." *Id.* at 1138. The timing of AEDPA, *Atkins*, and *Roper* "supports the conclusion that the narrow set of cases presenting issues of constitutional ineligibility for execution is another lacuna in the [§ 2255] statute." *Id.* Failing to authorize savings clause review under these circumstances, "would lead in some cases . . . to the intolerable result of condoning an execution that violates the Eighth Amendment." *Id.* at 1139.

C.     **The Panel's Analysis Is Contrary to the Due Diligence Standard in *Webster* and Violates this Court's Savings Clause Jurisprudence, *Atkins*, and *Moore I*.**

While the Panel acknowledged the structural defect, the changes in the diagnostic standards, and the fact that those changes would have brought Mr. Fulks's IQ scores within the range for intellectual disability, it nevertheless found savings clause review inappropriate because it was not *impossible* for Mr. Fulks to have filed an *Atkins* claim in his initial § 2255 proceedings. *See* Section A, *supra*. This violated the due diligence standard set forth in *Webster I* and *II*.

In *Webster I*, the newly discovered evidence upon which Webster relied was a set of social security records containing evidence of his impairments. Webster

11

proffered evidence that his trial counsel had sought the records from the social security administration, but the social security administration had failed to produce them and indicated that no records existed. *Id.* at 1142-43. Having identified the defect in § 2255(h) set forth above, the *Webster I* court remanded Webster's case for an evidentiary hearing to consider the threshold issue of whether "the records were unavailable and all due diligence was exercised," and—if diligence was found—whether Webster could establish that he was intellectually disabled by a preponderance of the evidence. *Id.* at 1146.

This Court considered Webster's case a second time after the § 2241 court found his trial attorney "did not discover the Social Security records despite reasonable diligence" and granted Webster relief on his *Atkins* claim. *Webster II*, 975 F.3d at 669. Webster's trial attorney requested Webster's social security records prior to his 1996 trial, was informed by the social security office that it possessed no records for Webster, and "took the Social Security office at its word and did not think there was anything else he could do." *Id.* at 674-75. Webster's trial attorney ceased his attempts to obtain the records because he "had no good faith belief that the records existed at that point." *Id.* at 684. Webster's current attorneys were provided with the newly discovered records when they made an additional request in 2009. *Id.* at 674-75. This Court upheld the lower court's finding that Webster's trial attorney had been sufficiently diligent. *Id.* at 684-85. It

12

also rejected the government's argument that Webster's trial lawyer should have made additional efforts of obtain the records, because "no records existing meant there was nothing to continue requesting" and that a lawyer in those circumstances "ought to be able to take the government at its word when it says no records exist." *Id.* at 684.

Here, Mr. Fulks more than meets the standard of diligence set forth in *Webster*, which conflicts with the literal-impossibility test employed by the Panel. Mr. Fulks's prior counsel—including attorneys the § 2255 court referred to as the "dream team" of capital defense—conducted a "wide-ranging mitigation investigation" of Mr. Fulks's background that yielded "as complete and exhaustive a mitigation defense as one could reasonably expect in capital cases." *Fulks v. United States*, 875 F. Supp. 2d 535, 565-574 (D.S.C. Aug. 20, 2010). This investigation uncovered extensive evidence of adaptive and cognitive impairments that have been present since birth and stemmed from a Fetal Alcohol Spectrum Disorder. *See* PA0300-0478 (describing Petitioner's adaptive functioning and the origins and onset of his cognitive and adaptive deficits). However, testing conducted in preparation for his trial returned IQ scores of 77, 78, and 79.[3]

---

[3] PA0475. The one- and two-point increase in the testing is independently explained by either random variations in test administration or the "practice effect," which is the spurious inflation of IQ scores due to repeat administrations of IQ testing. *See, e.g., id.*; Supp. App. 10-11.

13

Because diagnostic standards in place at that time required an IQ score of 75 or below to satisfy prong one, these scores showed lifelong impairments in intellectual functioning, but fell into the borderline range of intellectual functioning which was "slightly above the cut" for intellectual disability. *Fulks*, 875 F. Supp. 2d at 558.

Prior counsel collectively consulted with six mental health experts who opined on Mr. Fulks's intellectual and cognitive functioning. All six of these experts concluded that Mr. Fulks was on the cusp of a diagnosis of intellectual disability, but in the borderline range of intellectual functioning and just shy of ID. *Fulks*, 4 F.4th at 588; *see also*, PA0560-66 (describing Mr. Fulks as brain damaged and significantly impaired, and having "borderline" IQ scores that were "slightly above the cut" of ID, and that with a "few less points," he would have passed this threshold); PA0549-56 (finding Mr. Fulks to be brain damaged, and having "borderline" intellectual functioning, rather than intellectually disabled); PA0570-73 (same); PA0576 (finding cognitive impairment and low IQ, but not reaching a diagnosis of intellectual disability); ECF No. 55-1 at App. 274-75 (finding cognitive impairment and borderline intellectual functioning, but not reaching a diagnosis of intellectual disability), ECF No. 55-1 at App. 242-43 (finding significant cognitive impairments, but not intellectual disability).

14

At the time of Mr. Fulks's trial and § 2255 proceedings, his counsel knew that the second and third prongs of intellectual disability were present, but had been informed by six mental health experts that his reported IQ—while certainly impaired—was "slightly above the cut" for intellectual disability. *Fulks*, 875 F. Supp. 2d at 558. Absent a diagnosis of intellectual disability, prior counsel were prevented from raising an *Atkins* claim at Mr. Fulks's trial and in his § 2255 proceedings.

Diagnostic advances in the field of intellectual disability changed this. After Mr. Fulks's § 2255 proceedings had concluded, AAIDD–2012 and the DSM-5 were issued in 2012 and 2013, respectively. With the issuance of the DSM-5, the diagnostic community unanimously mandated correcting for the Flynn Effect. *Fulks*, 4 F.4th at 591; PA524; PA0497. Consistent with this development, in 2015, the AAIDD recognized the consensus that had emerged on the issue of Flynn-correction, stating that: "A consensus among the professional and scientific community of intelligence and ID scholars has emerged. This consensus is that given the high-stakes nature of *Atkins* ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, *a Flynn effect correction to a person's scores in this setting is now considered best or standard practice*." PA0535 (AAIDD-2015) (emphasis in original).

15

The DSM-5 and AAIDD-2012 also rejected the use of hard IQ cutoffs by emphasizing the clinical assessment of intellectual functioning in addition to the use of IQ testing and requiring IQ scores to be interpreted through clinical judgment. PA0497 (DSM-5); *see also* PA0524 (AAIDD–2012) ("A fixed cutoff for ID is not psychometrically justifiable. The diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.")

These new developments were significant in Mr. Fulks's case. His Flynn-corrected IQ scores of 75, 76, and 77 meet the diagnostic requirements of prong one. And, even if these scores were not corrected, the current standards' emphasis on the *clinical* assessment of intelligence, as opposed to an actuarial determination, would again place these scores within the range for intellectual disability. Consistent with these new developments, in 2019, neuropsychologist Barry M. Crown, Ph.D., assessed Mr. Fulks under current diagnostic standards and diagnosed him as intellectually disabled. *Fulks*, 4 F.4th at 588.

The Panel acknowledged the diagnostic developments that led to Mr. Fulks's current diagnosis of intellectual disability but denied Mr. Fulks § 2241 review because it was not *impossible* for him to have pursued a claim of intellectual disability in his initial § 2255 proceedings. By basing its analysis on whether it was *possible* for Mr. Fulks to present a claim of intellectual disability, rather than whether prior counsel were diligent, the Panel's opinion contravened the due

16

diligence standard set forth in *Webster I* and *II*. Because, as noted above, *Purkey* imposes a standard of *practical* rather than *literal* possibility, this analysis is contrary to *Purkey* as well. *See Purkey*, 964 F.3d at 615; Section A, *supra*. Just as in *Webster*, having consulted with six experts, prior counsel had no "good faith belief" that Mr. Fulks was intellectually disabled. Just as in *Webster*, lawyers in those circumstances "ought to be able to take," each of their experts at his or her word.

The Panel's determination that Mr. Fulks "could have raised substantially the same argument he brings now" in his initial § 2255 motion, *Fulks*, 4 F.4th at 591, and that, given the impairments prior counsel had uncovered at the time of trial "he had every opportunity to take the next step and argue … that he was intellectually disabled" *id.* at 593, similarly employs an analysis that rejects the diligence standard imposed by *Webster I* and *II*. A diagnosis of intellectual disability was and is a necessary predicate for the presentation of an *Atkins* claim. With six experts stating that Mr. Fulks was not intellectually disabled—a finding that was consistent with the diagnostic standards in place at that time—prior counsel had no factual basis to raise an *Atkins* claim. Anything they filed on this issue would have been denied without an evidentiary hearing, and counsel would have violated ethical directives against filing frivolous claims. *See* Fed. R. Civ. P. 11(b)(2)-(3). In essence, the Panel's determination is that no defendant can receive

17

§ 2241 review on an *Atkins* claim if he or she could have submitted such a claim on paper during § 2255 proceedings—regardless of whether there was a factual basis to support it. Because all defendants can claim that they are intellectually disabled if the absence of a factual basis is not an issue, no defendant could ever reach this threshold.

The facts of *Webster* reinforce this point. It was not *impossible* for Webster to raise an intellectual-disability claim in his prior proceedings: he could and did raise one more than once. *Webster I*, 784 F.3d at 1127-32. It was similarly not *impossible* for Webster to have acquired the social security records earlier. Counsel could have "kept pushing" after being told that no records existed so that the social security administration's eventual disclosure occurred earlier. *Webster II*, 975 F.3d at 684. But *Webster I* and *II* appropriately applied a due diligence standard to its analysis, rather than a determination that hinged on whether it was *impossible* for Webster to have raised an *Atkins* claim earlier. The Panel decision in Mr. Fulks's case thus conflicts with this Court's precedent.

The unreachable nature of this standard similarly violates the Eighth Amendment. Because no *Atkins* claimant could ever meet this threshold, the defect in § 2255(h) would go uncorrected. In a case like Mr. Fulks's, that defect would lead "to the intolerable result of condoning an execution that violates the Eighth Amendment." *Webster I*, 784 F.3d at 1139. Furthermore, this standard would

18

prevent consideration of a claim of intellectual disability under *current* diagnostic standards. "Reflecting improved understanding over time," current diagnostic standards are "the best available description of how mental disorders are expressed and can be recognized by trained clinicians." *Moore I*, 137 S. Ct. at 1053. For this reason, *Moore I* further held that *current* diagnostic standards are binding in *Atkins* proceedings and that the use of outdated standards creates an "unacceptable risk" that an intellectually disabled person will be erroneously denied relief and executed. *Moore I*, 137 S. Ct. at 1051-53. The Panel's ruling would confine the intellectual-disability analysis to the standards in place at the time of trial, no matter how obsolete they might currently be. Such a rule violates *Atkins*, *Moore I*, and this Court's savings clause jurisprudence.

## D.    *Bourgeois v. Watson* Does Not Apply to Mr. Fulks's Case.

This Court's opinion in *Bourgeois* does nothing to undermine Mr. Fulks's request for § 2241 review. Bourgeois raised a claim of intellectual disability and argued that § 2241 review was appropriate because the standard employed by his § 2255 court in adjudicating that claim had since been rejected by *Moore I*, *Moore II*, and current diagnostic standards. *Id.* at 635-39. Because Bourgeois had relied on then-current medical standards when he raised his § 2255 ID claim and was granted a full evidentiary hearing on that claim, the *Bourgeois* court concluded that nothing "formally prevented" him from raising his current arguments in § 2255

19

proceedings. *Id.* at 636-37. It reasoned that Bourgeois was entitled to a "reasonable opportunity" to litigate his claim of intellectual disability in his initial § 2255 proceedings, and that he had been given such an opportunity because he could and did litigate such a claim at that time. *Id.* at 636-39.

Here, Mr. Fulks *was "*formally prevented" from raising his *Atkins* claim in his initial § 2255 proceedings and did not have a "reasonable opportunity" to present such a claim at that time because he had no diagnosis to proffer in support of that claim. Because a diagnosis of intellectual disability is a necessary predicate for an *Atkins* claim, *no* court has adjudicated the merits of Mr. Fulks's intellectual disability. To the contrary, the district court that denied Mr. Fulks § 2241 review characterized the evidence in support of this claim as "extensive," PA0002, and the government explicitly declined to substantively challenge the merits of Mr. Fulks's diagnosis at this stage in the proceedings. ECF No. 66 at 45 n.14.

E.      *United States v. Roane* **Strengthens Mr. Fulks's Request for Review.**

The Panel concluded that the *Roane* court's willingness to accept the hard IQ cutoff of 75 endorsed by diagnostic standards in 2004 "thereby show[s] amenability that Fulks, with an IQ score of 75, is likewise intellectually disabled." *Fulks*, 4 F.4th at 593. But Mr. Fulks's uncorrected IQ score is 77, two points above the hard cutoff of 75 in place at the time *Roane* was issued *and* at the time of Mr. Fulks's § 2255 proceedings. Cory Johnson, the defendant who raised the *Atkins*

claim in *Roane*, also had a reported IQ of 77, which was also two points above 75 and "just above the level of mental retardation" according to the psychologist who assessed him for the defense. *Roane*, 378 F.3d at 408-09.

While Johnson argued that his IQ score was inflated by the Flynn Effect, the Fourth Circuit rejected Johnson's argument based on the findings of the psychologist—who did not make a Flynn-correction. *Id.* The Fourth Circuit concluded that "Johnson is not barred from execution due to mental retardation," and affirmed the summary denial of Johnson's § 2255 motion without an evidentiary hearing. *Id.* The *Roane* court further concluded that, "Johnson's lawyer was presented with a mental health report" indicating that Johnson was not intellectually disabled, Johnson's lawyer "was under no mandate to second-guess that report," and Johnson's counsel was not ineffective for failing to raise an *Atkins* claim. *Id.* at 409.

Even assuming that Fourth Circuit precedent would not have precluded consideration under diagnostic standards in place at the time of Mr. Fulks's § 2255 proceedings, Mr. Fulks must still be diagnosed by a mental health professional as intellectually disabled under prevailing diagnostic standards in order to proceed on an *Atkins* claim. Mr. Fulks's counsel were presented with reports from *six* mental health experts, none of whom corrected for the Flynn Effect, and all of whom indicated that Mr. Fulks was deeply impaired but not intellectually disabled. Just as

21

in *Roane*, Mr. Fulks's § 2255 counsel were "under no mandate to second-guess" those reports. Just as in *Roane*, had Mr. Fulks brought an *Atkins* claim that was accompanied by six expert reports stating that he was not intellectually disabled, this claim would have been dismissed without an evidentiary hearing—and perhaps alongside an order asking counsel to show cause why the court should not impose sanctions because the claim's "factual contention" of ID lacked "evidentiary support." Fed. R. Civ. P. 11(b)(3).

The holdings in *Roane* and *Bourgeois* make clear that the Panel's ruling in Mr. Fulks's case places defendants such as Mr. Fulks in a Catch-22 situation. Had Mr. Fulks presented an *Atkins* claim in his initial § 2255 proceedings, it would have been summarily denied under *Roane* as it was contrary to the opinions of the six mental health experts who had assessed him. *Roane*, 378 F.3d at 408-09. Once the DSM-5 and AAIDD-2012 were issued, Mr. Fulks would again be barred from receiving § 2241 review under *Bourgeois*, which precludes savings clause consideration of an *Atkins* claim that has been denied in a defendant's initial § 2255 proceedings. 977 F.3d at 638-39. This type of heads-the-government-wins, tails-the-defendant-loses procedural barrier prevents an intellectually disabled defendant in Mr. Fulks's position from ever receiving merits review in any proceeding. Such a procedural barrier violates creates an "unacceptable risk" that

22

an intellectually disabled person will be erroneously executed and—in the case of

Mr. Fulks—will lead to the execution of an intellectually disabled person.

## CONCLUSION

For these reasons, the petition for rehearing en banc or panel rehearing

should be granted.

Respectfully submitted,

/s/ *Peter Williams*
Peter Williams
   *Counsel of Record*
Claudia Van Wyk
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215–928–0520

Dated: September 2, 2021

23

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This petition complies with the type-volume limitations of Fed. R. App. P. 35(b)(2)(B) and 40(b)(1), as modified by this Court's September 1, 2021 order granting Petitioner-Appellant's Motion for Leave to File Overlength Petition for Rehearing En Banc or Panel Rehearing, because it contains 5351 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

*/s/ Peter Williams*
Peter Williams

**CERTIFICATE OF SERVICE**

I, Peter Williams, hereby certify that on September 2, 2021, I electronically filed the foregoing petition with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Peter Williams*
Peter Williams